# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                      No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA and SHAUNA
GUTIERREZ,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' Joint Motion to Vacate March 2017 Trial Setting, Impose a Discovery Scheduling Order and Request for a Hearing, filed September 7, 2016 (Doc. 676)("Motion to Vacate"); (ii) the Joint Motion for Disclosure and Production of Confidential Informant, filed September 22, 2016 (Doc. 698)("Motion to Disclose"); and (iii) the Joint Motion to Exclude the Prosecution Team from December 2, 2016 Evidence Viewing, filed November 8, 2016 (Doc. 763)("Motion to Exclude").  The Court held a hearing on November 29, 2016.  The primary issues are: (i) whether good cause exists to continue the March, 2017, trial date because of the amount of discovery and requisite pretrial preparations; (ii) whether the Defendants' counsel may view certain physical evidence -- at Southern New Mexico Correctional Facility ("Southern New Mexico") and the police station in Las Cruces, New Mexico -- without Plaintiff United States of America's presence; and (iii) whether the United States must disclose a confidential informant ("CI") whose report has implicated various Defendants, but whom the United States intends to call to testify at trial. Because the Court concludes that good cause exists to continue the trial, in light of the lengthy preparations and discovery needed to adequately facilitate this case, the Court will allow a continuance of the trial date.  Further, because the Court concludes that it is appropriate under the law for the Defendants to view the evidence at the upcoming evidence viewing without the United States' presence, it will allow the sequestered viewing, and will further require that the United States not attempt to determine what occurred while the defense teams attended the viewing.  Last, because the Court is not wholly convinced that all of the Defendants joining the Motion to Disclose have made the proper showing to disclose the CI's identity, the Court will at this time require the United States to disclose the CI's identity only to Baca, but not to others,

under a protective order limiting disclosure to attorneys and investigator's eyes only, and will require the other Defendants joining that Motion to Disclose to make a more substantial showing at a future date should they still seek disclosure of the CI.  Accordingly, the Court will grant the Motion to Vacate, grant the Motion to Exclude, and grant in part and deny in part the Motion to Disclose.

## FACTUAL BACKGROUND

The Court takes its facts from the Superseding Indictment.  The facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, filed October 28, 2016 (Doc. 753).  See United States v. DeLeon, 2016 WL 7242579 (D.N.M. 2016)(Browning, J.).  See also United States of America v. Angel DeLeon, 2016 WL 3124632 (D.N.M. 2016)(Browning, J.).  The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background is largely the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") allegedly committed through its members.  See Superseding Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Superseding Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  See Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured.  See Superseding Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  See Superseding Indictment at 3.  SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members."  Superseding Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Superseding Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Superseding Indictment at 4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Superseding Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Superseding Indictment at 4.  If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power.  See Superseding Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Superseding Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show it superiority over others."  Superseding Indictment at 4-5.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses,

homosexuals, or sex offenders.  See Superseding Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Superseding Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Superseding Indictment at 7.  SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the present investigation.  See United States v. Garcia, No. 15-4275 JB, Memorandum Opinion and Order at 2, filed November 16, 2016 (Doc. 133)(citing United States' Response to Defendant's Motion to Designate Complex (Doc. 56) at 1, filed May 3, 2016 (Doc. 70)("United States' Garcia Response")).  The other relevant facts giving rise to this case are as follows.

In March of 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico state prison.  See United States v. DeLeon, 2016 WL 7242579, at *3.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See United States v. DeLeon, 2016 WL 7242579, at *3.  That grand-jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See United States v. DeLeon, 2016 WL 7242579, at *3.  The Doña Ana County District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015.  See United States v. DeLeon, 2016 WL 7242579, at *3.

"A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." See United States v. DeLeon, 2016 WL 7242579, at *3.

The United States now brings this case against thirty Defendants, charging them with a total of fifteen counts.  See Superseding Indictment at 1.  All Defendants are accused of participating in the operation and management of the enterprise and committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Superseding Indictment at 6-31.  Defendants Arturo Arnulfo Garcia, Gerald Archuleta, Benjamin Clark, Mario Rodriguez, Anthony Ray Baca, Robert Martinez, Roy Paul Martinez, and Daniel Sanchez are the alleged leaders of the enterprise.  See Superseding Indictment at 6.  The other twenty Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Superseding Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant;" and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Superseding Indictment at 9.  In all, the indictment alleges fifteen different counts against the various Defendants.

Specifically, the Superseding Indictment provides that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia allegedly

murdered "F.C."  Superseding Indictment at 9.  On the same day, Defendants Lujan, B. Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G." Superseding Indictment at 12.  On June 17, 2007, Defendants Javier Alonso, Troup, A.A. Garcia, Clark, and Ruben Hernandez allegedly murdered "F.S."  Superseding Indictment at 15.  On November 12, 2012, Defendants J. Gallegos and Andrew Gallegos allegedly conspired to murder "A.B."  Superseding Indictment at 18.  On the same day, Defendants J. Gallegos and A. Gallegos allegedly murdered A.B.  See Superseding Indictment at 19.  In March 2014, Defendants Jerry Armenta, Montoya, Rodriguez, Timothy Martinez, Baca, Mauricio Varela, Sanchez, Carlos Herrera and Rudy Perez allegedly conspired to murder "J.M."  Superseding Indictment at 20-21. On March 7, 2014, Defendants Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M.  See Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Defendants Baca, Archuleta, and Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Superseding Indictment at 27.  Starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Defendants Baca, R.P. Martinez and Robert Martinez allegedly conspired to murder "D.S."  Superseding Indictment at 28.  During the same period of time, Defendants Baca, R.P. Martinez, R. Martinez and Christopher Garcia allegedly conspired to murder "G.M."  Superseding indictment at 28.  On November 29, 2015, Defendant C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm.  See Superseding Indictment at 29.  On the same day, Defendant C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder.  See Superseding Indictment at 29.

On March 17, 2015, Defendant J. Gallegos allegedly committed assault with a dangerous weapon against "J.G."  Superseding Indictment at 30.  From February 1, 2016, until February 27, 2016, Defendants J. Gallegos, Santos Gonzalez, Paul Rivera, Shauna Gutierrez "and others known and unknown to the grand jury," allegedly conspired to murder "J.G."  Superseding Indictment at 30.  The final count alleges that, on February 27, 2016, Defendants J. Gallegos, Gonzalez, Rivera and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.  See Superseding Indictment at 31.

For fuller context, there are four cases before the Court related to SNM's alleged criminal activity.  In a related case -- United States of America v. Anthony Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.), the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).  See United States v. Baca, No. CR 16-1613, Sealed Indictment, filed April 21, 2016 (Doc. 1).[1]  There is also a prosecution of one Defendant for drug crimes, see United States v. Garcia, No. 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for further alleged conduct, as is alleged in the present case, constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see United States v. Varela, No. 15-4269 JB (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

On December 1, 2015, a federal grand jury indicted twenty-four Defendants for the crimes of Murder (under 18 U.S.C. § 1959(a)(1)); Violent Crimes in Aid of Racketeering and U.S.C. § 2: Principals), Conspiracy to Murder (under 18 U.S.C. § 1959(a)(5); and Conspiracy to

---

[1]The Court declared that case complex.  See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

Commit Assault Resulting in Serious Bodily Injury (under 18 U.S.C. § 1959(a)(6)).   See Indictment at 1.  The Defendants are all allegedly members, prospects, or otherwise associated with SNM, which constitutes an enterprise as 18 U.S.C § 1959(b)(2) defines that term.   See Indictment at 2.

On April 21, 2016, a grand jury, in a Superseding Indictment, indicted thirty Defendants -- twenty-four of whom were Defendants in the original Indictment.  See Superseding Indictment at 1.  In addition to the new Defendants, the Superseding Indictment also contains new charges under modified count numbers.   See Superseding Indictment at 9-31.   The Superseding Indictment contains fifteen counts for: (i) the Murder of F.C. ("Count 1"); (ii) the Murder of R.G. ("Count 2"); (iii) the Murder of F.S. ("Count 3"); (iv) Conspiracy to Murder A.B. ("Count 4"); (v) the Murder of A.B. ("Count 5"); (vi) Conspiracy to Murder J.M. ("Count 6"); (vii) the Murder of J.M. ("Count 7"); (viii) Conspiracy to Commit Assault Resulting in Serious Bodily Injury to J.R. ("Count 8"); (ix) Conspiracy to Murder D.S. ("Count 9"); (x) Conspiracy to Murder G.M. ("Count 10"); (xi) Felon in Possession of a Firearm ("Count 11"); (xii) Using and Carrying a Firearm During and in Relation to a Crime of Violence ("Count 12"); (xiii) Assault with Dangerous Weapon of J.G. ("Count 13"); (xiv) Conspiracy to Murder J.G. ("Count 14"); and (xv) Attempted Murder of J.G., Assault with a Dangerous Weapon Upon J.G., Resulting in Serious Bodily Injury to J.G. ("Count 15").  See Superseding Indictment at 9-31.  At the time of the Superseding Indictment's filing, some of the Defendants were death-penalty eligible.  See The United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc. 567)(stating that it would not seek a death sentence against twenty-one Defendants).   The Honorable Ken Gonzales, District Judge for the United States District of New Mexico, initially

presided over the case until it was reassigned to the Court on March 30, 2016.[2]  See Judge

Update, filed December 1, 2015, and Notice of Case Reassignment, filed March 30, 2016 (Doc.

351).  Given the large number of Defendants and the safety concerns at issue in these cases, the

Court has entered a Protective Order regulating discovery, and the Defendants receive their

discovery on tablets that a coordinated discovery management firm maintains.[3]  See Protective

Order, filed June 16, 2016 (Doc. 589)("Protective Order").

      1.     **Motion to Vacate.**

      Perez filed the Motion to Vacate, and J. Gallegos, Troup, Lujan, B. Garcia, Patterson,

Chavez, Alonso, A.A. Garcia, Clark, Montoya, Rodriguez, Varela, Sanchez, Villegas, Baca, R.

Martinez, R.P. Martinez, C. Garcia, and Herrera joined the Motion to Vacate.  See Motion to

Vacate at 1.  The Motion to Vacate begins by arguing that the SNM prosecution might be the

largest and most complicated prosecution the District of New Mexico has ever seen.  See Motion

to Vacate at 1.  Accordingly, the Motion to Vacate explains that discovery in each of the separate

indictments bleeds together, that the discovery is being undertaken in a wholly unique -- and

slow -- manner, and that trial preparation will likely take "twice as long" as normal.  Motion to

Vacate at 1-2.  The Motion to Vacate Defendants thus "request the Court vacate the trial date and

schedule a hearing so the parties can discuss a realistic timetable for all discovery to be produced

_____

[2]The Judge Gonzales declared United States v. DeLeon complex in January, 2016.  See Order Declaring Case Complex, filed January, 7, 2016 (Doc. 211).

[3]On January 2, 2016, Judge Gonzales granted the Defendants' Joint Ex Parte Motion for Order Appointing Coordinating Discovery Attorney, Russell M. Aoki, for the Benefit of All Court-Appointed Counsel.  See Order Appointing Coordinating Discovery Attorney, filed January 22, 2016 (Doc. 231)("Discovery Coordinator Appointment Order").  Judge Gonzales held a hearing on January 20, 2016, with all parties present.  See Discovery Coordinator Appointment Order at 1.  The Court found that appointing Mr. Aoki is justified given the complexity of this case and the thousands of pages of discovery documents.  See Discovery Coordinator Appointment Order at 2.

by the government, and for defendants to review said discovery." Motion to Vacate at 2. In support of the request, the Motion to Vacate again highlights the case's complexity and breadth, the multiple indictments, a protective order restricting discovery, and the use of a coordinated discovery management firm. See Motion to Vacate at 2-5. Discovery, because of the use of the coordinated discovery management firm, is thus variable, the Motion to Vacate argues, because some Defendants have to date received more or less than others. See Motion to Vacate at 3-4.

The Motion to Vacate reiterates, then, that discovery is still ongoing -- and enormous -- making the present timetable for trial untenable. See Motion to Vacate at 6-7. The Motion to Vacate thus argues that "pursuant to the requirements of 18 U.S.C. § 3161(h)(7)(B), and consistent with the holding in United States v. Toombs, 574 F.3d 1262 (10th Cir. 2009), good grounds exist for the continuance . . . ." Motion to Vacate at 7. Beyond the discovery's complexity, the pretrial preparations will, according to the Motion to Vacate, be of such a nature that a continuance will be necessary. See Motion to Vacate at 8-9. In sum, the "Defendants who join this Motion agree that they cannot be prepared to try a case of this complexity by the March trial date and a continuance is needed." Motion to Vacate at 9. The United States opposes the Motion to Vacate, but only to the extent that the Defendants in the "parallel RICO indictment in 16-cr-1613 do not oppose a continuance of their trial date in July." Motion to Vacate at 9. Ultimately, the United States did not file a response to the Motion to Vacate. See Notice of Completion of Briefing, filed September 30, 2016 (Doc. 707).

### 2.  **Motion to Disclose.**

Perez filed the Motion to Disclose,

pursuant to Fed. R. Crim. 12(b)(1), *Giglio v. United States*, 405 U.S. 150 (1972); and *Roviaro v. United States*, 353 U.S. 53 (1957) [to move] the Court for an order requiring the United States to disclose the identity of a confidential informant and

all information concerning the use of this informant during the investigation and prosecution of Mr. Perez' case.

Motion to Disclose at 1.  The requests in the Motion to Disclose "includ[e] but [are] not limited to, the informant's name, addresses, statements  given in this proceeding and others, criminal history, past cooperation as an informant, and any consideration, such as promises, inducements, or payments, extended to and/or received by this informant."  Motion to Disclose at 1.  Troup, Sanchez, Montoya, Baca, Gallegos, and Herrera join the Motion to Disclose.  See Motion to Disclose at 1.

The Motion to Disclose is primarily concerned with Counts 6 and 7 of the Superseding Indictment, which allege that Perez, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, and Herrera, "conspired to and did murder Javier Molina on March 7, 2014." Motion to Disclose at 1-2.  According to the Motion to Disclose, at the time of J.M.'s murder, all Defendants named in Counts 6 and 7 and J.M. -- also alleged to be a SNM member -- were inmates at Southern New Mexico.  See Motion to Disclose at 2.  J.M. was murdered in his cell in pod 1A-B, and multiple shanks were recovered "from trash cans and shower drains" in the investigation thereafter.  Motion to Disclose at 2.  The Motion to Disclose contends that Perez, who uses a wheel chair, was in his cell on pod 1A-B's bottom level when J.M. was murdered on the upper level.  See Motion to Disclose at 2.  Indeed, the Motion to Disclose provides, the defense "has found only one document that contains information suggesting Mr. Perez assisted in killing Mr. Molina."  Motion to Disclose at 2 (citing FBI Confidential Human Source Reporting (dated February 11, 2016), filed September 22, 2016 (Doc. 698-1)).  The Motion to Disclose explains that a CI alleges that Perez "provided his walker to make shanks that were used in the murder."  Motion to Disclose at 2.

The Motion to Disclose then explains that, in the CI's report, the informant discusses attempting to purchase heroin from another SNM member's mother, which Perez contends indicates that the same CI was involved in the December SNM indictments giving rise to this case.  See Motion to Disclose at 2-3 (providing that the similarity between the informant's report regarding heroin purchases from the SNM family member is important).  The Motion to Disclose also recounts that Armenta, "a co-defendant and cooperating witness," neglected to implicate Perez in the murder underlying Counts 6 and 7.  Motion to Disclose at 3-4.  Accordingly, where Perez argues that the only allegation tying him to J.M.'s murder is that his walker was used to make shanks, and the Motion to Disclose provides that "[t]he vague statement made by the informant regarding Mr. Perez's role offers little insight into the basis of the informant's knowledge, making his identity critical."  Motion to Disclose at 4.  The Motion to Disclose further explains that "the informant will provide key testimony for the prosecution, and he possesses information that would benefit Mr. Perez's defense."  Motion to Disclose at 4.

In support of its request, the Motion to Disclose provides that disclosure of CIs can be required where that source "is a participant in and a material witness to the alleged crime."  Motion to Disclose at 6 (citing Roviaro v. United States, 353 U.S. at 59-61).  Then, citing to the Court's opinion in United States v. Rivas, 26 F. Supp. 1082, 1120 (D.N.M. 2014)(Browning, J.), the Motion to disclose explains:

> Three broad categories of cases involving [CIs] exist:  At one extreme are the cases where the informant is a mere tipster, and disclosure is not required.  At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial.  In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

Motion to Disclose at 6.  Here, the Motion to Disclose argues that "the informant in this case may have played a crucial role in the alleged criminal transaction based on the allegations he is making, requiring disclosure of his identity."  Motion to Disclose at 6.  "The Tenth Circuit's take on this analysis is well-known."  Motion to Disclose at 6.  Further, the Motion to Disclose provides, "[w]hen a confidential source plays an active role in the government's investigation, the court must consider: '(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors.'"  Motion to Disclose at 7 (citing United States v. Padilla, 2010 WL 4337819, at * 7 (D.N.M. 2010)(Browning, J.)).

The Motion to Disclose, accordingly, argues that "Mr. Perez's right to prepare his defense outweighs the United States' interest in keeping the informant's identity confidential." Motion to Disclose at 7.  This case is one where Perez' interest outweighs the United States', the Motion to Disclose argues, because -- at least for Perez -- a great weight of evidence does not support the allegations against him, and it appears that the CI is the single source of evidence against Perez who the United States will seek to use at trial.  See Motion to Disclose at 7-9. And, further, because the CI appears to have been an integral part of the murder of J.M., the Motion to Disclose contends that disclosure is well within the Court's discretion.  See Motion to Disclose at 7-9.  In conclusion, the Motion to Disclose suggests:

> Disclosing the informant's identity is essential to the fair adjudication of Mr. Perez's case and outweighs the government's interest in keeping it confidential. Learning the identity of the informant at the earlier stage of discovery will be critical given this is the only witness who links Mr. Perez to the crime charged.

Motion to Disclose at 14.

### 3.    Motion to Disclose Response.

The United States responded to the Motion to Disclose with the United States' Response in Opposition to the Joint Motion for Disclosure and Production of Confidential Informant [698],

filed October 17, 2016 (Doc. 741)("Motion to Disclose Response").  The Motion to Disclose

Response informs the Court that "the United States and Perez's counsel agreed to disclosure of

the [CI]'s identity under a protective order.  Perez's counsel agrees that the United States'

agreement to disclosure under the protective order satisfies Perez's requests under the Disclosure

Motion."  Motion to Disclose Response at 4.  Yet, for the other Defendants purporting to join the

Motion to Disclose, the United States objects to disclosure of this CI, because "there is no basis

on which the Court may properly conclude that the particular circumstances of the case,

including the crime charged, the possible defenses, and the significance of the informer's

testimony may be helpful to those remaining Defendants."  Motion to Disclose Response at 4

(citing United States v. Rivas, 26 F. Supp. at 1114)(internal quotation marks and alterations

omitted).  The United States thus requests that the Court deny the Motion to Disclose for

overbreadth as it pertains to any Defendant besides Perez.  See Motion to Disclose Response at

4.

      **4.**     **Motion to Disclose Reply.**

      Troup, Sanchez, Baca, and Herrera replied in support of the Motion to Disclose with their

Reply to Government's Response to Joint Motion for Disclosure and Production of Confidential

Informant (Doc. 698), filed November 7, 2016 (Doc. 762)("Motion to Disclose Reply").  The

purpose of the Motion to Disclose Reply is to "provide . . . background to assist the Court in

determining whether the Confidential Human Source's (CHS) identity should be disclosed."

Motion to Disclose Reply at 2.  With respect to Troup, the Motion to Disclose Reply explains

that Troup "has been indicted in Counts 1 and 3 with the murders of F.C. and F.S.," and that

"this is a case where there appears to be no physical or scientific evidence nor any objective

witness implicating Mr. Troup in these crimes."  Motion to Disclose Reply at 2.  The Motion to

Disclose Reply then continues its explanation that "F.S. was a known informant," and that, according to the CI at issue in this motion, "paperwork relating to F.S. was delivered by 'Cheech.'"  Motion to Disclose Reply at 2.  Yet, the Motion to Disclose Reply argues, another inmate named Kyle Lynn Dwyer has admitted to being the individual who delivered the paperwork -- in fact, Dwyer was disciplined and sent to "PNM Level VI" as a result of delivering the paperwork, with "paperwork" meaning something that indicates that the subject of whichever paperwork has cooperated with law enforcement.  Motion to Disclose Reply at 3.  The Motion to Disclose Reply thus argues that, regarding any potentially contrary information this CI might have, Troup is entitled to discover the CI's "identity to ascertain, among other things, if such information is exculpatory, especially given Mr. Dwyer's unavailability [now deceased]."  Motion to Disclose Reply at 3.  In addition, the Motion to Disclose Reply contends that the informant in question states that Troup and another Defendant, "Weno," "saw that these two individuals were taking too long and killed F.S." themselves.  Motion to Disclose Reply at 3.  Apparently, according to the Motion to Disclose Reply, this informant's report thus "implicates two, unindicted individuals as alternate suspects and provides a motive that otherwise has not been produced in discovery," and Troup therefore needs the CI's "identity to investigate . . . veracity, ability to perceive, ability to contradict other government informants, and to otherwise adequately prepare his defense to the charges."  Motion to Disclose Reply at 3.

The Motion to Disclose Reply then turns to argument by Sanchez, who "has been indicted in Counts 6 and 7 with conspiracy to murder J.M. and the murder of J.M."  Motion to Disclose Reply at 3.  Because Sanchez is implicated in the same murder as Perez is charged, the Motion to Disclose Reply argues that Sanchez should be entitled to the CI's identity so he can investigate the aspects of the crime involving Perez.  See Motion to Disclose Reply at 3.  The

Motion to Disclose Reply then makes the same argument on behalf of Baca, who has been implicated in J.M.'s murder, because the CI "may very well have been a participant in and a material witness to the crime."  Motion to Disclose Reply at 4.  The Motion to Disclose Reply clarifies that the CI does not directly implicate him in J.M.'s murder, but that the CI suggests that Baca orchestrated narcotics facilitation in the prison.  See Motion to Disclose Reply at 4. Further, Baca explains that he was not at Southern New Mexico at the time of J.M.'s murder, meaning that

> any witnesses that the United States intends to call in an attempt to connect Mr. Baca to J.M.'s death must be disclosed so that Mr. Baca may adequately prepare for and defend against the inevitable testimony on the critical issue of whether Mr. Baca was involved in any capacity with J.M.'s death.

Motion to Disclose Reply at 5.  To that point, the Motion to Disclose Reply contends that the United States has not provided the defense with admissible evidence, yet, that Baca was involved in the murder; so far, the United States' case rests only on differing statements from Armenta implicating Baca as the orchestrator of J.M.'s murder.  See Motion to Disclose Reply at 5-6. Accordingly, for Baca, the Motion to Disclose Reply provides that Baca is in the same position as Perez regarding the information this CI has divulged.  See Motion to Disclose Reply at 6.

Last, regarding Herrera, who "has been indicted in Counts 6 and 7" regarding J.M.'s murder, the Motion to Disclose Reply argues that Herrera was not in J.M.'s pod during the murder and that he is implicated only because Armenta has suggested Herrera was involved. Motion to Disclose Reply at 6.  Further, the Motion to Disclose Reply thus contends that, because Armenta has given conflicting statements at different times in the aftermath of J.M.'s murder, that the informant's statements at issue here could be exculpatory and thus Herrera should be entitled to the CI's identity for investigation.  See Motion to Disclose Reply at 7.  The CI, according to the Motion to Disclose Reply, also implicates Herrera's mother with

- 17 -

involvement in "trafficking and racketeering."  Motion to Disclose Reply at 7.  The Motion to Disclose Reply thus concludes by requesting that the Court order disclosure of the CI's identity to Troup, Sanchez, Baca, and Herrera.  Motion to Disclose Reply at 7-8.

     5.      **Second Motion to Disclose Reply**.

Montoya replied in support of the Motion to Disclose with his Supplement to Joint Motion for Disclosure and Production of Confidential Informant (Doc. 698), filed November 11, 2016 (Doc. 768)("Second Motion to Disclose Reply").  The Second Motion to Disclose Reply argues that Montoya, whom the United States "alleges . . . used a shank provided by co-defendant Rudy Perez in order to murder Javier Molina," is implicated only by the CI at issue's statements linking him to the murder.  Second Motion to Disclose Reply at 2.  According to Montoya, the United States "alleges that an inmate in Santa Fe named Jesse Sosa transferred information to imprisoned SNM members [in] Las Cruces, and that information was the motive for killing Javier Molina."  Second Motion to Disclose Reply at 2.  Montoya argues that the CI has information about Jesse Sosa.  See Second Motion to Disclose Reply at 2-3.  Montoya also argues that the CI has divulged information to the United States with respect to SNM and drug traffickers that "were working off their own charges."  Second Motion to Disclose Reply at 3.  In light of this arrangement, Montoya argues, the CI may be such a drug trafficker, and he otherwise might have information "likely to lead to information critical to the defense," necessitating discovery of his identity.  Second Motion to Disclose Reply at 3.

     6.      **Third Motion to Disclose Reply**.

Defendant Richard Gallegos, a Defendant in United States v. Baca, and C. Garcia, have submitted the Sealed Reply Supporting Sealed Opposed Motion to Compel the Production of Unredacted Discovery and the Identification of Confidential Informant, filed November 28, 2016

(Doc. 778)("Third Motion to Disclose Reply").  The Third Motion to Disclose Reply is broader than the Motion to Disclose, and was filed in United States v. Baca and United States v. Garcia in addition to the present case, United States v. DeLeon.  See Third Motion to Disclose Reply at 1-2.  The Third Motion to Disclose Reply, at the outset, highlights Gallegos and Garcia's unique position, because the United States' prosecution of them has resulted in a trial date sooner than that of the large group of Defendants in United States v. DeLeon.  See Third Motion to Disclose Reply at 1-2.  Accordingly, the Third Motion to Disclose Reply argues that, for the discovery provided to date to Garcia and Gallegos, "many of the redactions obscure obviously important discoverable information," information that, in fact, Gallegos and Garcia contend has been disclosed to other Defendants.  Third Motion to Disclose Reply at 3-4.  Accordingly, the Third Motion to Disclose Reply argues that the redactions are improper, and thus, for twenty-seven different discovery documents and CI reports, now requests copies of those documents and reports sans redaction.  See Third Motion to Disclose Reply at 4-7.  The Third Motion to Disclose Reply does not specifically address the Motion to Disclose's contents, but instead appears to have been filed as a reply to the Motion to Disclose -- as well as to other motions in the other cases -- to provide Gallegos and Garcia's arguments regarding the legal standard for disclosing the identities of CIs.  See Third Motion to Disclose Reply at 7-12.  Accordingly, the Third Motion to Disclose Reply explains:

> The Tenth Circuit's analysis on disclosure of a confidential informant's identity, as articulated by this Court, involves, [t]he balancing of the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense.  In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony.  Where it is clear that the informant cannot aid the defense the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure. *Aguilar*, [2010 WL 2977708, at *16-17 (D.N.M. 2010)(Browning, J.)], citing,

> *United States v. Sinclair*, 109 F. 3d 1527, 1538 (10th Cir. 1997); *See United*
> *States v. McKenzie*, No. CR 08-1669 JB, 2010 U.S. Dist. LEXIS 13362 *3-4
> (D.N.M 2010) (Browning, J.)(quoting *Sinclair* at 1538).  "The defendant must
> present more than mere speculation about the possible usefulness of an
> informant's testimony."  *Aguilar*, at 17, citing *United States v. Morales*, 908 F 2d
> 565, 567 (10th Cir. 1990).  None of these documents Defendants are requesting
> are cumulative in nature.

Third Motion to Disclose Reply at 10-11.  The Third Motion to Disclose Reply then concludes, stating that Garcia and Gallegos agree that the Court requires a case-by-case analysis regarding disclosure of CIs, and also that the Defendants bear the burden of explaining why the United States' privilege should be defeated in any given case.  See Third Motion to Disclose Reply at 12.  Here, the Third Motion to Disclose Reply argues, the burden is met.  See Third Motion to Disclose Reply at 12.

        7.    **Motion to Exclude.**

        Perez filed the Motion to Exclude to request "the Court to order the prosecution team, including employees of the Office of the United States Attorney and agents of the Security Threat Intelligence Unit of the Department of Corrections ('STIU'), be precluded from attending the evidence viewing scheduled for December 2, 2016."  Motion to Exclude at 1.  Baca, Gallegos, S. Gutierrez, Herrera, T. Martinez, Montoya, and Sanchez joined the Motion to Exclude.  Motion to Exclude at 1.  The Motion to Exclude explains that the Defendants charged in the Superseding Indictment's Counts 6 and 7 are planning to view certain evidence and tour Southern New Mexico, and that the information they receive is going to be work product which they wish be protected from disclosure to the prosecution.  See Motion to Exclude at 1-2.  The reason that the Motion to Exclude gives to support that work product will entail from the evidence viewing is that

> members of the respective defense teams, including counsel, investigators and
> experts [will] view, discuss, document, and record evidence and their impressions

- 20 -

of that evidence. The resulting processes, discussions, notations, recordings, measurements, photographs and other tangible things that will be generated and created by the respective defense teams constitute work product and are not discoverable by the prosecution.

Motion to Exclude at 3. In addition, the Motion to Exclude contends that the "Defendants are therefore entitled to a prosecution-free zone in which to view, record and discuss evidence." Motion to Exclude at 4-5. The Motion to Exclude further contends that excluding the prosecution will not otherwise compromise the evidence or the evidence's custody and control, as the Defendants do not seek to exclude supervisory agents who are not aligned with the prosecution. See Motion to Exclude at 5.

8.    **Motion to Exclude Response.**

The United States responded to the Motion to Exclude with its United States' Response to Defendant's Joint Motion to Exclude the Prosecution Team from December 2, 2016 Evidence Viewing, filed November 25, 2016 (Doc. 775)("Motion to Exclude Response"). The United States primarily opposes the Motion to Exclude, because

(1) Defendant fails to demonstrate that the work-product privilege applies, (2) public policy disfavors Defendant's motion to exclude . . ., (3) the presence of agents and correctional officers at the evidence viewing negates any interest in Defendant's claim to privacy under the work-product doctrine, and (4) Defendant's claim to a "Prosecution Free Zone" is unfounded.

Motion to Exclude Response at 1. Regarding the inapplicability of the work-product doctrine, the United States argues that the request is prospective and that, because the United States has not attempted to compel disclosure of Defendants' work-product, the doctrine does not yet apply. See Motion to Exclude Response at 2. Thus, according to the United States, "if no work product has been produced, the rule should not apply." Motion to Exclude Response at 3. Also, the United States contends that "public policy disfavors" the Motion to Exclude, because "public policy favors an agreement" amongst the parties as to the parameters of the United States'

presence, as opposed to a total exclusion.  Motion to Exclude Response at 5-6.  Last, the United

States argues that, if anyone acting as an United States agent is there, then the work-product

protection is waived, because it is not a total exclusion.  See Motion to Exclude Response at 7.

>    **9.      The November 29, 2016, Hearing.**

The Court held a hearing on November 29, 2016.  See Transcript of Hearing (taken

November 29, 2016), filed December 20, 2016 (Doc. 804)("Tr.").   The Court first heard

argument on the Motion to Vacate.  See Tr. at 15:25-16:3 (Court).  The Court provided that, in

the related case United States v. Baca, the Defendants in that case had agreed to move their trial

date, which was the only contingency noted by the United States in their Motion to Vacate

Response, meaning that there likely were not any remaining issues in the Motion to Vacate and it

should be granted.  See Tr. at 16:3-17 (Court).  Perez then explained that there were no issues

remaining, because the United States no longer opposed the Motion to Vacate, but that he

wanted to reiterate the issues surrounding receipt of the tablets.  See Tr. at 17:3-17 (Villa).

Accordingly, given the massive amount of discovery and some of the logistical issues with the

Defendants' review of the discovery, Perez requested that -- in addition to moving the trial date -

- the "scheduling order" dates would move in conjunction with the new trial date.  Tr. at 19:1-

21:2 (Villa).  This, apparently, was an issue for Perez, because the original scheduling order had

garnered agreement amongst all parties, and he was not sure there was still such a consensus in

that regard at the present time.  See Tr. at 21:5-9 (Villa).  Montoya then seconded Perez'

discontent with the tablet discovery process, and suggested that no new scheduling order dates be

set until all discovery was received by the Defendants.  See Tr. at 23:11-25:1 (Hammond).

Herrera similarly then asked the Court "to appreciate the logistics of the discovery issue in this

case."  Tr. at 27:7-15 (Davis).  B. Garcia argued, next, that the related case -- United States v.

Baca -- was less cumbersome and complex, and should be argued before the present case.  See Tr. at 27:23-30:1 (Castle).  Additionally, B. Garcia suggested, as did Montoya, that trial and scheduling order dates not be set in stone until the discovery had been received by all Defendants.  See Tr. at 27:23-30:1 (Castle).  Both Troup and Baca then parroted their co-Defendants' arguments relating to the discovery issues, with Baca explaining to the Court that, on top of the logistical problems in receiving the tablets and loading them with discovery, it was hard to work on the tablets with only minimal technological experience.  See Tr. at 31:8-33:22 (Harbour-Valdez, Lowry).

> The United States then argued, and explained that
>
> we had agreed to the continuance in this case that Mr. Villa presented, if the other case, the Baca case, was continued, and that's why we had agreed to the continuance of the Baca case and we had agreed to the continuance in this case. And our understanding was at the time they were just asking that it be continued to next summer, 2017.

Tr. at 34:4-11 (Armijo).  The United States then commiserated that the discovery process was more cumbersome than usual, and explained that discovery would be rolling and that they were "working very hard on it."  Tr. at 34:12-37:13 (Armijo).  The United States maintained that "we would request that the Court set a trial date . . . next summer," and that regarding a scheduling order and timetable, "we can change the dates to reflect that new [trial] date on the discovery order that's already in place."  Tr. at 37:14-24 (Armijo).

Perez then replied to the United States' argument, and generally reiterated how logistically complicated, and expansive, the discovery process has been.  See Tr. at 40:18-42:8 (Villa).  C. Garcia reiterated the complicated nature of the discovery, and argued that the tablet process -- which the United States suggested and implemented -- is clearly not working, and that it was disingenuous of the United States to wash its hands of the problems in getting the tablets

to the Defendants, because it was the United States idea in the first place.  See Tr. at 42:13-44:17 (Sirignano).  The Court then ruled that the United States' "consent here to move this trial is premised on the fact that we're sliding Baca back, and DeLeon is going to move forward and sort of take its place.  So I think we had that much of agreement. . . .  So I'm going to set the trial July 10th."  Tr. at 46:15-25 (Court).  The Court noted that it was aware of all of the discovery issues, and explained that all parties were going to need to work "extremely hard," and that "we need to stick with the schedule that we hammered out in this case, hammered out in Baca, and take the agreement that we have, and see if we can try to move this case along."  Tr. at 47:1-10 (Court).  Thus, the Court set the trial date for July 10, 2017, and imposed the scheduling order and deadlines accordingly.  See Tr. at 47:11-14 (Court).  The Court, then, at the United States' request, called the related case -- United States v. Varela -- to set a new trial date in that case as well, and then set the trial date for October 2, 2017.  See Tr. at 48:9-49:23 (Court).

The Court then specifically addressed Montoya and B. Garcia's requests that the Court not set a trial date until the discovery process was complete, and explained that such a procedure "is just not realistic."  Tr. at 50:6-11 (Court).  The Court provided that discovery issues are not novel -- "it's just part of litigation" -- and that it was the Court's impression that the United States had already done the bulk of its discovery provision.  Tr. at 50:12-51:9 (Court).  The Court then agreed to modify the scheduling order to reflect a four month difference across the board. See Tr. at 54:1-4 (Court).  The Court thus granted the Motion to Vacate, and moved to the Motion to Exclude.  See Tr. at 55:12-24 (Court).

With respect to the Motion to Exclude, the Court explained that "sometimes it's normal to have somebody set in there" when opposing counsel was reviewing discovery documents in another's law office.  Tr. at 56:19-57:9 (Court).  However, the Court surmised,

in the particular circumstances of this, where we may have a large number of defense lawyers there, they are going to probably be discussing this with each other. . . .  And if the Government lawyers are there I think it's going to inhibit their ability to do the things they need to do to do a site visit.

Tr. at 57:9-17 (Court).  Further, the Court surmised that "I think there are work thoughts, their work product will be disclosed, or . . . it will not take place," given the unique nature of this particular site visit.  Tr. at 57: 18-25 (Court).  Perez then argued the Motion to Exclude, and clarified that "we are scheduled, not only to visit Southern New Mexico Correctional Facility, but also to view all the evidence in this case, all tangible physical evidence," regarding Counts 6 and 7.  Tr. at 58:23-59:13 (Fox-Young).  Perez indicated that "there are easy measures that the Government takes" to use information against the Defendants, such as serving warrants using "filter agents," which Perez wishes to avoid by having the Court "order that any discussions, any work product -- and we think that everything we say, produce, develop, record, any processes that we employ on Friday, are work product, and we don't want that information disclosed to the prosecution team."  Tr. at 60:3-19 (Fox-Young).

The United States then responded, and argued that, in all of its years of experience it had never seen a request like this before.  See Tr. at 61:11-21 (Castellano).  The United States explained its lack of experience with this type of request was, first, probably because it is a nonissue that never arises -- indeed, in this case, they have had smaller evidence viewings where the United States was present, and when Defendants needed to converse, the United States stepped back to allow as much.  See Tr. at 62:7-63:20 (Castellano).  Further, the United States argued, "the presence of a third party vitiates any issues related to privilege," and because here Defendants were conducive to the presence of non-prosecution team law enforcement, they cannot avail themselves of some privilege.  Tr. at 63:21-64:19 (Castellano).  The Court, however, suggested that might not be the case, as it often will have United States Marshalls in

the presence of a defendant and defense counsel during a private conversation, and that did not disavail the defendant of any type of privilege.  See Tr. at 64:21-65:8 (Court).  The United States hesitantly agreed, but still maintained its argument against the Motion to Exclude, and stated further that "it's just not practical, because we need to look at the evidence also, and we don't have that many hours in the day either."  Tr. at 65:9-66:10 (Castellano).  The Court then attempted to figure out just how long and in depth this evidence viewing and site visit would be, and why the United States could not simply go another day.  See Tr. at 67:8-13 (Court).  The United States indicated that there was an evidence viewing in Las Cruces, New Mexico, and also the site visit to Southern New Mexico, which would take a full day.  See Tr. at 67:14-68:9 (Castellano).

Perez then replied by arguing that he recognizes it "is an unusual request, but this is also an unusual case."  Tr. at 68:20-69:1 (Fox-Young).  Perez indicated that they were intent on seeing all of the physical evidence in this case, and not just the evidence in Counts 6 and 7, because all of the allegations are interrelated.  See Tr. at 69:4-13 (Fox-Young).  Perez also reiterated that it was impractical to do this evidence viewing and site visit with the United States present, because of all of the moving parts and the need to confidentially cooperate amongst defense counsel.  See Tr. at 69:14-70:5 (Fox-Young).  Further, Perez explained that the reason the Defendants were seeking to make such a large group visit and viewing was because the United States had declined to allow individual defense counsel to make such a visit and viewing. See Tr. at 71:2-12 (Fox-Young).  B. Garcia then argued that, although the Court was considering the Motion to Exclude in the context of Counts 6 and 7, he assumed the Court's order on the Motion to Exclude would dictate the procedures for future site visits and evidence viewings for other counts.  See Tr. at 71:18-72:12 (Castle).  B. Garcia also argued that the United States, for

Counts 1 and 2 Defendants, had similarly denied individual requests to confidentially view evidence, and that if the United States was requiring these joint viewings, it couldn't also maintain its argument that Defendants were waiving a privilege.  See Tr. at 72:2-22 (Castle).  B. Garcia also said that the only unusual aspect of the Motion to Exclude was the United States' refusal to allow confidentiality, because that is the normal course of action in these cases.  See Tr. at 72:23-73:12 (Castle).  Baca reiterated Perez' argument that "this Court should order that there is no waiver just because other individuals or law enforcement officers may be present; that that doesn't vitiate any work product privilege or attorney-client privilege that would exist."  Tr. at 74:7-16 (Lowry).  The Court then granted the Motion to Exclude, explaining that the "prosecution team should not go in the next day or any other time and try to elicit information about what the defense lawyers did while they were there.  And if approached by anyone with the Corrections Department or State Police -- if that's where the viewing of the other evidence takes place -- with information, they should not take that information without . . . consulting with coordinating counsel, and seeing if it can be worked out."  Tr. at 74:20-75:6 (Court).  The Court further held that

> If the Government wishes to challenge, down the road, that there is not work product here, they can raise that down the road in the specific context of the information that they're trying to get ahold of, or saying that's been waived, rather than us trying to decide that today in a vacuum . . . I think I am trying to preserve the defendants' ability to talk while they're there, and do what they need and can do there.  So I'd be inclined to continue to protect it down the road, whether it fits neatly into some recognized privilege or protection, or just my ability to control the discovery in this case.

Tr. at 75:12-24 (Court).

The Court then turned argument to the Motion to Disclose, which Perez had initially filed, but thereafter had entered into a disclosure agreement regarding the CI whose identity he sought by the Motion to Disclose.  See Tr. at 79:8-14 (Villa).  The Court then took up Troup's

arguments in the Motion to Disclose Reply, with Troup arguing that there had been discovery

that F.S. -- Freddie Sanchez, the victim of Counts 1 and 2 -- was a known informant who's

"paperwork" proving his informant status had been circulated to inmates at Southern New

Mexico.  Tr. at 83:7-11 (Harbour-Valdez).  According to Troup, the CI at issue in the Motion to

Disclose is the first person who indicates "that someone by the name of Cheech delivered that

paperwork to Southern New Mexico."  Tr. at 83:24-84:2 (Harbour-Valdez).  This is relevant to

Troup, he argued, because another gentleman -- named Kyle Dwyer, now deceased -- had been

disciplined by the prison system for his admission that he was the person who delivered

paperwork from "PNM in Santa Fe down to Southern New Mexico."  Tr. at 84: 3-11 (Harbour-

Valdez).  Troup also explained that Kyle Dwyer had appealed his discipline by the prison system

for this admission, but that the result of that appeal was as of then unknown.  See Tr. at 85:2-11

(Harbour-Valdez).  Troup argued that "if in fact Mr. Dwyer was exonerated, perhaps someone

named Cheech is responsible.  We would very much like to know who Cheech is, or [who] was

at PNM at the time and knows about the paperwork."  Tr. at 85:12-22 (Harbour-Valdez).  The

informant's identity, then, who discusses this person named Cheech and the relevant paperwork,

is important because he has provided "an alternate suspect, who perhaps had a hand in this

incident."  Tr. at 84: 20-22 (Harbour-Valdez).  The Court then asked Troup to explain the United

States' case against him, to which Troup replied that the United States alleges that Troup and a

number of other individuals killed "Mr. Sanchez, after this paperwork was circulated in the pod."

Tr. 86:20-23 (Harbour-Valdez).  Troup thus argued that investigating into Cheech and the CI

could lead to exculpatory information for Troup, because the CI talks about Cheech, who

apparently may have delivered paperwork from PNM, and also "the Rascon brothers," who

apparently were in bad standing with SNM and took too long to carry out the hit that Troup is

- 28 -

now alleged to have undertaken.  Tr. at 87:20-88:11 (Harbour-Valdez).  The United States then argued, and explained that it matters whether a CI is a testifying witness or a nontestifying confidential human source, because the analysis pertaining disclosure will differ accordingly. See Tr. at 92:20-93:4 (Beck).  If they are a testifying witness, then the Jencks Act applies to the CI's disclosure, whereas in the case of no intention to testify, a separate calculus will apply.  See Tr. at 94:5-22 (Beck).  And, although Troup agreed that that was the correct phrasing of the applicable law, Montoya then argued that "the law is not black and white on this.  I believe the law is that, even with a testifying CI, if there are reasons presented why the identity of the CI needs to be known now for investigative purposes, and preparation purposes of -- particularly if the CI himself may have been a participant in the crime, I believe that courts have ordered that CI information be produced well in advance of the Jencks deadlines."  Tr. at 96:17-97:5 (Hammond).  The United States maintained argument that there are district courts which agree with Montoya's position, primarily because the defendant is going to know the testifying CI's identity at some time, and they will just need to wait.  See Tr. at 98:13-20 (Beck).  The United States also explained that it would disclose its testifying CIs in due time, and that it did not anticipate calling all of its CIs -- meaning, it would not, in all likelihood, be an unmanageable Jencks Act disclosure.  See Tr. at 99:12-15 (Beck).  The United States then suggested that the most fair approach to the CIs' disclosure, generally, would be for the Court to "go ahead and make the determination as to whether the CI should be disclosed, and then -- but they wouldn't be disclosed immediately, because [the United States] is planning to call them at trial -- but if it's -- for some reason [the United States is] not going to call that witness . . . then [it] would immediately disclose that . . . ."  Tr. at 101:2-20 (Beck, Court).  The United States then specifically argued why the Court should not order the CI's identity disclosed to Troup, because

while the information about Cheech and the paperwork might be helpful to Troup, that is not the standard; instead, the standard is that "the Court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony," where, here, the CI is planning to testify.  Tr. at 102:15-103:10 (Beck). The Court then asked if the United States could ask the CI who Cheech is and then give that information to Troup.  See Tr. at 104:1-4 (Court).  The United States said that request was possible and agreed to ask the CI.  See Tr. at 104:14-18 (Court).  The Court then asked the United States to clarify its theory with respect to Troup, which the United States explained was that "at some point, there was paperwork . . . passed to two people.  And then, we believe that . . . the Rascon brothers were ordered to hit Freddie Sanchez, and that Troup was one of the people who did it at Southern New Mexico Corrections Facility."  Tr. at 105:11-17 (Beck).

> Troup then argued:
>
> [O]bviously, the CHS is going to testify.  What we're trying to determine is whether he was, in fact, a witness or participant; whether he was one of the people in this pod at Southern, or was in the pod at PNM, from which the paperwork allegedly -- and the hit allegedly derived.

Tr. at 107:23-108:5 (Harbour-Valdez).  Essentially, Troup argued, "the identity of the CHS" would help him "find out if he was, in fact there; if he was an active participant."  Tr. at 108:12-16 (Harbour-Valdez).  The Court was not convinced, however, and pushed Troup to explain why, beyond potentially being present, this CI was different than anyone "else on the planet." Tr. at 108:17-22 (Court).  The Court concluded:

> I'm not going to order the production of the CHS at the present time.  I'm first going to determine whether the CI analysis is obviated if, in fact, the person is going to be a testifying witness. . . .  I'm going to require the Government to go ahead and give you Cheech, figure out who he is; maybe you'll be able to bulk up your request.

Tr. at 109:18-110:9 (Court).  The Court continued,

> at the moment, it seems to me the CHS, as far as Troup, may be a little bit on the periphery of just somebody that -- you know, obviously, everybody would like to know who is there.  But if I start saying I'm going to disclose every CI to see if they were there, I think I've just pretty much required every CI to be disclosed. So I think it's got to be higher than that.

Tr. at 110:10-17 (Court).  Thus, "I'm inclined to leave this one on the Jencks disclosure list, but maybe you can bulk it up with what you get with Cheech. . . .  I'm not making a final final here, because I don't have to because of this Jencks issue."  Tr. at 110:18-23 (Court).  Sanchez then indicated that he was not interested in the identity of the same CI as Troup, so he did not argue in favor of the Motion to Disclose Reply at that time.   See Tr. at 111:22-112:10 (Jewkes). Accordingly, Baca took up argument, and explained that the theory of his involvement was that he

> was able to issue paperwork that went from Level 6 to Level 5 at PNM, and then was couriered from Level 5 of PNM down to Southern in order to give the authority to murder Mr. Molina.  And according to the discovery, and what we know about Molina, the Government's allegations of the Molina murder, that paperwork arrived on a Friday, and Mr. Molina was killed -- well, the paperwork arrived on a Thursday; it didn't get into the hands of the people in Mr. Molina's pod until Friday, and then Mr. Molina was allegedly killed based on the paperwork.

Tr. at 113:6-23 (Lowry).  Baca argued, however, that the "confidential human source indicates . . . something entirely different . . . that there was a plot to kill Mr. Molina some time before the paperwork ever arrived, was in the equation, or anything."  Tr. at 113:24-114:3 (Lowry).  Baca bases this argument in the fact that he does not think Perez could have provided his walker for the shanks used in Molina's murder in such a short time span of about twenty-four hours.  See Tr. at 114:10-21 (Lowry).  Baca then reiterated that, for the United States' theory of a conspiracy -- opposed to random jailhouse murder -- to hold water, Perez must have provided his walker in accordance with orders and paperwork, making the time frame all the more relevant.  See Tr. at 116:16-117:2 (Lowry).  Montoya then argued in support of Baca, and himself, by explaining:

We are in the same count with Mr. Baca.  The story that Mr. Lowry recounted is a story that, in one version of the Government's case, results in a shank being in the hands of our client, and that shank being used to carry out this killing.  We have seen discovery in this case that says that the shank or shanks came from the walker.  We have seen other discovery that says that the shank or shanks did not come from the walker.  For us, we think it's as important for our client -- who is alleged to have been directly involved in the homicide -- to know exactly what Mr. Perez is finding out; who is this CI, and what information does he have that would suggest that in some way that there had been a coordinated plot or plan to kill Mr. Molina?  The only evidence we have, other than from a cooperating defendant, is that this homicide was not an ordered hit from on high, but was a result of a beef between two inmates.  That would be very important in this case.  And as far as I can tell, other than the one cooperating defendant, who is sitting here to my right, there is no other witness that we have been told about who would say that there was a plan or a plot.  And so for us, in the defense of our client, we very much need to know, just as Mr. Perez needs to know, who is saying that these shank or shanks were part of a coordinated plot?

Tr. at 118:1-119:4 (Hammond).  Montoya also explained that he had interest in understanding whether the CI is an eyewitness and that, where the provider of the weapons obtained the CI's identity, so should the person accused of using the shank.  See Tr. at 119:15-120:7 (Hammond).

At this point, B. Garcia argued:

The problem here is a problem that's going to reoccur with all these CIs.  And that is that the Government's reports are often devoid of any information as to whether the confidential source has personal knowledge of that which is being reported.  So there is no way to determine whether they're an eye and ear witness to a particular thing that they're recounting, whether they're a hearsay witness.  And so that's a recurring problem.  And so one of the solutions to the problem -- and I just offer this -- is that the Government is probably aware, based upon their interviews with these witnesses, whether they are, in fact, percipient witnesses, or whether they're just a witness that is going to give overall background about the SNM, for example.  So what all these attorneys seem to be getting at is, we don't know whether this is a percipient witness under 613, Federal Rule 613, or whether it's not.  And, instead of us all guessing, and finding out perhaps at the last minute, right before trial, that they were a percipient witness, they were aware of exculpatory information, or they heard it through the grapevine, the Government could disclose to the defense who are the percipient witnesses here in these materials.  It would cut down on the number of motions to disclose confidential informants considerably.

Tr. at 122:10-123:12 (Castle).   Baca concluded by explaining that this particular CI was providing information that was very important to the United States' theory that Molina's murder was part of a conspiracy.  See Tr. at 124:5-15 (Lowry).

The Court then questioned the United States whether the time frame between Baca's order and Perez' provision of the walker for use as a weapon hurts the United States' case against Baca, "because the timing becomes a pretty important issue there."  Tr. at 126:21-25 (Court).  The United States agreed that "it could," but that the "United States' case is that the Molina murder was outstanding for a number of years.  It's not as if there was paperwork passed on one day and it happened the next day."  Tr. at 127:23-128:3 (Beck).  Further, the United States argued, this particular CI -- who was providing information about certain murders, as well as information that Baca was regaining, or trying to regain, control of SNM so he could restore it to its former power -- was not one of the most significant contributors of this information, because there are multiple sources at play.  See Tr. at 128:4-18 (Beck).  The Court decided:

> I'm going to have to review this in connection with . . . Jencks, I'm not going to order the production to Mr. Baca at this time.  I'll study the legal issue, and see if this requires any CI analysis.  But if it does require CI analysis, I'm going to think about it a little further.  But I'm inclined to order the production here because of this timing issue.

Tr. at 129:19-130:1 (Court).  The Court determined to take a hard look at the issue, because

> this information got to him, and then Mr. Perez made shanks out of his walker all within 24 hours.  It seems to me that may be the only -- since this is the only source of information to either Mr. Perez or to Mr. Baca, I may need to require its production if I do the CI analysis.

Tr. at 130:4-13 (Court).  The United States quickly countered, however, that "Tapes have been disclosed in which Mr. Baca admits his involvement in the Molina murder," undercutting the importance of the CI's identity, and that the United States' theory is not that Baca ordered the hit within twenty-four hours, but instead that it was outstanding for a long time.  Tr. at 131:1-3, 14-

- 33 -

20 (Beck).  The Court then ultimately concluded that, because the short time frame was the

reason that it was inclined to order disclosure to Baca, the parties would need to get the Court

"some particular discovery that you want me to stare at before I make a final decision on the CI

analysis . . . .  [and] something specific, as far as recordings or something that link Mr. Baca up

to the Molina hit orders . . . ."  Tr. at 133:15-21, 133:23-134:6 (Court).

      Herrera then argued in favor of disclosure to him, explaining that "he was actually

housed in a connecting cell block called A pod.  The murder occurs in B pod."  Tr. at 135:6-15

(Davis).  The United States, at the Court's beckoning, interjected to explain that "Mr. Herrera

was involved -- we have recordings and admissions from him as to his involvement.  He

basically sanctioned the hit . . . ."  Tr. at 135:25-136:3 (Armijo).  Herrera argued, however, that

in all of the discovery he has reviewed, despite this CI's characterization of him as a high

ranking SNM leader, nothing else characterizes him as a leader.  See Tr. at 138:12-18 (Davis).

According to Herrera, then, "it's our position that . . . .  [i]f we had the identity of that CS, we

could obviously talk to that person, and, in fact verify that Mr. Herrera is not who the

Government thinks he is."  Tr. at 140:4-10 (Davis).  At this point, the United States explained

that it was fighting the disclosure requests for this CI to protect his identity, because SNM has a

history of killing informants.  See Tr. at 140:20-141:3 (Beck).  The United States also argued

that Herrera was seeking this CI's identity so he could impeach him by omission, with respect to

what the informant did not say in the report, which is something available to Herrera at trial, but

does not factor into this disclosure analysis.  See Tr. at 141:12-142:4 (Beck).  The Court

concluded that

        I probably am not going to start disclosing CIs because of what's not in these case
        reporting documents or CHS reporting documents.  I'm a bit of a proponent of the
        dog doesn't bark theory from time to time.  But it's probably got to be stronger

than that.  So I probably am not going to make the government disclose CHSs on what's not in these reports without a stronger showing.

Tr. at 147:16-23 (Court).

Montoya then took up argument on his Second Motion to Disclose Reply, and explained:

the account that we've seen -- and it's in videos -- is that there was some kind of an altercation in a cell on the second floor; that after that altercation, Mr. Molina came out.  You can see in the video that there is blood on his chest.  He goes down the steps, both -- my client happens to come down the steps, Mr. Armenta comes down.  My client has a very brief fist-to-fist encounter at the bottom, no shank.  And Mr. Armenta comes down.  And you can't see exactly what's going on in the corner, because the camera isn't there.  But the bottom line of this is that Mr. Molina is shanked something like 40-something times.  And then he dies there at the bottom of the steps.  Now, the account that we've been given is that all of that was arranged essentially overnight; that Mr. Baca had given some order; that there was paperwork, the paperwork was brought down from Santa Fe, just as Mr. Lowry summarized it this morning.  Somehow that paperwork had been passed between A pod and B pod, and the instruction had been given to carry out this hit right now.

Tr. at 150:23-151:20 (Hammond).  Montoya, then, maintained that this factual scenario is more

akin to a beef between two inmates and was not a coordinated hit that SNM orchestrated.  See

Tr. at 153:2-19 (Hammond).  This CI is relevant to Montoya's defense, he argued, because "he

was not part of any plan at all . . . he was . . . merely present," and this is a witness, apparently,

about which Montoya did not know about until reading the CI's report.  Tr. at 155:6-24

(Hammond).  Montoya concluded by stating that "We don't have any other eyewitnesses, other

than the defendants in this case.  So if there is somebody there, I'd like to know that.  But my

primary concern is with what he has to say about the shank or shanks."  Tr. at 157:9-18

(Hammond).

The Court then questioned the United States, stating

when I've got two people like Mr. Hammond and Mr. Lowry saying they thought all along that the Government's case was that this was thought up in compressed period of time, you know, I guess I would draw from that that there is something in the record that would support that theory.

Tr. at 158:1-6 (Court).  The United States, accordingly, explained:

> There are other players.  Mr. Sanchez is charged with this murder, Mr. Herrera.
> There is a lot of players in this case that come into play.  But our theory is
> basically that this hit had been out on Mr. Molina for some time.  We have
> Anthony Baca admitting to this on a recording, that has been disclosed, about how
> this hit had been carried out, and why it was necessary to carry it out, and his
> involvement.  We have Mr. Herrera, who his involvement was basically saying he
> wanted to make sure and see the paperwork, to make sure that the hit was a valid
> hit, because they wanted to basically make sure it was righteous, so to speak.  And
> we have him on recording saying that. . . .  We believe that Mr. Sanchez went and
> told Mr. Armenta and Mr. Montoya: You're doing this hit.  You haven't put in your
> time, you haven't done your bones for the SNM.  You guys are going to be
> doing this.  There were three shanks that were actually recovered; not one, not
> two, but three shanks during this investigation afterwards.  I believe on the
> videotape Mr. Montoya is seen assaulting him.  And despite Mr. Hammond's
> rendition of it, I believe on the videotape, you can actually see Mr. Montoya
> handing a shank over to Mario Rodriguez, who then goes and hides the shanks.
> So there is a lot more to the videotape.  We have videotape.  We have statements
> from Mr. Montoya, Mr. Armenta.  After this incident we have cooperators that
> occurred -- that have given statements, obviously, like the one we have here, that
> know about it.  And we have recordings from three defendants to CHSs that were
> made, with them not knowing that they're talking to cooperators while they're
> incarcerated.  So there is many moving parts to this.  There is three shanks; there
> is videotapes.  And this order had been outstanding for a long time.  With the
> SNM, an order can be outstanding for a very long time.

Tr. at 161:4-163:7 (Armijo).  After some exchange with the United States about their theory, the

Court allowed Montoya to reply, and Montoya argued that, if there was no hit from SNM

leaders, then there was no conspiracy and this killing was simply a jailhouse beef.  See Tr. at

176:2-25 (Hammond).  Montoya said that an important issue with respect to the murder and

conspiracy is the hit's timing and the shank's manufacture, because:

> If it turns out that Mr. Perez just made shanks for there to be in the pod -- and
> frankly, that wouldn't surprise me if there were shanks in pods all across this
> state, I wouldn't be surprised by that.  But there is a lot of difference between
> having a shank in a pod and having a shank that is there because someone says
> that the SNM ordered it to be there, and to be used for a specific purpose.  And
> that is what I understand -- at least a piece of that is what this CI is going to say.
> And I believe we need to know that.

Tr. at 177:10-20 (Hammond).  The Court concluded:

> Well, I think that probably Mr. Hammond and Mr. Beck have probably dragged
> me back to where I was with Mr. Baca.  I'm inclined to find that the CI should be
> disclosed.  We've got this Jencks issue that I'm going to have to deal with as far
> as timing.  But if I, in fact, order CI disclosed at this time, then I'm inclined to
> think it should be disclosed as to Mr. Baca.  I'm not convinced as to Mr.
> Montoya.  I think that -- like I said originally, I think your situation is more akin
> to Mr. Troup's back here.  If I start lowering the bar to that level, that we just
> want to know whether there is a scheme, or whether we want to know who is
> present, probably I'd drop the bar to a point where almost all these CIs will be
> disclosed.  And I don't think that's probably what the law requires.  So I'll give it
> some thought, but I'm not inclined to grant Mr. Montoya's request.

Tr. 178:13-179:6 (Court).  Last, regarding the Third Motion to Disclose Reply, C. Garcia stated

that he and R. Gallegos would be providing the Court supplemental briefing, and thus did not

want a final conclusion as to the disclosures they sought at the time.  See Tr. at 183:5-9 (Adams).

The Court thus ended the hearing.

### 10.  Baca's Supplemental Brief.

Defendant Anthony Ray Baca's Supplemental Brief Regarding Timing of the Disclosure

of the Identity of Confidential Informant, filed January 8, 2017 (Doc. 816)("Baca's

Supplemental Brief"), addresses "when" the United States must disclose the CI's identity at issue

in Counts 6 and 7, which deals with J.M.'s murder at Southern New Mexico in March, 2014.

See Baca's Supplemental Brief at 1.  Baca is implicated in J.M.'s murder given the allegation

that he gave paperwork to Varela "confirming Mr. Molina's cooperation with law enforcement,

and that [he] authorized or 'green-lighted' the killing."  Baca's Supplemental Brief at 2.  The

allegations, then, are that Baca gave the paperwork to Varela and that Varela, upon his transport

from PNM to Southern New Mexico, delivered that paperwork to Defendants at Southern New

Mexico and that J.M. was killed within twenty-four hours.  See Baca's Supplemental Brief at 2.

Essentially, Baca's Supplemental Brief argues that, "[o]nce the Court determines that disclosure

of the identity of a confidential informant is appropriate, the defense must have the opportunity to interview the witness in order to determine whether to call him at trial, irrespective of whether the United States plans to do so."  Baca's Supplemental Brief at 4 (referencing Roviaro v. United States, 353 U.S. at 62).   In support, Baca's Supplemental Brief relies on language from the United States Court of Appeals for the Seventh Circuit which states that, "[w]hen a criminal defendant seeks access to confidential informant files, we rely particularly heavily on the sound discretion of the trial judge to protect the rights of the accused as well as the government." Baca's Supplemental Brief at 5 (citing United States v. Phillips, 854 F.2d 273, 277 (7th Cir. 1988)).  Baca's Supplemental Brief, then, explains that the issue in this case is that the United States is incorrectly asserting that "the Court cannot order disclosure of [the CI's] identity prior to trial so long as the government states an intention to call the informant as a witness."  Baca's Supplemental Brief at 5.

Baca's Supplemental Brief thus explains that neither the United States Court of Appeals for the Tenth Circuit nor the Supreme Court of the United States of America have "held that the *Roviaro* analysis applies only to non-testifying witnesses" and that, instead, "the better reasoned decisions from other circuits have held that *Roviaro* trumps the witness disclosure rules."  Baca's Supplemental Brief at 5.  Further, Baca's Supplemental Brief argues that "Baca is not asking the Court to order the government to disclose the witnesses it intends to call at trial, but rather identify a particular person with knowledge that may assist in his defense."   Baca's Supplemental Brief at 5 (citing United States v. Norton, 504 F.2d 342, 343 n.1 (8th Cir. 1974)(citing Roviaro v. United States, and holding that the rules regarding production of witness lists have no bearing in the context of CIs)).  Baca's Supplemental Brief, accordingly, argues that, where an appellate court considers that the failure to disclose a CI "was not error in the

particular circumstances of that case" when that CI ultimately testifies, such a decision has no

bearing on the defendant's right in a criminal trial to the CI's identity upon a successful Roviaro

v. United States analysis.  Baca's Supplemental Brief at 6-7.  Indeed, according to Baca, that is

the factual scenario at issue in United States v. Pennick, 500 F. 2d 184 (1974), which Baca's

Supplemental Brief argues the United States misplaces reliance, because it only held that the trial

court's failure to order disclosure of the United States' witnesses did not constitute error, where

they testified.  Baca's Supplemental Brief at 8 n.4.  Further, Baca's Supplemental Brief explains,

the district court, in that case, had, nonetheless, undergone a Roviaro v. United States analysis in

reaching its decision not to disclose the testifying CIs' identities.  See Baca's Supplemental Brief

at 8 n.4.

Baca's Supplemental Brief last addresses the Honorable Judge Brack, United States

District Judge for the District of New Mexico's, opinion in United States v. Lujan, 530 F. Supp.

2d 1224 (D.N.M. 2008), which held that "there is differentiation between testifying witnesses

and confidential informants who will not testify.  And that *Roviaro* and that calculus applies only

when it's a CHS that will not testify at trial."  Baca's Supplemental Brief at 8.  Baca's

Supplemental Brief explains, however:

> In that case, the defense filed a motion for disclosure of information "concerning
> the Government's witnesses, informants, confidential sources, etc." *Lujan*, 530 F.
> Supp. 2d at 1260.  The request included both testifying and non-testifying
> informants. *Id*.  In response to the motion, the government asserted that there was
> "no one involved in [the] case who provided information on a confidential basis
> who would be considered an informant or source." *Id*.  The government further
> asserted that it had previously disclosed the identity of two informants who it
> intended to call as witnesses at trial. *Id*.  It then claimed privilege as to any non-
> testifying confidential informants. *Id*.  Thus, the only issues before Judge Brack
> were (1) whether the defense was entitled to disclosure of the government's
> witness list prior to trial, and (2) whether the government was required to disclose
> to the defense any non-testifying confidential informants.

Baca's Supplemental Brief at 8-9 (emphasis added).  Baca's Supplemental Brief thus argues that, where the emphasized language above is the most pertinent to this case's facts, Judge Brack determined that "the defendants' request moot based on the government's representation that it had previously disclosed the only two people it would consider to be cooperating individuals. . . . .  Judge Brack also found that the defendants had not 'demonstrated the need for any informant's testimony with any particularity.'"  Baca's Supplemental Brief at 9 (quoting United States v. Lujan, 530 F. Supp. at 1261).

**11.    United States' Supplement.**

The United States' Supplement in Response to Opposition to the Joint Motion for Disclosure and Production of Confidential Informant [698], filed January 13, 2017 (Doc. 824)("United States' Supplement"), begins by explaining the evidentiary basis for Baca's involvement in J.M.'s murder, which includes recorded statements, involving potentially two CIs, linking Baca to the order to kill J.M.  See United States' Supplement at 1-6.  There is a recording of Baca speaking to a CI about Baca's involvement, and Perez speaking to a CI about Baca's involvement.  See United States' Supplement at 1-6.  The United States' Supplement explains:

> The Court requested additional evidence linking Anthony Ray Baca to the murder of J.M., and corroborating that the 'green light' on J.M. had been outstanding longer than 24-48 hours, because the Court concluded that additional corroborating evidence negates that the confidential informant (CI) at issue[] has information that is helpful and 'significan[t]' to Baca's defense.

United States' Supplement at 2.  The United States' Supplement then argues against the pretrial disclosure of testifying CIs, first by arguing that Roviaro v. United States can be distinguished, because, there, "the informer . . . did not testify and was the sole participant, other than the accused, in the transaction charged . . . [and] the informer was the only witness in a position to

amplify or contradict the testimony of government witnesses."  United States' Supplement at 6-8.  The United States' Supplement also cites to Smith v. Illinois, 390 U.S. 129, 133 n.8 (1968), where the Supreme Court "noted that the *Roviaro* confidential informer privilege was not relevant to the subject matter of a testifying witness," United States' Supplement at 8, and Banks v. Dretke, 540 U.S. 668, 697 (2004), where the Supreme Court stated that the Roviaro v. United States analysis is limited to non-testifying CIs, see United States' Supplement at 8.

The United States' Supplement then draws the Court's attention to United States v. Pennick, where the Tenth Circuit concluded that "[t]he significant difference between *Roviaro* and the instant case is that in the former the informer did not testify at trial, and in our case he did.  Such ruled out a possibility that the informer's testimony could somehow be helpful to Pennick."  United States' Supplement at 10 (citing United States v. Pennick, 500 F.2d at 187). The United States' Supplement also explains that the Tenth Circuit concluded that there was "no persuasive reason to depart from the . . . general rule that in a case of this type the Government need not disclose prior to trial the identity of any of its witnesses."  United States' Supplement at 10 (citing a number of Tenth Circuit cases standing for the proposition that there is generally no requirement that the United States disclose its witness list).  The United States thus argues that "[t]he Tenth Circuit's *Pennick* decision stands on the principle that *Roviaro* analysis does not apply to a testifying confidential informer, because production of a confidential informer as a witness at trial forecloses any concern for the effect of non-disclosure on the defendant's right to a fair trial."  United States' Supplement at 10.  The United States' Supplement then concludes by citing to various out of circuit cases which, the United States argues, stand for the proposition that a trial court does not error when refusing to order disclosure of testifying CIs and that the Roviaro v. United States analysis was limited to the case of non-testifying CIs.  See United

States' Supplement at 11 (citing <u>United States v. Foster</u>, 815 F.2d 1200, 1202-03 (8th Cir. 1987);

<u>United States v. Perkins</u>, 994 F.2d 1184 (6th Cir. 1993); <u>United States v. Casseus</u>, 282 F.3d 253,

257 (3d Cir. 2002); <u>United States v. Glover</u>, 583 F. Supp. 2d 5, 12 (D.D.C. 2008)).

### LAW REGARDING THE SPEEDY TRIAL ACT, 18 U.S.C. § 3161

"The dual purpose of the Speedy Trial Act is to protect a defendant's constitutional right

to a speedy indictment and trial, and to serve the public interest in bringing prompt criminal

proceedings."  <u>United States v. Saltzman</u>, 984 F.2d 1087, 1090 (10th Cir. 1993)(quoting <u>United</u>

<u>States v. Noone</u>, 913 F.2d 20, 28 (1st Cir. 1990)).  The Speedy Trial Act, 18 U.S.C. § 3161(c)(1),

reads in relevant part:

> In any case in which a plea of not guilty is entered, the trial of a defendant
> charged in an information or indictment with the commission of an offense shall
> commence within seventy days from the filing date (and making public) of the
> information or indictment, or from the date the defendant has appeared before a
> judicial officer of the court in which such charge is pending, whichever date last
> occurs.  If a defendant consents in writing to be tried before a magistrate judge on
> a complaint, the trial shall commence within seventy days from the date of such
> consent.

18 U.S.C. § 3161(c)(1).

The Speedy Trial Act requires "that an accused person's trial must begin within seventy

days of his indictment or initial appearance, whichever is later."  <u>United States v. Cano-Silva</u>,

402 F.3d 1031, 1034 (10th Cir. 2006)(citing 18 U.S.C. § 3161(c)(1)).  The Speedy Trial Act

provides that certain periods of delay are not included in computing the time limits for trial.  18

U.S.C. § 3161 states in relevant part:

> **(h)**     The following periods of delay shall be excluded in computing the time
> within which an information or an indictment must be filed, or in   computing  the
> time within which the trial of any such offense must commence:
>
> > **(1)**     Any period of delay resulting from other proceedings
> > concerning the defendant, including but not limited to --

**(A)** delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant;

. . . .

**(F)** delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

. . . .

**(J)** delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

. . . .

**(4)** Any period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to   stand trial.

. . . .

**(7)**

**(A)** Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of   the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.  No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the  court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161. Courts are instructed to consider specific factors when determining whether to grant a continuance, and thereby suspend the Speedy Trial Act's deadlines, under section (A) of 18 U.S.C. § 3161(h)(7). See 18 U.S.C. § 3161(h)(7)(B). Section 3161(h)(7)(B) sets forth the factors a court should consider:

> **(B)** The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:
>
> > **(i)** Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.
> >
> > **(ii)** Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.
> >
> > **(iii)** Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.
> >
> > **(iv)** Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable  time  to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B).

The Supreme Court, in United States v. Zedner, 547 U.S. 489 (2006), held that, when a district court makes no findings on the record to support a § 3161(h)(8) continuance -- now § 3161(h)(7) -- harmless-error review is not appropriate. See 547 U.S. at 506-07. In United States

v. Williams, 511 F.3d 1044 (10th Cir. 2007), the Tenth Circuit held that "the Act does not allow a district court to retroactively grant an ends-of-justice continuance. 'Congress intended that the decision to grant an ends-of-justice continuance be prospective, not retroactive; an order granting a continuance on that ground must be made at the outset of the excludable period.'" 511 F.3d at 1055 (quoting United States v. Doran, 882 F.2d 1511, 1516 (10th Cir. 1989)). In granting an ends-of-justice continuance, a district court must make explicit finds showing why the continuance is necessary. See United States v. Hernandez-Mejia, 406 F. App'x 330, 336 (10th Cir. 2011)(unpublished). The Tenth Circuit has explained:

> This court has interpreted strictly the requirements of § 3161(h)(7)(A) and (B). We have held (1) that to satisfy the requirements of § 3161(h)(7)(A), the district court must make explicit oral or written on-the-record findings explaining the reasons why a trial continuance is necessary, unless the facts supporting the continuance "are obvious and set forth in the motion for the continuance itself," United States v. Occhipinti, 998 F.2d 791, 797 (10th Cir. 1993)(internal quotation marks omitted); (2) that "the record must clearly establish [that] the district court considered the proper factors at the time such a continuance was granted," [United States v.] Toombs, 574 F.3d [1262,] 1269 [(10th Cir. 2009)]; (3) that "it must be clear from the record that the trial court struck the proper balance when it granted the continuance," United States v. Williams, 511 F.3d 1044, 1056 (10th Cir. 2007)(alteration and internal quotation marks omitted); and (4) that although adequate trial-preparation time is a permissible reason for granting a continuance and tolling the Act, "such a reason must be supported by the information and evidence presented to the district court," United States v. Gonzales, 137 F.3d 1431, 1435 (10th Cir. 1998).

United States v. Hernandez-Mejia, 406 F. App'x at 336. See United States v. Fuentes, 2011 WL 2533079, at *5 (D.N.M. 2011)(Browning, J.).

Section 3162(a)(1) and (2) of the Act sets out the sanctions applicable when the United States has not filed an indictment or information, or when the defendant is not brought to trial within the time limits that § 3161(b) and (c) require:

**(a)**

> **(1)**      If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter, such charge against that individual contained in such complaint shall be dismissed or otherwise dropped.    In determining whether to dismiss the case with  or   without   prejudice,  the   court   shall consider,  among  others,  each  of  the  following  factors:  the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of  justice.

> **(2)**      If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant.  The defendant shall have the burden of  proof          of supporting such motion but the Government shall have the burden of  going  forward  with  the  evidence  in  connection  with  any exclusion of time under subparagraph 3161(h)(3).   In determining whether to dismiss the case   with     or    without    prejudice,   the court shall consider,   among  others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case   which led  to  the  dismissal;  and  the  impact  of  a reprosecution on the   administration of this chapter and on the administration of justice.   Failure of the defendant to move for dismissal  prior  to  trial  or  entry  of  a  plea  of  guilty  or  nolo contendere shall constitute a waiver of the right to dismissal under this section.

18 U.S.C. § 3162(a)(1), (2).

In United States v. Cano-Silva, the Tenth Circuit stated: "The fact that a violation has taken place is not alone sufficient for the application of the more severe sanction of dismissal with  prejudice,  which  should  be  reserved  for  more  egregious  violations.    Dismissal  with prejudice is a strong message indeed, and one ill-suited to an isolated and inadvertent violation." 402 F.3d at 1035.

> While  dismissal  of  the  indictment  is  mandatory,  the  district  court  retains discretion  to  determine  whether  the  indictment  is  dismissed  with  or  without prejudice.  In determining whether to dismiss with or without prejudice, the court

"shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice."

United States v. Cano-Silva, 402 F.3d at 1034 (quoting 18 U.S.C. § 3162(a)(2))(citations omitted). The offense's seriousness must be weighed against the delay's severity. See United States v. Jones, 213 F.3d 1253, 1257 (10th Cir. 2000). In addition, the Supreme Court has suggested that the trial court should also consider, when determining whether to dismiss an indictment with prejudice, the prejudice to the defendant that a Speedy Trial violation delay has caused. See United States v. Taylor, 487 U.S. 326, 333-34 (1988).

"It is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays." United States v. Taylor, 487 U.S. at 342. "Preindictment delay that rises to a constitutional violation requires dismissal of the indictment with prejudice to retrial." United States v. Johnson, 120 F.3d 1107, 1110 n.2 (10th Cir. 1997)(citing United States v. Marion, 404 U.S. 307, 324 (1971)). "Where the delay is the result of intentional dilatory conduct, or a pattern of neglect on the part of the Government, dismissal with prejudice is the appropriate remedy." United States v. Saltzman, 984 F.2d at 1093. See United States v. Johnson, 120 F.3d at 1112 ("Ms. Johnson bears no responsibility for the circumstances leading to the Speedy Trial Act violation, and . . . she properly asserted her rights under the Act."). In United States v. Johnson, one aspect of the Speedy Trial Act violations that troubled the Tenth Circuit was that, although the nature of the offense was relatively uncomplicated, the government delayed almost two years in indicting her. See 120 F.3d at 1112.

In United States v. Perez-Alcatan, 376 F. Supp. 2d 1253 (D.N.M. 2005)(Browning, J.), the Court dismissed Perez-Alcatan's indictment without prejudice, because the United States,

through inadvertent error, failed to indict him within thirty days of the arrest, as the Speedy Trial Act requires.  See 376 F. Supp. 2d at 1257.  Thirty days from Perez-Alcatan's arrest was May 26, 2005, and a grand jury indicted Perez-Alcatan on June 14, 2005.  See 376 F. Supp. 2d at 1254. Perez-Alcatan argued that the Court should dismiss his case with prejudice.  See 376 F. Supp. 2d at 1256.  He contended that his charged crime, re-entry into the United States after conviction for an aggravated felony, which carried a 16-level enhancement under the United States Sentencing Guidelines, was not a serious crime.  See 376 F. Supp. 2d at 1257.  His underlying aggravated felony, however, was voluntary manslaughter.  See 376 F. Supp. 2d at 1254.  The Court looked to the Sentencing Guidelines, stating that a 16-level enhancement is among the largest in the Sentencing Guidelines, which signals Congress' intent to consider the crime a serious one.  See 376 F. Supp. 2d at 1256.  Furthermore, the Court stated that the Guidelines lack of authorization for probation in such circumstances, and that Congress is hiring more border agents and Assistant United States Attorneys to slow the flow of immigration, and punish those who are already felons, indicates the crime's seriousness.  See 376 F. Supp. 2d at 1256.  The Court concluded that the seriousness of the offense favored dismissal without prejudice.  See 376 F. Supp. 2d at 1256.  The Court also held that the facts and circumstances that led to the delay did not favor dismissal with prejudice.  See 376 F. Supp. 2d at 1256-57.

While most immigration cases in which a defendant waives a preliminary hearing and detention hearing also involve a waiver of presentment to the grand jury, Perez-Alcatan chose to waive the detention hearing and the preliminary hearing, but not presentment to the grand jury. See 376 F. Supp. 2d at 1256.  As a result of the unique situation, the file cover in the United States Attorney's Office was annotated "waiver" and was incorrectly filed, causing untimely presentment.  376 F. Supp. 2d at 1257.  The Court further held that, because the delay-producing

conduct was an administrative oversight and was without bad faith, dismissing the case with prejudice would do little to prevent such future mistakes.  See 376 F. Supp. 2d at 1257.  The Court stated that the "United States continues to present its cases for indictment in a timely manner; dismissal with prejudice would not improve the professional efforts already in place in adhering to the Speedy Trial Act."  376 F. Supp. 2d at 1257.  The Court also stated that Perez-Alcatan had not alleged any actual prejudice in his ability to defend himself.  See 376 F. Supp. 2d at 1257.  The Court, therefore, dismissed the case without prejudice.  See 376 F. Supp. 2d at 1257.

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE
## IN CRIMINAL CASES

In Brady v. Maryland, the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87 ("Brady").  In Giglio v. United States, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153 ("Giglio"); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"

Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at 682).   See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").   On the other hand, "[i]t is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess."   United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. 2005)(Browning, J.)(internal quotation marks omitted).   "A prosecutor does not have a duty . . . to obtain evidence from third parties."   United States v. Badonie, 2005 WL 2312480, at *2.

During a criminal prosecution, the Federal Rules of Criminal Procedure and the Constitution of the United States of America require the United States to disclose certain evidence to a criminal defendant.   Rule 16 of the Federal Rules of Criminal Procedure is one source that imposes such a duty on the United States.   The Due Process Clause of the Constitution is another source imposing a duty to disclose on the United States.

## <u>LAW REGARDING RULE 16</u>

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.**  Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

    **(i)**      the item is material to preparing the defense;

    **(ii)**     the government intends to use the item it its case-in-chief at trial; or

    **(iii)**   the item was obtained from or belongs to the defendant.

- 50 -

Fed. R. Crim. P. 16(a)(1)(E).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rule 16 also does not obligate the United States to "take action to discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure information from third parties.  See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.  The court may permit a party to show good cause by a written statement that the court will inspect ex parte.  If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1).   In <u>re Terrorist Bombings of United States Embassies in East Africa</u>, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information."   <u>In re Terrorist Bombings of United States Embassies in East Africa</u>, 552 F.3d at 122.   In <u>United States v. Delia</u>, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." <u>United States v. Delia</u>, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16.   <u>United States v. Wicker</u>, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.**  If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or
>
> **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

<u>United States v. Charley</u>, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting <u>United States v. Gonzales</u>, 164 F.3d 1285, 1292 (10th Cir. 1999)).   In <u>United</u>

States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the Tenth Circuit held that "a court should impose the least severe sanction."  455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)).  The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies."  455 F.3d at 1131.

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

The Due Process Clause of the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government."  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution

has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

      1.    **Material Exculpatory Evidence Under Brady.**

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . including whether the defendant should testify." Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d at 1059). The Supreme Court in Cone v. Bell, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as
> interpreted by Brady, only mandates the disclosure of material evidence, the

obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations.  See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)").  See also ABA Model Rules of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; the defendants have no obligation to first note that such materials exist.  See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6 (D.N.M. 2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way."  Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.

2.      **Timing of the Disclosure Under** Brady.

"The obligation of the prosecution to disclose evidence under <u>Brady</u> can vary depending on the phase of the criminal proceedings and the evidence at issue."  <u>United States v. Harmon</u>, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), <u>aff'd</u>, 742 F.3d 451 (10th Cir. 2014). As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in <u>Brady v. Maryland</u>."  <u>United States v. Burke</u>, 571 F.3d at 1054.  The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the <u>Brady</u> rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  <u>United States v. Burke</u>, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  <u>United States v. Burke</u>, 571 F.3d at 1054.  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with <u>Brady</u>, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

<u>United States v. Burke</u>, 571 F.3d at 1054.  Notably, "not every delay in disclosure of <u>Brady</u> material is necessarily prejudicial to the defense."  <u>United States v. Burke</u>, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  <u>United States v. Burke</u>, 571 F.3d at 1056.

Once a prosecutor's obligations under <u>Brady</u> have been triggered, however, they "continue[] throughout the judicial process."  <u>Douglas v. Workman</u>, 560 F.3d at 1173.  For instance, the prosecutor's obligation to disclose <u>Brady</u> material can arise during trial.  <u>See United</u>

States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway.").  The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not.").  The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original).  The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632.  The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that

are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 630. The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[4]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence, but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just

---

[4]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. Johnson; United States v. Hernandez-Mejia, 406 F. App'x at 336; McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002); and United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

> impeachment, evidence.  Second, Ohiri's plea agreement was executed the day
> jury selection was to begin, and not before indictment in conjunction with a "fast-
> track" plea.  Thus, the government should have disclosed all known exculpatory
> information at least by that point in the proceedings. By holding in <u>Ruiz</u> that the
> government committed no due process violation by requiring a defendant to
> waive her right to impeachment evidence before indictment in order to accept a
> fast-track plea, the Supreme Court did not imply that the government may avoid
> the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour
> plea agreement while ignorant of withheld exculpatory evidence in the
> government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished).  The Tenth Circuit

qualified its holding in <u>United States v. Ohiri</u>, however, stating that the case presented "unusual

circumstances."  133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether <u>Brady v.

Maryland</u>'s restrictions apply to suppression hearings."  <u>United States v. Harmon</u>, 871 F. Supp.

2d at 1151.  In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u>

applies to a suppression hearing, rejected a defendant's argument that the prosecution violated

<u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that

the evidence was not impeachment evidence and not material.  <u>See</u> <u>United States v. Johnson</u>, 117

F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically,

the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if
> impeaching, would not establish a reasonable probability that the outcome of the
> suppression hearing would have been different.  First, we question whether the
> evidence in question would have been admitted at the suppression hearing.  Even
> if it had been admitted, however, in light of [the defendant's] lack of truthfulness,
> our confidence in the result of the hearing has not been undermined.  Therefore,
> we hold that the evidence was not material, and that its nondisclosure by the
> prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the Brady line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet Brady rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'"   United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation omitted).   Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie.   See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the Brady issues at stake here.").   The Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."   United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).   The Second Circuit also noted that Brady's applicability to suppression hearings was not "obvious" for plain error purposes.   United States v. Nelson, 193 F. App'x 47, 50 (2d Cir. 2006).

Before the Supreme Court issued its United States v. Ruiz decision, the United States Court of Appeals for the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that Brady applies to suppression hearings.   See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady

to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "Brady rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment." United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013)(acknowledging that "[w]hether Brady's disclosure requirements even apply at the motion to suppress stage is an open question")).  Although the United States Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea." United States v. Harmon, 871 F. Supp. 2d at 1151. The Tenth Circuit affirmed United States v. Harmon, in which the Court concluded that the United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of United States v. Ruiz to suppression hearings.  The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial.  The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing.  In United States v. Ruiz, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632 . . . .  Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the

> Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632 . . . .

United States v. Harmon, 871 F. Supp. 2d at 1169 (emphasis in original).  Accordingly, Brady does not require the United States to disclose impeachment evidence before suppression hearings.  See United States v. Harmon, 871 F. Supp. 2d at 1165-67.

### 3.      Evidence Must Be in the United States' Possession.

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'"  United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2.  On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case."  Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).  Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access."  United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'"  United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

## LAW REGARDING THE JENCKS ACT

In <u>Jencks v. United States</u>, 353 U.S. at 667, the Supreme Court held that a "criminal action must be dismissed when the government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672. In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671. Congress later codified <u>Jencks v. United States</u> in 18 U.S.C. § 3500. <u>See United States v. Kimoto</u>, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in <u>Jencks v. United States</u>, 353 U.S. 657 . . . .").

Section 3500 of Title 18 of the United States Code provides:

**(a)**   In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**   After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b). "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United

States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d 1224, 1232

(D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the

general statutory aim to restrict the use of such statements to impeachment."  Palermo v. United

States, 360 U.S. 343, 349 (1959).  The Jencks Act's purpose is "not only to protect Government

files from unwarranted disclosure but also to allow defendants materials usable for the purposes

of impeachment."  United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo

v. United States, 360 U.S. at 352).

> The Jencks Act defines statements as:
>
> **(1)**   a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> **(2)**   a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> **(3)**   a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act

if they are substantially verbatim."  United States v. Smith, 984 F.2d 1084, 1086 (10th Cir.

1993).  At least one district court within the Tenth circuit has distinguished interview notes from

reports that "embody only the agent's epitomization, interpretation, or impression of an

interview," finding that the latter are not producible under the Jencks Act.  United States v.

Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.).  In United States v. Lujan, the

Honorable Robert C. Brack, United States District Judge for the District of New Mexico,

explained that rough interview notes may be discoverable under the Jencks Act, when a

defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes

contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack held that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must, under 18 U.S.C. § 3500, preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses." 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); United States v. Harry, 2013 WL 684671, at *10 (D.N.M. 2013)(Browning, J.). To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). See United States v. Burton, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. 2015)(Browning, J.). The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements. See United States v. Smith, 984 F.2d at 1086. For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had met his burden and made a

- 65 -

prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before she testified, and the defense counsel moved for production of the notes.  See 984 F.2d at 1085-86.  Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  See 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant.  No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86).  The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for cross-examination at trial of the FBI agent who conducted the interview.  See No. CR 05-801 JB, Order at 1-2.  The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be given to the defendants after the agents testify at trial.  See United States v. Goxcon-Chagal, 2012 WL 3249473, at **2, 6 (D.N.M. 2012)(Browning, J.).  In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial.  See 760 F. Supp. 2d at 1164, 1167.

## THE NEED FOR PRACTICAL AND EFFECTIVE CRIMINAL DISCOVERY

In 1990, a state jury convicted Debra Milke of murdering her four-year-old son, Christopher.  See Milke v. Ryan, 711 F.3d 998, 1000 (9th Cir. 2013).  The state judge sentenced

her to death.  See Milke v. Ryan, 711 F.3d at 998.  The Honorable Alex Kozinski, Chief Judge

for the Ninth Circuit, described the trial as "a swearing contest between Milke and Phoenix

Police Detective Armando Saldate, Jr."  711 F.3d at 1000.  At the trial, Saldate testified that

Milke confessed to the murder; Milke vehemently protested her innocence and denied

confessing.  See 711 F.3d at 1000.  With no other witnesses, the state judge and jury believed

Saldate.  See Milke v. Ryan, 711 F.3d 998.  They were unaware, however, of one fact that might

have changed their minds: Saldate had a "long history of lying under oath and other

misconduct."  711 F.3d at 1000-01.  Specifically, Saldate had lied to a grand jury or a judge in

four cases, requiring state judges to throw out indictments or confessions.  See 711 F.3d at 1004.

In another four cases, "judges threw out confessions or vacated convictions because Saldate had

violated suspects' Miranda and other constitutional rights during interrogations, often

egregiously."  Milke v. Ryan, 711 F.3d at 1004.  Finally, Saldate's personnel file documented a

five-day suspension "for taking sexual liberties with a motorist he stopped and then lying to his

supervisors about it."  711 F.3d at 1011.  The file revealed that his "supervisors had caught him

in a lie and concluded that his credibility was compromised."  711 F.3d at 1006, 1012

(describing the report as showing that "Saldate has no compunction about lying during the course

of his official duties" and that he has "a willingness to abuse his authority to get what he wants").

The information about Saldate's misconduct was in the hands of the party responsible for

ensuring that justice is achieved -- the state.  Unfortunately, however, the state did not disclose

this information, despite its requirements under Brady and Giglio.  See Milke v. Ryan, 711 F.3d

at 1005 (describing how the state did not mention the evidence, even though an important

question in Milke's case was whether Saldate ignored Milke's request for an attorney).  "This

error resulted in a 'one-sided presentation of evidence' and 'impeded [the jury's] ability to fully

and fairly assess the credibility of both [Milke] and Saldate." Milke v. Ryan, 711 F.3d at 1005 (alterations in the original). More than that problem, however, the error resulted in Milke's death sentence and imprisonment on death row for twenty-two years. See Milke v. Ryan, 711 F.3d at 1001.[5]

The disclosure problem is not confined to the context of overzealous police officers closing murder cases. It reaches to all corners of the criminal justice system. Judges and scholars are increasingly recognizing the problem with blatant Brady violations. See Daniel S. Medwed, Brady's Bunch of Flaws, 67 Wash. & Lee L. Rev. 1533 (2010); David Keenan et al., The Myth of Prosecutorial Accountability After Connick v. Thompson: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct, 121 Yale L.J. Online 203 (2011). For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history. See United States v. Stevens, 2009 WL 6525926 (D.D.C. 2009)(Sullivan, J.). See Henry F. Schuelke III, Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in In re Special Proceedings, No. 1:09-mc-00198-EGS (D.D.C. March 15, 2012)("Stevens Report"). Special prosecutor Henry F. Schuelke III's blistering report found that the United States team concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to

---

[5]After the Ninth Circuit vacated Milke's conviction and gave Arizona the chance to re-try Milke, the Arizona Court of Appeals barred any re-trial in a scathing opinion that garnered the New York Times' attention. See Arizona: No Retrial for Woman Freed from Death Row, N.Y. Times (Dec. 11, 2014), http://www.nytimes.com/2014/12/12/us/arizona-no-retrial-for-woman-freed-from-death-row.html?_r_1. The Arizona Court of Appeals described the "long course of Brady/Giglio violations" as a "flagrant denial of due process" and a "severe stain on the Arizona justice system." Milke v. Mroz, 339 P.3d 659, 665-66, 668 (Ariz. Ct. App. 2014).

defend himself against false-statements charges.  See Stevens Report at 12.  Stevens lost his

Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later.  See

Carrie Johnson, Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR News (May 15,

2012),           http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-

stevens-case.  Schuelke based his 500-page report on a review of 128,000 documents and

interviews with prosecutors and FBI agents.  See Stevens Report at 12.  United States Attorney

General Eric Holder moved to vacate Stevens' conviction.  See Jerry Seper, Inquiry Slams

Prosecution of Stevens Corruption Case By Justice Department, The Washington Times (March

15, 2012).  The Department of Justice ("DOJ") subsequently "instituted a sweeping training

curriculum for all federal prosecutors, and made annual discovery training mandatory."  Mark

Memmott, Report Slams Sen. Stevens' Prosecutors, NPR News (March 15, 2012),

http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-sen-stevens-

prosecutors.

        As Milke v. Ryan and the Stevens Report reveal, prosecutors hold a tremendous amount

of power in criminal prosecutions, often more than the jury.  See Alex Kozinski, Criminal Law

2.0, 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, xxii (2015)(explaining that prosecutors often hold

more power "than jurors because most cases don't go to trial").  They are the ones with access to

the evidence, both inculpatory and exculpatory.  They can disclose it easier than anyone else can.

See  Scott H. Greenfield,  The Flood Gates Myth, Simple  Justice (Feb. 16,  2015),

http://blog.simplejustice.us/2015/02/16/the-flood-gates-myth/.  As one illustration, in Milke v.

Ryan, Milke discovered the impeachment evidence detailing Saldate's misconduct "only after a

team of approximately ten researchers in post-convictions proceedings spent nearly 7000 hours

sifting through court records."  711 F.3d at 1018.  The team worked eight hours a day for three

and a half months searching through the clerk of court's officers for Saldate's name in every criminal case file from 1982 to 1990.  See 711 F.3d at 1018.  It took another researcher another month to review motions and transcripts from each of those cases to find examples of Saldate's misconduct.  See 711 F.3d at 1018.  The Ninth Circuit concluded: "A reasonably diligent lawyer couldn't possibly have found these records in time to use them at Milke's trial."  711 F.3d at 1018.  The prosecutor was in the best position to give Milke the opportunity to effectively cross-examine Saldate and ensure that she had a fair trial.  Although Brady and Giglio require prosecutors to disclose exculpatory evidence to the defense, it is often extremely difficult for criminal defendants to know whether the prosecution is complying with this obligation.  Furthermore, prosecutors exert tremendous control over witnesses.

> They can offer incentives -- often highly compelling incentives -- for suspects to testify.  This includes providing sweetheart plea deals to alleged co-conspirators and engineering jail-house encounters between the defendant and known informants.  Sometimes they feed snitches non-public information about the crime so that the statements they attribute to the defendant will sound authentic.   And, of course, prosecutors can pile on charges so as to make it exceedingly risky for a defendant to go to trial.  There are countless ways in which prosecutors can prejudice the fact-finding process and undermine a defendant's right to a fair trial.

Kozinski, supra, at xxii (internal footnotes omitted).

To address this problem, Holder put together a working group of senior prosecutors, law enforcement representatives, and information technology professionals to improve the DOJ's discovery practices.  See Hearing on the Special Counsel's Report on the Prosecution of Senator Ted Stevens at 3-4, Committee on the Judiciary United States Senate (March 28, 2012)("Hearing").  The DOJ then issued guidelines that federal prosecutors must follow in complying with their discovery obligations in criminal cases.  See Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Issuance of Guidance and Summary of Actions Taken in Response to the Report of the Department of Justice Criminal

Discovery and Case Management Working Group (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Requirement for Office Discovery Policies in Criminal Matters (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), https://www.justice.gov/dag/memorandum-department-prosecutors.  These memoranda are intended to establish a methodical approach to discovery obligations and to address inconsistent discovery practices among prosecutors within the same office.  See Hearing at 4-5.  Although these memoranda are "not intended to have the force of law or to create or confer any rights, privileges or benefits," DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations.  Later in January, 2010, Deputy Attorney General David W. Ogden appointed a long-serving career prosecutor as the DOJ's first full-time National Criminal Discovery Coordinator to lead and oversee all DOJ efforts to impose disclosure practices.  See Hearing at 4.

Many courts and scholars, however, have argued that training prosecutors is insufficient to fully combat discovery abuse.  Instead of relying on prosecutors alone to disclose all potentially exculpatory evidence, they have suggested that judges take a more active role in preventing Brady and Giglio violations.  See United States v. Jones, 686 F. Supp. 2d 147, 149 (D. Mass. 2010)(Wolf, J.)(expressing the district court's skepticism that prosecution-initiated training sessions, in the absence of strong judicial action, would effectively curb Brady violations).  Chief Judge Kozinski has asserted that "[t]here is an epidemic of *Brady* violations

abroad in the land.  Only judges can put a stop to it."[6]  United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013)(Kozinski, C.J., dissenting).  Two years after Chief Judge Kozinski described the "epidemic of *Brady* violations," he observed that his use of the phrase "caused much controversy but brought about little change in the way prosecutors operate."  Kozinski, supra, at viii (citing Center for Prosecutor Integrity, An Epidemic of Prosecutor Misconduct, White Paper (Dec. 2013),         available         at         http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutor-Misconduct.pdf.  The reason that there was little action on his charge may have been that neither he nor anyone else has done what needs to be done to substantiate his claim with empirical data.  Nonetheless, he proposed some additional reforms, such as requiring open-file discovery.  See Kozinski, supra, at xxvi-vii.  North Carolina has adopted such a rule by statute that requires courts to order the "State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant."  N.C. Gen. Stat. § 15A-903(a)(1) (2011).  The DOJ, however, has opposed such a law, instead advocating that prosecutors should remain in charge of deciding what evidence will be material to the defense.  See Video Recording: Ensuring that Federal Prosecutors Meet Discovery Obligations: Hearing on S. 2197 Before the S. Judiciary Comm., 112th Cong. (2012)(on file with S. Judiciary Comm.)(statement of James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice opposing the bill: "[I]n reacting to the *Stevens* case, we must not let ourselves forget . . . true improvements to discovery practices will come from prosecutors and agents . . . . In other words, new rules are unnecessary."); Eric Holder Jr., Preface, In the Digital Age,

---

[6]Neither Chief Judge Kozinski nor anyone else has empirically shown that an epidemic of Brady violations is occurring.  The Court does not see an epidemic of Brady violations.  The Assistant United States Attorneys appear to take their duties very seriously.

<u>Ensuring that the Department Does Justice</u> iii, 41 Geo. L.J. Ann. Rev. Crim. Proc. (2012).  Chief

Judge Kozinski contends that effectively deterring <u>Brady</u> and <u>Giglio</u> violations means that

prosecutorial offices across the country must establish firm open-file policies to ensure

compliance.[7]  <u>See</u> Kozinski, <u>supra</u>, at xxviii.

---

[7]In New Mexico, the New Mexico Legislature has not enacted an open-file policy for its state prosecutors, nor does the United States Attorney's Office -- according to an Assistant United States Attorney -- operate under an open-file policy.  <u>See</u> <u>United States v. Hykes</u>, Tr. at 12:7-15 (Hurtado)("I want to affirm clearly in open Court and on the record that there is no open file policy that the U.S. Department of Justice or the United States Attorney's office follows either in this district or across the entire United States.").  Despite the Assistant United States Attorney's contention in that case, however, the United States Attorney's Office has previously represented to the Court that the Albuquerque office operates under such a policy.  <u>See</u> <u>United States v. Rodella</u>, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)(Browning, J.)(stating that the United States Attorney's Office for the District of New Mexico has "consistently represented that they maintain an 'open file policy'").  The Court recognized that, despite the United States' representations that it maintains an open-file policy, its "conduct before the Court suggests otherwise."  <u>United States v. Rodella</u>, 2015 WL 711931, at *39 n.12.

These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more.  In <u>United States v. Roybal</u>, No. CR 12-3182 JB, 2014 WL 4748136 (D.N.M. Sept. 4, 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps.  *See* 2014 WL 4748136, at *1.  The United States did not give a reason for denying the defendants' request for the information, other than the law did not require it to produce the documents.  *See* 2014 WL 4748136, at *4.  Again in <u>United States v. Folse</u>, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information.  <u>See</u> <u>United States v. Folse</u>, No. CR 14-2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75). . . .  By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice.  In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice.  Defendants are often left in the dark, not knowing what information the United States has in its possession.  While Courts and Congress have placed requirements on what information the United States must disclose, these requirements are a bare minimum and not a recommendation.  Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment.  The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required.  After the

While these reforms may indeed decrease the number of Brady and Giglio violations that occur, the Court cannot unilaterally impose those requirements upon attorneys.  Judges have several other tools at their disposal, however, and the Court uses several of these tools to ensure compliance with Brady and Giglio in the District of New Mexico.  First, while the Court must rely heavily on the prosecutors to do their job under Brady and Giglio, the Court does more than rely solely on the prosecutors to comply with their obligations.  See Kozinski, supra, at xxxiii ("*Brady* is not self-enforcing; failure to comply with *Brady* does not expose the prosecutor to any personal risk."); Imbler v. Pachtman, 424 U.S. 409, 430, 431 n.34 (1976)(noting that prosecutors are absolutely immune for "activities [that are] intimately associated with the judicial phase of the criminal process," including the willful suppression of exculpatory evidence).  The District of

_____

United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- *i.e.* the appearance of justice.  The nation may not be well served when a defendant is left wondering whether things would have been different if the United States had disclosed all of the information that it possessed.  By refusing to disclose all available information, the United States may create the perception that it obtained a conviction through gamesmanship and concealment, i.e., through sharp practices, and not through the pursuit of truth and justice.  This perception undermines the pillars of our criminal justice system.  The Court will continue to faithfully follow the law and will not require the United States to disclose any information which the law does not require it to disclose.  The Court, however, cautions the United States that, if it continues its pattern of refusing to disclose available information to criminal defendants, it is undermining the representation that it routinely makes that it has an open file policy and that the Court will take that purported policy with a grain of salt.  That representation, which is not completely accurate, and the unclear practices of the Assistant United States Attorneys undermine the administration of justice and the public's perception of the justice system. It also puts its convictions unnecessarily at risk, if the Court is wrong that the United States did not have to produce the documents. The United States is a key player in the adversarial system; as the people's representative, it too plays a fundamental role in ensuring the appearance of justice.

United States v. Rodella, 2015 WL 711931, at *39.  It appears that the United States has finally abandoned its representations that it has an open-file policy.

New Mexico Magistrate Judges enter orders at the beginning of cases directing prosecutors to comply with those obligations by disclosing documents and objects, reports and tests, expert witness opinions, and all relevant material that Brady and Giglio require.  If courts do not enter an order requiring prosecutors to comply with Brady and Giglio, the court lacks the power to sanction attorneys, because those attorneys will not have violated any court-imposed obligations.  See Henry F. Schuelke III, supra, at 507-510.  By entering such orders, the Court can hold prosecutors personally responsible for failures to disclose information.

Second, when prosecutors hide Brady and Giglio material, courts can name the offending prosecutors in their judicial opinions.  One author terms this technique "public shaming."  Adam M. Gershowitz, Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct, 42 U.C. Davis L. Rev. 1059 (2009).  Naming prosecutors' names can serve as a unique tool to encourage compliance with a prosecutor's disclosure obligations.  Prosecutors will know that non-compliance can expose them to embarrassment in front of their friends and colleagues.  See Jenia Iontcheva Turner, Policing International Prosecutors, 45 N.Y.U. J. Int'l L. & Pol. 175, 229 (2012)("The court's judgment condemning particular actions of prosecutors as unlawful can serve as a potent deterrent for most prosecutors, who would not like to be called out publicly by a court for failing in their obligation.").  While the Court is usually reluctant, in both civil and criminal cases, to name the attorneys it sanctions, prosecutors run the risk that the Court may, depending on the egregiousness of a violation, believe that more than a sanction is necessary.

Finally, several scholars have endorsed Professor Jason Kreag's proposal that judges engage in a formal colloquy with the prosecutor on the record during pretrial hearings.  See Jason Kreag, The Brady Colloquy, 67 Stan. L. Rev. Online 47 (2014); Kozinski, supra, at xxxiv (endorsing Kreag's colloquy); Adam M. Samaha & Lior Jacob Strahilevitz, Don't Ask, Must

Tell -- And Other Combinations, 103 Cal. L. Rev. 919, 984 n.296 (2015).  Kreag suggests that

trial judges routinely ask a series of questions such as:

1. Have you reviewed your file, and the notes and file of any prosecutors who handled this case before you, to determine if these materials include information that is favorable to the defense?

2. Have you requested and reviewed the information law enforcement possesses, including information that may not have been reduced to a formal written report, to determine if it contains information that is favorable to the defense?

3. Have you identified information that is favorable to the defense, but nonetheless elected not to disclose this information because you believe that the defense is already aware of the information or the information is not material?

4. Are you aware that this state's rules of professional conduct require you to disclose all information known to the prosecutor that tends to be favorable to the defense regardless of whether the material meets the *Brady* materiality standard?

5. Now that you have heard the lines of cross-examination used by the defense and have a more complete understanding of the theory of defense, have you reviewed your file to determine if any additional information must be disclosed?

Kreag, supra, at 50-51 (internal footnotes omitted).  Kreag contends that the formality of facing a

judge on the record impresses upon prosecutors the need to scrupulously comply with their

disclosure obligations.  See Kreag, supra, at 49.  He further argues that the colloquy will require

prosecutors to explain why they are not disclosing certain information at the time they decide not

to disclose that information, instead of asking for an explanation years later when the non-

disclosure comes to light.  See Kreag, supra, at 53-54.

The Court agrees that some form of pretrial questioning will increase compliance with

Brady and Giglio.  Despite this agreement, the Court believes that the formal colloquy that Kreag

proposes is not only unnecessary, but also somewhat impractical for district judges that see

hundreds of criminal cases a year.  Because the District of New Mexico sees more felony cases

than any other federal district in the country,[8] and more criminal cases than most courts in the

country, the Court has developed professional relationships with the Assistant United States

Attorneys who appear before it on a regular basis.  See Criminal Cases Commenced, by Number

of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015,

JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-

caseload-tables (listing New Mexico as having the highest number of criminal cases involving

felony defendants in the nation).   Asking Assistant United States Attorneys whether they

intentionally refused to disclose exculpatory information can appear derogatory and insulting to

attorneys who frequently appear before the Court.  See Radley Balko, Judge Says Prosecutors

Should Follow Law.   Prosecutors Revolt., Wash. Post. (March 7, 2014), http://

www.washingtonpost.com/news/the-watch/wp/2014/03/07/judge-says-prosecutors-should-

follow-the-law-prosecutors-revolt (describing how a prosecutor opposed the Arizona Supreme

Court's recommendation that Arizona adopt an ethical rule to ensure that prosecutors disclose

new evidence of a potential wrongful conviction, in part because he was insulted by the

suggestion that an ethical guideline was needed to encourage him to do what he said he would do

as a matter of course).  Kreag concedes that "some prosecutors might be insulted by having to

answer these or similar questions from the court, believing that the questions themselves amount

---

[8]In addition to seeing more felony cases than other courts, the District of New Mexico
consistently sees more criminal cases than most other courts in the country.  See Criminal Cases
Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods
Ending   March   31,   2015   and   2016,   JNET,   Criminal   Caseload   Tables,
http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables   ("Criminal
Filings").  In the 12-Month Period ending March 21, 2016, alone, 4,641 criminal cases were filed
in the District of New Mexico.  See Criminal Filings at 1.  Only Arizona, with 5,349, and Texas'
Southern and Western Districts, with 6,128 and 5,899, respectively, saw more criminal filings.
See Criminal Filings at 1.  In comparison, 115 criminal cases were filed in the District of Rhode
Island, 170 were filed in Vermont, 135 were filed in the Northern District of Mississippi, 141
were filed in the Western District of Wisconsin, and 89 were filed in the Eastern District of
Oklahoma.  See Criminal Filings at 1.

to an accusation."  Kreag, supra, at 56.  The Court agrees with this assessment.  The Court has known many of these lawyers for years; there is no need to insult them with questions about whether they have complied with their ethical duties that it does not ask of defense lawyers or civil lawyers.

Moreover, the Court can accomplish the same goals that the colloquy seeks to accomplish by getting assurances at a pretrial hearing that the United States has complied with its duty. Merely holding a hearing or a pretrial conference where the United States Attorney knows that he or she must answer to the Court about discovery issues, and what has been produced, heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court.[9]  The Court can therefore "signal to young prosecutors [] the importance the judge places on enforcing a prosecutor's ethical and *Brady* obligations" by holding a hearing or pretrial conference, and asking about discovery issues, without running through a standardized and potentially insulting checklist.  Kreag, supra, at 54.  Second, a hearing or pretrial conference does more than demonstrate the seriousness of the situation.  Like the colloquy, it also personalizes the prosecutor's decision not to disclose.  A hearing or pretrial conference requires prosecutors to acknowledge that they made the non-disclosure decision, and that they are responsible for providing an explanation for that non-disclosure.  Furthermore, the hearing emphasizes -- without having to say it -- that they may be sanctioned for any misrepresentations they make about Brady and Giglio material.  This

---

[9]Those professors and judges who have endorsed the formal colloquy do not hear criminal cases at the district court level, especially with the frequency that the Court does.  See Kozinski, supra; Kreag, supra.  The District of New Mexico sentences hundreds more criminal defendants than judges in most other districts.  A formal colloquy is not always practical in this context.

accountability -- and threat of sanctions for making misrepresentations to the Court -- increases disclosure on the front-end without the need for "public shaming" on the back end if the Court later discovers a Brady or Giglio violation.  The Court agrees that some of Kreag's suggested questions may be useful in some hearings or pretrial conferences.  Other situations, however, call for more pointed and probing questions.  Moving away from a checklist of questions gives judges the flexibility to get to the point more quickly and easily, to ask specific questions rather than general ones, and to avoid impairing its working relationship with United States Attorneys and the assistants in the meantime.  Finally, holding a hearing or pretrial conference encourages prosecutors to review their notes and to effectively prepare a reason for non-disclosure early in the proceedings.  Accordingly, while asking some of Kreag's questions may be helpful, the Court can more practically curb Brady and Giglio violations by asking questions tailored to the circumstance rather than going through a standardized formal checklist.

In sum, the Court is not comfortable with engaging in a colloquy with an Assistant United States Attorney like he or she is a defendant.  While no one wants to admit this fact, the truth is that, if the DOJ prosecutors do not do their duties under Brady and Giglio, the system is in trouble.  The Court, the defense bar, and the nation, to a great extent, trust them.  They are, therefore, entitled to respect, not suspicion, mistrust, or hostility, until they conduct themselves in a manner that is unprofessional.  Sometimes more vigilance is achieved in a respectful environment than one where the Court asks the lawyer: "Have you been ethical today?"

One additional check that the Court requires of prosecutors is to disclose officers' and investigators' notes as "statement[s]" within the meaning of the Jencks Act.  United States v. Harry, 2013 WL 684671, at *1 (D.N.M. 2013)(Browning, J.).  As explained above, some courts -- including the Court -- have concluded that an officer's interview notes are "statement[s]" that

the Jencks Act requires the United States to disclose.  18 U.S.C. § 3500.  See United States v. Harry, 2013 WL 684671, at *11-12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses . . . ."); United States v. Tarango, 760 F. Supp. 2d at 1164, 1167 (requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial); United States v. Cooper, 283 F. Supp. 2d at 1238 (noting that rough interview notes may be discoverable under the Jencks Act); United States v. Smith, 984 F.2d at 1086 ("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).  Officers then maintain these notes pursuant to various standards and protocols.  See United States v. Harrison, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975); United States v. Lujan, 530 F. Supp. 2d at 1267 (stating that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500).  Officers then use their notes as the basis for their reports.  When officers write their reports, however, they may exclude certain information that does not help the prosecution.  These reports are then placed in a prosecutor's file, but the notes are not.  To ensure that any impeachment information is disclosed, the Court requires prosecutors to disclose the investigating officer's notes as Jencks material after the United States' witness testifies at trial.  This disclosure could reveal information that conflicts with the officer's report, serving as valuable impeachment evidence.  The more often that district judges require prosecutors to disclose a testifying officer's notes, the more care officers will take to ensure that

their reports reflect their notes and accurately summarize the events leading to an arrest.  Even if some courts resist requiring such disclosure, see United States v. Lujan, 530 F. Supp. 2d at 1266, cases are randomly assigned to different judges.  The threat of being assigned to a judge who requires disclosure may incentivize officers to include all exculpatory and impeachment evidence in their formal report.  Additionally, even if a prosecutor's file omits the officer's notes, courts must require prosecutors to disclose exculpatory information in officers' notes under Brady.  See Kyles v. Whitley, 514 U.S. at 437 (placing an affirmative obligation on prosecutors to learn of exculpatory evidence in others' possession); United States v. Padilla, 2011 WL 1103876, at *5 (D.N.M. 2011)(Browning, J.)("The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment."); United States v. Burke, 571 F.3d at 1054 (holding that the "belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an earlier disclosure would have created a reasonable doubt of guilt").

The Court recently reiterated its approach to criminal discovery in United States v. Hykes, which concerned a defendant's motion filed pursuant to Giglio, requesting that the United States "disclose certain pertinent information pertaining to [police officers testifying at his suppression hearing] as the information is relevant to impeachment."  United States v. Hykes, 2016 WL 1730125, at *2 (D.N.M. 2016)(Browning, J.)(internal quotation marks and citations omitted).  See United States v. DeLeon, Sealed Memorandum Opinion and Order at 97-111, filed January 3, 2017 (Doc. 809).  The Defendant in United States v. Hykes argued that

> the Supreme Court's Giglio decision requires the government to disclose evidence affecting a government witness' credibility.  [Hykes] states that he "has a good faith basis to believe that the internal personnel files of some o[r] all of these officers contain information that may potentially be properly used for impeachment."  Hykes asserts that "witnesses have revealed that the information relied upon by officers to arrest Mr. Hykes was false.  [Hykes] contends that this

false information led the arresting officers to arrest him, beat him, and search him without warrants. [Hykes] states that, because the Court will determine whether Hykes' Motion to Suppress is well-founded, the officers' credibility is "of critical import for this Court's ultimate decision Hykes reasons that the officers' personnel files will reveal whether the officers are trustworthy. Hykes argues that credibility information is especially relevant in this case, where the only witnesses against him are police officers, so "anything that goes to their credibility is exculpatory and admissible."

2016 WL 1730125, at **2-3 (citations omitted). The United States contested the discovery request for the officers' personnel files in United States v. Hykes, because

the government's review and determination is controlling unless the defense provides grounds to believe there is impeachment information in the items to which the defense seeks access. . . . Hykes must "make a particularized showing of what information he was seeking or how it would be material" rather than making broad discovery demands.

2016 WL 1730125, at *4 (citations omitted).

Accordingly, the Court held in United States v. Hykes that

Hykes is not sending the United States on a fishing expedition. Hykes demonstrates that the officers' personnel files may contain impeachment evidence. As support, Hykes points to the officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with Hykes.

2016 WL 1730125, at *20. Cf. United States v. Lafayette, 983 F.2d 1102 (D.C. Cir. 1993)(affirming the denial of the appellants' request for an officer's personnel file, because "nothing in appellants' brief informs us why they have any reason to believe that the personnel files would provide any useful evidence whatsoever"); United States v. Andrus, 775 F.2d 825, 843 (7th Cir. 1985)(noting that the defendant was "not entitled to the personnel files of the law enforcement witnesses without even a hint that impeaching material was contained therein"). The Court then reiterated that Hykes had requested specific information contained within the personnel files and that thus "the United States must search the personnel files of the testifying

officers pursuant to the Court's order at the hearing, examining the list of documents that Hykes

specifically requests in his <u>Giglio</u> Motion."  2016 WL 1730125, at *20.

United States v. Hykes did not deviate from the Court's general philosophy regarding the

administration of discovery under <u>Giglio</u>, <u>Brady</u>, the Jencks Act, and rule 16.  Instead, the Court

in <u>United States v. Hykes</u> merely maintained that

> if the United States uncovers any such exculpatory material, it must produce any
> material evidence in time for its effective use at trial.  <u>See</u> <u>United States v. Coppa</u>,
> 267 F.3d 132, 144 (2d Cir. 2001)("[W]e reiterate the longstanding constitutional
> principle that as long as a defendant possesses *Brady* evidence in time for its
> effective use, the government has not deprived the defendant of due process of
> law.").

<u>United States v. Hykes</u>, 2016 WL 1730125, at **19-20.  Where the Defendant demonstrated that

there was particular impeachment material in the officers' personnel files, the Court ordered the

United States to review the files for the requested information in accordance with its continuing

discovery and disclosure obligations.  <u>United States v. Hykes</u>, 2016 WL 1730125, at **20-21. ).

<u>See</u> <u>United States v. DeLeon</u>, Sealed Memorandum Opinion and Order at 97-111, filed January

3, 2017 (Doc. 809).

## <u>LAW REGARDING THE DISCLOSURE OF AN INFORMANT'S IDENTITY</u>

The Supreme Court, in 1957, held that the government has a privilege "to withhold from

disclosure the identity of persons who furnish information of violations of law to officers

charged with enforcement of that law."  <u>Roviaro v. United States</u>, 353 U.S. at 59.  In that case,

the Supreme Court considered whether the district court

> committed reversible error when it allowed the Government to refuse to disclose
> the identity of an undercover employee who had taken a material part in bringing
> about the possession of certain drugs by the accused, had been present with the
> accused at the occurrence of the alleged crime, and might be a material witness as
> to whether the accused knowingly transported the drugs as charged.

Roviaro v. United States, 353 U.S. at 55.  The defendant in Roviaro v. United States was charged with selling "heroin to one 'John Doe'" and "on the same date and in the same city he 'did then and there fraudulently and knowingly receive, conceal, buy and facilitate the transportation and concealment after importation of . . . heroin, knowing the same to be imported into the United States contrary to law . . . .'"  353 U.S. at 55.

At trial, "the Government relied on the testimony of two federal narcotics agents, Durham and Fields, and two Chicago police officers, Bryson and Sims, each of whom knew" the defendant, and who had "met at 75th Street and Prairie Avenue in Chicago with an informer described only as John Doe."  Roviaro v. United States, 353 U.S. at 56.  At this point, one of the officers -- Bryson -- hid in John Doe's vehicle's trunk as John Doe drove away, and, thereafter, overheard a conversation between the defendant and John Doe after John Doe stopped the vehicle and allowed the defendant to enter.

> He heard [the defendant] greet John Doe and direct him where to drive.  At one
> point, [the defendant] admonished him to pull over to the curb, cut the motor, and
> turn out the lights so as to lose a "tail.  "He then told him to continue "further
> down."  [The defendant] asked about money Doe owed him.  He advised Doe that
> he had brought him "three pieces this time."  When Bryson heard Doe being
> ordered to stop the car, he raised the lid of the trunk slightly.  After the car
> stopped, he saw [the defendant] walk to a tree, pick up a package, and return
> toward the car.  He heard [the defendant] say, "Here it is," and "I'll call you in a
> couple of days."

353 U.S. at 57.  Upon investigation, the officers discovered that the package the defendant left under the tree was heroin, and they then arrested the defendant at his home.  See 353 U.S. at 57. The district court's decision that the Supreme Court reviewed progressed as follows: "Before trial, petitioner moved for a bill of particulars requesting, among other things, the name, address and occupation of 'John Doe.'  The Government objected on the ground that John Doe was an informer and that his identity was privileged.  The motion was denied."  353 U.S. at 55.  Further,

"[d]uring the trial John Doe's part in the charged transaction was described by government witnesses, and counsel for petitioner, in cross-examining them, sought repeatedly to learn John Doe's identity.  The court declined to permit this cross-examination and John Doe was not produced, identified, or otherwise made available."  353 U.S. at 55.  The testifying witnesses explained that John Doe was an informant and special employee.  See 353 U.S. at 55, 56 n.3.

The Supreme Court thus took up the issue -- "the propriety of the nondisclosure of the informer's identity," because, obviously, John Doe's identity went undisclosed -- and explained that "the purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."  353 U.S. at 59.  Yet, the Supreme Court explained, the privilege is not absolute, and, where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."  353 U.S. at 60-61.  Indeed, the Supreme Court also held:

> The scope of the privilege is limited by its underlying purpose.  Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged.  Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

Roviaro v. United States, 353 U.S. at 60-61.  The Supreme Court then further indicated that the desirability of calling the informant as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide.  See 353 U.S. at 64.  Accordingly, when an informant is a "participant in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required.  353 U.S. at 65.

The standard the Supreme Court thus announced for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is "not fixed"; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors."  353 U.S. at 62.  In the specific context of Roviaro v. United States, the Supreme Court was concerned with the scenario where the informant "helped to set up the criminal occurrence and had played a prominent part in it.  [And h]is testimony might have disclosed an entrapment."  353 U.S. at 64.  The Supreme Court thus concluded that the district court's failure to order disclosure of the informant's identity, who did not testify at trial, "in the face of repeated demands by the accused for his disclosure," was prejudicial error. 353 U.S. at 64-65.

The Supreme Court has, recently, added a gloss to its holding in Roviaro v. United States by distinguishing Roviaro v. United States in a case where the state did not disclose the status of a testifying witness as a CI to the defendant before trial, because, the State argued, "disclosure [of an informant's identity] is not automatic," and, "[c]onsequently, it was [defendant's] duty to move for disclosure of otherwise privileged material," pursuant to the standard in Roviaro v. United States.  Banks v. Dretke, 540 U.S. 668, 697-98 (2004).  In Banks v. Dretke, a postconviction proceeding, the Supreme Court was considering a murder where "Bowie County Deputy Sheriff Willie Huff, lead investigator of the death, learned from two witnesses that [the victim] had been in the company of petitioner, 21-year-old Delma Banks, Jr."  540 U.S. at 676.  Apparently, "Huff received a call from a confidential informant reporting that 'Banks was coming to Dallas to meet an individual and get a weapon.'"  540 U.S. at 676.  Banks was then apprehended, interrogated, and charged with the murder.  See 540 U.S. at 676.  Banks, at a pretrial hearing, thus sought information concerning that "confidential informant" who had

tipped Huff about Banks' trip to Dallas, to which the State explained it "will, without necessity

of motions provide you with all discovery to which you are entitled." 540 U.S. at 676.  At trial, a

man named "Robert Farr was a key witness for the prosecution," the paid informant who tipped

Huff about Banks' movements, and accompanied Banks to Dallas.  540 U.S. at 678.  Farr

testified, however, that he had not served as a paid confidential informant.  See 540 U.S. at 678.

In sum, Banks was convicted, and over the course of his postconviction appeals, maintained that

Farr's status as a confidential informant was material pursuant to Brady.  The Supreme Court, in

dicta after already having overturned the conviction, held:

> We need not linger over this argument.  The issue of evidentiary law in *Roviaro*
> was whether (or when) the Government is obliged to reveal the identity of an
> undercover informer the Government does not call as a trial witness. . . .  The
> Court there stated that no privilege obtains "[w]here the disclosure of an
> informer's identity, or of the contents of his communication, is relevant and
> helpful to the defense of an accused." . . . .  Accordingly, even though the
> informer in *Roviaro* did not testify, we held that disclosure of his identity was
> necessary because he could have "amplif[ied] or contradict[ed] the testimony of
> government witnesses.

Banks v. Dretke, 540 U.S. at 697-98.  Thus, according to the Supreme Court:

> Here, the State elected to call Farr as a witness.  Indeed, he was a key witness at
> both guilt and punishment phases of Banks's capital trial.  Farr's status as a paid
> informant was unquestionably "relevant"; similarly beyond doubt, disclosure of
> Farr's status would have been "helpful to [Banks's] defense." . . .  Nothing in
> *Roviaro*, or any other decision of this Court, suggests that the State can examine
> an informant at trial, withholding acknowledgment of his informant status in the
> hope that defendant will not catch on, so will make no disclosure motion.

Banks v. Dretke, 540 U.S. at 698.  The Supreme Court continued:

> In summary, Banks's prosecutors represented at trial and in state postconviction
> proceedings that the State had held nothing back.  Moreover, in state
> postconviction court, the State's pleading denied that Farr was an informant. . . .
> It was not incumbent on Banks to prove these representations false; rather, Banks
> was entitled to treat the prosecutor's submissions as truthful.  Accordingly, Banks
> has shown cause for failing to present evidence in state court capable of
> substantiating his Farr *Brady* claim.

Banks v. Dretke, 540 U.S. at 698.  In light of Banks v. Dretke, then, courts are left to wonder whether, if at all, Roviaro v. United States applies in the case of disclosure of testifying witnesses.  See Banks v. Dretke, 540 U.S. at 697-98 ("The issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does not call as a trial witness.").

As for an answer to that specific question of timing, the Court first looks to the specific principles originally articulated by the Supreme Court in Roviaro v. United States.  In that regard, at least as to non-testifying witnesses, "[t]he Tenth Circuit's take on this analysis is well-known."  United States v. Padilla, 2010 WL 4337819, at *7 (D.N.M. 2010)(Browning, J.).  "Anonymity of informants encourages communications to law enforcement officers."  Usery v. Local Union 720, Laborers' Int'l Union of N. Am., AFL-CIO, 547 F.2d 525, 527 (10th Cir. 1977).  Cf. United States v. Brantley, 986 F.2d 379, 383 (10th Cir. 1993)("Nor must the government supply the defendant with information about an informer when the individual introduces suspected traffickers to narcotics agents."); United States v. Ortiz, 804 F.2d 1161, 1166 (10th Cir. 1986)("We have ruled previously that the government is not required to supply information about an informer to a defendant when the informer merely provides the initial introduction.").  The Tenth Circuit's take on the analysis thus places the burden on the defendant to show that the informant's possible aid to the defendant outweighs the public's interest in protecting the flow of information, which the confidentiality of the informant's identity facilitates:

> The disclosure of a confidential informant's identity involves balancing the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense.  In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony.  Where it is clear that

> the informant cannot aid the defense, the government's interest in keeping secret
> his identity must prevail over the defendant's asserted right of disclosure. A
> defendant seeking disclosure has the burden of proof, and we review the district
> court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted). See

United States v. McKenzie, 2010 WL 597971, at **3-4 (D.N.M. 2010)(Browning, J.)(citing

United States v. Sinclair, 109 F.3d at 1538). "[T]he defendant must present more than mere

speculation about the possible usefulness of an informant's testimony." United States v.

Moralez, 908 F.2d at 567. In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his
> testimony might be relevant to the defendant's case and justice would be best
> served by disclosure[, but d]isclosure of an informant is not required . . . where
> the information sought from the informer would be merely cumulative, or where
> the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d 512, 517 (10th Cir. 1986)(internal citations omitted). See

United States v. Moralez, 908 F.2d at 567. Disclosure of a CI, therefore, involves a balancing

act of many competing interests.

The Court has required the United States to disclose a CI's identity where the CI "was

integrally involved in the criminal transaction[,] . . . observed the criminal transaction[,] and was

not a mere bystander." United States v. Aguilar, 2010 WL 2977708, at *5 (D.N.M.

2010)(Browning, J.). In United States v. Aguilar, the defendant, Aguilar, was one of three

defendants charged with a conspiracy to traffic in cocaine, stemming from a transaction between

his two co-defendants and a government CI. See 2010 WL 2977708, at *1. In relation to the

first factor that the Supreme Court identified in Roviaro v. United States -- the crime charged --

the Court noted that "the crimes charged in this case are relatively egregious -- conspiracy,

possession with intent to distribute cocaine, and possessing a gun while committing the other

crimes." 2010 WL 2977708, at *6. As to the second and third Roviaro v. United States factors -

- 89 -

- the possible defenses and the possible significance of the informer's testimony -- it appeared that the defendant intended to argue that he did not know his alleged co-conspirator possessed cocaine or that the drug transaction was going to occur, and the Court found that, given the CI was present during the crime, the CI's testimony "could be highly significant" to the defenses:

> The [CI] was present in the car with Mirabal, Aguilar, and Garner, and would be in a unique position to testify to what conversations, if any, occurred in the car and whether Aguilar took part in them. After the four individuals arrived at the [CI]'s residence, again, the [CI] would be in a unique position to testify whether it appeared that Aguilar had any idea that the bag Mirabal retrieved from the car contained cocaine. Once the three Defendants and the [CI] were inside the [CI]'s residence, the [CI] was able to observe Aguilar's demeanor and whether he actively participated in the drug transaction. The [CI] could testify as to where Aguilar was and what he did while the [CI] made the alleged drug transaction with Mirabal.

2010 WL 2977708, at *6. Additionally, the Court noted that the CI might provide relevant information which no other witness could, because Aguilar's "alleged co-conspirators might try to push blame away from themselves and on to Aguilar, and Villegas, a law-enforcement officer, might tend to be biased toward the United States." 2010 WL 2977708, at *6. The Court thus granted Aguilar's motion and ordered the United States to disclose the CI's identity. See 2010 WL 2977708, at *6. The Court also incorporated the following protective order in its decision:

> Ms. Johnson[, Aguilar's attorney,] is ordered that she will not disclose the identity of the CI to anyone -- except the defense investigator she retains in this case -- unless and until she seeks further leave of the Court. Any information that the United States provides to Ms. Johnson regarding the CI may be discussed only with the investigator and the Assistant United States Attorneys who disclosed it. Finally, any information the United States provides must be returned once this case is closed. These requirements should minimize the danger, if any, to the CI and perhaps permit law-enforcement to use him in a covert capacity again in the future, if they so desire.

2010 WL 2977708, at *6. See also United States v. Rivas, 26 F. Supp. 3d 1082 (D.N.M. 2014)(Browning, J.).

As to the issue of timing for the disclosure of the identity of CIs who plan to testify at

- 90 -

trial, one district court has explained:

> With respect to [testifying] informants, several circuits have adopted the rule that pretrial disclosure of informants' identities is not necessary where they will testify at trial. *E.g., United States v. Perkins,* 994 F.2d 1184, 1190 (6th Cir. 1993). That rule is gaining ground in this circuit. *See DiBlasio v. Keane,* 932 F.2d 1038, 1043 (2d Cir. 1991); *United States v. Leonard,* 817 F. Supp. 286, 302 (E.D.N.Y. 1992). <u>This court agrees with these authorities, that when no more particularized need for disclosure is averred by defendants, the testimony of a confidential informant at trial obviates the need for pretrial disclosure.</u> The Jencks Act, 18 U.S.C. § 3500, prescribes the time the government must provide relevant information about testifying witnesses. *See United States v. Valerio,* 737 F. Supp. 844, 846 (S.D.N.Y. 1990).

<u>United States v. Murgas</u>, 967 F. Supp. 695, 712 (N.D.N.Y. 1997)(Munson, S.J.)(emphasis added)(discussing informant who did not testify, but whose identity was not disclosed and was relevant to the defendant's entrapment defense). See, e.g., <u>United States v. Ford</u>, 2016 WL 483871, at *4-5 (D.D.C. 2016)(Friedman, J.)(discussing different standards for non-testifying witnesses -- where <u>Roviaro v. United States</u> governs -- and testifying witnesses -- where the district court, without expressly disavowing the potential import of <u>Roviaro v. United States</u>, explained are generally governed by <u>Brady</u>, <u>Giglio</u>, rule 16, and the Jencks Act). The Court agrees that there is a difference between testifying CIs and non-testifying CIs. It is clear that the <u>Roviaro v. United States</u> analysis applies to non-testifying CIs. The issues are whether <u>Roviaro v. United States</u> also applies to testifying CIs, whether the United States has an absolute right not to disclose a CI's identity when they testify at trial, or whether some combination of <u>Brady</u>, <u>Giglio</u>, and rule 16 covers testifying CIs.

The law regarding the application of <u>Roviaro v. United States</u> in the Tenth Circuit, specifically regarding the timing of the disclosure of a testifying CI, is unsettled. In <u>United States v. Pennick</u>, the issue was broader, however, than the disclosure of CIs; instead, the issue involved the trial court's denial of a request "[p]rior to trial . . . to compel the Government to

identify the persons it intended to call as witnesses.  In this regard Pennick's counsel particularly requested that the Government identify and [sic] informer who was to be called as a Government witness."  United States v. Pennick, 500 F.2d at 185.  Pennick was convicted and appealed, explaining:

> The Government's evidence showed that a Government drug agent, and his informer, went to Pennick's home in Junction City, Kansas, on two separate occasions in September 1972.  On each occasion the informer was searched and, after being given money by the agent, the informer proceeded to gain admission to Pennick's house, the informer and Pennick being friends.  The informer was called as a Government witness and his testimony was that on each occasion he bought heroin from Pennick which he later turned over to the Government agent.

500 F.2d at 186.  Pennick, accordingly, argued that "the judgment should be reversed because of the refusal of the trial court to compel the Government to identify its witnesses by way of pre-trial discovery, particularly as concerns any witness who was also an informer."  United States v. Pennick, 500 F.2d at 186.  Further, Pennick argued that, "while Pennick may have no right to such disclosure prior to trial, the trial court in the exercise of its discretion could nonetheless order, and under the circumstances should have ordered, such disclosure, particularly when we are dealing with an informant."  500 F.2d at 186.  The Tenth Circuit, first, indicated that

> Section 3432, 18 U.S.C., provides that a person charged with treason or other capital offense shall be furnished at least three days prior to trial with a list of the witnesses to be produced at the trial for proving the indictment.  The statute has been construed as meaning that in a noncapital case a defendant is not entitled as a matter of right to a list of the Government's witnesses in advance of trial. . . .  In the instant case the informer was a Government witness and did appear and testify upon trial, submitting himself to examination and cross-examination, a fact which we deem to be significant.  In other words, we are not here concerned with an informer who does not appear on trial as a Government witness, and who conceivably could be helpful to the defendant in his defense.  So, the informer in the instant case being himself a Government witness, under the general rule cited above Pennick was not entitled to learn the identity of the informer, or any other Government witness, prior to trial.

United States v. Pennick, 500 F.2d at 186.  The Tenth Circuit ultimately, then, disagreed with

Pennick that he was entitled to the informant's identity, stating:

> We do not agree with such reasoning and in our view the fact that one of the
> Government's witnesses was an informer weakens, rather than strengthens,
> Pennick's argument that he was entitled in advance of trial to a list of the
> Government's witnesses. As the trial court noted, informers whose identity is
> revealed prior to trial are often among the missing when the trial date rolls
> around.

500 F.2d at 186. The Tenth Circuit then explained, however:

> In the instant case the trial court applied the "balancing test" referred to in
> *Roviaro* and took into consideration the various factors mentioned in that case,
> and then in the exercise of its discretion refused to require the Government to
> reveal the identity of its informer who all knew was to testify upon trial. In so
> doing the trial court did not err.

500 F.2d at 187. Accordingly, the Tenth Circuit concluded that "[t]he significant difference

between *Roviaro* and the instant case is that in the former the informer did not testify at trial, and

in our case he did. Such ruled out a possibility that the informer's testimony could somehow be

helpful to Pennick." 500 F.2d at 187.

     Thus, despite silence with respect to the timing of the disclosure of a testifying CI, in

United States v. Pennick, the Tenth Circuit -- at the least -- gave district courts guidance that they

may be able to apply Roviaro v. United States in the case of a testifying CI. See United States v.

Pennick, 500 F.2d at 187. Given this discussion of the application of the Roviaro v. United

States analysis to a testifying CI, and the conclusion that it was not in error, district courts are left

to conclude that, at the least, Roviaro v. United States does not preclude a district court from

ordering disclosure of a testifying CI, upon a satisfactory showing by a defendant under Roviaro

v. United States before the time that the United States is generally required to disclose the

identity of its witness list. See United States v. Pennick, 500 F.2d at 187 ("In the instant case the

trial court applied the 'balancing test' referred to in *Roviaro* and took into consideration the

various factors mentioned in that case, and then in the exercise of its discretion refused to require

the Government to reveal the identity of its informer who all knew was to testify upon trial.  In so doing the trial court did not err.").

In the same year, but a couple of months before United States v. Pennick, the Tenth Circuit decided United States v. Baca, 494 F.2d 424 (10th Cir. 1974).  The Tenth Circuit there considered a trial court's denial of a defendant's motion to disclose the identity of a CI to "permit him to prepare adequately for trial."  494 F.2d at 427.  The trial court denied the motion upon the United States' argument that "in view of the fact that no search warrants were involved and no arrests were effected prior to indictment, that the United States was not obligated to reveal its 'witnesses' at that time."  494 F.2d at 427.  The Tenth Circuit found no error in the trial court's decision, where the CI had testified as to her involvement in controlled narcotic buys, summarily explaining that "[i]t is settled law in this circuit that, in the absence of a statutory or constitutional requirement, the government is not required to endorse the names of its witnesses on the information or indictment, nor is there a requirement that the government disclose its witnesses in any manner, except in a case where trial is for treason or other capital offense." United States v. Baca, 494 F.2d at 427 (emphasis added).

More recently, the Tenth Circuit considered the pretrial disclosure of a witness' identity in United States v. Nevels, 490 F.3d 800, 803 (10th Cir. 2007), where it stated: "We review the admission of testimony from an unlisted government witness for abuse of discretion."  490 F.3d at 803.  In that case, the United States had learned of the existence of an undisclosed witness three days before trial, notified the defendant about the witness three days before trial, and filed a formal notice with the court on the eve of trial as to the witness' likelihood to testify.  See 490 F.3d at 803.  The defendant objected to the witness' testimony at trial, but the district court ordered that the United States needed to make the witness available to the defendant on that first

day of trial and ultimately allowed her testimony two days later.  See 490 F.3d at 803.   In

considering this issue, then, the Tenth Circuit concluded there was no error by the trial court in

allowing this surprise-witness, because, as was the case in United States v. Baca, "in the absence

of a statutory or constitutional requirement, . . . there [is no] requirement that the government

disclose its witnesses in any manner, except in a case where trial is for treason or other capital

offense." U.S. v. Nevels, 490 F.3d at 803.

    Roviaro v. United States' plain language, however, suggests that the desirability of

calling a CI as a witness, or at least interviewing the informant in advance of trial, is a matter for

the accused, rather than the government, to decide.  See 353 U.S. at 64.  Indeed, in United States

v. Pennick, the Tenth Circuit indicated that the defendant's satisfactory showing in that case,

under Roviaro v. United States, may have entitled the defendant to the CI's  identity, despite the

"general rule . . .  [that a defendant is] not entitled to learn the identity of the informer, or any

other Government witness, prior to trial."  United States v. Pennick, 500 F.2d at 186 ("In the

instant case the trial court applied the 'balancing test' referred to in *Roviaro* and took into

consideration the various factors mentioned in that case, and then in the exercise of its discretion

refused to require the Government to reveal the identity of its informer who all knew was to

testify upon trial.  In so doing the trial court did not err.").  Although the Supreme Court in

Banks v. Dretke explains that, factually, the CI at issue in Roviaro v. United States was a non-

testifying witness, making that factual scenario distinct from that which was at issue in Banks v.

Dretke, the Supreme Court in Roviaro v. United States did not otherwise restrict its guidance to a

non-testifying witness.  Nor did the Supreme Court in Banks v. Dretke explicitly restrict its

holding to non-testifying witnesses when it summarily dismissed Roviaro v. United States'

import, because Roviaro v. United States had dealt with a non-testifying witness.  See Banks v.

Dretke, 540 U.S. at 697-98.  Roviaro v. United States' plain language does not preclude the Court from instructing the United States to disclose a CI's identity upon the proper showing, regardless of future potential for testimony.  See 353 U.S. at 60-61 (holding that the privilege to withhold a CI's identity is not absolute, and, where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way").

Other courts, in addition to the Tenth Circuit in United States v. Pennick, have indicated that there might be a significant difference between testifying and non-testifying CIs.  Indeed, the Courts of Appeals, which are generally in the position of reviewing a CI's untimely disclosure or nondisclosure, tend to rely on that dichotomy in reaching a conclusion that the trial court below did not error.  See United States v. Casseus, 282 F.3d 253, 257 (3d Cir. 2002); United States v. Tejada, 974 F.2d 210, 217 (1st Cir. 1992); United States v. Norton, 504 F.2d at 343 n.1.  For the most part, those Courts of Appeals have concluded that, where a CI ultimately testifies, a district court's failure to order early disclosure of the CI's identity does not constitute error.  See United States v. Casseus, 282 F.3d 253, 257 (3d Cir. 2002); United States v. Tejada, 974 F.2d 210, 217 (1st Cir. 1992); United States v. Norton, 504 F.2d at 343 n.1.

The United States Court of Appeals for the Third Circuit, in United States v. Casseus, although not specifically dealing with CIs, dealt with joint defendants who, on appeal, argued that "the District Court erred by refusing to order the prosecution, within a reasonable time before trial, to disclose and allow the defense to interview the only available eyewitnesses, who were in the prosecution's custody."  282 F.3d at 257.  Dispelling the appellants' arguments, the Third Circuit explained that "a criminal defendant does not have the right to full discovery of the government's case," and that here the witnesses the appellants wished to have interviewed did

not have <u>Brady</u> information, as "the record is clear that the witnesses had no exculpatory information to offer."   <u>United States v. Casseus</u>, 282 F.3d at 257.   Further, the Third Circuit summarily rejected the appellants' reliance on <u>Roviaro v. United States</u>, as that case regards "the duty of the prosecution to disclose the identity of confidential informants who will not testify. Here, all witnesses did testify, and appellants were actually allowed to interview these witnesses before trial.   We conclude that the Court did not abuse its discretion by denying discovery." <u>United States v. Casseus</u>, 282 F.3d at 257.

The Sixth Circuit, in <u>United States v. Perkins</u>, 994 F.2d 1184 (6th Cir. 1994), addressed the United States' failure to disclose a testifying confidential informant's identity, where that informant ultimately testified against the defendants' interests, and the defense argued that the "district court erred in denying his motion for a bill of particulars. . . . ask[ing] for particulars of the overt acts of the conspirators, the date and places where they were performed, the names of any unindicted coconspirators, and the names and addresses of any informants."   994 F.2d at 1191.  The Sixth Circuit found "no persuasive reason to depart from the . . . general rule" that the government does not have to disclose its witnesses, because the circumstances involved a testifying informant whom the defendant can cross-examine.   994 F.2d at 1191.   In such cases, the Sixth Circuit concluded that, as government witnesses, CIs' testimony would not be helpful to the defendant.   994 F.2d at 1191.   There was no discussion whether the district court, in making its decision, considered the <u>Roviaro v. United States</u> factors as to the disclosure of testifying CIs.

The Sixth Circuit has also considered the following language in <u>Roviaro v. United States</u>: "[O]nce the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable."   <u>Roviaro v. United States</u>, 353 U.S. at

60.  In United States v. Sierra-Villegas, the Sixth Circuit stated:

> The dictum in Roviaro that Sierra-Villegas relies on -- "once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable" -- must be understood in light of the purpose of the informant privilege: "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials, and, by preserving their anonymity, encourages them to perform that obligation."  . . . . Disclosure to those who might resent the informant's cooperation with law enforcement eliminates the privilege because such disclosure exposes the informant to potential harm, and the privilege is designed to shield the informant from harm that might arise from his or her cooperation.  But so long as some potential harm from further disclosure or publication remains, the government retains an interest in non-disclosure and the privilege may still apply.

United States v. Sierra-Villegas, 774 F.3d 1093, 1098 (6th Cir. 2014).  Where the Court orders CI disclosures under a protective-disclosure agreement, as the United States has already used here in this cased in its disclosure to an individual Defendant, the Court will follow the Sixth Circuit's directions and guidance regarding this language in Roviaro v. United States, when that case -- or its principles -- are applicable.

The United States Court of Appeals for the Eighth Circuit, to the contrary, in United States v. Norton, explained in a footnote that

> these cases do not stand for the proposition that the government may withhold names of participating informants so long as it intends to call them at trial.  Nor do they stand as an invitation to trial courts to routinely deny defendants access to the names and addresses of informants prior to trial on the theory that the error may be cured by making the informant available at trial.  A finding of no prejudice in a particular case ought never be construed as an invitation to deliberate error in the future.

504 F.2d at 343 n.1.  United States v. Norton did not focus, however, on an argument that the failure to disclose a testifying CI harmed a defendant, but instead focused on an argument that the defendant "was injured by the failure of the government to arrest him promptly, a failure which he claims deprived him of the opportunity to interview the informant, thereby discovering

and preserving any exculpatory evidence." 504 F.2d at 343.  In United States v. Gullickson, 982 F.2d 1231, 1234 (8th Cir. 1993), the Eighth Circuit also provided that "[t]he reasoning [under Roviaro v. United States] hinges on the fact that the informant was not produced before trial and did not appear at trial." 982 F.2d at 1234

District courts, nonetheless, take the cases case-by-case, considering that approach to be the most appropriate analytical approach to adequately balance the differing interests under Roviaro v. United States, Brady, Giglio, rule 16, and the Jencks Act.  Cf. United States v. Nance, 168 F. Supp. 3d 541, 552 (W.D.N.Y. 2016)(Arcara, J.).   In United States v. Nance, the trial court, without discussion of whether a number of requested CIs were going to testify, stated:

> a conclusory statement is inadequate to meet Nance's burden of showing that an "informant's testimony is . . . material to the defense."  United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988).  Nance must demonstrate that an informant would do more than "merely . . . cast doubt on the general credibility of one of the Government's witnesses."

United States v. Nance, 168 F. Supp. 3d at 552.  This observation accords with the Eighth Circuit's guidance in United States v. Norton.  Indeed, in the Court's review, no court has suggested that merely because a CI testifies, the failure to disclose that CI's identity to a requesting defendant, who makes an ample showing under Brady, Giglio, rule 16, and Roviaro v. United States as to that defendant's entitlement to the CI's identity, is somehow a cure for not disclosing that CI's identity early enough in the pretrial proceedings for the defendant to interview that CI.  See United States v. Norton, 504 F.2d at 343 n.1.

Again, the issues here are whether Roviaro v. United States applies to testifying CIs, whether the United States has an absolute right not to disclose a CI's identity when they testify at trial, or whether some combination of Brady, Giglio, and rule 16 covers testifying CIs.  The Court rejects the second notion that the United States has an absolute right not to disclose

testifying CI's identities.  The general rule is certainly that the United States does not have to disclose witnesses before trial.  The United States cannot, however, refuse to disclose potentially material, exculpatory information.  The United States' witnesses often have nothing helpful to say for a defendant.  Rarely does the United States prepare a witness who is testifying favorably to a defendant.  Some witnesses are just a mixed bag.  The United States cannot keep the defendant from finding out about exculpatory evidence just because the United States intends to call the witness.  The favorable evidence that a United States' testifying witness may have still might constitute <u>Brady</u>, <u>Giglio</u>, and rule 16 information, and the Court will apply those doctrines accordingly.

It is true that the Court, in making this observation and conclusion, cannot undercut the Jencks Act's restrictions, and the general rule that the United States does not have to disclose its witnesses until trial.  The Court thinks its rule is consistent with the Jencks Act and the general non-disclosure rule.  The Jencks Act and the non-disclosure rule remain the rules -- no disclosure until trial, when applicable.  But nothing in the United States Constitution protects the United States.  The Jencks Act and the non-disclosure rule are legislative and judicially created rules; they are not protections like, and certainly do not supersede, the Constitution.  <u>Brady</u>, <u>Giglio</u>, and, to a certain extent, rule 16, are grounded in the Constitution's protections of defendants.  Thus, as with most things in the law, when judge-made and legislative rules conflict with the Constitution, the Constitution trumps.

When <u>Roviaro v. United States</u> uses words indicating that disclosure must be had where: "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, [because] the privilege must give way," 353 U.S. at 60-61, academics and appellate judges may be able to draw distinctions between these

phrases and tests, but on the street-level, district-court level -- like this case -- these finer distinctions may be hard to apply. In a case like this one, where there may be as many as 350 CIs, the Court has to make quick and decisive rulings regarding the disclosure and necessity of their identities, and, all the while, ensuring CI safety; the Court has to make this case work, and it has to make rulings almost as quickly as evidentiary rulings. It cannot get bogged down in appellate-level consideration of the fine distinctions underlying various disclosure and discovery obligations in criminal cases; it has to enter orders and make rulings while balancing every interest of the parties in a case. In the end, too, the Court has to ensure a trial that protects the defendant's constitutional rights.

Thus, the Court concludes that Roviaro v. United States does not apply to testifying witnesses. It also concludes, however, that the distinction does not really make a difference. The Court concludes that Brady, Giglio, and, to an extent, rule 16, still apply to testifying witnesses and the testimony that they will give, even if the United States will call that witness and, normally, does not have to disclose that witness until trial. A benefit of this rule is that the Court can be creative and flexible in creating disclosure orders. It can order disclosure for attorney's eyes only. It can deny the production to protect the CI. In other words, rather than a blanket, fixed rule, the Court can fashion a disclosure order that gets the defendant and/or counsel anything they need, and still try to protect the CI's safety as much as possible.

In sum, the Court is not requiring the United States to disclose its trial witnesses, but is ordering the United States to disclose a particular person with knowledge that the defendant has shown that person is likely to have material, exculpatory information under Brady. The Court cannot soundly conclude that, just because the United States has a person on its witness list, the United States does not need to disclose that person's identity pretrial. If the witness does not

have <u>Brady</u> information, then the United States does not have to disclose the witness, even if it intends to call the witness at trial.  The United States can completely protect CIs having nothing favorable to say about the Defendants, but if the CI has exculpatory evidence, it will need to disclose that witness' identity, just like it does all other <u>Brady</u> material.  If the rule were otherwise, the United States could shield a lot of <u>Brady</u>, <u>Giglio</u>, and rule 16 information from disclosure just by putting a CI on an undisclosed witness list.  Such would not be consistent with due process and <u>Brady</u>.

Given the aforementioned principles underlying a defendant's ability to overcome the United States' privilege to withhold a non-testifying CI's identity upon a factual showing consistent with <u>Roviaro v. United States</u>, <u>Brady</u>, <u>Giglio</u>, and rule 16,  and that the Supreme Court in <u>Roviaro v. United States</u> did not explicitly restrict its holding to the case of a non-testifying CI, the Court sees no sound reason why, upon a sufficient showing, disclosure of a testifying CI's identity should not occur pretrial.  The Court has accurately concluded, in another case, that "there is a difference between a confidential informant, whose identity the government often never wants to reveal, and a confidential witness, whose identity will ultimately be revealed to facilitate the witness' testimony at trial and the defendant's opportunity to cross examine that witness."  <u>United States v. Tarango</u>, 760 F. Supp. 2d 1163, 1168 (D.N.M. 2009)(Browning, J.).  And, in <u>United States v. Tarango</u>, the Court reached its conclusion to not automatically order disclosure of a testifying CI, in part, because the defendant "will know these witnesses' identities if they become witnesses; the issue is one of timing, not disclosure."  760 F. Supp. 2d at 1168.  The Court, however, did not reach the timing issue in that case, because:

> The United States has offered to give Tarango more than what is required.  Specifically, the United States has agreed to allow Tarango's attorney, Mr. Fisher, to access certain witnesses on the weekend before trial, after the United States has been able to secret those witnesses.  The United States also tentatively

offered to turn over the identities of witnesses and other information for attorney's-eyes only review. This arrangement[] would be suitable if both parties can come to an agreement on the details.

760 F. Supp. 2d at 1170. The Court reached a similar agreement in United States v. Padilla, where it held:

> In this case, there is a strong inference -- based on the information confidential sources provided in the search-warrant affidavit -- that the identities of confidential informants who will be called as witnesses may aid the Defendants. The Court believes that, to adequately investigate information which may be valuable for impeachment purposes, the Defendants' attorneys and investigator should have sufficient time to conduct an investigation, attempt to interview the witnesses, and request necessary information -- which the United States may not have in its possession -- from the proper sources. Thus, the Court is requiring the United States to provide a list of its witnesses thirty days before trial.

> The Court, however, incorporates a protective order. Mr. Twohig and Mr. Gorence are ordered that they will not disclose the identities of the confidential informants whom the United States intends to call as witnesses and other sensitive witnesses to anyone -- except the defense investigator they retain in this case -- unless and until Mr. Twohig and Mr. Gorence seek further leave of the Court or until fourteen days before the trial, when the United States must make its witness list publicly available. Any information that the United States provides to Mr. Twohig and Mr. Gorence regarding the confidential informants whom the United States intends to call as witnesses and other sensitive witnesses may be discussed only with the investigator and the Assistant United States Attorneys who disclosed it.

2010 WL 4337819, at *8. Because of these agreements, the defendants in those cases did not raise further argument as to the precise timing of the disclosure of the relevant testifying CIs in those cases. Other courts have reached similar disclosure agreements amongst the parties.

> Based upon the record, the court finds that it is appropriate for the government to reveal the identities of informants numbers 4, 6, 7 and 11 ten days before trial. This ruling is based upon the court's concern for the safety of these and other informants. Disclosure of the identities of these informants ten days before trial will provide the defendants an adequate opportunity to prepare their defenses.

United States v. Avalos, 753 F. Supp. 871, 872 (D. Or. 1991)(Frye, J.).

The United States' Brady obligations bolster the lawfulness of disclosure of CIs'

identities, testifying or not, upon a satisfactory showing under Brady, Giglio, rule 16, or Roviaro v. United States.  "The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823.  Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment."  Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010).  A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).  Where the Court is making an in depth and detailed analysis under  Brady, Giglio, rule 16, or Roviaro v. United States, and concludes that the United States must disclose a testifying CI's identity, the obligations the United States has under Brady counsel against the United States' refusal to order disclosure until, for instance, the United States' obligations under the Jencks Act arise.  Such an individual case-by-case  inquiry, it appears, must occur in the Tenth Circuit, and disclosure must be had -- pretrial -- where the Court concludes that the principles at stake in Brady and the other criminal discovery obligations, and potentially in Roviaro v. United States, so demand.

## LAW REGARDING THE CONSTITUTIONAL BASIS FOR ROVIARO V. UNITED STATES

The Supreme Court has held that the principles underlying its holding in Roviaro v. United States are rooted in the Due Process Clause and Confrontation Clause.  In Roviaro v. United States the Supreme Court concluded that there was error in the failure to disclose a non-testifying CI, but that case was "not decided on the basis of constitutional claims."  United States v. Valenzuela-Bernal, 458 U.S. 858, 870 (1982).  The Supreme Court, in McCray v. Illinois, 386

U.S. 300 (1967), considered both Due Process and Confrontation Clause claims in its <u>Roviaro v.</u>

<u>United States</u> analysis, albeit in the context of a hearing to determine probable cause for an arrest

where testifying officers attested to their CIs' veracity.  See <u>McCray v. Illinois</u>, 386 U.S. at 309-

14.  The Supreme Court in <u>McCray v. Illinois</u> ultimately held, in the context of a probable-cause

hearing, that "nothing in the Due Process Clause of the Fourteenth Amendment requires a state

court judge in every such hearing to assume the arresting officers are committing perjury" and

that the Sixth Amendment was similarly not implicated.  386 U.S. at 313-14 (referencing the

Sixth Amendment, which states "In all criminal prosecutions, the accused shall enjoy the right to

a speedy and public trial, by an impartial jury of the State and district wherein the crime shall

have been committed, which district shall have been previously ascertained by law, and to be

informed of the nature and cause of the accusation; to be confronted with the witnesses against

him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance

of Counsel for his defence," U.S. Const. amend. VI).  In so holding, the Supreme Court stated

that it is generally understood that <u>Roviaro v. United States</u> has a constitutional basis, because

> [w]hile *Roviaro* was not decided on the basis of constitutional claims, its subsequent affirmation in *McCray v. Illinois*, 386 U.S. 300[], where both due process and confrontation claims were considered by the Court, suggests that *Roviaro* would not have been decided differently if those claims had actually been called to the Court's attention.

<u>United States v. Valenzuela-Bernal</u>, 458 U.S. at 870.

The Tenth Circuit noted that <u>Roviaro v. United States</u> protects constitutional rights in

<u>Gaines v. Hess</u>, 662 F.2d 1364, 1368 (10th Cir. 1981).  There, the Tenth Circuit stated:

> The Court in *Roviaro* declared that "fundamental requirements of fairness" require restrictions on the Government's privilege to refuse disclosure of an informant's identity. . . .  This strongly indicates that the Court was referring to a constitutional limitation on the privilege, for few phrases are more closely associated to a constitutional guarantee than is the term fundamental fairness. The very "touchstone of due process is fundamental fairness."

Gaines v. Hess, 662 F.2d at 1368.  The Tenth Circuit further concluded:

> We do not see how the Court's usage of the term could be otherwise construed. The public's interest in effective law enforcement is an important one.  But at some point, withholding the identity of an informant who may be critical to the conduct of the defense infringes the defendant's constitutional right to a fair trial, which obviously includes the right to adequately prepare and present that defense. *Roviaro* clearly establishes that a blanket disclosure rule is not required.  <u>Only under circumstances in which nondisclosure would deprive the defendant of his due process right to a fundamentally fair trial is disclosure constitutionally mandated</u>.

Gaines v. Hess, 662 F.2d at 1368 (emphasis added).  Cf. McCray v. Illinois, 386 U.S. at 311 ("What *Roviaro* makes clear is that this Court was unwilling to impose any absolute rule requiring disclosure of an informer's identity even in formulating evidentiary rules for federal criminal trials.").  In that case, the Tenth Circuit considered a drug-buy scenario where the "informant in question set up the transaction and was the only witness to the sale," and, "[t]hus, the informant could testify directly to the critical issue in the case: whether [defendant] was the seller."  Gaines v. Hess, 662 F.2d at 1368.  At trial, "[t]he informant's existence was revealed by [a witness'] testimony, and the informant was the only one mentioned in the record, other than [the defendant] himself, who could corroborate or discredit [that witness'] testimony."  662 F.2d at 1368.  The Tenth Circuit thus held that, "[o]n these facts, it would violate [the defendant's] due process rights to deny disclosure if in fact the informant could provide potentially significant exculpatory testimony."  Gaines v. Hess, 662 F.2d at 1368.

Thus, the Due Process Clause does not require the United States to disclose the identity of CIs in every case, see McCray v. Illinois, 386 U.S. at 309-14, but, to justify compelled disclosure under Roviaro v. United States and the Due Process Clause, a defendant can show that his right to the information outweighs the traditional privilege to withhold CIs' identities, as the Supreme Court explained in Roviaro v. United States, 353 U.S. at 59-62 ("Where the disclosure

of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."). That showing, accordingly, entails demonstrating that disclosure is material to the defense or to the fair determination of the cause. See United States v. Rovario at 60-61.

## RELEVANT LAW REGARDING CIVIL DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for documents. See Fed. R. Civ. P. 34. Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

    **(1)**    to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

        **(A)**    any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

        **(B)**    any designated tangible things; or

    **(2)**    to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a). Rule 26(b)(1) explains that the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Information sought is relevant "if the discovery appears reasonably calculated to lead to discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Federal courts have held that the scope of discovery under rule 26 is broad. See Gomez v. Martin Marietta Corp., 50 F.3d 1511,

1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information."). The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947). As a result of this policy, rule 26 "contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case." Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-50 (D.N.M. 2007)(Browning, J.)(internal quotations marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x at 217. "'Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, 2012 WL 3860744, at *1 (D.N.M. 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)). See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(noting that courts do, and should, remain concerned about "fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value

before an order to compel disclosure of otherwise inadmissible material will issue." Zenith

Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (N.D. Ill. 1998). Courts have also recognized

that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of

admissibility should not be misapplied so as to allow fishing expeditions in discovery." Zenith

Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26(b)(1) was amended in 2000. Before the 2000 amendments, rule 26(b)(1) defined

the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is
> relevant to the subject matter involved in the pending actions, whether it relates to
> the claim or defense of the party seeking discovery or to the claim or defense of
> any other party, including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things and the identity
> and location of persons having knowledge of any discoverable matter. The
> information sought need not be admissible at the trial if the information sought
> appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996). The 2000 amendments made the following changes, shown here

in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is
> relevant to ~~the subject matter involved in the pending actions, whether it relates to~~
> the claim or defense of ~~the party seeking discovery or to the claim or defense of~~
> any ~~other~~ party, including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things and the identity
> and location of persons having knowledge of any discoverable matter. <u>For good
> cause, the court may order discovery of any matter relevant to the subject matter
> involved in the action.  Relevant</u> ~~The~~ information ~~sought~~ need not be admissible
> at the trial if discovery the ~~information sought~~ appears reasonably calculated to
> lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). Putting aside the changes to the last sentence -- which the advisory

committee's notes make clear was a housekeeping amendment to clarify that inadmissible

evidence must still be relevant to be discoverable -- the 2000 amendments have two effects:

(i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts

into the process in the entirely new second sentence.

In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions.  Discovery and Disclosure Practice, supra, at 44-45 (1997).  The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party.  The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause.  The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery.  The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery.   Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center.  See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action.  The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.  The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision.  A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example,**

**other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. See 8 Federal Practice & Procedure § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing.  It is not surprising that Congress would want to increase judicial presence: "relevance" is a wide-open concept even in the context of trial, see Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."), and it is often said that relevance for discovery is an even broader concept.  One might then say that old rule 26(b)(1)'s relevant discovery provision was toothless.  It is likewise unsurprising that the rulemakers are unable to articulate precise language narrowing the substantive scope of discovery: no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, etc.  The determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers wanted when they: (i) encouraged district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Of course, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188.  The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action."  This good-cause standard is intended to be flexible.  When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be.  "[T]he actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

## LAW REGARDING ATTORNEY WORK PRODUCT IMMUNE FROM DISCOVERY

The work-product doctrine, which the Supreme Court first recognized in Hickman v. Taylor, 329 U.S. 495 (1947), "shelters the mental processes of the attorney, providing a

privileged area within which he can analyze and prepare his client's case." <u>United States v.</u>
<u>Nobles</u>, 422 U.S. 225, 238 (1975). "In performing his various duties . . . it is essential that a
lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing
parties and their counsel." <u>Hickman v. Taylor</u>, 329 U.S. at 510. "Unlike the attorney-client
privilege, the work-product doctrine is distinguishable from the testimonial . . . privileges."
<u>United States v. Ary</u>, 518 F.3d 775, 783 n.4 (10th Cir. 2008). <u>See</u> <u>In re Qwest Commc'n Int'l.</u>
<u>Inc.</u>, 450 F.3d 1179, 1184 n.3 (10th Cir. 2006). "The work-product doctrine is codified in Fed.
R. Civ. P. 26(b)(3) and is therefore excepted from Fed. R. Evid. 501." <u>United States v. Ary</u>, 518
F.3d at 783 n.4 ("Unlike the attorney-client privilege, the work-product doctrine is
distinguishable from the testimonial "true" privileges. <u>See</u> <u>In re Qwest Commc'n Int'l. Inc.</u>, 450
F.3d at 1185 n.3[].").

Rule 26(b)(3) of the Federal Rules of Civil Procedure governs work-product issues. <u>See</u>
<u>Frontier Ref. Inc. v. Gorman-Rupp Co., Inc.</u>, 136 F.3d 695, 702 n.10 (10th Cir. 1998). Rule
26(b)(3)(A)-(B) states:

> (A) *Documents and Tangible Things*. Ordinarily, a party may not discover
> documents and tangible things that are prepared in anticipation of litigation or for
> trial by or for another party or its representative (including the other party's
> attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule
> 26(b)(4), those materials may be discovered if:
>
>> (i) they are otherwise discoverable under Rule 26(b)(1); and
>>
>> (ii) the party shows that it has substantial need for the materials to
>> prepare its case and cannot, without undue hardship, obtain their
>> substantial equivalent by other means.
>
> (B) *Protection Against Disclosure*. If the court orders discovery of those
> materials, it must protect against disclosure of the mental impressions,
> conclusions, opinions, or legal theories of a party's attorney or other
> representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A)-(B)(emphasis in original).

"[T]he work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Citizens Progressive Alliance v. U.S. Bureau of Indian Affairs, 241 F. Supp. 2d 1342, 1358 (D.N.M. 2002)(Smith, M.J.)(citing United States v. Nobles, 422 U.S. at 238). The attorney-work product doctrine "is intended only to guard against divulging the attorney's strategies and legal impressions. . . ." Resolution Trust Corp. v. Dabney, 73 F.3d 262, 266 (10th Cir. 1995). The work-product doctrine does not protect documents or other items that do not reflect the attorney's mental impressions. See United States v. Nobles, 422 U.S. at 238 ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."); In re Grand Jury Proceedings, 658 F.2d 782, 784-85 (10th Cir. 1981)("Such mental impressions are a prerequisite to the invocation of the work product doctrine.").

Analysis whether a communication falls within the attorney-client privilege should precede any inquiry into whether the work-product protection applies. See Upjohn Co. v. United States, 449 U.S. 383, 397 (1981). The work-product protection is broader in scope and reach than the attorney-client privilege, because the privilege extends only to client communications, while the work-product protection encompasses much that has its source outside client communications. See United States v. Nobles, 422 U.S. at 238. Further, rule 26(b)(3) permits disclosure of documents and tangible things constituting attorney-work product only upon a showing of substantial need and inability to obtain the substantial equivalent without undue hardship. See Fed. R. Civ. P. 26(b)(3). The focus of the determination whether a document falls within the work-product protection is whether "the motivating purpose" behind its creation was

to aid in litigation or possible future litigation.  In re Universal Serv. Fund Tel. Billing Practices Litig., 232 F.R.D. 669, 676 (D. Kan. 2005)(O'Hara, J.).

"'Ordinary work product generally refers to materials that are gathered at the request of an attorney in anticipation of litigation.  This type of work product receives less protection than opinion work product.  Opinion work product is, basically, the mental impressions of the attorney.'"  Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 651 (D.N.M. 2007)(Browning, J.)(quoting Sinclair Oil Corp. v. Texaco, Inc., 208 F.R.D. 329, 334 (N.D. Okla. 2002)).  "The party asserting the work-product protection has the burden of demonstrating that it applies and that it has not been waived."  Anaya v. CBS Broad., Inc., 251 F.R.D. at 651 (citing Kovacs v. Hershey Co., 2006 WL 2781591, at *10 (D. Colo. 2006)(Wiley, J.)).

For the work-product doctrine to apply, the asserting party must show that the documents or materials were prepared in anticipation of litigation by or for a party or that party's representative.  See Fed. R. Civ. P. 26(b)(3).  See also S.E.C. v. Goldstone, 301 F.R.D. 593, 650-53 (D.N.M. 2014)(Browning, J.).  "Litigation need not necessarily be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."  Anaya v. CBS Broad., Inc., 251 F.R.D. at 651.  See Fox v. Cal. Sierra Fin. Servs., 120 F.R.D. 520, 524 (N.D. Cal. 1988)(Woelflen, J.)("There is no requirement that the litigation have already commenced in order for the work-product doctrine to be operative, however, there must be more than a remote possibility of litigation.").  If the party asserting the work-product protection establishes entitlement to the protection, rule 26(b)(3) allows production of attorney-work product materials only upon a showing that the party seeking discovery has "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A).  "Work product can be

opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may be discoverable under appropriate circumstances."   In re Qwest Commc'n Int'l, 450 F.3d at 1186.   See generally S.E.C. v. Goldstone, 301 F.R.D. at 650-53 (Browning, J.).

## ANALYSIS

The Court will grant the Motion to Vacate and the Motion to Exclude.  The Court will grant in part and deny in part the Motion to Disclose.  At the hearing, the Court and some of the Defendants that had joined in the Motion to Disclose -- or filed a reply in support of the Motion to Disclose after the United States and Perez entered into a disclosure agreement mooting the Motion to Disclose as it pertained to him -- came to the agreement that, in preparation for the next hearing, the Defendants would supplement their briefing to make a stronger showing as to why the disclosure of the present CI's identity was proper as to each of the individual Defendants, because the CI's potential presence at the scene of a murder was not going to constitute a sufficient showing requiring disclosure at this stage.  That ruling was made applicable to Troup, Sanchez Montoya, and Herrera -- as well as Gallegos, who did not contribute to the Motion to Disclose Reply or make argument at the hearing -- and absent a stronger showing in the future, the CI's identity will not be ordered disclosed to those Defendants at this time, and the Motion to Disclose will be denied without prejudice as to those Defendants.  The Court was, however, inclined to require the United States to disclose the CI's identity to Baca, and will thus order such disclosure at this time.  The Court further requested that Baca and the parties provide supplemental briefing that addressed the legal standard for the timing of the disclosure of a CI's identity, because that standard was a source of disagreement at the hearing, and the Court was not certain whether the disclosure had to be immediate.  The

Court now concludes that an analysis under Brady is appropriate in the context of a testifying CI, and that the United States' disclosure of such CIs -- where a Defendant has made a sufficient showing under Brady, which is practically similar to the showing under United States v. Roviaro -- must be pretrial, and the Court, in these cases, will order immediate disclosure under attorney and investigator eyes-only protective orders, absent an agreement otherwise amongst the parties.

## I.     THE COURT WILL GRANT THE MOTION TO VACATE.

The Court will grant the Motion to Vacate.  The Motion to Vacate Defendants "request the Court vacate the trial date and schedule a hearing so the parties can discuss a realistic timetable for all discovery to be produced by the government, and for defendants to review said discovery."  Motion to Vacate at 2.  In support of the request, the Motion to Vacate highlights the case's complexity and breadth, the multiple indictments, a protective order restricting discovery, and the use of a coordinated discovery management firm.  See Motion to Vacate at 2-5.  The United States opposes the Motion to Vacate, but only to the extent that the Defendants in the "parallel RICO indictment in 16-cr-1613 do not oppose a continuance of their trial date in July."  Motion to Vacate at 9.  Before the Court took over the case, Judge Gonzales had already declared this case complex, and not adopted the typical scheduling order and time frame for trial.  All parties appear to agree, however, that the scheduling order and trial date which the Court set after it declared the case complex has become, yet again, untenable because of the case's complexity.  See Motion to Vacate at 1-2, 9.  Courts, generally, are instructed to consider specific factors when determining whether to grant a continuance and thereby further continue the Speedy Trial Act's deadlines under section (A) of 18 U.S.C. § 3161(h)(7).  See 18 U.S.C. § 3161(h)(7)(B).  Section 3161(h)(7)(B) sets forth the factors a court should consider:

**(B)**    The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

> **(i)**    Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.
>
> **(ii)**    Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.
>
> . . . .

18 U.S.C. § 3161(h)(7)(B). The Court concludes that "failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible," because "the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits" established by the current scheduling order and trial date. 18 U.S.C. § 3161(h)(7)(B)(i)-(ii). This case, United States v. DeLeon, has already been declared complex, as has the case in United States v. Baca, reinforcing the complexity and logistical difficulty the SNM prosecution presents for the United States, for the Defendants, and for the Court. At this time, where both the United States and the Defendants agree that there is necessity to extend the trial date further into the future, the Court reaches the same conclusion. See Tr. at 34:4-37:24 (Armijo)(discussing how the United States agrees that the discovery process is more cumbersome than usual; however, discovery would be rolling and that they were "working very hard on it," and with the United States stating: "we would request that the Court set a trial date . . . next summer"). As the Motion to Vacate provides, this might be the largest and most complicated prosecution the District of New Mexico

has ever seen.  See Motion to Vacate at 1.  As well, the Motion to Vacate explains that discovery

in each of the separate indictments bleeds together, that the discovery is being undertaken in a

wholly unique -- and slow -- manner, and that trial preparation will likely take "twice as long" as

normal.  Motion to Vacate at 1-2.  The United States does not otherwise refute that assertion,

and, thus, the Court concludes that good grounds exist for the continuance, pursuant to both the

Speedy Trial Act and United States v. Toombs, 574 F.3d at 1269, and the Court will,

accordingly, grant the Motion to Vacate.

## II.    THE COURT WILL GRANT THE MOTION TO EXCLUDE.

The Court will grant the Motion to Exclude.  The Motion to Exclude explains that the

Defendants charged in the Superseding Indictment's Counts 6 and 7 are planning to view certain

physical evidence and tour Southern New Mexico -- in particular, the pod where one of the

charged murders occurred -- and that the information they receive is going to be work product

which they wish to be protected from disclosure to the prosecution.  See Motion to Exclude at 1-

2.  The reason that the Motion to Exclude gives to support that work product will entail from the

evidence viewing is that

> members of the respective defense teams, including counsel, investigators and
> experts [will] view, discuss, document, and record evidence and their impressions
> of that evidence.  The resulting processes, discussions, notations, recordings,
> measurements, photographs and other tangible things that will be generated and
> created by the respective defense teams constitute work product and are not
> discoverable by the prosecution.

Motion to Exclude at 3.  The Court recognizes, and stated at the hearing, that "in the particular

circumstances of this [case], where we may have a large number of defense lawyers there, they

are going to probably be discussing this with each other. . . .  And if the Government lawyers are

there I think it's going to inhibit their ability to do the things they need to do to do a site visit."

Tr. at 57:9-17 (Court).  Thus, the Court surmised that "I think there are work thoughts, their

work product will be disclosed, or . . . it will not take place," given the unique nature of this

particular site visit.  Tr. at 57: 18-25 (Court).  The Court adheres to this conclusion, because the

work-product doctrine counsels in favor of allowing the Defendants' attorneys to tour Southern

New Mexico and to view the physical evidence with a "certain degree of privacy, free from

unnecessary intrusion by opposing parties and their counsel."  Hickman v. Taylor, 329 U.S. at

510.  Rule 26(b)(3) of the Federal Rules of Civil Procedure governs work-product issues, see

Frontier Ref. Inc. v. Gorman-Rupp Co., Inc., 136 F.3d at 702 n.10, and states:

> (A) *Documents and Tangible Things*.  Ordinarily, a party may not discover
> documents and tangible things that are prepared in anticipation of litigation or for
> trial by or for another party or its representative (including the other party's
> attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule
> 26(b)(4), those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
> >
> > (ii) the party shows that it has substantial need for the materials to
> > prepare its case and cannot, without undue hardship, obtain their
> > substantial equivalent by other means.
>
> (B) *Protection Against Disclosure*.  If the court orders discovery of those
> materials, it must protect against disclosure of the mental impressions,
> conclusions, opinions, or legal theories of a party's attorney or other
> representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A)-(B)(emphasis in original).  Indeed, then, "the work-product doctrine

shelters the mental processes of the attorney, providing a privileged area within which he can

analyze and prepare his client's case."  Citizens Progressive Alliance v. U.S. Bureau of Indian

Affairs, 241 F. Supp. 2d at 1358 (citing United States v. Nobles, 422 U.S. at 238).  The attorney-

work product doctrine "is intended only to guard against divulging the attorney's strategies and

legal impressions . . . ."  Resolution Trust Corp. v. Dabney, 73 F.3d at 266.  The work-product

doctrine does not protect documents or other items that do not reflect the attorney's mental

impressions.  See United States v. Nobles, 422 U.S. at 238; In re Grand Jury Proceedings, 658

F.2d at 784-85 ("Such mental impressions are a prerequisite to the invocation of the work

product doctrine.").

      The Court recognizes that the discussions and conversations which might ensue during

this and other similar evidence viewings in this case do not fit neatly into work-product

protections.  See Fed. R. Civ. P. 26(b)(3)(protecting from discovery documents and tangible

things that are prepared in anticipation of litigation, or for trial by or for another party or its

representative).  The principles underlining work-product protections cause the Court to exclude

the United States, where

> in the particular circumstances of this [case], where we may have a large number
> of defense lawyers there, they are going to probably be discussing this with each
> other. . . .  And if the Government lawyers are there I think it's going to inhibit
> their ability to do the things they need to do to do a site visit, exclude the United
> States so that the Defendants can effectively prepare for litigation, in private,
> without divulging their mental impressions to opposing counsel.

Tr. at 57:9-17 (Court).  See Hickman v. Taylor, 329 U.S. at 510.  The statements which might be

made by each of the Defendants' attorneys to each other as they view the evidence will likely

indicate what the Defendants' attorneys mental impressions of the case are, limiting their ability

to confide in each other if the United States was present and listening to every word.  See

Hickman v. Taylor, 329 U.S. at 510.  The Court is cognizant that it cannot make an informed

work-product determination without knowing the statements made, questions asked, notes taken,

and/or information given.  The Court is confident, however, that the Defendants' attorneys will

generate some work product at the site and evidence visits and examination.  It is true that the

Defendants' attorneys could take notes that would be work product, and the notes thus would be

protected from production, and, at the same time, the United States would see the rest of what

occurs.  But the presence of the United States will likely chill the production of work product,

rendering the visits and inspections less useful.  The Defendants are entitled to a robust site visit and examination, where they can talk, look at things, and do things outside of the United States' presence.  The Defendants are owed as robust of an opportunity to gather work product as possible consistent with security needs, and the United States' presence is likely to unnecessarily put pressure on that product and create an environment and atmosphere that does not facilitate work product development.  Thus, the Court cannot soundly rely on the work-product doctrine to create an environment for the creation of work product, but it can use its powers under the Criminal Justice Act, 18 U.S.C. § 3006A, with its powers to supervise the effective administration of these complex cases to give the Defendants what they ask.  The Court, accordingly, will grant the Motion to Exclude.

## III.   THE COURT WILL ORDER THE CI'S IDENTITY DISCLOSED TO BACA BEFORE TRIAL.

In addressing the disclosure of the CI implicating Baca in Counts 6 and 7, the Court provides guidance and reiterates the proper legal standard when analyzing the timing of a CI's disclosure where the Court has concluded that the United States must disclose the identity pursuant to Brady -- that conclusion meaning that the Defendant has shown that the CI likely has material, exculpatory evidence, where, should it not be disclosed, "there is a reasonable probability that . . . the result of the proceeding would [be] different,"  Kyles v. Whitley, 514 U.S. at 433 (discussing Brady standards).  The parties are in agreement that disclosure of both testifying and non-testifying CIs' identities -- under Roviaro v. United States, Brady, Giglio, rule 16, or the Jencks Act -- is, under some circumstances, and at some point, appropriate.  The primary dispute is generally only over the timing of that disclosure after the Court has concluded that disclosure is appropriate.  Regarding CIs in particular, the United States has a privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to

officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. at 59. "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." Roviaro v. United States, 353 U.S. at 59. "Anonymity of informants encourages communications to law enforcement officers." Usery v. Local Union 720, Laborers' Int'l Union of N. Am., AFL-CIO, 547 F.2d at 527.

The privilege is not absolute, however, and where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Roviaro v. United States, 353 U.S. at 60-61. The Supreme Court in Roviaro v. United States stated that the desirability of calling the CI as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide. See 353 U.S. at 64. When a CI is a "participant in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required. Roviaro v. United States, 353 U.S. at 65. The standard for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is not fixed; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors." Roviaro v. United States, 353 U.S. at 62. In Roviaro v. United States, for example, the CI "helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment." 353 U.S. at 64. The Supreme Court found that the district court's failure to order disclosure of the CI's identity "in the face of repeated demands by the accused for his disclosure" was prejudicial error. 353 U.S. at 64-65.

The Tenth Circuit's take on the analysis is "well known," United States v. Padilla, 2010 WL 4337819, at *7, and places the burden on the defendant to show that the CI's possible aid to the defendant outweighs the public's interest in protecting the flow of information, which the confidentiality of the informant's identity facilitates:

> The disclosure of a confidential informant's identity involves balancing the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense. In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony. Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure. A defendant seeking disclosure has the burden of proof, and we review the district court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted). See United States v. McKenzie, 2010 WL 597971, at **3-4 (quoting United States v. Sinclair, 109 F.3d at 1538). "[T]he defendant must present more than mere speculation about the possible usefulness of an informant's testimony." United States v. Moralez, 908 F.2d at 567. In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his testimony might be relevant to the defendant's case and justice would be best served by disclosure[, but d]isclosure of an informant is not required . . . where the information sought from the informer would be merely cumulative, or where the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d at 517 (internal citations omitted). See United States v. Moralez, 908 F.2d at 567. Specific considerations include the confidential informant's role:

> [C]ases involving confidential informants fall into several broad categories. At one extreme are the cases where the informant is a mere tipster, and disclosure is not required. At the other extreme are cases such as Roviaro itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial. In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

United States v. Moralez, 908 F.2d at 568 (citations omitted).  Cf. United States v. Arms, 2014 WL 6958046, at *3 (E.D. Wis. 2014)(Duffin, M.J.), aff'd sub nom. United States v. Bailey, 2015 WL 687490 (E.D. Wis. 2015)(Adelman, J.).

The Court has required the United States to disclose a CI's identity where the CI "was integrally involved in the criminal transaction[,] . . . observed the criminal transaction[,] and was not a mere bystander."  United States v. Aguilar, 2010 WL 2977708, at *5.  In United States v. Aguilar, the defendant, Aguilar, was one of three defendants charged with a conspiracy to traffic in cocaine, stemming from a transaction between his two co-defendants and a government CI.  See 2010 WL 2977708, at *1.  In relation to the first factor that the Supreme Court identified in Roviaro v. United States -- the crime charged -- the Court noted that "the crimes charged in this case are relatively egregious -- conspiracy, possession with intent to distribute cocaine, and possessing a gun while committing the other crimes."  United States v. Aguilar, 2010 WL 2977708, at *6.  As to the second and third Roviaro v. United States factors -- the possible defenses and the possible significance of the informer's testimony -- it appeared that the defendant intended to argue that he did not know his alleged co-conspirator possessed cocaine or that the drug transaction was going to occur, and the Court found that, given the CI was present during the crime, the CI's testimony "could be highly significant" to the defenses:

> The [CI] was present in the car with Mirabal, Aguilar, and Garner, and would be in a unique position to testify to what conversations, if any, occurred in the car and whether Aguilar took part in them.  After the four individuals arrived at the [CI]'s residence, again, the [CI] would be in a unique position to testify whether it appeared that Aguilar had any idea that the bag Mirabal retrieved from the car contained cocaine.  Once the three Defendants and the [CI] were inside the [CI]'s residence, the [CI] was able to observe Aguilar's demeanor and whether he actively participated in the drug transaction.  The [CI] could testify as to where Aguilar was and what he did while the [CI] made the alleged drug transaction with Mirabal.

2010 WL 2977708, at *6.  Additionally, the Court noted that the CI might provide relevant

information which no other witness could, because Aguilar's "alleged co-conspirators might try

to push blame away from themselves and on to Aguilar, and Villegas, a law-enforcement officer,

might tend to be biased toward the United States."  2010 WL 2977708, at *6.  The Court thus

granted Aguilar's motion and ordered the United States to disclose the CI's identity.  See 2010

WL 2977708, at *6.  The Court also incorporated the following protective order in its decision:

> Ms. Johnson[, Aguilar's attorney,] is ordered that she will not disclose the identity
> of the CI to anyone -- except the defense investigator she retains in this case --
> unless and until she seeks further leave of the Court.  Any information that the
> United States provides to Ms. Johnson regarding the CI may be discussed only
> with the investigator and the Assistant United States Attorneys who disclosed it.
> Finally, any information the United States provides must be returned once this
> case is closed.  These requirements should minimize the danger, if any, to the CI
> and perhaps permit law-enforcement to use him in a covert capacity again in the
> future, if they so desire.

2010 WL 2977708, at *6.  See United States v. Rivas, 26 F. Supp. 3d at 1082.

The Supreme Court has considered Roviaro v. United States where the State asserted that

"disclosure [of an informant's identity] is not automatic," and, "[c]onsequently, it was

[defendants's] duty to move for disclosure of otherwise privileged material."  Banks v. Dretke,

540 U.S. at 697-98.  The Supreme Court held:

> We need not linger over this argument.  The issue of evidentiary law in Roviaro
> was whether (or when) the Government is obliged to reveal the identity of an
> undercover informer the Government does not call as a trial witness. . . .  The
> Court there stated that no privilege obtains "[w]here the disclosure of an
> informer's identity, or of the contents of his communication, is relevant and
> helpful to the defense of an accused." . . . .  Accordingly, even though the
> informer in Roviaro did not testify, we held that disclosure of his identity was
> necessary because he could have "amplif[ied] or contradict[ed] the testimony of
> government witnesses.

Banks v. Dretke, 540 U.S. at 697-98.  Accordingly, the Supreme Court has clearly held that there

is no privilege to withhold the identity of a non-testifying CI whom, after the Court has

conducted its analysis of the factors pursuant to Roviaro v. United States, has "relevant and

helpful to the defense of an accused." Roviaro v. United States, 353 U.S. at 60-61.  Given the aforementioned principles underlying a defendant's ability to overcome the United States' privilege to withhold a CI's identity upon a factual showing consistent with Roviaro v. United States, and that the Supreme Court in Roviaro v. United States did not explicitly restrict its holding to the case of a non-testifying CI, the Court sees no sound reason why, upon a sufficient showing, disclosure of a testifying CI's identity should not, or cannot, similarly be imminent or at least pretrial.  The Court has indeed concluded, in another case, that "there is a difference between a confidential informant, whose identity the government often never wants to reveal, and a confidential witness, whose identity will ultimately be revealed to facilitate the witness' testimony at trial and the defendant's opportunity to cross examine that witness."  United States v. Tarango, 760 F. Supp. 2d at 1168.   In United States v. Tarango, the Court reached its conclusion to not automatically order disclosure of a testifying CI, in part, because the defendant "will know these witnesses' identities if they become witnesses; the issue is one of timing, not disclosure."  760 F. Supp. 2d at 1168.  The Court, however, did not reach the timing issue in that case:

> The United States has offered to give Tarango more than what is required. Specifically, the United States has agreed to allow Tarango's attorney, Mr. Fisher, to access certain witnesses on the weekend before trial, after the United States has been able to secret those witnesses.  The United States also tentatively offered to turn over the identities of witnesses and other information for attorney's-eyes only review.  This arrangement[] would be suitable if both parties can come to an agreement on the details.

760 F. Supp. 2d at 1170.  The Court reached a similar agreement in United States v. Padilla, where it held that:

> In this case, there is a strong inference -- based on the information confidential sources provided in the search-warrant affidavit -- that the identities of confidential informants who will be called as witnesses may aid the Defendants.  The Court believes that, to adequately investigate information

- 128 -

which may be valuable for impeachment purposes, the Defendants' attorneys and investigator should have sufficient time to conduct an investigation, attempt to interview the witnesses, and request necessary information -- which the United States may not have in its possession -- from the proper sources. Thus, the Court is requiring the United States to provide a list of its witnesses thirty days before trial.

The Court, however, incorporates a protective order. Mr. Twohig and Mr. Gorence are ordered that they will not disclose the identities of the confidential informants whom the United States intends to call as witnesses and other sensitive witnesses to anyone -- except the defense investigator they retain in this case -- unless and until Mr. Twohig and Mr. Gorence seek further leave of the Court or until fourteen days before the trial, when the United States must make its witness list publicly available. Any information that the United States provides to Mr. Twohig and Mr. Gorence regarding the confidential informants whom the United States intends to call as witnesses and other sensitive witnesses may be discussed only with the investigator and the Assistant United States Attorneys who disclosed it.

2010 WL 4337819, at *8. Because those agreements worked in the defendants' favor in those cases, there was no further argument as to the precise timing of the disclosure of the relevant testifying CIs in those cases. Other courts have reached similar disclosure agreements amongst the parties. See United States v. Avalos, 753 F. Supp. 871, 872 (D. Or. 1991)(Frye, J.); United States v. Arms, No. 14-CR-78, 2014 WL 6958046, at *3, aff'd sub nom. United States v. Bailey, No. 14-CR-78, 2015 WL 687490.

Based upon the record, the court finds that it is appropriate for the government to reveal the identities of informants numbers 4, 6, 7 and 11 ten days before trial. This ruling is based upon the court's concern for the safety of these and other informants. Disclosure of the identities of these informants ten days before trial will provide the defendants an adequate opportunity to prepare their defenses.

United States v. Avalos, 753 F. Supp. at 872. Here, however, it is evident that the Defendants seeking disclosure of testifying CIs' identities are not amenable to the United States' proffer of disclosure fourteen days before trial, which the United States argues comports with the Jencks Act. Absent another agreement, the Court must consider when disclosure of a testifying CI's identity can be disclosed pursuant to Roviaro v. United States, and if so, when -- or, if in fact

Roviaro v. United States cannot apply to testifying witnesses, whether Brady similarly requires disclosure.

The Court's analysis begins with Roviaro v. United States' plain language, which states that the desirability of calling the CI as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide.  See 353 U.S. at 64.  Although Banks v. Dretke explains that, factually, the CI at issue in Roviaro v. United States was a non-testifying witness, making that factual scenario distinct from that which was at issue in Banks v. Dretke, the Supreme Court in Roviaro v. United States did not otherwise restrict its guidance to such a non-testifying witness.  The Tenth Circuit in United States v. Pennick, 500 F.2d at 187, stated that "[t]he significant difference between Roviaro and the instant case is that in the former the informer did not testify at trial, and in our case he did.  Such ruled out a possibility that the informer's testimony could somehow be helpful to Pennick." United States v. Pennick, 500 F.2d at 187.  The Court is not convinced, however, that the Tenth Circuit held in United States v. Pennick that the United States can absolutely avoid disclosing pretrial a CI with potentially exculpating information for a defendant by virtue of that CI testifying.  See 500 F.2d at 187.  Further, the trial court, which did not err in denying disclosure of a testifying CI, and whose ruling was at issue in United States v. Pennick, had "applied the 'balancing test' referred to in Roviaro and took into consideration the various factors mentioned in that case, and then in the exercise of its discretion refused to require the Government to reveal the identity of its informer who all knew was to testify upon trial."  United States v. Pennick, 500 F.2d at 187.

Instead, under Roviaro v. United States' plain language instructions, the United States must disclose a CI's identity upon the proper showing under that case, regardless of future

potential for testimony.  See 353 U.S. at 60-61.  The Court recognizes, however, that there are

other Supreme Court and Court of Appeals cases that suggest a different analysis under Roviaro

v. United States which relies on that case's facts.   See, e.g., United States v. Ford, 2016 WL

483871, at *4-5 (D.D.C. 2016)(Friedman, J.)(discussing different standards for non-testifying

witnesses -- which Roviaro v. United States governs -- and testifying witnesses -- which the

district court, without expressly disavowing the potential import of Roviaro v. United States,

explained are generally governed by Brady, Giglio, rule 16, and the Jencks Act).  The United

States is correct that the Court, the Tenth Circuit in United States v. Pennick, and other courts

have indicated that there is a significant difference between testifying and non-testifying CIs.

See United States v. Pennick, 500 F.2d at 186.   Indeed, the Supreme Court and Courts of

Appeals, who are generally in the position of reviewing the untimely disclosure or nondisclosure

of a CI, have often relied on that dichotomy in reaching a conclusion that the trial court below

did not err by refusing to order early disclosure of a testifying CI's identity pretrial.  See United

States v. Casseus, 282 F.3d at 257; United States v. Tejada, 974 F.2d at 217.  Cf. United States v.

Norton, 504 F.2d at 343 n.1.  The Court finds persuasive the Eighth Circuit's language in United

States v. Norton, where it explained:

> [T]hese cases do not stand for the proposition that the government may withhold
> names of participating informants so long as it intends to call them at trial.  Nor
> do they stand as an invitation to trial courts to routinely deny defendants access to
> the names and addresses of informants prior to trial on the theory that the error
> may be cured by making the informant available at trial.  A finding of no
> prejudice in a particular case ought never be construed as an invitation to
> deliberate error in the future.

504 F.2d at 343 n.1.  Further, the Court is not concluding that the United States needs to disclose

its entire witness list pretrial in contravention of the "general rule" in this circuit, that general

rule being the primary issue at stake in United States v. Pennick.  United States v. Pennick, 500

F.2d at 186.

> Section 3432, 18 U.S.C., provides that a person charged with treason or other capital offense shall be furnished at least three days prior to trial with a list of the witnesses to be produced at the trial for proving the indictment. The statute has been construed as meaning that in a noncapital case a defendant is not entitled as a matter of right to a list of the Government's witnesses in advance of trial.

United States v. Pennick, 500 F.2d at 186.

Accordingly, the Court will, upon a sufficient Brady showing to satisfy the burden to overcome the informant's privilege, order the pretrial disclosure of testifying CIs pursuant to a protective order, to ensure the CI's safety, as the United States and Perez have already entered into. Cf. United States v. Nance, 168 F. Supp. 3d at 552 (stating, without discussion whether a number of requested CIs were to testify, that in that case "a conclusory statement is inadequate to meet Nance's burden of showing that an informant's testimony is . . . material to the defense. . . . Nance must demonstrate that an informant would do more than merely . . . cast doubt on the general credibility of one of the Government's witnesses")(internal quotation marks omitted). Roviaro v. United States does not apply to testifying CIs, but the United States' Brady obligations remain, regardless, and must defeat the informant's privilege upon a satisfactory showing. Unless the parties agree otherwise, that disclosure must be immediate in this case, pursuant to Brady, and, for the present time, the disclosure will be for attorneys and investigators' eyes only; and disclosure to Baca himself must come, if at all, at trial. The Court considers this system, as it outlined supra in its law regarding sections, to be the most appropriate analytical and practical approach to adequately balance the differing interests under Brady, Giglio, rule 16, the Jencks Act, and Roviaro v. United States, in this highly complex and complicated case which may be one of the largest prosecutions in this district's history.

As to this particular CI, whom Baca contends has relevant, helpful information to his defense, and thus should have his identity disclosed to Baca, the Court must first ensure that Baca has met his burden under Brady before it orders the disclosure.  Roviaro v. United States' principles are informative.   Accordingly, the Court shoulders the burden on the defendant to show that the CI's possible aid to the defendant outweighs the public's interest in protecting the flow of information, which the confidentiality of the informant's identity facilitates:

> The disclosure of a confidential informant's identity involves balancing the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense.  In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony.  Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure.  A defendant seeking disclosure has the burden of proof, and we review the district court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted).  See United States v. McKenzie, 2010 WL 597971, at **3-4 (quoting United States v. Sinclair, 109 F.3d at 1538).  "[T]he defendant must present more than mere speculation about the possible usefulness of an informant's testimony."  United States v. Moralez, 908 F.2d at 567.  In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his testimony might be relevant to the defendant's case and justice would be best served by disclosure[, but d]isclosure of an informant is not required . . . where the information sought from the informer would be merely cumulative, or where the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d at 517 (internal citations omitted).  See United States v. Moralez, 908 F.2d at 567 ("Disclosure of an informant is not required where the information sought from him or her would be merely cumulative, or where the informant is not a participant in or a witness to the crime charged.").  Specific considerations include the CI's role:

[C]ases involving confidential informants fall into several broad categories.  At one extreme are the cases where the informant is a mere tipster, and disclosure is not required.  At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial.  In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

United States v. Moralez, 908 F.2d at 568 (citations omitted).[10]  Cf. United States v. Arms, 2014 WL 6958046, at *3, aff'd sub nom. United States v. Bailey, 2015 WL 687490.  To help make this inquiry, the Court may, under Gaines v. Hess, 662 F.2d at 1369, conduct an in camera hearing to determine whether the informant's testimony would lend aid to the defense.  See 662 F.2d at 1369.

Here, Baca explains, he is implicated in J.M.'s murder, because "[t]he government has supplied an FBI 302 dated September 18, 2015 containing statements made by Jerry Armenta that attempt to associate Mr. Baca with J.M.'s death."  Motion to Disclose Reply at 5.  Baca also provides:

The Court should understand, however, that Jerry Armenta provided a videotaped interview less than one month later, on October 6, 2015, to the state prosecutors who were handling the state prosecution of J.M.'s death.  In that videotaped interview, Jerry Armenta does not claim what the FBI 302 purports to say: that the "paperwork was a police report which contained statements made by [J.M.].  The report was obtained by Anthony Ray 'Pup' BACA in Northern New Mexico Correctional Facility and was passed to the Southern New Mexico Correctional Facility by Lupe URQUIZO and Archie VARELA."  *See* [FD 302 at 2, filed

---

[10]The United States has tried to characterize too many CIs in this case as being mere tipsters.  There are definitely tipsters, but perhaps fewer in criminal cases than the United States suggests.  The Court considered the issue of "tipsters" in United States v. McKenzie, with the Court concluding that the CI in that case -- an Amtrak ticket agent that sent information to the DEA -- was the classic example of a mere tipster, stating "The Court is concerned that, if the Court adopts McKenzie's argument, anytime a police officer trains citizens to be alert to criminal activity and they supply information to the police, they become law enforcement officers rather than a tipster.  The Court does not believe that such training is enough to convert a citizen to a law enforcement officer."  United States v. McKenzie, 2010 WL 597971, at **4-5.

September 22, 2016 (Doc. 698-3)].  Instead, Jerry Armenta claims that after J.M. had died, he heard rumors in his pod that Mr. Baca had called for J.M.'s death.

Motion to Disclose Reply at 5.  Baca also argues that the theory of his involvement is that he

> was able to issue paperwork that went from Level 6  to Level 5 at PNM, and then was couriered from Level 5 of PNM down to Southern in order to give the authority to murder Mr. Molina.  And according to the discovery, and what we know about Molina, the Government's allegations of the Molina murder, that paperwork arrived on a Friday, and Mr. Molina was killed -- well, the paperwork arrived on a Thursday; it didn't get into the hands of the people in Mr. Molina's pod until Friday, and then Mr. Molina was allegedly killed based on the paperwork.

Tr. at 113:6-23 (Lowry)(emphasis added).  Accordingly, Baca is arguing that, after seeing the present CI's 302 report, where -- in the context of J.M.'s murder -- the CI at issue has stated that Perez "assisted in the killing of Javier MOLINA; PEREZ provided his walker to make shanks that were used in the murder," and where Baca allegedly ordered that murder, the CI appears to have in-depth knowledge of the murder and is likely to provide material, exculpatory information for Baca's defense.  Baca makes this argument, because the CI "indicates . . . something entirely different [from Montoya's allegations] . . . [indicating instead] that there was a plot to kill Mr. Molina some time before the paperwork ever arrived, [or] was in the equation . . . ."  Tr. at 113:244-114:3 (Lowry).  Baca bases this argument in the fact that he does not think Perez could have provided his walker for the shanks used in Molina's murder in such a short time span of about twenty-four hours.  See Tr. at 114:10-21 (Lowry).  Baca thus contends that, for the United States' theory that J.M.'s murder was the result of a conspiracy which Baca spearheaded -- opposed to this being a random jailhouse murder -- to succeed, Perez must have provided his walker in accordance with orders and paperwork that Baca allegedly sent from PNM, making evidence regarding the time between the hit's order and murder relevant.  See Tr. at 116:16-117:2 (Lowry).  In other words, the United States' case against Baca and Perez appears to rely, in

- 135 -

part, upon a quick turnaround that Baca argues is fundamentally inconsistent with reality.  At the hearing, the Court suggested that there was little evidence indicating how the paperwork was delivered to Southern New Mexico and how "Mr. Perez made shanks out of his walker all within 24 hours.  It seems to me that may be the only -- since this is the only source of information to either Mr. Perez or to Mr. Baca, I may need to require its production if I do the CI analysis."  Tr. at 130:4-13 (Court).  In response to the scant evidence, in supplemental briefing, the United States provided two exchanges between Perez and a CI, and Baca and a CI, which the United States contends support Baca's involvement in J.M.'s murder.  The evidence that the United States provides, however, while tending to implicate Baca, does not explain the short time frame from the alleged paperwork delivery to the murder.  Thus, although the United States has indicated the hit may be longstanding and only reconfirmed by Baca's order, there is still uncertainty about the manufacture of the shanks in such a short time frame.  Thus, pursuant to Brady, the Court concludes that Baca has maintained his showing that the CI -- who appears to have intimate knowledge of both the murder and Perez' walker's involvement -- might have material, exculpatory information for Baca's defense.  Indeed, the CI might disavow Baca's involvement, and the order's impact, altogether.  In light of the particular circumstances of this case, where Baca was not at Southern New Mexico, and the possible material, exculpatory significance of the informer's testimony, where Baca is arguing he did not order J.M's murder, evidenced by the short, less than twenty-four hours, time frame between his alleged delivery of paperwork and the completion of the murder, the Court concludes that Baca has made a sufficient showing for disclosure of the CI.

Regarding the security of the CI, the United States has indicated, by entering into a disclosure agreement with Perez, that it can disclose the CI's identity in a manner -- limiting the

disclosure of the CI's identity to Perez' attorneys and investigators -- that can alleviate some concerns which the United States has about the CI's security.  The Court recognizes that the United States alleges that SNM attacks, and even murders, persons who cooperate with law enforcement, giving rise to heightened security concerns for the CIs in this case.  Accordingly, the Court will order the CIs' identities' disclosure in this case under the protective-disclosure agreement that the United States used for Perez and the present CI.  In sum, because in this instance Baca has persuaded the Court that the CI at issue in Counts 6 and 7 must be disclosed to him under Brady, the Court will order his immediate disclosure to his attorneys and investigators.

## IV.   THE COURT WILL DENY THE MOTION TO DISCLOSE AS TO TROUP, MONTOYA, AND HERRERA AT THIS TIME.

Troup, Sanchez, Montoya, and Herrera have not made a sufficient showing under Brady to warrant pretrial disclosure of this CI at this time.  With respect to Troup, the Motion to Disclose Reply explains that Troup "has been indicted in Counts 1 and 3 with the murders of F.C. and F.S.," and that "this is a case where there appears to be no physical or scientific evidence nor any objective witness implicating Mr. Troup in these crimes."  Motion to Disclose Reply at 2.  The Motion to Disclose Reply then continues its explanation that "F.S. was a known informant," and that, according to the CI at issue in this motion, "paperwork relating to F.S. was delivered by 'Cheech.'"  Motion to Disclose Reply at 2.  The Motion to Disclose Reply argues that another inmate named Kyle Lynn Dwyer has admitted to being the individual who delivered the paperwork -- in fact, Dwyer was disciplined and sent to "PNM Level VI" as a result of delivering the paperwork, with "paperwork" meaning something which indicates that the paperwork's subject has cooperated with law enforcement.  Motion to Disclose Reply at 3.  In addition, the Motion to Disclose Reply contends that the informant in question states that Troup

and another Defendant, "Weno," "saw that these two individuals were taking too long and killed F.S." themselves.  Motion to Disclose Reply at 3.  The Motion to Disclose Reply thus argues that, regarding any potentially contrary information this CI might have, Troup is entitled to discover the CI's "identity to ascertain, among other things, if such information is exculpatory, especially given Mr. Dwyer's unavailability [now deceased]."  Motion to Disclose Reply at 3.

The United States has agreed, however, to disclose the identity of the individual that the CI mentions in his report -- "Cheech" -- to Troup so that Troup may investigate "Cheech" to make a showing that he is entitled to disclosure of the CI's identity at issue in the Motion to Disclose.  At the hearing, Troup argued that, "the identity of the" CI would help him "find out if [the CI] was, in fact there; if he was an active participant" in the murder at issue in Count 3, F.S.'s murder.  Tr. at 108:12-16 (Harbour-Valdez).  Troup, however, could not make a showing as to why, beyond potentially being present, this CI was different than anyone "else on the planet."  Tr. at 108:17-22 (Court).  The Court concluded:

> I'm not going to order the production of the CHS at the present time.  I'm first going to determine whether the CI analysis is obviated if, in fact, the person is going to be a testifying witness. . . .  I'm going to require the Government to go ahead and give you Cheech, figure out who he is; maybe you'll be able to bulk up your request.

Tr. at 109:18-110:9 (Court).  The Court continued:

> At the moment, it seems to me the CHS, as far as Troup, may be a little bit on the periphery of just somebody that -- you know, obviously, everybody would like to know who is there.  But if I start saying I'm going to disclose every CI to see if they were there, I think I've just pretty much required every CI to be disclosed.  So I think it's got to be higher than that.

Tr. at 110:10-17 (Court).  The Court's ruling at the hearing is consistent with the factors under Brady, as Troup has not indicated, beyond merely speculating, that the CI will have relevant, material, and exculpatory information for his defense -- indeed, Troup has not sufficiently

demonstrated to the Court that "there is a slight possibility a defendant might benefit from disclosure" in order to overcome the United States' interest in protecting this CI.  United States v. Moralez, 908 F.2d at 568.  The only showing Troup has made is that the CI was likely present to witness that Troup and another Defendant, "Weno," "saw that . . . two [other] individuals were taking too long [to murder F.S.,] and [thus] killed F.S." themselves.  Motion to Disclose Reply at 3.  The Court is not convinced that the CI's presence at the murder scene, absent more, suggests that the CI will be able to provide material, exculpatory information for Troup's defense -- the statement quoted above from the CI is, in fact, inculpatory.  Without something more, something to suggest exculpatory information, the Court cannot conclude that it should order the CI's identity's disclosure under Brady.

Regarding Sanchez, the Motion to Disclose Reply indicates that, because Sanchez is implicated in the same murder as Perez is charged, Sanchez should be entitled to the CI's identity so that he can investigate the aspects of the crime involving Perez.  See Motion to Disclose Reply at 3.  Sanchez declined to make argument at the hearing, however, stating that he was not interested in the identity of the same CI as Troup.  See Tr. at 111:22-112:10 (Jewkes).  This statement was probably the result of a miscommunication at the hearing, however, as the CI provides information regarding both F.S. and J.M's murders, and the Court thus nonetheless relies on the showing Sanchez made for this CI in the Motion to Disclose Reply at 3.  Sanchez does not, however, clear his hurdle under Brady, as he has merely alleged that Counts 6 and 7 name him, alongside Perez, the Defendant whom the CI names in his report.

The Court pauses to note that the Sixth Circuit has considered an argument similar to that which Sanchez attempts to make here, which the Court infers to be relying on the following language in United States v. Roviaro: "[O]nce the identity of the informer has been disclosed to

those who would have cause to resent the communication, the privilege is no longer applicable."

United States v. Roviaro, 353 U.S. at 60.  The Court is making its holding, for this testifying CI, in accordance with Brady, but nonetheless addresses this argument for clarity.  In United States v. Sierra-Villegas, the Sixth Circuit stated:

> The dictum in *Roviaro* that Sierra-Villegas relies on -- "once the identity of the informer has been disclosed to those who would have  cause to resent the communication, the privilege is no longer applicable" -- must be understood in light of the purpose of the informant privilege: "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials, and, by preserving their anonymity, encourages them to perform that obligation."  . . . . Disclosure to those who might resent the informant's cooperation with law enforcement eliminates the privilege because such disclosure exposes the informant to potential harm, and the privilege is designed to shield the informant from harm that might arise from his or her cooperation.  But so long as some potential harm from further disclosure or publication remains, the government retains an interest in non-disclosure and the privilege may still apply.

United States v. Sierra-Villegas, 774 F.3d at 1098.  Given that the Court is ordering these CI disclosures under a protective-disclosure agreement the United States has already used in its disclosure to Perez, the Court will follow the Sixth Circuit's directions regarding this language in United States v. Roviaro.

Turning then to Montoya, the Second Motion to Disclose Reply argues that Montoya, whom the United States "alleges . . . used a shank provided by co-defendant Rudy Perez in order to murder Javier Molina," is implicated only by the CI's statements linking him to the murder. Second Motion to Disclose Reply at 2.  After hearing argument that the CI could enlighten Montoya about the conspiracy's strictures and about J.M.'s murder, the Court ruled:

> I'm not convinced as to Mr. Montoya.  I think that -- like I said originally, I think your situation is more akin to Mr. Troup's back here.  If I start lowering the bar to that level, that we just want to know whether there is a scheme, or whether we want to know who is present, probably I'd drop the bar to a point where almost all these CIs will be disclosed.  And I don't think that's probably what the law

- 140 -

requires.   So I'll give it some thought, but I'm not inclined to grant Mr.
Montoya's request.

Tr. 178:13-179:6 (Court).  The Court maintains this holding, because Montoya, like Troup, has

not made a satisfactory showing under Brady that the CI would have material, exculpatory

information for Montoya.  Unlike Baca's case, where he could benefit, by exculpatory testimony

by the CI as to the timing of the shanks' manufacture in relation to Baca's alleged order of the

hit, Montoya has not demonstrated that this CI, as opposed to anyone else, is likely to offer him

material, exculpatory information.  The Court will thus not order disclosure of the CI's identity

to Montoya at this time.

Regarding Herrera, the Motion to Disclose Reply argues that Herrera was not in J.M.'s

pod during the murder and that he is implicated only because Armenta has suggested Herrera

was involved.  See Motion to Disclose Reply at 6.  The Motion to Disclose Reply thus contends

that, because Armenta has given conflicting statements at different times in the aftermath of

J.M.'s murder, that the informant's statements at issue here could be exculpatory, and, thus, that

he is entitled to the CI's identity for investigation.  See Motion to Disclose Reply at 7.  The CI,

according to the Motion to Disclose Reply, also implicates Herrera's mother with involvement in

"trafficking and racketeering" for SNM.   Motion to Disclose Reply at 7.   Herrera's only

argument in his favor is that "it's our position that . . . .  [i]f we had the identity of that CS, we

could obviously talk to that person, and, in fact verify that Mr. Herrera is not who the

Government thinks he is."  Tr. at 140:4-10 (Davis).  As the United States argued at the hearing,

Herrera is seeking this CI's identity so he could impeach him by omission according to what the

informant does not say in the report.  See Tr. at 141:12-142:4 (Beck).  The Court thus concluded

that

I probably am not going to start disclosing CIs because of what's not in these case
reporting documents or [CI's] reporting documents.  I'm a bit of a proponent of

the dog doesn't bark theory from time to time.[11]  But it's probably got to be stronger than that.  So I probably am not going to make the government disclose [CI]s on what's not in these reports without a stronger showing.

Tr. at 147:16-23 (Court).  The Court will maintain this ruling for the time being and not order the disclosure of this CI to Herrera absent a stronger showing under <u>Brady</u>.

**IT IS ORDERED** that: (i) the Defendants' Joint Motion to Vacate March 2017 Trial Setting, Impose a Discovery Scheduling Order and Request for a Hearing, filed September 7, 2016 (Doc. 676), is granted; (ii) the Joint Motion to Exclude the Prosecution Team from December 2, 2016 Evidence Viewing, filed November 8, 2016 (Doc. 763), is granted; and (iii) The Joint Motion for Disclosure and Production of Confidential Informant, filed September 22, 2016 (Doc. 698), is granted in part, as the Court is ordering disclosure under a protective order to Baca, and denied in part without prejudice, leaving open the possibility for the Defendants Edward Troup, Daniel Sanchez, Jerry Montoya, and Carlos Herrera to make a sufficient <u>Brady</u> showing for disclosure of the CI's identity at a later date.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
   United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

---

[11]<u>See</u> <u>Sir Arthur Conan Doyle</u>, Silver Blaze (1892)(involving a story, where Sherlock Holmes is investigating a race-horse theft, and he solves the case by focusing on the fact that a guard dog did not bark during the commission of the crime).

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

     *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

   *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

-- and --

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

   *Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

   *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

-- and --

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

   *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

   *Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

-- and --

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

-- and --

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

-- and --

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

-- and --

Christopher W. Adams
Charleston, South Carolina

     *Attorneys for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

-- and --

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

> *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

> *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

> *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

> *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

> *Attorney for Defendant Shauna Gutierrez*