# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                              No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

     **THIS MATTER** comes before the Court on: (i) Defendant Santos Gonzales' Motion for

Production of Alleged Co-Conspirator Statements, Pre-Trial Hearing on Their Admissibility

Pursuant to Fed.R.Evid. 801(d)(2)(E), filed May 9, 2017 (Doc. 1141)("Gonzales Motion"); (ii) Defendant Rudy Perez's Motion for Production of Alleged Co-Conspirator Statements and for Pre-Trial Hearing on Their Admissibility, filed August 21, 2017 (Doc. 1228)("Perez Motion"); (iii) the Opposed Motion for Specification of Co-Conspirator Statements and a Pre-Trial Hearing on the Statements' Admissibility, filed October 6, 2017 (Doc. 1303)("C. Garcia Motion"); (iv) Motion to Prevent the Admission of Statements of Non-Testifying Codefendants Implicating Defendant Billy Garcia and for an Order for the Government to Specify Such Statements Prior to Trial, filed October 10, 2017 (Doc. 1307)("B. Garcia Motion"); (v) Motion for James Hearing and Determination of Co-Conspirator Statements Admissibility at a Pre-Trial Hearing, filed October 13, 2017)(Doc. 1317)("J. Gallegos Motion"); (vi) Defendant Shauna Gutierrez' Opposed Motion for a James Hearing, filed October 13, 2017 (Doc. 1321)("Gutierrez Motion"); (vii) Motion in Limine to Exclude Statement of Cooperating Government Witnesses, filed November 30, 2017 (Doc. 1514)("Perez MIL"); (viii) Opposed Motion in Limine to Exclude Co-Defendant's [sic] Statements, filed December 1, 2017 (Doc. 1517)("C. Garcia MIL"); (ix) Defendant Anthony Ray Baca's Motion in Limine to Prohibit the Government From Questioning Jerry Armenta About Defendant Anthony Ray Baca's Involvement in Counts 6 & 7, filed December 4, 2017 (Doc. 1540)("Baca MIL"); (x) Defendant Daniel Sanchez's Motion in Limine to Preclude the Admission of Un-Confronted, Out of Court Statements Proffered by the Government at the *James* Hearing, filed January 8, 2018 (Doc. 1616)("Sanchez MIL"); and (xi) the Joint Motion to Renew Motion to Sever Defendants Charged with Offenses in Counts 6 and 7, filed January 21, 2018 (Doc. 1664)("Severance Motion"). The Court held hearings on November 27-29, 2017, December 8, 2017, December 19-20, 2017, and January 9, 2018. See Transcript of Hearing (held November 27, 2017), filed December 6, 2017 (Doc. 1545)("Nov. 27

Tr."); Transcript of Hearing (held November 28, 2017), filed December 6, 2017 (Doc. 1546)("Nov. 28 Tr."); Transcript of Hearing (held November 29, 2017), filed December 6, 2017 (Doc. 1547)("Nov. 29 Tr."); Transcript of Hearing (held December 8, 2017), filed December 15, 2017 (Doc. 1577)("Dec. 8 Tr."); Transcript of Hearing (held December 19, 2017), filed January 4, 2018 (Doc. 1608)("Dec. 19 Tr."); Transcript of Hearing (held December 20, 2017), filed January 5, 2018 (Doc. 1610)("Dec. 20 Tr."); Transcript of Hearing (held January 9, 2018), filed January 24, 2018 (Doc. 1683)("Jan. 9 Tr."). The primary issues are whether the out-of-court statements -- largely statements of Defendants Daniel Sanchez, Anthony Ray Baca, Carlos Herrera, and Rudy Perez, and of cooperating Defendants and other inmates -- that Plaintiff United States of America intends to offer in evidence at trial to prove the matter asserted: (i) can be admitted notwithstanding the Sixth Amendment to the Constitution of the United States of America's Confrontation Clause; (ii) can be admitted for their truth, because -- as coconspirator statements made during and in furtherance of the conspiracy, see Fed. R. Evid. 801(d)(2)(E) -- they are not hearsay; (iii) can be admitted, even though they are hearsay, as statements against penal interest made by an unavailable declarant, see Fed. R. Evid. 804(b)(3); (iv) can be admitted for their truth, because, as admissions offered against Baca, Herrera, or Perez, see Fed. R. Evid 801(d)(2)(A), they are not hearsay; (v) can be admitted, with a limiting instruction, in a joint trial if the statement is nontestimonial, incriminates multiple Defendants, and is admissible against some -- but not all -- of those Defendants; and (vi) necessitate sufficiently many limiting instructions that the Court should alter how the case should be tried. The Court analyzes individually the out-of-court statements at issue and concludes that it can admit nontestimonial statements that are admissible against only some of the Defendants if it gives a limiting instruction. While there will be multiple limiting instructions, the United States'

willingness to <u>Bruton</u>-ize[1] Baca's, Herrera's, and Perez' statements removes statements that one Defendant made and that directly incriminate other Defendants from the trial, so the jury will never hear those statements.[2]  Thus, while the Defendants are entitled to limiting instructions

---

[1]Under <u>Bruton v. United States</u>, 391 U.S. 123 (1968)(Brennan, J.) and its progeny, "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand," and a limiting instruction does not prevent one defendant's confession from being used against a codefendant if the confession is "facially incriminating" vis-à-vis the codefendant.  <u>Richardson v. Marsh</u>, 481 U.S. 200, 206-07 (1987)(Scalia, J.).  A limiting instruction is effective, however, when a "confession [i]s not incriminating on its face, and bec[o]me[s] so only when linked with evidence introduced later at trial."  <u>Richardson v. Marsh</u>, 481 U.S. at 207.  <u>Bruton</u>-izing a statement thus requires redacting it such that the statement does not directly incriminate anyone other than the declarant.

[2]In a pretrial hearing on January 26, 2018, three days before Baca's, Sanchez', Herrera's, and Perez' trial began, the Court announced that it was concerned about the number of limiting instructions that a four-Defendant trial would require and whether a jury could "really grapple with the number of very proper and required limiting instructions."  Transcript of Hearing at 52:10-13 (Court)(held January 26, 2018), filed February 7, 2018 (Doc. 1759)("Jan. 26 Tr.").  The Court indicated that it was "thinking about impaneling two juries," so one could consider the charges against Baca and Sanchez while the other would hear the charges against Herrera and Perez.  Jan. 26 Tr. at 52:14-19 (Court).  The Court could excuse the Baca-Sanchez jury when evidence was admissible only against Herrera or Perez, and vice versa.  <u>See</u> Jan. 26 Tr. at 52:16-25 (Court).  The Court explained its reasoning:

> I'm not inclined to sever out [Counts] 6 and 7; that doesn't seem to me -- it never has seemed to me to be quite the solution.  But I do think that the defendants have pointed to enough problems that maybe the way to do it is to pick two juries, and have, at critical points, the juries excused so that the number of limiting instructions is greatly reduced.  Or when they are given, they're given because they're allowed.  But the evidence that we're asking the jury to ignore is not probative of the other defendant in that case.

Jan. 26 Tr. at 53:15-25 (Court).

The next day, the United States indicated that -- in lieu of impaneling two juries -- it was willing to "redact the recordings [of Baca, Herrera, and Perez] to take out references to the other co-Defendants on trial made by the declarant-Defendant."  United States' Sealed Motion to Reconsider the Court's Two Jury Proposal at 6, filed January 27, 2018 (Doc. 1712)("Two Jury Motion").  In the Two Jury Motion, the United States argues that the redacted recordings will incriminate Defendants other than the declarant, if at all, only indirectly, so the jury will be able to obey the Court's limiting instructions more easily.  <u>See</u> Two Jury Motion at 6.  The United States also observes that, even if the jury misuses the recordings, redacting the recordings minimizes any resulting prejudice.  <u>See</u> Two Jury Motion at 6.

under the Federal Rules of Evidence, there is not much, if anything, that the jury could meaningfully use against the non-declarant Defendants. Using the statements in this way does not violate the Fifth or Sixth Amendments, and the Defendants will receive a just and fair trial.

## **FACTUAL BACKGROUND**

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment"). The background facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, 2017 WL 6496441, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. Superseding Indictment at 3.

---

On the first day of jury selection, the Court indicated that it would accept the United States' proposal and present redacted transcripts to a single jury. Over the course of trial, the Court worked diligently to work with the parties to ensure that the recordings and transcripts admitted into evidence and presented to the jury were properly redacted.

During the riot, thirty-three inmates were killed, and over 200 were injured.  See Superseding Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  See Indictment at 3.  SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Indictment at 3-4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Indictment at 4.  If another gang does not abide by SNM's demands, SNM will assault or kill one of the other gang's members to show its power.  See Indictment at 4.  SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment at 4.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment at 8.  SNM's recent activities in a conspiracy to murder high-ranking New

Mexico Corrections Department Officials inspired the Federal Bureau of Investigation's present investigation. See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133). The other relevant facts giving rise to this case are as follows.

In March 2014, a Doña Ana County, New Mexico grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753). The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. See Memorandum Opinion and Order, 2016 WL 7242579, at *3. That New Mexico indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. See Memorandum Opinion and Order at 6-7, 2016 WL 7242579, at *3. In November, 2015, the District Attorney dismissed the charges against Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy. See Memorandum Opinion and Order at 7, 2016 WL 7242579, at *3. "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." Memorandum Opinion and Order at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts. See Indictment at 1,

9-18.   All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."   Indictment at 9-18.   Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta,[3] Defendant Benjamin Clark, M. Rodriguez, Defendant

---

[3]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture and distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity. In 2003, I was an active member of the SNM. The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM. J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM. The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting. The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico. This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it. Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R. This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement, filed June 16, 2016 (Doc. 586).

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[4] and Sanchez are the enterprise's alleged leaders.  See Indictment at 6.  The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846.  Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9 (Count 1).  On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen

_____

[4]R.P. Martinez plead guilty on September 15, 2016, stipulating:

> In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including  murder, kidnapping, attempted murder, and conspiracy to manufacture and distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.  In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State.  Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.  Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement, filed September 15, 2016 (Doc. 686).

Patterson, and Christopher Chavez allegedly murdered "R.G." Indictment at 10 (Count 2). On June 17, 2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez allegedly murdered "F.S." Indictment at 10-11 (Count 3). On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B." Superseding Indictment at 11 (Count 4). On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B. See Indictment at 11-12 (Count 5). In March, 2014, Armenta, Montoya, M. Rodriguez, Defendant Timothy Martinez, Baca, Defendant Mauricio Varela, Sanchez, Defendant Carlos Herrera and Defendant Rudy Perez allegedly conspired to murder "J.M." Indictment at 12 (Count 6). On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M. See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Indictment at 13-14 (Count 8). Starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S." Indictment at 14 (Count 9). During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M." Indictment at 15 (Count 10). On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Indictment at 15-16 (Count 11). On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder. See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Indictment at 16 (Count 13). From February 1, 2016, until February 27, 2016, J. Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy

Rodriguez allegedly conspired to murder "J.G." Indictment at 17 (Count 14). Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Indictment at 17-18 (Count 15). The same Defendants also allegedly tampered with a witness, J.G. See Indictment at 18 (Count 16).

For fuller factual context, there are now four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)[5] -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[6] There is also a separate prosecution of C. Garcia for drug crimes, see United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant

_____

[5]The Court has granted a conditional severance of one Defendant in that case. See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.). The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his Speedy Trial Act, 18 U.S.C. §§ 3161-74, rights. The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping. Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . . If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32. Ultimately, the Court notes, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor. See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld). On March 22, 2017, R. Gallegos pled guilty in his severed case. See Plea Agreement at 1, United States v. Gallegos, No. CR 16-4299, filed March 22, 2017 (Doc. 24).

[6]The Court has also declared that case complex under the Speedy Trial Act. See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959.  See United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

## FINDINGS OF FACT

Pursuant to rule 12(d) of the Federal Rules of Criminal Procedure, the Court states its essential factual findings on the record.  See Fed. R. Crim. P. 12(d).  The Court bases its conclusions on the testimony it heard at its James hearing as well as the evidence it admitted at that hearing.  The Court details that evidence and testimony below, in its procedural background section.  The Court makes these findings by a preponderance of the evidence and only to determine preliminary questions regarding whether evidence is admissible.  See Fed. R. Evid. 104(a).  Notwithstanding the Court's findings, all of the Defendants are presumed innocent.  The Court makes the following findings of fact:

1.      A conspiracy to kill Javier Molina existed.  See, e.g., Plea Agreement of Timothy Martinez, ¶ 8, at 4-5, filed January 26, 2017 (Doc. 852)("T. Martinez Plea Agreement"); Plea Agreement of Jerry Armenta ¶ 8, at 4-5, filed December 13, 2016 (Doc. 802)("Armenta Plea Agreement").

2.      Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera, and Perez were members of the Molina conspiracy.  See, e.g., T. Martinez Plea Agreement ¶ 8, at 4-5; Armenta Plea Agreement ¶ 8, at 4-5.

3.      The Molina conspiracy continued until at least Molina's death on March 7, 2014. See, e.g., T. Martinez Plea Agreement ¶ 8, at 4-5; Armenta Plea Agreement ¶ 8, at 4-5.

4.      A conspiracy to assault Julian Romero existed.  See, e.g., Plea Agreement of Conrad Villegas ¶ 9, at 4, filed November 1, 2017 (Doc. 1392)("Villegas Plea Agreement"); Plea Agreement of Gerald Archuleta ¶ 7, at 4-5, filed June 16, 2016 (Doc. 586)("Archuleta Plea

Agreement").

5.      Baca, Archuleta, and Villegas were members of the Romero conspiracy.  <u>See</u>, <u>e.g.</u>, Villegas Plea Agreement ¶ 9, at 4; Archuleta Plea Agreement ¶ 7, at 4-5.

6.      The Romero conspiracy began in or about 2003 and continued until Romero's assault on July 13, 2015.  <u>See</u>, <u>e.g.</u>,  Villegas Plea Agreement ¶ 9, at 4; Archuleta Plea Agreement ¶ 7, at 4-5.

7.      A conspiracy to kill Dwayne Santistevan existed.  <u>See</u>, <u>e.g.</u>, Plea Agreement of Robert Martinez ¶ 8, at 5-6 (Doc. 716)("R. Martinez Plea Agreement"); Plea Agreement of Roy Paul Martinez ¶ 7, at 4-5, filed September 15, 2016 (Doc. 686)("R.P. Martinez Plea Agreement").

8.      Baca, R.P. Martinez, and R. Martinez were members of the Santistevan conspiracy.  <u>See</u>, <u>e.g.</u>, R. Martinez Plea Agreement ¶ 8, at 5-6; R.P. Martinez Plea Agreement ¶ 7, at 4-5.

9.      A conspiracy to kill Gregg Marcantel existed.  <u>See</u>, <u>e.g.</u>, R. Martinez Plea Agreement ¶ 8, at 5-6; R.P. Martinez Plea Agreement ¶ 7, at 4-5.

10.     Baca, R.P. Martinez, R. Martinez, and C. Garcia were members of the Marcantel conspiracy.  <u>See</u>, <u>e.g.</u>, Plea Agreement of Christopher Garcia ¶ 13, at 5-6, filed January 25, 2017; (Doc. 1705); R. Martinez Plea Agreement ¶ 8, at 5-6; R.P. Martinez Plea Agreement ¶ 7, at 4-5.

## PROCEDURAL BACKGROUND

The Court severed this case into two distinct trial groupings.  <u>See</u> Memorandum Opinion and Order, 2017 WL 3054511, at *1, filed June 30, 2017 (Doc. 1204)("Severance MOO").  The Court will first try Counts 6-12 of the Indictment and then, in a separate proceeding, it will try Counts 1-5 alongside Counts 13-16.  <u>See</u> Severance MOO, 2017 WL 3054511, at *1.  The first

trial is set to begin on January 29, 2018. See Fourth Scheduling Order ¶ 15, at 2, filed July 7, 2017 (Doc. 1205)("Scheduling Order"). The second trial is set to begin on April 9, 2018. See Scheduling Order ¶ 16, at 3.

### 1.    The Motions.

In several different motions, the Defendants ask the Court to order the United States to identify "alleged co-conspirator statements which the government seeks to introduce under Fed. R. Evid. 801(d)(2)(E)" and to hold a hearing, pursuant to United States v. James, 590 F.2d 575 (5th Cir. 1979)("James"), to determine, by a preponderance of the evidence, whether: "(i) a conspiracy existed; (ii) the declarant and defendant were members of that conspiracy; and (iii) the statements the United States seeks to admit were made during the course and in furtherance of the conspiracy," Gonzales Motion at 1, 3. Accord Perez Motion at 1 ("Rudy Perez . . . hereby respectfully moves the Court for the production of any and all alleged co-conspirator statements that the government seeks to introduce under Fed. R. Evid. 801(d)(2)(E) in this matter and for a pre-trial hearing on the admissibility of those statements."); C. Garcia Motion at 1 ("[C. Garcia and Baca] respectfully move this Honorable Court to order the government to specify any purported statements by alleged co-conspirators it intends to introduce under Federal Rule of Evidence 801(d)(2)(E) and show at a pretrial hearing that those statements are admissible."); B. Garcia Motion at 1-2 ("Defendant Billy Garcia moves . . . for an order for the government to specify which such statements it intends to offer so that the parties can litigate admissibility issues outside the presence of the jury."); J. Gallegos Motion at 1 ("Defendants request that this Court hold a pre-trial hearing, pursuant to United States v. James, 590 F.2d 575, 581-582 (5th Cir. 1979)."); Gutierrez Motion at 1 ("Defendant Shauna Gutierrez . . . moves this Court for a pretrial evidentiary hearing to determine the admissibility or

inadmissibility of each and every statement the Government intends to attribute to any Defendant in this case as statements of co-conspirators.").

## 2. **The Perez Motion Response.**

The United States filed a response to the Perez Motion. <u>See</u> United States' Response to Defendant Perez's Motion for Production of Alleged Co-Conspirator Statements and for a *James* Hearing on Their Admissibility [1228], filed September 5, 2017 (Doc. 1243)("Perez Motion Response"). The United States indicates that it does not oppose holding a "pretrial hearing to determine the existence of a conspiracy before certain co-conspirator statements are allowed before the jury." Perez Motion Response at 1. The Perez Motion Response identifies several statements that Perez made:

> Rudy Perez made statements while in NMCD that were recorded. Specifically, Perez stated that he supplied two pieces of metal from his walker to be fashioned into shanks for use during the murder. Perez said that he even verified with co-defendant Daniel Sanchez that the weapons would be used for the murder. Perez went into detail on why the murder occurred, and why it was justified. Perez stated that he was proud to be assisting the SNM in this manner. These recordings took place in 2016.

> Perez was interviewed back in 2014 as part of the original investigation. However, at that time, Perez stated that he was taking a shower and when he got out of the shower, someone had removed a piece of metal from his walker.

Perez Motion Response at 2-3. The United States asserts that, for a statement to be admissible under rule 801(d)(2)(E), the court needs to determine: "(1) a conspiracy existed; (2) that both the declarant and the defendant were members of the conspiracy; and (3) that the statements were made in furtherance of the conspiracy." Perez Motion Response at 3-4. The United States then provides several examples of statements made in furtherance of a conspiracy: "[s]tatements made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a co-conspirator's fears, or keep co-conspirators abreast of an ongoing conspiracy's activities."

Perez Motion Response at 5.  The United States observes that "[s]ome of the conspiracy evidence in this case arises from tape-recorded intercepts of direct conversations of the defendants/co-conspirators," and predicts that "[m]uch of this evidence will meet all aspects of the three-part test for admitting co-conspirator statements on its own accord, with little need for independent evidence."  Perez Motion Response at 7.  The United States also predicts that "a significant amount of evidence will not be introduced under Rule 801(d)(2)(E), but rather through Rule 801(d)(2)(A) as admissions by the defendant himself," and that other statements will be offered for purposes other than the truth of the matter asserted.  Perez Motion Response at 7.

> 3.      **The November 27-29, 2017 and December 8, 2017 Hearings.**

The Court took up the Defendants' motions for a James hearing in its November 27, 2017 hearing.  See Nov. 27 Tr. at 10:12-14 (Court).  The Court orally granted those motions to the extent that they seek a James hearing.  See Nov. 27 Tr. at 10:23-24 (Court)("So I think we will have a James hearing . . . ."); id. at 12:14-15 (Villa)("I think that was really the goal of the motions, to get us to the James hearing . . . .").  But see C. Garcia Motion at 7 (seeking "timely pre-hearing disclosure of statements the government intends to introduce at the *James* hearing"); B. Garcia Motion at 17-20 (arguing that specific statements are inadmissible); J. Gallegos Motion at 5 (seeking to exclude statements "from Defendant Santo Gonzales"); Gutierrez Motion at 3-5 (arguing that Gutierrez is not a member of any conspiracy); id. at 5-6 (arguing that Gutierrez' statements were not in furtherance of a conspiracy).  The Court also provided initial guidance regarding the James hearing's structure:

> I don't think we should be trying to have a trial like this, and just relying upon the Government's linking it up down the road is the way to go.  So I think that we will have a James hearing, and the Government will have to produce a live witness or witnesses. I don't think that a written proffer is enough.  The

> Government -- I mean, the Tenth Circuit has also indicated that those are not favored. And so I would prefer to have live witnesses, live witness or witnesses.
>
> The Government has asked that they be able to put on a case agent that summarizes the co-conspirator statements. It seems the Tenth Circuit has approved that. I'm not telling the Government how to try their case, and I'm not going to tell them how to do the James hearing. But you've got to make your proof by a preponderance of the evidence. If you think you can establish it with one agent, subject to cross-examination, bringing in the statements, then the Tenth Circuit seems to have approved that, and I will, too, but -- so it's not the method that I'm approving. You just have a burden of proving it by a preponderance of the evidence. If you can do it with one witness or witnesses, that's -- the Government always has to make that assessment as to how they're going to prove their case. And I can't tell you in advance whether one witness or more are going to be necessary. So you'll have to make that judgment. But in certain situations the Tenth Circuit has indicated that is appropriate.

Nov. 27 Tr. at 10:21-12:1 (Court). The United States then proffered "about 14 plea agreements in this case which will establish at least the first two requirements of James, which is the existence of the conspiracy, as well as membership in the conspiracy." Nov. 27 Tr. at 17:9-13 (Castellano).

The United States stated that those plea agreements are "basically the plea agreement of each defendant who has pled guilty in this case, including admissions that a conspiracy existed and admissions that other people remaining in the case were members of the conspiracy." Nov. 27 Tr. at 18:11-15 (Castellano). The Court then asked whether any of the Defendants objected to the introduction of the plea agreements as "documentary evidence." Nov. 27 Tr. at 19:19-23(Court). B. Garcia objected, arguing that the United States drafts the plea-agreement statements and that those statements are "not subject to any kind of evaluation here by the Court as to whether they're to be trusted." Nov. 27 Tr. at 19:11-18 (Castle). B. Garcia admitted, however, that "as long as the defense has the opportunity to call those witnesses and examine them . . . that would probably be a sufficient remedy to allow us to contest the information within those plea agreements." Nov. 27 Tr. at 20:9-21 (Castle). No other Defendant objected to the

admission of the plea agreements, so the Court admitted those agreements as "Government's Exhibits 1 through 14 . . . for the purposes of the James hearing." Nov. 27 Tr. at 23:9-13 (Court).[7]

Later that day, the United States reported to the Court that it had reached an agreement with the Defendants regarding <u>James</u> hearing procedure. <u>See</u> Nov. 27 Tr. at 102:8-23 (Castellano). The Defendants in the first trial group indicated a preference to proceed directly to a <u>James</u> hearing, "since we're here, and it's the week after Thanksgiving, and we're going to be in front of a jury in two months, we'd just like to get a witness up and get it going." Nov. 27 Tr. at 105:15-18 (Adams). The Court confirmed that "everybody else," <u>i.e.</u>, the second trial group, "is going to get bifurcated, get to see the statements first, then you get to decide whether you want a James hearing? Everybody in agreement on that?" Nov. 27 Tr. at 108:25-109:3 (Court.) None of the Defendants voiced an objection. <u>See</u> Nov. 27 Tr. at 109:4-5 (Court).

The United States then began the <u>James</u> hearing for the statements it intends to offer under rule 801(d)(2)(E) at the first trial by calling Federal Bureau of Investigation Special Agent Byran Acee to the stand. <u>See</u> Nov. 27 Tr. at 145:23-24 (Castellano). Acee's direct examination indicated that the United States intends to call "a witness named Lupe Urquizo" at trial. Nov. 27 Tr. at 146:21-23 (Castellano). According to Acee's testimony, Urquizo will testify that Baca told him "to get with the shot callers down at the Southern New Mexico Correctional Facility, or Southern,[8] and to let them know that Baca wanted Javier Molina hit . . . and that if they didn't

_____

[7]Mr. Castellano was mistaken regarding the number of plea agreements; there were fifteen plea agreements, <u>see</u> Nov. 28 Tr. at 48:9-11 (Castellano), and the fifteenth plea agreement was admitted as "Government's Exhibit 15," Nov. 28 Tr. at 48:12-14 (Court).

[8]Acee explained some terminology regarding the New Mexico prison system:

   If you think of PNM [Penitentiary of New Mexico] as a campus, if you will, there are different facilities there. So the north facility is the Level 6. The

- 18 -

do it, he told Urquizo to just stab him." Nov. 27 Tr. at 147:8-16 (Acee). That conversation, according to Urquizo, took place "while he was still at the Level 6 up at PNM, the north facility." Nov. 27 Tr. at 147:24-148:2 (Acee). Acee's direct examination disclosed another out-of-court statement that Urquizo will relate at trial: David Calbert, an uncharged SNM member, brought "the paperwork indicating or substantiating the hit on Javier Molina," Nov. 27 Tr. at 148:8-11 (Castellano, Acee), and "explained to Urquizo that Baca wanted the paperwork to go down to Southern in Las Cruces," Nov. 27 Tr. at 149:17-19 (Acee).[9]

Acee testified that Urquizo was subsequently transferred to Southern, see Nov. 27 Tr. at 149: 22-25 (Castellano, Acee), and that, while Urquizo was in orientation at Southern, he "didn't have his property" and could not "freely talk" to other inmates, but he "had a conversation with both Mario Rodriguez and Timothy Martinez," by holding notes up to a window. Nov. 27 Tr. at 150:4-25 (Acee). According to Urquizo, M. Rodriguez and T. Martinez asked, via note, whether he had the Molina paperwork, and Urquizo replied that he had the paperwork, "[b]ut that it was still in his property." Nov. 27 Tr. at 150:11-20 (Acee). Two days later, again according to

---

south facility is the Level 5. And then you also will hear us talk about the Southern New Mexico Correctional Facility, which is here in Las Cruces, which is referred to as "Southern."

Nov. 27 Tr. at 149:3-9 (Acee).

[9]The Molina paperwork was, per Acee's testimony, "a two-page LCPD [Las Cruces Police Department] report, or two pages from that report," Nov. 27 Tr. at 148:11-12 (Acee), "that indicated Molina cooperated or gave a statement to the police," Nov. 27 Tr. at 151:5-8 (Acee). Acee also testified about why that paperwork was important:

[A]t the time there was some disagreement within the SNM about the significance of the paperwork. There had been some hits carried out where it was on one or two members' word. And members were now, at this time, insisting on actually seeing the paperwork. So that was the significance of the actual documents traveling down to the south -- excuse me to the Southern facility, where Molina was located.

Nov. 27 Tr. at 148:15-23 (Acee).

Urquizo, "Carlos Herrera inquired whether or not Urquizo had the paperwork," and Urquizo -- who "had just received his box of property" -- gave the paperwork to Herrera as well as "Dale Chavez, Juan Mendez, and Alex Munoz," three other SNM members, "and each made a comment to the effect of, Damn, this is it? It's just two sentences in this report." Nov. 27 Tr. at 151:1-13 (Acee).

Acee also testified that M. Rodriguez sent a letter to Urquizo:

He sent it under the door. And in that Rodriguez -- he communicated that Rodriguez and Sanchez were going to move on Molina. Rodriguez explained the plan. And apologized to Urquizo for moving so quickly. And that the reason he did that is during the Molina hit there were actually supposed to be three individuals that were supposed to be hit at the same time. However, the paperwork didn't come down supporting the subject being hit that Urquizo wanted hit. So that's what that apology was about. And he wanted to -- he, Rodriguez -- wanted to make sure that Urquizo wasn't upset about that fact. He had a lot of respect for him, and just said, Hey, we've got to move, and it's going to happen quickly.

And that was generally what was in that letter. And Urquizo said he wrote back to Rodriguez and said he understood.

Nov. 27 Tr. at 152:8-24 (Acee). Acee stated that "Urquizo said he heard Daniel Sanchez yell, 'Fuck, yeah'" toward the end of the Molina hit. Nov. 27 Tr. at 153:6-10 (Acee).

The United States then turned its attention to "a couple of [out-of-court] statements related to the Julian Romero assault" that the United States may attempt to present to the jury via Urquizo's trial testimony. Nov. 27 Tr. at 153:11-13 (Castellano). According to Urquizo's account,

Julian Romero was down here at the Southern Facility at the time Urquizo and another member named Jonathan Gomez were in charge of the pod. Word had come down via Jonathan Gomez that they were to hit Julian Romero. And they picked Conrad Villegas to do that. They discussed that. They agreed to it, and they gave that instruction to Conrad. And he followed through with it.

The other thing that Urquizo related was that it was important to Baca -- that is Anthony Baca -- that Julian not be killed; that he just be stabbed or beat up, but not killed.

Nov. 27 Tr. at 153:19-154:5 (Acee).

The United States then began questioning Acee about out-of-court statements concerning the Molina murder that -- the United States contends -- M. Rodriguez made on the day of the Molina murder and that the United States may introduce at trial via Montoya's testimony.  See Nov. 27 Tr. at 154:6-13, 155:16-18 (Castellano, Acee).  Acee testified:

> Mr. Montoya told me that sometime after 5:00 p.m., while in the pod, Mario Rodriguez called out to him and told him to follow him to Rodriguez' cell. Rodriguez gave Montoya a shank and said that it was from Rudy Perez. Rodriguez told Montoya that it was time to put in some work.
>
> Montoya asked who, inquiring who was going to be the recipient of the work, if you will.  And Rodriguez answered "Javier."
>
> Montoya asked, "Why?"
>
> And Rodriguez said, "Because he's a rat."  Montoya asked to see the paperwork, and Rodriguez said that it had already been passed to another pod, but that he didn't need to worry because he, Rodriguez, had verified it, as had "Dan Dan" or Daniel Sanchez.  Montoya had some other questions and asked where he was to actually hit Molina.  Rodriguez told him that it would be in Molina's cell.
>
> Montoya protested a little bit and said that he didn't think that would be a good location because of the cameras.  He argued about the angles of the cameras with Rodriguez.  And Rodriguez ultimately said, "Dan doesn't want the cameras covered.  He has an evidentiary hearing coming up, and needs to be seen on camera."
>
> . . . .
>
> Mr. Rodriguez explained to Mr. Montoya that Jerry Armenta would also have a shank and would help, and that Daniel Sanchez had already talked to Armenta and Armenta was ready. He also told Montoya that "Red," or Timothy Martinez would be helping; that he'd go into Molina's cell and get him high, and then knock him out, so that the two Jerrys, Jerry Montoya and Jerry Armenta, could come in and commence with stabbing Molina.
>
> . . . .
>
> Dan Sanchez came in sometime later and asked, ["]You know what's up?" Montoya said, "Yeah."  Sanchez said, "Okay, be trucha," which I understand to mean to be careful or to watch out.
>
> . . . .

Armenta explained that he was -- he, Armenta -- was perching in front of his cell, which is just kind of squatting and hanging out. Daniel Sanchez signaled for Montoya to go upstairs because he'd been downstairs.

Montoya did. After getting to the top of the stairs, he squatted next to Armenta, and in a low voice said to him, said to Armenta that, "It's him or us," and by "him," he was referring to Molina. And Armenta basically repeated the same thing back, like, "Yeah, it's either him or us."

Nov. 27 Tr. at 155:19-159:2 (Acee).

The United States then presented, via Acee's examination, out-of-court statements

regarding the Molina murder that it may present to the jury by calling T. Martinez as a witness:

So on the morning of the Molina murder, Tim Martinez had come back from his work detail at the wheelchair program. And shortly after entering the pod, Mario Rodriguez called him over, and then told him to go get high. Timothy thought that was an unusual request. I think he described himself as not a regular user of drugs. And so he asked Mario why. Mario Rodriguez again told him, "Just trust me. Go get high." And Timothy kind of objected to that and kept questioning him. So Mario said, "Sit down, I'll explain what's going on." And then they had a conversation about what was to take place.

. . . .

It was explained to him that the paperwork on Molina had arrived; that he was a snitch, and that he was to get hit. And then from there they went into more detail.

. . . .

And [M. Rodriguez explained] that Daniel Sanchez had insisted on Martinez participating. Specifically Rodriguez said, "Dan is making you go."

Martinez said, "Okay. What do I have to do?"

Rodriguez answered, "Dan wants you to go into the room and beat him up so he can't leave." By "him," that would be Molina. "So that he can't leave the room and Jerry and Jerry" -- being Montoya and Armenta -- "will go in and hit him. They have some bone crushers. And Molina has to go." By bone crushers, that's a slang term for larger shanks.

. . . .

[Later,] Sanchez was in the cell next door to Martinez and began pounding on the wall. Sanchez asked of Martinez, "Did 'Blue' talk to you" -- something to that effect, "'Blue' talk to you yet?" And Martinez told him that he, "Blue," or

Rodriguez had talked to him.

Q. What was Daniel Sanchez' explanation to Timothy Martinez about why he should be involved?

A. What Martinez told me -- and this is a direct quote -- "You've got to do this. You got to earn your huesos," or your bones.

Sanchez went on about how the SNM had lost respect over the years, and they needed to take things back to the old days when the S used violence to get respect. Sanchez said, "S is about violence. We get respect through violence." Martinez said that he questioned Sanchez about why Molina had to be hit and why he needed to be involved in it. Why he, Martinez, needed to be involved in it.

. . . .

[Sanchez] basically said that Martinez hadn't done anything yet. He hadn't earned his bones, hadn't committed any violent acts, and that he needed to do something more significant than just bring drugs into the institution.

. . . .

Martinez told me that Sanchez told him he'd have to do it or else. And Martinez took that to understand that "or else" would be you need to do this or you're going to get hit.

Q. Now, did Mario Rodriguez at some point explain to Timothy Martinez that he didn't want him to go? By that I mean go to commit the murder?

A. Yes. As Mr. Martinez explained it, they were friends, and that he had lobbied -- he, Mario Rodriguez -- had lobbied to have Timothy not go and to get a pass on it. But that Daniel Sanchez had insisted. And Rodriguez said -- and this is a quote -- "But if it's your time, you've got to go. You got to do this for the family. Then it will be someone else's time."

. . . .

Q. And was there an explanation by Mr. Martinez about something to do with Mr. Molina's shank?

A. Yeah, quite by coincidence, Molina -- I mean, he had a shank, but he gave it to Timothy Martinez that morning. He was going to go shower, if I recall. And he said, Here, hold my shank, hold my fiero, or whatever term he used. And Timothy Martinez took the shank and put it in his cell in his commissary bag. Timothy Martinez related that to Mario Rodriguez. And I think they both just thought it was, based on their comments, good fortune on their part that Molina wouldn't have a shank and be able to fight back.

Q. And what was Mr. Rodriguez' comment to Timothy Martinez about having taken the shank?

A. He said, "Perfect, now he can't stab you."

Nov. 27 Tr. at 159:10-163: 25 (Castellano, Acee). Acee then testified:

Martinez told me that Sanchez, Daniel Sanchez, had obtained one of them [the shanks] from who they referred to as "Fat Ass," which was sort of a in-house nickname for Rudy Perez. Sanchez had told Martinez that Perez had given him two pieces of metal from his walker, and that that's what they'd made the shanks out of. Sanchez had made the comment to Martinez, "What else is Fat Ass going to do?" And actually, the comment made after that was Martinez' opinion. So that concluded what Sanchez said about that.

Nov. 27 Tr. at 164:4-14 (Acee). Acee added:

I specifically asked [T. Martinez] what conversation or what statements were made by Mario Rodriguez when they were in the cell, in Molina's cell. And Martinez said that Mario Rodriguez was standing in the doorway. And as Molina was getting up, Mario Rodriguez said, "He's getting up. What the fuck?"

Nov. 27 Tr. at 166:12-17 (Acee).

The United States then transitioned to another set of statements, which Baca made almost

two years after the Molina murder, see Nov. 27 Tr. at 164:21-23 (Acee), that it intends to present

to the jury:

Baca and Martinez [were] incarcerated up at the Level 6 at PNM North. And Baca told Martinez, "If they would have let me out, Javier wouldn't be dead, and that man would still be alive. But they didn't, and what's done is done. When they wouldn't let me out we had to make a statement. They called my bluff. And now they have a dead man on their hands."

Q. Was there ever any indication that Mr. Baca had kept in touch with Jonathan Gomez?

A. Yes.

Q. And what was that discussion?

A. Jonathan Gomez, or "Baby G," was and is often referred to as Mr. Baca's protege, and that communications would come down to other members through Jonathan Gomez, and that Jonathan Gomez had related to Timothy Martinez and others that "Pup" didn't trust Molina and to -- they should keep their eye on Molina.

Nov. 27 Tr. at 164:23-165:16 (Castellano, Acee).  Acee testified:

> [A]fter Baca kind of went on a rant with Martinez about Javier Molina, and the fact that the Corrections Department should have listened to him, Baca.
>
> Baca told Martinez that there was stuff in the works for Marcantel and Santistevan.  Specifically, he said that he'd like to get the wardens, too.  Baca explained that to Martinez, that "If we hit them, what's the worst that's going to happen?  They'll send us out of state, but then they'll ship us back.  And then they'll know we're for real.  It started with Javier Molina, and now it continues.  Javier was a building block for bigger jobs for Marcantel and for the respect we once had."

Nov. 27 Tr. at 167:5-18 (Acee).

Acee then described a set of statements attributed to C. Garcia that the United States may introduce via T. Martinez' testimony:

> Q.     And what about statements relating from -- to Timothy Martinez by Mr. Garcia, Christopher Garcia?
>
> A.     That conversation took place after the first wave of indictments and take-down arrests.  When they were out at the Otero prison facility, Martinez said that Chris Garcia -- they were actually talking about the guy named Jeremiah Martinez, a/k/a "Cyclone."  And the conversation turned to Gregg Marcantel.  At the time, Chris Garcia was upset about the situation and blamed it on Baca.  He specifically said to Martinez, "Pup" -- which is an alias for Baca -- "called me saying he needed guns.  It was right after the Holly Holmes fight and people were shooting guns in the air.  So "Pup" tells me he needs some guns for a job to hit Marcantel and Santistevan.  And I thought: Who the fuck is going to do that?  'Pup' was talking all drunk, saying Krazo" -- who is Eric Duran -- "had a phone.  I didn't trust Krazo so anyway."
>
> Q.     And that was a statement by Christopher Garcia?
>
> A.     It was.  He and Martinez continued to talk about it.  And that's where this Jeremiah Martinez comes up, and how they acquire the firearm that's to be used.
>
> Q.     What was the nature of that conversation?
>
> A.     Garcia was kind of laying out what happened with the Marcantel and the Santistevan hit, or planned hit, and why it was so screwed up. And he said, "I called 'Cyclone'" -- in this case that's Jeremiah Martinez -- "for the guns.  He gave me some piece of shit .22 or .25" -- caliber. "Those fucking things weren't going to do shit.  They would have just made Marcantel mad.  'Cyclone'

claimed it was good one. He had used it a few times." And Garcia said, "It was a piece of shit, maybe one or two shots because the clip was all fucked up."

Nov. 27 Tr. at 167:19-169:6 (Castellano, Acee).

The next day, the United States called FBI Agent Nancy Stemo to the stand. <u>See</u> Nov. 27

Tr. at 40:2-7 (Castellano, Court). Stemo described statements that the United States may offer at

trial via Armenta's testimony:

> Daniel Sanchez ordered Armenta to carry out the hit on Javier Molina because he needed to put in work for the SNM. And he stated that if Armenta refused, he could also be killed.
>
> Q.     And what did he say that Mr. Sanchez said during the time that Mr. Armenta was assaulting Javier Molina?
>
> A.     After Javier Molina exited his cell and Jerry Armenta and Jerry Montoya were following Molina down to the bottom tier, Armenta overheard Daniel Sanchez saying, "Get him, get him."

Nov. 28 Tr. at 40:23-41:8 (Castellano, Stemo). Stemo also testified regarding several other out-

of-court statements that the United States may introduce at trial by calling Armenta and M.

Rodriguez to the stand:

> Q.     What did Mr. Armenta tell you about conversations he had related to the Marcantel conspiracy to murder?
>
> A.     Jerry Armenta mentioned that Robert Martinez had told him that Robert Martinez and Roy Martinez had put a hit order on Gregg Marcantel and Dwayne Santistevan.
>
> Q.     Okay. Now, I want to turn your attention to a conversation you had with Mario Rodriguez. Did you have a chance to speak to him?
>
> A.     I did.
>
> Q.     . . . What did Mr. Rodriguez indicate about a statement made to him by Daniel Sanchez related to the Molina paperwork?
>
> A.     While Rodriguez and Daniel Sanchez were reading the paperwork, Daniel Sanchez stated, "It's done."
>
> Q.     And in what context was that made in terms of reviewing the paperwork?

A.     That the decision had been made because they had received the paperwork.

Q.     And what did Daniel Sanchez want Timothy Martinez to do?

A.     He wanted Timothy Martinez to be involved in some fashion in the murder.

Q.     I also want to ask you about a statement from Carlos Herrera to Mr. Rodriguez about the Molina murder?

A.     When Carlos Herrera gave Mario Rodriguez the paperwork, Daniel Sanchez wanted to verify it, and Carlos Herrera told [M. Rodriguez] to, "Get that shit fucking done."

Q.     And had Mr. Rodriguez volunteered to participate in the murder?

A.     He had. But Daniel Sanchez told him not to.

Q.     And what was said from Mr. Sanchez about covering the cameras?

A.     He stated he did not want the cameras covered because the murder would be in a blind spot.

Q.     Can you tell the Court about a statement made by Rudy Perez when Mr. Sanchez was in his cell?

A.     When Mario Rodriguez went to Rudy Perez' cell, Daniel Sanchez pointed at a piece of Perez' walker, and Perez stated he was "down for whatever, as long as it was not me."

Q.     And what did Mr. Rodriguez say about a conversation he had with Timothy Martinez, once Mr. Martinez returned from the wheelchair program?

A.     Rodriguez told Timothy Martinez to go get high because the paperwork had arrived.

Q.     What was the purpose of getting high, do you remember?

A.     I don't.

Q.     And was there a clarification about who the paperwork was for?

A.     There was. Timothy Martinez initially volunteered to do the hit, because he thought the paperwork on Jerry Montoya had arrived. But Rodriguez clarified that the paperwork on Javier Molina had arrived instead.

Q.     And what statements did Timothy Martinez make about Javier Molina's fiero or shank?

A. Martinez stated that Molina had given him his shank prior to count, [sic] and Martinez had placed that shank inside of a bag of canteen. Martinez later gave that shank to Rodriguez.

. . . .

Q. Can you tell the Court whether Mr. Rodriguez confirmed to Mr. Montoya that he had seen the paperwork on Javier Molina?

A. He did.

. . . .

Q. Once Mr. Montoya learned that the paperwork was there, what was his response?

A. He said he would do it.

Q. What did Mr. Sanchez tell Mr. Rodriguez about leaving any dope behind in Javier Molina's cell?

A. Mr. Sanchez told Rodriguez to not leave any dope behind in Molina's cell and that they could go halfers on it later.

Q. Once they were inside Javier Molina's cell, what did Mr. Rodriguez tell Timothy Martinez about exiting the cell?

A. Rodriguez told Martinez to exit the cell.

Q. What happened next?

A. Jerry Armenta and Jerry Montoya entered and began stabbing Molina. Rodriguez instructed both Armenta and Montoya to not let Molina out of the cell. Rodriguez overheard Montoya tell Molina to stay back, and Molina did not.

Q. And when Mr. Molina made a statement that he was done, saying, Come on, I'm done now, what was Rodriguez' response to that?

A. He told Molina that he was no carnal.

Q. When it came to Mr. Herrera wanting to pass the paperwork to green pod, what was Mr. Rodriguez' response to him?

A. Rodriguez told Herrera not to pass the paperwork to green pod because the individuals in green pod had been protecting Molina.

Nov. 28 Tr. at 41:14-46:15 (Castellano, Stemo). Stemo then identified a document as a

"transcript of a recording of conversations between Rudy Perez and [Billy Cordova]," that Cordova recorded in February, 2016. Nov. 28 Tr. at 46:24-47-5. The Court admitted that transcript as Government's <u>James</u> Hearing Exhibit 16. <u>See</u> Nov. 28 Tr. at 48:4-5 (Castellano); <u>id.</u> at 50:16-19 (Court).

On November 29, 2017, the United States called Acee to the stand again. <u>See</u> Nov. 29 Tr. at 228:11-12 (Acee). The United States asked Acee "about some letters that were either intercepted or retrieved by STIU [Security Threat Investigation Unit] agents in this case related to the . . . conspiracies to murder Mr. Marcantel and Mr. Santistevan." Nov. 29 Tr. at 229:3-7 (Castellano). The first letter "was received by STIU on or about March 27, 2015," Nov. 29 Tr. at 229:9-10 (Castellano), and

> is from Roy Martinez, a/k/a "Shadow." It's addressed to Juan Carlos Gutierrez, a/k/a, "Gotti." In this letter Martinez orders Gutierrez to kill Gregg Marcantel pursuant to orders that were given to him by Anthony Baca, while they were housed together at the Southern New Mexico Correctional Facility in 2013.
>
> The letter goes on instructing Gutierrez to contact other members on the street to make this happen. And if the other members on the street failed to help carry out the hit, they should be killed. And that other members would be in contact with him to help him -- him being, excuse me, Gutierrez -- to help ensure that that hit took place.

Nov. 29 Tr. at 229:16-230:4 (Acee). The second letter

> was written by Roy Martinez, addressed to Damian Lobrado, a/k/a "Cuba." And in this letter Martinez tells him that the time has come for "Cuba" to show his loyalty to the S, which he had not yet done, and that he was to kill Gregg Marcantel.
>
> It also goes on to say that Gutierrez -- the person that we just talked about on the first letter would be in contact, and that they should work together. Other members would be in touch, and that they should not fail this mission.

Nov. 29 Tr. at 230:9-19 (Acee). The third letter

> is also from Roy Martinez. This one is addressed to Arthur Chavez, a/k/a "Lonely."

Q.      What's the content?  Well, who is it written to?

A.      Again, this is to Chavez, a/k/a "Lonely," and Martinez is telling him that at the direction of the viejo, who we believe is Anthony Baca, and that it's about a list Anthony Baca and Chavez had previously discussed.  Martinez said that Gregg Marcantel had degraded Anthony Baca and dishonored the SNM.  In the letter he ordered Chavez to handle the hit carefully and discreetly.  Martinez concluded the letter by threatening Chavez that there were other members on the street to take out any members who refused to carry out the hit.  Martinez advised that there would be no more second chances.   And then Martinez again referenced a hit list that Anthony Baca discussed with Chavez, and named Marcantel as the priority.  And I'm quoting Martinez; he said, "He must go," a reference to Marcantel.

Q.      And further down on that document, do you see where there is additional information about a green light for members who refused to carry out the hit?

A.      Yes. Martinez gave Chavez the green light to take out any SNM members who refused to assist with completing the objective of killing Marcantel.  Martinez also gave Chavez a deadline of August 31, 2015, at midnight, to complete the hit. Martinez also threatened Chavez that if he failed to do this or refused to conduct it, that he'd be hit as well, as would any other member that failed to go along with the mission.

He also claimed -- Martinez claimed that there were three SNM members watching Chavez at the time Chavez was on the street.

Q.      What was purpose of watching him?

A.      To ensure that he was making good on progressing on the mission.

Nov. 29 Tr. at 230:25-232:14 (Castellano, Acee).  The fourth letter is

from Robert Martinez, a/k/a "Baby Rob," and it's addressed to Sammy Griego, a/k/a "Sammy G."  In this letter Robert Martinez stated that the SNM leadership had decided to allow Griego one opportunity to show his loyalty to the SNM by taking out Gregg Marcantel and Dwayne Santistevan.  In the letter Martinez gave Griego the flexibility to work out the details of the hits on his own.  Martinez threatened Griego by stating if he failed to conduct the hits, he'd be taken out.

Martinez also told Griego that other SNM members would be in touch with him; that they should work together.  Martinez instructed Griego to get in touch with Gerald Archuleta, a/k/a "Styx."

In the letter Archuleta is referred to as "Grandma."

Nov. 29 Tr. at 232:17-233:7 (Acee).  The fifth and final letter:

is from Robert Martinez, "Baby Rob," to Ruben Hinojosa. In this letter Martinez stated that the SNM leadership are tired of SNM members getting out of the prison and doing nothing for the SNM. Martinez said that this type of behavior would no longer be tolerated and ordered Ruben to show his loyalty by taking out Gregg Marcantel and the Dwayne Santistevan. Martinez threatened Ruben just like the other letters, and advised that other SNM members would be getting in contact with him. And concluded that, if he didn't follow through with the mission, that his life would be in jeopardy.

Nov. 29 Tr. at 233:10-22 (Acee). The United States then turned from letters to out-of-court statements that Baca made.

[I]n reference to the hits on Marcantel and Santistevan, the CHS [Confidential Human Source] told me and the other agents that Anthony Baca was eager to hit both Marcantel and Santistevan; that according to this source, Baca told the source that he was excited about the recognition the SNM would get all over the country if they were successful.

This source claims that Baca told him that not even the Mexican Mafia had been able to kill a prison director or cabinet secretary. The CHS stated that Baca first ordered Billy Cordova, a/k/a "Little Shadow," and Robert Sanchez, a/k/a, "Tiny," to hit STIU Administrator Dwayne Santistevan back in 2014, when they were both released from prison. However, both got picked up while they were on parole, and were unable to enact that plan.

. . . .

Okay, so in October, on October 22, 2015, as part of our investigative strategy, Anthony Baca was returned to New Mexico from U.S. Prison -- one of the facilities, one of the four facilities up in Florence, Colorado. He was housed at the Level 6 facility, and he was housed next to one of our confidential human sources.

We utilized electronic surveillance, both what I'll refer to as body wires or ELSUR devices, as well as what would otherwise be considered a contraband cellular telephone that I had a wire interception order on.

During Mr. Baca's incarceration at the Level 6, Mr. Baca and the CHS, as well as other people, other SNM members in and around the CHS, engaged in conversations. Much of those conversations were recorded via the body wire and/or the contraband phone.

The CHS had a reputation for having phones in the past, and I don't think it surprised anyone that he had one in this circumstance. And so as I mentioned numerous phone calls were made and recorded, as were conversations.

Q.     And what was said about the conspiracy to kill Messrs. Marcantel

and Santistevan?

      A.      Quite a bit.

. . . .

      "Additionally, upon his return to New Mexico, Baca added STIU Coordinator Adam Vigil to the hit list. He added Vigil because Vigil was scheduled to testify against the SNM as an expert witness for the State of New Mexico in the Molina homicide prosecution."

. . . .

      "CHS says to 'Pup' that Robert" -- in this case Robert Martinez -- "wrote 'Pup' a wila saying he was going to take care of Santistevan because he knows 'Pup' hates him. 'Pup' responds with 'Yes.'"

. . . .

      "'Pup' explains that Javier Molina and Jerry Montoya were close despite what people thought.

      Javier would go to Montoya's door and call him names so people thought there was a beef. But they were actually close. 'Pup' told Montoya that if Javier kept talking to him like that, then Montoya needed to hit Javier. But Montoya told 'Pup' it was not serious. 'Pup' then said, 'I even told 'Conejo,' Samuel Silva, 'I'm going to push this shit, eh.'?

. . . .

      "'Pup' tells CHS to have Mario, "Poo-poo," who is Mario Montoya hit Santistevan, and/or Adam Vigil, not Marcantel, and have Chris Garcia finance it. He says it needs to be done because the administration is going to tear us to shreds little by little. 'Pup' says after the hits are done, all the brothers will be separated in various states, and that communication with one another will be critical."

. . . .

      "'Pup' decided that it's better to" -- I believe that's a typo. It says his; I think it should say "hit. "'Pup' decided that it's better to hit Santistevan and Adam Vigil because they are the one telling lies to Marcantel. Once the hits are carried out and the investigation is done, the news media will realize the corruption and scandals in the prison system and fire Marcantel. 'Pup' is adamant that he wants it done. And says the worst that will happen to the SNM is that they will be sent out of state."

      "'Pup' wants research to be done on where Vigil and Santistevan live. He believes that the warden lives on prison grounds on Oasis Street, but also

observed other houses that could belong to Vigil or Santistevan. He says it will be easier to get them if they do not reside on the prison grounds. He also says he wants to bring down Bustos, a former Associate Warden, who 'Pup' blames for sending him to the ADX. 'Pup' does not specify that he wants Bustos hit, but it appears he wants the get him in trouble. 'Pup' believes that Bustos owns a Santa Fe real estate company."

. . . .

Q. And what is Mr. Baca's statement about where he believes Mr. Marcantel lives in the next statement?

A. "'Pup' believes Marcantel also lives on prison grounds."

Q. And just to be clear, for the Court's determination on these statements, at any point did Mr. Baca talk about murdering Mr. Vigil with anyone other than a cooperator that you're aware of?

A. I think he talks about it with Mario Rodriguez, "Blue."

Q. I just want to make sure we're keeping track of who they are.

A. He may also talk about it with Chris Garcia during the phone conversations.

. . . .

"'Pup' and CHS ask Garcia" -- in this case it's Chris Garcia -- "for Mario's phone number." Mario is Mario Montoya.

Q. And to put the statement in context, what was the purpose of obtaining Mario's phone number?

A. Mario Montoya is a good SNM soldier on the streets, and the one that's designated to lead the mission, the hit on Marcantel and Santistevan.

Q. And at this point, for the Court's consideration, was Mario working as a cooperator for the Government?

A. He was.

Q. And were Mr. Baca or Mr. Garcia aware of that?

A. No.

. . . .

"'Pup' instructs the CHS what to tell Mario regarding Santistevan and Vigil hits. 'Pup' says, 'All the shit that's going on with the rasa, it's all fucked up

- 33 -

because of those two individuals. So we need this fucking perro done. We'll give you a few days to try to hunt down this motherfucker. 'Pup' also says, 'That's only way this shit is going to stop. If they get handled, you know. Either one of them, it don't matter which one."

The CHS then asks, "Either Santistevan or Adam?

"Pup" responds, "Yes, either one. It doesn't matter. One of them will be dealt with in order to stop this foul ass shit that they are doing."

. . . .

"Pup" and the CHS talk with Mario on the cellphone. "Pup" tells Mario to reach out and touch Santistevan or Adam Villa. "Pup" says, "Fucking Adam Vigil and fucking Santistevan are making it real fucked up. They're creating a lot of perro that -- making the brothers fight with each other. And we need -- and we need somebody on the calle to fucking touch either of them. It don't matter."

. . . .

"Pup" says, "And if he, Mario, needs any squina or feria to finance the perro to get it done, then we're gonna -- we're gonna to work on it till it gets done."

. . . .

A. "Pup" instructs Mario to make a silencer out of a lawn mower muffler and a packet with steel wool. Pup says that Chris Garcia can finance Mario if needed. "Pup" asks Mario, "Okay, now, how are the brothers acting out there?" Mario tells him that the brothers don't do anything, and like to get high, but deny it. "Pup" says, "We're going to fucking start identifying them fuckers. That way, when we come in here, knock them off."

. . . .

A. "'Pup' tells Yvonne to mail in Suboxone strips and 2K so that he can make money."

Q. What's your understanding of what 2K refers to?

A. It's a synthetic marijuana.

Q. And who is Yvonne?

A. I believe that's Mr. Baca's girlfriend. I don't believe they're married. They may be, though.

MR. CASTELLANO: For the record, that would be conspiracy to bring

- 34 -

contraband into the jail or to distribute narcotics. So we still consider it a co-conspirator statement, but just not related to those two counts. We'll be moving for its admission at trial.

. . . .

A.      "Pup" and the CHS are talking about planning the hits and the best weapon to be used. "Pup" says, "What's a good cuete for that? It has to be a revolver, carnal, not an automatic. Automatic might jam. Those are easier to put a silencer on, too, a homemade silencer, because it has a barrel."

. . . .

A.      "Pup" said, "You can't say cuete on the phone." And Eric says -- excuse me, Eric, the CHS, Eric Duran, says, "Well, it's my phone," like this phone is good. And then Pup tells him, "Yeah, but we don't know that Chris' phone is good because Chris is always hot."

. . . .

"Pup" and the CHS are talking via the cellphone to Mario, getting an update on how Mario's planning is going. "Pup" insists that Mario find out addresses on Google. And again, I'm going to add some notes here from my review of the transcripts. "Pup" is telling Mario to run their names, and make sure he uses someone else's computer, like going to the library. And Mario kind of jokes back and says, Well, "I can't just put their name in and it's going to tell me all this stuff about them." So they kind of banter back and forth about that.

. . . .

A.      "Pup" suggests that Mario research upcoming meetings or charities that the targets might attend.

Q.      For what purpose?

A.      To locate them; that they're -- especially Marcantel, he'd attend various meetings and functions. I added a note there that you'll see when you review this that says, "Pup" encourages Mario to take his time, that it needed to be done right.

. . . .

"Pup" and the CHS are talking about Michael Snow. "Pup" tells the CHS, "Ask him if he could try to get me a cuete. If he could, just get one, and I'll have him give it to somebody." Specifically, "Pup" asks for a revolver.

. . . .

Q.      And are you aware of whether or not Michael Snow is a convicted felon?

A.      He is.

Q.      Okay. Two bullet points below that it says, "'Pup' asks Snow if he's heard" -- can you tell us the rest of that statement?

A.      "'Pup' asks Snow if he's heard from Becky, and if she still gets prescriptions for Suboxone.  'Pup' tells Snow to acquire some Suboxone strips, and then give them to his hita."

. . . .

"'Pup' wants to send us a message to 'Creeper'" -- who we believe was Jerry Armenta's "family that they will be harmed if he testifies for the state. 'Pup' wants the family to know 'Creeper' is fucking up.  If he take[s] the stand against this perro, against anybody, we're coming for your ass.  'Pup' agrees that Mario is the best person to deliver the message."

Q.      And can you tell the Court whether at this point the Molina murder was still charged at the state level?

A.      It was.

Q.      So when he refers to Jerry Armenta testifying for the state, are we talking about Molina at the state level at that point?

A.      Yes.

. . . .

"'Pup' and CHS are talking with Mario Montoya.  'Pup' says he is working on getting Mario guns."

Q.      In that call are you aware of what the purpose is of obtaining guns at that point in time?

A.      Hit Marcantel, Santistevan, Vigil.  "CHS read a text message from Chris Garcia to 'Pup.'  Chris is nervous about giving guns to Mario because other brothers have been coming to him asking for Suboxone strips for 'Styx.'  But then they never send them to 'Styx.'  Chris wants "Pup" to make sure Mario is completely on board before he gives them the guns.  Chris says, 'So just see what's up.  Make sure that everything is going to be good, because these are nice toys.  And if they're in the wrong hands and the carnal needs to get right, then those are gone.'"

Q.      Who is "Styx" referring to?

A.      Gerald Archuleta.

Q.      Tell us about the next statement, please.

A.      "This message from Chris concerns 'Pup.'   'Pup' is getting nervous about too many people knowing about the mission, and says that they just kept only one carnal on it."

Q.      So what's the concern at that point?

A.      Too many people know about it.

. . . .

"'Pup' is trying to work out what to do with Chris not trusting Mario enough to give him a gun.  'Pup' thinks it may just be best to get Mario money so he can get his own gun."

Then I add some comments from my review of the transcripts, which is "'Pup' wants Mario to watch out for cameras."   He was real concerned that Marcantel would have cameras on his house.  He made the comment, "He needs to make sure he's not wearing a beanie or a mask when he walks up there."

. . . .

"Mario should have done the hit over the night.   'Pup' and CHS are wondering if the feds are going to charge the SNM.   'Pup' talks about the steps the feds would have to take, gather state evidence, bring in STIU and local law enforcement.  'Pup' complains about carnals doing interviews for TV shows like Gang Land and MSNBC."

. . . .

"The CHS asked 'Pup' if the SNM will get respect from the Mexican Mafia if Mario successfully kills the Secretary and all the carnales get sent into the federal system. 'Pup' responds, 'They already respect us. And with us going over there like that, with that type of fucking charge, oh, yeah, they fucking -- not only them' -- the Mexican Mafia -- 'everybody else respects the fuck out of that shit.'"

Q.      And since we have more than one Mario mentioned in this case, who is this Mario referring to?

A.      Montoya.

Continuing on?

Q.      Yes.  Next statement, please.

A.      "'Pup' says that the murder will fucking bring us all kinds of" -- unintelligible -- "fuck -- unintelligible -- "get notoriety like fuck. And then all them vatos and the feds will be like, 'Fuck, yeah, you fucker.'"

Q.      Okay. Next statement, please.

A.      "'Pup' realizes that once the Secretary is killed, law enforcement will probably identify Mario. 'Pup' says that he woke up early this morning to watch the news, and see if the secretary was killed. And also he warned 'Dan Dan' that the feds would be coming after them. CHS explains to 'Pup' how Javier Molina's murder went down. And 'Pup' says, 'That wasn't to happen like that.' CHS says that 'Blue' is upset about how the murder happened. And 'Pup' said he would talk with 'Blue.' CHS asked 'Pup' what 'Blue' said when 'Pup' told him they would threaten "Creeper's" -- again, Jerry Armenta's family -- "'Pup' responds, 'Oh, he said, 'Fuck, yeah.'"

Q.      So we have context here, who is "Blue"?

A.      Mario Rodriguez.

Q.      And earlier I asked you about a statement where Mr. Baca said not to kill Mr. Marcantel. At this point has he -- in the investigation, has he agreed that Mr. Marcantel should be killed?

A.      Clearly.

. . . .

"Pup" is talking about Jerry Armenta testifying. "And his family, his family gets hit. And that shit will hit the news, carnal. And they're going to say the only motive behind that has been because that fucker testified. That shit hits the news, too. That gives us more power. Because of that fact, everybody is going to know, a la verde, they're going to hit my family, I'm never going to tell them."

. . . .

The CHS tells "Pup" that if Mario gets caught, and the news gets out that the SNM hit the Secretary, then the Eme will look at the SNM different. 'Pup' responds, "Hell, yeah, they are." "'Pup" complains to the CHS that 'Dan Dan' is too quick to want to fall under the Eme. 'Pup' views the SNM as equal to the Eme."

. . . .

Q.      In order to lay the groundwork for this exhibit, which I'm putting up on the visualizer -- it's Government's Exhibit 26 -- what is the context in which this statement takes place?

A. So this is November 29, 2015. The previous evening, Chris Garcia called Mario Montoya and said that he had the gun that was to be used to hit Marcantel. I didn't want to go out in the evening. It's more difficult to do surveillance. So Mario told Chris something, and we set it up for the following day.

So this is a transcript from a body wire that Mario wore when he went to Chris Garcia's house to pick up the firearm.

MR. CASTELLANO: And for purposes of the James hearing, Your Honor, I'm actually moving in the entire conversation as part of the co-conspirator statements.

Q. Look at some of the highlighted areas, Agent Acee. There is discussion about a .22 long rifle. What is that referring to?

A. Ammunition, a bullet, a cartridge.

Q. A .22 long rifle cartridge goes in what type of firearm?

A. A .22 caliber firearm.

Q. And was there a firearm turned over from one person to another on that date?

A. Yes. Chris Garcia gave Mario Montoya a .22 caliber semi-automatic pistol.

Q. For what purpose?

A. To kill Gregg Marcantel.

Q. Okay. And can you tell the Court what this reference is regarding the clip?

A. He's referring to the magazine. He says, "Well, the firearm didn't have a magazine. It needs a magazine to be fully loaded." So what Garcia is explaining to Montoya is: "Put the bullet in the fucker and then you can shoot it. Or you can get a clip and, you know, do it the right way. Order a clip."

Q. Down here -- this is on page 1086 at the bottom of this exhibit, there is a reference to somebody named "Chuco." Can you tell us who that person is?

A. That's Mandel Parker.

Q. And can you tell the Court whether Mandel Parker became part of this conspiracy?

A.     He did.

Q.     What was the context in which he became involved?

A.     Mario Montoya contacted SNM members on the street, explained the mission that he was on. "Chuco" volunteered, and was actually eager to help.

Q.     Did he show his interest in joining the conspiracy to murder Gregg Marcantel?

A.     Enthusiastically.

Q.     On the next page at the bottom is 1087.  Tell us about the discussion here with the word feria?

A.     So here, the CHS is expressing some concern that -- well, one he's trying to get some money out of this.  And then I think that he's kind of negotiating that he should get some money because Marcantel is a, quote, "big motherfucker." And at this point he's been given a .22 to kill him that can only hold one bullet.

Q.     And so is there a concern that one .22 caliber round won't do the job for someone as big as Mr. Marcantel?

A.     Yes.

Q.     And what's the discussion in here about River's Edge 3?

A.     This is where the CHS is reporting that -- kind of how he's going to do the hit.  They've done their reconnaissance or their scouting.  And he's saying that Marcantel, he has two big old dogs.  He lives over there on River's Edge 3.  That's a housing neighborhood off -- I think it's off 528 in either Rio Rancho/Bernalillo area.  And he's just saying that he walks the dogs two or three times a week, and that that would be a good place to hit him.

Q.     And you see further discussion about killing Santistevan, the question by Mr. Garcia?

A.     Yes.

Q.     And if you recall from this conversation, you know what they're talking about when they talk about giving him a double, and leaving him with everything?

A.     Yes. They're talking about killing Mandel Parker, and then leaving the murder weapon and any other evidence with Parker, so it looked like he did it.

Q.     On the next page at the bottom, it's 1088.  Is there -- the word

"gauge" is used there. Do you remember what the discussion referred to at that point?

A. Yes. Chris Garcia said that when Montoya expressed some concern about it just being a .22, Garcia said that he also had a shotgun, but he needed more time to get it. I think he said it was at his brother's house. And so he said he'd get the gauge too. It was a good one. He actually did follow up and tell -- send Mario either a phone call or a text message saying that, Hey, he had the gauge, do you want to come get it.

Q. And what ultimately happened there?

A. Well, we didn't, because we ended up arresting everybody.

Q. Now, turning to page 1090 of the exhibit. Some discussion about somebody eating at Barelas Cafe. How can you put that in context for us?

A. This is where Chris Garcia is telling the CHS that he saw Marcantel eating, and that he couldn't believe it. He was at the Barela's Cafe. He was eating by himself. And then later on down there, where you have the highlighted, it says, "He carries a cuete, too." Garcia is telling the source that he carries a gun also, he being Marcantel.

. . . .

Q. And at the bottom of the page under the next page it says, "That's the one I'm going to send 'Pup' out of the state." Who is that referring to?

A. That's referring to Marcantel. After the Javier Molina murder, Marcantel is regarded by the SNM as being responsible for sending "Pup" and Mr. Sanchez and others out of state.

. . . .

So this is just Mario Montoya, the CHS, and Chris Garcia talking about -- they're talking about what "Pup" wanted, what "Pup" -- excuse me, what Mr. Baca's instructions were to Mario. And they're talking about the neighborhood. They're talking about the gun. It looks like the fourth block down it says, "See if I get this clip. If not, um, let me get that gauge, too. What he's saying is if I can order the clip in time for the magazine for this .22, sure. Otherwise, let me get the gauge.

And I had instructed Montoya to get whatever Garcia was providing for this. It didn't matter what they were.

Q. What was Mr. Garcia's response?

A. He says, "Yeah, that gauge, that gauge is perfect. You could even

tell what's his name where it's at." Some of that is unintelligible. "If you're around the neighborhood where he walks the dogs, there is going to be cameras." And Garcia is just warning them, "I have cameras at my pad."

The CHS goes on to say, basically he scouted it. "There is a back way in. It's down there by the bosque." I think what he's referring to is below River's Edge is the Rio Grande River, so there are some walking trails and stuff like that.

Q.    What is Mr. Garcia's suggestion about going to the barber shop and getting hair?

A.    You know, I'm actually -- I have reviewed this, but that's not -- I guess he's making reference to going to the barber shop to get some hair. Act like they had to use the restroom, and then maybe put it in your pocket and leave, to leave at the crime scene, somebody else's hair. That's what I'm discerning from that.

Q.    So, in other words, if you left someone's hair at the scene, would that provide a DNA sample of other people?

A.    Yes. Either that or even attaching someone else's hair to your head. Either way, it's to throw off the crime scene.

. . . .

It says -- this is Garcia talking and there is some overlap. He's talking about what I believe is a light affixed to the shotgun. He says, "This fucker is bright. You turn the bright on it, and I swear to God, the light on it is bright as fuck. And" --unintelligible -- "during the daytime, like that, where the, where the" -- unintelligible -- "I got it" -- unintelligible -- "it's a pretty bright light." He goes on to say, "You know what I mean brights" -- and the something -- and so the CHS and Garcia are kind of interacting how to come up with this light affixed to it, I believe, and approach somebody, and all they can see is the light and then you see it says, "Boom!" there.

So that's based on my listening live at the time, reviewing this, and then debriefing the source immediately after, that that's what they were talking about.

The next one, I would turn the page to 1089. This was -- this stood out with me starting at the top where they're talking about Andrew. And that's Andrew Romero. Now, he's not a defendant in this case. He was just convicted in the state of murdering the Rio Rancho Police Officer. And shortly after that he was brought into the SNM, while he was incarcerated at Central. And there has been some disagreement among members on whether or not he should be in or not, because he may have been a rat before. And that's what they're talking about here. But there is other conversation where that murder of that cop may have made him a good guy.

Nov. 29 Tr. at 234:10-269:8 (Castellano, Acee).

The United States finished examining Acee regarding Exhibit 26 on December 8, 2017.

See Dec. 28 Tr. at 206:9-13 (Castellano, Court).  The United States began with questions about

Exhibit 26 statements:

> Q.     Okay.  I'm going to go ahead -- and we've covered some other parts of the conversation, so I'll move to Bates stamp 1095 on that transcript.  I'll start here with the highlighted portion, where the CHS says, "I'm going to put this away and Imma come back."  Can you tell us what's going on there?
>
> A.     The CHS has received a .22 caliber pistol from Garcia, and he's telling him that he's going to go put it away, and that he'll come back to the house afterward.
>
> Q.     Okay.  Then tell us about the rest of the conversation.
>
> A.     Mr. Garcia brings up "Chuco," who is Mandel Parker.  Do you want me to read from this, or just tell you what I know of it?
>
> Q.     Yes, tell us what the rest of the conversation means in the context of this page.
>
> A.     Sure. So Mr. Garcia says, "Then with 'Chuco' too he has to be, like you said, right after we take him, if he looks" -- unintelligible.  Both are speaking at the same time, there is overlap -- "take it all."  Garcia says, "At all just right there.  Even if he has to take him to the fucking thing and get him and put the thing on him.  The weapon on him, and leave it on, leave it there.  A la verga.  It's fucked up, but if he -- if he right away gets out and says, What's up fool."
>
> Montoya says, "I'm gonna say nothing.  He's not gonna say nothing.  You're gonna get down and do it and that's it.  I mean" -- unintelligible -- "do it.  I'm going to do it."
>
> Garcia says, "Yeah."
>
> Montoya says, "I'll do it and then I'll do him right after, know what I mean. I already, I already pretty much got" -- unintelligible -- "good."
>
> Q.     Let me stop there.  What's going on in the context of that conversation?
>
> A.     Garcia is expressing some doubts about "Chuco," Mandel Parker, who had previously agreed to help Mario Montoya kill Marcantel and Santistevan.  And what they're discussing is "Chuco," or Mandel Parker, might be

a weak link.  If he gets picked up, he might tell.  So that they're discussing killing Parker, and leaving all the evidence, to include the murder weapon, with Parker.

Q.      So was it your understanding from the operation that Mr. Baca, Mr. Garcia, and Mr. Parker had agreed to kill Secretary Marcantel?

A.      Yes.

Q.      Okay. I'm turning to the next page.  It's Bates stamped 1096. And I want to focus on the last statement highlighted on the page, which is Mr. Garcia's.

A.      Garcia says, "Give him a hotshot, you know, whatever.  But hey, just tell him, yeah, fucking a, my only chance, let me put in some jale for you.  I told him."

Q.      What was your understanding of the discussion about the hotshot?

A.      Garcia is suggesting to the CHS, Mario Montoya, that he give Mandel Parker a hotshot, which is a fatal dose of heroin.

Dec. 8 Tr. 207:12-209:23 (Castellano, Acee).  The United States then asked Acee some questions about statements in Exhibit 16:

Q.      Okay. I want to turn attention to a statement here by Rudy Perez referring to "Crocodile" answering for it and BB answering for it. Do you see that portion?

A.      Yes.

Q.      Can you tell us basically what the statement is and who was involved in the statement?

A.      Do you want me to read it first, or just --

Q.      Go ahead and read it, and then put it into context, please.

A.      Rudy Perez says, "Yeah, and you know, check this out, a, and it's like what was discussed.  'Crocodile' about has to answer for it.  BB has to answer for it, um, I think there is four or five that have to answer.  Why it was never done the first the paperwork got sent down."

Q.      Do you know what that is a discussion about?

A.      Yes.

Q.      What is it?

- 44 -

A.     Mr. Perez is talking about the prior times the paperwork for Javier Molina was sent down to Southern.  "Crocodile" is an SNM member who was in charge of the pod; I don't remember his name.  BB was another SNM member in charge of the pod down there.  That's Javier Rubio.  And they're going to have to answer for the fact that paperwork went down and Molina wasn't hit.

Q.     And who is that statement attributed to? I'm going to draw your attention to the next portion there.

A.     Mr. Perez is saying, "I, I heard 'Pup' say they have to answer for that no matter how close I am to them."

Q.     Okay. And so what type of conspiracy are we talking about when it comes to the paperwork and "Pup," or Mr. Baca saying people have to be responsible?

A.     There was an expectation that when the paperwork was produced, the other members of the gang would act on it.  They didn't.  And in this statement Mr. Perez is saying that he heard from "Pup," Anthony Baca, that they would have to answer for it.

Q.     And is that because from the investigation you've learned that the paperwork went down previously, but the murder was not committed?

A.     Yes.

Q.     The next statement is from DeLeon Bates stamp 20544.  I'm going to direct your attention now to more discussion about paperwork.  Who is making the statement this time?

A.     Mr. Perez.

Q.     And what is the statement as it relates to paperwork?

A.     Within that statement he's saying, quote, "He's got the paperwork a year before. That's when he told me, hey, we got it.  Yes, but we're not gonna show it.  So you just make sure you show some love, no?"

Q.     Okay.  And then continue.

A.     The CHS says, "Orale, so hey, that's -- so that's why -- so that's why that fool Javi, Javier was fucking always sending coffee to him because he knew he was a chaffa fucker."

Perez says, "He was. He was covering his ass, dog."

Q.     Can you tell the Court whether that was a further discussion of the paperwork that was discussed just a minute ago in your testimony?

A.     Yes, I believe it is.

Q.     And for purposes of context, are you familiar with the word "chaffa" that's on that page?

A.     Yes.

Q.     What does that generally refer to?

A.     They're no good.

Q.     I'm drawing your attention to DeLeon Bates stamp 20555. And I want to talk to you once again about discussions about paperwork.

A.     I'll start where you pointed, or --

Q.     Yes.

A.     So the CHS is asking, "So that's what it was, it was the paperwork on Jesse Sosa."

Mr. Perez responds, "That, that, that, that was part of it, and then Archie's boy was the other half."

Q.     And I'll show you right here. Tell us what Mr. Perez says about his discussions with others.

A.     Toward the bottom of his statement, Mr. Perez says, "I told them vatos not like" -- unintelligible -- "think about that, and they basically told me, you know what, a this is going to happen regardless, just stay out of it."

Q.     Now, what's your understanding of the context of this statement? Stay out of what?

A.     The Molina hit.

Q.     And was it your understanding from the investigation that there was a conspiracy to murder Javier Molina?

A.     Yes.

Q.     And once again, DeLeon 20557. I'm going to direct your attention here to a statement by Mr. Perez.

A.     Mr. Perez is saying, "You feel me? Like I say, they told me to shut up and just stay out of it, and they did what they wanted to do. Then later on, suicide mission was there."

Q.     And what's the discussion about the pieces?

A.     CHS asked Mr. Perez, "So why did you give them pieces, carnal?"

Q.     Okay. Continue on down the page with the discussion, and tell us who was making each statement here.

A.     They continue talking about the pieces, and Mr. Perez says, "I just, I just get out of it, let them do their own thing.  I was nobody, I just, fuck it."

The source says, "Yeah, but they fucking got them" -- unintelligible -- "from your fucking, from your walker, carnal.  Could have gotten you caught up, you know what I'm saying?"

Mr. Perez says, "Oh, it did, it did.  Look where I'm at."

Q.     Let me take you down the page here to Mr. Perez' explanation.

A.     Mr. Perez says, "I just got out of the hold" -- I believe that's a mistake; it should be hole -- "I was real sick.  So for me to actually participate in doing some dirt" -- unintelligible -- "physically I wasn't able to.  But we all have to do our part."

Q.     Continue with that statement, please.

A.     "But we all have to do our part, you know what I mean? One way or another, homes, everybody has to put their part.  Do you feel me?"

Q.     Now, taking you back to the pieces.  What is that a discussion of?

A.     The shanks.

Q.     From where?

A.     Mr. Perez' walker.

Q.     And can you put it in the context of him saying he has to do his part?

A.     He just got done describing that he got out of the hole.  He was sick.  He physically wasn't able to do his part.  But he was, by providing the metal that were fashioned into shanks to do the hit.

Q.     Turning your attention to DeLeon Bates stamp 20558, and I want to draw your attention to the top of the page here, where it says, "The old man was pissed."  Can you tell us who made that statement?

A.     Mr. Perez made that statement.

Q.     Okay. Please continue reading the statement and we'll put it into context.

A.     "The old man was pissed, bro, he was like, he, he, he, he was upset with them, the other fools over there.  They -- why didn't they handle it a year sooner when the" -- unintelligible -- "took the paperwork over there.  Well you send the paperwork up there."

Q.     Okay, continue.

A.     CHS asks "Who?"

Mr. Perez says, "Who?"

CHS says, "Spider."

Mr. Perez says, "Yeah."

Q.     Continue.

A.     Source says, "Yeah, I already know."

Mr. Perez: "And, and, and see, that was something that he was going to have to handle when he got over there, a."

CHS asks: "Who, 'Spider'?"

Mr. Perez says, "Yup, they told him you send the fucking" -- unintelligible -- "over there and find out why the fuck it wasn't taken care of."

The CHS asked: "Is that what 'Pup' told him?"

Mr. Perez says: "Huh?"

CHS asked: "Is that what 'Pup' told him?"

Mr. Perez says: "I know somebody told him.  I don't know who exactly but I knew, I knew" --

The CHS asks: "What did 'Pup' say, because what did 'Pup' say because the" -- unintelligible -- "wasn't done earlier?"

Mr. Perez responds: "He, he didn't like it."

Q.     Let me stop you there.  First of all, there is mention of "Spider" here.  Do you know who "Spider" is?

A.     That's David Calbert.

Q.     And do you know what "Spider"'s role was in the Molina murder?

A.     Mr. Calbert passed the paperwork, in this case, two pages from an

- 48 -

LCPD police report, that indicated Molina gave a statement to the police and cooperated. Mr. Calbert took that from the Level 6 at PNM to the Level 5 at PNM and gave it to Lupe Urquizo, "Marijuano."

Q. What was the purpose of moving the paperwork?

A. Urquizo and Varela -- Mauricio Varela -- were scheduled to be transported down to the Southern New Mexico Correctional Facility. So they were passing paperwork to eventually make it down to Southern, where Molina was.

Q. For what purpose?

A. To provide the paperwork so Molina could be hit.

Q. So when there is a discussion about the "old man" on top, and then "Pup," who is that referring to?

A. One and the same, Mr. Baca.

Q. So is it an indication that Mr. Baca was not happy that the hit had not been taken care of earlier?

A. Yes.

Dec. 8 Tr. at 210:15-219:2 (Castellano, Acee).

4. **The First Motions in Limine**.

Perez objects to "hearsay statements offered by Mr. Perez's co-defendants, turned government witnesses, Timothy Martinez and Jerry Montoya." Perez MIL at 1. According to Perez, "testimony at the James hearing conducted November 27-29, 2017," leads him to believe that "Timothy Martinez will testify that co-defendant Daniel Sanchez told him that 'Sanchez had obtained [the shanks] from "fat ass" the nickname Sanchez used for Rudy Perez'" and "that Sanchez told him that Mr. Perez gave Sanchez pieces of metal from his walker to be made into shanks, because according to Martinez, Sanchez said 'What else is fat ass gonna do?'" Perez MIL at 1 (alteration in the original). Perez also expects Montoya "to testify that Mario Rodriguez provided him a shank to use to kill Javier Molina" and that, "when Rodriguez did so, he inexplicably volunteered that the shank came from Mr. Perez' walker." Perez MIL at 2.

Perez asserts that rule 801(d)(2)(E) does not apply to those statements, but he defers that argument, see Perez MIL at 3 ("Mr. Perez will pursue this argument at the conclusion of the James hearing."), and instead "seeks a ruling by the Court that the out-of-court statements of Mr. Sanchez and Mr. Rodriguez that it is expected Mr. Martinez and Mr. Montoya will testify about do not meet any other exception and constitute inadmissible hearsay as to Mr. Perez," Perez MIL at 3. Perez argues that the Court cannot admit Sanchez' and Rodriguez' out-of-court statements as statements against penal interest. See Perez MIL at 4. Perez contends that the Court cannot admit Rodriguez' out-of-court statements as statements against penal interest, because "Rodriguez is expected to testify" and the statement-against-interest exception is available only when the declarant is unavailable. Perez MIL at 4 (citing Fed R. Evid. 804). Perez admits that Sanchez is unavailable, but he contends that Sanchez' out-of-court statements are not statements against his penal interest. See Sanchez MIL at 4-6. Perez also admits that Sanchez' statements "may be admissible against Mr. Sanchez as a statement of a party opponent," but he contends that, "given the minimal probative value, the Court should exclude them under Rule 403." Perez MIL at 7.

C. Garcia "request[s] the Court order the government not to attempt to elicit, mention, or refer to any evidence of co-defendants' statements that implicate a defendant in front of a jury until a hearing has been held outside the presence of the jury." C. Garcia MIL at 1. C. Garcia does not identify any particular statements, but he argues generally that "[t]he use of co-defendant's statements implicating or suggesting a defendant maybe [sic] highly prejudicial to jointly tried defendants," and violates their "right to cross-examination pursuant to the Confrontation Clause . . . when a co-defendant chooses not to testify." C. Garcia MIL at 1-2.

Baca seeks to exclude "any potential testimony offered by witness Jerry Armenta that

Defendant Anthony Ray Baca played any role or part in the Javier Molina homicide on March 7, 2014." Baca MIL at 1. Baca argues that as part of Armenta's now-aborted state-court prosecution, "the State prosecutor interviewed Armenta on October 6, 2015" and asked him "to describe how the Molina homicide happened." Baca MIL ¶ 4-5, at 2. According to Baca, Armenta "acknowledged that he did not learn anything about Defendant Anthony Ray Baca's purported involvement in the matter until after the murder had taken place," and "[n]othing about Armenta's statement reflected any first-hand knowledge on Armenta's part that Defendant Anthony Ray Baca was involved, in any way, with the Molina homicide." Baca MIL ¶¶ 6, 11, at 2. Baca argues that, because Armenta lacks first-hand knowledge, his testimony would be based on the out-of-court statements of others, and those statements "could [not] be considered admissible under any theory or rule of evidence." Baca MIL ¶ 11, at 2. Baca asserts that those out-of-court statements are not admissible via rule 801(d)(2), because "Armenta is neither recalling any admission made by Defendant Anthony Ray Baca (he could not, since they never met each other), nor were the statements Armenta overheard in furtherance of the conspiracy as Armenta heard them after the objective of the alleged conspiracy had been achieved." Baca MIL ¶ 11, at 2-3. Baca also asserts that no "exception to the rule against hearsay evidence applies." Baca MIL ¶ 11, at 3.

5. **The December 19-20, 2018 Hearings.**

On December 19, 2017, the Court took up the Baca MIL, which seeks "to prohibit the Government from questioning Jerry Armenta about Mr. Baca's involvement in Counts 6 and 7." Dec. 19 Tr. at 254:24-254:3 (Lowry). The Court asked Baca to "refresh my memory as to what Mr. Armenta would say and how he would know what he's saying?" Dec. 19 Tr. at 4-6 (Court). Baca described a videotaped interview, from October, 2015, in which Armenta

walks the State investigators through the Molina event. And at no time did he mention Mr. Baca at all, until he had gone through it. And then he was asked a pointed question by the folks that were talking to him, if Mr. Baca had anything to do with this at all.

And his answer was interesting. But more to the point, he said, "I didn't know anything about that rumor" -- he describes it as a rumor that was going in the pod -- until after the event altogether. And so it couldn't be in furtherance of any kind of conspiracy because he had no prior knowledge whatsoever. He talks about what he had heard from other people in the pod later, after the fact.

Dec. 19 Tr. at 254:11-24 (Lowry). Baca clarified that "we'd ask just that that portion of the video . . . and then Mr. Armenta's testimony to the extent the Government is going to rely on it, not go into anything he learned after the fact, from the rumor mill." Dec. 19 Tr. at 254:25-255:5 (Lowry). According to Baca, Armenta's after-acquired knowledge is based on statements that were not made "in furtherance of any kind of conspiracy," and Armenta lacks "any kind of firsthand knowledge whatsoever." Dec. 19 Tr. at 255:10-13(Lowry). The United States admitted that Baca is correct, "[i]f it's just rumors from uninvolved people." Dec. 19 Tr. at 255:22-23 (Castellano). On the other hand, "if it's a rumor from somebody who is involved with the conspiracy, then that would be a statement that falls under the Smalls case, because it would be a statement against interest." Dec. 19 Tr. at 255:22-256:2 (Castellano).

On December 20, 2017, the Court briefly heard testimony from Acee, see Dec. 20 Tr. at 150:5-151:14, 152:5-153:10 (Lowry, Acee), before asking the parties for argument, see Dec. 20 Tr. at 154:1-2 (Court). The United States argued that the plea agreements of cooperating defendants, which it introduced as Exhibits 1-15, establish the existence of a conspiracy. See Dec. 20 Tr. at 155:14-24 (Castellano). Specifically, the United States asserted that M. Rodriguez', Montoya's, and T. Martinez' plea agreements show that there was a conspiracy to murder Javier Molina and its membership. See Dec. 20 Tr. at 155:14-156:9 (Castellano). The United States also asserted that R. Martinez' and R.P. Martinez' plea agreements show that there

was a conspiracy to murder Gregg Marcantel and Dwayne Santistevan and that R. Martinez, R.P. Martinez, and Baca were members of that conspiracy. Dec. 20 Tr. at 156:10-24.

The Court then described its initial impression:

It certainly seems to me there has been sufficient evidence for the Court to find by a preponderance of the evidence, which I think is the requirement on a James hearing, that I find that the Government established by a preponderance of the evidence that a conspiracy exists; that the members, the defendants, and the declarants were members of the conspiracy, and that the statements that I have heard, that I've listened to carefully, that I've looked at were made in furtherance.

I think the Government has put on a fairly comprehensive demonstration for these statements. And these are the statements -- remember, that they're going to introduce pursuant to the co-conspirator statements. And if they did not bring it into the James hearing, then we're not going to try to see it through the -- we're not going to see the Government trying to get it in through a co-conspirator statement.

So it's a fairly contained list of statements that the Government has brought forward. As I've listened to those, as I've read them, I have not seen anything that would not come in under the co-conspirator statement.

I guess what I would do -- I mean, ultimately, it's the Government's burden, but I think they've met their burden. Unless the defendants bring statements to me and say, you know, just as you would in the course of trial, you'd make an objection, and that's the way you note that they haven't done it. So it would seem to me that, probably, the Government ought to sit down, and that I ought to be quiet, and see if anybody disagrees with the conclusion that I've reached. It's a tentative conclusion, subject to your arguments.

But I'm not sitting here seeing in the box that we've taken in James over several days, and now over several weeks -- so if the defendants want to challenge some and have me relook at them, and think of them in general, and have the Government argue in specific, I'm game.

But, otherwise, the box we have put the Government in in these particular statements, I'm not seeing why they shouldn't come in under co-conspirator. They seem to meet all three prongs.

Mr. Castellano, unless you have something else you want to do, we might see if the defendants want to pick up some individual statements.

Dec. 20 Tr. at 159:17-161:16 (Court).

The United States agreed to the Court's proposed methodology, with one caveat:

I just want to add one statement that came out of Billy Cordova's testimony [in a separate pretrial hearing]. He was talking to Daniel Sanchez through the door. Daniel Sanchez told Billy Cordova, "I already hit him up," meaning he had already taken the -- taken or agreed to take the shanks from Mr. Perez' walker. I think that would clearly fall within James.

Dec. 20 Tr. at 161:18-24 (Castellano). The Court indicated that it agreed that Sanchez' statement, as related by Cordova, qualified as a co-conspirator statement under rule 801(d)(2)(E). See Dec 20 Tr. at 161:25-165:5 (Court).

At Baca's prompting, the Court elaborated regarding its initial impression:

THE COURT: Well, there [are] two conspiracies that the Government is proposing. One on the Molina murder and then the other on the threats on Marcantel. And so those are the two conspiracies. So we've taken those separately. It seems to me that being precise, I think that those two conspiracies exist. And that, therefore, in the box that we did of each one, it seemed to me, listening carefully, I didn't see that -- it seemed to me that they had established by a preponderance of the evidence conspiracies on both those boxes. So a little bit more precise. That's what I meant.

MR. LOWRY: Thank you, Your Honor. Because I just want to make sure if I understood the Court's perspective. I guess, for lack of a better term, there have been two separate conspiracies that may have overlapped at certain places with the players.

THE COURT: They may have. Although, the way the Government has presented it, I think, has been that they are separate conspiracies. They all go to trying to advance the cause of the enterprise. But I think the way they've tried it, they mounted the burden of them being separate conspiracies, unless Mr. Castellano tells me something different or I missed something.

Dec. 20 Tr. at 162:25-163:25 (Court, Lowry).

Baca then "dr[e]w the Court's attention to the [transcript of the] recorded conversations with Mr. Perez that took place years after the homicide." Dec. 20 Tr. at 164:10-12.[10] Baca asserted that the transcript contains statements that Perez, in the transcript, attributes to Baca. See Dec. 20 Tr. at 165:12-15 (Lowry). The United States then noted an example attributed

_____

[10]The transcript of these recordings are in the record as Government's James Hearing Exhibit 16. See Dec. 20 Tr. at 165:4-6 (Lowry).

statement:

> One discussion we were having outside before the hearing was, at the bottom of [Bates number] 20531 there is an example of Rudy Perez, a couple of years after the murder, recounting the conversation during the time of the conspiracy. So what he describes is people coming in to him, and they tell him, "Look, Big Dog, something has to be taken care of. But we need squina. You don't have to do nothing, you don't have to do nada." And this is the discussion where they're saying: You don't need to do anything else other than provide your walker for the shanks.

Dec. 20 Tr. at 167:8-18 (Castellano). Baca expressed indifference regarding that statement, because it does not involve Baca. <u>See</u> Dec. 20 Tr. at 168:19-24 (Lowry). Baca provided an alternative example:

> MR. LOWRY: Absolutely, Your Honor. And you can see it right here, where this is Mr. Perez, and he's saying, quote, The old man was pissed bro, he was like, he was upset with them the other fools over there, why didn't they handle it a year sooner when they took the paperwork over there? Well you send paperwork up there."
>
> [THE COURT:] Well, it would seem to me -- assuming "Old man" refers to Mr. Baca, which I think it does -- his complaints to Mr. Perez, another member of the conspiracy, as has been proved by the Government, and Molina would be in furtherance. I mean, that's what people do when they're in a conspiracy. They complain to members of the group. And the reason you complain is to try to make the group better, or advance your purposes. So it seems to me that that would be classic co-conspirator exception material.
>
> MR. LOWRY: Well, I'm having a hard time -- if this complaint can be attributed to Mr. Baca, it's a complaint about after the fact, after the objective of the alleged conspiracy has been completed.

Dec. 20 Tr. at 177:2-22 (Lowry, Court). The United States expressed some uncertainty regarding the timing of the statement that Perez attributed to Baca, because "we're not quite sure of the timeframe," but added that, "even if it were to fall out of a James statement, I think we would be falling into Smalls' statements as a statement against interests." Dec. 20 Tr. at 177:17-20, 178:4-6 (Castellano).

Sanchez identified a statement that Molina made while he was being stabbed, and argued

that Molina's statement was not a coconspirator statement, see Dec. 20 Tr. at 200:12-15 (Jacks), and the United States agreed, see Dec. 20 Tr. at 200:23-24 (Castellano). The Court accepted that such a statement would not be admissible for its truth under rule 801(d)(2)(E), but it predicted that such a statement would probably constitute admissible hearsay. See Dec. 20 Tr. at 201:5-12 (Court). Sanchez also argued that "statements or puffery about prison politics" do not qualify as coconspirator statements, see Dec. 20 Tr. at 201:20-202:3 (Jacks), and the United States again agreed that such statements would not be coconspirator statements, but it argued that such statements would be admissible under rule 801(d)(2)(A), see Dec. 20 Tr. at 203:19-204:25 (Court, Castellano). Sanchez admitted that such statements would be admissible against the declarant, but added that the potential for unfair prejudice raises rule 403 concerns. See Dec. 20 Tr. at 205:3-10 (Jacks).

The United States later clarified that, for rule 801(d)(2)(E) purposes, there are four relevant conspiracies:

> One is the conspiracy to murder Javier Molina. The next is the conspiracy to assault Julian Romero. That's one we don't discuss very much, but Mr. Baca is the only remaining defendant in that count. There is a conspiracy there. And then a conspiracy to murder Dwayne Santistevan. And a conspiracy to murder Gregg Marcantel. I've generally spoken about Santistevan and Marcantel together, but they are two conspiracies.

Dec. 20 Tr. at 215:18-216:1 (Castellano). The United States commented on the temporal relationship between the first two conspiracies:

> [W]hen the SNM was locked down following the Molina murder, eventually they decided to lift the lockdown. And within hours, another person was assaulted, and that was Julian Romero. And that resulted in the SNM being locked down once again. And that is covered in one of the plea agreements I referenced earlier.

Dec. 20 Tr. at 216:7-12 (Castellano). The United States identified several statements that were made in furtherance of the Molina murder:

> I believe one we introduced at the hearing, at least as related to Lupe Urquizo, is

that "Anthony Ray Baca told Mr. Urquizo to let the shot callers at Southern know that Baca wanted Javier Molina hit." The next statement was that, "Baca told Urquizo to make sure the guys running Southern took care of Molina." The next statement is that, "Baca told Urquizo if you guys down there don't handle it, then just stab him," referring to Molina -- I'm sorry, that's Molina -- I apologize, those are related to Mr. Molina.

Dec. 20 Tr. at 218:6-18 (Castellano).

According to the United States, the conspirators in the "Julian Romero assault" include "Gerald Archuleta, Conrad Villegas, and Mr. Baca, among others." Dec. 20 Tr. at 216:17, 21-22 (Castellano). The United States then provided background information about the Romero assault and identified statements that, it contends, were made during and in furtherance of that conspiracy:

So in terms of background, one of the things that causes some divides in the gang were that -- maybe as far as 2003 -- Gerald Archuleta was in prison, if I recall correctly. He allowed Julian Romero to stay at his house. And he ended up sleeping with Gerald Archuleta's wife, or girlfriend. So, from that time forward, there was an ongoing conspiracy to murder Mr. Romero. And in 2003, he was actually shot as part of that conspiracy. And the conspiracy remained outstanding up until the time he was assaulted. And that's referenced on pages 4 and 5 of Gerald Archuleta's plea agreement.

. . . .

The two statements we have from Mr. Urquizo are that "Mr. Urquizo and Jonathan Gomez told Conrad Villegas to hit Julian Romero." And the next one was that, "Anthony Baca sent down word to Southern that Romero should be beat but not stabbed or killed." And ultimately that's what happened. Those are at least two of the statements I can find right offhand that we introduced related to the Julian Romero beating or assault.

Dec. 20 Tr. at 217:17-219:1 (Castellano). The United States indicated, however, that Urquizo will testify at trial regarding the substance of the first statement -- that Urquizo and Gomez instructed Villegas to assault Romero -- so, according to the United States, there will be no need at trial to introduce an out-of-court statement for its truth on that point. See Dec. 20 Tr. 221:5-11 (Court, Castellano). The United States clarified that the second statement "would be Mr.

Urquizo telling the jury that Mr. Gomez told him that Mr. Baca only wanted the victim smashed or beat up, but not stabbed or killed." Dec. 20 Tr. at 229:14-17 (Castellano).

The Court then articulated its findings regarding statements in furtherance of the Romero conspiracy:

> I think specifically as to Romero, I'm going to find that there is, by a preponderance of the evidence, evidence that a conspiracy existed. I don't think that there is much dispute on that. The question is whether or not Mr. Baca was a part of it, being a declarant.
>
> And I think finding by a preponderance of the evidence there is evidence that -- quite a bit that we've heard and I've read -- that he is the leader, or at least at one time was acknowledged as the leader of the SNM Gang; that his orders were sent down and carried out. There may be times when he didn't, when they weren't carried out. But I don't think that that's the element of the hearsay exception. And I do think this was in furtherance of the conspiracy, how it would be taken care of, limitations on it. I think those were part. So I do think these statements in the Romero box, the conspiracy, do satisfy the hearsay exception. And so I will admit them.

Dec. 20 Tr. at 241:15-242:9 (Court). The Court also articulated general findings:

> Let me now say for all four conspiracies -- because I do want to take what Ms. Sirignano said seriously -- for all four conspiracies I am finding that the statements that have been identified in the four conspiracies by the Government do come within the hearsay exception. I do think that they -- the Government has established the four conspiracies. I think they have satisfied the members of it and the declarants are members of that conspiracy, and that the statements were made in furtherance of the conspiracy.
>
> We have, this afternoon, identified a few statements that either lacked dates and specificity, that I will not rely on the hearsay exception for co-conspirators. And for those that we identified this afternoon, I will be relying upon either present sense for Mr. Molina's stabbing, or statements against interests, or the person is testifying, the first declarant is testifying. But I will not be for those that we identified and found alternatives for. Those will be coming in, but they'll be coming a different way.
>
> With one caveat -- and I now want to ask the Government to help me because this was some stuff we covered this summer, and I want to make sure that I have a firm basis for what I've just said as far as the statement against interests. Let me -- Mr. Castellano, take again the Mr. Perez and Mr. Cordova statements. I'm not concerned about a Bruton problem, I'm not concerned about particularly a Smalls or testimonial or Crawford issue, so I'm putting those aside. But I'll come

back and reference them. But that's not my concern. But take Mr. Perez, for example, his statements to Cordova. I've said that the statements that are being made in Mr. Perez' statements are -- come within the co-conspirator exception with some statements we identified this afternoon that we'll not be relying on. But all the others I will rely on. But I want to go back to Mr. Perez' statements. You and I, in our discussions earlier -- and no defendant disputed this -- we were relying upon the fact that Mr. Perez was a party opponent. I think Smalls deals with the Crawford-Bruton problem, so there is no constitutional problems. But I'm looking for the hearsay exception that gets the statements of Mr. Perez on the tape to be used against other people. . . . [P]resumably, the United States will want to use the Perez recording against Mr. Perez, which I think is quite all right. . . .

But it is only nonhearsay against Mr. Perez. It seems to me that something has to be done to make it nonhearsay against others, or is this a situation where we have to give a limiting instruction? Again, it's not a Bruton problem or Crawford problem or testimonial problem to say that the jury cannot consider the statements of Mr. Perez against any other party.

Dec. 20 Tr. at 242:10-245:8 (Court). The United States replied that Perez' statements could be admitted for their truth against all of the Defendants as a statement against interest under rule 804(b)(3). See Dec. 20 Tr. at 248:3-10 (Castellano).

### 6.     The Response.

The United States responds to the Perez MIL, the C. Garcia MIL, and the Baca MIL in a single document. See United States' Response to Defendant Ruby Perez's Motion to Exclude Statement of Cooperating Government Witnesses [1514], Defendant Chris Garcia's Motion to Exclude Co-Defendant's Statements [1517], and Defendant Anthony Ray Baca's Motion to Prohibit the Government from Questioning Jerry Armenta About Anthony Ray Baca's Involvement in Counts 6 & 7 [1540], filed December 26, 2017 (Doc. 1596)("Response"). The United States argues that the Confrontation Clause does not bar the introduction of out-of-court codefendant statements so long as those statements are not testimonial. See Response at 2-3. The United States then asserts that the statements which Perez, C. Garcia, and Baca identify "were not made to be used for investigation or prosecution of a crime," so there "simply is no

sound basis in the facts to conclude that the primary purpose of the statements was to 'establish or prove past events potentially relevant to later criminal prosecution.'"  Response at 5-6 (quoting United States v. Smalls, 506 F.3d 765, 777 (10th Cir. 2010)).

Additionally, the United States argues that "Sanchez's statement to Martinez that Sanchez received the shanks from Perez, and Rodriguez's statements to Montoya that the shanks came from Perez's walker" are admissible under rule 801(d)(2)(E).  Response at 6.  The United States argues that Perez was a coconspirator viz. Sanchez and Rodriguez, "[b]ecause Perez did, in fact, volunteer his walker to Sanchez to be put into shanks," and because Perez is "a long-time member of the SNM in good standing."  Response at 6.  The United States also argues that Sanchez' and Rodriguez' statements were made in furtherance of the conspiracy, because "the knowledge that Perez's walker, as opposed to other shanks lying around . . . helped the coconspirators avoid detection and prosecution for their crime, [which] renders these statements in furtherance of the conspiracy."  Response at 7.  According to the United States,

> law enforcement followed the red herring that the SNM planted about the hanks used in the Molina murder coming from the wheelchair program.  Instead of following investigatory leads that would lead them to Perez's walker, and Perez's involvement in the Molina murder, they followed the rumors from all involved (and some not) about shanks coming from the SNMCF wheelchair program.  Thus, Rodriguez's statement to Montoya and Sanchez's statement to Martinez about Perez providing the shanks from his walkers helped further the conspiracy by allowing all of the Defendants to know from where the shanks came, and from where they did not, which would lead to a dead-end investigation if inquired about by law enforcement."

Response at 7.

### 7.    The Sanchez Motion in Limine.

Sanchez filed a motion in limine on January 8, 2018.  See Sanchez MIL at 23.  According to Sanchez, Michigan v. Bryant, 562 U.S. 344 (2011), and Ohio v. Clark, 135 S. Ct. 2173 (2015), which post-date United States v. Smalls, 414 F.3d 765 (10th Cir. 2010), indicate that whether a

particular statement is testimonial -- and therefore subject to the Confrontation Clause -- depends "on the circumstances in which the encounter between the declarant and interrogator occurs, including whether an emergency exists at the time of the encounter, and the statements and actions of **both the declarant and interrogator**," whereas "the *Smalls* inquiry only focuses on the statements and actions of the declarant."  Sanchez MIL at 9 (emphasis in original).  Sanchez argues that, under <u>Michigan v. Bryant</u> and <u>Ohio v. Clark</u>, Perez' statements to Antonio Palomares, a New Mexico State Police Sergeant, and James Mulheron, the SNMCF Deputy Warden, during the Molina murder investigation are testimonial.  <u>See</u> Sanchez MIL at 3-4, 9-10. Sanchez also argues that Perez' in-prison statements to Cordova, a confidential human source, and Baca's, C. Garcia's, and others' in-prison statements to Duran, also a confidential human source, are testimonial, because, according to Sanchez, Cordova and Duran are government agents, and used psychological interrogation tactics to obtain out-of-court statements to be used at trial.  <u>See</u> Sanchez MIL at 10-12.

Sanchez asserts that the statements which Perez made to Cordova were not made during and in furtherance of the conspiracy to kill Molin -- charged in the Indictment's Count 6 -- because Perez made those statements over a year after Molina's death.  <u>See</u> Sanchez MIL at 13-14.  Sanchez also asserts that Perez' statements to Cordova were not against Perez' penal interest, because Perez testified that he made those statements "to allay concerns that he was informing about the crime," so "a reasonable person in Perez's position may have made the statements even if they were not true," Sanchez MIL at 14-15, and because some of Perez' statements deflect or reduce his culpability, <u>see</u> Sanchez MIL at 14-15.  Sanchez contends that statements in furtherance of the Counts 8-10 conspiracies would be inadmissible hearsay as against him -- even if those statements are relevant -- because he is not a Counts 8-10

conspirator.  See Sanchez MIL at 16-17.  Sanchez concludes by arguing:

> It is a mind-boggling exercise to envision the type and number of limiting instructions needed to even attempt to protect each defendant's Due Process right not to be convicted on inadmissible evidence; and an even more impossible task for the jury to try to properly apply any such instructions.  The only adequate protection to the defendant's individual rights to Due Process as guaranteed by the Fifth Amendment is to either wholly exclude any hearsay statements that are inadmissible against any of the five trial defendants or to grant a severance of Counts.

Sanchez MIL at 21.

### 8.    The January 9, 2018 Hearing.

On January 9, 2018, Sanchez argued that Supreme Court of the United States of America precedent that post-dates United States v. Smalls implicitly overrules the United States Court of Appeals for the Tenth Circuit's decision in that case.  See Jan. 9 Tr. at 156:13-157:18 (Jacks).  According to Sanchez, Michigan v. Bryant repudiates United States v. Smalls' narrow focus on the declarant's primary purpose when determining whether an out-of-court statement is testimonial for Confrontation Clause purposes.  See Jan. 9 Tr. at 156:13-157:18 (Jacks).  It follows, again according to Sanchez, the Confrontation Clause inquiry regarding statements that Perez made and Billy Cordova recorded should consider "that Billy Cordova went in there to the prison and made comments to Mr. Perez, as a government agent, in an effort to gather evidence for a criminal prosecution."  Jan. 9 at 158:21-24 (Jacks).  Further, in an effort to distinguish United States v. Smalls, Sanchez contended, regarding Perez' resulting statements, that "you can[not] classify those remarks as an unwitting statement to a fellow inmate," because "they were the product of that custodial interrogation, along with, I think, other circumstances, such as the fact that he was in isolation, he was unable to go to recreation, and he was on heavy doses of narcotic painkillers."  Jan. 9 Tr. at 159:19-160:3 (Jacks).

On the same day, Perez argued that Sanchez' out-of-court statement to T. Martinez

regarding the source of the Molina murder weapon -- "it came from Fat Ass' or Fatso's walker. What else is he going to do?," Jan. 9 Tr. at 177:22-23 (Villa) -- was not made in furtherance of the conspiracy to kill Molina, <u>see</u> Jan. 9 Tr. at 178:8-13 (Villa). The United States replied "that's a statement by a party opponent as it relates to Daniel Sanchez. But it's also a statement in furtherance of the conspiracy, because it identifies another member of the conspiracy was Mr. Perez." Jan. 9 Tr. at 182:4-8 (Castellano).

**9. The Severance Motion.**

About a week before trial, Perez moved to sever the trial of Counts 6-7 from Counts 8-12. <u>See</u> Severance Motion at 1. Perez argues that a "plethora of co-conspirator statements that will be offered by the government in its attempt to prove Counts 8-12 are not admissible against Defendants Sanchez, Herrera or Perez." Severance Motion at 2. According to Perez, "the only way to prevent the reversible error that will otherwise surely occur is to sever Counts 6 and 7 from Counts 8 through 12." Severance Motion at 3.

**10. The Sanchez Memo.**

Sanchez filed an additional memorandum in support of the Sanchez MIL. <u>See</u> Defendant Daniel Sanchez's Supplemental Memorandum and Argument in Support of his Motion in Limine to Preclude the Admission of Un-Confronted, Out of Court Statements (Doc. 1616) at 2, filed January 22, 2018 (Doc. 1665)("Sanchez Memo"). Sanchez argues that a "serious and fundamental denial of due process . . . will result if un-confronted out of court statements of Mr. Sanchez's Count 6-7 co-defendants are admitted at ***any joint trial***, whether it be at a trial of Counts 6-12, or at an independent trial of Counts 6-7 only." Sanchez Memo at 2 (emphasis in original). Sanchez pays particular attention to "statements of codefendants Rudy Perez and Carlos Herrera to government informants Billy Cordova and Gerald Archuleta in February of

2016." Sanchez Memo at 3.[11]   According to Sanchez, admitting those statements at a joint trial and instructing the jury to use them only against the declarant -- either Perez or Herrera, depending on the statement -- would be futile "to cure the insult to Mr. Sanchez's constitutional right to due process of law caused by admission of these inadmissible statements at a joint trial." Sanchez Memo at 3-4.

### 11.    The January 28, 2018 Letters.

On the eve of trial, the United States filed a pair of letters.  See Letter Disclosing Co-Conspirator (James) Statements, filed January 28, 2018 (Doc. 1715)("James Letter); Letter Disclosing Non-Co-Conspirator Statements, filed January 28, 2018 (Doc. 1716)("Non-James Letter").  The James Letter discloses "co-conspirator (*James*) statements that we received from likely testifying witnesses in our pretrial preparations over the past weeks."  James Letter at 1. The Non-James Letter discloses "statements (admissions) that we received from likely testifying witnesses in our pretrial preparations over the last weeks."  Non-James Letter at 1.  The James Letter identifies several out-of-court statements that the United States may attempt to present to the jury via the testimony of several witnesses:

---

[11]Sanchez asserts that portions of these recordings and the associated transcripts are listed as Exhibits 175-216 on the United States' list of trial exhibits.  See Sanchez Memo at 3 n.2.  See also United States' Exhibit List at 30-37, filed January 12, 2018 (Doc. 1637)("Government Exhibit List")(listing recordings and transcripts of Perez statements obtained by Cordova as Exhibits 175-190, recordings and transcripts of Herrera statements obtained by Cordova as Exhibits 191-204, and recordings and transcripts of Herrera statements obtained by Archuletta as Exhibits 205-216).  The Sanchez Memo refers to the statements identified on the Government Exhibit List as "portions" of a "custodial interrogation of defendant Perez" or of a "custodial interrogation of defendant Herrera."  Sanchez Memo at 3 n.2.  Other than those passing references to custodial interrogation, the Court does not read the Sanchez Memo to argue that Perez' and Herrera's statements were obtained by violating Perez' or Herrera's rights under Miranda v. Arizona, 384 U.S. 436 (1966), and the Court notes that such an argument would fail, because, although Perez and Herrera made statements while in custody, i.e., while behind bars, "service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." Howes v. Fields, 565 U.S. 499, 512 (2012)(Alito, J.).

**Mario Rodriguez**:

Carlos Herrera gave him the paperwork. Daniel Sanchez wanted to wait, but Herrera said, "just get it done." Herrera was worried about someone dropping a "kite" and then it wouldn't be done.

Sanchez said he would figure out the weapons, and told Herrera it would happen after quenta.

Rodriguez overheard Sanchez tell Herrera in yellow pod after the Molina murder, "how do you like that baby?"

Someone yelled back, "fuck ya."

**Timothy Martinez:**

. . . .

Anthony Ray Baca tells Martinez in October, 2015:

I sent them letter, [sic] they didn't want to take me seriously when I said would stop killings: thought I was joking. Now they have a body on their hands. From now on, we will make our presence felt, the way it once was . . . . Got some stuff lined up for Marcantel and Santistevan. . . . About to make some big power moves, Molina was just the beginning to show our power. Wouldn't mind getting a couple of wardens: going for the top. Need to hit someone from the top. All they can do is send us out of state: what will they do? We will come back and have the respect we once day. Take us more serious now. Tells him about the State case: stay solid, stay good: we know he is working, he have someone working on his family. You got this. It's our new beginning.

**Lupe Urquizo:**

Lupe Urquizo and Baby G told Conrad Villegas to get Julian Romero because of the pending hit called by Styx approximately 10 years prior. Romero had messed up with Styx and was "no good." Pete Miranda and "Whacky" David LNU, were also tasked with participating in the assault. Urquizo, Mario Rodriguez, Carlos Herrera, and David Calbert were on the tabla at the time and Baby Rob was the leader. Anthony Ray Baca had sent word to Baby G to take care of the hit. Baby G told Urquizo that the order came from Baca. The two agreed to pursue it, as they both wanted to move up in the SNM ranks. They picked Villegas because he was housed close to Romero and would have the opportunity.

. . . .

**Jerry Montoya:**

A few weeks before the Javier Molina murder, Daniel Sanchez and Jerry Montoya discussed that Sanchez wanted to send a "clear message" that the SNM will kill snitches. Sanchez told Montoya that he's "fucking sick and tired of people coming into the unit and PCing[12] and going to the line." Sanchez wanted SNM to look strong. Sanchez wanted to send that clear message through violence. Montoya understood that to mean that the SNM would "pick up arms and stab" snitches.

On the day of the Molina murder, Montoya went into the common area and Sanchez nodded his head, which Montoya understood to mean that Sanchez was instructing Montoya to go upstairs to Molina's floor of the pod.

When Mario Rodriguez told Montoya to stab Molina, Rodriguez told Montoya that Rodriguez would take Montoya's shank after the murder.

When Montoya comes out of the room following Molina after stabbing Molina, Mario Rodriguez says: "Get 'em, get 'em."

After the Molina murder, Montoya sent a letter to Anthony Ray Baca that "he was not pleased" with Sanchez's actions.

**Javier Rubio:**

On the day of the Molina murder, Javier Rubio was the leader of the third SNM pod -- not Blue or Yellow pod. Before Molina was murdered, Juan Mendez told Javier Rubio that paperwork on Molina had come down from PNM. Mendez told Rubio that Mendez, Alex Muñoz, and Carlos Herrera made the decision to murder Molina. Mendez told Rubio that the paperwork had come from Anthony Ray Baca, to David Calbert, to Lupe Urquizo. Mendez said that Mendez, Muñoz, and Herrera told Daniel Sanchez "to handle it."

. . .

**Jerry Armenta:**

Jerry Armenta ove[r]heard Mario Rodriguez say, "You got it?" and "It's probably in your property" when he was at the door between blue and yellow pods.

Rodriguez previously told Armenta to give his shank to Daniel Sanchez when he was done with it.

---

[12]"PCing" is a prison-slang term for going into protective custody.

When Armenta tried giving his shank to Sanchez, Sanchez told him to throw it in the trash can.

Armenta asked Rodriguez about covering the cameras before the murder. Rodriguez told Armenta that Sanchez said not to cover the cameras.

After the Molina murder, Carolos Herrera told Armenta that Sanchez called the hit.

Herrera also told Armenta after the murder that Herrera also called the hit because Armenta and Montoya had not earned their bones yet

**Roy Martinez:**

Roy Martinez filed a lawsuit against New Mexico Corrections Department because he was locked down in a strip cell without a hearing. Martinez spoke to Eric Duran and Anthony Ray Baca about the murder of [Gregg Marcantel, Dwayne Santistevan, or both].

**Billy Cordova:**

Anthony Ray Baca told Billy Cordova in 2013 that he wanted Molina hit.

Carlos Herrera admitted to Cordova that he was on the tabla.

When the Molina paperwork arrived to SNMCF in 2014, Herrera told Cordova "They want this done. I'm gonna push the issue."

Either March 6 or 7, 2014, Daniel Sanchez asked Cordova for a "fierro," but Cordova did not give him one. Afterwards, Sanchez told Cordova he was getting shanks from "Fat Ass."

When asked by Herrera, Cordova agreed with Herrera that Molina should be hit.

Cordova agreed that an SNM member should be hit when such circumstances are supported by cause.

**Jake Armijo:**

Christopher Garcia asked Jake Armijo about Mandel Parker. Christopher Garcia told Armijo that he was on a mission for Anthony Ray Baca to hit Gregg Marcantel. Christopher Garcia told Armijo that Mandel Parker was supposed to help take care of Marcantel. Christopher Garcia told Armijo that he was also in contact with Mario Montoya about the Marcantel hit.

Baby G. told Armijo to hit Molina on Baca's orders. This happened sometime before Armijo left prison in 2012.

<u>James</u> Letter 2-5.  The Non-<u>James</u> Letter also identified several out-of-court statements that the

United States may attempt to present to the jury via the testimony of several witnesses:

**Mario Rodriguez:**

> As Javier Molina was rushing out of his cell after having been stabbed, Molina told Rodriguez: "I am already done Carnal."

**Timothy Martinez:** . . .

> In 2012, Javier Molina and Timothy Martinez discussed what would happen if SNM members ever came to kill Molina.  Molina said: One of these days, they might put you in a position to kill one of your friends. You might have to kill me.

**Lupe Urquizo:**

> Lupe Urquizo spoke to Rudy Perez on the transport to PNM after the Molina homicide.  Perez said he believed he was going to be charged in the homicide because he gave up a piece of his walker for the shanks.

> Right after the Molina murder, Carlos Herrera went to Urquizo's door, told him that Molina had gotten hit, and said "that fucker looks dead."

**David Calbert:**

> Rudy Perez and David Calbert talked about the Molina murder at the Torrence County/Estancia jail.  Perez told Calbert that he gave up a piece of his walker for the Molina Murder. Perez said that he wanted to credit; he put in work.

**Jerry Montoya:**

> A few weeks before the Javier Molina murder, Daniel Sanchez and Jerry Montoya discussed that Sanchez wanted to send a "clear message" that the SNM will kill snitches.  Sanchez also told Montoya about people who needed to be hit.

> In the Torrence County/Estancia jail, Rudy Perez admitted to Montoya that he provided the shanks for Molina's murder.  Perez told Montoya that Sanchez and Rodriguez needed "metal."  Perez told Montoya that he said, if you need my walker, have at it.  Montoya understood Perez to indicate that he was obliged to put in work.

> Before the Molina murder, Anthony Ray Baca and Montoya discussed Montoya becoming a treasurer for SNM.  Baca told Montoya that he wanted Montoya on the streets.  Baca wanted Montoya to sell "dope" for

the SNM. Baca told Montoya that he wanted Montoya to get together with other "carnals" on the streets to sell "dope." Baca told Montoya that he wanted Montoya to collect money on the streets for drugs, to build up a money supply. Baca told Montoya that they would later send that money into the prisons. Later, Baca met with other SNM members, including Daniel Sanchez, in the "yard," to tell the other SNM members that he did not want "Silly," Chris Trujillo, or Montoya, to put in work, because he wanted them released.

Sometime after this meeting in the yard, Sanchez told Montoya that he was going to do everything in his power to get Montoya home.

Montoya heard Baca had a conversation with prison officials about improving living conditions for the SNM at SNMCF, including allowing TVs and other improvements.

Approximately a week or less before the Molina murder, Montoya heard Carlos Herrera "politicking" for Molina to be hit by "Drama," FNU LNU.

**Javier Rubio:**

When Anthony Ray Baca arrived at SNMCF in approximately 2008, Baca met with SNM members and discussed placing a leader in each pod. Baca allowed the pod members to vote for the leaders; Javier Rubio was present and was voted a leader. Baca wrote a list of rules for the SNM. Baca provided that list to Rubio and the other pod leaders, to copy for their own list to instruct new SNM members. Rubio took the list from Baca in the pod, copied it down in his cell, and returned it to Baca after he copied it. The list included SNM rules and consequences.

Rubio confronted Baca in 2012 or 2013 about issues Rubio had with Baca's leadership. Rubio told Baca that he needed to lead by example. Baca agreed in response to Rubio.

Rubio and Baca had a discussion in Green Pod sometime before the Molina murder. Baca asked Rubio if Rubio wanted to hit him. Baca asked Rubio if Rubio wanted to take SNM's position.

Sometime after the Molina murder, but before 2017, Alex Muñoz and Juan Mendez told Rubio that Baca put a "green light" on Rubio.

In July or August 2013, Jesse Sedillo brought the Molina paperwork to Rubio and asked Rubio what to do with it. Rubio said to stay out of it. Rubio said to not show the paperwork to anyone. Sedillo told Rubio that "Little Cruces", Frankie Telles, brought the paperwork down from P.N.M. North.

After the Molina murder, in the cages in the recreation yard, Carlos

Herrera told Rubio that he, Juan Mendez, and Alex Muñoz called the hit without Rubio.

**Gerald Archuleta:**

Gerald Archuleta received calls confirming the hit on Julian Romero afterwards, from Carlos Herrera, Lupe Urquizo, and Christopher Garcia.

**Billy Cordova:**

Carlos Herrera admitted to Billy Cordova that he was on the tabla.

**Julian Romero**

After Shane Dix shot Christopher Garcia, Christopher Garcia told Julian Romero that he wanted Shane Dix dead. Christopher Garcia attempted to hire Romero to kill Dix.

Non-James Letter at 1-4.

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, 2011 WL 5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802). Under rule 801(c) of the Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999)(Carnes, J.). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)(Hartz, J.)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within

hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

1.    **Rule 801(d)(2).**

A statement is not hearsay, even if it is offered for its truth, if it is offered against an opposing party and it:

**(A)** was made by the party in an individual or representative capacity;

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2). The Tenth Circuit has stated:

Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility.

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 667 (10th Cir. 2006)(Seymour, J.)(internal quotation marks and alterations omitted).[13]

---

[13]The 2011 restyling of the Federal Rules removed "admissions" from the language of rule 801(d) of the Federal Rules of Evidence, and uses instead the term "statements." Fed. R. Evid. 801(d). This replacement was purposeful: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense -- a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made." Fed. R. Evid. 801, advisory committee's note on 2011 Amendments.

## 2.    **Rule 803(1).**

Rule 803(1) provides an exception to the rule against hearsay for "[a] statement describing an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1).   "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question."   United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994).   "The present sense impression exception applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures."   Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004).   "The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication."   United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995) cert. granted, judgment vacated on other grounds, 516 U.S. 1168 (1996).   "The admissibility of spontaneous utterances -- one ground relied on by the state trial court -- was recognized by the Supreme Court over a century ago in Insurance Co. v. Mosley, 75 U.S. (8 Wall.) 397, 406-07 . . . (1869)."   Martinez v. Sullivan, 881 F.2d 921, 928 (10th Cir. 1989).

## 3.    **Rule 803(2).**

Rule 803(2), commonly referred to as the excited utterance exception, provides an

---

Although the advisory committee made the commentary quoted in the text regarding the trustworthiness of "admissions by a party-opponent" before the 2011 amendments to the Federal Rules of Evidence, the analysis should not be different under the new 2011 restyling of the rules. Because the advisory committee's purpose for the 2011 restyling was to make the rules "more easily understood and to make style and terminology consistent through the rules," and there was no "intent to change any result in any ruling on evidence admissibility," the analysis applied before 2011 remains useful for cases after the restyling.  Fed. R. Evid. 801.

exception to the exclusion of hearsay statements for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The United States Court of Appeals for the District of Columbia has noted that "[t]he rationale underlying the 'excited utterance' exception is that 'excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable.'" United States v. Alexander, 331 F.3d 116, 122 (D.D.C. 2003)(quoting United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001)). "Thus, to qualify as an excited utterance, the declarant's state of mind at the time that the statement was made must preclude conscious reflection on the subject of the statement." United States v. Alexander, 331 F.3d at 122 (quoting United States v. Joy, 192 F.3d 761, 766 (7th Cir. 1999))(internal quotations and changes omitted). The Tenth Circuit, in United States v. Smith, 606 F.3d 1270 (10th Cir. 2010), set forth a district court's required analysis for whether a statement is admissible under the excited-utterance exception:

> The so-called excited-utterance exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event. [T]here is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance. Admissibility hinges on a statement's contemporaneousness with the excitement a startling event causes, not the event itself. There is no hard time limit that must be met under Rule 803; what is relevant is whether the declarant is still under the excitement of the startling event.

606 F.3d at 1279 (internal citations and question marks omitted). The Tenth Circuit has noted:

> Courts consider a range of factors in determining whether a declarant made a statement while under the stress of a particular event. Among the more relevant factors are: the amount of time between the event and the statement; the nature of the event; the subject matter of the statement; the age and condition of the declarant; the presence or absence of self-interest; and whether the statement was volunteered or in response to questioning.

United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009). "Permissible subject matter of

the statement is [not] limited . . . to description or explanation of the event or condition . . . . [T]he statement need only relate to the startling event or condition, thus affording a broader scope of subject matter coverage." United States v. Frost, 684 F.3d 963, 973 (10th Cir. 2012)(quoting Fed. R. Evid. 803 Advisory Comm. Notes). "If the trial court has access to a recording of the declarant's statement, it may also consider the declarant's 'tone and tenor of voice' in determining whether the declarant made that statement while under the stress of excitement." United States v. Alexander, 331 F.3d 116, 123 (D.C. Cir. 2003)(Quoting United States v. Woodfolk, 656 A.2d 1145, 1151 n.16 (D.C. 1995)(collecting cases)).

The United States Court of Appeals for the Second Circuit has provided an analysis of the similarities and subtle differences between the present-sense-impression and excited-utterance exceptions to the rule against hearsay:

> As defined by the Federal Rules of Evidence, a present sense impression is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1), Fed. R. Evid. Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory. See United States v. Brewer, 36 F.3d 266, 272 (2d Cir. 1994).

> The hearsay exception for excited utterances is premised on a similar, though distinct, assumption that the reliability of a statement increases as opportunity for reflection by the declarant decreases. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), Fed. R. Evid. As we have explained, "[t]he rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." [United States v. ]Tocco, 135 F.3d [] [116,] 127[ (2d Cir. 1998)]. Unlike present sense impressions, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible." Id. Rather "[t]he length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement caused by the event or condition.'" United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990).

> . . . .

Thus while the hearsay exception for present sense impressions focuses on contemporaneity as the guarantor of reliability, and requires that the hearsay statement "describe or explain" the contemporaneous event or condition, Rule 803(1), Fed. R. Evid., the excited utterance exception is based on the psychological impact of the event itself, and permits admission of a broader range of hearsay statements - i.e. those that "relate to" the event. Rule 803(2), Fed. R. Evid.

United States v. Jones, 299 F.3d 103, 112 & n.3 (2d Cir. 2002).

Many courts across the country have found it proper to admit a 911 caller's statements as a present-sense impression and/or an excited utterance. See, e.g., United States v. Thomas, 453 F.3d 838, 841 (7th Cir. 2006)(holding that admission of a three minute and fifty-three second 911 call, in which the caller said that a man holding a handgun had shot someone outside her apartment and was still there, and in which the "emergency operator [] asked a series of questions about the facts of the situation and the caller narrated what she was seeing as it happened," was proper as either a present-sense impression or excited utterance); United States v. Hawkins, 59 F.3d at 730 (holding that the tape of the 911 emergency telephone call from the defendant's wife reporting that the defendant displayed gun to his wife during a domestic dispute was proper as a present-sense impression, because of its sufficient contemporaneity to underlying events and because of its reliability, as evidenced by the wife's detailed description of gun); United States v. Mejia-Valez, 855 F. Supp. 607, 613-15 (E.D.N.Y. 1994)(Korman, J.)(concluding that admission of two callers' 911 call tape recordings as excited utterances and present-sense impressions was proper, because the two callers were at the scene of the underlying shooting, they placed the calls moments after the shooting, and both men described the shooting's circumstances, including giving the location and the shooter's description).

4.      **Rule 803(3).**

One of these exceptions, rule 803(3), excepts from the general bar on hearsay "[a] statement of the declarant's then existing state of mind [or] emotion." Fed. R. Evid. 803(3). Rule

803(3) permits the introduction of "hearsay . . . , even though the declarant is available as a witness," for a statement of the declarant's "[t]hen existing mental, emotional, or physical condition":

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3).

For the statement to qualify under the exception, it "must relate to the declarant's state of mind during" the incident in question. United States v. Netschi, 511 F. App'x. 58, 61 (2d Cir. 2013)("To admit statements of one's state of mind with regard to conduct that occurred . . . earlier as in this case would significantly erode the intended breadth of this hearsay exception.")(quoting United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991))(internal quotations omitted). This requirement is not to say that the statement must be said at the very moment of the incident, but for intent to be proved, it must be "contemporaneous" to the act. Mutual Life Ins. Co. of New York v. Hillmon, 145 U.S. 285, 295 (1892). To be contemporaneous and therefore admissible under the present state of mind exception, a statement must be "part of a continuous mental process." United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991). In addition to the requirements that the statement be contemporaneous to the incident at hand and relevant to the issues of the case, it must also be established that there was no opportunity for the declarant to "fabricate or to misrepresent his thoughts." United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir. 1986)(quoting United States v. Layton, 549 F. Supp. at 909). The statements of intent must reveal information or details about the future, which has been contrasted with statements of memory, or looking back to the past. See Shepard v. United

States, 290 U.S. 96, 104 (1933).  When statements entail issues of looking into the past combined with other concerns, it can often be too confusing for a jury to extract, upsetting the balance of advantage, and ultimately making the evidence inadmissible.  See Shepard v. United States, 290 U.S. at 104.  "The most obvious risk of prejudice is that the jury will consider the hearsay statement not as proof of state of mind and the subsequent conduct of the declarant, but rather for the truth of the facts that are related in the statement."  Stephen A. Saltzburg et al., Fed. Rules of Evidence Manual §803.02, at 4-803 (11th ed. 2017).

### 5. **Rule 804(b)(3).**

Under rule 804(b)(3) of the Federal Rules of Evidence, an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest."  United States v. Lozado, 776 F.3d at 1125 (citing Williamson v. United States, 512 U.S., 594, 599-600 (1994)).  A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true."  Fed. R. Evid. 804(b)(3)(A).  Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).

Rule 804(b)(3) embodies "'the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.'"  United States v. Smalls, 605 F.3d at 780-81 (quoting Williamson v. United States, 512 U.S. at 599).  The Tenth Circuit has said: "We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend."  United States v. Smalls, 605 F.3d at 783.  That sort of

statement is admissible, however, only to the extent that it inculpates the declarant, because "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." Williamson v. United States, 512 U.S. at 600.

## LAW REGARDING COCONSPIRATOR STATEMENTS

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay evidence usually is not admissible. See Fed. R. Evid. 802. Some out-of-court statements, however, are not hearsay even when they are offered for proof of the matter asserted. See Fed. R. Evid. 801(d). Statements that are "offered against an opposing party" and were "made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay. Fed. R. Evid. 801(d)(2)(E).

To admit out-of-court statements by coconspirators under rule 801(d)(2)(E), "the United States must demonstrate by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii) the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy." United States v. Vigil, No. CR 05-2051, 2006 WL 4109681, at *3 (D.N.M. Aug. 31, 2006)(Browning, J.)(citing United States v. Sinclair, 109 F.3d 1527, 1533 (10th Cir. 1997)). The Court may consider the statements themselves, as well as independent evidence, to determine whether the conspiracy existed. See United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996)("In making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with independent

evidence tending to establish the conspiracy.").  While the statement itself "does not by itself establish . . . the existence of the conspiracy or participation in it," Fed. R. Evid. 801(d)(2), "there need only be some independent evidence linking the defendant to the conspiracy." United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotations and citations omitted).  This "independent evidence may be sufficient even when it is not 'substantial.'" United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal citation omitted).  The Tenth Circuit has noted: "We have defined independent evidence as evidence other than the proffered coconspirator statements themselves." United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotation marks and alterations omitted)(quoting United States v. Martinez, 825 F.2d 1451, 1451 (10th Cir. 1987)).

"[I]t is not necessary for the United States to show that proffered statements were made during the time in which [the defendant] was a member of a conspiracy." United States v. Vigil, 2006 WL 4109681, at *5 (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948))("With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.")).  Moreover, a newcomer to a conspiracy assumes the risk for what has already happened in the course of the conspiracy.  See United States v. Brown, 943 F.2d 1246, 1255 (10th Cir. 1991)("The fact that appellant may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible."); United States v. Adamo, 882 F.2d 1218, 1230-31 (7th Cir. 1989)(holding one who joins and participates in a conspiracy "adopt[s] the previous acts and declarations of his fellow co-conspirators").

In determining the admissibility of coconspirator statements, "[t]he strongly preferred order of proof" is for the district court to hold a hearing "outside the presence of the jury to

determine by a preponderance of the evidence the existence of a predicate conspiracy." United States v. Urena, 27 F.3d 1487, 1491 (10th Cir. 1994). A defendant does not possess a right to a pretrial hearing on admissibility of coconspirators statements; however, "a district court can only admit coconspirator statements if it holds a James hearing or conditions admission on forthcoming proof of a 'predicate conspiracy through trial testimony or other evidence.'" United States v. Townley, 472 F.3d 1267, 1273 (10th Cir. 2007)(quoting United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995)). The Tenth Circuit affords trial courts this flexibility, because it recognizes that it is not always practical for the United States to demonstrate that a conspiracy existed before admitting specific evidence at trial. See United States v. Peterson, 611 F.2d 1313, 1330 (10th Cir. 1979)(noting that the admissibility determination contemplates presentation of requisite conspiracy evidence before or during the United States' case in chief).

In United States v. Vigil, the Court did not hold a James hearing, because the defendant, Robert Vigil, had already been tried once, ending in a hung jury, and the Court concluded that "the evidence that" the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, "admitted at the first trial satisfies the preponderance standard on the basis of the transcripts of the first trial's testimony." 2006 WL 4109681, at *4. Vigil was charged, among other charges, with being a member of a conspiracy to commit RICO violation, and the United States moved the Court to permit it to elicit non-hearsay coconspirator statements in Vigil's retrial. See 2006 WL 4109681, at *1. The Court noted that it had previously found, in deciding Vigil's rule 29 motion for acquittal, that "'a reasonable jury could have found that Vigil agreed with at least one other person to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity, or knowingly and voluntarily participated in the conspiracy.'" 2006 WL 4109681, at *4 (citing United States v. Vigil, No. CR 05-2051 JB,

Memorandum Opinion, filed Aug. 7, 2006 (Doc. 268)).

In support of its determination that the United States had met its burden to prove that Vigil participated in the existent conspiracy, the Court pointed to testimony asserting that Garcia, an alleged coconspirator, "told Vigil that he would set up the same arrangement with Vigil as with Montoya, Vigil learned about the prior arrangement with Montoya through Garcia, Vigil indicated that he intended to continue the fee-sharing arrangement that Montoya had set up, and Vigil threatened to withhold the SLOM contract from Everage." 2006 WL 4109681, at *4 (internal quotation marks and citations omitted). The Court reasoned that "[p]roof of the existence of a conspiracy is often based on circumstantial evidence, and this testimony is sufficient to establish Vigil's participation in a conspiracy by a preponderance of the evidence." 2006 WL 4109681, at *5. The Court thus concluded that it would "permit the United States to elicit from its witnesses at trial co-conspirator statements made in furtherance of the conspiracy charged." 2006 WL 4109681, at *6.

## LAW REGARDING CONSPIRACY

The Tenth Circuit has outlined what the government must prove to establish the existence of a conspiracy:

> To prove a conspiracy, the government must show: (1) that two or more people agreed to violate the law[,] (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent. . . . A single conspiracy does not exist solely because many individuals deal with a common central player. What is required is a shared single criminal objective, not just similar or parallel objectives between similarly situated people. On the other hand, a defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy. The government need only prove by direct or circumstantial evidence that the defendant knew at least the essential objectives of the conspiracy and the defendant knowingly and voluntarily became part of it.

United States v. Small, 423 F.3d 1164, 1182-83 (10th Cir. 2005)(quoting United States v. Evans,

970 F.2d 663, 668-671 (10th Cir. 1992), and United States v. Mendoza-Solgado, 964 F.2d 993,

1005 (10th Cir. 1992))(internal citations, quotations, and emphasis omitted).  Conspiracy is not a

collection of various separate and distinct events, but rather is "the prototypical continuing

offense."   United States v. Acosta-Gallardo, 656 F.3d 1109, 1122 (10th Cir. 2011)(quoting

United States v. Jaynes, 75 F.3d 1493, 1505 (10th Cir. 1996)).  "'A conspirator is only liable for

the acts of co-conspirators until the conspiracy accomplished its goals or that conspirator

withdraws.'"  United States v. Thornburgh, 645 F.3d 1197, 1204 (10th Cir. 2011)(quoting United

States v. Cherry, 217 F.3d 811, 817 (10th Cir. 2000))

## LAW REGARDING THE CONFRONTATION CLAUSE

The Clause states: "In all criminal prosecutions, the accused shall enjoy the right . . . to

be confronted with the witnesses against him."  U.S. Const. amend. VI.  In Crawford v.

Washington, 541 U.S. 36 (2004), the Supreme Court held that, under the Confrontation Clause,

"[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant

is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  541

U.S. at 59.  In Davis v. Washington, 547 U.S. 813 (2006), the Supreme Court elaborated

regarding which statements made during police interrogation are testimonial:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.  The Tenth Circuit defines a testimonial statement, without reference to police

interrogation, as "a 'formal declaration made by the declarant that, when objectively considered,

indicates' that the 'primary purpose of the [statement is] to establish or prove past events

potentially relevant to later criminal prosecution.'"  United States v. Morgan, 748 F.3d 1024,

1048 (10th Cir. 2014)(alteration in original)(quoting United States v. Smalls, 605 F.3d at 777-78). Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial statement).

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court addressed whether the admission of a sworn affidavit by a forensic chemist, who testified in the affidavit that the substance which police seized from the defendant was cocaine of a certain amount, violated the Confrontation Clause. See 557 U.S. at 307. The Supreme Court first found that such affidavits were testimonial, because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" and because, under Massachusetts law, the sole purpose of the affidavit was to provide prima facie evidence of the content of the substance seized. 557 U.S. at 310. The Supreme Court then used the affidavit introduced by the prosecution to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine." At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed. While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs[.]" At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320 (citation omitted). Because there was no opportunity to cross-examine the affidavit declarant on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause. See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits,

and the admission of such evidence against Melendez-Diaz was error.").  The Supreme Court extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Bullcoming v. New Mexico, 564 U.S. 647, 652, 661 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" (quoting Melendez-Diaz v. Massachusetts, 557 U.S. at 319 n.6).

"Except in rare cases, the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face violates a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness."  United States v. Chapman, 2015 WL 4042177, at *19 (D.N.M. June 29 2015)(Browning, J.).  See United States v. Sandoval, No. CR 04-2362, 2006 WL 1228953, *7-9 (D.N.M. Mar. 7, 2006)(Browning, J.).  In a pre-Crawford v. Washington case, Maryland v. Craig, 497 U.S. 836 (1990), the Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way closed circuit television, which did not allow the witness to view the defendant.  See 497 U.S. at 860.  See also Wrotten v. New York 560 U.S. 959, 959 (2010)(Sotomayor, J., statement respecting the denial of certiorari)(tacitly assuming that Maryland v. Craig remains good law and commenting that, "[b]ecause the use of video testimony in this case arose in a strikingly different context than in Craig, it is not clear that the latter is controlling").  While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court recognized that the "central concern of the

Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." 497 U.S. at 845.[14]

The Supreme Court recognized that an adversary proceeding before the trier of fact "is the norm of Anglo-American criminal proceedings," and involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor." Maryland v. Craig, 497 U.S. at 846. It also acknowledged that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause.'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)). Nevertheless, the Supreme Court concluded that the Confrontation Clause's "preference for face-to-face confrontation at trial . . . must occasionally give way to considerations of public policy and the necessities of the case." Maryland v. Craig, 497 U.S. at 849 (internal quotation marks omitted). The Supreme Court emphasized, however, a defendant's Confrontation Clause right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 497 U.S. at 850.

A Confrontation Clause violation does not occur when a defendant calls a non-hostile witness telephonically or via videoconference. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." (emphasis added)). Cf. United States v. Olguin, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying

---

[14]The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence. See Crawford v. Washington, 541 U.S. at 61.

against him, not against others."). Adversity is not present when the witness is aligned with the defendant. See Maryland v. Craig, 497 U.S. at 845. The Supreme Court based Crawford v. Washington on a defendant's need for "an adequate opportunity to cross-examine" a witness, but such a need is not present when the witness is aligned with the defendant. 541 U.S. at 58. The Federal Rules of Evidence, for example, generally do not permit a party to ask a non-hostile witness leading questions, a key cross-examination tool. See Fed. R. Evid. 611(c).[15] Alternatively, it is possible that a defendant waives a Confrontation Clause objection by calling a witness by videoconference or telephonically. See United States v. Lopez-Medina, 596 F.3d 716, 730-734 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause. The parties do not argue Crawford changed this rule." (quoting Hawkins v. Hannigan, 185 F.3d 1146, 1154 (10th Cir. 1999)(Ebel, J.))).

Like many constitutional rights, a defendant may choose to waive Confrontation Clause rights. In 1969, the Supreme Court recognized that a defendant may waive Confrontation Clause rights and that defendants commonly do so when pleading guilty. See Boykin v. Alabama, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. . . . Third, is the right to confront one's accusers."). The Tenth Circuit recognized, both before and after Crawford v. Washington, that a defendant may knowingly waive Confrontation Clause rights at trial. See United States v. Lopez-Medina, 596 F.3d at 730-734 (recognizing that Confrontation Clause rights may be

---

[15]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c) (bold in original).

waived at trial "at least where there is an explicit waiver").  Specifically, the Tenth Circuit stated:

"Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the

Confrontation Clause.  The parties do not argue Crawford changed this rule."  United States v.

Lopez-Medina, 596 F.3d at 731 (citations omitted).  The Tenth Circuit has held that a

defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate

the Confrontation Clause if doing so "was a matter of prudent trial strategy."  Hawkins v.

Hannigan, 185 F.3d 1146, 1155 (10th Cir. 1999).  The United States Court of Appeals for the

Sixth Circuit has recognized that such a waiver can be permissible in the context of the

prosecution admitting one of its witnesses' videotaped deposition.  See Earhart v. Konteh, 589

F.3d 337, 344 (6th Cir. 2009).  The Sixth Circuit in that case relied on one of its prior decisions

where it had permitted such a waiver:

> The State relies upon our holding in Bailey v. Mitchell, 271 F.3d 652 (6th Cir.
> 2001), to argue that Earhart waived his right to contest the admission of the
> videotape deposition.  In Bailey, we held that a criminal defendant waived his
> right to confrontation by entering into a quid pro quo agreement with a state
> prosecutor. Id. at 657.  The petitioner in Bailey had agreed to allow the State to
> admit the videotape deposition if the prosecutor would consent to the defendant's
> motion for a continuance.  Id.  Importantly, the Ohio state courts found as a
> factual matter that Bailey had made an explicit deal with the prosecutor for the
> admission of the videotape.  Id.

Earhart v. Konteh, 589 F.3d at 344.

## LAW REGARDING CODEFENDANT STATEMENTS

In Bruton v. United States, 391 U.S. 123 (1968)(Brennan, J.), the Supreme Court held

that, in a multiple-defendant trial, admitting a non-testifying defendant's confession that

implicates a codefendant violates the Confrontation Clause even if the court instructs the jury to

only use the confession against the defendant who made it.  See 391 U.S. at 128-29.  George

Bruton and William Evans were jointly tried for robbery, and, upon his arrest, Evans gave a

confession to a postal inspector in which he admitted that he and Bruton had committed the

robbery. See Bruton v. United States, 391 U.S. at 124. At trial, the prosecution was allowed to introduce Evans' confession, and the trial court -- perhaps recognizing that evidence might pose a problem -- gave a limiting instruction charging the jury that it was not to consider Evans' confession "in any respect to the defendant Bruton." Bruton v. United States, 391 U.S. at 125. Both Bruton and Evans were convicted, but the Supreme Court held that the trial court erroneously admitted Evans' confession implicating Bruton and that the court's limiting instruction did not cure the error. See 391 U.S. at 128-29. The Supreme Court observed: "If it were true that the jury disregarded the reference to the codefendant, no question would arise under the Confrontation Clause, because by hypothesis the case is treated as if the confessor made no statement inculpating the nonconfessor." 319 U.S. at 126. See 391 U.S. at 128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, . . . the problem arising only because the statement was . . . admissible against the declarant."). The Supreme Court discounted that possibility, because

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

391 U.S. at 135-36. The Supreme Court also stated:

> If it is a denial of due process to rely on a jury's presumed ability to disregard an involuntary confession, it may also be a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when it is determining that defendant's guilt or innocence.

391 U.S. at 130-31. Ultimately, the Supreme Court determined: (i) there is a substantial risk

that, if a defendant's confession implicates codefendants, the jury will use that confession against the codefendants notwithstanding a limiting instruction to the contrary; and (ii) that substantial risk means a defendant's confession implicating codefendants is inadmissible unless the defendant who made the confession is subject to cross examination. See 391 U.S. at 137.

The Supreme Court elaborated on its Bruton v. United States decision in Richardson v. Marsh, 481 U.S. 200 (1987)(Scalia, J.). See 481 U.S. at 202. Marsh and Williams were tried jointly, and Williams did not testify. See 481 U.S. at 202, 204. The prosecution introduced evidence of Williams' confession, which implicated both Williams and Marsh. See 481 U.S. at 203-04. The trial court redacted the confession to remove references to Marsh, and "omitted all indication that anyone other than [a third party] and Williams participated in the crime." 481 U.S. at 203. The trial court also instructed the jury not to use Williams' confession against Marsh. See 481 U.S. at 204. The Supreme Court concluded that the trial court properly admitted Williams' redacted confession, because, vis-à-vis Marsh, the redacted confessions "was not incriminating on its face." 481 U.S. at 208. The Supreme Court explained that, because it did not implicate Marsh, Williams' confession fell "outside the narrow exception we created" in Bruton v. United States, to the general rule that "a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." 481 U.S. at 206, 208.

In Gray v. Maryland, 523 U.S. 185 (1998)(Breyer, J.), Anthony Bell and Kevin Gray were tried jointly for murder. See 523 U.S. at 188. After Bell was arrested, Bell confessed, and his confession said that Gray and a third person were also responsible for the victim's death. See Gray v. Maryland, 523 U.S. at 188. At Bell and Gray's joint trial, the court admitted a redacted version of Bell's confession into evidence. See 523 U.S. at 188. The detective who testified

about Bell's confession said "deleted" or "deletion" whenever the name of Gray or the third participant appeared. 523 U.S. at 188. Immediately thereafter, however, the detective testified that the police arrested Gray only upon Bell's confession. See 523 U.S. at 189. The prosecution introduced a written copy of Bell's confession Gray's and the third person's names replaced with blank spaces separated by commas. See 523 U.S. at 189. The trial court instructed the jury that Bell's confession could not be used as evidence against Gray. See 523 U.S. at 189.

The Supreme Court acknowledged that, in Richardson v. Marsh, it had, indeed, held that the admission of co-defendant confessions that are redacted to remove any reference to the existence of the other defendants will not violate Bruton v. United States. See Gray v. Maryland, 523 U.S. at 190-91. The Supreme Court noted, however, that, unlike the redacted confession in Richardson v. Marsh, the confession in Gray v. Maryland referenced the existence of the non-confessing defendant, because the government merely replaced Gray's name with the word "deleted" or a blank space. Gray v. Maryland, 523 U.S. at 192. The Supreme Court concluded that a redaction which replaced a defendant's name with an obvious indication of deletion falls within Bruton v. United States' purview, because "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton [v. United States*'] unredacted statements that, in our view, the law must require the same result." Gray v. Maryland, 523 U.S. at 189.

Six years after Gray v. Maryland, Crawford v. Washington upended the Supreme Court's Confrontation Clause jurisprudence. See Crawford v. Washington, 541 U.S. at 36. In Crawford v. Washington, the Supreme Court held that that the Confrontation Clause prohibits testimonial hearsay's introduction against a criminal defendant if the hearsay declarant does not testify at trial, unless: (i) the declarant is unavailable for trial; and (ii) the defendant had an opportunity to

cross-examine the declarant before trial.  See 541 U.S. at 59-61.  Crawford v. Washington held

that the Confrontation Clause is violated only when testimonial hearsay is admitted against a

defendant and the defendant is not given the opportunity to cross-examine the declarant.  See

U.S. at 59-61.  Crawford v. Washington does not, however, indicate how courts should

determine whether a particular statement is testimonial; it instead noted that "various

formulations," "articulations," or "definitions" of "testimonial" could be posited, and identified

statements that would qualify as testimonial under any definition, but it specifically declined to

define the term "testimonial."  541 U.S. at 51-53, 68.  After Crawford v. Washington, the

Supreme Court indicated "statements made unwittingly to a Government informant and

statements from one prisoner to another" are clearly nontestimonial.  Davis v. Washington, 547

U.S. at 825.

The Supreme Court's decision in Crawford v. Washington undermines Bruton v. United

States, because that decision indicates that introducing a non-testifying defendant's confession

and using that confession against a codefendant does not offend the Confrontation Clause so long

as the confession is nontestimonial.  See 541 U.S. at 59-61.  See also United States v. Clark, 717

F.3d 790, 816 (10th Cir. 2013)(Holmes, J.)(concluding that nontestimonial statements "fall

outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*."); United

States v. Dale, 614 F.3d 942, 956 (8th Cir. 2010)(holding that defendant's statements to prisoner

were not testimonial and that their admission, therefore, did not violate a codefendant's

Confrontation Clause rights); United States v. Castro-Davis, 612 F.3d 53, 65 (1st Cir.

2010)(holding that defendant's recorded telephone statements to his mother were non-

testimonial); United States v. Smalls, 605 F.3d at 768 n.2 ("[T]he *Bruton* rule, like the

Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay

statements."); <u>United States v. Johnson</u>, 581 F.3d 320, 326 (6th Cir. 2009)(holding that, because <u>Bruton v. United States</u> is based on the Confrontation Clause, then it also only applies to testimonial statements, and any non-testimonial statement is not subject to it); <u>United States v. Pike</u>, 292 F. App'x 108, 112 (2d Cir. 2008)("[B]ecause the statement was not testimonial, its admission does not violate either *Crawford* or *Bruton*.").

## LAW REGARDING RULE 403

Under rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See <u>United States v. Record</u>, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." <u>United States v. Pettigrew</u>, 468 F.3d 626, 638 (10th Cir. 2006)(quoting <u>United States v. Sides</u>, 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has admonished district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." <u>United States v. Smalls</u>, 605 F.3d 765, 787 (10th Cir. 2010)

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, <u>see</u> <u>United States v. Lugo</u>, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, <u>see</u> <u>United States v. Bice-Bey</u>, 701 F.2d 1086, 1089 (4th Cir. 1983); <u>United States v. Masters</u>, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court has noted:

In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997)(Souter, J.). "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." Old Chief v. United States, 519 U.S. at 180-81. In light of rule 404(b)'s

prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence." Old Chief v. United States, 519 U.S. at 182.

<u>ANALYSIS</u>

The Court concludes that the four conspiracies that the United States identified at the James hearing, which correspond to the conspiracies that Count 6 and Counts 8-10 charge, exist. See supra FOF ¶¶ 1, 4, 7, 9. The Court also concludes that Sanchez, Baca, Herrera, and Perez were members of the Count 6 conspiracy, see supra FOF ¶ 2, while Baca was a member of the Counts 8-10 conspiracies, see supra FOF ¶¶ 5, 8, 10. The United States has, thus, established that the statements it introduced at the James hearing satisfy two of rule 801(d)(2)(E)'s three elements: (i) that a conspiracy existed; (ii) that the declarant and the defendant were both members; and (iii) that the statement was made during and in furtherance of the conspiracy. See Fed. R. Evid. 801(d)(2)(E).

It is necessary to evaluate particular statements, however, to determine: (i) whether those statements are testimonial; (ii) whether those statements were made during and in furtherance of a particular conspiracy; (iii) whether those statements are admissible for their truth against all the Defendants as declarations against penal interest by an unavailable declarant, see Fed. R. Evid. 804(b)(3), even if rule 801(d)(2)(E) does not apply; and (iv) whether those statements are admissible for their truth against a declarant-Defendant. The Court must also determine whether statements that are admissible against some -- but not all -- of the Counts 6-10 Defendants are admissible at a joint trial if the Court gives limiting instructions regarding how the jury is

permitted to use those statements.  In making those determinations, the Court will focus on the

Baca, Herrera, and Perez statements that government cooperators -- specifically Eric Duran,

Billy Cordova, and Archuleta -- surreptitiously recorded.  See United States' Amended Exhibit

List Nos. 177-217, filed January 27, 2018 (Doc. 1713).[16]  The Court concludes by extending its

analysis to other out-of-court statements in a chart listing out-of-court statements and its

conclusions regarding those statements.

I.     **MOST -- BUT NOT ALL -- OF THE OUT-OF-COURT STATEMENTS THAT THE UNITED STATES IDENTIFIES ARE NONTESTIMONIAL.**

Introducing an out-of-court statement for its truth offends the Confrontation Clause when

the declarant is not subject to cross-examination only if the statement is testimonial.  See

Whorton v. Bockting, 549 U.S. 406, 420 (2007)("Under *Crawford*, on the other hand, the

Confrontation Clause has no application to [nontestimonial] statements and therefore permits

their admission even if they lack indicia of reliability.").  Whether a statement is testimonial

depends on "whether, in light of all the circumstances, viewed objectively, the 'primary purpose'

of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'"  Ohio v.

Clark, 135 S. Ct. 2173, 2180 (2015)(Sotomayor, J.)(quoting Michigan v. Bryant, 562 U.S. 344,

358 (2011)).  Statements that are not the product of an interrogation can be testimonial, and,

"even when an interrogation exists, it is in the final analysis the declarant's statements, not the

interrogator's questions, that the Confrontation Clause requires us to evaluate."  Davis v.

Washington, 547 U.S. at 822 n.1.  Accordingly, "a court measures the declarant's intent" when it

determines whether a statement is testimonial, and that measurement is based on an "objective

---

[16]The United States' Amended Exhibit list refers to redacted recordings and transcripts, because the Court accepted the United States' proposal that -- to avoid needing to empanel two juries -- to redact Herrera's, Baca's, and Perez' statement such that those statements only directly incriminate the declarant-defendant.  See United States' Sealed Motion to Reconsider the Court's Two Jury Proposal at 6-7, filed January 27, 2018 (Doc. 1712).

standard." United States v. Smalls, 605 F.3d at 778. It follows that statements made unwittingly to a government informant and statements from one prisoner to another are nontestimonial. See United States v. Smalls, 605 F.3d. at 777 ("In *Davis,* the Court expressed the view that 'statements made unwittingly to a Government informant' or 'statements from one prisoner to another' are 'clearly nontestimonial.'" (quoting Davis v. Washington, 547 U.S. at 825)).

Sanchez argues, on the contrary, that Michigan v. Bryant -- which post-dates both Davis v. Washington and United States v. Smalls -- requires a broader inquiry, because,

> [w]hile the *Bryant* inquiry focuses on the circumstances in which the encounter between the declarant and interrogator occurs, including whether an emergency exists at the time of the encounter, and the statements and actions of ***both the declarant and interrogator*** to ascertain the primary purpose of the interrogation, the *Smalls* inquiry only focuses on the statements and actions of the declarant.

Sanchez MIL at 9 (emphasis in original). Sanchez' argument does not persuade the Court, however, because Michigan v. Bryant's command that, "[i]n determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances," such as "the statements and actions of all participants," did not broaden the primary purpose test. Michigan v. Bryant, 562 U.S. at 369-70. See id. at 367-68 ("In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers."). Instead, it clarified "*how* the courts are to assess the nature of the declarant's purpose," Michigan v. Bryant, 562 U.S. at 367 n.11 (emphasis in original), and recognized that, "[i]n many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers," id. at 367-68. While an interrogator's intent and motivation can help a court ascertain a declarant's purpose, "it is the statements, and not the questions," which must pass constitutional muster. Michigan v. Bryant, 562 U.S. at 367 n.11.

Many of the statements that the United States identified at the James hearing -- including

all of the Perez statements that Billy Cordova recorded, see Government's James Exhibit 16 --

were made unwittingly to a government informant, and many of those statements were made

from one prisoner to another. The Court, in accordance with United States v. Smalls, concludes

that those statements are nontestimonial. Likewise, statements that were made in furtherance of

a conspiracy are nontestimonial. See United States v. Patterson, 713 F.3d 1237, 1247 (10th Cir.

2013)("[B]ecause these statements were made in furtherance of a conspiracy, they are

nontestimonial and present no Sixth Amendment problem."). Perez' statements to Palomares

and Mulheron as part of the Molina murder investigation, however, were made to people who

Perez knew were law enforcement officials investigating a particular crime, so those statements

are testimonial and can be admitted for their truth -- against defendants other than Perez -- only if

Perez testifies. See Sanchez MIL at 9 ("Rudy Perez's statements to NMSP investigator

Palomares and Deputy Warden Mulheron are testimonial and should not be admitted at a joint

trial as evidence against Mr. Sanchez, unless Mr. Sanchez is provided an opportunity to cross-

examine Perez.").[17]

## II.     RULE 801(d)(2)(E) DOES NOT APPLY TO STATEMENTS MADE AFTER A CONSPIRACY'S OBJECT IS ACCOMPLISHED OR BECOMES IMPOSSIBLE.

Under rule 801(d)(2)(E), statements "offered against an opposing party and . . . made by

the party's coconspirator during and in furtherance of the conspiracy" are not, by definition,

---

[17]Perez' testimonial statements to Palomares and Mulheron are admissible against Perez notwithstanding the Confrontation Clause, because Perez does not have the right to confront himself. See, e.g., United States v. Hansen, 434 F.3d 92 (1st Cir. 2006). See also Stephen A. Saltzburg, Michael M. Martin et al., Federal Rules of Evidence Manual § 801.02[8](3)(11th ed. 2017)("Clearly, a person has no constitutional right to confront himself. *Crawford* does not change this rule, because even if the accused's statement is testimonial, there is no right to cross-examine yourself."). Perez' statements do not implicate his codefendants, so introducing those statements against Perez does not offend their Confrontation Clause rights. See Richardson v. Marsh, 481 U.S. at 208 (stating that a defendant's confession was admissible in a joint trial, because, as to the declarant's codefendant, "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial").

hearsay.  Fed. R. Evid. 801(d)(2)(E).  Whether a particular statement was made during and in furtherance of a conspiracy is a question of fact that a judge must determine by a preponderance of the evidence.  See Bourjaily v. United States, 483 U.S. 171, 176 (1987).  See also Fed. R. Evid. 104(a)("The court must decide any preliminary question about whether . . . evidence is admissible.").  "No talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy."  United States v. Perez, 989 F.2d 1574, 1578 (10th Cir. 1993).  See id. at 1578-79 ("To the contrary, this determination must be made by examining the context in which the challenged statement was made.").

The Tenth Circuit has, however, articulated several rules of thumb.  First, "mere narratives between coconspirators or narrative declarations of past events" are not, generally, in furtherance of a conspiracy.  United States v. Roberts, 14 F.3d 502, 514-15 (10th Cir. 1993).  Second, "statements of future intent that set transactions integral to the conspiracy in motion and maintain the information flow among coconspirators" are usually in furtherance of the conspiracy.  United States v. Roberts, 14 F.3d at 515.  Third,

> Statements made to induce enlistment or further participation in the group's activities . . . to prompt further action on the part of conspirators . . .[,] to "reassure" members of a conspiracy's continued existence . . .[,] to allay a coconspirator's fears . . .[, or] to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the "in furtherance" of requirement.

United States v. Roberts, 14 F.3d at 515 (alterations in original)(quoting United States v. Yarbrough, 852 F.2d 1522, 1535-36 (9th Cir. 1988)).  Fourth, "[w]hen a conspiracy is ongoing, statements that relate to 'avoiding detection by law enforcement personnel' can be in furtherance of the conspiracy."  United States v. Alcorta, 853 F.3d at 1139 (quoting United States v. Williamson, 53 F.3d at 1520).

A coconspirator must make a statement while the conspiracy persists for rule

801(d)(2)(E) to apply. See Fed. R. Evid. 802(d)(2)(E). According to the Supreme Court, a statement is not made "pursuant to and in furtherance of objectives of the conspiracy" if it is made "after those objectives either had failed or had been achieved." Krulewitch v. United States, 336 U.S. 440, 442 (1949)(Black, J.). See United States v. Alcorta, 853 F.3d 1123, 1139 (10th Cir. 2017)("To be sure, to qualify for the coconspirator exception a statement must have been made during the conspiracy. Statements made after the objectives of the conspiracy have either failed or been achieved are not made during the conspiracy and must be excluded."). That rule makes sense, because "[t]here can be no furtherance of a conspiracy that has ended." Lutwak v. United States, 344 U.S. 604, 617-18 (1953)(Minton, J.).

Moreover, once the "central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." Grunewald v. United States, 353 U.S. 391, 401-02 (1957)(Harlan, J.)(emphasis in original). The Supreme Court emphasized the "vital distinction . . . between acts of concealment done in furtherance of the main criminal objective of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose of covering up after the crime." Grunewald v. United States, 353 U.S. at 405. In the former case, "acts of concealment [are] in furtherance of the objectives of the conspiracy itself," -- because if a conspiracy is discovered its objectives will, presumably, be thwarted -- whereas, "[i]n the latter case, . . . the acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended -- a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." Grunewald v. United States, 353 U.S. at 405-06. See id. at 402 ("Acts of covering up, even though done in the

context of a <u>mutually understood</u> need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." (emphasis added)).  <u>See</u> <u>also</u> <u>United States v. Silverstein</u>, 737 F.2d 864, 867 (10th Cir. 1984)(Logan, J.)("The duration of a conspiracy does not extend to attempts to conceal the crime.").

The United States has identified four distinct conspiracies for rule 801(d)(2)(E) purposes. The first corresponds to Counts 6 of the Indictment, <u>i.e.</u>, the Molina murder.  <u>See</u> Dec. 20 Tr. at 215:18-19 (Castellano); Indictment at 13 (Count 6).  The central aim of that conspiracy was accomplished with Molina's death on March 7, 2014.  <u>See</u> Indictment at 13.  The United States alleges that Montoya, M. Rodriguez, Baca, Varela, Sanchez, Herrera, and Perez were members of that conspiracy.  <u>See</u> Indictment at 12 (Count 6).  The second is "the conspiracy to assault Julian Romero."  Dec. 20 Tr. at 215:19-20 (Castellano).  <u>See</u> Indictment at 13-14 (Count 8).  The Romero conspiracy's central aim was accomplished when Romero was assaulted on July 13, 2015.  <u>See</u> Indictment at 13 (Count 8).  The United States alleges that Baca, Archuleta, and Villegas were members of the second conspiracy.  <u>See</u> Dec. 20 Tr. at 216: 20-22 (Castellano); Indictment at 14 (Count 8).  The third conspiracy is "the conspiracy to murder Dwayne Santistevan."  Dec. 20 Tr. at 215:22-23 (Castellano).  <u>See</u> Indictment at 14 (Count 9).  The United States alleges that Baca, R.P. Martinez, and R. Martinez were members of the Santistevan conspiracy.  <u>See</u> Indictment at 14 (Count 9).  The fourth conspiracy is "a conspiracy to murder Gregg Marcantel."  Dec. 20 Tr. at 215:23-24 (Castellano).  <u>See</u> Indictment at 15 (Count 10).  The United States alleges that Baca, R.P. Martinez, R. Martinez, and C. Garcia were members of the fourth conspiracy.  <u>See</u> Indictment at 15 (Count 10).  The United States has not identified a fifth separate conspiracy to conceal any of the four charged conspiracies.  <u>See</u> Dec. 20 Tr. at 215:16-

18 (Castellano)("But I want to make sure we're talking about multiple conspiracies. I think four actually.").[18]

The United States argues that "Sanchez's statement to Martinez that Sanchez received the shanks from Perez, and Rodriguez's statements to Montoya that the shanks came from Perez's walker" were made during and in furtherance of the conspiracy to kill Molina. Response at 6. See Perez MIL at 1 ("Martinez is expected to testify that Sanchez told him that Mr. Perez gave Sanchez pieces of metal from his walker to be made into shanks . . . ."); id. at 2 ("Jerry Montoya is expected to testify that Mario Rodriguez provided him a shank to use to kill Javier Molina. Montoya is expected to testify that when Rodriguez did so, he inexplicably volunteered that the shank came from Mr. Perez's walker."). According to the United States, those statements furthered the conspiracy, "by allowing all of the Defendants to know from where the shanks came, and from where they did not," which led to "law enforcement follow[ing] the red herring that the SNM planted about the shanks used in the Molina murder coming from the wheelchair program," instead of following "investigatory leads that would lead them to Perez's walker, and Perez's involvement in the Molina murder." Response at 7. The Court concludes that Sanchez and M. Rodriguez made statements regarding the source of the Molina murder weapon during and in furtherance of the Molina conspiracy, because they made those statements while arranging Molina's murder, and convincing T. Martinez and Montoya to participate in the Molina

_____

[18]While the United States represented on December 20, 2017, that it intended to offer, under rule 801(d)(2)(E), only statements that were made during and in furtherance of the Count 6 and Counts 8-10 conspiracies, see Dec. 20 Tr. at 215:16-18 (Castellano), a month earlier, however, the United States orally asserted that it would offer, against Baca, statements made during and in furtherance of a "conspiracy to bring contraband into the jail or to distribute narcotics," Nov. 29 Tr. at 244:19-20 (Castellano). The Court does not address those statements in this Memorandum Opinion and Order, because it appears -- from the United States' subsequent statements -- that it no longer intends to offer those statements into evidence at trial under rule 801(d)(2)(E).

conspiracy. <u>See</u> Nov. 27 Tr. at 163:20-164:14 (Castellano, Acee)(regarding Sanchez' statement); <u>id.</u> at 183:6-13 (Lowry, Acee)(regarding M. Rodriguez' statement).

On the other hand, Perez made statements to Cordova, which Cordova surreptitiously recorded, in February, 2016. <u>See</u> Dec. 20 Tr. at 4-8 (Lowry). Those statements were not made during the conspiracy to kill Molina, because they post-date Molina's death by over a year. Likewise, those statements did not further the conspiracy to kill Molina, because it is impossible to further a terminated conspiracy. That multiple SNM members attempted to conceal SNM's crimes does not permit the Court to infer that those SNM members formed an agreement -- tacit or otherwise -- to conceal those crimes. <u>See</u> <u>United States v. Grunewald</u>, 353 U.S. at 402 ("Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." <u>Cf.</u> <u>United States v. Alcorta</u>, 853 F.3d at 1136 (stating that a conspiracy requires "an agreement with another person to violate the law"). Even if the Court could soundly conclude that such a conspiracy existed, there is no evidence that Perez was a member of such a conspiracy. Accordingly, Perez' recorded statements do not qualify as coconspirator statements under rule 801(d)(2)(E).

Contrary to the United States' suggestion, that the Indictment alleges VICAR violations, some of which are based on conspiracy offenses, does not alter the conspiracies' scope. <u>See</u> Response at 8 (arguing that Perez' statements were in furtherance of the conspiracy, even though they occurred years after the Molina murder, "[b]ecause the conspiracy is a VICAR conspiracy to murder, which includes as an element that it was done in furtherance of or to gain some type of benefit from the SNM gang," so Perez' statements indicating involvement in the Molina murder "thus, further his standing in the SNM and the VICAR conspiracy to murder"). That

conspiring to commit murder "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" violates VICAR is immaterial for rule 802(d)(2)(E) purposes. 18 U.S.C. § 1959. The inquiry under rule 801(d)(2)(E) is whether a statement was made during and in furtherance of a conspiracy, but a VICAR violation is not, itself, a conspiracy even though it may have a conspiracy as its underlying offense.

### III. THE STATEMENTS BY ONE SNM MEMBER TO ANOTHER THAT CORDOVA AND DURAN RECORDED ARE NOT ADMISSIBLE HEARSAY UNDER THE STATEMENTS AGAINST PENAL INTEREST EXCEPTION.

An out-of-court statement is admissible hearsay if the declarant is unavailable and if "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). The statement must also be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3)(B). In United States v. Smalls, the Tenth Circuit declared that "[w]e may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend." 605 F.3d at 783.

Making that surmise is not safe, however, when the declarant makes a statement while in prison to someone who is apparently a fellow prison-gang member and not just an acquaintance or friend. While people in ordinary situations expose themselves to both social censure and criminal liability when they falsely confess to committing a crime, prison-gang members speaking to fellow members earn social benefits -- such as respect or an appearance of power -- when they make inculpatory claims. Further, law enforcement agents are unlikely to learn of such claims from the declarant's fellow prison-gang members, because prison-gang members

face violent retaliation for collaborating with law enforcement. Consequently, a reasonable prison-gang member might make self-inculpatory statements even if those statements were not true. Accordingly, such statements are not typically admissible under rule 804(b)(3).

That generalization is true in Perez' case, because, when Perez made his statements to Cordova, prison-yard rumors indicated, falsely, that Perez cooperated with the United States regarding the Molina murder. Perez' statements to Cordova suggest that those life-threatening rumors are false, because they demonstrate loyalty to the SNM, and because, if Perez helped carry out the Molina murder, then providing information to law enforcement would expose him to criminal liability. Consequently, a reasonable person in Perez' position might make self-incriminating statements regarding the Molina murder to another SNM member to combat life-threatening prison-yard rumors, even if those self-incriminating statements were not true. Accordingly, Perez' statements do not satisfy rule 804(b)(3) of the Federal Rules of Evidence and are not admissible as statements against the declarant's penal interest.

## IV. AN OUT-OF-COURT STATEMENT IS ADMISSIBLE FOR ITS TRUTH UNDER RULE 801(D)(2)(A) TO THE EXTENT THAT IT IS OFFERED AGAINST THE PERSON WHO MADE THE STATEMENT.

A statement is not hearsay if it is offered against a party and it was "made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). Rule 801(d)(2)(A) does not, however, permit such a statement to be used against anyone other than the party who made the statement, such as codefendants. See United States v. Wolf, 839 F.2d 1387, 1393 & n.4 (10th Cir. 1988)(analyzing whether five statements, which were admissible against one defendant under rule 801(d)(2)(A), were admissible against another defendant under different evidentiary rules). See also Stephen A. Saltzburg, Michael M. Martin et al., Federal Rules of Evidence Manual § 801.02[6][c] (11th ed. 2017)("All that is required to satisfy Rule 801(d)(2)(A) is that the statement was made by the party and that it is offered at trial by a party-

opponent."). Rule 801(d)(2)(A) applies only when a statement is offered "against an opposing party," and codefendants are not opposing parties, so one defendant cannot use rule 801(d)(2)(A) offer another defendant's statement for its truth. See United States v. Gossett, 877 F.2d 901, 906 (11th Cir. 1989)("The testimony was not admissible under Rule 801(d)(2) because the admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent of both defendants."); United States v. Harwood, 998 F.2d 91, 97 (2d Cir. 1993)(quoting United States v. Gossett, 877 F.2d at 906). But see Federal Rules of Evidence Manual § 801.02[6][b] ("We think that the *Harwood* court's construction of the Rule 801(d)(2)(A) exemption is questionable. It smacks of technicality."); id. ("We also note that the Harwood reading of the rule ends up treating civil and criminal defendants unequally. . . . Criminal defendants, however, cannot file cross-claims, and are therefore totally dependent on the government's decision whether to admit the statement of one of the codefendants.").

Complications arise when a statement is admissible against the party who made it and that statement contains an embedded statement attributed to someone else. For example, Perez' statements that Cordova recorded contain statements that Perez attributes to Baca. Perez' statements are admissible, under rule 801(d)(2)(A), for their truth against Perez and not Baca, so they are admissible to show, as to Perez, that Baca made particular statements. Consequently, that Baca made those statements can be used against Perez for non-hearsay purposes, e.g., to show the statement's effect on the hearer. Those out-of-court Baca statements are not, however, admissible for their truth against Perez under rule 801(d)(2)(A), because Perez did not make those statements. See Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

As against Baca, rule 801(d)(2)(A) permits any statements that Baca made -- including the Baca statements that Perez related to Cordova -- to be used against Baca for their truth notwithstanding rule 802's general hearsay prohibition. Admitting those statements also requires, however, an evidentiary foundation that shows that the statements are what they purport to be. See Fed. R. Evid. 901 ("[T]he proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); Stephen A. Saltzburg, Michael M. Martin et al., Federal Rules of Evidence Manual § 901.02[1] ("[W]hen a witness testifies to statements made by someone else, the witness must be able to identify the person from whom the statements emanated so that the trier of fact is able to properly attribute the statements."); id. § 901.02[2] (stating that, without an admissible foundation, "the evidence will not be relevant"). See also; Fed. R. Evid. 901 advisory committee notes ("This requirement of showing authenticity or identity falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)."); Fed. R. Evid. 104(b)("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). Because Perez' statements are admissible against only Perez under rule 801(d)(2)(A), Perez' statements cannot authenticate -- as against Baca -- the Baca statements that Perez related to Cordova unless some other rule permits those statements to be offered against Baca for their truth. See Johnson v. Weld County, 594 F.3d 1202, 1208 (10th Cir. 2010)(Gorsuch, J.)("Because the district court couldn't consider the hearsay statements of Mr. Bogott, Ms. Burns, or Mr. Willoughby, by necessity it couldn't consider anything contained within them, including Mr. Speckman's alleged party-opponent admissions."); id. at 1209 (concluding that "Mr. Speckman's comments" were not admissible -- notwithstanding assertions that those comments were admissions of a party opponent -- because

the only way "to prove the act of Mr. Speckman's comments [wa]s through Mr. Bogott's, Ms. Burns's, and Mr. Willoughby's out-of-court hearsay statements").  See also Stephen A. Saltzburg, Michael M. Martin et al., Federal Rules of Evidence Manual § 901.02[1] ("In order for the trier of fact to make a rational decision as to authenticity, the foundation evidence must itself be admissible.").  Accordingly, Perez' statements to Cordova are not admissible against Baca.

## V.     UNDER TENTH CIRCUIT PRECEDENT, A NONTESTIMONIAL STATEMENT IMPLICATING SEVERAL DEFENDANTS CAN BE ADMITTED AGAINST ONE DEFENDANT EVEN IF IT IS NOT ADMISSIBLE AGAINST THE OTHERS.

Many United States Courts of Appeal have read Bruton v. United States as a Confrontation Clause case and concluded that it does not apply to nontestimonial statements. See United States v. Rodriguez, 591 F. App'x 897, (11th Cir. 2015)("[A]s Bruton was premised on the Confrontation Clause, its protections only apply to testimonial statements."); United States v. Vasquez, 766 F.3d 373, 379 (5th Cir. 2014); United States v. Clark, 717 F.3d 790, 814 (10th Cir. 2013)(Holmes, J.)(concluding that nontestimonial statements "fall outside the protective ambit of the Confrontation Clause and, by extension, Bruton"); United States v. Dagan, 738 F.3d 643, (4th Cir. 2013)("Bruton is simply irrelevant in the context of nontestimonial statements."); United States v. Berrios, 676 F.3d 118 (3d Cir. 2012)(Fisher, J.)("Bruton is no more than a by-product of the Confrontation Clause . . . ."); United States v. Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir. 2010)(Lipez, J., joined by Baldock, J., sitting by designation)(stating that, when applying Bruton v. United States, "[t]he threshold question in every case is whether the challenged statement is testimonial"); United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009)(Cole, J.)("Because it is premised on the Confrontation Clause, the Bruton rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."); United States v. Vargas, 570 F.3d 1004, 1009 (8th Cir. 2009)(Wollman, J.)("Garcia's statement

identifying Vargas as his source was not testimonial and thus did not implicate Vargas's Sixth Amendment confrontation clause right.  We find no *Bruton* error."); United States v. Pike, 292 F. App'x 108, 112 (2d Cir. 2008)(per curiam)(stating that "because the statement was not testimonial, its admission does not violate either *Crawford v. Washington . . .* or *Bruton v. United States . . . .*").

On the other hand, commentators, scholars, and the District of Columbia Court of Appeals[19] have read Bruton v. United States as a limiting-instruction case and not only as a Confrontation Clause case, i.e. as a case defining an exception to the general rule that juries obey limiting instructions.  See Fed. R. Evid. 105 advisory committee note ("In *Bruton v. United States*, 389 U.S. 818 . . . (1968), the Court ruled that a limiting instruction did not effectively protect the accused against the prejudicial effect of admitting in evidence the confession of a codefendant which implicated him."); Colin Miller, Avoiding a Confrontation -- How Courts Have Erred in Finding That Non-Testimonial Hearsay is Beyond the Scope of the Bruton Doctrine, 77 BROOK. L. REV. 625, 626 (2012)("*Bruton* focuses upon the damage to a defendant's case based upon the admission of his codefendant's statement, not the (un)reliability of that statement.  Therefore, the doctrine depends on the inadmissibility of codefendant confessions combined with their harmfulness, not their constitutional unreliability."); Jason Portwood Hipp, Redacting the Constitution: Securing Bruton's Confrontation Protections for a Codefendant During Non-Evidentiary Counsel Commentary, 44 COLUM. HUM. RTS. L. REV. 259, 264 (2012)("While *Crawford* arguably limited *Bruton* violations to testimonial hearsay, the key factor for a *Bruton* analysis is a judge's evaluation of the efficacy of jury instructions."  (footnote

---

[19]The District of Columbia Court of Appeals is "the equivalent of a state supreme court" and is "the highest court of the District of Columbia."  More About the Court of Appeals, DISTRICT OF COLUMBIA COURTS, https://www.dccourts.gov/court-of-appeals/learn-more.

omitted)); Thomas v. United States, 978 A.2d 1211, 1233 (D.C. Ct. App. 2009)(Glickman, J.)(concluding that "the principles governing redaction under *Bruton* apply" to one defendant's nontestimonial statements "that were not admissible against [a codefendant] under any hearsay exception"). See also United States v. Williams, No. CR 09-0414, 2010 WL 3909480, at *5 (E.D. Va. Sept. 23 2010)(Cacheris, J.)("[T]he Court finds that the statements at issue in this case *may* implicate *Bruton,* even if they are not testimonial under *Crawford.*" (emphasis in original))

Under the academic view, the Supreme Court's Confrontation Clause analysis in Bruton v. United States broke no new ground, because there was no doubt, when Bruton v. United States was decided, that using a non-testifying defendant's confession against a codefendant was impermissible. See Bruton v. United States, 391 U.S. at 128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence . . . ."). See also, e.g., Tong's Case, 84 Eng. Rep. 1061, 1062 (1662)(permitting, when "a conspirator be examined before a privy councellor or a justice of peace, and upon his examination without torture confess the treason," the use of that confession against that conspirator at trial even though "the confession there spoken of, is not meant a confession before the Judges at his trial, but a confession upon his examination," with the proviso that the confession "is only evidence against the party himself who made the confession, but cannot be made use of as evidence against any others whom on his examination he confessed to be in the treason."), cited in Crawford v. United States, 541 U.S. at 45.

Bruton v. United States addressed instead, again according to the academic view, whether giving a limiting instruction permits courts to admit an out-of-court confession against a declarant-defendant without admitting the confession against a codefendant it implicates. See Bruton v. United States, 391 U.S. at 124. That the Supreme Court "granted certiorari to

reconsider Delli Paoli [v. United States, 389 U.S. 818 (1957)]," Bruton v. United States, 391

U.S. at 125, strongly suggests that Bruton v. United States dealt with a limiting-instruction issue

and not a Confrontation Clause issue, because Delli Paoli v. United States does not even mention

the Confrontation Clause. That case addresses only a limiting instruction's efficacy. See Delli

Paoli v. United States, 352 U.S. at 259 ("The issue here is whether, under all the circumstances,

the court's instructions to the jury provided petitioner with sufficient protection so that the

admission of Whitley's confession, strictly limited to use against Whitley, constituted reversible

error."). See also Bruton v. United States, 391 U.S. at 126 ("The basic premise of Delli Paoli

was that it is 'reasonably possible for the jury to follow' sufficiently clear instructions to

disregard the confessor's extrajudicial statement that his codefendant participated with him in

committing the crime." (quoting Delli Paoli v. United States, 352 U.S. at 239)); United States v.

Clark, 717 F.3d 790, 814 (10th Cir. 2013)(stating that "*Bruton* provides the foundation for

affirmative remedial measures -- most notably severance -- upon a proper showing that a co-

defendant's statement offered into evidence would inculpate the defendant," and that "[t]hese

measures are meant to avoid the extrinsic (i.e. collateral) damage to a defendant from the jury's

undue consideration of a co-defendant's facially inculpatory statement -- a factor that the jury

would be highly unlikely to 'disregard' and one that cannot be remedied by a curative

instruction"). Bruton v. United States resolves that disputed issue by holding that "the almost

invariable assumption of the law that jurors follow their instructions" does not apply when a

defendant's confession that implicates codefendants is admitted at a joint trial. Richardson v.

Marsh, 481 U.S. at 206. See Bruton v. United States, 391 U.S. at 128 ("Delli Paoli assumed that

this encroachment on the right to confrontation could be avoided by the instruction to the jury to

disregard the inadmissible hearsay evidence. But, as we have said, that assumption has since

been effectively repudiated." (footnote omitted)).

Bruton v. United States' exception to the general rule that juries can and will obey limiting instructions implicates the Confrontation Clause, because, absent Bruton v. United States, courts could side-step Confrontation Clause issues in joint trials by instructing juries to use one defendants' out-of-court statements against that defendant only and not against codefendants. See Bruton v. United States, 391 U.S. at 126 ("If it were true that the jury disregarded the reference to the codefendant, no question would arise under the Confrontation Clause, because by hypothesis the case is treated as if the confessor made no statement inculpating the nonconfessor."). See also Richardson v. Marsh, 481 U.S. at 206 ("Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."). Bruton v. United States recognizes, however, that "the practical and human limitations of the jury system" render that route around the Confrontation Clause impassible when "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." Bruton v. United States, 391 U.S. at 135-36. See Cruz v. New York, 481 U.S. 186, 190 (1987)(Scalia, J.)(reading Bruton v. United States to hold that the principle that "a witness whose testimony is introduced in a joint trial with the limiting instruction that it be used only to assess the guilt of one of the defendants will not be considered to be a witness 'against' the other defendants" does not "validate, under the Confrontation Clause, introduction of a nontestifying codefendant's confession implicating the defendant, with instructions that the jury should disregard the confession insofar as its consideration of the defendant's guilt is concerned"). That roundabout analysis means -- at least in pre-Crawford v. Washington cases -- that "the rule announced in Bruton v. United States . . .

forbids the prosecution to introduce a nontestifying codefendant's confession implicating [another] defendant in the crime." Greene v. Fisher, 565 U.S. 34 (2011)(Scalia, J.).

The academic view reasons that, after Crawford v. Washington, however, the Confrontation Clause does not police the use of nontestimonial statements, so it no longer matters, for Confrontation Clause purposes, whether limiting instructions restrain how juries use nontestimonial confessions in joint trials. See Whorton v. Bockting, 549 U.S. at 420 (stating that "the Confrontation Clause has no application to [nontestimonial] statements"). It follows that, notwithstanding Bruton v. United States, permitting the admission of nontestimonial confessions in multiple-defendant trials does not offend the Confrontation Clause, i.e., "the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements." United States v. Smalls, 605 F.3d at 768 n.2. See United States v. Clark, 717 F.3d at 816 (concluding that nontestimonial statements "fall outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*.").

In the absence of binding precedent, the Court would agree with the academic view that the Supreme Court's recent Confrontation Clause decisions do not mean that Bruton v. United States is absolutely silent regarding nontestimonial statements. The Court agrees that Crawford v. Washington's discussion of Roman law, see 541 U.S. at 43, "Marian bail and committal statutes," 541 U.S. at 44, and "the 1603 trial of Sir Walter Raleigh for treason," 541 U.S. at 44, does not impact "the practical and human limitations of the jury system," Bruton v. United States, 391 U.S. at 135, or call Bruton v. United States' rationale into question see Richardson v. Marsh, 481 U.S. at 211 (declaring that "we continue to apply *Bruton* where we have found its rationale validly applies"). Consequently, even though a nontestimonial statement's admissibility is no longer a constitutional issue, see United States v. Smalls, 605 F.3d at 780

("[T]he only question pertinent to the admissibility of a nontestimonial statement is whether it meets the requirements of the Federal Rules of Evidence."), Bruton v. United States' holding -- i.e., a jury may not follow a limiting instruction regarding a defendant's out-of-court statements, so they are admissible only if they are admissible against all the defendants they directly implicate -- should remain good law no matter whether a statement is testimonial until and unless the Supreme Court expressly says otherwise.

If it properly could, the Court would, thus, conclude that Bruton v. United States' language regarding the efficacy of limiting instructions applies no matter whether an evidentiary rule or a constitutional one renders a defendant's out-of-court statement inadmissible against codefendants.[20] Accordingly, the United States would be forced to: (i) redact Perez' statements that are admissible for their truth solely under rule 801(d)(2)(A) such that they do not directly implicate Sanchez, Baca, or Herrera; (ii) try Perez alongside Sanchez, Baca, and Herrera without

---

[20]The distinction between inadmissibility premised on the Confrontation Clause and inadmissibility premised on the Federal Rules of Evidence would matter on appeal, however, because a different harmless error standard applies to constitutional and nonconstitutional errors. Compare Champan v. California, 386 U.S. 18, 24 (1967)(Black, J.)("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."), with Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)(Rutledge, J.)(concluding, "except perhaps where the departure is from a constitutional norm," that, "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected"). See United States v. Lane, 474 U.S. 438, 460 (1986)(Brennan, J., concurring in part and dissenting in part)("[C]onstitutional errors are governed by the Due Process Clauses of the Fifth and Fourteenth Amendments rather than by [28 U.S.C.] § 2111 and Rule 52(a). Thus, the test for harmless constitutional error is stricter than its statutory counterpart." (citations omitted)). Harmless error standards are immaterial to the Court's analysis, however, because, while the Defendants are "entitled to a fair trial but not a perfect one," Lutwak v. United States, 344 U.S. 604, 619 (1953)(Minton, J.), the Court is nevertheless duty-bound to strive for an error-free trial just as Sisyphus must push his boulder up the mountain, see Albert Camus, THE MYTH OF SISYPHUS (1942)("One must imagine Sisyphus happy.").

resort to Perez' statements that are admissible for their truth only under rule 801(d)(2)(A) and directly implicate Baca, Herrera, or Sanchez; or (iii) proceed against Perez in a single-defendant trial.

The Court is not, however, free to restrict the United States' case so severely, because it must obey Tenth Circuit precedent stating that <u>Bruton v. United States</u> does not apply to nontestimonial statements. <u>See</u>, <u>e.g.</u>, <u>United States v. Clark</u>, 717 F.3d at 816 (concluding that statements which a coconspirator made in furtherance of the conspiracy are nontestimonial, and therefore "fall outside the protective ambit of the Confrontation Clause and, by extension, <i>Bruton</i>"); <u>United States v. Patterson</u>, 713 F.3d at 1247 ("The admission of these two statements violated neither <i>Crawford</i> nor <i>Bruton</i> because both statements were made in furtherance of a conspiracy and were therefore nontestimonial."). A careful examination of Tenth Circuit precedent shows that the Tenth Circuit's statements are dicta, because none of them analyzed a defendant statement that was nontestimonial and not admissible, under the Federal Rules of Evidence, against a codefendant which the statement implicated. The defendant in <u>United States v. Smalls</u> was not convicted in a joint trial. <u>See</u> 605 F.3d at 768 ("The district court severed the trials of Defendant Smalls and Cook as a result of an out-of-court statement Cook made to a confidential informant (CI), also an inmate at the detention center, implicating both himself and Defendant Smalls in the murder."). Further, the nontestimonial statements at issue in <u>United States v. Smalls</u> were admissible for their truth as declarations against interest by an unavailable declarant no matter against whom those statements were offered. <u>See</u> 605 F.3d at 785-86 (applying rule 804(3) of the Federal Rules of Evidence). On the other hand, a coconspirator made the out-of-court statements at issue in <u>United States v. Clark</u> and <u>United States v. Patterson</u> in furtherance of the conspiracy, which rendered them both nontestimonial and admissible --

under rule 801(d)(2)(E) -- for their truth against all the defendants they implicated.  See United States v. Clark, 717 F.3d at 816; United States v. Patterson, 713 F.3d at 1247.

If the issue comes squarely before it, perhaps via an appeal taken by the Defendants in this case, the Tenth Circuit may decide that the Court took United States v. Clark, United States v. Patterson, and United States v. Smalls too literally, and instead apply Supreme Court precedent to limit their unnecessarily overbroad pronouncements regarding the application of Bruton v. United States to nontestimonial statements.  See EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 488 (10th Cir. 2006)("[T]he district court in this case seems to have taken the 'rubber stamp' metaphor too literally, requiring that an explicit recommendation must cross the desk of the decisionmaker . . . ."); English v. Colo. Dep't of Corrections, 248 F.3d 1002, 1011 (10th Cir. 2001)(Ebel, J.)(stating that a plaintiff can recover on a rubber-stamp theory only if "'the decisionmaker followed [a] biased recommendation . . . without independently investigating the complaint against the employee'" (quoting Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999)).  Unless the Tenth Circuit does so, however, the Court must obey those pronouncements:

> [J]urisdiction is about *who* gets to decide.  It's about choosing the group of people who get to choose the judges, to write the rules of procedure and evidence, to supply the jury -- that is, to dispose of "all [the defendants'] worldly goods," and often their liberty to boot.  In particular, because jurisdiction includes the power to come to the *wrong* judgment, it's about choosing the people who have power to make the *wrong* choices on all these counts and who have the right to see their choices enforced anyway.

Stephen E. Sachs, Pennoyer Was Right, 95 Texas L. Rev. 1249, 1324 (2017)(emphasis and second alteration in the original)(footnotes omitted)(quoting Burnham v. Superior Court, 495 495 U.S. 604, 623 (1990)(Scalia, J., plurality opinion)).

The Court's preferred reading of Bruton v. United States, i.e. as a limiting instruction case and not just as a direct application of the Confrontation Clause, is importantly different from

Sanchez' argument that "*Jackson* [v. Denno, 378 U.S. 368 (1964)] and *Bruton* clearly recognize that a criminal defendant has a Due Process right not to be convicted with inadmissible evidence." Sanchez MIL at 20. Both state and federal courts must observe due process of law, see U.S. Const. amends. V, XIV § 1, so, if Sanchez' argument rooting Bruton v. United States in due process is correct, then neither state nor federal courts can depart from that case's determination that admitting "the powerfully incriminating extrajudicial statements of a codefendant" creates a "risk that the jury will not, or cannot, follow instructions [that] is so great . . . that the practical and human limitations of the jury system cannot be ignored." Bruton v. United States, 391 U.S. at 135.

Contrary to Sanchez' argument, however, the Constitution permits state courts to admit one defendant's out-of-court statement implicating a codefendant -- even when the statement is "hearsay as to the latter, and therefore inadmissible against him under state evidence law" -- if the declarant-defendant testifies. Nelson v. O'Neil, 402 U.S. 622, 626 (1971)(Stewart, J.). But see Roberts v. Russel, 392 U.S. 293, 293-94 (1968)(concluding that state courts cannot admit a defendant's out-of-court statements that implicate a codefendant if the declarant-defendant does not testify).[21] The Supreme Court rejected the proposition that "the Federal Constitution forbids the States to assume that juries can follow instructions that tell them to wipe their minds of highly damaging, incriminating admissions of one defendant that simultaneously incriminate

---

[21]Roberts v. Russel and Nelson v. O'Neil and can be reconciled no matter whether Bruton v. United States is a Confrontation Clause case or a limiting-instruction case. If Bruton v. United States is a Confrontation Clause case, it would create problems in Roberts v. Russel and not Nelson v. O'Neil, because the declarant-defendant did not testify in Roberts v. Russel. See Roberts v. Russel, 392 U.S. at 293-94; Nelson v. O'Neil, 402 U.S. at 626-27. If Bruton v. United States is, instead, a limiting-instruction case, it would raise problems in Roberts v. Russel and not Nelson v. O'Neil, because federal law determined whether a limiting instruction cured Roberts v. Russel's Confrontation Clause problem while state law determined whether a limiting instruction cured Nelson v. O'Neil's state-law hearsay problem.

another defendant." Nelson v. O'Neil, 402 U.S. at 634 (Brennan, J., dissenting). Nelson v. O'Neil instead permits states, in crafting evidentiary rules, to depart from the federal "rule that juries are presumed to follow their instructions" and Bruton v. United States' exception to that rule. Richardson v. Marsh, 481 U.S. at 211. See Nelson v. O'Neil, 391 U.S. at 211. Consequently, "due process of law," U.S. Const. amend. XIV § 1, does not incorporate that federal rule.

## VI. THE COURT MAKES THE FOLLOWING DETERMINATIONS REGARDING STATEMENTS THAT THE DEFENDANTS HAVE NOT SPECIFICALLY IDENTIFIED AS OBJECTIONABLE.

The Court applies its evidentiary analysis to particular statements that the United States presented during the Court's James hearing. In the following table, the Court designates statements by both declarant and transcript citation. That table also contains the Court's conclusions.

| Declarant(s) | Citation | The Court's Conclusions |
|---|---|---|
| Baca | Nov. 27 Tr. at 147:8-16 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Calbert and Baca | Nov. 27 Tr. at 149:17-21 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Baca | Nov. 27 Tr. at 149:17-21 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| M. Rodriguez and T. Martinez | Nov. 27 Tr. at 150:11-20 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| T. Martinez | Nov. 27 Tr. at 150:11-20 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Herrera | Nov. 27 Tr. at 151:1-13 | Nontestimonial; rule 801(d)(2)(A) applies as against Herrera; the Court will give a limiting instruction as to Sanchez, Baca, and Perez |
| M. Rodriguez | Nov. 27 Tr. at 152:8-24 | Nontestimonial |
| Sanchez | Nov. 27 Tr. at 153:6-10 | Nontestimonial; rule 801(d)(2)(A) applies as against Sanchez; rule 803(3) applies generally |
| Gomez | Nov. 27 Tr. at 153:19-154:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 8 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |

| | | |
|---|---|---|
| Baca | Nov. 27 Tr. at 153:19-154:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 8 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| M. Rodriguez | Nov. 27 Tr. at 155:19-159:2 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 159:10-160:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 160:6-161:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 160:6-161:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 161:5-162:13 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 162:14-163:25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 164:4-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Baca | Nov. 27 Tr. at 164:23-165:16 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Gomez | Nov. 27 Tr. at 164:23-165:16 | Nontestimonial |
| Baca | Nov. 27 Tr. at 167:5-18 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| C. Garcia | Nov. 27 Tr. at 167:19-169:6 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 27 Tr. at 167:19-169:6 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Sanchez | Nov. 28 Tr. at 40:23-41:8 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| R. Martinez | Nov. 28 Tr. at 41:14-20 | Nontestimonial |
| Sanchez | Nov. 28 Tr. at 42:1-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Herrera | Nov. 28 Tr. at 42:15-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 28 Tr. at 42:22-43:14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Perez | Nov. 28 Tr. at 43:9-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |

| | | |
|---|---|---|
| T. Martinez | Nov. 28 Tr. at 43:15-44:15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 43:15-44:15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 45:5-8 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Montoya | Nov. 28 Tr. at 45:12-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 28 Tr. at 45:15-20 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 45:22-46:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Montoya | Nov. 28 Tr. at 46:5-6 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 46:6-9 | Nontestimonial |
| Molina | Nov. 28 Tr. at 46:6-9 | Nontestimonial; rule 804(b)(2) applies |
| M. Rodriguez | Nov. 28 Tr. at 46:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Herrera | Nov. 28 Tr. at 46:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| R.P. Martinez | Nov. 29 Tr. at 229:16-230:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R.P. Martinez | Nov. Tr. at 230:6-19 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R.P. Martinez | Nov. 29 Tr. at 230:22-232:14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 232:15-233:7 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 233:7-24 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 233:25-234:19 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 234:19-25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the court will give a limiting instruction as to Sanchez, Herrera, and Perez |

| | | |
|---|---|---|
| Baca | Nov. 29 Tr. at 236:21-237:5 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 237:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 237:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 238:3-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Montoya | Nov. 29 Tr. at 238:3-11 | Nontestimonial |
| Baca | Nov. 29 Tr. at 238:25-239:3 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 239:3-8 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 239:18-240:3 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 240:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 240:15-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 241:3-4 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 241:19-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 242:11-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to the other Defendants |
| Baca | Nov. 29 Tr. at 243:3-18 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr.at 243:24-244:7 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |

| | | |
|---|---|---|
| Baca | Nov. 29 Tr. at 244:10-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 244:25-245:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 245:12-17 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 245:24-246:9 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 247:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 248:3-7 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 248:16-19 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 249:5-12 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:3-5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:11-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| C. Garcia | Nov. 29 Tr. at 250:11-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:25-251:3 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| C. Garcia | Nov. 29 Tr. at 250:25- | Nontestimonial; rule 801(d)(2)(E) applies as to |

| | 251:3 | Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
|---|---|---|
| Baca | Nov.29 Tr. at 251:8-17 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 252:14-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 256:17-25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:7-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:13-14 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:15-16 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:17-18 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:19-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Duran | Nov. 29 Tr. at 257:20-21 | Nontestimonial |
| M. Rodriguez | Nov. 29 Tr. at 257:20-21 | Nontestimonial; rule 803(3) applies |
| Baca | Nov. 29 Tr. at 257:21-22 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| M Rodriguez | Nov. 29 Tr. at 257:25 | Nontestimonial |
| Baca | Nov. 29 Tr. at 258:12-20 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 259:1-4 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| C. Garcia | Nov. 29 Tr. at 261:7-13; James Hearing Exhibit 26[22] | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and |

___

[22]The United States indicated at the November 29, 2017 hearing that it would highlight, via Acee's testimony, portions of James Hearing Exhibit 26, "a transcript from a body wire that

| | | Perez |
|---|---|---|
| Parker | Nov. 29 Tr. at 262:1-4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Montoya | Nov 29 Tr. at 262:8-263:4 | Testimonial[23] |

**IT IS ORDERED** that: (i) Defendant Santos Gonzales' Motion for Production of Alleged Co-Conspirator Statements, Pre-Trial Hearing on Their Admissibility Pursuant to Fed.R.Evid. 801(d)(2)(E), filed May 9, 2017 (Doc. 1141), is granted; (ii) Defendant Rudy Perez's Motion for Production of Alleged Co-Conspirator Statements and for Pre-Trial Hearing on Their Admissibility, filed August 21, 2017 (Doc. 1228), is granted; (iii) the Opposed Motion for Specification of Co-Conspirator Statements and a Pre-Trial Hearing on the Statements' Admissibility, filed October 6, 2017 (Doc. 1303), is granted in part and denied in part; (iv) Motion to Prevent the Admission of Statements of Non-Testifying Codefendants Implicating Defendant Billy Garcia and for an Order for the Government to Specify Such Statements Prior to Trial, filed October 10, 2017 (Doc. 1307), is granted in part and denied in part; (v) Motion for James Hearing and Determination of Co-Conspirator Statements Admissibility at a Pre-Trial Hearing, filed October 13, 2017)(Doc. 1317), is granted; (vi) Defendant Shauna Gutierrez' Opposed Motion for a James Hearing, filed October 13, 2017 (Doc. 1321), is granted; (vii) Motion in Limine to Exclude Statement of Cooperating Government Witnesses, filed

Mario wore when he went to Chris Garcia's house to pick up the firearm," Nov. 29 Tr. at 260:9-11 (Acee), but it added, "I'm actually moving in the entire conversation as part of the co-conspirator statements," Nov. 29 Tr. at 260:13-15 (Castellano).

[23]When Montoya made this statement, he was acting as confidential human source, and he was wearing a wire. See Nov. 29 Tr. at 260:2-11 (Acee). Accordingly, his statement was not made in furtherance of the conspiracy -- because Montoya, as a confidential human source -- was actively working to thwart the conspiracy. That Montoya was wearing a wire indicates that Montoya would reasonably expect his recorded statements to be introduced as evidence at a trial, so those statements are testimonial.

November 30, 2017 (Doc. 1514), is granted in part and denied in part; (viii) Opposed Motion in Limine to Exclude Co-Defendant's [sic] Statements, filed December 1, 2017 (Doc. 1517), is denied; (ix) Defendant Anthony Ray Baca's Motion in Limine to Prohibit the Government From Questioning Jerry Armenta About Defendant Anthony Ray Baca's Involvement in Counts 6 & 7, filed December 4, 2017 (Doc. 1540), is denied; (x) Defendant Daniel Sanchez's Motion in Limine to Preclude the Admission of Un-Confronted, Out of Court Statements Proffered by the Government at the *James* Hearing, filed January 8, 2018 (Doc. 1616), is denied; and (xi) the Joint Motion to Renew Motion to Sever Defendants Charged with Offenses in Counts 6 and 7, filed January 21, 2018 (Doc. 1664), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
   United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

      *Attorneys for Defendant Joe Lawrence Gallegos*

- 124 -

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

    *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

    *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

    *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

    *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

    *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

*Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

*Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

*Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and

Ray Velarde
El Paso, Texas

*Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

*Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

*Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

*Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

*Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*