# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                    No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ,
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States' Sealed Supplemental Notice of Proposed *James*[1] Statements for Trial II, filed April 19, 2018 (Doc. 2135)("James Notice"); (ii) the United States' Sealed Trial Brief Regarding Michael Jaramillo's Testimony, filed April 20, 2018 (Doc. 2138)("Brief"); and (iii) the Defendants' oral motion to exclude Michael Jaramillo's testimony. The primary issues are: (i) whether Plaintiff United States of America must comply with 18 U.S.C. § 3432 -- which provides certain procedural protections to "[a] person charged with treason or other capital offense" -- if the United States does not seek to impose the death penalty in a particular case; (ii) whether the United States' failure to include Jaramillo in its pretrial witness list violates 18 U.S.C. § 3432 if that statute applies; (iii) whether excluding Jaramillo's testimony is an appropriate remedy for the United States' § 3432 violation if one occurred; and (iv) whether, if Jaramillo takes the stand, the out-of-court statements that the United States identifies in the James Notice and which Jaramillo will relate to the jury are admissible for their truth as co-conspirator statements under rule 801(d)(2)(E) of the Federal Rules of Evidence. The Court concludes that a capital offense is "[a] crime for which the death penalty may be imposed," Capital Offense, Black's Law Dictionary (10th ed. 2014), so 18 U.S.C. § 3432's requirements apply even if the United States does not seek to impose the death penalty in a particular case. The Court determines that the United States violated 18 U.S.C. § 3432 by failing to include Jaramillo on its witness list, but the Court also determines that excluding Jaramillo's testimony is not an appropriate remedy for this violation. Finally, the Court concludes that the out-of-court statements that the James Notice identifies are admissible for their truth.

---

[1]United States v. James, 590 F.2d 575 (5th Cir. 1979)("James").

## FACTUAL BACKGROUND

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment"). The background facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or as the truth. The Court recognizes that the factual background largely reflects the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. See Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at the PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. See Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New

Mexico penal system, but it also conveys orders outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, . . . includ[ing] murder and assaults." Indictment at 4. SNM also "intimidate[es] and influenc[es] smaller New Mexico Hispanic gangs" to expand its illegal activities. Indictment at 4. If another gang does not abide by SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment at 8. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the Federal Bureau of Investigation's ("FBI") present investigation. United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133). The other relevant facts giving rise to this case are as follows.

In March, 2014, a Doña Ana County, New Mexico grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder, and four other felonies, related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO"). The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. See MOO at 6, 2016 WL 7242579, at *3. That New Mexico indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. See MOO at 6-7, 2016 WL 7242579, at *3. In November, 2015, the state District Attorney dismissed the charges against Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy. See MOO at 7, 2016 WL 7242579, at *3. "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts. See Indictment at 1, 9-18. All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Indictment at 9-18. Defendant Arturo Arnulfo

Garcia, Defendant Gerald Archuleta,[2] Defendant Benjamin Clark, M. Rodriguez, Defendant

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[3] and Sanchez are

---

[2]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2003, I was an active member of the SNM. The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM. J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J.R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM. The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting. The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico. This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R. This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[3]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM

the enterprise's alleged leaders.  <u>See</u> Indictment at 6.  The other Defendants are allegedly

members or associates who acted under the direction of the enterprise's leaders.  <u>See</u> Indictment

at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in:

(i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) define that term; (ii) murder and

robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512,

and 1513, "involving obstruction of justice, tampering with or retaliating against a witness,

victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21

U.S.C. §§ 841 and 846.  Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon,

Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9

(Count 1).  On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen

Patterson, and Christopher Chavez allegedly murdered "R.G."  Indictment at 10 (Count 2).  On

June 17, 2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben

---

constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State. Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

Hernandez allegedly murdered "F.S." Indictment at 10-11 (Count 3). On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B." Superseding Indictment at 11 (Count 4). On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B. See Indictment at 11-12 (Count 5). In March, 2014, Armenta, Montoya, M. Rodriguez, Defendant Timothy Martinez, Baca, Defendant Mauricio Varela, Sanchez, Defendant Carlos Herrera, and Defendant Rudy Perez allegedly conspired to murder "J.M." Indictment at 12 (Count 6). On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera, and Perez allegedly murdered J.M. See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Indictment at 13-14 (Count 8). Starting "on a date uncertain, but no later than 2013," and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S." Indictment at 14 (Count 9). During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M." Indictment at 15 (Count 10). On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Indictment at 15-16 (Count 11). On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder. See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Indictment at 16 (Count 13). From February 1, 2016, until February 27, 2016, J. Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez allegedly conspired to murder "J.G." Indictment at 17 (Count 14). Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to

murder J.G., and committed assault with a dangerous weapon and assault resulting in serious

bodily injury to J.G. See Indictment at 17-18 (Count 15). The same Defendants also allegedly

tampered with a witness, J.G. See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged

criminal activity. In a related case -- United States v. Baca, No. CR 16-1613

(D.N.M.)(Browning, J.)[4] -- the United States names twelve defendants, all alleged SNM

members or associates, who have allegedly engaged in a racketeering conspiracy, under 18

U.S.C. § 1962(d).[5] There is also a separate prosecution of C. Garcia for drug crimes, see United

States v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for

---

[4]The Court has granted a conditional severance of one Defendant in that case. See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.). The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his Speedy Trial Act, 18 U.S.C. §§ 3161-74, rights. The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping. Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here . . ." in federal court. See July Tr. at 10:13-18 (Ray). If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *31. Ultimately, the Court notes, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor. See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld). On March 22, 2017, R. Gallegos pled guilty in his severed case. See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

[5]The Court has also declared that case complex under the Speedy Trial Act. See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959.  See United States v.

Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

Early in this case, the United States indicated that it would not seek the death penalty.

See Notice of Intent Not to Seek a Sentence of Death at 1, filed June 6, 2016 (Doc. 567).  On

June 30, 2017, the Court severed for trial the Indictment's Counts 6-12 from its Counts 1-5 and

Counts 13-16.  See Memorandum Opinion and Order at 3, 2017 WL 3054511, at *1, filed June

30, 2017 (Doc. 1204)("Severance MOO").  The result of this severance is one trial for the

Indictment's Counts 6-12,[6] and another, separate trial for the Indictment's Counts 1-5 and 13-

16.[7]  See Severance MOO at 3, 2017 WL 3054511, at *1.  At the time of severance, nineteen

Defendants remained in the case.  See Severance MOO at 175, 2017 WL 3054511, at *102.  The

trial of the Indictment's Counts 1-5 and 13-16 "would then involve the prosecution of eleven

Defendants, none of whom are named in Counts 6-12."  Severance MOO at 175, 2017 WL

3054511, at *102.  Further, the trial of the Indictment's Counts 6-12 "would involve the

prosecution of eight Defendants none of whom are named in Counts 1-5 or 13-16."  Severance

MOO at 175, 2017 WL 3054511, at *102.  The trial for Counts 6-12 would proceed first, with

jury selection to begin on January 19, 2018 ("Trial I"), followed by the trial for Counts 1-5 and

13-16, with jury selection to begin on April 9, 2018 ("Trial II").  See Fourth Scheduling Order at

3, filed July 7, 2017 (Doc. 1205).  This Memorandum Opinion and Order deals with Trial II.

---

[6]Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera, Perez, Archuleta, Villegas, R.P. Martinez, R. Martinez, and C. Garcia are charged in these Counts.

[7]DeLeon, J. Gallegos, Troup, Lujan, B. Garcia, E. Martinez, Patterson, Chavez, Alonso, A.A. Garcia, Clark, Hernandez, A. Gallegos, Gonzalez, Rivera, Gutierrez, and B. Rodriguez are charged in these Counts.

Seven Defendants proceeded to trial for Trial II: J. Gallegos, Troup, B. Garcia, Patterson, Chavez, A.A. Garcia, and A. Gallegos (collectively, "Trial II Trial Defendants").

On March 12, 2018, the Court held a pretrial conference for Trial II. See Transcript of Hearing at 6:8-16 (taken March 12, 2018)(Court), filed April 3, 2018 (Doc. 2026)("March 12 Tr."). At that pretrial conference, Defendant Edward Troup requested "that, like you did in the first trial, . . . you order the Government to provide a may call and a will call witness list two weeks prior to the start of the trial, which would be March 26." March 12 Tr. at 45:6-9 (Harbour-Valdez). The United States replied:

> I think that we have narrowed it down to will call. The first list is pretty much a significant long list. But we have it narrowed down, and so I think that everyone we put on there has a pretty good chance of being called. If there [are] people that we're going to add in that are just potentials, we will do it. But right now the list that we're working on will be a list that is pretty significant.
>
> . . . .
>
> . . . If after we meet -- as you know, we've been busy[8] -- if after we're able to meet and decide on additional people to put in there, then we would put in the list that we filed potential witnesses.

March 12 Tr. at 45:25-46:4 (Armijo). The United States added that "we would ask for a reciprocal date before -- I don't have the order in front of me, but I believe previously we had dates that both parties gave witness lists. So as long as the defendants want[] to give their witness list on March 26, that's fine." March 12 Tr. at 46:19-24 (Armijo). After some wrangling about dates, the Court set out -- and the United States confirmed -- the United States and the Defendants' agreement regarding witness lists:

---

[8]The jury's deliberations in Trial I began on Tuesday, March 6, 2018, just six days before Assistant United States Attorney Maria Armijo made this statement on March 12, 2018. See Transcript of Jury Trial Volume 25 at 318:4-10 (taken March 5, 2018)(Court), filed February 22, 2019 (Doc. 2541). The jury gave its verdict in the middle of this March 12, 2018, hearing. See March 12 Tr. at 76:4-5.

THE COURT: Let's do this: Let's just -- I mean, I think it's most important to give -- to get the Government's into your hands. So I will set March 26 as the date. Sounds like the Government is pretty far along in figuring out who their will call people may be, and they will have a short list of may call. So I think you're going to get what you want.

Why don't the defendants do the same thing. And I understand you may have to revise it after you see the Government's list. So you'll have a chance to do it. But at least at the present time you'll have a reciprocal exchange, with the understanding that after the Government shows you their list, you may have to revise your list.

MS. HARBOUR-VALDEZ: And Your Honor, Mr. Cooper pointed out that the prior deadline would have been March 23 for the will call list. The Jencks deadline was March 26.

THE COURT: All right. So the Government is shaking their head yes.

MS. ARMIJO: That's fine, Your Honor. We can do the 23rd. And then if the defense wants [to] file their witness list on the 26th, have the weekend, that's fine, too. We'll provide ours the 23rd.

THE COURT: All right. So let's do that.

March 12 Tr. at 47:5-48:3 (Court, Harbour-Valdez, Armijo). The United States' first witness list did not include Jaramillo. See United States' Sealed Supplemental Witness List for Trial II at 1-2, filed March 23, 2018 (Doc. 1968)("United States' Pretrial Witness List"). The United States filed a supplemental witness list on the first day of jury selection, but that list does not include Jaramillo. See United States' Sealed Amended Supplemental Witness List for Trial II at 1-2, filed April 9, 2018 (Doc. 2091). That day, during voir dire, the United States listed its potential witnesses and asked whether any members of the venire knew those individuals; Jaramillo was not included on that list. See Transcript of Jury Trial at 81:12-82:18 (taken April 9, 2018)(Beck), filed July 25, 2018 (Doc. 2354). During the second day of voir dire, the United States read its list to the venire again and included Jaramillo on that list. See Transcript of Jury Trial at 114:2-3 (taken April 10, 2018)(Beck), filed July 25, 2018 (Doc. 2355). FBI Special

Agent Bryan Acee, the case agent and the United States' designated representative under rule 615(b) of the Federal Rules of Evidence, handed a yellow sticky note with Jaramillo's name to Assistant United States Attorney Mathew Beck, who read that name after reading all of the names on the United States' typed witness list, almost as an afterthought. A jury was seated and sworn on Wednesday, April 11, 2018.

1.      **The Opening Statements.**

Opening statements began the next day. In his opening statement, B. Garcia emphasized that the United States' case rests on uncorroborated testimony. See Transcript of Excerpt of Opening Statements at 26:23-27:2 (taken April 12, 2018)(Castle), filed May 9, 2018 (Doc. 2233)("Openings Tr.")("[W]hat you're going to find out in this case is there is absolutely no corroboration. What I mean by 'corroboration' is facts that prove what someone says, as opposed to just their words."). B. Garcia identified several of the United States' witnesses and explained why, in his opinion, those witnesses are not trustworthy. See Openings Tr. at 50:13-58:20 (Castle); id. at 63:15-68:20 (Castle); id. at 79:11-89:16 (Castle). B. Garcia was careful to note, however, that his list was not exhaustive and that the United States might have other witnesses:

> Now, there might be a few more inmates. We don't know. I mean, sometimes new stuff bubbles up because more prisoners want to get out of their sentence or see this as an opportunity. So there might be people I haven't shown you that might come in here, that we don't know about yet. But I'd be almost shocked if there wasn't more guys thinking that this is an opportunity to walk out some door somewhere. But this is what we've been able to find out about, the ones that we know about.
>
> It's upon the word and character of those men that the Government rests its entire case. It's not DNA. It's not corrections officers who saw anything. It's not videotape. It's not fingerprints. It's not fingernail scrapings. It's not hair. It's nothing other than the word and character of these men.

Openings Tr. at 89:17-90:8 (Castle). J. Gallegos and Troup likewise identified United States

witnesses, and attacked their credibility during their opening statements. See Openings Tr. at

95:8-97:7 (Benjamin); id. at 110:7-112:5 (Benjamin); id. at 115:4-119:5 (Burke).

2.      **The Jaramillo Interview**.

On Wednesday, April 18, 2018, the United States -- through Mr. Beck and FBI Special

Agent Joseph Sainato -- presented a Kastigar letter[9] to Jaramillo and interviewed him for the first

time.[10]  See FBI 302 of Michael Jaramillo at 1 (dated April 19, 2018), filed April 19, 2018

(Doc. 2135-1)("Jaramillo 302"). Jaramillo's interview focuses on the Count 1 homicide of Frank

Castillo in 2001. Jaramillo 302 at 2-4; Indictment at 9. Jaramillo stated that, a few days before

Castillo's murder, Lujan approached him and had him follow Lujan to the library, where DeLeon

---

[9]Both the United States and the Defendants have repeatedly referred to the letters immunizing the United States' witnesses as Kastigar letters, named from Kastigar v. United States, 406 U.S. 441 (1972)("Kastigar"). That term is apparently a misnomer, because, if the Letter from Maria Armijo to John Samore (dated June 9, 2016), filed May 10, 2018 (Doc. 2246)(Clerk's Exhibit 15)("Cordova Letter"), is representative, Kastigar letters do not afford the United States' witnesses the immunity that Kastigar requires. Calling those documents Kastigar letters is accurate, however, in a limited sense; those documents explain that permitting the United States to make derivative use of information and to pursue investigative leads is necessary "to eliminate the necessity for a Kastigar hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted." Cordova Letter ¶ 2, at 1. See Kastigar Hearing, Black's Law Dictionary (10th ed. 2014)("A hearing at which the prosecution must establish by a preponderance of the evidence that the government's evidence derives from proper, nonimmunized sources.")

[10]The United States' oral representations to the Court indicate that Jaramillo was unwilling to speak with the United States without both a subpoena and a Kastigar letter. The United States has not explained, however, why it did not use the Grand Jury to subpoena him earlier. The Defendants indicate that they "had an investigator for our team [go] out and talk[] to Mr. Jaramillo and he said he didn't know anything about" the Count 1 murder of Frank Castillo. Draft Trial Transcript at 7:6-8 (taken April 19, 2018)(Sindel)("April 19 Tr."). The Jaramillo 302 confirms that a defense investigator for J. Gallegos visited Jaramillo about a year-and-a-half to two years before the interview, but that Jaramillo "told the investigator that he did not know anything and did not want any part of the case." Jaramillo 302 at 4.

was waiting.  See Jaramillo 302 at 2.  According to Jaramillo, Lujan told Jaramillo that he needed to "put in work" -- that B. Garcia wanted Lujan to find people to kill Castillo and that Lujan wanted Jaramillo, J. Gallegos, and DeLeon to do it.  Jaramillo 302 at 2.  Jaramillo relayed that he and DeLeon then spoke with J. Gallegos about the order, and that J. Gallegos said "that he was waiting on a delivery of heroin and that they would wait until after the delivery to make the move on" Castillo.  Jaramillo 302 at 2.  Jaramillo said that J. Gallegos' heroin delivery "came in later that day or the next," and that J. Gallegos called Jaramillo and DeLeon into his cell before the evening lockdown to inform them that they would enter Castillo's cell as soon as doors opened the next morning.  Jaramillo 302 at 3.  Jaramillo stated that J. Gallegos told them that they would use heroin with Castillo, then DeLeon would hold down Castillo as he took his heroin and Jaramillo would then strangle him.  See Jaramillo 302 at 3.  According to Jaramillo, J. Gallegos said that Troup would serve as lookout for them and told them to refuse any police-requested DNA tests.  See Jaramillo 302 at 3.  Jaramillo also said that J. Gallegos promised that "his family would pay for an attorney for them if they got in trouble."  Jaramillo 302 at 3.  Jaramillo stated that this conversation ended after J. Gallegos called over Troup and told Troup that he would be a lookout the next morning.  See Jaramillo 302 at 3.  Jaramillo recalled that he went back to his cell and used heroin, which J. Gallegos had given him earlier that day, for the first time.  See Jaramillo 302 at 3.

Jaramillo said that, the next morning, he joined J. Gallegos, DeLeon, and Castillo in Castillo's cell.  See Jaramillo 302 at 3.  Jaramillo stated that J. Gallegos gave Castillo the heroin, and as Castillo was injecting himself, Jaramillo and DeLeon "grabbed him, flipped him around and held him face-down on his bed, with his head toward the wall."  Jaramillo 302 at 3.  Jaramillo said that he took the drawstring from Castillo's laundry bag, wrapped it around

Castillo's neck, and tied a knot in the string once Castillo stopped struggling. See Jaramillo 302 at 3. Jaramillo said that he left the cell and saw Troup downstairs, but nobody else, returned to his own cell, and then went to breakfast. See Jaramillo 302 at 3. Jaramillo said that New Mexico Corrections Department officials instituted lockdown after breakfast and put everyone in their cells, which Jaramillo estimated occurred less than an hour after Castillo's murder. See Jaramillo 302 at 3-4. Jaramillo stated that New Mexico State Police arrived that night, and that he gave them a DNA sample and a brief statement. See Jaramillo 302 at 4.

The United States provided Sainato's notes from that interview to the Defendants later in the afternoon of April 18, 2019. See Brief at 14. The next day, April 19, 2018, Sainato drafted the Jaramillo 302, see Jaramillo 302 at 1, and the United States provided that document to the Defendants, see Brief at 2. The United States also filed the James Notice on that day. See James Notice at 1. The James Notice summarizes out-of-court statements that the United States expects, based on the Jaramillo 302, that Jaramillo will relate to the jury when he takes the stand. See James Notice at 1. The United States also filed witness lists on that day listing Jaramillo as a witness for the first time. See United States' Sealed Supplemental Witness List for Trial II at 2, filed April 19, 2018 (Doc. 2136); United States' Sealed Supplemental Witness List for Trial II at 3, filed April 19, 2018 (Doc. 2137).

Also on April 19, 2018, the Count 1 Trial Defendants -- J. Gallegos, Troup, and B. Garcia -- orally moved the Court to prevent Jaramillo from testifying. See Draft Trial Transcript at 121:17-122:4 (taken April 19, 2018)(Burke)("April 19 Tr.").[11] They asserted that they first learned that Jaramillo might be a witness when they received Sainato's notes. See April 19 Tr. at

_____

[11]The Court's citations to the trial transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

2:11-24 (Sindel); id. at 120:18-121:5 (Burke)  J. Gallegos indicated that "an investigator for our team had gone out and talked to Mr. Jaramillo and he said he didn't know anything about" the Castillo murder.  April 19 Tr. at 7:6-8 (Sindel).

The Count 1 Trial Defendants contended that, if they had known earlier that Jaramillo might testify, their opening statements and voir dire -- as well as their planned cross-examination of Lujan, who had not yet taken the stand -- would have been different.  See April 19 Tr. at 3:4-16 (Sindel); id. at 6:3-11 (Sindel).  They explained that the Jaramillo 302 disclosure affects their cross-examination of Lujan, because Jaramillo's statements contradict Lujan's expected testimony.  See April 19 Tr. at 6:14-24 (Sindel).  The Court instructed the United States to delay Lujan's testimony so that the Defendants could prepare to cross-examine Lujan in light of the United States' disclosures regarding Jaramillo.  See April 19 Tr. at 12:9-19 (Court).  The Court indicated that the United States' failure to identify Jaramillo on its witness list likely violated both the United States' agreement with the Defendants regarding pretrial disclosure of witness lists and 18 U.S.C. § 3432's requirement that "[a] person charged with treason or other capital offense shall at least three entire days before commencement of trial . . . be furnished with . . . a list . . . of the witnesses to be produced on the trial for proving the indictment."  18 U.S.C. § 3432.  See April 19 Tr. at 12:12-13 (Court); id. at 141:22-142:6 (Court); id. at 142:15-19 (Court).  The Court told the United States that, "for present purposes," it would need to plan its case without Jaramillo's testimony.  April 19 Tr. at 202:7.  See id. at 202:7-9.

### 3.    **The Brief.**

The United States argues that 18 U.S.C. § 3432 does not apply to this case, because "the United States did not file a notice of intent to seek the death penalty, *see* 18 U.S.C. § 3593, [so] the death penalty may not be imposed, and this is not, therefore, a capital offense for purposes of

§ 3432." Brief at 1. The United States notes that the Courts of Appeals "that have analyzed this issue uniformly agree that § 3432 does not apply where a defendant does not face the death penalty at the start of trial." Brief at 8 (citing <u>United States v. Shepperson</u>, 739 F.3d 176, 181 n.3 (4th Cir. 2014)). Accordingly, the United States maintains that it did not need "to provide a witness list three days before trial." Brief at 1. The United States also contends that § 3432 "does not apply when 'material testimony [is] discovered during the progress of trial,'" so even if § 3423 applies, the Court should admit Jaramillo's testimony as it was revealed during the trial, albeit "in an FBI 302 instead of on the stand." Brief at 2 (quoting <u>United States v. Rosenberg</u>, 195 F.2d 583, 599-600 (2d Cir. 1952)). Further, the United States asserts that § 3234 is inapplicable to rebuttal witnesses, and Jaramillo's testimony is "essential" to the United States' rebuttal of Lujan. Brief at 2. The United States notes that it filed a witness list, which inadvertently omitted Jaramillo, in compliance with § 3432 -- although the United States asserts § 3432 does not apply. <u>See</u> Brief at 1.

According to the United States, this failure to include Jaramillo on the witness list did not cause significant prejudice to the Defendants, because they

> have been on notice of the possibility Michael Jaramillo, a.k.a., "Criminal," being a witness in this case in Count 2[12] for the murder of Frank Castillo, a.k.a., "Pancho," since the outset of the case. One of the first documents produced in discovery, and a key piece of discovery since the beginning, was Leonard Lujan's recorded interview with Albuquerque Police Department Detective Rich Lewis from August of 2007. Lujan identified Joe Gallegos, Angel DeLeon, and "Criminal" -- Jaramillo -- as the three persons he tasked with murdering Castillo. And Lujan never waivered from that testimony. The Defendants are, therefore, not caught off guard by the appearance of a heretofore-unknown individual for whom they have never received notice. Rather, they have the benefit of knowing Jaramillo's testimony prior to taking the stand, rather than being surprised by it while he's on the stand.

---

[12]The United States erroneously identifies Count 2 as the Castillo murder; however, the Castillo murder is charged in Count 1. <u>See</u> Indictment at 9.

- 18 -

Brief at 7.  The United States therefore maintains that its inadvertent omission of Jaramillo from the witness list "is readily apparent" to the Defendants.  Brief at 14.  Accordingly, the United States argues that, even if 18 U.S.C. § 3432 applies to this case, "the proper remedy isn't exclusion of the witness."  Brief at 11-12.  The United States contends that its failure to include Jaramillo should, at most, "result in an adjournment for time to prepare," Brief at 12, because excluding Jaramillo's testimony would significantly impede "the truth-seeking purpose of the court system," Brief at 16.

4.    **The Response**.

A.A. Garcia filed a written response to the United States' Brief.  <u>See</u> Response to Government's Trial Brief Doc. 2138 Regarding Testimony of Michael Jaramillo, filed April 20, 2018 (Doc. 2139)("Response").  A.A. Garcia asserts that the United States' failure to include Jaramillo on its witness list prejudiced the Defendants, because they were not

> informed that they would have to meet the testimony of Mr. Jaramillo. Consequently, defense counsel and their clients have been unable to prepare their defense against Mr. Jaramillo's testimony.  The Defendants, and in particular, Joe Gallegos and Edward Troup, were unable to conduct voir dire in light of Mr. Jaramillo's testimony; they were unable to present opening statement in light of this; their entire defense has been impacted in substantial ways by Mr. Jaramillo's late entry into the case, if he is permitted to testify.

Response at 3.  According to A.A. Garcia, "[e]ven if the notice requirement of § 3432 did not apply, the Defendants would be deprived of their rights to due process and to present a defense, if the Government is allowed to present the testimony of Mr. Jaramillo in this trial."  Response at 6.  A.A. Garcia also argues that the Court has broad discretion to exclude Jaramillo's testimony.  <u>See</u> Response at 9.  A.A. Garcia asserts that excluding Jaramillo's testimony is appropriate, because giving the Defendants time to prepare for Jaramillo's testimony "would fail to cure the prejudice" that they suffer as a result of Jaramillo's omission from the United States' witness list,

Response at 10, because "the Defendants were not allowed to conduct voir dire in relation to Mr. Jaramillo's confession; they were not allowed to present opening statements in light of his confession; [and] they were not allow[ed] to present their defense against the Government's case in chief with this information in hand," Response at 11.

A.A. Garcia argues that 18 U.S.C. § 3432 applies because "the death penalty was originally sought, and only at a later date, was the death penalty taken off the table," Response at 5, and the statute's purpose is "to prevent trial by ambush" and enable the defendant to prepare a defense, Response at 3. He further asserts that "[t]he exception for rebuttal witnesses discovered during trial does not apply here, where none of the Defendants intends to present a case in chief pertaining to Mr. Jaramillo." Response at 2. A.A. Garcia maintains that, if the rebuttal exception applies here -- where the United States is attempting to use Jaramillo to rebut the Defendants' cross-examination of the United States' case in chief -- § 3432's notice requirement would serve no purpose. Response at 8. A.A. Garcia contends that § 3432 does not contain "a broad exception for inadvertence." Response at 3. Accordingly, A.A. Garcia underscores that the United States' late addition of Jaramillo as a trial witness "would dramatically alter the complexion of the case" and violates § 3432, and requests that the Court exclude Jaramillo's testimony. Response at 11. See id. at 2-3, 13.

>   **5.   The Court's Decision on Jaramillo's Testifying.**

After thinking about the issue over the weekend, on Monday, April 23, 2018, the Court told the parties that it is "going to conclude that the statute does require in this case the United States to disclose its witnesses three entire business days, not including holidays and weekends, in advance" of trial. Transcript of Excerpt of Testimony of Leonard Lujan at 94:20-23 (taken April 23 and 24, 2018)(Court), filed May 16, 2018 (Doc. 2282)("April 23 Tr."). The Court noted

that the statute does not include a remedy for its violation and so the remedy is within the Court's discretion, April 23 Tr. at 95:3-9 (Court); id. at 96:15-16 (Court), and informed the parties that it had "concluded that exclusion is not an appropriate remedy in this case" and that exclusion is "too Draconian in this case," April 23 Tr. at 95:9-11 (Court). The Court acknowledged the Defendants' arguments that they would have approached the case differently had they known earlier that Jaramillo would be called, but stated that, even had Jaramillo been named in the United States' witness list, the Defendants would not have known "what his testimony would be" and, thus, the Court did not believe that the Defendants "would have done anything or much differently than what they had, in fact, done." April 23 Tr. at 95:17-20 (Court). See id. at 95:11-16 (Court). The Court therefore concluded that the appropriate remedy for the violation of § 3432 is "push[ing] this evidence down so the [D]efendants have more time to deal with Mr. Jaramillo." April 23 Tr. at 95:24-96:1 (Court).

**FINDINGS OF FACT**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court bases these conclusions on the testimony it heard at its James hearing as well as the evidence it admitted at that hearing. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263,

1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Notwithstanding the Court's findings, all of the Defendants are presumed innocent. Accordingly, the Court makes the following findings:

1.    A conspiracy to kill Frank Castillo existed. See Leonard Lujan Plea Agreement ¶ 7, at 4-5, filed March 13, 2017 (Doc. 963)(James Hearing Exhibit 11)("Lujan Plea Agreement").[13]

2.    The Castillo conspiracy included five indicted conspirators: (i) DeLeon, (ii) J. Gallegos; (iii) Troup; (iv) Lujan; and (v) B. Garcia. See Lujan Plea Agreement ¶ 7, at 4-5.

3.    The Castillo conspiracy included eight unindicted conspirators: (i) Angel Munoz,

---

[13]The Court accepted into evidence a letter by Assistant United States Attorney Jack Burkhead stating that Lujan would be incredible in the eyes of a rational factfinder. See Transcript of Motions Hearing at 182:3-4 (taken March 16, 2018)(Castle), filed April 3, 2018 (Doc. 2030)("March 16 Tr.")(providing that Exhibit R has been admitted); id. at 185:11-20 (reading from Exhibit R, Burkhead's letter, stating that "Mr. Lujan's credibility is in serious doubt"). The Court expressed its concern regarding "whether I can find by a preponderance of the evidence, just based on him [Lujan], without any corroborating evidence at all," that a conspiracy to kill Castillo existed. Transcript of Motions Hearing at 271:21-23 (taken March 16, 2018)(Court), filed April 3, 2018 (Doc. 2030)("March 16 Tr."). Evidence that the Court can consider when deciding whether a conspiracy to kill Castillo existed, however, corroborates the Lujan Plea Agreement. See, e.g., FBI 302 of Samuel Gonzales at 5, filed March 9, 2018 (Doc. 1909-3)("Francisco CASTILLO was killed in 2001 because he 'messed up' with Billy GARCIA."); FBI 1023 at 2, filed March 9, 2018 (Doc. 1909-5)("2001 Murder of Frank Castillo and Rolando Garcia at the Southern New Mexico Correctional Facility in Las Cruces were called by BILLY GARCIA ('Wild Bill'). Several members participated in the double homicide and EDWARD TROUP and CHRI[S]TOPHER CHAVEZ admitted to the murders during conversations with the [Confidential Human Source]."); Jaramillo 302 at 2 ("LUJAN relayed that GARCIA told LUJAN to find people to murder CASTILLO and LUJAN chose JARAMILLO, GALLEGOS and DELEON."). This corroborating evidence assuages the Court's concern regarding Lujan's credibility that it expressed on March 16, 2018.

see Transcript of Motions Hearing at 9:17-10:9 (taken March 13, 2018)(Castellano, Stemo), filed April 3, 2019 (Doc. 2027)("March 13 Tr."); (ii) Leroy Lucero, see March 13 Tr. at 16:16-24 (Castellano, Stemo); (iii) Jaramillo, see March 13 Tr. at 18:22-4 (Castellano, Stemo); id. at 20:2-9 (Castellano, Stemo); (iv) Federico Munoz, see March 13 Tr. at 21:10-22 (Castellano, Stemo); (v) Willie Amador, see March 13 Tr. at 29:16-24 (Castellano, Stemo); and (vi) Jessie Ibarra, see March 13 Tr. at 29:16-24 (Castellano, Stemo).

    4.    The Castillo conspiracy continued until Castillo's death on March 26, 2001.  See Lujan Plea Agreement ¶ 7, at 4-5.

### LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

    The United States' duty to disclose in criminal cases arises from at least three sources: (i) rule 16 of the Federal Rules of Criminal Procedure; (ii) the Due Process Clause of the Fifth Amendment to the Constitution of the United States of America; and (iii) the Jencks Act, 18 U.S.C. § 3500.  Put roughly, rule 16 requires the United States to disclose items material to the defense, items it intends to use in its case-in-chief, and items it obtained from the defendant. See Fed. R. Crim. P. 16.  The Due Process Clause requires the United States to furnish information in its possession that is favorable to the accused.  Finally, the Jencks Act requires the United States to disclose statements that its witnesses made if those statements are in the United States' possession and relate to those witnesses' trial testimony, after those witnesses have testified at trial.

    1.    **Rule 16.**

    Rule 16 of the Federal Rules of Criminal Procedure provides:

        Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs,

tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

> (i)  the item is material to preparing the defense;
>
> (ii)  the government intends to use the item in its case-in-chief at trial; or
>
> (iii)  the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). Criminal defendants may not, however, embark on a "broad or blind fishing expedition among documents possessed by the Government." Jencks v. United States, 353 U.S. 657, 667 (1957)(quoting Gordon v. United States, 344 U.S. 414, 419 (1953)). Rule 16(a)(2) provides, in part, that rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). The Supreme Court of the United States has interpreted the term "defense" in this statute as referring to "an argument in response to the prosecution's case in chief." United States v. Armstrong, 517 U.S. 456, 462 (1996)("[W]e conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief."). Additionally, rule 16 does not require the United States to produce "reports, memoranda, or other internal government documents . . . [or] statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16 (a)(2).

### 2.  **Due Process Clause.**

"The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment." United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *5 (D.N.M. 2011)(Browning, J.). In Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), the Supreme Court explained that "the

suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. In Giglio v. United States, 405 U.S. 150 (1972)("Giglio") the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See Giglio, 405 U.S. at 153; United States v. Torres, 569 F.3d 1277, 1282 (10th Cir. 2009)("Impeachment evidence is considered exculpatory for Brady purposes."); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [government's] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985))); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."). "[T]he Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have

sufficient time to investigate their backgrounds for impeachment information." United States v. Ashley, 274 F. App'x 693, 697 (10th Cir. 2008)(unpublished).[14] See Weatherford v. Bursey, 429 U.S. 545, 559 (1977)("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably."); United States v. Harmon, 871 F. Supp. 2d. 1125, 1149 (D.N.M. 2012)(Browning, J.).

### a.      Timing of the Disclosure.

The prosecution's obligation to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue. As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady . . . ." United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009). The Tenth Circuit has recognized that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." United States v. Burke, 571 F.3d at 1054. "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)). The Tenth Circuit has stated:

---

[14]United States v. Ashley is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Ashley has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054.  On the other hand, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056.  "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.  Courts should, "[w]hen assessing the materiality of Giglio information, . . . consider the significance of the suppressed evidence in relation to the entire record."  United States v. Gonzalez-Montoya, 161 F.3d 643, 650 (10th Cir. 1998).

When a prosecutor's obligations under Brady are triggered, however, they "continue[] throughout the judicial process."  Douglas v. Workman, 560 F.3d at 1173.  For instance, the obligation to disclose material under Brady can arise during trial.  See United States v. Headman, 594 F.3d 1179, 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway.").  Additionally, the disclosure obligation continues even while a case is on direct appeal.  See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819-820 (10th Cir. 1997)(applying Brady to an allegation that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal); United States v. Harry, No. CR 10-1915 JB, 2013 WL 684671, at *5 (D.N.M. Feb. 6, 2013)(Browning, J.).

b.      **Material Exculpatory Evidence.**

The holding in Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682. The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also found that "[d]uplicative impeachment evidence is not material." Douglas v. Workman, 560 F.3d at 1173. "To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)). See United States v. Hykes, No. CR 15-4299 JB, 2016 WL 1730125, at *20 (D.N.M. April 11, 2016)(Browning, J.)(requiring the United States to search police personnel files where "officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with" the defendant suggested that the files contained impeachment evidence).

The burden is on the United States to produce exculpatory materials; the burden is not on the defendant to first note that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent

responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6.  The United States' good or bad faith is irrelevant. See Brady, 373 U.S. at 87; United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982)("Under Brady, the good or bad faith of government agents is irrelevant.").  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation exists only "when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)).  On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).  Additionally, "[t]he constitution does not grant criminal defendants the right to embark on a broad or blind fishing expedition among documents possessed by the" United States. United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)(quoting Jencks v. United States, 353 U.S. at 667).

### c.      Evidence Must Be in the United States' Possession.

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)). Accord

United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, No. CR 03-2062, 2005 WL 2312480, at *3 (D.N.M. Aug. 29, 2005)(Browning, J.). On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984). Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Johnson, No. 96-40082-02-SAC, 1997 WL 447681, at *3 (D. Kan. June 9, 1997)(Crow, J.)). See United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992). A prosecutor does not have a duty, however, to obtain evidence from third parties. See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady does not oblige the government to obtain evidence from third parties). See also United States v. DeLeon, No. CR 15-4268 JB, 2017 WL 2271430, at *50 (D.N.M. Feb. 8, 2017)(Browning, J.)(concluding that, where "[t]he New Mexico Corrections Department is jumping at the chance to help the prosecution[,] . . . the Court can confidently say that the New Mexico Corrections Department's records, under the unique facts of this case, are under the [Assistant United States Attorney's] control"); United States v. Huerta-Rodriguez, No. CR 09-3206, 2010 WL 3834061, at *4, *10 (D.N.M. Aug. 12, 2010)(Browning, J.)(noting that the United States cannot be compelled to produce the New Mexico State Police officers' personnel files, because the New Mexico State Police, which was not a party to the case,

possessed the files, and the United States was able to review the files only at the New Mexico State Police office, and could not remove or photocopy any documents without a subpoena); United States v. Badonie, 2005 WL 2312480, at *3 (denying a motion to compel, because the New Mexico State Police possessed the documents, and the United States did not possess the documents which a defendant sought to be produced, even though the United States "could get the information [Defendant] Badonie seeks merely by requesting them").

3.      **The Jencks Act.**

In Jencks v. United States, the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672. In so holding, the Supreme Court recognizes that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671. Congress later codified Jencks v. United States' holding in 18 U.S.C. § 3500. See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657").

Section 3500 of Title 18 of the United States Code provides:

**(a)** In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)** After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(a)-(b). "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. § 3500(a)-(b)). The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352). The Jencks Act defines statements specifically:

**(e)** The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means--

**(1)** a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)** a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)** a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993). At least one district court within the Tenth Circuit has distinguished interview

notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act. United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the Honorable Robert C. Brack, now-Senior United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack held that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500. 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."). To satisfy this burden, the defendant need not prove that particular materials are within the Jencks Act's scope, as the documents are not in the defendant's possession, but, rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith,

984 F.2d at 1086 (quoting <u>Ogden v. United States</u>, 303 F.2d 724, 733 (9th Cir. 1962)).  The

defendant's demand for documents under the Jencks Act must be sufficiently precise for a court

to identify the requested statements.  <u>See</u> <u>United States v. Smith</u>, 984 F.2d at 1086.  For example,

in <u>United States v. Smith</u>, the Tenth Circuit concluded that a defendant had met his burden and

made a prima facie showing that a statement of a witness existed which may be producible under

the Jencks Act when a government witness testified during the United States' case in chief that a

government agent had interviewed her before testifying, and the defense counsel moved for

production of the notes.  <u>See</u> 984 F.2d at 1085-86.  Once the defendant makes a prima facie

showing that a witness statement exists which may be producible under the Jencks Act, the court

should conduct a hearing or in camera review of the statement.  <u>See</u> <u>United States v. Smith</u>, 984

F.2d at 1086.

The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes,

generated from interviews with defendants, holding that the notes must be disclosed to the

defendants after the agents testify at trial.  <u>See</u> <u>United States v. Goxcon-Chagal</u>, No. CR 11-

2002, 2012 WL 3249473, at *2, *6 (D.N.M. Aug. 4, 2012)(Browning, J.).  In <u>United States v.</u>

<u>Tarango</u>, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C.

§ 3500, held that the United States must produce FBI agents' reports, after the United States'

witnesses testified at trial, to the extent that those reports contain statements from witnesses who

testified at trial.  <u>See</u> 760 F. Supp. 2d at 1164, 1167.  <u>See also</u> <u>United States v. Harry</u>, 2013 WL

684671, at *11.

## LAW REGARDING COCONSPIRATOR STATEMENTS

The Federal Rules of Evidence define hearsay as "a statement that: **(1)** the declarant does

not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to

prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay evidence usually is not admissible. See Fed. R. Evid. 802. Some out-of-court statements, however, are not hearsay even when they are offered for proof of the matter asserted. See Fed. R. Evid. 801(d). Statements that are "offered against an opposing party" and were "made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay. Fed. R. Evid. 801(d)(2)(E).

To admit coconspirators' out-of-court statements under rule 801(d)(2)(E), "the United States must demonstrate by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii) the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy." United States v. Vigil, No. CR 05-2051 JB, 2006 WL 4109681, at *3 (D.N.M. Aug. 31, 2006)(Browning, J.)(citing United States v. Sinclair, 109 F.3d 1527, 1533 (10th Cir. 1997)). The court may consider the statements themselves, as well as independent evidence, to determine whether the conspiracy existed. See United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996)("In making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with independent evidence tending to establish the conspiracy."). While the statement itself "does not by itself establish . . . the existence of the conspiracy or participation in it," Fed. R. Evid. 801(d)(2), "there need only be some independent evidence linking the defendant to the conspiracy," United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotation marks omitted)(quoting United States v. Martinez, 825 F.2d 1451, 1453 (10th Cir. 1987)). This "independent evidence may be sufficient even when it is not 'substantial.'" United States v. Lopez-Gutierrez, 83 F.3d at 1242 (quoting United States v. Rascon, 8 F.3d 1537, 1541 (10th Cir. 1993)). The Tenth Circuit has

noted: "We have defined 'independent evidence' as 'evidence other than the proffered [coconspirator] statements themselves.'" United States v. Lopez-Gutierrez, 83 F.3d at 1242 (alteration in United States v. Lopez-Gutierrez)(quoting United States v. Martinez, 825 F.2d at 1451).

"[I]t is not necessary for the United States to show that proffered statements were made during the time in which [the defendant] was a member of a conspiracy." United States v. Vigil, 2006 WL 4109681, at *5 (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948)("With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.")). Moreover, a newcomer to a conspiracy assumes the risk for what has already happened in the course of the conspiracy. See United States v. Brown, 943 F.2d 1246, 1255 (10th Cir. 1991)("The fact that appellant may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible."); United States v. Adamo, 882 F.2d 1218, 1230-31 (7th Cir. 1989)(holding that one who joins and participates in a conspiracy "adopt[s] the previous acts *and declarations* of his fellow co-conspirators" (internal quotation marks omitted)(quoting United States v. Coe, 718 F.2d 830, 839 (7th Cir. 1983))). Once the conspiracy has ended, however, any statements made afterward are not admissible under this exception as they are not made in furtherance of the conspiracy. See United States v. DeLeon, 287 F. Supp. 3d 1187, 1253 (D.N.M. 2018)(Browning, J.)(citing Lutwak v. United States, 344 U.S. 604, 617-18 (1953)).

In determining the admissibility of coconspirator statements, "[t]he strongly preferred order of proof" is for the district court to hold a James hearing "outside the presence of the jury

to determine by a preponderance of the evidence the existence of a predicate conspiracy." United States v. Urena, 27 F.3d 1487, 1491 (10th Cir. 1994).  A defendant does not possess a right to a pretrial hearing on admissibility of coconspirators statements; however, "a district court can only admit coconspirator statements if it holds a *James* hearing or conditions admission on forthcoming proof of a 'predicate conspiracy through trial testimony or other evidence.'"  United States v. Townley, 472 F.3d 1267, 1273 (10th Cir. 2007)(quoting United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995)).  See United States v. DeLeon, 287 F. Supp. 3d at 1201-02 (allowing a James hearing and providing guidance on its structure).  The Tenth Circuit affords trial courts this flexibility, because it recognizes that it is not always practical for the United States to demonstrate that a conspiracy existed before admitting specific evidence at trial.  See United States v. Peterson, 611 F.2d 1313, 1330 (10th Cir. 1979)(noting that the admissibility determination contemplates presentation of requisite conspiracy evidence before or during the United States' case in chief).

In United States v. Vigil, the Court did not hold a James hearing, because the defendant, Robert Vigil, had already been tried once, ending in a hung jury, and the Court concluded that "the evidence that" the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, "admitted at the first trial satisfies the preponderance standard on the basis of the transcripts of the first trial's testimony."  2006 WL 4109681, at *4.  Vigil was charged, among other charges, with being a member of a conspiracy to commit Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, violations, and the United States moved the Court to permit it to elicit non-hearsay coconspirator statements in Vigil's retrial.  See 2006 WL 4109681, at *1.  The Court noted that it had previously found, in deciding Vigil's rule 29 motion for acquittal, that "a reasonable jury could have found that Vigil agreed

with at least one other person to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity, or knowingly and voluntarily participated in the conspiracy." 2006 WL 4109681, at *4 (internal quotation marks omitted)(quoting United States v. Vigil, No. CR 05-2051 JB, 2006 WL 4109683, at *16 (D.N.M. Aug. 7, 2006)(Browning, J.)).

In support of its determination that the United States had met its burden to prove that Vigil participated in the existent conspiracy, the Court pointed to testimony asserting that Angelo Garcia, an alleged coconspirator, "told Vigil that he would set up the same arrangement with Vigil as with Montoya, Vigil learned about the prior arrangement with Montoya through Garcia, Vigil indicated that he intended to continue the fee-sharing arrangement that Montoya had set up, and Vigil threatened to withhold the SLOM contract from Everage."  2006 WL 4109681, at *4 (internal quotation marks omitted)(quoting United States v. Vigil, 2006 WL 4109683, at *16). The Court reasoned that "[p]roof of the existence of a conspiracy is often based on circumstantial evidence, and this testimony is sufficient to establish Vigil's participation in a conspiracy by a preponderance of the evidence." 2006 WL 4109681, at *5.  The Court thus concluded that it would "permit the United States to elicit from its witnesses at trial co-conspirator statements made in furtherance of the conspiracy charged."  2006 WL 4109681, at *6.

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802).  Under rule 801(c) of the Federal Rules of Evidence: "'Hearsay' means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an

exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

1.  **Rule 801(d)(2).**

A statement is not hearsay, even if it is offered for its truth, if it is offered against an opposing party and it:

**(A)** was made by the party in an individual or representative capacity;

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2). The United States Court of Appeals for the Tenth Circuit has stated:

> "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of trustworthiness is required in the case of an admission. The freedom

which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility."

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 667 (10th Cir. 2006)(emphasis omitted)(quoting United States v. Pinalto, 771 F.2d 457, 459 (10th Cir. 1985)).[15]

## 2. **Rule 803(1).**

Rule 803(1) provides an exception to the rule against hearsay for "[a] statement describing an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question." United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994)(Korman, J.). "The present sense impression exception applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures." Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004). "The underlying

---

[15]The 2011 restyling of the Federal Rules removed "admissions" from the language of rule 801(d) of the Federal Rules of Evidence, and uses instead the term "statements." Fed. R. Evid. 801(d). This replacement was purposeful: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense -- a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made." Fed. R. Evid. 801 advisory committee's note to 2011 Amendments.

Although the advisory committee made the commentary quoted in the text regarding the trustworthiness of "admissions by a party-opponent" before the 2011 amendments to the Federal Rules of Evidence, the analysis should not be different under the new 2011 restyling of the rules. Because the advisory committee's purpose for the 2011 restyling was to make the rules "more easily understood and to make style and terminology consistent through the rules," and there was no "intent to change any result in any ruling on evidence admissibility," the analysis applied before 2011 remains useful for cases after the restyling. Fed. R. Evid. 801 advisory committee's note to 2011 Amendments.

rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication." United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995)(internal quotation marks omitted)(quoting United States v. Parker, 936 F.2d 950, 954 (7th Cir. 1991)), cert. granted, vacated on other grounds, 516 U.S. 1168 (1996). "The admissibility of spontaneous utterances -- one ground relied on by the state trial court -- was recognized by the Supreme Court [of the United States] over a century ago in *Insurance Co. v. Mosley*, 75 U.S. (8 Wall.) 397, 406-07 . . . (1869) . . . ." Martinez v. Sullivan, 881 F.2d 921, 928 (10th Cir. 1989).

3.      **Rule 803(2).**

Rule 803(2), commonly referred to as the excited utterance exception, provides an exception to the exclusion of hearsay statements for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The United States Court of Appeals for the District of Columbia Circuit has noted that "[t]he rationale underlying the 'excited utterance' exception is that 'excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable.'" United States v. Alexander, 331 F.3d 116, 122 (D.D.C. 2003)(quoting United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001)). "Thus, to qualify as an excited utterance, 'the declarant's state of mind at the time that the statement was made [must] preclude[] conscious reflection on the subject of the statement.'" United States v. Alexander, 331 F.3d at 122 (alterations in United States v. Alexander)(quoting United States v. Joy, 192 F.3d 761, 766 (7th Cir. 1999)). The Tenth Circuit, in United States v. Smith, 606 F.3d 1270 (10th Cir. 2010)(Tymkovich, J.), set forth a district court's required analysis for whether a statement is admissible under the excited-utterance

exception:

> The so-called "excited-utterance exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event." "[T]here is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance." Admissibility hinges on a statement's contemporaneousness with the excitement a startling event causes, not the event itself.

606 F.3d at 1279 (alteration in United States v. Smith)(internal citations omitted)(first quoting United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009); and then quoting United States v. Ledford, 443 F.3d 702, 711 (10th Cir. 2005), abrogated on other grounds by Henderson v. United States, 135 S. Ct. 180 (2015)). There is no hard time limit that must be met under Rule 803; what is relevant is whether the declarant is still under the excitement of the startling event. See United States v. Smith, 606 F.3d at 1279; United States v. Ledford, 443 F.3d at 711. The Tenth Circuit has noted:

> Courts consider a range of factors in determining whether a declarant made a statement while under the stress of a particular event. Among the more relevant factors are: the amount of time between the event and the statement; the nature of the event; the subject matter of the statement; the age and condition of the declarant; the presence or absence of self-interest; and whether the statement was volunteered or in response to questioning.

United States v. Pursley, 577 F.3d at 1220. "Permissible subject matter of the statement is [not] limited . . . to description or explanation of the event or condition . . . . [T]he statement need only relate to the startling event or condition, thus affording a broader scope of subject matter coverage." United States v. Frost, 684 F.3d 963, 973 (10th Cir. 2012)(Tymkovich, J.)(first alteration in United States v. Frost)(internal quotation marks omitted)(quoting Fed. R. Evid. 803 advisory committee's notes to 1972 proposed rules), overruled on other grounds by United States v. Bustamonte-Conchas, 850 F.3d 1130 (10th Cir. 2017). "If the trial court has access to a

recording of the declarant's statement, it may also consider the declarant's 'tone and tenor of voice' in determining whether the declarant made that statement while under the stress of excitement." United States v. Alexander, 331 F.3d 116, 123 (D.C. Cir. 2003)(quoting United States v. Woodfolk, 656 A.2d 1145, 1151 n.16 (D.C. 1995)(collecting cases)).

The United States Court of Appeals for the Second Circuit has provided an analysis of the similarities and subtle differences between the present-sense-impression and excited-utterance exceptions to the rule against hearsay:

> As defined by the Federal Rules of Evidence, a present sense impression is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1), Fed. R. Evid. Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility of intentional deception or failure of memory. *See United States v. Brewer*, 36 F.3d 266, 272 (2d Cir. 1994).

> The hearsay exception for excited utterances is premised on a similar, though distinct, assumption that the reliability of a statement increases as opportunity for reflection by the declarant decreases. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), Fed. R. Evid. As we have explained, "[t]he rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." [United States v. ]*Tocco*, 135 F.3d [116,] 127 [(2d Cir. 1998)]. Unlike present sense impressions, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible." *Id.* Rather "[t]he length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement caused by the event or condition.'" *United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990).

> . . . .

> Thus while the hearsay exception for present sense impressions focuses on *contemporaneity* as the guarantor of reliability, and requires that the hearsay statement "describe or explain" the contemporaneous event or condition, Rule 803(1), Fed. R. Evid., the excited utterance exception is based on the *psychological impact* of the event itself, and permits admission of a broader range

> of hearsay statements -- *i.e.* those that "relate to" the event.  Rule 803(2), Fed. R.
> Evid.

United States v. Jones, 299 F.3d 103, 112 & n.3 (2d Cir. 2002)(emphasis and first, second, sixth, and seventh alterations in United States v. Jones).

Many courts across the country have found it proper to admit a 911 caller's statements as a present-sense impression and/or an excited utterance.  See, e.g., United States v. Thomas, 453 F.3d 838, 841 (7th Cir. 2006)(holding that admission of a three minute and fifty-three second 911 call, in which the caller said that a man holding a handgun had shot someone outside her apartment and was still there, and in which the "emergency operator . . . asked a series of questions about the facts of the situation and the caller narrated what she was seeing as it happened," was proper as either a present-sense impression or excited utterance); United States v. Hawkins, 59 F.3d at 730 (holding that the tape of the 911 emergency telephone call from the defendant's wife reporting that the defendant displayed gun to his wife during a domestic dispute was proper as a present-sense impression, because of its "sufficient contemporaneity to the underlying events" and because of its reliability, as evidenced by the wife's detailed description of the gun); United States v. Mejia-Valez, 855 F. Supp. at 613-15 (concluding that admission of two callers' 911 call tape recordings as excited utterances and present-sense impressions was proper, because the two callers were at the scene of the underlying shooting, they placed the calls moments after the shooting, and both men described the shooting's circumstances, including giving the location and the shooter's description).

### 4. **Rule 803(3).**

Rule 803(3), excepts from the general bar on hearsay "[a] statement of the declarant's then-existing state of mind . . . or emotional, sensory, or physical condition."  Fed. R. Evid.

803(3).  Rule 803(3) permits the introduction of "hearsay . . . , regardless of whether the declarant is available as a witness," for a statement of the declarant's "then-existing mental, emotional, or physical condition," Fed. R. Evid. 803(3) (title case and bolding omitted):

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed. R. Evid. 803(3).

For the statement to qualify under the exception, it "must relate to the declarant's state of mind during" the incident in question.  United States v. Netschi, 511 F. App'x. 58, 61 (2d Cir. 2013)(emphasis omitted)("To admit statements of one's state of mind with regard to conduct that occurred . . . earlier as in this case would significantly erode the intended breadth of this hearsay exception."  (internal quotation marks omitted)(quoting United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991))).  This requirement is not to say that the statement must be said at the very moment of the incident, but for intent to be proved, it must be "contemporaneous" to the act.  Mutual Life Ins. of N.Y. v. Hillmon, 145 U.S. 285, 295 (1892).  To be contemporaneous and therefore admissible under the present state of mind exception, a statement must be "part of a continuous mental process."  United States v. Cardascia, 951 F.2d at 488.  In addition to the requirements that the statement be contemporaneous to the incident at hand and relevant to the issues of the case, it must also be established that there was no opportunity for the declarant to "fabricate or to misrepresent his thoughts." United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir. 1986)(internal quotation marks omitted)(quoting United States v. Layton, 549 F. Supp. 903, 909 (N.D. Cal. 1982)(Peckham, C.J.)).  The statements of intent must reveal information or details about the future, which has been contrasted with statements of memory, or looking back

to the past.  See Shepard v. United States, 290 U.S. 96, 104 (1933).  When statements entail issues of looking into the past combined with other concerns, it can often be too confusing for a jury to extract, upsetting the balance of advantage, and ultimately making the evidence inadmissible.  See Shepard v. United States, 290 U.S. at 104.  "The most obvious risk of prejudice is that the jury will consider the hearsay statement not as proof of state of mind and the subsequent conduct of the declarant, but rather for the truth of the facts that are related in the statement."  4 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 803.02[4][b], at 803-33 (11th ed. 2017).

**5.  Rule 804(b)(3).**

Under rule 804(b)(3) of the Federal Rules of Evidence, an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest."  United States v. Lozado, 776 F.3d 1119, 1125 (10th Cir. 2015)(citing Fed. R. Evid. 804(b)(3)(A)).  A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true."  Fed. R. Evid. 804(b)(3)(A).  Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).

Rule 804(b)(3) embodies "the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."  United States v. Smalls, 605 F.3d 765, 780-81 (10th Cir. 2010)(internal quotation marks omitted)(quoting Williamson v. United States, 512 U.S. 594, 599 (1994)).  The Tenth Circuit has said: "We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not

particularly honest -- falsely confessed a murder to an apparent acquaintance or friend." United States v. Smalls, 605 F.3d at 783. That sort of statement is admissible, however, only to the extent that it inculpates the declarant, because "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." Williamson v. United States, 512 U.S. at 600.

## ANALYSIS

The Court determines that a capital offense for purposes of 18 U.S.C. § 3432 is any crime for which the death penalty may be imposed. Accordingly, that the United States decides not to seek the death penalty in a particular case does not affect the applicability of 18 U.S.C. § 3432. As the Count 1 Trial Defendants who seek Jaramillo's exclusion are charged with a capital offense -- because the death penalty could have been imposed against them -- § 3432's notice requirement applies in this case, and the United States violated this requirement by inadvertently omitting Jaramillo from its witness list. The Court concludes, however, that excluding Jaramillo's testimony from trial is not an appropriate remedy for the § 3432 violation and will allow Jaramillo to testify at a later date during trial, as to allow the Count 1 Trial Defendants time to prepare. Finally, the Court concludes that the out-of-court statements that the James Notice identifies and which Jaramillo will relate to the jury are admissible for their truth.

## I.   18 U.S.C. § 3432 APPLIES WHENEVER THE UNITED STATES PROSECUTES AN OFFENSE THAT IS PUNISHABLE BY DEATH.

The United States does not seek to impose the death penalty in this case, see Notice of Intent Not to Seek a Sentence of Death at 1, even though several of the Defendants are accused of committing crimes that are punishable by death, see 18 U.S.C. § 1959(a)(1) (stating that a

violation is punishable "by death or life imprisonment"); Indictment at 9, 12, 15, 19, 21 (alleging five different 18 U.S.C. § 1959(a)(1) violations). Some procedural rules apply whenever the United States prosecutes an offense for which the United States Code permits a death sentence. See, e.g., 18 U.S.C. § 3235 ("The trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience."); 18 U.S.C. § 3281 ("An indictment for any offense punishable by death may be found at any time without limitation."). Other procedural rules apply only when the United States seeks to impose the death penalty in a particular case. See, e.g., 18 U.S.C. § 3593(a) (requiring the United States to file a notice, "[i]f . . . the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified," that sets forth the aggravating factors which the United States "proposes to prove as justifying a sentence of death"); Fed. R. Crim. P. 24(b)(1) ("Each side has 20 peremptory challenges when the government seeks the death penalty."). Whether 18 U.S.C. § 3432's pretrial witness disclosure requirement belongs in the former category or the latter, i.e., whether it applies in this case, depends on whether the term "capital offense" means an offense for which the death penalty is a legally permissible punishment or if it means, instead, an offense for which the United States seeks to impose the death penalty in a particular case. 18 U.S.C. § 3432 ("A person charged with treason or other capital offense shall at least three entire days before commencement of trial . . . be furnished with . . . a list . . . of the witnesses to be produced on the trial for proving the indictment . . . .").[16]

---

[16]Congress enacted this statutory language when, in 1948, it enacted Title 18 of the United States Code as positive law. See Act of June 25, 1948, Pub. L. No. 80-772, § 3432, 62 Stat. 683, 831. Before 1948, 18 U.S.C. § 3432's statutory predecessor was codified at 18 U.S.C. § 562, and read:

When any person is indicted of treason, a copy of the indictment and a list of the jury, and of witnesses to be produced at trial for proving the indictment, stating the place of abode of each juror and witness, shall be delivered to him at least three entire days before he is tried for the same. When any person is indicted on any other capital offense, such copy of the indictment and list of the jurors and witnesses shall be delivered to him at least two entire days before trial.

18 U.S.C. § 562 (1946). Congress changed the statute's language in 1948, because "permitting an additional day's preparation for trial in homicide, kidnapping, rape, and other capital cases seemed not unreasonable." H.R. Rep. No. 80-304, at A168 (1947). Section 3432's pretrial notice requirement was originally imposed -- in the United States -- by the Crimes Act of 1790:

That any person who shall be accused and indicted of treason shall have a copy of the indictment, and a list of the jury and witnesses, to be produced on the trial for proving the said indictment, mentioning the names and places of abode of such witnesses and jurors, delivered unto him at least three entire days before he shall be tried for the same; and in other capital offences, shall have such copy of the indictment and list of the jury two entire days at least before the trial . . . .

Crimes Act of 1790, ch. 9, § 29, 1 Stat. 112, 118. Notably, pretrial notice regarding witnesses was required, circa 1790, only in treason prosecutions and not for other capital offenses even though those other offenses were punishable by death, see Crimes Act of 1790, ch. 9, § 29, 1 Stat. at 118, and defendants accused of capital crimes other than treason were not entitled to a pretrial witness list until 1875, see Revised Statutes of the United States § 1033 (1st ed. 1875). That defendants accused of capital offenses other than treason were not entitled to a pretrial witness list for nearly a century belies later contentions that "§ 3432 is designed to prevent trial by ambush where a defendant's life is at stake," United States v. Fulks, 454 F.3d 410, 422 (4th Cir. 2006), that "the purpose of the witness list right is to reduce the chance that an innocent defendant would be put to death," or that "the statute's purpose derives from the severity of the punishment rather than from the nature of the offense," United States v. Steel, 759 F.2d 706, 709-10 (9th Cir. 1985).

The Crimes Act of 1790's witness list requirement echoes an English statute adopted during the reign of Queen Anne:

when any Person is indicted for High Treason or Misprision of Treason a List of the Witnesses that shall be produced on the Tryal for proving the said Indictment and of the Jury mentioning the Names Profession and Place of Abode of the said Witnesses and Jurors be also given at the same Time that the Copy of the Indictment is delivered to the party indicted and that Copies of all Indictments for the Offences aforesaid with such Lists shall be delivered to the Party indicted Ten Days before the Tryal and in presence of Two or more credible Witnesses Any Law or Statute to the contrary notwithstanding.

An Act for Improving the Union of the Two Kingdoms, 1708, 7 Anne ch. 21, § 14, 9 Statutes of the Realm 93, 95.

Title 18 of the United States Code does not define a capital offense, so that term takes its "ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979)(Burger, C.J.). The language that is now codified at 18 U.S.C. § 3432 has origins in the Crimes Act of 1790, ch. 9, § 29, 1 Stat. 112, 118, but Congress has significantly amended the provision in both the nineteenth and twentieth centuries. See supra note 16 (tracing the statutory lineage of 18 U.S.C. § 3432's pretrial witness requirement to the reign of Queen Anne). Consequently, the Court cannot restrict its inquiry to a single time period when attempting to determine the "contemporaneous" meaning, Perrin v. United States, 444 U.S. at 42, of "capital offense" as 18 U.S.C. § 3432 uses the term. Compare Antonin Scalia & Bryan A. Garner, Reading Law 78 (2012)("Words must be given the meaning they had when the text was adopted."), with id. at 256 ("If the legislature amends or reenacts a provision other than by way of a consolidating statute or restyling project, a significant change in language is presumed to entail a change in meaning."). Thankfully, legal usage has been remarkably consistent over the centuries. Black's Law Dictionary indicates that a capital offense is "[a] crime for which the death penalty may be imposed. -- Also termed *capital crime*." Capital Offense, Black's Law Dictionary, supra. Bouvier's Law Dictionary also defines a capital offense as a "[c]rime for which the punishment may be death," and provides that "[a] person commits a capital offense by committing an act that violates a criminal prohibition punishable by death, even if the person is neither indicted with such a liability or sentenced to death." 1 Bouvier Law Dictionary 699 (Stephen Michael Sheppard ed. 2012) A Dictionary of American and English Law, with Definitions of the Technical Terms of the Canon and Civil Laws, a nineteenth century source, does likewise. See 1 Stewart Rapalje & Robert L. Lawrence, A Dictionary of American and English Law, with Definitions of the Technical Terms of the Canon and Civil Laws 169

(1888)(defining a capital crime as "[a]n offence for which the punishment of death is provided by law"). See also id. ("The punishment of death is frequently termed capital punishment; and those offences are called capital offenses for which death is the penalty allotted by law."). Scholarly sources refer to capital crimes and capital offenses in a similar way.

> [N]o accurate listing is presently available for capital offenses defined by the laws of the states, the District of Columbia and the laws of the Federation.

> This paper intends to fill this lacuna, to some degree, by determining what offenses are punishable by death in the United States as of January 1953, whether or not the courts ever applied this penalty.

Leonard D. Savitz, Capital Crimes as Defined in American Statutory Law, 46 J. Crim. Criminology & Police Sci. 355, 355 (1955)(footnote omitted). Treatises agree: "A 'capital' crime is generally an offense which is punishable by death. The fact that the prosecution is not seeking imposition of the death penalty does not render an otherwise capital offense noncapital." 21 Am. Jur. 2d Criminal Law § 24 (2019)(footnote omitted).

Defining a capital offense as an offense punishable by death is consistent with other ways in which the United States Code uses the term capital offense. See Atl. Cleaners & Dyers v. United States, 286 U.S. 427, 433 (1932)("Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."). For example, 18 U.S.C. § 3281 is titled "Capital offenses," but its text provides the statute of limitations -- or the lack thereof -- for "any offense punishable by death"; implicitly, the two phrases are equivalent. 18 U.S.C. § 3281.[17] 18 U.S.C. § 3282 complements § 3281's provisions

---

[17]The United States Code contains codified titles, which Congress enacts as a whole, and uncodified titles, which the Office of the Law Revision Counsel of the House of Representatives of the United States compiles from various congressional enactments. See 1 U.S.C. § 204(a); 2 U.S.C. §§ 285, 285b. Codified titles are authoritative expositions of the law whereas uncodified titles are prima facie evidence of the law. See 1 U.S.C. § 204(a). Congress codified Title 18 of

regarding a statute of limitations for offenses punishable by death with a statute of limitations that applies to "any offense, not capital," i.e., any offense that is not punishable by death.  18 U.S.C. § 3282.  In United States v. Ealy, 363 F.3d 292 (4th Cir. 2004), the United States Court of Appeals for the Fourth Circuit equated § 3281's reference to offenses punishable by death with § 3282's reference to capital offenses:

> Even assuming . . . that the death penalty could not have been constitutionally imposed for these crimes, we agree with the district court that whether a crime is "punishable by death" under § 3281 or "capital" under § 3282 depends on whether the death penalty may be imposed for the crime under the enabling statute, *not* "on whether the death penalty is in fact available for defendants in a particular case."

United States v. Ealy, 363 F.3d at 296-97 (emphasis in original)(first quoting 18 U.S.C. § 3281; then quoting 18 U.S.C. § 3282; and then quoting United States v. Church, 151 F. Supp. 2d 715, 717 (W.D. Va. 2001)(Jones, J.)).  Recently, the Second Circuit likewise concluded: "That the Government elected not to pursue capital punishment here is immaterial to whether . . . offenses are in fact capital offenses for purposes of § 3281."  United States v. Guerrero, 813 F.3d 462,

---

the United States Code -- including its section headings -- in 1948.  See Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683.  Congress, thus, enacted 18 U.S.C. § 3282's heading, which is a permissible guide when construing ambiguous statutory text.  See Immigration & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991)("[W]e have stated that the title of a statute or section can aid in resolving an ambiguity in the legislation's text."); Mead Corp. v. Tilley, 490 U.S. 714, 723 (1989)(resolving ambiguity of 29 U.S.C.§ 1344 by looking at its title); Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R., 331 U.S. 519, 528-29 (1947)("[H]eadings and titles are not meant to take the place of the detailed provisions of the text. . . . For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase.  They are but tools available for the resolution of a doubt."); Church of the Holy Trinity v. United States, 143 U.S. 457, 462 (1892)("Among other things which may be considered in determining the intent of the legislature is the title of the act.").

466 (2d Cir. 2016).[18]

---

[18]The courts are divided whether a similar statute, 18 U.S.C. § 3005 -- which states that "[w]hoever is indicted for treason or other capital crime" is entitled to two court-appointed attorneys, "of whom at least 1 shall be learned in the law applicable to capital cases" -- applies when the United States does not seek to impose the death penalty. The United States Courts of Appeals disagree on the issue. According to the Fourth Circuit,

> [i]t appears, however, that *Furman* [v. Georgia, 408 U.S. 238 (1972),] neither repealed statutes, such as [18 U.S.C.] § 1111, which contain death penalty provisions that probably cannot be constitutionally applied, nor did it repeal statutes such as § 3005 which depend for their operation on the defendant being charged with a "capital crime." In a very literal sense, the offense defined in § 1111 is still a "capital crime;" the *statute* still authorizes the imposition of the death penalty and Congress has not repealed it.

United States v. Watson, 496 F.2d 1125, 1127 (4th Cir. 1973)(Winter, J., joined by Haynsworth, C.J.)(emphasis in original). The Fourth Circuit buttressed its textual argument with policy considerations:

> Were we convinced that defendant's exposure to the risk of imposition of the death penalty was the sole reason for the two-attorney requirement in § 3005, we would be inclined to agree with the government. However, we believe that there is a significant chance that other considerations also underlay the two-attorney requirement.
>
> . . . Yet it seems to us that it is more likely than not that an alleged offense of the type for which Congress has purportedly continued the death penalty will be a complex and difficult case to prepare and try. The kinds of crimes made punishable by death are usually such as to generate revulsion in the trier of fact and, as a result, a high degree of prejudice if the trial is not conducted strictly in accord with recognized procedures, including the rules of evidence and burden of proof. It is not unlikely that Congress may have also sought to buttress the defense with two attorneys to provide greater assurance that a defendant's rights would be fully observed. As a consequence, we are unable to say, absent a clear legislative expression, that the possibility of imposition of the death penalty was the *sole* reason why Congress gave an accused the right to two attorneys.

United States v. Watson, 496 F.2d at 1128 (emphasis in original)(footnote omitted). See United States v. Boone, 245 F.3d 352, 359 (4th Cir. 2001)(Widener, J., joined by Luttig, J.)(reasserting that § 3005's "text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty" (emphasis in original)). The United States Court of Appeals for the Seventh Circuit, however, acknowledged and rejected the argument that § 3005 applies when the United States does not seek to impose the death penalty:

Section 3005 applies only to a "capital crime." The term "capital," when used to modify "crime," means punishable by death. Webster's Third New International Dictionary 332 (1971). In that context it has no other meaning. Nevertheless, we can conceive of a case in which the reason for a particular requirement is the seriousness of the crime rather than the penalty, yet at the time the requirement was adopted the word "capital" served to define the serious crimes to which the requirement was to apply. It is therefore appropriate to look beyond the dictionary for Congress' intention.

There is no clue, however, in the legislative history from 1790, when the two counsel provision first appeared, to the present as to why Congress adopted the provision initially or has continued it in force. See *United States v. Watson, supra,* 496 F.2d at 1128, 1130 (Murray, J., dissenting). We are therefore left to inference. In our opinion, the reason for this and the other procedural provisions giving defendants added rights in capital cases, is humane rather than pragmatic. We believe the purpose of the two counsel provision was to reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel, and to attempt to prevent mistakes that would be irrevocable because of the finality of the punishment. Many kinds of criminal cases are typically more complex and difficult to prepare and try than those for which Congress has provided the death penalty. Yet no provision has been made for more than one appointed counsel in any but those involving a "capital crime." There is nothing in Congress' action or inaction over the years to indicate that the two-counsel provision was intended to apply to any case in which a death sentence could not be imposed.

We hold that the provision does not apply because there is no possibility that the death penalty can be imposed. The judgment of conviction is affirmed.

United States v. Shepherd, 576 F.2d 719, 728-29 (7th Cir. 1978)(Tone, J., joined by Fairchild and Campbell, JJ.)(footnote omitted). That courts are divided regarding whether 18 U.S.C. § 3005 applies when an offense, as written, is punishable by death and the death penalty cannot be imposed in a particular case means that reasoning by analogy does not help the Court construe 18 U.S.C. § 3432. United States v. Watson and United States v. Shepherd agree, however, that a capital crime means an offense punishable by death; the Fourth and Seventh Circuits disagree regarding only whether to give effect to that term's meaning.

The Court does not need to determine whether the Defendants are entitled to two attorneys under 18 U.S.C. § 3005 for two reasons. First, the Court appointed two attorneys for all the Trial II Trial Defendants. Second, 18 U.S.C. § 3005's two-attorney requirement applies only "upon the defendant's request." 18 U.S.C. § 3005.

If, however, the Court needed to determine whether 18 U.S.C. § 3005 applies whenever a defendant is indicted for a capital offense, the Court would conclude that it does so apply. To conclude differently would be inapposite to the statute's plain text and the Court's read of § 3432. Section 3005's two-attorney requirement is triggered "upon indictment for a capital

crime," i.e., any crime punishable by death, "and not upon the later decision by the government to seek or not to seek the death penalty." United States v. Boone, 245 F.3d at 359. That § 3005 requires one of the attorneys to "be learned in the law applicable to capital cases" does not change the Court's conclusion. 18 U.S.C. § 3005. Congress added this language to § 3005 by its passage of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 ("1994 Crimes Act"). 1994 Crimes Act, § 60026, 108 Stat. at 1982 (adding the "of whom at least 1 shall be learned in the law applicable to capital cases" language to § 3005). Section 3005's title, "[c]ounsel and witnesses in capital cases," 18 U.S.C. § 3005, which the 1994 Crimes Act did not change, see 18 U.S.C. § 3005 (1988), indicates that, within Title 18 of the United States Code, a "capital case" is one in which treason or a capital crime is charged. Further, Congress could have easily and explicitly limited the two-attorney requirement to those cases in which the death penalty is actually sought should it have wished to do so. Accordingly, the Court will not read into § 3005 such a requirement as it is not readily apparent. See United States v. Hood, 343 U.S. 148, 151 (1952)("We should not read such laws so as to put in what is not readily found there."). In addition, reduction of the chance that a defendant will be put to death due to counsel's errors is not the only purpose § 3005 may serve. One other reason that Congress gives defendants charged with a capital offense two counsel is that these cases, regardless whether the death penalty is on the table, tend to be complex. Like this one, taking the death penalty off the table reduced the complexity, but it did not eliminate it, and the Court, defense counsel, and the Tenth Circuit's Criminal Justice Act counsel all agreed that some defendants needed two counsel in this complex and lengthy proceeding and trial.

Further, the Court concludes that it should interpret § 3005 and § 3432 consistently with each other. Both statutes contain the term "capital cases" in their titles and utilize synonymous language in their hooks. Compare 18 U.S.C. § 3005 (entitled "[c]ounsel and witnesses in capital cases" and beginning "[w]hoever is indicted for treason or other capital crime shall"), with 18 U.S.C. § 3432 (entitled "[i]ndictment and list of jurors and witnesses for prisoner in capital cases" and beginning "[a] person charged with treason or other capital offense shall"). Both statutes are mandatory upon an indictment -- which charges a person with an offense -- for treason or other capital offense -- "capital offense" being a synonym of "capital crime," see Capital Offense, Black's Law Dictionary, supra. Accordingly, the Court concludes that a defendant indicted of a capital offense -- i.e., an offense which may be punished by death -- may take advantage of § 3005's two-attorney provision. The Court's interpretation is not in accord with the United States Court of Appeals for the Second, Fifth, Seventh, Eighth, Ninth, Eleventh, and District of Columbia Circuits.

> [W]e agree with the majority of the federal courts of appeals that once the government has formally informed the court and the defendant of its intention not to seek the death penalty, the matter is no longer a capital case within the meaning of § 3005 and that section does not require the district court to continue the appointment of a second attorney.

United States v. Douglas, 525 F.3d 225, 237 (2d Cir. 2008). See United States v. Cordova, 806 F.3d 1085, 1101 (D.C. Cir. 2015)(holding that § 3005 requires two attorneys only when the defendant faces the death penalty, but once the government decides not to seek the death penalty

That definition is also consistent with the Supreme Court's decision in <u>Smith v. United States</u>, 360 U.S. 1 (1959)("<u>Smith</u>").  When the Supreme Court decided <u>Smith</u>, rule 7 of the Federal Rules of Criminal Procedure stated: "'An offense which *may* be punished by death *shall be* prosecuted by indictment.  An offense which may be punished by imprisonment for a term exceeding one year or at hard labor shall be prosecuted by indictment, or if indictment is waived, it may be prosecuted by information.'"  <u>Smith</u>, 360 U.S. at 6-7 (emphasis in <u>Smith</u>)(quoting Fed. R. Crim. P. 7(a) (1958)).  In <u>Smith</u>, notwithstanding that rule, the United States prosecuted a federal kidnapping offense -- punishable by death, <u>circa</u> 1959,[19] unless the victim was released

_____

"the trial court retains the discretion to keep or dismiss the second attorney"); <u>United States v. Waggoner</u>, 339 F.3d 915, 918 (9th Cir. 2003)(holding that "the government's irrevocable decision not to pursue the death penalty eliminated Waggoner's right under § 3005 to a second court-appointed counsel"); <u>United States v. Grimes</u>, 142 F.3d 1342, 1347 (11th Cir. 1998)(holding that defendant "was properly denied benefits afforded to a capital defendant," including those under § 3005, "because the Government stipulated that it would not seek the death penalty and thereby transformed this case into a non-capital proceeding"); <u>United States v. Shepherd</u>, 576 F.2d at 729 (holding that § 3005 does not apply where "there is no possibility that the death penalty can be imposed," such as the prosecutor's disavowing seeking the death penalty);  <u>United States v. Weddell</u>, 567 F.2d 767, 770 (8th Cir. 1977)(holding that, because <u>Furman v. Georgia</u> "precluded the imposition of the death penalty, the case lost its capital nature as charged in the indictment" and § 3005 does not apply); <u>United States v. Hoyt</u>, 451 F.2d 570, 571 (5th Cir. 1971)(holding that, because the government could not seek the death penalty, "the lower court's treatment of the case as non-capital for all purposes," including for application of statutes applicable only to capital cases, "was correct").  <u>Cf.</u> <u>In re Sterling-Suarez</u>, 306 F.3d 1170, 1174 (1st Cir. 2002)(holding "that a defendant who might still be executed" is entitled the right to "swift appointment of learned counsel" and favorably citing <u>United States v. Boone</u>).  Neither the Supreme Court nor the Tenth Circuit, however, have decided this issue, and so the Court, without binding precedent to steer it, will not ignore the statute's plain language.

[19]In <u>United States v. Jackson</u>, 390 U.S. 570 (1968)(Stewart, J.), the Supreme Court held the Federal Kidnapping Act of 1932, Pub. L. No. 72-189, 47 Stat. 326 (codified at 18 U.S.C. § 1201) -- which defined the offense at issue in <u>Smith</u> -- unconstitutional insofar as "the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die."  <u>United States v. Jackson</u>, 390 U.S. at 580.  The Supreme Court concluded, however, that "the clause authorizing capital punishment is severable from the remainder of the kidnapping statute and that the

unharmed -- via information, and that information did not specify whether the alleged victim was released unharmed.  Smith, 360 U.S. at 7.  The United States contended that "whether a specific kidnapping constitutes a capital offense requires examination of the evidence to determine whether the victim was released harmed or unharmed," and that "the mere filing of an information by the United States Attorney eliminated the capital element of the crime."  Smith, 360 U.S. at 8.

The Supreme Court rejected those two contentions, because, "[a]lthough the imposition of th[e death] penalty will depend on whether sufficient proof of harm is introduced during the trial, that circumstance does not alter the fact that the offense itself is one which may be punished by death and thus must be prosecuted by indictment."  Smith, 360 U.S. at 8.  It continued, providing that "when the offense as charged is sufficiently broad to justify a capital verdict, the trial must proceed on that basis."  Smith, 360 U.S. at 8.  The Supreme Court appealed to pragmatic considerations to justify its conclusion that federal kidnapping is a capital offense due to the possibility of a capital verdict, even when "the evidence later establishes that such a verdict cannot be sustained because the victim was released unharmed."  Smith, 360 U.S. at 8.  "It is neither procedurally correct nor practical to await the conclusion of the evidence to determine whether the accused is being prosecuted for a capital offense.  For the trial judge must make informed decisions prior to trial which will depend on whether the offense may be so punished."  Smith, 360 U.S. at 8.  According to Smith, those pretrial decisions, i.e., decisions that depend on whether the charged offense is punishable by death, include "whether the accused has the right to obtain a list of veniremen and government witnesses[.]"  Smith, 360 U.S. at 8 (citing

unconstitutionality of that clause does not require the defeat of the law as a whole."  United States v. Jackson, 390 U.S. at 586.

18 U.S.C. § 3432). The Supreme Court provided that "the substantial safeguards to those charged with serious crimes cannot be eradicated under the guise of technical departures from the rules." Smith, 360 U.S. at 9. Further, "in view of the traditional canon of construction which calls for the strict interpretation of criminal statutes and rules in favor of defendants where substantial rights are involved," the Supreme Court accordingly refused to loosely construe rule 7 as the United States requested. Smith, 360 U.S. at 9.

Smith's reasoning resonates with an earlier Supreme Court case, Logan v. United States, 144 U.S. 263 (1892)("Logan"), abrogated on other grounds by Witherspoon v. Illinois, 391 U.S. 510 (1968), which analyzed the version of 18 U.S.C. § 3432 that was then in force and stated that "[t]he words of the existing statute are too plain to be misunderstood." 144 U.S. at 304. The Supreme Court noted that the statute is "mandatory to the government," and that "its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense." Logan, 144 U.S. at 304. In Logan, the United States did not provide pretrial notice regarding the names of its witnesses, and "[t]he indictments charged the defendants not only with a conspiracy, which was not a capital offense, but also with having, in the prosecution of the conspiracy, committed a murder, which was a capital offense." Logan, 144 U.S. at 307. See id. at 304-05. See also supra note 16 (describing 18 U.S.C. § 3432's statutory pedigree). Accordingly, the Supreme Court stated that the Logan defendants "could not therefore lawfully be put on trial, against their objection, until at least two days after they had been furnished with a list of the witnesses to be called against them." Logan, 144 U.S. at 307. The Logan defendants were acquitted on the murder charge, but they were convicted on the conspiracy charge. See Logan, 144 U.S. at 307. The United States asserted that its failure to give pretrial notice

was cured by the verdict acquitting the defendants of the capital charge, and convicting them of the lesser crime only. The argument is that the defendants, having prevailed in their defense against the capital charge, have not been legally prejudiced, because they would not have been entitled to a list of witnesses if they had been indicted and tried on the only charge of which they were ultimately convicted.

Logan, 144 U.S. at 307. That argument is consistent with modern readings of 18 U.S.C. § 3432 which tie its application to concerns attending a death sentence's imposition. See, e.g., United States v. Steel, 759 F.2d 706, 709-10 (9th Cir. 1985)("In our view, the purpose of the witness list right is to reduce the chance that an innocent defendant would be put to death by providing a pretrial safeguard not available in noncapital criminal prosecutions."). Logan, however, was dubious:

It may be doubted whether this is a satisfactory answer to the objection. An indictment for a capital offense usually includes an offense less than capital, and the defendant may be convicted of either. For instance, one indicted of murder may be convicted of manslaughter, or of an assault only. The statute does not make a defendant's right to a list of the witnesses to be called against him depend upon the degree of the crime of which upon trial he is ultimately convicted, but upon the degree of crime for which he is indicted. The list is to be delivered before the trial to "any person indicted of a capital offense." The objection that these defendants had been furnished with no list of the witnesses was not like an ordinary objection to the competency of particular testimony, but it affected the whole course of the trial, and put the defendants in anxiety and danger of being capitally convicted until the return of the verdict. True, the government might have elected not to indict them for the capital offense, or might perhaps, when the objection to the want of a list of witnesses was first taken, have entered a *nolle prosequi* of so much of the indictment as contained the allegations necessary to make out that offense, and unnecessary to constitute the lesser crime of conspiracy, and have thereupon proceeded to trial without delivering any list of the witnesses. But the government, having elected to indict and to try the defendants for the capital crime, may well be held bound to afford them those means of preparing their defense which the statute required, and which, had they been furnished, might perhaps have enabled the defendants to secure a complete acquittal of everything charged against them. The case bears some analogy to that of a defendant held to answer for an infamous crime without presentment or indictment of a grand jury, of which this court has said: "The question is whether the crime is one for which the statutes authorize the court to award an infamous punishment, not whether the punishment ultimately awarded is an infamous one.

When the accused is in danger of being subjected to an infamous punishment if convicted, he has the right to insist that he shall not be put upon his trial, except on the accusation of a grand jury." Ex parte Wilson, 114 U.S. 417, 426, 5 Sup. Ct. Rep. 935.

It is unnecessary, however, in this case, to express a definitive opinion upon the question whether the omission to deliver the list of witnesses to the defendants would of itself require a reversal of their conviction and sentence for less than a capital offense, inasmuch as they are entitled to a new trial upon another ground.

Logan, 144 U.S. at 307-08.

While Smith and Logan appear to resolve the issue before the Court by indicating that whether 18 U.S.C. § 3432 applies depends on whether the offense as charged may be punished by death, several strands of post-Smith, United States Courts of Appeals precedent muddy matters. The first strand of cases wrestle with issues associated with the implications of Furman v. Georgia, 408 U.S. 238 (1972), which held unconstitutional the regime of discretionary capital punishment that applied when the Supreme Court decided Smith, and similar Supreme Court cases such as United States v. Jackson, 390 U.S. 570 (1968), which prohibited capital punishment for a violation of the federal kidnapping statute. The United States Court of Appeals for the Ninth Circuit, for example, held that, in light of United States v. Jackson, a defendant indicted for kidnapping "was never faced with a capital charge" and thus "was not entitled to the benefit of the provisions of 18 U.S.C. § 3432." Reed v. United States, 432 F.2d 205, 208 (9th Cir. 1970)(holding that United States v. Jackson applies retroactively). Other Courts of Appeals are in accord with this holding, reasoning that, if the death penalty is unconstitutional for the charged offense, then it is not a "capital offense" for § 3432's purposes. See United States v. Kaiser, 545 F.2d 467, 475 (5th Cir. 1977)(concluding that, because the capital punishment provision of the defendant's charged offense "is unconstitutional and void," the offense is "non-

capital for all purposes," and, thus, § 3432 does not apply); United States v. Bolden, 514 F.2d

1301, 1313 (D.C. Cir. 1975)(holding that § 3432 did not apply, because "this was not a capital

case at the time of the trial" in light of Furman v. Georgia's invalidation of the death penalty

(citing United States v. Heinlein, 490 F.2d 725, 727-28 (D.C. Cir. 1973)); Hall v. United States,

410 F.2d 653, 660 (4th Cir. 1969)(concluding that § 3432 did not apply, because "from the

beginning the trial was understood not to present the possibility of a capital sentence," as United

States v. Jackson prohibited such a sentence and the United States "disavowed any intention of

seeking the capital penalty"). But see United States v. Crowell, 442 F.2d 346, 347-48 (5th Cir.

1971)(remanding case to determine if the defendant was afforded the witness list, because

"[s]ection 3432 is mandatory, and a defendant indicted for a capital offense must be given the

benefits of its provisions," even though the Supreme Court had since held unconstitutional the

capital punishment provision of the offense with which the defendant was charged). The Court

does not find this strand of caselaw persuasive, as it is inapplicable to this case -- capital

punishment is constitutionally available here; the United States just chose not to pursue it.

The other strand of cases deals with the situation where the United States affirms that it

will not seek the death penalty. Under the modern capital sentencing regime, the United States

provides notice of its intent to seek the death penalty "a reasonable time before the trial" of a

capital offense so that, after conviction, there will be a separate hearing for the jury to determine

whether the death sentence should be imposed. 18 U.S.C. § 3593. The Courts of Appeals which

have considered § 3593's implications have determined that, when the United States does not file

the notice or seek the death penalty, the case no longer involves a capital offense and § 3432

does not apply. See United States v. Shepperson, 739 F.3d 176, 181 (4th Cir. 2014)(concluding

that "the instant case may not be a capital case, as the Attorney General never elected to seek the

death penalty" and that the United States' reading of the witness list during jury selection satisfied § 3432's purpose); United States v. Grimes, 142 F.3d 1342, 1347 (11th Cir. 1998)(concluding that "a defendant is not entitled to benefits he would otherwise receive in a capital case," including those under § 3432, "if the government announces that it will not seek the death penalty or the death penalty is otherwise unavailable by force of law"). Before § 3593's enactment imposing the notice requirement, some Courts of Appeals came to the same conclusion in cases where the United States announced it would not seek the death penalty. See United States v. Trapnell, 638 F.2d 1016, 1029-30 (7th Cir. 1980)(holding that, when "the government announced in court . . . that it was no longer seeking the death penalty[, it] was not required to comply with the provisions of" § 3432); Loux v. United States, 389 F.2d 911, 915 (9th Cir. 1968)(holding that, upon the United States' agreement to be bound by its decision not to seek the death penalty, "the death penalty was impossible," so the case was no longer a capital case necessitating the safeguards of § 3432). This caselaw is applicable here, because the United States elected not to pursue the death penalty and did not file the § 3593 notice. The Court does not find, however, these cases persuasive. That the United States elects not to pursue the death penalty in a particular case does not change the underlying offense from capital to noncapital; this election merely takes the death penalty off the table for that particular case. Section 3432's language is clear, and imposes the witness-list requirement upon a charge for "treason or other capital offense." 18 U.S.C. § 3432. The United States' decision whether to seek capital punishment does not change the charge as the indictment provides.

Accordingly, the Court concludes that 18 U.S.C. § 3432 applies to any case in which a capital offense is charged, irrespective whether the United States chooses to seek capital punishment. The statute's language is clear by imposing the witness-list requirement upon the

United States when it has "charged [a person] with treason or other capital offense." 18 U.S.C. § 3432. Congress did not impose this requirement only when capital punishment is sought; instead, it chose to impose the requirement upon indictment for a capital offense. The Court is confident that Congress is aware of the time it takes for an indicted defendant to go to trial and that, in this time period, the United States could, and often does, choose to not pursue capital punishment. The Court thus sticks to the traditional canons of construction by understanding Congress' language to have its ordinary meaning, giving effect to every word, and strictly construing the criminal statute that protects a capital defendant's right to know those witnesses he or she will face and thus better prepare a defense. See Taniguchi v. Kan. Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012)("When a term goes undefined in a statute, we give the term its ordinary meaning."); Corely v. United States, 556 U.S. 303, 314 (2009)("The Government's reading is thus at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004))); Smith, 360 U.S. at 9 ("We cannot do this in view of the traditional canon of construction which calls for the strict interpretation of criminal statutes and rules in favor of defendants where substantial rights are involved."). The Court therefore concludes § 3432 applies when a person has been charged with a capital offense, even if the United States chooses not to pursue capital punishment. Accordingly, § 3432 applies in this case, as the Trial II Trial Defendants were charged with an offense that may be punished with death, even though they will not ultimately be punished with death.[20]

_____

[20]The Court notes that some Courts of Appeals interpret the term "capital offense" differently for different provisions of the United States Code based on their belief as to the

## II.   **THE UNITED STATES VIOLATED 18 U.S.C. § 3432.**

The Count 1 Trial Defendants are charged with a capital offense.   See 18 U.S.C.

§ 1959(a)(1) (providing for punishment "by death or life imprisonment"); Indictment at 9

(accusing the Count 1 Trial Defendants of committing murder in violation of 18 U.S.C.

§ 1959(a)(1)).   Accordingly, the Count 1 Trial Defendants were entitled to receive, "three entire

days before commencement of trial," a list of the United States' "witnesses to be produced on the

trial for proving the indictment."   18 U.S.C. § 3432.[21]   The United States did not include

Jaramillo on its pretrial witness list.   See United States' Pretrial Witness List at 1-2.

---

specific provision's purpose.   The Ninth Circuit, for example, has determined that § 3432's "purpose derives from the severity of the punishment rather than from the nature of the offense," and, thus, "the elimination of the death penalty also eliminated the appellant's right under 18 U.S.C. § 3432 to a prosecution witness list."   United States v. Steel, 759 F.2d 706, 710 (9th Cir. 1985).   The Ninth Circuit determined that the statute of limitations for "[c]apital offenses," 18 U.S.C. § 3281, is justified by "the serious nature of the crime rather than from a concern about, for example, what procedural protections those who face a penalty as grave as death are to receive," United States v Manning, 56 F.3d 1188, 1196 (9th Cir. 1995).

The Court declines to adopt this inconsistent interpretation and sticks to the statute's plain language.   The Court's conclusion here is consistent with its interpretation of two other similar statutes, 18 U.S.C. § 3281 -- "Capital offenses" -- and 18 U.S.C. § 3235 -- "Venue in capital cases."   In United States v. Martinez, 505 F. Supp. 2d 1024 (D.N.M. 2007)(Browning, J.), the Court noted "the difference between a statutorily available sentence and case-specific sentence," and determined that "Congress did not want such rules[, such as § 3281], to depend on case specifics as much as on the category of substantive crime."   United States v. Martinez, 505 F. Supp. 2d at 1031.   Further, in United States v. Baca, No. CR 16-1613 JB, 2018 WL 3494814 (D.N.M. July 19, 2018)(Browning, J.), the Court relied on the textual similarity between § 3281 and § 3235 to determine that "§ 3235 likewise applies no matter whether the United States seeks to impose the death penalty on a particular occasion."   United States v. Baca, 2018 WL 3494814, at *11.   The provision at issue here, 18 U.S.C § 3234, is textually similar to both of these statutes and, thus, the Court interprets it consistently to hold that it, too, "applies whenever death is a legally authorized penalty."   United States v. Baca, 2018 WL 3494814, at *11.   Thus, the Court declines to follow the cases to which the United States cites for the opposite proposition, i.e., that § 3234 looks at the case's specifically available sentence rather than the applicable statute's to hold that § 3234 applies only when the death penalty is sought.

[21] 18 U.S.C. § 3432's witness list requirement contains an exception such that a list "need not be furnished if the court finds by a preponderance of the evidence that providing the list may

It does not necessarily follow, however, that the United States violated 18 U.S.C. § 3432. Section 3432 does not require the United States to provide pretrial notice regarding its rebuttal witnesses.

> The words "for proving the indictment," and the connection in which they are used, clearly refer to the witnesses relied upon by the prosecution to establish the charge made by the indictment. They do not extend to such witnesses as may be rendered necessary for rebuttal purposes resulting from the testimony introduced by the accused in his defense.

Goldsby v. United States, 160 U.S. 70, 76 (1895)(quoting Rev. Stat. § 1033).[22] Additionally, when the United States discovers a new witness after trial begins, the United States can call that witness as part of its case in chief even though it did not include the newly discovered witness on its witness list under some circumstances:

> [A] witness not included on the prosecution's § 3432 pretrial witness list should only be permitted to testify at trial in a capital case when the prosecution has demonstrated that its failure to include the witness on the list was in good faith and not the result of a lack of diligent investigation. Even then, if the defendant can demonstrate actual prejudice resulting from the lack of pretrial notice that the witness would testify, the trial court should preclude the witness from testifying unless a brief adjournment of the trial would cure the prejudice.

United States v. Fulks, 454 F.3d 410, 424 (4th Cir. 2006)(King, J., joined by Widener, J.).[23]

---

jeopardize the life or safety of any person." 18 U.S.C. § 3432. The Court has made no such finding in this case, however, so this exception does not apply.

[22]Rev. Stat. § 1033 is a statutory predecessor to 18 U.S.C. § 3432, and Congress has not altered the relevant language. See supra note 16.

[23]The Honorable Karen J. Williams, former United States Circuit Court Judge for the Fourth Circuit, agreed with the majority's judgment but did not concur in this portion of the opinion. See United States v. Fulks, 454 F.3d at 438 (Williams, J., concurring). Judge Williams disagreed with the majority's interpretation of 18 U.S.C.§ 3432, instead concluding that, even in the good-faith situation outlined in the text, the prosecution violates § 3432. See United States v. Fulks, 454 F.3d at 439 . Judge Williams concluded that the statute's "using the definite article 'the' without relevant exception, the statute's plain language calls for a list of each and every witness to be produced at trial 'for proving the indictment,'" and not only those who have been

The Court cannot soundly characterize Jaramillo as a rebuttal witness, nor can it excuse the United States' failure to list Jaramillo as a good-faith omission of an after-discovered witness. The United States intended to call Jaramillo as a witness since before this trial began. See Brief at 5 (asserting that the United States "subpoenaed Jaramillo for trial," which began on April 9, 2018, "in March of 2018, planning to call him as a witness"). The United States, thus, intended to call Jaramillo as part of its case in chief and not to rebut evidence that the Defendants introduced, so Jaramillo is not a rebuttal witness.[24] Likewise, that the United States intended to

_____

discovered to date. United States v. Fulks, 454 F.3d at 440 (quoting 18 U.S.C. § 3432). Judge Williams conceded that the majority's exception "is grounded in sound judgment and makes perfect sense as a policy matter," but Congress explicitly enumerated an exception in the statute, which Judge Williams noted "counsels against reading judge-made exceptions into the statute." United States v. Fulks, 454 F.3d at 440. Accordingly, Judge Williams "would hold that the district court erred in allowing the two witnesses that were not included on the witness list to testify during the prosecution's case-in-chief," but "would find the error harmless after taking a traditional Rule 52(a) [of the Federal Rules of Criminal Procedure] harmlessness analysis." United States v. Fulks, 454 F.3d at 441.

[24]The United States argues that Jaramillo's testimony "serves to rebut the Defendants' impeachment of Lujan's truthfulness," Brief at 12, but Jaramillo's anticipated testimony -- per the Jaramillo 302 -- does not deal with "Lujan's character for truthfulness," Brief at 13. Instead, it describes Jaramillo's role in the Castillo murder, see Jaramillo 302 at 2-3, which might corroborate Lujan's testimony, but, even if Jaramillo's testimony corroborates Lujan's testimony, Jaramillo's testimony would not indicate that Lujan is a truthful person. Jaramillo's testimony responds to the Defendants' attack on Lujan's truthfulness only insofar as Jaramillo's testimony is inculpatory whereas the attacks on Lujan's truthfulness are exculpatory. That connection is not enough to render Jaramillo's testimony rebuttal evidence, even if the United States did not acknowledge its actual intention to call Jaramillo during its case in chief.

Moreover, the Court interprets the role of rebuttal witnesses narrowly. See Harapat v. Vigil, No. CIV 08-0512, 2010 WL 11596680, at *1 (D.N.M. Jan. 22, 2010)(Browning, J.)("[T]he Court retains discretion to disallow rebuttal testimony when a party seeks to rebut testimony which was known or could have reasonably been anticipated."). See also Koch v. Koch Indus., Inc., 203 F.3d 1202, 1224 (10th Cir. 2000)("When plaintiffs . . . seek to rebut defense theories which they knew about or reasonably could have anticipated, the district court is within its discretion in disallowing rebuttal testimony."). The United States knew that the Defendants' attacks on Lujan's credibility were coming; on March 16, 2018, during a pretrial hearing, the United States addressed a letter that Assistant United States Attorney Jack Burkhead wrote in March, 2015, declining to prosecute the case:

call Jaramillo as a witness in March, 2018, indicates that Jaramillo is not an after-discovered witness.[25] See Brief at 5.

---

     MR. BECK: Anticipating that was the case, that's why I think it would be wise to look closely at the letter from Mr. Burkhead. It says -- in the second paragraph, it says, "That a federal prosecution of these homicides would in large part hinge on the testimony of former SNM member Leonard Lujan. Unfortunately, **Mr. Lujan's credibility is in serious doubt**." . . . And if we look at **the reasons, they're not surprising**. As Special Agent Acee just testified: A long and troubled criminal background; that's the SNM. His history of malingering and otherwise manipulating the penal system for personal gain; that's the SNM. His receipt of past consideration and ongoing demands for future consideration as quid pro quo for cooperation in this case; that's every defendant who enters a plea agreement with a 5K or is opened as a federal FBI source. And the FBI pays people for their time. They paid Mr. Lujan $500 for his time. His sustained use of narcotic drugs; the Court's jury instruction in the last trial listed almost every single person who testified from the prison as an abuser of drugs. And a history of mental health issues; several people in the prisons have histories of mental health issues. . . .

     THE COURT: Keep reading.

     MR. BECK: "He is quite simply unusable as a witness, because **all these concerns would be fodder for what would inevitably be a long and tortuous cross-examination that would leave him incredible** in the eyes of a rational fact finder." . . .

     THE COURT: I think you've got to sort of face the reality, that thing is going to be on that screen.

     MR. BECK: And that does not concern me in the least. It doesn't concern me.

March 16 Tr. at 272:23-274:18 (Beck, Court)(emphasis added). The United States, thus, knew that Lujan's credibility would be an issue well before trial began, so even if Jaramillo's testimony went to Lujan's credibility, that use would not render Jaramillo's testimony admissible as rebuttal evidence. Lujan's credibility is at issue, so the United States can anticipate it needs to deal with this problem in its case in chief, and not try to wait until rebuttal, which deals partly with unanticipated developments or evidence.

[25]The United States argues that it discovered the content of Jaramillo's testimony only when it interviewed Jaramillo on April 18, 2018. See Brief at 6 & n.2. There are two problems with that argument. First, it is a non sequitur, because 18 U.S.C. § 3432 requires pretrial disclosure of the names of the United States' witnesses and not the content of their testimony.

Accordingly, the Court concludes that the United States violated § 3432 by not including Jaramillo on its pretrial witness list. As the United States concedes, Jaramillo provides "highly probative evidence of the events at issue." Brief at 16. Further, despite providing for Jaramillo's appearance at trial via a subpoena issued in March, 2018, the United States left Jaramillo off its pretrial witness list. See United States' Pretrial Witness List at 1-2. With no exceptions to the witness-list requirement applying in this case, Jaramillo's omission from the United States' Pretrial Witness List means that the United States violated § 3432 by calling this undisclosed witness.

## III. EXCLUDING JARAMILLO'S TESTIMONY IS NOT AN APPROPRIATE REMEDY FOR THE UNITED STATES' 18 U.S.C. § 3432 VIOLATION.

Jaramillo can testify even though the United States' failure to list Jaramillo on its pretrial witness lists violates 18 U.S.C. § 3432. "As a general matter, where a statute does not specifically provide for the exclusion of evidence in the event of a violation, federal courts disfavor exclusion as a judicially-fashioned remedy." United States v. Young, 533 F.3d 453, 461 (6th Cir. 2008). See United States v. Moffett, 84 F.3d 1291, 1294 (10th Cir. 1996)(agreeing with United States v. Thompson, 936 F.2d 1249 (11th Cir. 1991), which held that exclusion of

---

Second, even if Jaramillo's April 18, 2018, interview made Jaramillo a newly discovered witness, the United States cannot explain why that interview could not have occurred before the trial began. See United States v. Fulks, 454 F.3d at 424 (requiring the United States to show that "failure to include the witness on the list was in good faith and not the result of a lack of diligent investigation"). That Jaramillo would not talk with the United States unless he was subpoenaed and immunized does not explain the United States' delay, because the United States did not have to wait until trial began to use a Grand Jury subpoena and a Kastigar letter to speak with Jaramillo. Accordingly, the United States' reliance on United States v. Rosenberg, 195 F.2d 583 (2d Cir. 1952) is misplaced, for the Second Circuit in United States v. Rosenberg made an inference from the witness' "testimony that the government did not know of [the witness] until the day before he was called as a witness, [and so] it could not have included his name in the witness-list handed defendants before the trial." 195 F.2d at 599. Here, the United States clearly knew of Jaramillo and, despite not knowing his testimony, could have included his name on the witness list.

evidence allegedly obtained in violation of pen register statute is improper, "because the statute does not provide the remedy of exclusion"); United States v. Alabi, No. CR 11-2292 JB, 2013 WL 2284956, at *55 (D.N.M. May 15, 2013)(Browning, J.)("Although the exclusionary rule provides some redress for improper law enforcement, it also places a large burden on society and on the truth-seeking role courts play in society by exacting as payment the exclusion of probative, reliable evidence."). See also United States v. Harmon, 785 F. Supp. 2d 1146, 1170 n.4 (D.N.M. 2011)("Both scholars and judges have posited that exclusion of probative, reliable evidence of a defendant's guilt is too high a price to pay for the unknown degree of deterrence that exclusion achieves."). Section 3432 does not specify a remedy for a violation, so it falls to the Court to determine "an appropriate remedy for violation of the statute by supplementing a timely presented list with" Jaramillo's name after trial began. United States v. Young, 533 F.3d at 462.

Excluding Jaramillo's testimony is not an appropriate remedy in this case, because the Count 1 Trial Defendants have not identified how the United States' failure to list Jaramillo as a potential witness prejudices them. The Court cannot soundly conclude that, if Jaramillo had been included on the United States' witness list, the Count 1 Trial Defendants' voir dire, opening statements, and "entire approach to defending against Count 1, involving the Castillo homicide, would have been different." Response at 6. Before trial began, neither the United States nor the Defendants believed that Jaramillo's testimony would significantly advance the United States' case or that Jaramillo would be a cooperative witness. See Brief at 5 ("Over the course of this investigation, the United States attempted to interview Jaramillo several times, but Jaramillo was uncooperative and maintained that he didn't remember what happened."); Apr. 19 Tr. at 7:6-8 (Sindel)("[A]n investigator for our team had gone out and talked to Mr. Jaramillo and he said he

didn't know anything about it.").[26]  That the Count 1 Trial Defendants' entire trial strategy would have changed in response to a single then-uncooperative witness' addition to the United States' March 23, 2018, witness list, which contains 142 names, is implausible.  See United States' Pretrial Witness List.  The Court credits, however, the Count 1 Trial Defendants' assertion that their trial strategy would have been profoundly different if they knew the substance of Jaramillo's testimony before trial began.  See Response at 11 ("[T]he Defendants were not allowed to conduct voir dire in relation to Mr. Jaramillo's confession; they were not allowed to present opening statements in light of his confession; they were not allow[ed] to present their defense against the Government's case in chief with this information in hand.").

That assertion does not impact the Court's analysis, because the Defendants are not entitled to pretrial disclosure regarding the substance of the testimony that the United States' witnesses will provide.  Under 18 U.S.C. § 3432, the Defendants are entitled only to the names and places of abode "of the witnesses to be produced on the trial for proving the indictment."  18 U.S.C. § 3432.  The Due Process Clause requires the United States to disclose information in its possession that is exculpatory or that could be used to impeach the United States' witnesses.  See Strickler v. Greene, 527 U.S. 263, 281 (1999).  The Due Process Clause does not, however, require the United States to disclose the names of its witnesses who will testify unfavorably against the Defendants.  See Weatherford v. Bursey, 429 U.S.5 545, 559 (1977).  Thus, the United States had a duty to disclose Jaramillo's name only under § 3432, and a duty to disclose the substance of Jaramillo's testimony to the defense before trial under the Due Process Clause

---

[26]The United States intended to call Jaramillo as a witness, even though Jaramillo had not been cooperative, because "even if Jaramillo refused to answer any questions, or answered untruthfully, that would be helpful to the United States to prove the power of the SNM and its deadly enforcement of its code of silence."  Brief at 5 n.1.

only if the United States possessed that information, and it is exculpatory or useful for impeachment.  See Strickler v. Greene, 527 U.S. at 281.  Here, the United States did not possess the substance of Jaramillo's testimony until it interviewed him on April 18, 2018, after trial had begun, and provided to the Defendants the interview notes the same day and Jaramillo's 302 the day after.  See April 19 Tr. at 2:11-24 (Sindel); id. at 134:25-135:1 (Burke).  This interview was the first time Jaramillo cooperated with anybody and spoke about the Castillo homicide.  See April 19 Tr. at 10:12-15 (Beck).  Accordingly, allowing Jaramillo to testify does not violate the Defendants' due process rights, only § 3432.  In light of the Court's function as a truth seeker; § 3432's purpose to prevent "trial by surprise," United States v. Young, 533 F.3d at 432; the Defendants assertion that, from the beginning of the case, they suspected Jaramillo's involvement in Castillo's murder, see, e.g., April 19 Tr. at 2:14-16 (Sindel); id. at 121:6-14 (Burke); and the United States' provision of Jaramillo's suspected testimony, see James Notice at 3-17; the Court concludes that the Defendants are not surprised or prejudiced by Jaramillo's being a witness and, thus, exclusion of Jaramillo's testimony is not an appropriate remedy.  Cf. United States v. Duhart, 496 F.2d 941, 943 (9th Cir. 1974)(finding no prejudice where the defendant had knowledge of the United States' intention to call the witness -- whose name was absent from the witness list -- and of the anticipated testimony).  Instead, the Court will push back the United States' introduction of Jaramillo's testimony as much as possible, as to allow the Defendants more time to prepare their defense against Jaramillo's expected testimony.

## IV.    THE **JAMES** NOTICE STATEMENTS ARE ADMISSIBLE NOTWITHSTANDING THE RULE AGAINST HEARSAY.

Under the Federal Rules of Evidence, only statements constitute hearsay.  See Fed. R. Evid. 801(c) (stating that hearsay "means a statement" that satisfies certain conditions).  A

statement must be an assertion.  See Fed. R. Evid. 801(a) ("'Statement' means a person's oral

assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.").  See

also id. advisory committee's notes to 1972 proposed rules ("The effect of the definition of

'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or

nonverbal, not intended as an assertion.").  Verbal actions like orders and commands, e.g., "fetch

me a shrubbery," as well as questions, e.g., "what do you want to eat for lunch?," are not always

assertions, because they are neither true nor false.  See Fed. R. Evid. 801 advisory committee's

notes to 1972 proposed rules ("When evidence of conduct is offered on the theory that it is not a

statement, and hence not hearsay, a preliminary determination will be required to determine

whether an assertion is intended.").  Consequently, orders and questions generally are not

hearsay, both because hearsay must be a statement, and because something that is neither true

nor false cannot be offered to prove the truth of the matter asserted.  See Fed. R. Evid. 801(c)

(defining hearsay as an out-of-court statement offered "to prove the truth of the matter

asserted").  See also 4 Saltzburg et al., supra, § 801.02[1][c], at 801-17 ("If proffered evidence is

not a 'statement' within the meaning of Rule 801(a), then it cannot be hearsay, and so cannot be

excluded under the rule.").

    While orders and commands are not, themselves, assertions, they may -- like questions --

contain implicit assertions.  See United States v. Summers, 414 F.3d at 1300 (concluding that a

defendant's question -- "How did you guys find us so fast?" -- was an implicit assertion of "both

guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so

quickly").[27]  For example, a lawyer asking a witness whether the witness stopped beating his

---

[27]The Court is not convinced, as much as the Tenth Circuit was, that the question was not
a question but an assertion.

wife indicates both that the witness has a wife and that the witness abused his wife.  Whether

those two indications are assertions, however, depends on the lawyer's intent.  "Taken together,

[United States v. Jackson, 88 F.3d 845 (10th Cir. 1996),] and [United States v. Long, 805 F.2d

1572 (D.C. Cir. 1990)(Thomas, J.),] do not foreclose the possibility that a declaration in the form

of a question may nevertheless constitute an assertion within the meaning of Rule 801(a) and (c).

Rather, both cases properly focus the inquiry on the declarant's intent."  United States v.

Summers, 414 F.3d at 1300.  Thus, the verbal acts that the James Notice identifies can qualify as

statements -- and, hence, as hearsay -- if they were intended to be assertions.  See Fed. R. Evid.

801 advisory committee's notes to 1972 proposed rules ("The key to the definition is that noting

is an assertion unless intended to be one.").

Even if an out-of-court utterance qualifies as a statement and is offered for its truth, it is

not hearsay if it "is offered against an opposing party," and "was made by the party's

coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  The

Court finds, by a preponderance of the evidence, that a conspiracy to kill Frank Castillo existed,

and the conspiracy persisted until Castillo died on March 26, 2001.  See supra FOF ¶ 1.

Jaramillo, B. Garcia, Lujan, J. Gallegos, and Troup were members of the conspiracy.  See supra

FOF ¶¶ 2-3.  The Court conducts a statement-by-statement analysis of the United States' James

Notice statements to determine whether they qualify as statements for hearsay purposes and, if

so, whether they are not hearsay -- even if offered to prove the truth of the matter asserted --

under rule 801(d)(2)(E).  The Court sets out that analysis in the following table.

| Statement | Ruling |
|---|---|
| Statement 1: "Leonard Lujan told Michael Jaramillo, a.k.a., 'Criminal,' that Billy Garcia told Lujan to find people to murder Frank Castillo and Lujan chose Jaramillo, Joe Gallegos, and Angel Deleon."<br><br>Declarant: Leonard Lujan<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Statement 1 presents a potential hearsay-within-hearsay issue, because it is an out-of-court Lujan statement describing an out-of-court B. Garcia statement. See Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). B. Garcia's directions to Lujan are commands and not assertions, so they are not hearsay. The Court will not give a limiting instruction regarding this portion of the statement. Lujan's statements relaying B. Garcia's directions were made in furtherance of the conspiracy to kill Castillo, because Lujan made those statements to convince Jaramillo to participate. Consequently, those statements are admissible under rule 801(d)(2)(E). The Court will give a limiting instruction, upon request, regarding this portion of the statement as to Defendants other than B. Garcia, J. Gallegos, and Troup. |
| Statement 2: "Leonard Lujan told Michael Jaramillo, a.k.a., 'Criminal,' to discuss details with Joe Gallegos."<br><br>Declarant: Leonard Lujan<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Lujan's directions to Jaramillo are commands and not assertions. Consequently, those directions are not hearsay, so they are admissible. The Court will not give a limiting instruction. |
| Statement 3: "Leonard Lujan told Michael Jaramillo, a.k.a., 'Criminal,' that Jaramillo was going to have to "put in work" for the SNM, and to speak with Joe Gallegos and Angel DeLeon about it."<br><br>Declarant: Leonard Lujan<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Lujan's directions to Jaramillo -- go speak with Joe Gallegos and DeLeon -- are commands and not statements, so they are admissible. Lujan's statements to Jaramillo, i.e., that Jaramillo was going to have to put in work for the SNM, were made in furtherance of the conspiracy to kill Castillo, because Lujan made those statements to convince Jaramillo to participate. Consequently, those statements are admissible under rule 801(d)(2)(E). The Court will give a limiting instruction, upon request, as to Defendants other than B. Garcia, J. Gallegos, and Troup. |
| Statement 4: "Joe Gallegos told Michael Jaramillo and Angel DeLeon that they | Statement 4 is a statement of the declarant's then-existing state of mind, i.e., J. Gallegos' plan to kill |

| | |
|---|---|
| would wait for an anticipated heroin delivery before killing Castillo."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Castillo. Consequently, statement 4 is admissible hearsay. <u>See</u> Fed. R. Evid. 803(3). Because statement 4 is admissible against all the Defendants under rule 803(3), the Court will not give a limiting instruction. J. Gallegos made the statement to explain when he, Jaramillo, and DeLeon were going to kill Castillo, so J. Gallegos made the statement in furtherance of the conspiracy to kill Castillo. Consequently, statement 4 is admissible for its truth under rule 801(d)(2)(E). Additionally, it is admissible against J. Gallegos as an admission of a party opponent under rule 801(d)(2)(A). |
| Statement 5: "Leonard Lujan told Michael Jaramillo the order was coming from Billy Garcia so Jaramillo knew it was serious."<br><br>Declarant: Leonard Lujan<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Lujan made statement 5 to convince Jaramillo to participate in the Castillo murder. Consequently, Lujan made statement 5 in furtherance of the conspiracy to murder Castillo, so it is admissible under rule 801(d)(2)(E). The Court will give a limiting instruction, upon request, as to Defendants other than B. Garcia, J. Gallegos, and Troup. |
| Statement 6: "Once the heroin came in, Joe Gallegos called Michael Jaramillo and Angel DeLeon to his cell to order the murder of Castillo to take place in the morning."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | That J. Gallegos called Jaramillo and DeLeon into his cell is an action and not an assertion, so it is not hearsay, and it is admissible. That J. Gallegos ordered Jaramillo and Deleon to murder Castillo in the morning is an order and not an assertion, so it is not hearsay, and it is admissible. The Court will not give a limiting instruction. |
| Statement 7: "Joe Gallegos told Michael Jaramillo and Angel DeLeon that the plan was go [sic] the Castillo cell when the doors open in the morning and use heroin with Castillo and then 'take him out.'"<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Statement 7 is a statement of the declarant's then-existing state of mind, <u>i.e.</u>, J. Gallegos' plan to kill Castillo. Consequently, statement 7 is admissible hearsay. <u>See</u> Fed. R. Evid. 803(3). Because statement 7 is admissible against all the Defendants under rule 803(3), the Court will not give a limiting instruction. J. Gallegos made statement 7 to explain to Jaramillo and DeLeon what they are supposed to do vis-à-vis the Castillo murder, so J. Gallegos made the statement in furtherance of the conspiracy to kill Castillo. Consequently, statement 7 is admissible for its truth under rule 801(d)(2)(E). Additionally, it |

| | is admissible against J. Gallegos as an admission of a party opponent under rule 801(d)(2)(A). The Court will give a limiting instruction, upon request, as to Defendants other than B. Garcia, J. Gallegos, and Troup. |
|---|---|
| Statement 8: "Joe Gallegos told Michael Jaramillo and Angel DeLeon that Gallegos's family would pay for an attorney if they got in trouble."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | J. Gallegos made statement 8 to convince Jaramillo and DeLeon to participate in the Castillo murder, so J. Gallegos made statement 8 in furtherance of the conspiracy to kill Castillo. Consequently, statement 8 is admissible for its truth under rule 801(d)(2)(E). |
| Statement 9: "Joe Gallegos told Michael Jaramillo and Angel DeLeon to refuse DNA testing if the police requested it."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Statement 9 is a command -- refuse DNA testing -- and not an assertion, so it is not hearsay. It is admissible, and the Court will not give a limiting instruction. |
| Statement 10: "Joe Gallegos told Angel DeLeon, in the presence of Michael Jaramillo, that he was to hold Castillo down as he took a hit of heroin."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Statement 10 is a command -- hold Castillo down as he takes a hit of heroin -- and not an assertion, so it is not hearsay. It is admissible, and the Court will not give a limiting instruction. . |
| Statement 11: "Joe Gallegos told Michael Jaramillo, in [the] presence of Angel DeLeon, that he was to 'choke out' Castillo while Gallegos and DeLeon held Castillo down."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Statement 11 is a command -- choke out Castillo -- and not an assertion, so it is not hearsay. It is admissible, and the Court will not give a limiting instruction. |

| | |
|---|---|
| Statement 12: "Joe Gallegos, in the presence of Michael Jaramillo and Angel DeLeon, called Edward Troup, a.k.a., 'Huero Troop,' over to Gallegos's cell and told Troop to be the lookout during the murder and to keep everybody in their cell during the murder."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | J. Gallegos' directions to Troup are commands -- be the lookout and keep everyone in their cells -- and not assertions, so they are not hearsay; they are admissible. That J. Gallegos called Troup to his cell is an action and not an assertion, so it is not hearsay; it is admissible. The Court will not give a limiting instruction |
| Statement 13: "Joe Gallegos, in the presence of Michael Jaramillo and Angel DeLeon, told Jaramillo that he was going to have Edward Troup, a.k.a., 'Huero Troop,' act as a lookout during the murder."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Statement 13 is a statement of J. Gallegos' then-existing state of mind, specifically his plan, so it is admissible hearsay. See Fed. R. Evid. 803(3). J. Gallegos made the statement to explain to Jaramillo and DeLeon how the Castillo murder would proceed, so J. Gallegos made the statement in furtherance of the conspiracy to murder Castillo. Consequently, statement 13 is admissible under rule 801(d)(2)(E). Additionally, it is admissible against J. Gallegos as an admission of a party opponent under rule 801(d)(2)(A). |
| Statement 14: "Edward Troup voiced his agreement to be the lookout during the murder and to keep everybody in their cell during the murder."<br><br>Declarant: Edward Troup<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | Statement 14 is admissible against Troup as an admission of a party opponent under rule 801(d)(2)(A). Troup made statement 14 to inform J. Gallegos, DeLeon, and Jaramillo that he would do his part in committing the Castillo murder, so Troup made the statement in furtherance of the conspiracy to kill Castillo. Consequently statement 14 is admissible for its truth under rule 801(d)(2)(E). The Court will give a limiting instruction, upon request, as to Defendants other than B. Garcia, J. Gallegos, and Troup. |
| Statement 15: "Joe Gallegos gave Michael Jaramillo the heroin."<br><br>Declarant: Joe Gallegos<br><br>Source: Michael Jaramillo<br><br>Date: On or before March 26, 2001 | That J. Gallegos gave Jaramillo the heroin is an action and not an assertion, so it is not hearsay, and it is admissible. The Court will not give a limiting instruction. |

**IT IS ORDERED** that the Defendants' oral motion to exclude Michael Jaramillo's testimony is denied. The United States may call Jaramillo as a witness, but must push down his testimony as to allow the Defendants time to prepare their defense.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

*Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

*Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

      *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

      *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

      *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

      *Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

      *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

      *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

      *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

      *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

      *Attorneys for Defendant Benjamin Clark*

Leon Encinias
Lean Encinias Attorney at Law
Albuquerque, New Mexico

--and--

Pedro Pineda
Las Cruces, New Mexico

      *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

      *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

      *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

      *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

      *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

 *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

 *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Brusuelas-Benavidez
Albuquerque, New Mexico

 *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

 *Attorneys for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC

Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

   *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

   *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

   *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

   *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

   *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

      *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

      *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

      *Attorneys for Defendant Santos Gonzalez*

Keith R. Romero
Albuquerque, New Mexico

      *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

      *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

      *Attorneys for Defendant Brandy Rodriguez*