# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                   No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA; SHAUNA GUTIERREZ;
and BRANDY RODRIGUEZ,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

    **THIS MATTER** comes before the Court on: (i) the United States' Notice of Proposed

*James* Statements for Trial 2, filed March 8, 2018 (Doc. 1903)("<u>James</u> Notice"); (ii) Defendant

Billy Garcia's Targeted Response to United States Notice of Proposed James Statements for Trial 2 (Doc. No. 1903), filed March 9, 2018 (Doc. 1909)("B. Garcia Response"); (iii) General Response to United States Notice of Proposed James Statements for Trial 2 (Doc. 1903), filed March 9, 2018 (Doc. 1910)("General James Response");[1] (iv) United States' Sealed Opposed Motion *In Limine* Regarding Statements Against Penal Interest Under Rule 804(b)(3), filed March 10, 2018 (Doc. 1912)("804(b)(3) MIL"); (v) Response to United States Notice of Proposed James Statements for Trial II (Doc. 1901), filed March 11, 2018 (Doc. 1914)("Gutierrez Response"); (vi) Response to United States Notice of Proposed James Statements for Trial 2 (Doc. 1901), filed March 11, 2018 (Doc. 1916)("C. Chavez Response"); (vii) Andrew Gallegos' Response to United States Notice of Proposed James Statements for Trial 2 (Doc. 1903), filed March 11, 2018 (Doc. 1917)("A. Gallegos Response"); (viii) Defendant Joe Gallegos' Response to the United State's [sic] Notice of Proposed James Statements (Doc. 1903), filed March 12, 2018 (Doc. 1918)("J. Gallegos Response"); (ix) Edward Troup's Specific Response to United States Notice of Proposed James Statements for Trial 2 (Doc. No. 1901), filed March 12, 2018 (Doc. 1920)("Troup Response"); (x) Allen Patterson's Response to the United States Notice of Proposed James Statements (Doc. 1903), filed March 14, 2018 (Doc. 1939)("Patterson Response"); (xi) United States' Notice Regarding *James* Statements From Trial 1, filed March 15, 2018 (Doc. 1944)("Trial 1 James Notice"); (xii) Supplement to Defendant Billy Garcia's Targeted Response to United States Notice of Proposed James Statements for Trial 2 (Doc. No. 1903), filed March 31, 2018 (Doc. 2009)("B. Garcia Supplement"); and (xiii) Brief in Support of Inapplicability of of [sic] Fed. R. 803(b)(3) [sic]

---

[1]"Defendants Joe Gallegos, Edward Troup, Christopher Chavez, Allen Patterson, Arnulfo Arturo Garcia, Andrew Gallegos, and Shauna Gutierrez all join in this response." General James Response at 1.

(Doc. Nos. 1909 and 2009), filed April 6, 2018 (Doc. 2085)("B. Garcia Brief"). The Court held an evidentiary hearing on March 12-16, 2018. <u>See</u> Transcript of Motion Proceedings (taken March 12, 2018), filed April 3, 2018 (Doc. 2026)("March 12 Tr."); Transcript of Motions Hearing (taken March 13, 2018), filed April 3, 2018 (Doc. 2027)("March 13 Tr."); Transcript of Motion Proceedings (taken March 14, 2018), filed April 3, 2018 (Doc. 2028)("March 14 Tr."); Transcript of Motion Proceedings (taken March 15, 2018), filed April 3, 2018 (Doc. 2029)("March 15 Tr."); Transcript of Motions Hearing (taken March 16, 2018), filed April 3, 2018 (Doc. 2030)("March 16 Tr."). The primary issues are (i) whether admitting the statements identified in the Proffer Under Fed. R. Evid. 801(d)(2)(E) and Objections, filed March 8, 2018 (Doc. 1903-1)("<u>James</u> Proffer"), which the Plaintiff United States of America attaches to its <u>James</u> Notice, would offend the Confrontation Clause of the Sixth Amendment to the Constitution of the United States of America; (ii) whether admitting non-testifying Defendants' statements would violate the Confrontation Clause; (iii) whether the <u>James</u> Proffer statements are admissible for their truth -- and if so, against whom -- under rule 801(d)(2)(E) of the Federal Rules of Evidence; (iv) whether the non-testifying Defendants' statements are admissible as statements against interest under rule 804(b)(3) of the Federal Rules of Evidence; and (v) whether the <u>James</u> statements from the first trial in this case are admissible in the second trial under rule 801(d)(2)(E). The Court concludes that none of the <u>James</u> Proffer statements or the non-testifying Defendants' statements are testimonial, so admitting them raises no Confrontation Clause issues. The Court also concludes that some -- but not all -- of the <u>James</u> Proffer statements are admissible under rule 801(d)(2)(E) for their truth against some -- but not all -- of the Defendants, while other <u>James</u> Proffer statements are admissible for their truth under different rules. Finally, the Court determines that some of the non-testifying Defendants'

statements are admissible for their truth against all the Defendants as declarations against interest under rule 804(b)(3), while other statements are admissible for their truth against only the declarant under rule 801(d)(2)(A), but none of the first trial's <u>James</u> statements are admissible. Accordingly, the Court grants in part and denies in part the 804(b)(3) MIL.

## **FACTUAL BACKGROUND**

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment"). The background facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or as the truth. The Court recognizes that the factual background largely reflects the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. <u>See</u> Indictment at 3. After the PNM

riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, . . . includ[ing] murder and assaults." Indictment at 4. SNM also "intimidate[es] and influenc[es] smaller New Mexico Hispanic gangs" to expand its illegal activities. Indictment at 4. If another gang does not abide by SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment at 8. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the Federal Bureau of Investigation's ("FBI") present

investigation.  United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133).  The other relevant facts giving rise to this case are as follows.

In March, 2014, a Doña Ana County, New Mexico grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder, and four other felonies, related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO").  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See MOO at 6, 2016 WL 7242579, at *3.  That New Mexico indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See MOO at 6-7, 2016 WL 7242579, at *3.  In November, 2015, the state District Attorney dismissed the charges against Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy. See MOO at 7, 2016 WL 7242579, at *3.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level."  MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts.  See Indictment at 1, 9-18.  All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as

consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and

for the purpose of gaining entrance to and maintaining and increasing position in SNM, an

enterprise engaged in racketeering activity."   Indictment at 9-18.   Defendant Arturo Arnulfo

Garcia, Defendant Gerald Archuleta,[2] Defendant Benjamin Clark, M. Rodriguez, Defendant

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[3] and Defendant

---

[2]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2003, I was an active member of the SNM.  The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM.  J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R.  Based upon my status in the SNM, this "green-light" was well known to members of the SNM.  The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting.  The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico.  This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R.  This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[3]R.P. Martinez plead guilty on September 15, 2016, stipulating:

- 7 -

Daniel Sanchez are the enterprise's alleged leaders.  <u>See</u> Indictment at 6.  The other Defendants

are allegedly members or associates who acted under the direction of the enterprise's leaders.

<u>See</u> Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly

engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) define that term;

(ii) murder and robbery in violation of State of New Mexico law; (iii) acts, indictable under 18

U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating

against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in

violation of 21 U.S.C. §§ 841 and 846.  Indictment at 9.

 Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon,

Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9

---

  In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

  In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State.  Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

  Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

(Count 1).  On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G."  Indictment at 10 (Count 2).  On June 17, 2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez allegedly murdered "F.S."  Indictment at 10-11 (Count 3).  On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B."  Indictment at 11 (Count 4).  On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B.  See Indictment at 11-12 (Count 5).  In March, 2014, Armenta, Montoya, M. Rodriguez, Defendant Timothy Martinez, Baca, Defendant Mauricio Varela, Sanchez, Defendant Carlos Herrera, and Defendant Rudy Perez allegedly conspired to murder "J.M."  Indictment at 12 (Count 6).  On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera, and Perez allegedly murdered J.M.  See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Indictment at 13-14 (Count 8).  Starting "on a date uncertain, but no later than 2013," and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S."  Indictment at 14 (Count 9).  During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M."  Indictment at 15 (Count 10).  On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm.  See Indictment at 15-16 (Count 11).  On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder.  See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G."  Indictment at 16 (Count 13).  From February 1, 2016, until February 27, 2016,

J. Gallegos and Defendants Santos Gonzalez, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez allegedly conspired to murder "J.G." Indictment at 17 (Count 14). Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzalez, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Indictment at 17-18 (Count 15). The same Defendants also allegedly tampered with a witness, J.G. See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.)[4] -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18

_____

[4]The Court has granted a conditional severance of one Defendant in that case. See United States v. Baca, No. CR 16-1613 JB, 2016 WL 6404772 (D.N.M. Oct. 20, 2016)(Browning, J.). The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his Speedy Trial Act, 18 U.S.C. §§ 3161-74, rights. The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping. Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here . . ." in federal court. See July Tr. at 10:13-18 (Ray). If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *31. Ultimately, the Court notes, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor. See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld). On March 22, 2017, R. Gallegos pled guilty in his severed case. See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

U.S.C. § 1962(d).[5]  There is also a separate prosecution of C. Garcia for drug crimes, see United States v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

The Court severed this case into two trial groups.  See Memorandum Opinion and Order at 3, 2017 WL 3054511, at *1, filed June 30, 2017 (Doc. 1204)("Severance MOO").  The Court held a trial on Counts 6-12 of the Indictment from January 29, 2018, to March 12, 2018.  See Clerk's Minutes, filed March 12, 2018 (Doc. 1932); Clerk's Minutes, filed January 29, 2018 (Doc. 1746).  The Court will try Counts 1-5 alongside Counts 13-16 in a second trial.  See Severance MOO at 3, 2017 WL 3054511, at *1.  The Court set the second trial to begin on April 9, 2018.  See Fourth Scheduling Order ¶ 15, at 2, filed July 7, 2017 (Doc. 1205).

Before the first trial began, several Defendants asked the Court to hold a hearing under United States v. James, 590 F.2d 575 (5th Cir. 1979)("James"), to determine, by a preponderance of the evidence, whether statements that the United States will attempt to introduce for their truth under rule 801(d)(2)(E) of the Federal Rules of Evidence satisfy that rule's requirements, i.e.: (i) that a conspiracy existed; (ii) that the declarant and the Defendant against whom the United States offers a statement were members of that conspiracy; and (iii) the statement was made during and in furtherance of that conspiracy.  See Memorandum Opinion and Order at 14, 287 F. Supp. 3d 1187, 1200, filed March 7, 2018 (Doc. 1882)("James MOO").  See also Fed. R. Evid. 801(d)(2)(E).  On November 27, 2017, the Court orally granted those requests.  See

---

[5]The Court has also declared that case complex under the Speedy Trial Act.  See United States v. Baca, 2016 WL 6404772, at *1.

Transcript of Hearing at 10:12-24 (taken November 27, 2017)(Court), filed December 6, 2017 (Doc. 1545)("Nov. 27 Tr."). The Trial 1 Defendants[6] indicated that they would have preferred pre-James-hearing notice regarding the statements that the United States intends to offer at their trial under rule 801(d)(2)(E) of the Federal Rules of Evidence, but they added that,

> at this point, with a January 29 [trial] date, we'd rather just have a witness put up cold, and get into it, just so we can know what we're dealing with right around the corner. So we would have loved the Government's response to have been: Hey, let's do this bifurcated way, so you can actually prepare for the hearing. But since we're here, and it's the week after Thanksgiving, and we're going to be in front of a jury in two months, we'd just like to get a witness up and get it going.

Nov. 27 Tr. at 105:9-18 (Adams). In contrast, the United States agreed to notify the Trial 2 Defendants[7] in writing regarding the statements that it intends to offer at their trial under rule 801(d)(2)(E), and the Court indicated that it would hold a James hearing regarding any of those statements that the Trial 2 Defendants found objectionable. See Nov. 27 Tr. at 106:7-10 (Castellano)("It's my understanding [the Trial 2 Defendants will] get the statements and they'll make a determination at that point whether they want to challenge the statements."). See also James MOO at 16-17, 287 F. Supp. 3d at 1201-02.

## 1.  **The James MOO.**

The Court issued the James MOO after having a three-day James hearing. See Transcript of Hearing (held November 27, 2017), filed December 6, 2017 (Doc. 1545)("Nov. 27 Tr."); Transcript of Hearing (held November 28, 2017), filed December 6, 2017 (Doc. 1546)("Nov. 28 Tr."); Transcript of Hearing (held November 29, 2017), filed December 6, 2017 (Doc. 1547)("Nov. 29 Tr."). At the James hearing, the United States "proffered 'about 14 plea

---

[6]The Trial 1 Defendants are Sanchez, Baca, Herrera, and Perez.

[7]The Trial 2 Defendants who have not pleaded out as of March 16, 2018, are Troup, J. Gallegos, A. Gallegos, Gutierrez, B. Garcia, Chavez, A.A. Garcia, and Patterson.

agreements in this case which will establish at least the first two requirements of James, which is the existence of the conspiracy, as well as membership in the conspiracy.'" James MOO at 17, 287 F. Supp. 3d at 1202 (quoting Nov. 27 Tr. at 17:9-13 (Castellano)). The United States introduced "the statements it intends to offer under rule 801(d)(2)(E) at the first trial by calling [FBI Special Agent Bryan Acee] to the stand." James MOO at 18, 287 F. Supp. 3d at 1202-03 (citing Nov. 27 Tr. at 145:23-24 (Castellano)). The Court provides a table, in which it "designates statements by both declarant and transcript citation," and also includes its conclusions as to admissibility. James MOO at 117, 287 F. Supp. 3d at 1264. This table is provided below, with its footnotes.

| Declarant(s) | Citation | The Court's Conclusions |
|---|---|---|
| Baca | Nov. 27 Tr. at 147:8-16 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Calbert and Baca | Nov. 27 Tr. at 149:17-21 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Baca | Nov. 27 Tr. at 149:17-21 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| M. Rodriguez and T. Martinez | Nov. 27 Tr. at 150:11-20 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| T. Martinez | Nov. 27 Tr. at 150:11-20 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Herrera | Nov. 27 Tr. at 151:1-13 | Nontestimonial; rule 801(d)(2)(A) applies as against Herrera; the Court will give a limiting instruction as to Sanchez, Baca, and Perez |
| M. Rodriguez | Nov. 27 Tr. at 152:8-24 | Nontestimonial |
| Sanchez | Nov. 27 Tr. at 153:6-10 | Nontestimonial; rule 801(d)(2)(A) applies as against Sanchez; rule 803(3) applies generally |
| Gomez | Nov. 27 Tr. at 153:19-154:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 8 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |

| | | |
|---|---|---|
| Baca | Nov. 27 Tr. at 153:19-154:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 8 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| M. Rodriguez | Nov. 27 Tr. at 155:19-159:2 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 159:10-160:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 160:6-161:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 160:6-161:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 161:5-162:13 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 162:14-163:25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 164:4-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Baca | Nov. 27 Tr. at 164:23-165:16 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Gomez | Nov. 27 Tr. at 164:23-165:16 | Nontestimonial |
| Baca | Nov. 27 Tr. at 167:5-18 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| C. Garcia | Nov. 27 Tr. at 167:19-169:6 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 27 Tr. at 167:19-169:6 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Sanchez | Nov. 28 Tr. at 40:23-41:8 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| R. Martinez | Nov. 28 Tr. at 41:14-20 | Nontestimonial |
| Sanchez | Nov. 28 Tr. at 42:1-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Herrera | Nov. 28 Tr. at 42:15-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 28 Tr. at 42:22-43:14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |

| | | |
|---|---|---|
| Perez | Nov. 28 Tr. at 43:9-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| T. Martinez | Nov. 28 Tr. at 43:15-44:15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 43:15-44:15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 45:5-8 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Montoya | Nov. 28 Tr. at 45:12-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 28 Tr. at 45:15-20 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 45:22-46:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Montoya | Nov. 28 Tr. at 46:5-6 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 46:6-9 | Nontestimonial |
| Molina | Nov. 28 Tr. at 46:6-9 | Nontestimonial; rule 804(b)(2) applies |
| M. Rodriguez | Nov. 28 Tr. at 46:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Herrera | Nov. 28 Tr. at 46:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| R.P. Martinez | Nov. 29 Tr. at 229:16-230:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R.P. Martinez | Nov. Tr. at 230:6-19 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R.P. Martinez | Nov. 29 Tr. at 230:22-232:14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 232:15-233:7 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 233:7-24 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |

| | | |
|---|---|---|
| Baca | Nov. 29 Tr. at 233:25-234:19 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 234:19-25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 236:21-237:5 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 237:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 237:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 238:3-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Montoya | Nov. 29 Tr. at 238:3-11 | Nontestimonial |
| Baca | Nov. 29 Tr. at 238:25-239:3 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 239:3-8 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 239:18-240:3 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 240:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 240:15-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 241:3-4 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 241:19-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 242:11-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to the other Defendants |

| Baca | Nov. 29 Tr. at 243:3-18 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
|------|--------|--------|
| Baca | Nov. 29 Tr. at 243:24-244:7 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 244:10-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 244:25-245:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 245:12-17 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 245:24-246:9 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 247:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 248:3-7 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 248:16-19 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 249:5-12 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:3-5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:11-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |

| | | |
|---|---|---|
| C. Garcia | Nov. 29 Tr. at 250:11-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:25-251:3 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| C. Garcia | Nov. 29 Tr. at 250:25-251:3 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov.29 Tr. at 251:8-17 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 252:14-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 256:17-25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:7-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:13-14 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:15-16 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:17-18 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:19-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Duran | Nov. 29 Tr. at 257:20-21 | Nontestimonial |
| M. Rodriguez | Nov. 29 Tr. at 257:20-21 | Nontestimonial; rule 803(3) applies |
| Baca | Nov. 29 Tr. at 257:21-22 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |

| M Rodriguez | Nov. 29 Tr. at 257:25 | Nontestimonial |
|---|---|---|
| Baca | Nov. 29 Tr. at 258:12-20 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 259:1-4 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| C. Garcia | Nov. 29 Tr. at 261:7-13; James Hearing Exhibit 26[8] | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Parker | Nov. 29 Tr. at 262:1-4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Montoya | Nov 29 Tr. at 262:8-263:4 | Testimonial[9] |

James MOO at 117-23, 287 F. Supp. 3d at 1264-70.

## 2. The James Notice and James Proffer.

The United States filed the James Notice and the James Proffer on March 8, 2018, see James Notice at 1; James Proffer at 1, pursuant to the agreement reached at the November 27, 2017, hearing that the United States would provide the Defendants a summary of the coconspirator statements it wishes to introduce, see Nov. 27 Tr. at 104:19-23 (Castellano). In the James Notice, the United States indicates that it intends to introduce the statements in the James

---

[8]The United States indicated at the November 29, 2017 hearing that it would highlight, via Acee's testimony, portions of James Hearing Exhibit 26, "a transcript from a body wire that Mario wore when he went to Chris Garcia's house to pick up the firearm," Nov. 29 Tr. at 260:9-11 (Acee), but it added, "I'm actually moving in the entire conversation as part of the co-conspirator statements," Nov. 29 Tr. at 260:13-15 (Castellano).

[9]When Montoya made this statement, he was acting as confidential human source, and he was wearing a wire. See Nov. 29 Tr. at 260:2-11 (Acee). Accordingly, his statement was not made in furtherance of the conspiracy -- because Montoya, as a confidential human source -- was actively working to thwart the conspiracy. That Montoya was wearing a wire indicates that Montoya would reasonably expect his recorded statements to be introduced as evidence at a trial, so those statements are testimonial.

Proffer at the second trial.  See James Notice at 1.  The United States also "reserves the right to introduce the co-conspirator statements introduced in Trial 1, which began January 29, 2018." James Notice at 1.  Finally, the United States "reserves the right to file additional notices of *James* statements should they be revealed in preparation for trial."  James Notice at 1.

The James Proffer enumerates eighty-eight distinct statements.  See James Proffer at 1-45.  For each statement, the James Proffer lists the statement's declarant, its source, and the approximate date on which the statement was made.  See James Proffer at 1-45.  The United States also identifies a basis of admission for each statement.  See James Proffer at 1-45.

### 3. **The B. Garcia Response.**

On the next day, B. Garcia filed a response to the James Notice and the James Proffer. See B. Garcia Response at 1.  B. Garcia argues that "all statements regarding counts 3-5 and 13-15" are irrelevant to the charges against him, and are "highly prejudicial."  B. Garcia Response ¶ 3, at 2.  B. Garcia lists particular James Proffer statements that he finds objectionable.  See B. Garcia Response ¶¶ 4-10, at 2-5.

B. Garcia also makes a blanket objection to admitting out-of-court statements that his non-testifying co-Defendants made insofar as those statements implicate him.  See B. Garcia Response ¶ 20, at 9.  In addition to that blanket objection, B. Garcia identifies specific individuals who he anticipates will testify that B. Garcia's co-Defendants made out-of-court statements -- which are not listed in the James Proffer -- that inculpate B. Garcia.  See B. Garcia Response ¶ 11, at 5 (James Garcia); id. ¶ 13, at 6 (Samuel Gonzales); id. ¶ 14, at 6-7 (Robert Lovato); id. ¶ 15, at 7 (Leroy Lucero); id. ¶ 16, at 7-8 (Fred Quintana); id. ¶ 17, at 8 (Ben Clark); id. ¶ 18, at 8-9 (Julian Romero); id. ¶ 19, at 9 (T. Martinez).  B. Garcia attaches documents to the B. Garcia Response as appendices, and these appendices summarize interviews with law

enforcement which contain statements attributed to B. Garcia's co-Defendants. <u>See</u> Appendix A at 2-3, filed March 9, 2018 (Doc. 1909-1)("J. Garcia 302")(containing the out-of-court co-Defendant statements about which B. Garcia anticipates J. Garcia will testify); Appendix C at 3, filed March 9, 2018 (Doc. 1909-3)("Samuel Gonzales 302")(containing the out-of-court co-Defendant statements about which B. Garcia anticipates Samuel Gonzales will testify); Appendix D at 2, filed March 9, 2018 (Doc. 1909-4)("Lovato 302")(containing the out-of-court co-Defendant statements about which B. Garcia anticipates Lovato will testify); Appendix E at 2, filed March 9, 2018 (Doc. 1909-5)("Quintana 1023")(containing the out-of-court co-Defendant statements about which B. Garcia anticipates Quintana will testify); Appendix F at 3-4, 9-10, filed March 9, 2018 (Doc. 1909-6)("Clark Debriefs")(containing the out-of-court co-Defendant statements about which B. Garcia anticipates Clark will testify); Appendix G at 7, filed March 9, 2018 (Doc. 1909-7)("Romero 302")(containing the out-of-court co-Defendant statements about which B. Garcia anticipates Romero will testify); Appendix H at 5, filed March 9, 2018 (Doc. 1909-8)("T. Martinez 302")(containing the out-of-court co-Defendant statements about which B. Garcia anticipates T. Martinez will testify). B. Garcia also contends that Phillip Gonzales "has made statements about who was responsible for the 2001 murders, however, he indicated he never spoke to any of the suspects for that homicide as he was in[] segregation at the time of the murders." B. Garcia Response ¶ 12, at 5. <u>See</u> Appendix B at 6, filed March 9, 2018 (Doc. 1909-2)("P. Gonzales 302")(describing P. Gonzales' statements). B. Garcia elaborates that "[t]here is no indication where Gonzales obtained the information about who ordered the hit so there is no ability to properly attribute or authenticate or assess what might be several levels of hearsay." B. Garcia Response ¶ 12, at 5-6.

B. Garcia makes two additional requests. First, he asks for a limiting instruction vis-à-vis out-of-court statements that his non-testifying co-Defendants made if those statements are admitted over his objection. See B. Garcia Response ¶¶ 11, 13-19, at 5-9. Second, B. Garcia "requests that if the Court admits any of the above referenced statements over the objections of B. Garcia that the court allow a continuing objection so as not to require counsel to interpose an oral objection during trial that would interrupt the flow of the presentation." B. Garcia Response ¶ 21, at 9.

### 4. The General James Response.

B. Garcia observes that, in the James Proffer, "the government generally addressed coconspirator statements it intends to offer under Fed. R. Evid. 801(d)(2)(E)," but "[w]ith some exceptions the government did not address statements it intended to offer as statements against interest under Fed. R. Evid. 804(b)([3]) or as admissions by a party opponent under Fed. R. Evid. 801(d)(2)(A)." General James Response ¶ 1, at 1. B. Garcia indicates that both the Trial 2 Defendants and the United States "believe it would be helpful to the parties to seek clarification from the Court" regarding the Court's application of rules 801(d)(2)(A) and 804(b)(3) to the statements at issue in the second trial. General James Response ¶ 4, at 3. B. Garcia provides an example:

> [D]efendant Billy Garcia is objecting to the admission of that portion of a statement allegedly made by defendant Troup to witness James ("Daffy") Garcia in which Troup indicated he had committed the Garza murder and that Billy Garcia gave the order for the murder. Defendant Garcia's objections are numerous but one set of objections rely only on whether Troup's supposed knowledge is authenticated, properly attributed to Billy Garcia and whether the government can establish Troup had personal knowledge. This would require motions hearing testimony by James Garcia who is subpoenaed to testify. But if the Court and the government will be redacting Billy Garcia's statement from James Garcia's testimony then no motions hearing is necessary.

General <u>James</u> Response ¶ 4, at 3. Finally, B. Garcia asserts that the <u>James</u> Proffer's statements "are inadmissible under the due process and confrontation clauses of the fifth and sixth amendments to the United States constitution." General <u>James</u> Response ¶ 6, at 4.

5. **The 804(b)(3) MIL.**

In the 804(b)(3) MIL, the United States acknowledges that, in the <u>James</u> MOO, the Court concluded that incriminating "statements that Defendant Rudy Perez made to a fellow gang member were not admissible under Rule 804(b)(3)," because Perez made those statements in circumstances where a reasonable person might make those statements even if they were false. 804(b)(3) MIL at 1 (citing <u>James</u> MOO at 104, 287 F. Supp. 3d at 1256). The United States argues, however, that "[t]he Court should not apply that particularized conclusion that the circumstances around Defendant Perez's confession did not corroborate the statements' trustworthiness to the Defendants' statements against penal interest that the United States offers under Rule 804(b)(3) in this [trial] for two reasons." 803(b)(3) MIL at 1-2. First, the United States draws a factual distinction between Perez' statements and the Trial 2 Defendants' statements:

> Defendants cannot show that the circumstances that may have tended to make Defendant Perez's admissions untrustworthy -- rumors that surfaced after the original December 2015 Indictment was filed in this case that Defendant Perez cooperated with the United States -- are circumstances that inhere to any statements against penal interest that the United States intends to offer in this trial against the other Defendants.

804(b)(3) MIL at 2. The United States underscores that, for the statements it seeks to admit against the Trial 2 Defendants, there is "no evidence of rumored cooperation of the declarant and there's no lack of strength of independent evidence corroborating the conduct in question." 804(b)(3) MIL at 13. Second, the United States argues that the Court cannot apply a blanket rule

that "in-prison admissions are not against penal interest," and must instead "look at each statement individually and assess whether the factors that courts look to for the required corroboration apply to each of the offered statements in this trial." 803(b)(3) MIL at 2. Accordingly, the United States requests that the Court "conclude that statements that the United States seeks to admit against the Defendants are admissible under Rule 804(b)(3)." 803(b)(3) MIL at 2.

**6.** **The Gutierrez Response.**

Gutierrez incorporates the argument in the B. Garcia Response as it applies to her. See Gutierrez Response ¶ 1, at 1. Gutierrez also objects to specific James Proffer statements. See Gutierrez Response ¶¶ 2-12, at 1-2. Many of Gutierrez' objections are on the grounds of factual inaccuracy or of fallacy. See Gutierrez Response ¶¶ 2-4, 7-10, 12, at 1-2.

**7.** **The C. Chavez Response.**

C. Chavez objects to specific James Proffer statements. See C. Chavez Response ¶¶ 4-24, at 2-8. Otherwise, the C. Chavez Response largely echoes the B. Garcia Response. Compare C. Chavez Response ¶ 2, at 1 ("Christopher Chavez objects to the admission of all statements made by his alleged coconspirators on confrontation and due process grounds. Specifically, there is no reliability inherent in these out of court statements."); id. ¶ 3, at 1 ("Christopher Chavez objects to the admission of all statements regarding counts 1, 3-5 as they are irrelevant to the charges against him and are highly prejudicial as they create the strong probability of a negative spillover effect."); id. ¶ 25, at 8 ("Christopher Chavez objects to any statements, even if not listed above or in the government's James proffer alleged to have been made by any codefendant who is not testifying."); id. ¶ 26, at 8 ("The defense requests that if the Court admits any of the above references [sic] statements over the objection of Christopher Chavez that the

court allow a continuing objection so as not to require counsel to pose an oral objection during trial that would interrupt the flow of the presentation."), with B. Garcia Response ¶ 2, at 2 ("B. Garcia objects to the admission of all statements made by his alleged coconspirators on confrontation, due process and evidentiary grounds. There is no reliability inherent in these out of court statements."); id. ¶ 3, at 2 ("B. Garcia objects to the admission of all statements regarding counts 3-5 and 13-15 as they are irrelevant to the charges against him and are highly prejudicial as they create the strong probability of a negative spillover effect."); id. ¶ 20, at 9 ("B. Garcia objects to any statements, even if not listed above or in the government's *James* proffer, alleged to have been made by any codefendant who is not testifying and which either implicated B. Garcia or concerns the 2001 murders."); id. ¶ 21, at 9 ("The defense requests that if the Court admits any of the above referenced statements over the objections of B. Garcia that the court allow a continuing objection so as not to require counsel to interpose an oral objection during trial that would interrupt the flow of the presentation.").

8.    The A. Gallegos Response.

A. Gallegos identifies several James Proffer statements that he finds objectionable. See A. Gallegos Response ¶¶ 4-5, at 2-3. He "asserts there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. A. Gallegos also "joins and incorporate[s] fully the objections to Doc. 1903, previously filed by Billy Garcia and anticipated to be filed by Joe Gallegos." A. Gallegos Response ¶ 4, at 2. Otherwise the A. Gallegos Response largely echoes the B. Garcia Response. Compare A. Gallegos Response ¶¶ 2-3, 6-7, at 1-3, with B. Garcia Response ¶¶ 2-3, 20-21, at 2, 9.

9.      **The J. Gallegos Response.**

J. Gallegos argues that "[t]here are no statements [in the James Proffer] that provide a jurisdictional basis for the prosecution of Counts 4 and 5."[10]   J. Gallegos Response at 2. J. Gallegos objects to specific James Proffer statements.   See J. Gallegos Response ¶¶ 1-18, 20, at 3-7.   J. Gallegos adds that he "would object and request a limiting instruction for all statements that are attributed to the [Count 3 conspirators]," because he "is not alleged to have been involved in this act."   J. Gallegos Response ¶ 19, at 7.

10.      **The Troup Response.**

Troup identifies specific statements that he finds objectionable.   See Troup Response ¶¶ 4-18, at 2-4.   The Troup Response repeats the B. Garcia Response's objections to Samuel Gonzales', Fred Quintana's, and Ben Clark's anticipated testimony relating Troup's, DeLeon's, and J. Gallegos' out-of-court statements.   Compare Troup Response ¶¶ 19-21, at 5, with B. Garcia Response ¶¶ 13, 16-17, at 6-8.   The Troup Response also repeats the B. Garcia Response's general objections.   Compare Troup Response ¶¶ 2-3, 22-23, at 1-2, 6, with B. Garcia Response ¶¶ 2-3, 20-21, at 2, 9.

11.      **The Patterson Response.**

Patterson objects to the admissibility of specific James Proffer statements as against him. See Patterson Response ¶¶ 5-29, at 2-12.   Patterson identifies only one statement in the James Proffer which refers to him, and avers that, because the statement "identifies the declarant with a 50% accuracy at best," it is inadmissible.   See Patterson Response ¶ 4, at 2.   Otherwise, the

---

[10]The Court has already addressed J. Gallegos' jurisdictional arguments and concluded: (i) those arguments go to the sufficiency of the United States' evidence and not the Court's jurisdiction; and (ii) the Court cannot, without the United States' consent, make a pretrial determination regarding evidentiary sufficiency in a criminal case.   See Memorandum Opinion and Order at 3-6, 2018 WL 1388462, at *2-3, filed March 16, 2018 (Doc. 1950).

Patterson Response echoes the B. Garcia Response.  Compare Patterson Response ¶¶ 2-3, 30-31, at 1-2, 12, with B. Garcia Response ¶¶ 2-3, 20-21, at 2, 9.

12.    **The Hearing.**

The Court began its James hearing on March 12, 2018, by articulating its understanding of the James Notice and the James Proffer:

> So what I understand -- let's just review for a second -- in the first trial we had the Government provide a witness that -- Mr. Acee, I think, primarily, but I think it was also some other FBI agents that testified, and so they were subject to cross-examination; so that we could get through that and get to the preparation of the first trial, the Government agreed to the defendants' request to provide a list of James statements for Trial 2.  So they were treated differently.

> Now, my understanding was that that was to facilitate what we were doing today, so the defendants would have in hand all the James statements.  And then what we would be focusing on today would be maybe statements that defendants wanted me to look at more closely, that they felt did not fall within the co-conspirator exception to the hearsay rule.

> So, if the James hearing is proceeding differently than what I understand it to be, if we're going to do the same thing we did the first trial, y'all can let me know.

March 12 Tr. at 57:3-24 (Court).  The United States responded that "my understanding is that the table is now, in essence, supposed substitute for the testimony, so that we have the James statements in an easier to read and easier to understand format than what we did the first time by merely putting on testimony."  March 12 Tr. at 58:21-59:1 (Castellano).  The United States added that, "[i]f our agents were to testify, I think they would testify consistently with the statements in the table.  So we could do that, but I think that's what the table does, it substitutes for the testimony of those statements."  March 12 Tr. at 59:1-5 (Castellano).  The United States then described several exhibits:

> These exhibits are each of the plea agreements of various people who have pled guilty in this case.   And so in terms of establishing the existence of the

conspiracy, and tying various defendants to the conspiracy, what I've done is submitted -- or I'm proposing to submit, at this point, Government's Exhibit 11 through 18. And I'll give the Court the names of each of the exhibits:

> Government's Exhibit 11 is the plea agreement for Leonard Lujan.

> Exhibit 12 is the plea agreement for Benjamin Clark.

> Exhibit 13 is the plea agreement for Ruben Hernandez.

> Exhibit 14 is the plea agreement for Javier Alonso.

> Exhibit 15 is the plea agreement for Eugene Martinez.

> Exhibit 16 is the plea agreement for Paul Rivera.

> Exhibit 17 is the plea agreement for Brandy Rodriguez.

> And Exhibit 18 is the plea agreement for Santos Gonzalez.

> And I would move their admission at this time for purposes of the James hearing.

March 12 Tr. at 60:3-61:4 (Castellano). B. Garcia objected to the admission of those exhibits, because

> these are documents drafted, I believe, by the Government. They all appear to be the same typeset, same language, et cetera. So these are documents that the Government wrote up in a fashion. So I don't believe that satisfies the requirements under 801 to show the establishment of the conspiracy. I mean, it has to be something more than the Government's statements that there is a conspiracy; there has to be some evidence and foundation of that.

March 12 Tr. at 61:21-62:5 (Castle). The Court noted -- and B. Garcia conceded -- that "these are plea agreements that were signed, under oath, by the defendants that have been identified[.]"

March 12 Tr. at 62:7-9 (Court). See id. at 62:10 (Castle). B. Garcia asserted, however:

> They are signed under oath. But what they don't say is: This is a full and complete statement of the facts as they know it concerning the conspiracies. And so they're partial statements drafted by the Government for signature by the defendants, so they're not complete. But those are our objections.

March 12 Tr. at 63:15-21 (Castle). B. Garcia also specifically objected to the admittance of B. Rodriguez' and Gonzalez' plea agreements, because B. Rodriguez and Gonzalez will not testify at trial. See March 12 Tr. at 63:22-64:4 (Castle). Other Trial 2 Defendants joined in those objections. See March 12 Tr. at 64:8-10 (Benjamin); id. at 64:13-17 (Burke); id. at 65:9-11 (Solis). The Court overruled those objections and admitted the United States' exhibits, reasoning: "I'm simply determining that I think I can -- that's competent evidence I can consider for a James hearing, so I'll admit it into evidence." March 12 Tr. at 65:17-19 (Court). See id. at 65:13-17 (Court).

The Court later indicated that "it seems to me that if you take what's in the plea agreement, probably there is enough there to find a conspiracy. And I would group them around the different murders." March 12 Tr. at 80:11-15 (Court).

> So I would assume those are the conspiracies the Government is going to prove is the murder to kill Mr. Burns, the murder to kill Mr. Castillo, you know, that those would be the conspiracies. And then we need to be clear, that means I have to find who is a member of that conspiracy, and then we begin to focus then on the statements to make sure that the declarant was a member of that conspiracy, and that the statement was made during and [in] furtherance of the conspiracy.

March 12 Tr. at 80:15-24 (Court). The Court asked the United States, however, to "tell me how many conspiracies that you're going to try to establish in the case, who you allege [the] members to be." March 12 Tr. at 87:13-15 (Court). The United States agreed to do so:

> MR: CASTELLANO: Sure, Your Honor. Let's give it a shot.
>
> Let me start with the indictment, because as we go through any reports or anything else, there will be additional members of the conspiracy. For example, someone may have passed the paperwork. Starting with the indictment, just in terms of branding some of these conspiracies, so Count 1 involves the Castillo murder, and it's currently charged as Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia. And I'll go back and fill in the other blanks. But in terms of laying out the framework, I'll give the Judge the initial names.

So count 2.

. . . .

MR. CASTELLANO: Count 2 is the Garza murder.

. . . .

MR. CASTELLANO: For starters, we have Leonard Lujan.

. . . .

MR. CASTELLANO: Billy Garcia.

THE COURT: Okay.

MR CASTELLANO: Eugene Martinez, who has also pled guilty.

Allen Patterson.

THE COURT: Okay.

MR. CASTELLANO: And Christopher Chavez.

THE COURT: Okay.

MR. CASTELLANO: Count 3 is Freddie Sanchez.

THE COURT: Okay.

MR. CASTELLANO: Javier Alonso is the first person there, and he's pled guilty.

THE COURT: Okay.

MR. CASTELLANO: Next is Edward Troup.

THE COURT: All right.

MR. CASTELLANO: Arturo Garcia.

THE COURT: Okay.

MR. CASTELLANO: Benjamin Clark, who has pled guilty.

THE COURT: Okay.

MR. CASTELLANO: And Ruben Hernandez, who has also pled guilty.

THE COURT: All right.

MR. CASTELLANO: The next in Counts 4 and 5 [--] the conspiracy and murder of Adrian Burns.

THE COURT: So these are going to be the same?

MR. CASTELLANO: Yes. And those counts involve Joe and Andrew Gallegos.

. . . .

MR. CASTELLANO: [Count] 14 is conspiracy to murder Jose Gomez. And in that count is Joe Gallegos; Santos Gonzalez, who has pled guilty; Paul Rivera, who has pled guilty; Shauna Gutierrez; and Brandy Rodriguez, who has pled guilty.

THE COURT: Okay.

MR. CASTELLANO: And in count 15 is the attempted murder of Jose Gomez, which also includes [an] allegation of assault with a dangerous weapon resulting in serious bodily injury.

THE COURT: Has that got the same cast of characters as far as alleged conspiracy?

MR. CASTELLANO: That's correct.

THE COURT: All right.

MR. CASTELLANO: And the same applies to count 16, which is -- for shorthand, I'll just call it "witness tampering."

THE COURT: And this is related to Jose Gomez, the assault on him.

MR. CASTELLANO: Yes, sir, that's correct.

THE COURT: So it's the same conspiracy there?

MR. CASTELLANO: Yes. Counts 14, 15 and 16 can be grouped together.

March 12 Tr. at 87:20-93:10 (Court, Castellano). The United States continued by listing alleged

-- albeit unindicted -- members of those conspiracies:

THE COURT: All right. So now, going back, are there additional people

-- as far as the Fr[ank] Castillo [murder], are there additional co-conspirators that you may use to get statements in other than the people that are identified in the indictment?

MR. CASTELLANO: Yes, Your Honor. There should be additional people. And some of those are outlined in the table.

So let me start with the table. I'm looking at statement number 11.

THE COURT: So you've got a declarant, Angel Munoz?

MR. CASTELLANO: Yes.

THE COURT: And Angel Munoz, are you alleging that he is a co-conspirator?

MR. CASTELLANO: Yes. Leroy Lucero confirmed the message, and that's regarding the Castillo and Garza murders.

. . . .

MR. CASTELLANO: Statement number 13 on the table, Leonard Lujan met with Joe Gallegos, Angel DeLeon, and someone identified as Criminal.

. . . .

. . . . That person is Michael Jaramillo, Your Honor. Frederico Munoz should be identified as a co-conspirator in the Garza and Castillo murders. That's number 16 on the table.

THE COURT: Okay.

MR. CASTELLANO: Two more possible people are the Rascon brothers, Brian and Raymond. And this is for the Freddie Sanchez murder.

. . . .

. . . . I think for that count we can also add . . . Javier Alonso.

. . . .

. . . . Also related to the Freddie Sanchez murder in statement number 21 on the table, it's an unidentified person, so I put "first name unknown, last name unknown." That person sent word from green pod to the blue pod that if the murder wasn't carried out, other people in blue pod would be killed. So that's an unknown person who passed word from one pod to the next.

March 12 Tr. at 93:25-97:8 (Court, Castellano). The United States then indicated that Willie Amador and Jesse Ibarra were both members of the Castillo and Garza conspiracies. See March 12 Tr. at 98:10-25 (Castellano, Court). The United States also indicated that Kyle Dwyer, Jesse Trujillo, and Joe Martinez were members of the Sanchez conspiracy, see March 12 Tr. at 99:9-19 (Castellano)(identifying Dwyer); id. at 104:9-11 (Castellano)(identifying Trujillo); id. at 105:10-19 (Castellano, Court)(identifying Joe Martinez), and that Charlene Baldizan and Jason Van Veghel were members of the Burns conspiracy, see March 12 Tr. at 99:20-100:3 (Castellano). The United States then stated that it intends to offer out-of-court statements, under rule 801(d)(2)(E), that were made during and in furtherance of an uncharged conspiracy between B. Garcia and Baby Zack, B. Garcia's nephew, to kill Gerald Archuleta. See March 12 Tr. at 102:10-103:22 (Castellano, Court).

### 13. **The Trial 1 James Notice.**

In the Trial 1 James Notice, the United States "hereby gives notice that the United States may use the co-conspirator statements referenced in the attachment during Trial #2 in this case." Trial 1 James Notice at 1. The United States attaches pages 117 through 123 of the James MOO to the Trial 1 James Notice. See Attachment at 1-7, filed March 15, 2018 (Doc. 1944-1). These pages are the portion of the James MOO in which the Court provided a table of the statements, to which the Defendants did not object, and the Court's conclusions as to the statements that the United States presented during Trial 1's James hearing. James MOO at 117-23, 287 F. Supp. 3d at 1264-70.

### 14. **The B. Garcia Supplement.**

On March 31, 2018, B. Garcia supplemented his earlier motion in light of new disclosures in which "the government reveals two new witnesses who provide evidence from out

of court declarants that allegedly implicate Billy Garcia." B. Garcia Supplement ¶ 1, at 1. Those two additional witnesses are Joseph Otero and Josh Mirka. See B. Garcia Supplement ¶¶ 2-3, at 1-3.[11] B. Garcia objects to "an alleged statement made by an unidentified declarant to Joseph Otero in which he allegedly indicates that Billy Garcia ordered the hits." B. Garcia Supplement ¶ 2, at 1-2. B. Garcia also objects to "statements Christopher Chavez allegedly made to [Mirka] which implicate Billy Garcia." B. Garcia Supplement ¶ 3, at 2. B. Garcia requests "a pre-trial ruling regarding the statements' admissibility." B. Garcia Supplement ¶ 1, at 1.

### 15. **The B. Garcia Brief.**

B. Garcia asserts that, at the Court's pretrial hearings, "[w]itnesses Munoz, Clark, Lucero, Quintana, and Otero all testified that none of Billy Garcia's codefendants made any statements to them which implicated Billy Garcia." B. Garcia Brief ¶ 5, at 3. B. Garcia also asserts that "[n]o other evidence was introduced sufficient to make a finding that any alleged statement implicating Billy Garcia by any declarant to these [five] individuals" is admissible under rule 804(b)(3) of the Federal Rules of Evidence. B. Garcia Brief ¶ 5, at 3. It follows, according to B. Garcia, that any co-Defendant statements that those witnesses relate to the jury "must be accompanied by a limiting [in]struction preventing such evidence from being used

---

[11]Contrary to B. Garcia's assertion that the United States revealed two new witnesses in disclosures it made on March 30, 2018, see B. Garcia Supplement ¶ 1, at 1, the United States listed Joseph Otero on the first witness list it filed vis-à-vis Trial 2, see United States' Sealed Witness List Trial II at 4, filed January 22, 2018 (Doc. 1676), and the United States listed Josh Mirka on its supplemental witness list, see United States' Sealed Supplemental Witness List for Trial II at 2, filed March 23, 2018 (Doc. 1968). The documents that B. Garcia attaches to the B. Garcia Supplement -- which the Court assumes are the March 30, 2018, disclosures that the B. Garcia Supplement mentions, see B. Garcia Supplement ¶ 1, at 1 -- summarize interviews that the FBI conducted with Otero and Mirka on March 21, 2018, and March 22, 2018, respectively, and which were drafted on March 22, 2018, and March 23, 2018, respectively, see FBI 302 of Joseph Otero at 1 (dated March 22, 2018), filed March 31, 2018 (Doc. 2009-1); FBI 302 of Josh Mirka at 1 (dated March 23, 2018), filed March 31, 2018 (Doc. 2009-2).

against Billy Garcia as they would be admitted solely as statements by a party opponent and would be admissible solely against that party and not Billy Garcia." B. Garcia Brief ¶ 5, at 3.

B. Garcia admits that "Mikra did indicate that Christopher Chavez made a statement in which he stated that he didn't agree with some things Billy Garcia did when he ran 'the car.'" B. Garcia Brief ¶ 6, at 3. B Garcia argues, however, that C. Chavez' statement "is not self-inculpatory as to Christopher Chavez," so "it fails to meet the criteria for admission under" rule 804(b)(3). B. Garcia Brief ¶ 6, at 3-4. It follows, according to B. Garcia, that "any statement implicating Billy Garcia [that Mikra relates to the jury] must be stricken." B. Garcia Brief ¶ 6, at 4.

B. Garcia contends that, "[f]or witnesses Phillip Gonzales, Samuel Gonzales, Robert Lovato and Julian Romero, Billy Garcia proceeded through the introduction and admission of exhibits setting forth their statements," and that the United States did not introduce "any additional evidence regarding statements by codefendants to those four individuals" at the Court's pretrial hearings. B. Garcia Brief ¶ 7, at 4. B. Garcia also contends that "the Court should order that Phillip Gonzales be prevented from testifying to any statement by Christopher Chavez implicating Billy Garcia," because "[t]he government put on no evidence establishing either that Chavez implicated Billy Garcia or establishing a foundation under Fed R. Evid 804(b)(3)." B. Garcia Brief ¶ 8, at 4-5. Similarly, B. Garcia avers that "the Court should order that Samuel Gonzales be prevented from testifying to any statement by any codefendant implicating Billy Garcia," because "[t]he government put on no evidence establishing either that Chavez [or Troup] implicated Billy Garcia or establishing a foundation under Fed. R. Evid. 804(b)(3)." B. Garcia Brief ¶ 9, at 5. B. Garcia adds that the United States' failure to introduce evidence at the Court's pretrial hearing also indicates that Lovato and Romero should not be able

to testify to any co-Defendant statement that implicates B. Garcia.  See B. Garcia Brief ¶¶ 10-11, at 6-7.

### 16.    **The Response Brief.**

On April 7, 2018, the United States responded to the B. Garcia Brief.  See United States' Response in Opposition to Defendant Billy Garcia's Brief in Support of of [sic] Inapplicability of Fed. R. [sic] 803 [sic] (b) [sic] (3) [sic] (Doc. Nos. 1909 and 2009) [Doc. 2085] at 1, filed April 7, 2018 (Doc. 2086)("Response Brief").[12]  The United States argues that the evidence introduced at the Court's pretrial hearings indicates that the statements that the B. Garcia Response and the B. Garcia Supplement identify are "admissible under Rule 804(b)(3) as statements against penal interest," and that several circumstances corroborate those statements:

> (i) that SNM members almost always discuss SNM business, including their commissions of SNM crimes; (ii) they don't expect that their SNM brothers will tell law enforcement about these statements, but that they are always aware of the possibility that the SNM member may cooperate at some point and disclose these statements; and (iii) that these declarants -- Defendant Cristopher Chavez, Defendant Troup, Defendant Joe Gallegos, and Defendant Angel DeLeon --made statements consistent with each others' statements and consistent with a great amount of independent evidence.

Response Brief at 2.  The United States also argues that the B. Garcia Brief's assertions that "several witnesses testified that the Defendant-declarants' statements to them didn't include that Defendant B. Garcia ordered the murders" are non sequiturs, because those statements are admissible as statements against the declarant's penal interest under rule 804(b)(3) even if they do not implicate B. Garcia.  Response Brief at 6.  See id. at 6-7.  The United States adds that, "[b]ecause Rule 804(b)(3) is an exception to the rule against hearsay, that evidence comes in as

---

[12]All the bracketed material is originally in the United States' brief's title.  See Response Brief at 1.

any other non-hearsay evidence," so the jury can use statements that are admissible for their truth under rule 804(b)(3) against every Trial 2 Defendant, including B. Garcia, and limiting instructions are improper. Response Brief at 7. The United States also adds that it "does not seek to admit Defendant Chavez's statement to Mirka as a statement against penal interest" and that, "if the United States seeks to introduce this evidence at trial, this statement is admissible under Rule 803(3) as a statement of Defendant Chavez's then-existing state of mind." Response Brief at 9.

The United States avers that the B. Garcia Brief "suggests to the Court that the United States somehow waived these statements' admission into evidence" by failing to present evidence at the Court's pretrial hearings. Response Brief at 7 n.4. The United States argues that this suggestion is false. See Brief Response at 7 n.4. Instead, according to the United States, "the United States, as the evidence's proponent, bears the burden to establish its admissibility at trial" and not to establish its admissibility before trial begins. Response Brief at 7 n.4. The United States contends that, while the Court decided to conduct a pretrial hearing and "found this preview of the evidence helpful," whether a statement is admissible under rule 804(b)(3) is an issue that the Court will need to decide, ultimately, at trial. Response Brief at 7 n.4.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court bases these conclusions on the testimony it heard at its James hearing as well as the evidence it admitted at

that hearing. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Notwithstanding the Court's findings, all of the Defendants are presumed innocent. Accordingly, the Court makes the following findings[13]:

---

[13]The United States made several assertions at the Court's James hearing which the Court's findings of fact do not reflect. First, the United States asserted that a conspiracy to kill Adrian Burns existed, and that the conspiracy includes J. Gallegos, A. Gallegos, Baldizan, and Van Veghel. See March 12 Tr. at 91:15-20 (Court, Castellano); id. at 99:20-100:3 (Castellano). The evidence that the United States introduced at the James hearing indicates, at most, that Baldizan and Van Veghel agreed to conceal Burns' murder after the fact. See March 13 Tr. at 36:18-37:19 (Castellano, Stemo)(describing Baldizan's alleged involvement in hiding the Gallegos brothers from law enforcement and "agreeing to get rid of the van that the Gallegos brothers knew the police were looking for"); id. at 37:2-38:25 (Castellano, Stemo)(describing how Van Veghel allegedly assisted the Gallegos brothers by destroying evidence). Thus, the James hearing evidence indicates that Baldizan and Van Veghel might have joined a conspiracy to conceal the Burns murder, but it does not indicate that they joined a conspiracy to commit the Burns murder. Second, the United States presents no evidence indicating that J. Gallegos and A. Gallegos agreed to kill Burns as opposed to J. Gallegos killing Burns, and then enlisting his brother afterwards to help conceal the murder. Thus, the Court cannot find by a preponderance of the evidence at this time that a conspiracy to murder Burns existed. Third, the United States indicated, on March 13, 2018, that it intends to offer Statement 70 as a statement made during and in furtherance of an uncharged conspiracy to harm B. Rodriguez premised on an erroneous belief that she was cooperating with law enforcement. See March 13 Tr. at 55:9-14 (Castellano); id. at 55:19-56:16 (Court, Castellano). The only indication that such a conspiracy existed, however, is Statement 70 itself. For the purpose of rule 801(d)(2)(E), a statement "does not by itself establish . . . the conspiracy or participation in it." Fed. R. Evid. 801(d)(2). Accordingly, the Court does not find that a conspiracy to harm B. Rodriguez existed.

1.     A conspiracy to kill Frank Castillo existed.  <u>See</u> Leonard Lujan Plea Agreement ¶ 7, at 4-5, filed March 13, 2017 (Doc. 963)(<u>James</u> Hearing Exhibit 11)("Lujan Plea Agreement").[14]

2.     The Castillo conspiracy includes five indicted conspirators: (i) DeLeon, (ii) J. Gallegos; (iii) Troup; (iv) Lujan; and (v) B. Garcia.  <u>See</u> Lujan Plea Agreement ¶ 7, at 4-5.

3.     The Castillo conspiracy includes eight unindicted conspirators: (i) Angel Munoz, <u>see</u> March 13 Tr. at 16:22-17:3 (Castellano, Stemo); (ii) Leroy Lucero <u>see</u> March 13 Tr. at 16:16-24 (Castellano, Stemo); (iii) Michael Jaramillo, <u>see</u> March 13 Tr. at 18:22-19:4 (Castellano, Stemo); <u>id.</u> at 20:2-9 (Castellano, Stemo); (iv) Federico Munoz, <u>see</u> March 13 Tr. at 21:10-22 (Castellano, Stemo); (v) Amador, <u>see</u> March 13 Tr. at 28:16-24 (Castellano, Stemo); and (vi) Ibarra, <u>see</u> March 13 Tr. at 28:16-24 (Castellano, Stemo).

4.     The Castillo conspiracy continued until Castillo's death on March 26, 2001.  <u>See</u> Lujan Plea Agreement ¶ 7, at 4-5.

---

[14]The Court accepted into evidence a letter by Assistant United States Attorney Jack Burkhead stating that Lujan would be incredible in the eyes of a rational factfinder.  <u>See</u> March 16 Tr. at 182:3-4 (Castle)(providing that Exhibit R has been admitted); <u>id.</u> at 185:11-20 (reading from Exhibit R, Burkhead's letter, stating that "Mr. Lujan's credibility is in serious doubt").  The Court expressed its concern regarding "whether I can find by a preponderance of the evidence, just based on [Lujan], without any corroborating evidence at all," that a conspiracy to kill Castillo existed.  March 16 Tr. at 271:21-23 (Court).  Other evidence that the Court can consider when deciding whether a conspiracy to kill Castillo existed, however, corroborates the Lujan Plea Agreement.  <u>See</u>, <u>e.g.</u>, Samuel Gonzales 302 at 5 ("Francisco CASTILLO was killed in 2001 because he 'messed up' with Billy GARCIA."); Quintana 1023 ("2001 Murder of Frank Castillo and Rolando Garcia at the Southern New Mexico Correctional Facility in Las Cruces were called by BILLY GARCIA ('Wild Bill').  Several members participated in the double homicide and EDWARD TROUP and CHRIS[T]OPHER CHAVEZ admitted to the murders during conversations with the CHS.").  That corroborating evidence assuages the concern regarding Lujan's credibility that the Court expressed on March 16, 2018, and thus, on this point, finds him credible.

5.      A conspiracy to kill Rolando Garza existed.  <u>See</u> Eugene Martinez Plea Agreement ¶ 9, at 3-4, filed May 5, 2017 (Doc. 1138)(<u>James</u> Hearing Exhibit 15)("E. Martinez Plea Agreement"); Lujan Plea Agreement ¶ 7, at 4-5.

6.      The Garza conspiracy includes five indicted conspirators: (i) Lujan; (ii) B. Garcia; (iii) E. Martinez; (iv) Patterson; and (v) C. Chavez.  <u>See</u> E. Martinez Plea Agreement ¶ 9, at 3-4; Lujan Plea Agreement ¶ 7, at 4-5.

7.      The Garza conspiracy includes six unindicted conspirators: (i) A. Munoz, <u>see</u> March 13 Tr. at 16:22-17:3 (Castellano, Stemo); (ii) Lucero, <u>see</u> March 13 Tr. at 16:16-24 (Castellano, Stemo); (iii) F. Munoz, <u>see</u> March 13 Tr. at 21:10-22 (Castellano, Stemo); (iv) Amador, <u>see</u> March 13 Tr. at 28:16-24 (Castellano, Stemo); <u>id.</u> at 29:23-30:11 (Castellano, Stemo); (v) Ibarra, <u>see</u> March 13 Tr. at 28:16-24 (Castellano, Stemo); and (vi) Jimmy Gordon, <u>see</u> March 13 Tr. at 52:18-59:10 (Castellano, Stemo).[15]

8.      The Garza conspiracy continued until Garza's death on March 26, 2001.  <u>See</u> E. Martinez Plea Agreement ¶ 9, at 3-4; Lujan Plea Agreement ¶ 7, at 4-5.

9.      A conspiracy to kill Freddie Sanchez existed.  <u>See</u> Javier Alonso Plea Agreement ¶ 7, at 4-5, filed August 28, 2017 (Doc. 1237)(<u>James</u> Hearing Exhibit 14)("Alonso Plea Agreement"); Ruben Hernandez Plea Agreement ¶ 7, at 4, filed February 1, 2017 (Doc. 880)(<u>James</u> Hearing Exhibit 13)("Hernandez Plea Agreement"); Benjamin Clark Plea

---

[15]The United States identified Geraldine Martinez as a member of the conspiracy to murder Garza.  <u>See</u> March 12 Tr. at 102:2 (Castellano).  The United States presented evidence about her only in connection with Statement 67, indicating that Jimmy Gordon was asked to obtain information about Garza from G. Martinez.  <u>See</u> March 13 Tr. at 52:18-53:10 (Castellano, Stemo).  No evidence indicates that G. Martinez agreed to kill Garza, so the Court cannot soundly conclude that G. Martinez was a member of a conspiracy to kill Garza.

Agreement ¶ 7, at 4, filed November 15, 2016 (Doc. 768)(James Hearing Exhibit 12)("Clark Plea Agreement").

10.     The Sanchez conspiracy includes five indicted conspirators: (i) Alonso; (ii) Troup; (iii) A.A. Garcia; (iv) Hernandez; and (v) Clark.  See Alonso Plea Agreement ¶ 7, at 4-5; Hernandez Plea Agreement ¶ 7, at 4; Clark Plea Agreement ¶ 7, at 4.

11.     The Sanchez conspiracy includes four unindicted conspirators: (i) FNU/LNU, see March 13 Tr. at 23:22-24:7 (Castellano, Stemo);[16] (ii) Dwyer, see March 13 Tr. at 33:22-34:6 (Castellano, Stemo); (iii) Trujillo, see March 13 Tr. at 58:6-59:8 (Castellano, Stemo); and (iv) Ernest Guerrero, see March 13 Tr. at 24:1-11 (Castellano, Stemo).[17]

_____

[16]FNU/LNU stands for First Name Unknown/Last Name Unknown.  See March 12 Tr. at 97:1-8 (Castellano).

[17]The United States identified Brian Rascon and Raymond Rascon as Sanchez conspiracy members, but the testimony at the Court's James hearing indicates that the Rascon brothers refused to kill Sanchez.  See March 13 Tr. at 25:15-24 (Stemo).

> The Rascon brothers were tasked to do the hit [on Sanchez] originally. But when Javier Alonso approached them, Raymond Rascon said they didn't want to do it because they were short to the door, meaning they were going to get out of prison shortly.  Therefore, Javier Alonso instructed Edward Troup and they both went into Freddie Sanchez' cell and took care of business.  When they were doing that, the Rascon brothers came to offer their aid as a way to save face with the gang.

March 13 Tr. at 25:15-24 (Stemo).  That the Rascon brothers refused to kill Sanchez indicates that they did not agree to kill Sanchez, i.e., that they were not members of the Sanchez conspiracy.  That they subsequently offered their assistance "while Edward Troup and Javier Alonso were finishing killing Mr. Sanchez" indicates, at most, that the Rascon brothers joined a conspiracy to conceal the Sanchez murder and not a conspiracy to commit the Sanchez murder. March 13 Tr. at 25:9-11 (Castellano).  The record before the Court does not elaborate on what sort of aid the Rascon brothers were offering -- be it to finish killing Sanchez, to act as lookouts, or to clean up the murder scene.  Consequently, the Court concludes that the Rascon brothers were not members of the Sanchez conspiracy.

The United States also identified Joe Martinez as a member of the Sanchez conspiracy. See March 12 Tr. at 105:10-16 (Castellano, Court).  The United States introduced little evidence,

12.     The Sanchez conspiracy continued until Sanchez' death on June 17, 2007.  See Alonso Plea Agreement ¶ 7, at 4-5; Hernandez Plea Agreement ¶ 7, at 4; Clark Plea Agreement ¶ 7, at 4.

13.     A conspiracy to murder Jose Gomez and to prevent him from testifying existed. See Santos Gonzalez Plea Agreement ¶ 10, at 4-5, filed June 5, 2017 (Doc. 1180)(James Hearing Exhibit 18)("Gonzalez Plea Agreement"); Brandy Rodriguez Plea Agreement ¶ 13, at 5-6, filed February 23, 2018 (Doc. 1830)(James Hearing Exhibit 17)("B. Rodriguez Plea Agreement"); Paul Rivera Plea Agreement ¶ 8, at 4-5, filed February 1, 2017 (Doc. 877)(James Hearing Exhibit 16)("Rivera Plea Agreement").

14.     The Gomez conspiracy includes five people, all indicted conspirators: (i) Rivera; (ii) J. Gallegos;  (iii) Gonzalez;  (iv) Gutierrez;  and  (v) B. Rodriguez.     See Gonzalez Plea Agreement ¶ 10, at 4-5; B. Rodriguez Plea Agreement ¶ 13, at 4-5; Rivera Plea Agreement ¶ 8, at 4-5.

15.     The Gomez murder conspiracy began on or about February 1, 2016, and continued until on or about February 27, 2016.  See Gonzalez Plea Agreement ¶ 10, at 4-5; B. Rodriguez Plea Agreement ¶ 13, at 4-5; Rivera Plea Agreement ¶ 8, at 4-5.

16.     An uncharged conspiracy to kill Gerald Archuleta existed.  See March 13 Tr. at 53:11-22 (Castellano, Stemo).

---

however, indicating that he was a member of the Sanchez conspiracy.  All Stemo said was that "[t]here was" an "indication from the reports that Joe Martinez, also known as Cheech, helped to deliver the paperwork."  March 13 Tr. at 50:11-14 (Castellano, Stemo).  This is not enough for the Court to determine that J. Martinez was a member of the Sanchez conspiracy by a preponderance of the evidence.

17.    The conspiracy to kill Archuleta included B. Garcia and Reynaldo Garcia, a.k.a. Baby Zac.  See March 13 Tr. at 53:19-25 (Castellano, Stemo).

## LAW REGARDING COCONSPIRATOR STATEMENTS

The Federal Rules of Evidence define hearsay as "a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay evidence usually is not admissible.  See Fed. R. Evid. 802.  Some out-of-court statements, however, are not hearsay even when they are offered for proof of the matter asserted.  See Fed. R. Evid. 801(d).  Statements that are "offered against an opposing party" and were "made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay.  Fed. R. Evid. 801(d)(2)(E).

To admit coconspirators' out-of-court statements under rule 801(d)(2)(E), "the United States must demonstrate by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii) the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy." United States v. Vigil, No. CR 05-2051 JB, 2006 WL 4109681, at *3 (D.N.M. Aug. 31, 2006)(Browning, J.)(citing United States v. Sinclair, 109 F.3d 1527, 1533 (10th Cir. 1997)).  The court may consider the statements themselves, as well as independent evidence, to determine whether the conspiracy existed.  See United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996)("In making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with independent evidence tending to establish the conspiracy.").  While the statement itself "does not by itself establish . . . the existence of the conspiracy or participation in it," Fed. R. Evid. 801(d)(2),

"there need only be some independent evidence linking the defendant to the conspiracy," United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotation marks omitted)(quoting United States v. Martinez, 825 F.2d 1451, 1453 (10th Cir. 1987)).  This "independent evidence may be sufficient even when it is not 'substantial.'"  United States v. Lopez-Gutierrez, 83 F.3d at 1242 (quoting United States v. Rascon, 8 F.3d 1537, 1541 (10th Cir. 1993)).  The United States Court of Appeals for the Tenth Circuit has noted: "We have defined 'independent evidence' as 'evidence other than the proffered [coconspirator] statements themselves.'"  United States v. Lopez-Gutierrez, 83 F.3d at 1242 (alteration in United States v. Lopez-Gutierrez)(quoting United States v. Martinez, 825 F.2d at 1451).

"[I]t is not necessary for the United States to show that proffered statements were made during the time in which [the defendant] was a member of a conspiracy." United States v. Vigil, 2006 WL 4109681, at *5 (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948)("With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.")). Moreover, a newcomer to a conspiracy assumes the risk for what has already happened in the course of the conspiracy.  See United States v. Brown, 943 F.2d 1246, 1255 (10th Cir. 1991)("The fact that appellant may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible."); United States v. Adamo, 882 F.2d 1218, 1230-31 (7th Cir. 1989)(holding that one who joins and participates in a conspiracy "adopt[s] the previous acts *and declarations* of his fellow co-conspirators" (internal quotation marks omitted)(quoting United States v. Coe, 718 F.2d 830, 839 (7th Cir. 1983))).  Once the conspiracy has ended, however, any statements made afterward are not admissible under this

exception as they are not made in furtherance of the conspiracy.  See James MOO at 99, 287 F. Supp. 3d at 1253 (citing Lutwak v. United States, 344 U.S. 604, 617-18 (1953)).

In determining the admissibility of coconspirator statements, "[t]he strongly preferred order of proof" is for the district court to hold a James hearing "outside the presence of the jury to determine by a preponderance of the evidence the existence of a predicate conspiracy." United States v. Urena, 27 F.3d 1487, 1491 (10th Cir. 1994).  A defendant does not possess a right to a pretrial hearing on admissibility of coconspirators statements; however, "a district court can only admit coconspirator statements if it holds a *James* hearing or conditions admission on forthcoming proof of a 'predicate conspiracy through trial testimony or other evidence.'"  United States v. Townley, 472 F.3d 1267, 1273 (10th Cir. 2007)(quoting United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995)).  See James MOO at 16-17, 287 F. Supp. 3d at 1201-02 (allowing a James hearing and providing guidance on its structure).  The Tenth Circuit affords trial courts this flexibility, because it recognizes that it is not always practical for the United States to demonstrate that a conspiracy existed before admitting specific evidence at trial.  See United States v. Peterson, 611 F.2d 1313, 1330 (10th Cir. 1979)(noting that the admissibility determination contemplates presentation of requisite conspiracy evidence before or during the United States' case in chief).

In United States v. Vigil, the Court did not hold a James hearing, because the defendant, Robert Vigil, had already been tried once, ending in a hung jury, and the Court concluded that "the evidence that" the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, "admitted at the first trial satisfies the preponderance standard on the basis of the transcripts of the first trial's testimony."  2006 WL 4109681, at *4.  Vigil was charged, among other charges, with being a member of a conspiracy to commit Racketeering

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, violations, and the United States moved the Court to permit it to elicit non-hearsay coconspirator statements in Vigil's retrial. See 2006 WL 4109681, at *1. The Court noted that it had previously found, in deciding Vigil's rule 29 motion for acquittal, that "a reasonable jury could have found that Vigil agreed with at least one other person to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity, or knowingly and voluntarily participated in the conspiracy." 2006 WL 4109681, at *4 (internal quotation marks omitted)(quoting United States v. Vigil, No. CR 05-2051 JB, 2006 WL 4109683, at *16 (D.N.M. Aug. 7, 2006)(Browning, J.)).

In support of its determination that the United States had met its burden to prove that Vigil participated in the existent conspiracy, the Court pointed to testimony asserting that Angelo Garcia, an alleged coconspirator, "told Vigil that he would set up the same arrangement with Vigil as with Montoya, Vigil learned about the prior arrangement with Montoya through Garcia, Vigil indicated that he intended to continue the fee-sharing arrangement that Montoya had set up, and Vigil threatened to withhold the SLOM contract from Everage." 2006 WL 4109681, at *4 (internal quotation marks omitted)(quoting United States v. Vigil, 2006 WL 4109683, at *16). The Court reasoned that "[p]roof of the existence of a conspiracy is often based on circumstantial evidence, and this testimony is sufficient to establish Vigil's participation in a conspiracy by a preponderance of the evidence." 2006 WL 4109681, at *5. The Court thus concluded that it would "permit the United States to elicit from its witnesses at trial co-conspirator statements made in furtherance of the conspiracy charged." 2006 WL 4109681, at *6.

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802).

Under rule 801(c) of the Federal Rules of Evidence: "'Hearsay' means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

1. **Rule 801(d)(2).**

A statement is not hearsay, even if it is offered for its truth, if it is offered against an opposing party and it:

    **(A)** was made by the party in an individual or representative capacity;

    **(B)** is one the party manifested that it adopted or believed to be true;

    **(C)** was made by a person whom the party authorized to make a statement on the subject;

    **(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).  The Tenth Circuit has stated:

> "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.  No guarantee of trustworthiness is required in the case of an admission.  The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility."

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 667 (10th Cir. 2006)(emphasis omitted)(quoting United States v. Pinalto, 771 F.2d 457, 459 (10th Cir. 1985)).[18]

### 2.    Rule 803(1).

Rule 803(1) provides an exception to the rule against hearsay for "[a] statement describing an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1).  "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially

---

[18]The 2011 restyling of the Federal Rules removed "admissions" from the language of rule 801(d) of the Federal Rules of Evidence, and uses instead the term "statements."  Fed. R. Evid. 801(d).  This replacement was purposeful: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense -- a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made."  Fed. R. Evid. 801 advisory committee's note to 2011 amendments.

Although the advisory committee made the commentary quoted in the text regarding the trustworthiness of "admissions by a party-opponent" before the 2011 amendments to the Federal Rules of Evidence, the analysis should not be different under the new 2011 restyling of the rules.  Because the advisory committee's purpose for the 2011 restyling was to make the rules "more easily understood and to make style and terminology consistent through the rules," and there was no "intent to change any result in any ruling on evidence admissibility," the analysis applied before 2011 remains useful for cases after the restyling.  Fed. R. Evid. 801 advisory committee's note to 2011 amendments.

contemporaneous' with the event in question." United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994)(Korman, J.). "The present sense impression exception applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures." Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004). "The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication." United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995)(internal quotation marks omitted)(quoting United States v. Parker, 936 F.2d 950, 954 (7th Cir. 1991)), cert. granted, vacated on other grounds, 516 U.S. 1168 (1996). "The admissibility of spontaneous utterances -- one ground relied on by the state trial court -- was recognized by the Supreme Court [of the United States] over a century ago in *Insurance Co. v. Mosley*, 75 U.S. (8 Wall.) 397, 406-07 . . . (1869) . . . ." Martinez v. Sullivan, 881 F.2d 921, 928 (10th Cir. 1989).

### 3. **Rule 803(2).**

Rule 803(2), commonly referred to as the excited-utterance exception, provides an exception to the exclusion of hearsay statements for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The United States Court of Appeals for the District of Columbia Circuit has noted that "[t]he rationale underlying the 'excited utterance' exception is that 'excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable.'" United States v. Alexander, 331 F.3d 116, 122 (D.D.C. 2003)(quoting United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001)). "Thus, to qualify as an excited utterance, 'the declarant's state of mind at the time that the statement was made [must] preclude[] conscious reflection on the subject of the

statement.'"  United States v. Alexander, 331 F.3d at 122 (alterations in United States v. Alexander)(quoting United States v. Joy, 192 F.3d 761, 766 (7th Cir. 1999)).  The Tenth Circuit, in United States v. Smith, 606 F.3d 1270 (10th Cir. 2010)(Tymkovich, J.), set forth a district court's required analysis for whether a statement is admissible under the excited-utterance exception:

> The so-called "excited-utterance exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event."  "[T]here is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance."  Admissibility hinges on a statement's contemporaneousness with the excitement a startling event causes, not the event itself.

606 F.3d at 1279 (alteration in United States v. Smith)(internal citations omitted)(first quoting United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009); and then quoting United States v. Ledford, 443 F.3d 702, 711 (10th Cir. 2005), abrogated on other grounds by Henderson v. United States, 135 S. Ct. 180 (2015)).  There is no hard time limit that must be met under Rule 803; what is relevant is whether the declarant is still under the excitement of the startling event.  See United States v. Smith, 606 F.3d at 1279; United States v. Ledford, 443 F.3d at 711.  The Tenth Circuit has noted:

> Courts consider a range of factors in determining whether a declarant made a statement while under the stress of a particular event.  Among the more relevant factors are: the amount of time between the event and the statement; the nature of the event; the subject matter of the statement; the age and condition of the declarant; the presence or absence of self-interest; and whether the statement was volunteered or in response to questioning.

United States v. Pursley, 577 F.3d at 1220.  "Permissible subject matter of the statement is [not] limited . . . to description or explanation of the event or condition . . . .  [T]he statement need only relate to the startling event or condition, thus affording a broader scope of subject matter

coverage." United States v. Frost, 684 F.3d 963, 973 (10th Cir. 2012)(Tymkovich, J.)(first

alteration in United States v. Frost)(internal quotation marks omitted)(quoting Fed. R. Evid. 803

advisory committee's notes to 1972 proposed rules), overruled on other grounds by United States

v. Bustamonte-Conchas, 850 F.3d 1130 (10th Cir. 2017). "If the trial court has access to a

recording of the declarant's statement, it may also consider the declarant's 'tone and tenor of

voice' in determining whether the declarant made that statement while under the stress of

excitement." United States v. Alexander, 331 F.3d 116, 123 (D.C. Cir. 2003)(quoting United

States v. Woodfolk, 656 A.2d 1145, 1151 n.16 (D.C. 1995)(collecting cases)).

The United States Court of Appeals for the Second Circuit has provided an analysis of

the similarities and subtle differences between the present-sense-impression and excited-

utterance exceptions to the rule against hearsay:

> As defined by the Federal Rules of Evidence, a present sense impression is a
> statement "describing or explaining an event or condition made while the
> declarant was perceiving the event or condition, or immediately thereafter." Rule
> 803(1), Fed. R. Evid. Such statements are considered to be trustworthy because
> the contemporaneity of the event and its description limits the possibility for
> intentional deception or failure of memory. *See United States v. Brewer*, 36 F.3d
> 266, 272 (2d Cir. 1994).
>
> The hearsay exception for excited utterances is premised on a similar,
> though distinct, assumption that the reliability of a statement increases as
> opportunity for reflection by the declarant decreases. An "excited utterance" is
> "[a] statement relating to a startling event or condition made while the declarant
> was under the stress of excitement caused by the event or condition." Rule
> 803(2), Fed. R. Evid. As we have explained, "[t]he rationale for this hearsay
> exception is that the excitement of the event limits the declarant's capacity to
> fabricate a statement and thereby offers some guarantee of its reliability." [United
> States v. ]*Tocco*, 135 F.3d [116,] 127 [(2d Cir. 1998)]. Unlike present sense
> impressions, "[a]n excited utterance need not be contemporaneous with the
> startling event to be admissible." *Id.* Rather "[t]he length of time between the
> event and the utterance is only one factor to be taken into account in determining
> whether the declarant was, within the meaning of rule 803(2), 'under the stress of
> excitement caused by the event or condition.'" *United States v. Scarpa*, 913 F.2d
> 993, 1017 (2d Cir. 1990).

. . . .

> Thus while the hearsay exception for present sense impressions focuses on *contemporaneity* as the guarantor of reliability, and requires that the hearsay statement "describe or explain" the contemporaneous event or condition, Rule 803(1), Fed. R. Evid., the excited utterance exception is based on the *psychological impact* of the event itself, and permits admission of a broader range of hearsay statements -- *i.e.* those that "relate to" the event. Rule 803(2), Fed. R. Evid.

United States v. Jones, 299 F.3d 103, 112 & n.3 (2d Cir. 2002)(emphasis and first, second, sixth, and seventh alterations in United States v. Jones).

Many courts across the country have found it proper to admit a 911 caller's statements as a present-sense impression and/or an excited utterance. See, e.g., United States v. Thomas, 453 F.3d 838, 841 (7th Cir. 2006)(holding that admission of a three minute and fifty-three second 911 call, in which the caller said that a man holding a handgun had shot someone outside her apartment and was still there, and in which the "emergency operator . . . asked a series of questions about the facts of the situation and the caller narrated what she was seeing as it happened," was proper as either a present-sense impression or excited utterance); United States v. Hawkins, 59 F.3d at 730 (holding that the tape of the 911 emergency telephone call from the defendant's wife reporting that the defendant displayed gun to his wife during a domestic dispute was proper as a present-sense impression, because of its "sufficient contemporaneity to the underlying events" and because of its reliability, as evidenced by the wife's detailed description of the gun); United States v. Mejia-Valez, 855 F. Supp. at 613-15 (concluding that admission of two callers' 911 call tape recordings as excited utterances and present-sense impressions was proper, because the two callers were at the scene of the underlying shooting, they placed the calls moments after the shooting, and both men described the shooting's circumstances, including giving the location and the shooter's description).

4. **Rule 803(3).**

Rule 803(3) excepts from the general bar on hearsay "[a] statement of the declarant's then-existing state of mind . . . or emotional, sensory, or physical condition." Fed. R. Evid. 803(3). Rule 803(3) permits the introduction of "hearsay . . . , regardless of whether the declarant is available as a witness," for a statement of the declarant's "then-existing mental, emotional, or physical condition," Fed. R. Evid. 803(3) (title case and bolding omitted):

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed. R. Evid. 803(3).

For the statement to qualify under the exception, it "must relate to the declarant's state of mind during" the incident in question. United States v. Netschi, 511 F. App'x 58, 61 (2d Cir. 2013)(emphasis omitted)("To admit statements of one's state of mind with regard to conduct that occurred . . . earlier as in this case would significantly erode the intended breadth of this hearsay exception." (internal quotation marks omitted)(quoting United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991))). This requirement is not to say that the statement must be said at the very moment of the incident, but for intent to be proved, it must be "contemporaneous" to the act. Mutual Life Ins. of N.Y. v. Hillmon, 145 U.S. 285, 295 (1892). To be contemporaneous and therefore admissible under the present state of mind exception, a statement must be "part of a continuous mental process." United States v. Cardascia, 951 F.2d at 488. In addition to the requirements that the statement be contemporaneous to the incident at hand and relevant to the issues of the case, it must also be established that there was no opportunity for the declarant to "fabricate or to misrepresent his thoughts." United States v. Jackson, 780 F.2d 1305, 1315 (7th

Cir. 1986)(internal quotation marks omitted)(quoting United States v. Layton, 549 F. Supp. 903, 909 (N.D. Cal. 1982)(Peckham, C.J.)). The statements of intent must reveal information or details about the future, which has been contrasted with statements of memory, or looking back to the past. See Shepard v. United States, 290 U.S. 96, 104 (1933). When statements entail issues of looking into the past combined with other concerns, it can often be too confusing for a jury to extract, upsetting the balance of advantage, and ultimately making the evidence inadmissible. See Shepard v. United States, 290 U.S. at 104. "The most obvious risk of prejudice is that the jury will consider the hearsay statement not as proof of state of mind and the subsequent conduct of the declarant, but rather for the truth of the facts that are related in the statement." 4 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 803.02[4][b], at 803-33 (11th ed. 2017).

### 5. Rule 804(b)(3).

Under rule 804(b)(3) of the Federal Rules of Evidence, an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest." United States v. Lozado, 776 F.3d 1119, 1125 (10th Cir. 2015)(citing Fed. R. Evid. 804(b)(3)(A)). A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true." Fed. R. Evid. 804(b)(3)(A). Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(B).

Rule 804(b)(3) embodies "the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." United States v. Smalls, 605 F.3d 765, 780-81 (10th Cir.

2010)(internal quotation marks omitted)(quoting <u>Williamson v. United States</u>, 512 U.S. 594, 599 (1994)).  The Tenth Circuit has said: "We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend."  <u>United States v. Smalls</u>, 605 F.3d at 783.  That sort of statement is admissible, however, only to the extent that it inculpates the declarant, because "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability."  <u>Williamson v. United States</u>, 512 U.S. at 600.

## LAW REGARDING CONSPIRACY

The Tenth Circuit has outlined what the government must prove to establish the existence of a conspiracy:

> To prove conspiracy, the government must show: (1) that two or more people agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent. [<u>United States v. Evans</u>, 970 F.2d 663, 668 (10th Cir. 1992).]  . . .  "[A] single conspiracy does not exist solely because many individuals deal with a common central player."  <i>Id.</i> at 670.  "What is required is a <i>shared</i>, single criminal objective, not just similar or parallel objectives between similarly situated people."  <i>Id.</i>  On the other hand, "[a] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy."  <i>United States v. Mendoza-Salgado</i>, 964 F.2d 993, 1005 (10th Cir. 1992)(quotation omitted).  The government need only prove by direct or circumstantial evidence "that the defendant knew at least the essential objectives of the conspiracy and the defendant knowingly and voluntarily became part of it."  <i>Id.</i> (quotation omitted).

<u>United States v. Small</u>, 423 F.3d 1164, 1182-83 (10th Cir. 2005)(third alteration in <u>United States v. Small</u>, emphasis in <u>United States v. Evans</u>).  <u>See</u> <u>United States v. Leal</u>, 330 F. Supp. 3d 1257, 1278-78 (D.N.M. 2018)(Browning, J.)(determining whether the indictment charges a new,

separate conspiracy which does not violate Double Jeopardy).  Conspiracy is not a collection of various separate and distinct events, but rather is "the prototypical continuing offense."  United States v. Acosta-Gallardo, 656 F.3d 1109, 1122 (10th Cir. 2011)(internal quotation marks omitted)(quoting United States v. Jaynes, 75 F.3d 1493, 1505 (10th Cir. 1996)).  "A conspirator . . . is only liable for the acts of co-conspirators until the conspiracy accomplished its goals or that conspirator withdraws."  United States v. Thornburgh, 645 F.3d 1197, 1204 (10th Cir. 2011)(internal quotation marks omitted)(quoting United States v. Cherry, 217 F.3d 811, 817 (10th Cir. 2000)).

## LAW REGARDING THE CONFRONTATION CLAUSE

The Confrontation Clause states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that, under the Confrontation Clause, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  541 U.S. at 59.  In Davis v. Washington, 547 U.S. 813 (2006), the Supreme Court elaborated regarding which statements made during police interrogation are testimonial:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.  The Tenth Circuit defines a testimonial statement, without reference to police interrogation, as "a 'formal declaration made by the declarant that, when objectively considered,

indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'"  United States v. Morgan, 748 F.3d 1024, 1048 (10th Cir. 2014)(alteration in United States v. Morgan)(quoting United States v. Smalls, 605 F.3d at 777-78).  Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial statement).  The Confrontation Clause is not violated where, "considering all the relevant circumstances," the "statements clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution."  Ohio v. Clark, 135 S. Ct. 2173, 2181 (2015).

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court addressed whether the admission of a sworn affidavit by a forensic chemist, who testified in the affidavit that the substance which police seized from the defendant was cocaine of a certain amount, violated the Confrontation Clause.  See 557 U.S. at 307.  The Supreme Court first found that such affidavits were testimonial, because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" and because, under Massachusetts law, the sole purpose of the affidavit was to provide prima facie evidence of the content of the substance seized.  557 U.S. at 310 (internal quotation marks omitted)(quoting Crawford v. Washington, 541 U.S. at 52).  The Supreme Court then used the affidavit introduced by the prosecution to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed.  While we

still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs[.]" At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320 (citations to the record omitted). Because there was no opportunity to cross-examine the affidavit declarant on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause. See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error."). The Supreme Court extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Bullcoming v. New Mexico, 564 U.S. 647, 652 (2011). See id. at 661 ("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" (quoting Melendez-Diaz v. Massachusetts, 557 U.S. at 319 n.6)).

"Except in rare cases, the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face violates a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness." United States v. Chapman, No. CR 14-1065 JB, 2015 WL 4042177, at *19 (D.N.M. June 29, 2015)(Browning, J.). See United States v. Sandoval, No. CR 04-2362 JB, 2006 WL 1228953, at *7-9 (D.N.M. March 7, 2006)(Browning, J.). In a pre-Crawford v. Washington case, Maryland v. Craig, 497 U.S. 836 (1990), the Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child

molestation case, under certain circumstances, to testify via a one-way closed circuit television, which did not allow the witness to view the defendant. See 497 U.S. at 860. See also Wrotten v. New York 560 U.S. 959, 959 (2010)(Sotomayor, J., statement respecting the denial of certiorari)(tacitly assuming that Maryland v. Craig remains good law and commenting that, "[b]ecause the use of video testimony in this case arose in a strikingly different context than in *Craig,* it is not clear that the latter is controlling"). While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. at 845.[19]

The Supreme Court recognized that an adversary proceeding before the trier of fact "is the norm of Anglo-American criminal proceedings," and involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor." Maryland v. Craig, 497 U.S. at 846. It also acknowledged that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause.'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)). Nevertheless, the Supreme Court concluded that the Confrontation Clause's "'preference for face-to-face confrontation at trial' . . . 'must occasionally give way to considerations of public policy and the necessities of the case.'" Maryland v. Craig, 497 U.S. at 849 (first quoting Ohio v. Roberts, 448 U.S. 56, 63 (1980), abrogated by Crawford v. Washington; and then quoting Mattox v. United States, 156 U.S. 237, 243 (1895)). The Supreme Court emphasized, however, a defendant's

---

[19]The Supreme Court has since distanced itself from this holding that the Confrontation Clause's purpose is to ensure the reliability of evidence. See Crawford v. Washington, 541 U.S. at 61.

Confrontation Clause right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Maryland v. Craig, 497 U.S. at 850.

A Confrontation Clause violation does not occur when a defendant calls a non-hostile witness telephonically or via videoconference. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." (emphasis added)). Cf. United States v. Olguin, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others."). Adversity is not present when the witness is aligned with the defendant. See Maryland v. Craig, 497 U.S. at 845. The Supreme Court based Crawford v. Washington on a defendant's need for "an adequate opportunity to cross-examine" a witness, but such a need is not present when the witness is aligned with the defendant. Crawford v. Washington, 541 U.S. at 57. The Federal Rules of Evidence, for example, generally do not permit a party to ask a non-hostile witness leading questions, a key cross-examination tool. See Fed. R. Evid. 611(c).[20] Alternatively, it is possible that a defendant waives a Confrontation Clause objection by calling a witness by videoconference or telephonically. See United States v. Lopez-Medina, 596 F.3d 716, 730-34 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause. The parties do not

---

[20]Rule 611(c) of the Federal Rules of Evidence provides: "**Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: **(1)** on cross-examination; and **(2)** when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c) (bold in original).

argue <u>Crawford</u> changed this rule." (quoting <u>Hawkins v. Hannigan</u>, 185 F.3d 1146, 1154 (10th Cir. 1999))).

Like many constitutional rights, a defendant may choose to waive Confrontation Clause rights. In 1969, the Supreme Court recognized that a defendant may waive Confrontation Clause rights and that defendants commonly do so when pleading guilty. <u>See</u> <u>Boykin v. Alabama</u>, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. . . . Third, is the right to confront one's accusers."). The Tenth Circuit recognized, both before and after <u>Crawford v. Washington</u>, that a defendant may knowingly waive Confrontation Clause rights at trial. <u>See</u> <u>United States v. Lopez-Medina</u>, 596 F.3d at 730-34 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver"). Specifically, the Tenth Circuit stated: "Prior to <u>Crawford</u>, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause. The parties do not argue <u>Crawford</u> changed this rule." <u>United States v. Lopez-Medina</u>, 596 F.3d at 731 (quoting <u>Hawkins v. Hannigan</u>, 185 F.3d at 1154). The Tenth Circuit has held that a defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate the Confrontation Clause if doing so "was a matter of prudent trial strategy." <u>Hawkins v. Hannigan</u>, 185 F.3d at 1155. The United States Court of Appeals for the Sixth Circuit has recognized that such a waiver can be permissible in the context of the prosecution admitting one of its witnesses' videotaped deposition. <u>See</u> <u>Earhart v. Konteh</u>, 589 F.3d 337, 344 (6th Cir. 2009). The Sixth Circuit in that case relied on one of its prior decisions where it had permitted such a waiver:

> The State relies upon our holding in *Bailey v. Mitchell*, 271 F.3d 652 (6th Cir. 2001), to argue that Earhart waived his right to contest the admission of the videotape deposition. In *Bailey*, we held that a criminal defendant waived his

right to confrontation by entering into a *quid pro quo* agreement with a state prosecutor. *Id.* at 657. The petitioner in *Bailey* had agreed to allow the State to admit the videotape deposition if the prosecutor would consent to the defendant's motion for a continuance. *Id.* Importantly, the Ohio state courts found as a factual matter that Bailey had made an explicit deal with the prosecutor for the admission of the videotape. *Id.*

Earhart v. Konteh, 589 F.3d at 344. Notably, the Tenth Circuit's case of United States v. Lopez-Medina involves an oral waiver on the record in open court. See 596 F.3d at 731 ("It is clear from this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his client's) confrontation right through his questioning of [the witness].").

In United States v. Sandoval, the Court considered the Confrontation Clause in the context of a minor victim and her alleged sexual attacker, and a statute permitting the minor victim to testify over closed-circuit television if certain conditions are met. See 2006 WL 1228953, at *8-13. The Court granted "the United States' Motion for Two-Way Closed Circuit Television Testimony," finding "that the holding in *Maryland v. Craig* is still controlling law" after Crawford v. Washington, and, thus, such testimony pursuant to the statute "satisfied the requirements of the Confrontation Clause." 2006 WL 1228953, at *1. The Court explained how the accusations and unique circumstances allowed for such testimony:

> Jane Doe will suffer emotional trauma if forced to testify in open court, in the same courtroom, with the person who allegedly abused her, and will thus be unable to testify. Jane Doe will also be unable to testify because of her fear of her father -- Dr. Kern's opinion does not rest on Jane Doe's ability to testify in a court room setting generally, but is based upon the fear of her father. The Court had an opportunity to examine Dr. Kern's findings at a hearing before trial and to make specific findings to satisfy the factors set forth in *Maryland v. Craig* and § 3509. The Court will best protect Jane Doe's welfare if it allows her to testify by two-way closed circuit television, and Sandoval's Confrontation Clause rights will not be violated.

2006 WL 1228953, at *12.

# LAW REGARDING CODEFENDANT STATEMENTS

In <u>Bruton v. United States</u>, 391 U.S. 123 (1968), the Supreme Court held that, in a multiple-defendant trial, admitting a non-testifying defendant's confession that implicates a codefendant violates the Confrontation Clause even if the court instructs the jury to only use the confession against the defendant who made it.  <u>See</u> 391 U.S. at 128-29.  George Bruton and William Evans were jointly tried for robbery, and, upon his arrest, Evans gave a confession to a postal inspector in which he admitted that he and Bruton had committed the robbery.  <u>See</u> 391 U.S. at 124.  At trial, the trial court allowed the prosecution to introduce Evans' confession, and the court -- perhaps recognizing that this evidence might pose a problem -- gave a limiting instruction charging the jury that it was not to consider Evans' confession "in any respect to the defendant Bruton."  391 U.S. at 125 & n.2.  Both Bruton and Evans were convicted, but the Supreme Court held that the trial court erroneously admitted Evans' confession implicating Bruton and that the court's limiting instruction did not cure the error.  <u>See</u> 391 U.S. at 128-29.  The Supreme Court observed: "If it were true that the jury disregarded the reference to the codefendant, no question would arise under the Confrontation Clause, because by hypothesis the case is treated as if the confessor made no statement inculpating the nonconfessor."  319 U.S. at 126.  <u>See</u> <u>id.</u> at 128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, . . . the problem arising only because the statement was . . . admissible against the declarant Evans." (citations omitted)).  The Supreme Court discounted that possibility, because

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant,

are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

391 U.S. at 135-36 (citations omitted). The Supreme Court also stated:

"If it is a denial of due process to rely on a jury's presumed ability to disregard an involuntary confession, it may also be a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when it is determining that defendant's guilt or innocence."

391 U.S. at 130 (quoting People v. Aranda, 407 P.2d 265, 271 (Cal. 1965)(in bank)). Ultimately, the Supreme Court determined that: (i) there is a substantial risk that, if a defendant's confession implicates codefendants, the jury will use that confession against the codefendants notwithstanding a limiting instruction to the contrary; and (ii) substantial risk means a defendant's confession implicating codefendants is inadmissible unless the defendant who made the confession is subject to cross examination. See 391 U.S. at 137.

The Supreme Court elaborated on its Bruton v. United States decision in Richardson v. Marsh, 481 U.S. 200 (1987). See 481 U.S. at 202. Marsh and Williams were tried jointly, and Williams did not testify. See 481 U.S. at 202, 204. The prosecution introduced evidence of Williams' confession, which implicated both Williams and Marsh. See 481 U.S. at 203-04. The trial court redacted the confession to remove references to Marsh, and "omit[ted] all indication that *anyone* other than [a third party] and Williams participated in the crime." 481 U.S. at 203 (emphasis in original). The trial court also instructed the jury not to use Williams' confession against Marsh. See 481 U.S. at 204. The Supreme Court concluded that the trial court properly admitted Williams' redacted confession, because, vis-à-vis Marsh, the redacted confessions "was not incriminating on its face." 481 U.S. at 208. The Supreme Court explained that, because it

did not implicate Marsh, Williams' confession fell "outside the narrow exception we have created" in Bruton v. United States to the general rule that "a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." 481 U.S. at 206, 208 (quoting U.S. Const. amend. VI.).

In Gray v. Maryland, 523 U.S. 185 (1998), Anthony Bell and Kevin Gray were tried jointly for murder. See 523 U.S. at 188. After Bell was arrested, Bell confessed, and his confession said that Gray and a third person were also responsible for the victim's death. See 523 U.S. at 188. At Bell and Gray's joint trial, the court admitted a redacted version of Bell's confession into evidence. See 523 U.S. at 188. The detective who testified about Bell's confession said "deleted" or "deletion" whenever the name of Gray or the third participant appeared. 523 U.S. at 188. Immediately thereafter, however, the detective testified that the police arrested Gray only upon Bell's confession. See 523 U.S. at 189. The prosecution introduced a written copy of Bell's confession with Gray's and the third person's names replaced with blank spaces separated by commas. See 523 U.S. at 189. The trial court instructed the jury that Bell's confession could not be used as evidence against Gray. See 523 U.S. at 189.

The Supreme Court acknowledged that, in Richardson v. Marsh, it had, indeed, held that the admission of co-defendant confessions that are redacted to remove any reference to the existence of the other defendants will not violate Bruton v. United States. See Gray v. Maryland, 523 U.S. at 190-91. The Supreme Court noted, however, that, unlike the redacted confession in Richardson v. Marsh, the confession in Gray v. Maryland referenced the non-confessing defendant's existence, because the government merely replaced Gray's name with the word "deleted" or a blank space. Gray v. Maryland, 523 U.S. at 192. The Supreme Court concluded

that a redaction which replaced a defendant's name with an obvious indication of deletion falls within Bruton v. United States' purview, because "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result." Gray v. Maryland, 523 U.S. at 189.

Six years after Gray v. Maryland, Crawford v. Washington upended the Supreme Court's Confrontation Clause jurisprudence. See Crawford v. Washington, 541 U.S. at 36. In Crawford v. Washington, the Supreme Court held that the Confrontation Clause prohibits testimonial hearsay's introduction against a criminal defendant if the hearsay declarant does not testify at trial, unless: (i) the declarant is unavailable for trial; and (ii) the defendant had an opportunity to cross-examine the declarant before trial. See 541 U.S. at 59-61. Crawford v. Washington held that the Confrontation Clause is violated only when testimonial hearsay is admitted against a defendant and the defendant is not given the opportunity to cross-examine the declarant. See U.S. at 59-61. Crawford v. Washington does not indicate, however, how courts should determine whether a particular statement is testimonial; it instead notes that "[v]arious formulations," "articulation[s]," or "definition[s]" of the term "testimonial" could be posited, and identified statements that would qualify as testimonial under any definition, but it specifically declined to define the term "testimonial." 541 U.S. at 51-53, 68. After Crawford v. Washington, the Supreme Court indicated "statements made unwittingly to a Government informant" and "statements from one prisoner to another" are clearly nontestimonial. Davis v. Washington, 547 U.S. at 825 (citing Bourjaily v. United States, 483 U.S. 171, 181-84 (1987); Dutton v. Evans, 400 U.S. 74, 87-89 (1970)).

Many Courts of Appeals have read <u>Bruton v. United States</u> as a Confrontation Clause case and concluded that it does not apply to nontestimonial statements. <u>See</u> <u>United States v. Rodriguez</u>, 591 F. App'x 897, 902 (11th Cir. 2015)("[A]s *Bruton* was premised on the Confrontation Clause, its protections only apply to testimonial statements."); <u>United States v. Vasquez</u>, 766 F.3d 373, 379 (5th Cir. 2014)(discussing that the district court's admittance of a nontestimonial confession "was entirely in accordance with most of the circuit authorities interpreting the relationship between *Bruton* and *Crawford*); <u>United States v. Dagan</u>, 738 F.3d 643, 651 (4th Cir. 2013)("*Bruton* is simply irrelevant in the context of nontestimonial statements."); <u>United States v. Clark</u>, 717 F.3d 790, 816 (10th Cir. 2013)(Holmes, J.)(concluding that nontestimonial statements "fall outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*"); <u>United States v. Berrios</u>, 676 F.3d 118, 128 (3d Cir. 2012)("*Bruton* is no more than a by-product of the Confrontation Clause . . . ."); <u>United States v. Figueroa-Cartagena</u>, 612 F.3d 69, 85 (1st Cir. 2010)(Lipez, J., joined by Baldock, J., sitting by designation)(stating that, when applying <u>Bruton v. United States</u>, "[t]he threshold question in every case is whether the challenged statement is testimonial"); <u>United States v. Johnson</u>, 581 F.3d 320, 326 (6th Cir. 2009)("Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."); <u>United States v. Vargas</u>, 570 F.3d 1004, 1009 (8th Cir. 2009)("Garcia's statement identifying Vargas as his source was not testimonial and thus did not implicate Vargas's Sixth Amendment confrontation clause right. We find no *Bruton* error."); <u>United States v. Pike</u>, 292 F. App'x 108, 112 (2d Cir. 2008)(per curiam)(stating that, "because the statement was not testimonial, its admission does not violate either *Crawford v. Washington* . . . or *Bruton v. United States* . . .").

On the other hand, commentators, scholars, and the District of Columbia Court of

Appeals[21] have read <u>Bruton v. United States</u> as a limiting-instruction case and not only as a Confrontation Clause case, <u>i.e.</u> as a case defining an exception to the general rule that juries obey limiting instructions. <u>See</u> Fed. R. Evid. 105 advisory committee's note to 1972 proposed rules("In *Bruton v. United States*, . . . the Court ruled that a limiting instruction did not effectively protect the accused against the prejudicial effect of admitting in evidence the confession of a codefendant which implicated him."); <u>Thomas v. United States</u>, 978 A.2d 1211, 1233 (D.C. 2009)(Glickman, J.)(concluding that "the principles governing redaction under *Bruton* apply" to one defendant's nontestimonial statements that "were not admissible against [a codefendant] under any hearsay exception"); Colin Miller, <u>Avoiding a Confrontation? How Courts Have Erred in Finding That Nontestimonial Hearsay is Beyond the Scope of the Bruton Doctrine</u>, 77 Brook. L. Rev. 625, 626 (2012)("*Bruton* focuses upon the damage to a defendant's case based upon the admission of his codefendant's statement, not the (un)reliability of that statement. Therefore, the doctrine depends on the inadmissibility of codefendant confessions combined with their harmfulness, not their constitutional unreliability."); Jason Portwood Hipp, <u>Redacting the Constitution: Securing Bruton's Confrontation Protections for a Codefendant During Non-Evidentiary Counsel Commentary</u>, 44 Colum. Hum. Rts. L. Rev. 259, 264 (2012)("While *Crawford* arguably limited *Bruton* violations to testimonial hearsay, the key factor for a *Bruton* analysis is a judge's evaluation of the efficacy of jury instructions." (footnote omitted)). <u>See</u> <u>also</u> <u>United States v. Williams</u>, No. 1:09cr414 (JCC), 2010 WL 3909480, at *5 (E.D. Va. Sept. 23, 2010)(Cacheris, J.)("[T]he Court finds that the statements at issue in this case *may* implicate *Bruton*, even if they are not testimonial under *Crawford*." (emphasis in original)).

---

[21]The District of Columbia Court of Appeals is "the equivalent of a state supreme court" and is "the highest court of the District of Columbia." <u>More About the Court of Appeals</u>, D.C. Cts., https://www.dccourts.gov/court-of-appeals/learn-more (last visited May 1, 2019).

That the Supreme Court's Confrontation Clause analysis in <u>Bruton v. United States</u> broke no new ground supports the academic view. When <u>Bruton v. United States</u> was decided, there was no doubt that using a non-testifying defendant's confession against a codefendant was impermissible. <u>See</u> <u>Bruton v. United States</u>, 391 U.S. at 128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence . . . ."). That rule is, in fact, older than the United States. <u>See</u>, <u>e.g.</u>, <u>Tong's Case</u>, 84 Eng. Rep. 1061, 1062 (1662)(permitting, when "a conspirator be examined before a privy councellor or a justice of peace, and upon his examination without torture confess the treason[,]" the use of that confession against that conspirator at trial even though "the confession there spoken of, is not meant a confession before the Judges at his tryal, but a confession upon his examination," with the proviso that the confession "is only evidence against the party himself who made the confession, but cannot be made use of as evidence against any others whom on his examination he confessed to be in the treason"). <u>See also</u> <u>Crawford v. Washington</u>, 541 U.S. at 45 (citing <u>Tong's Case</u>, 84 Eng. Rep. at 1062). <u>Bruton v. United States</u>' innovation, according to the academic view, is its conclusion that limiting instructions do not solve the well-established Confrontation Clause issues that arise when a court admits an out-of-court confession against a non-testifying declarant when that confession implicates the declarant's codefendant. <u>See</u> <u>Bruton v. United States</u>, 391 U.S. at 124 ("If it were true that the jury disregarded the reference to the codefendant, no question would arise under the Confrontation Clause, because by hypothesis the case is treated as if the confessor made no statement inculpating the nonconfessor.").

That the Supreme Court "granted certiorari to reconsider *Delli Paoli* [<u>v. United States</u>, 352 U.S. 232 (1957)]," <u>Bruton v. United States</u>, 391 U.S. at 125, also suggests that <u>Bruton v.</u>

United States grappled with a limiting-instruction issue and not a Confrontation Clause issue, because Delli Paoli v. United States does not even mention the Confrontation Clause. That case addresses only a limiting instruction's efficacy. See Delli Paoli v. United States, 352 U.S. at 239 ("The issue here is whether, under all the circumstances, the court's instructions to the jury provided petitioner with sufficient protection so that the admission of Whitley's confession, strictly limited to use against Whitley, constituted reversible error."). See also Bruton v. United States, 391 U.S. at 126 ("The basic premise of *Delli Paoli* was that it is 'reasonably possible for the jury to follow' sufficiently clear instructions to disregard the confessor's extrajudicial statement that his codefendant participated with him in committing the crime." (quoting Delli Paoli v. United States, 352 U.S. at 239)); United States v. Clark, 717 F.3d at 814 (stating that "*Bruton* provides the foundation for affirmative remedial measures -- most notably severance -- upon a proper showing that a co-defendant's statement offered into evidence would inculpate the defendant," and that "[t]hese measures are meant to avoid the extrinsic (i.e. collateral) damage to a defendant from the jury's undue consideration of a co-defendant's facially inculpatory statement -- a factor that the jury would be highly unlikely to 'disregard' and one that cannot be remedied by a curative instruction"). Bruton v. United States overruled Delli Paoli v. United States by holding that "the almost invariable assumption of the law that jurors follow their instructions" does not apply when a defendant's confession that implicates codefendants is admitted at a joint trial. Richardson v. Marsh, 481 U.S. at 206. See Bruton v. United States, 391 U.S. at 128 ("*Delli Paoli* assumed that this encroachment on the right to confrontation could be avoided by the instruction to the jury to disregard the inadmissible hearsay evidence. But, as we have said, that assumption has since been effectively repudiated." (footnote omitted)).

Bruton v. United States' limiting-instruction analysis implicates the Confrontation Clause -- i.e., "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," U.S. Const. amend. VI -- because, absent that analysis, courts could use limiting instructions to side-step Confrontation Clause issues in joint trials; "[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant," Richardson v. Gray, 481 U.S. at 206 (quoting U.S. Const. amend. VI). Bruton v. United States recognizes that "the practical and human limitations of the jury system" render that route around the Confrontation Clause impassible when "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." Bruton v. United States, 391 U.S. at 135-36. See Cruz v. New York, 481 U.S. 186, 190 (1987)(reading Bruton v. United States to hold that the principle that "a witness whose testimony is introduced in a joint trial with the limiting instruction that it be used only to assess the guilt of one of the defendants will not be considered to be a witness 'against' the other defendants" does not "validate, under the Confrontation Clause, introduction of a nontestifying codefendant's confession implicating the defendant, with instructions that the jury should disregard the confession insofar as its consideration of the defendant's guilt is concerned" (quoting U.S. Const. amend. VI)). That roundabout analysis means -- at least in pre-Crawford v. Washington cases -- that "the rule announced in Bruton v. United States . . . forbids the prosecution to introduce a nontestifying codefendant's confession implicating [another] defendant in the crime." Greene v. Fisher, 565 U.S. 34, 36 (2011).

After Crawford v. Washington, however, using a defendant's nontestimonial confession against all the defendants in a joint trial does not offend the Confrontation Clause, so whether

limiting instructions restrain the defendants against whom juries use nontestimonial confessions is no longer a constitutional issue. See Whorton v. Bockting, 549 U.S. 406, 420 (2007)(stating that "the Confrontation Clause has no application to [nontestimonial] statements"). It follows that, even under Bruton v. United States, courts can admit a non-testifying defendant's nontestimonial confession in a joint trial -- even if that confession implicates defendants other than the declarant -- without violating the Confrontation Clause. See United States v. Clark, 717 F.3d at 816 (concluding that nontestimonial statements "fall outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*."). In short, "the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements." United States v. Smalls, 605 F.3d at 768 n.2.

In the absence of binding precedent, the Court would agree with the academic view that the Supreme Court's recent Confrontation Clause decisions do not mean that Bruton v. United States is absolutely silent regarding nontestimonial statements. Instead, the Court would apply Bruton v. United States when the Federal Rules of Evidence permit a defendant's out-of-court statement, testimonial or otherwise, to be offered against one defendant and not against others. See United States v. Smalls, 605 F.3d at 780 ("[T]he only question pertinent to the admissibility of a nontestimonial statement is whether it meets the requirements of the Federal Rules of Evidence."). For example, rule 801(d)(2)(A) permits the prosecution to offer a defendant's out-of-court statement against the declarant-defendant only. See Fed. R. Evid. 801(d)(2)(A). Likewise, rule 801(d)(2)(E) permits the prosecution to offer an out-of-court statement that one defendant made "during and in furtherance of the conspiracy" against all of that defendant's coconspirators and not against other defendants. Fed. R. Evid. 801(d)(2)(E).

The Court reaches that conclusion, because Crawford v. Washington's discussion of Roman law, see 541 U.S. at 43, "Marian bail and committal statutes," 541 U.S. at 44, and "the 1603 trial of Sir Walter Raleigh for treason," 541 U.S. at 44, does not impact "the practical and human limitations of the jury system," Bruton v. United States, 391 U.S. at 135, or call Bruton v. United States' rationale into question, see Richardson v. Marsh, 481 U.S. at 211 (declaring that "we continue to apply Bruton where we have found that its rationale validly applies"). Consequently, even though a nontestimonial statement's admissibility is no longer a constitutional issue after Crawford v. Washington, Bruton v. United States' holding -- i.e., defendant-made out-of-court statements are not admissible against any defendant unless they are admissible against all the defendants they directly implicate -- should remain good law no matter whether a statement is testimonial until and unless the Supreme Court expressly says otherwise.

If it properly could, the Court would, thus, conclude that Bruton v. United States' language regarding the efficacy of limiting instructions applies no matter whether an evidentiary rule or a constitutional one renders a defendant's out-of-court statement inadmissible against codefendants.[22] Accordingly, the United States would be forced to: (i) redact the co-defendant

---

[22]The distinction between inadmissibility premised on the Confrontation Clause and inadmissibility premised on the Federal Rules of Evidence might matter on appeal, however, because different harmless error standards apply to constitutional and nonconstitutional errors. Compare Champan v. California, 386 U.S. 18, 24 (1967)("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."), with Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."), and Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)(concluding, "except perhaps where the departure is from a constitutional norm," that, "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected"). "[C]onstitutional errors are governed by the Due Process Clauses of the Fifth and Fourteenth Amendments rather than by [28 U.S.C.] § 2111 and Rule 52(a). Thus, the test for harmless constitutional error is stricter than its statutory counterpart." United States v. Lane, 474

declarant's statements that are admissible for their truth solely under rule 801(d)(2)(A) such that they do not directly implicate other co-defendants; (ii) try the co-defendant declarant alongside the other co-defendants without resort to the co-defendant declarant's statements that are admissible for their truth only under rule 801(d)(2)(A) and directly implicate the other co-defendants; or (iii) proceed against the co-defendant declarant in a single-defendant trial.

The Court is not, however, free to restrict the United States' case so severely, because it must obey Tenth Circuit precedent stating that <u>Bruton v. United States</u> does not apply to nontestimonial statements. <u>See</u>, <u>e.g.</u>, <u>United States v. Clark</u>, 717 F.3d at 816 (concluding that statements which a coconspirator made in furtherance of the conspiracy are nontestimonial, and therefore "fall outside the protective ambit of the Confrontation Clause and, by extension, <u>Bruton</u>"); <u>United States v. Patterson</u>, 713 F.3d 1237, 1247 (10th Cir. 2013)("The admission of these two statements violated neither <i>Crawford</i> nor <i>Bruton</i> because both statements were made in furtherance of a conspiracy and were therefore nontestimonial."). A careful examination of Tenth Circuit precedent shows that the Tenth Circuit's statements are dicta, because none of the cases analyze a defendant statement that was nontestimonial and not admissible under the Federal Rules of Evidence against a codefendant whom the statement implicated. The defendant in <u>United States v. Smalls</u> was not convicted in a joint trial. <u>See</u> 605 F.3d at 768 ("The district court severed the trials of Defendant Smalls and Cook as a result of an out-of-court statement Cook made to a confidential informant (CI), also an inmate at the detention center, implicating

_____

U.S. 438, 460 (1986)(Brennan, J., concurring in part and dissenting in part)(citations omitted). Harmless error standards are immaterial to the Court's analysis, however, because, while defendants are "entitled to a fair trial but not a perfect one," <u>Lutwak v. United States</u>, 344 U.S. 604, 619 (1953), the Court is nevertheless duty-bound to strive for an error-free trial just as Sisyphus must push his boulder up the mountain, <u>see</u> Albert Camus, <u>The Myth of Sisyphus</u> (1942)("One must imagine Sisyphus happy.").

both himself and Defendant Smalls in the murder.").  Further, the nontestimonial statements at issue in United States v. Smalls were admissible for their truth as declarations against interest by an unavailable declarant no matter against whom those statements were offered.  See 605 F.3d at 785-86 (applying rule 804(3) of the Federal Rules of Evidence).  On the other hand, a coconspirator made the out-of-court statements at issue in United States v. Clark and United States v. Patterson in furtherance of the conspiracy, which rendered them both nontestimonial and admissible -- under rule 801(d)(2)(E) -- for their truth against all the defendants whom they implicated.  See United States v. Clark, 717 F.3d at 816; United States v. Patterson, 713 F.3d at 1247.

If the issue comes squarely before it, the Tenth Circuit may decide that the Court reads United States v. Clark, United States v. Patterson, and United States v. Smalls too literally, and instead apply Supreme Court precedent to limit their unnecessarily overbroad pronouncements regarding the application of Bruton v. United States to nontestimonial statements.  Compare EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 488 (10th Cir. 2006)(McConnell, J.)("[T]he district court in this case seems to have taken the 'rubber stamp' metaphor too literally, requiring that an explicit recommendation must cross the desk of the decisionmaker . . . ."), with English v. Colo. Dep't of Corr., 248 F.3d 1002, 1011 (10th Cir. 2001)(stating that a plaintiff can recover on a rubber-stamp theory only if "the decisionmaker followed [a] biased recommendation . . . without independently investigating the complaint against the employee" (internal quotation marks omitted)(quoting Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999)).  Unless the Tenth Circuit does so, however, the Court must obey those pronouncements in United States v. Clark, United States v. Patterson, and United States v. Smalls:

> [J]urisdiction is about *who* gets to decide. It's about choosing the group of people who get to choose the judges, to write the rules of procedure and evidence, to supply the jury -- that is, to dispose of "all [the defendants'] worldly goods," and often their liberty to boot. In particular, because jurisdiction includes the power to come to the *wrong* judgment, it's about choosing the people who have power to make the *wrong* choices on all these counts and who have the right to see their choices enforced anyway.

Stephen E. Sachs, <u>Pennoyer Was Right</u>, 95 Texas L. Rev. 1249, 1324 (2017)(emphasis and second alteration <u>Pennoyer Was Right</u>)(footnotes omitted)(quoting <u>Burnham v. Superior Court</u>, 495 U.S. 604, 623 (1990)(Scalia, J., plurality opinion)).

## LAW REGARDING RULE 403

Under rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. *See* <u>United States v. Record</u>, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter [under rule 403]." <u>United States v. Pettigrew</u>, 468 F.3d 626, 638 (10th Cir. 2006)(emphasis in <u>United States v. Sides</u>)(quoting <u>United States v. Sides</u>, 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has admonished district courts that they should be mindful that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." <u>United States v. Smalls</u>, 605 F.3d at 787 (internal quotation marks omitted)(quoting <u>United States v. Tan</u>, 254 F.3d 1204, 1211 (10th Cir. 2001)).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, *see* <u>United States v. Lugo</u>, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's

discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be *unfairly prejudicial*, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (emphasis in original)(quoting Fed. R. Evid. 403 advisory committee's note to 1972 proposed rules).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." Old Chief v. United States, 519 U.S. at 180. In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence." Old Chief v. United States, 519 U.S. at 182. In United States v. DeLeon, the Court weighed both rule 403 and rule 404(b) considerations in deciding whether evidence was relevant to certain counts in which a single defendant, in a multi-defendant trial, was not charged. See Memorandum Opinion and Order at 30-38, 323 F.R.D. 672, 690-94, filed December 18, 2017 (Doc. 1585)("Rule 403 MOO"). The Court determined that, as to the single defendant, the evidence relevant to the uncharged counts was also relevant to the charged counts because it establishes racketeering activity and longevity. See Rule 403 MOO at 30-33, 323 F.R.D. at 690-91. Further, because of the evidence's substantial probative value and slight danger of use as character evidence, the Court concluded that rule 403 did not preclude its use. See Rule 403 MOO at 33-38, 323 F.R.D. at 691-94.

## LAW REGARDING RULE 404(b)

Under rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith. See Fed. R. Evid. 404(b). Rule 404(b) provides:

**(b) Other Crimes, Wrongs, or Acts.**

> **(1) Prohibited Uses.**  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> **(2) Permitted Uses; Notice in a Criminal Case.**  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
>
> > **(A)** provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> >
> > **(B)** do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).  In other words, one cannot present evidence the relevance of which is based on the forbidden inference: the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too.  The rule, however, has a number of "exceptions" -- purposes for which such evidence will be admissible.  Those purposes include proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  See Fed. R. Evid. 404(b).  The Supreme Court has enunciated a four-part process to determine whether evidence is admissible under rule 404(b).  See Huddleston v. United States, 485 U.S. 681, 691-92 (1988).  The Tenth Circuit has consistently applied that test.

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test . . . :
>
> > (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(quoting United States v. Roberts, 185 F.3d 1125, 1141 (10th Cir.1999)). See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002); United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston v. United States, 485 U.S. at 691-92).

Rule 404(b)'s prohibition finds its source in the common-law protection of the criminal defendant from risking conviction on the basis of evidence of his character. See United States v. Dudek, 560 F.2d 1288, 1295-96 (6th Cir. 1977); 22 Charles Alan Wright & Kenneth Graham, Federal Practice and Procedure: Evidence § 5239, at 428, 436-37 & 439 (1991). In United States v. Phillips, 599 F.2d 134 (6th Cir. 1979), the Sixth Circuit noted, in addressing rule 404(b)'s precepts, that the rule addresses two main policy concerns:

> (1) that the jury may convict a "bad man" who deserves to be punished not because he is guilty of the crime charged but because of his prior or subsequent misdeeds; and (2) that the jury will infer that because the accused committed other crimes he probably committed the crime charged.

United States v. Phillips, 599 F.2d at 136.

When "bad act evidence is both relevant and admissible for a proper purpose, 'the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged.'" United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(quoting United States v. Himelwright, 42 F.3d 777, 782 (3d Cir. 1994)). The Tenth Circuit has also stated that district courts must "identify specifically the permissible purpose for which such evidence is offered and the inferences to be drawn therefrom." United States v. Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(Seymour, C.J.)(citing United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985)).

"[A] broad statement merely invoking or restating Rule 404(b) will not suffice." United States v. Kendall, 766 F.2d at 1436.

The Tenth Circuit has recognized the probative value of uncharged, unrelated acts to show motive, intent and knowledge, whether the acts involved previous conduct or conduct subsequent to the charged offense if the uncharged acts are similar to the charged crime and sufficiently close in time. See United States v. Olivo, 80 F.3d 1466, 1468-69 (10th Cir. 1996)(finding the district court did not abuse its discretion when it admitted evidence about an event over one year after a defendant's arrest); United States v. Bonnett, 877 F.2d 1450, 1461 (10th Cir. 1989)(holding that evidence about events over a year after the charged conduct was not "too remote in time and unrelated to the transactions with which [the defendant] was charged"). This similarity may be shown through "physical similarity of the acts or through the 'defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses.'" United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997)(quoting United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978)). See United States v. Bonnett, 877 F.2d at 1461 ("The closeness in time and the similarity in conduct [are] matters left to the trial court, and [its] decision will not be reversed absent a showing of abuse of discretion."). The more similar the act or state of mind, the more relevant the evidence becomes. See United States v. Queen, 132 F.3d at 996. Moreover, when establishing identity, although the uncharged crime must be similar to the charged offense if it is unrelated to the charged offense, it need not be identical. See United States v. Gutierrez, 696 F.2d 753, 755 (10th Cir. 1982); United States v. Ganadonegro, No. CR 09-0312 JB, 2011 WL 3957549, at *1-3 (D.N.M. Aug. 30, 2011)(Browning, J.).

## ANALYSIS

In the <u>James</u> Proffer, the United States identifies out-of-court statements that it may offer into evidence as coconspirator statements. <u>See</u> Fed. R. Evid. 801(d)(2)(E). The Trial 2 Defendants brought a second set of out-of-court statements to the Court's attention: statements attributed to the Trial 2 Defendants that the United States will offer into evidence -- if at all -- as admissions of a party opponent, <u>see</u> Fed. R. Evid. 801(d)(2)(A), or as statements against interest, <u>see</u> Fed. R. Evid. 804(b)(3). The Court concludes that the <u>James</u> Proffer statements are nontestimonial, so admitting them for their truth raises no Confrontation Clause concerns. Likewise, the statements attributed to the Trial 2 Defendants as admissions or statements against interest are nontestimonial, so they are admissible notwithstanding the Confrontation Clause. After addressing those constitutional issues, the Court analyzes whether, under the Federal Rules of Evidence, the <u>James</u> Proffer statements are admissible. Finally, the Court makes the same inquiry regarding the statements attributed to the Trial 2 Defendants as admissions or statements against interest.

## I. THE <u>JAMES</u> PROFFER STATEMENTS ARE NONTESTIMONIAL, SO THE <u>CONFRONTATION CLAUSE DOES NOT APPLY</u>.

The Tenth Circuit has defined testimonial statements -- for Confrontation Clause purposes -- in two alternative ways, without choosing between them:

> Synthesizing *Crawford* and *Davis*, we might today formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution. Or, to better conform to the current state of Tenth Circuit precedent, we might say: A formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime.

United States v. Smalls, 605 F.3d at 778. Supreme Court precedent indicates that whether a statement is testimonial depends on "whether a statement was given with the 'primary purpose of creating an out-of-court substitute for trial testimony.'" Ohio v. Clark, 135 S. Ct. at 2183 (quoting Michigan v. Bryant, 562 U.S. 344, 358 (2011)).

According to the Supreme Court, "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." Ohio v. Clark, 135 S. Ct. at 2182. But see id. (declining "to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment"). Exactly one statement, statement thirty-eight, in the James Proffer was made to law enforcement personnel: "Angel Deleon had a scratch on his finger and told a female CO that he cut himself." James Proffer at 20. The Court does not believe that this statement is testimonial, because it likely was not made "with a primary purpose of creating an out-of-court substitute for trial testimony," Michigan v. Bryant, 562 U.S. at 358, but even if it is testimonial, its admission would not offend the Confrontation Clause, because the United States' theory of the case is that DeLeon's statement was a lie, see March 13 Tr. at 33:9-18 (Castellano, Stemo)(indicating that DeLeon said this so people "didn't tie that injury to the murder of Mr. Castillo"). See also Crawford v. Washington, 541 U.S. at 59 n.9 ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)). Here, the statement's purpose would be to show circumstantial evidence of DeLeon's guilt, and not to show that DeLeon had cut himself.

Further, the "[Supreme] Court expressed the view that 'statements made unwittingly to a Government informant" or "statements from one prisoner to another' are 'clearly

nontestimonial.'"  United States v. Smalls, 605 F.3d at 778 (quoting Davis v. Washington, 547 U.S. at 825).  Likewise, statements that a coconspirator makes during and in furtherance of a conspiracy are nontestimonial.  See United States v. Patterson, 713 F.3d at 1247 ("[B]ecause these statements were made in furtherance of a conspiracy, they are nontestimonial and present no Sixth Amendment problem.").  Many of the statements in the James Proffer were made by one prisoner to another.  See, e.g., James Proffer at 12 ("Word was sent from the green pod that if Sanchez was not killed, others in the Blue pod would be killed.").  Similarly, conspirators made many of the statements in the James Proffer during and in furtherance of the conspiracy. See, e.g., James Proffer at 2 ("Billy Garcia tasked Leonard Lujan with finding an inmate to carry out the murders of Garza and Castillo.  The murders were to be executed simultaneous.").

That all but one of the statements in the James Proffer were made to individuals who were not in law enforcement leads the Court to conclude that the James Proffer identifies statements that can be admitted notwithstanding the Confrontation Clause.  That prisoners made many of those statements to other prisoners and that conspirators made many of those statements during and in furtherance of a conspiracy bolsters the Court's conclusion as to those statements.

## II.     THE STATEMENTS ATTRIBUTED TO THE DEFENDANTS AS PARTY-OPPONENT ADMISSIONS OR AS STATEMENTS AGAINST INTEREST ARE NONTESTIMONIAL, AND ADMISSIBLE FOR THEIR TRUTH.

The B. Garcia Response identifies several statements attributed to B. Garcia's co-Defendants that the James Proffer does not contain and that B. Garcia expects the United States will offer into evidence as party-opponent admissions, see Fed. R. Evid. 801(d)(2)(A), or as statements against interest, see Fed. R. Evid. 804(b)(3).  At the Court's evidentiary hearing, the United States confirmed B. Garcia's expectation.  See March 14 Tr. at 171:8-172:11 (Beck)(objecting to B. Garcia's desire for a pretrial evidentiary hearing to determine the

admissibility of such statements, because it is "the exact same evidence we'll have at trial").

First, B. Garcia indicates that the J. Garcia 302 contains an out-of-court confession attributed to Troup. See B. Garcia Response ¶ 11, at 5.

> [J. Garcia] stated that TROUP had told him about SANCHEZ's murder in approximately 2008 when violated his probation/parole and was incarcerated in the New Mexico Prison System. Additionally, during the same conversation, TROUP provided with information regarding his role in the murder of "Poncho" (agent note: identified as FRANK CASTILLO, DOB [redacted]) in approximately 2001 at the SNMCF [Southern New Mexico Correctional Facility]. TROUP told [J. Garcia] that BILLY GARCIA, aka Wild Bill, gave the order to kill Poncho, and that TROUP walked Poncho into his (Poncho's) cell where ANGEL DELEON and and [sic] others were waiting for Poncho. Once inside the cell, TROUP slammed the door, while DELEON and another SNM gang member/associate strangled Poncho to death.

J. Garcia 302 at 3. Second, B. Garcia contends that S. Gonzales will testify for the United States that "Troup made statements about the 2001 murders." B. Garcia Response ¶ 13, at 6.

> Edward TROUP spoke to GONZALES about the 2001 murder of Rolando GARZA. TROUP did not provide details, but told GONZALES that he was there. GARZA was killed because he was a known member of the rival prison gang Los Carnales. Francisco CASTILLO was killed in 2001 because he "messed up" with Billy GARCIA.

Samuel Gonzales 302 at 5. Troup's statements are nontestimonial. Third, B. Garcia asserts that Robert Lovato will testify that "Christopher Chavez admitted involvement in the 2001 murder of Garza." B. Garcia Response ¶ 14, at 6.

> In 2011, Christopher CHAVEZ, a.k.a. "Critter," came to [Lovato's] grandmother's house in Albuquerque. CHAVEZ and [Lovato] are from the same neighborhood and street gang. CHAVEZ talked about the murder of Rolando GARZA and was paranoid that he might get caught for it. CHAVEZ was under the impression that law enforcement might be making some arrests in the case and was worried. [Lovato] told CHAVEZ to lay low and not discuss the incident with anyone.

Lovato 302 at 2. C. Chavez' statement is nontestimonial. See United States v. Smalls, 605 F.3d at 778. Fourth, B. Garcia contends that Leroy Lucero will testify that "Chavez and Joe Gallegos

admitted involvement in the murder of Garza to him as did others." B. Garcia Response ¶ 15, at 7. Fifth, B. Garcia avers that Fred Quintana will testify that "both Troup and Chavez admitted to involvement in the 2001 murders." B. Garcia Response ¶ 16, at 7.

> 2001 Murder of Frank Castillo and Rolando Garcia at the Southern New Mexico Correctional Facility in Las Cruces were called by BILLY GARCIA ("Wild Bill"). Several members participated in the double homicide and EDWARD TROUP and CHRITOPHER CHAVEZ admitted to the murders during conversations with the CHS [Confidential Human Source, i.e., Quintana].

Quintana 1023 at 2. Troup's and C. Chavez' statements are nontestimonial. Sixth, B. Garcia contends that Ben Clark will testify that "Angel Deleon, Troup and Joe Gallegos confessed their involvement in the 2001 murders to him and that one or both indicated that B. Garcia called the hit." B. Garcia Response ¶ 17, at 8.

> In 2002, Billy Garcia, aka Wild Bill was the Shot Caller for the SNM and ordered the double homicide at Southern New Mexico Correctional facility. Angel De Leon, a Mexican national along with Eugene Martinez from Albuquerque and Ben Gallegos from Belen did the two murders. Martinez and De Leon told Clark that they killed one of the guys (Clark believed the guy's name was Frank Gonzales), an SNM member because he was supposed to stab someone at Southern New Mexico Correctional facility and didn't do it. Garcia ordered the hit on him and Martinez and De Leon both told Clark they carried the hit out. Martinez originally was the one that jumped on the guy's back but Martinez was too small and almost got Martinez off of him until De Leon tackled him on his bed where they finished him off. The other guy in the double murder was killed by Gallegos. He told Clark later that he had killed the guy and that he felt like the brother were turning on him on some paperwork someone found from the 1990s. Gallegos was upset that after he killed the guy the SNM was still turning against him. Neither of these murders have been solved and no charges have ever been filed

Clark Debriefs at 3-4.

> In late 2004, Edward TROUP and MARTINEZ were at the North with CLARK and they recounted the murder of GARZA. TROUP told CLARK that "Looney (GARZA) almost got away."

> MARTINEZ said, "Looney almost got away, but TROUP closed the door."

TROUP added, "I just closed the door."

TROUP and CLARK are/were good friends and put in a lot of work together. CLARK is fond of TROUP and described him as being a good person, who was trying to change his life. CLARK thought TROUP would cooperate if he and his wife were still together and doing good. CLARK explained that the SNM hadn't done anything good for TROUP, or any of the members and any man that wanted to build a life with his family would have to leave the SNM. Otherwise they would be stuck in prison, "doing more work for the S (SNM) and getting more time."

In 2002, CLARK was at the North, in 1B, with Joe Lawrence GALLEGOS, Mauricio VARELA, a.k.a. "Archie," Samuel SILVA, and FNU LNU "Chico."

VARELA said, "Man, you guys killed Pancho (Frank CASTILLO) easy." VARELA said this while in the pod and in a loud voice. CLARK was kind of surprised that VARELA did that.

GALLEGOS replied, "Shut the fuck up!"

That was all the conversation that took place at that time.

In 2004, CLARK and GALLEGOS were back at the North together. There were rumors going around that there was "paperwork" on GALLEGOS, which stemmed from an incident in which GALLEGOS had been shot at in Belen, NM. GALLEGOS talked to the police about the incident, but didn't give up who had shot at him. The Los Carnales Gang was passing the paperwork around to SNM members, suggesting that GALLEGOS was a snitch. Some SNM members spread the rumor.

CLARK and GALLEGOS were on the yard together and CLARK said "It's fucked up, what they're doing to you after all you've done" (for the gang). GALLEGOS agreed and began to recount all that he had done for the SNM, to include killing CASTILLO. GALLEGOS said Angel DELEON had a "monkey grip" or "gorilla grip" on CASTILLO that prevented him from moving. GALLEGOS then choked CASTILLO to death. GALLEGOS said, "It was easy."

Clark Debriefs at 9-10. Seventh, B. Garcia asserts that Julian Romero will testify that "Christopher Chavez confessed to his role in the 2001 murders." B. Garcia Response ¶ 18, at 8. "CHAVEZ admitted to ROMERO that he killed GARZA." Romero 302 at 7. Eighth, B. Garcia avers that Timothy Martinez will testify that "Christopher Chavez confessed to his involvement

in the murders and during such confession implicates Allen Patterson in the murder." B. Garcia Response ¶ 19, at 9.

> [T. Martinez] also spent time talking with Christopher CHAVEZ, aka: "Critter." CHAVEZ did tattoo work on [T. Martinez] while they were in Torrance. [T. Martinez] told SA Acee, "Critter said he held the legs. Eugene was choking him (GARZA). He was getting up and was gonna escape and then Allen PATTERSON came in and tackled him (GARZA). PATTERSON wasn't even in on the hit. He just gave skina [(backup)] and helped."

T. Martinez 302 at 5.

A SNM member made all those statements to other SNM members, and the SNM's rules make cooperating with law enforcement a capital offense. See, e.g., Samuel Gonzales 302 at 3 ("SNM gang members were expected to maintain a 'code of silence.' The consequence for breaking said code was death."). Consequently, none of those statements are "formal declaration[s] made by the declarant that, when objectively considered, indicate[] the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution." United States v. Smalls, 605 F.3d at 778. Similarly, none of them are "formal statement[s]" where "a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime." United States v. Smalls, 605 F.3d at 778. Accordingly, the Court concludes that none of those statements are testimonial.

## III. THE COURT MAKES PARTICULARIZED JUDGMENTS REGARDING THE JAMES PROFFER STATEMENTS' ADMISSIBILITY UNDER THE FEDERAL RULES OF EVIDENCE.

The Court is able to make general determinations regarding the existence of conspiracies and their membership. See supra Findings of Fact ("FOF") ¶¶ 1-17. The Court is also able to make general determinations regarding whether the James Proffer statements are testimonial.

See supra Analysis Part I. A statement-by-statement approach is necessary, however, when determining whether statements were made during and in furtherance of a conspiracy. See Fed. R. Evid. 801(d)(2)(E).[23] The Court makes a particularized conclusion as to admissibility for each statement within the James Proffer, as the following table[24] outlines:

---

[23]While the Court must make individualized determinations regarding whether -- and against whom -- individual statements are admissible under rule 801(d)(2)(E), the Court can make general determinations regarding the Defendants' requests for "a continuing objection." B. Garcia Response ¶ 21, at 9; A. Gallegos Response ¶ 7, at 3; Troup Response ¶ 23, at 6; Patterson Response ¶ 31, at 12. The Court will not grant that request for two reasons. First, the parties will need to make oral objections and not rely on continuing objections to apply the Court's evidentiary analysis to witness testimony. Second, the Court's pretrial determinations are the best that the Court can do pretrial, because evidence introduced at trial, or variances between witness testimony and the James Proffer, may alter those determinations. Oral objections will bring those issues to the Court's attention. Consequently, the Court will require the Defendants to make oral objections to evidence that they believe is inadmissible, and if the Court overrules those objections, the Defendants will need to determine whether they wish the Court to provide a limiting instruction. See Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose -- but not against another party or for another purpose -- the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly.").

[24]The Court provided four drafts of this table to the parties as it worked through the issues: (i) on April 4, 2018, before trial, the Court provided the Court's First Draft of Table to Be Included in the Impending Memorandum Opinion and Order Regarding the James Issue, filed April 10, 2018 (Doc. 2096); (ii) on April 9, 2018, the first day of trial, the Court provided the Court's Second Draft of Table to Be Included in the Impending Memorandum Opinion and Order Regarding the James Issue, filed April 10, 2018 (Doc. 2097); (iii) on April 9, 2018, the first day of trial, the Court provided the Court's Third Draft of Table to Be Included in the Impending Memorandum Opinion and Order Regarding the James Issue, filed April 10, 2018 (Doc. 2098); and (iv) on April 11, 2018, during trial, the Court provided the Court's Fourth Draft of Table to Be Included in the Impending Memorandum Opinion and Order Regarding the James Issue, filed April 12, 2018 (Doc. 2103).

| <u>James Proffer Statement</u>[25] | Ruling |
|---|---|
| Statement 1: "Billy Garcia tasked Leonard Lujan with finding an inmate to carry out the murders of Garza and Castillo. The murders were to be executed simultaneous."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | The Court finds, by a preponderance of the evidence, that B. Garcia is a member of the Count 1 conspiracy to murder Castillo and the Count 2 conspiracy to murder Garza, <u>see supra</u> FOF ¶¶ 2, 6, and that B. Garcia made this statement to Lujan before the alleged murders, <u>see</u> March 13 Tr. at 10:22-11:3 (Castellano, Stemo), to get Lujan to find people to carry out the murders simultaneously, <u>see</u> March 13 Tr. at 9:22-10:1 (Castellano, Stemo); <u>id.</u> at 10:11-11:6 (Castellano, Stemo). Accordingly, this statement was made by a member of the Counts 1 and 2 conspiracies, during and in furtherance of those conspiracies, and is therefore admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).[26] C. Chavez and Patterson are members of the Count 2 conspiracy, <u>see supra</u> FOF ¶ 6, so the Court overrules their objections, <u>see</u> C. Chavez Response ¶ 4, at 2; Patterson Response ¶ 5, at 2. The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Counts 1 or 2. |
| Statement 2: "Billy Garcia wanted Castillo and Garza 'to be taken out' by strangulation."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan | The Court finds, by a preponderance of the evidence, that B. Garcia -- a member of the Counts 1 and 2 conspiracies, <u>see supra</u> FOF ¶¶ 2, 6 -- made this statement before the alleged murders, to inform Lujan how to murder Castillo and Garza, <u>see</u> March 13 Tr. at 11:7-11 (Castellano, Stemo). Accordingly, this statement was made by a member of the Counts 1 and 2 conspiracies during and in furtherance of those conspiracies, and is therefore admissible for its truth against the members of the Counts |

---

[25]The <u>James</u> Proffer lists eighty-eight statements that the United States intends to offer into evidence as coconspirator statements under rule 801(d)(2)(E). The United States apparently compiled those statements from its pretrial interviews with potential witnesses, which the <u>James</u> Proffer denominates sources. The Court anticipates, however, that the United States will present the <u>James</u> Proffer statements to the jury by calling the sources to testify before the jury and not by introducing the source's pretrial statements.

[26]When a statement is admissible against some Trial 2 Defendants and not against all of them, the Court is willing to give a limiting instruction, but the parties will need to request one both to bring the issue to the Court's attention and because the Defendants may not always want the Court to give a limiting instruction -- even when they are entitled to one -- for fear of highlighting and emphasizing testimony's impermissible uses. <u>See</u> Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose -- but not against another party or for another purpose -- the court, **on timely request**, must restrict the evidence to its proper scope and instruct the jury accordingly." (emphasis added)).

| | |
|---|---|
| Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | 1 and 2 conspiracies under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy, <u>see supra</u> FOF ¶ 6, so the Court overrules their objections, <u>see</u> C. Chavez Response ¶ 5, at 2; Patterson Response ¶ 6, at 2-3. The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Counts 1 or 2. |
| Statement 3: "The Castillo and Garza murders were an order. Anyone who did not follow that order was to be killed as well."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | The Court finds, by a preponderance of the evidence, that B. Garcia -- a member of the Counts 1 and 2 conspiracies, <u>see supra</u> FOF ¶¶ 2, 6 -- made this statement before the alleged murders, to underscore to Lujan the importance of carrying through with the murders and to prompt action, <u>see</u> March 13 Tr. at 11:12-25 (Castellano, Stemo). Accordingly, this statement was made a member of the Counts 1 and 2 conspiracies during and in furtherance of those conspiracies, and is therefore admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy, <u>see supra</u> FOF ¶ 6, so the Court overrules their objections, <u>see</u> C. Chavez Response ¶ 6, at 2; Patterson Response ¶ 7, at 3. The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Counts 1 or 2. |
| Statement 4: "Billy Garcia was planning to kill everyone in the unit with a green light but was | This statement is a statement of B. Garcia's then-existing state of mind, specifically his plan, so it is admissible for its truth under rule 803(3).[27] <u>See</u> March 13 Tr. at 12:1-8 (Castellano, Stemo). The Court accordingly overrules |

---

[27]A number of the Trial 2 Defendants object to the admission of statements regarding the Counts in which they are not charged on the basis of irrelevancy, prejudice, and "the strong probability of a negative spillover effect." B. Garcia Response ¶ 3, at 2; C. Chavez Response ¶ 3, at 1; Troup Response ¶ 3, at 2; Patterson Response ¶ 3, at 2. <u>See</u> A. Gallegos Response ¶ 3, at 2. <u>See also</u> J. Gallegos Response ¶ 19, at 7 (requesting a limiting instruction for all "[s]tatements related to the 2007 events," as it is not alleged that J. Gallegos was "involved in this act"). These statements are relevant for the particular Count to which they go, and their probative value outweighs any such prejudice or spillover effect, so the Court will admit these statements as provided in the table. <u>See</u> <u>United States v. Edwards</u>, 69 F.3d 419, 434 (10th Cir. 1995)(concluding that there was no negative spillover effect where codefendants' statements were admitted). The Court's severance of the Indictment into two trials "alleviate[s] the burden on the jury to compartmentalize the discrete conduct charged in each Count," and the Court will provide limiting instructions "charg[ing] the jury to consider each Count in the abstract of the others." Severance MOO at 183, 2017 WL 3054511, at *106. Accordingly, the Court overrules these objections. <u>See</u> B. Garcia Response ¶ 3, at 2; C. Chavez Response ¶ 3, at 1; Troup Response ¶ 3, at 2; Patterson Response ¶ 3, at 2; A. Gallegos Response ¶ 3, at 2; J. Gallegos Response ¶ 19, at 7.

| | |
|---|---|
| starting with Castillo and Garza."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | C. Chavez' and Patterson's objections. <u>See</u> C. Chavez Response ¶ 7, at 2; Patterson Response ¶ 8, at 3-4. |
| Statement 5: "These murders needed to be done because the SNM gang was losing status with other gangs."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth under rule 803(3). <u>See</u> March 13 Tr. at 12:9-20 (Castellano, Stemo). The Court accordingly overrules C. Chavez' and Patterson's objections. <u>See</u> C. Chavez Response ¶ 8, at 3; Patterson Response ¶ 9, at 4. |
| Statement 6: "Leonard Lujan tells Eugene Martinez 'I'm telling you right now where it's coming from and everything,' referring to Billy Garcia."<br><br>Declarant: Leonard Lujan (first-level) and Billy Garcia (second-level).<br><br>Source: Leonard Lujan, Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | The Court finds, by a preponderance of the evidence, that, before the alleged murders, B. Garcia ordered Lujan -- who are both members of the Counts 1 and 2 conspiracies, <u>see</u> <u>supra</u> FOF ¶¶ 2, 6 -- to find people to kill Castillo and Garza, and that Lujan passed this order to E. Martinez to indicate the importance that they follow through with the order and to prompt action, <u>see</u> March 13 Tr. at 12:21-13:5 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Counts 1 and 2 conspiracies by a member of those conspiracies, and is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 6, so the Court overrules their objections, <u>see</u> C. Chavez Response ¶ 9, at 3; Patterson Response ¶ 10, at 4. The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Counts 1 or 2. |

| | |
|---|---|
| Statement 7: "Billy Garcia ordered the murder of Castillo due to him cooperating with law enforcement."<br><br>Declarant: Billy Garcia.<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth under rule 803(3). See March 13 Tr. at 13:6-14 (Castellano, Stemo). The Court accordingly overrules Patterson's objection. See Patterson Response ¶ 11, at 4-5. |
| Statement 8: "Billy Garcia ordered Garza to be killed for being a former Los Carnales member."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth under rule 803(3). See March 13 Tr. at 13:15-23 (Castellano, Stemo). The Court accordingly overrules C. Chavez' and Patterson's objections. See C. Chavez Response ¶ 10, at 3-4; Patterson Response ¶ 12, at 5. |
| Statement 9: "'What the fuck is going on? I sent word a long time ago to clean house.' Billy Garcia was upset Leonard Lujan had not taken charge in the facility."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | This statement could be offered for a purpose other than its truth, e.g., as circumstantial evidence of B. Garcia's state of mind. If it is offered for a non-hearsay purpose, the Court will give a limiting instruction informing the jury that it can use the statement for that limited purpose and not for its truth.<br><br>The Court finds, by a preponderance of the evidence, that this statement is also admissible for its truth against the Counts 1 and 2 Defendants under rule 801(d)(2)(E), because B. Garcia's recrimination regarding Lujan's failure to act was calculated to spur Lujan to take further action toward the Castillo and Garza murders. See March 13 Tr. at 13:24-14:5 (Castellano, Stemo); id. at 14:12-23 (Stemo, Castellano). This statement was made before the alleged murders in furtherance of the conspiracy to murder Castillo and Garza. C. Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see C. Chavez Response ¶ 11, at 4; Patterson Response ¶ 13, at 5-6. The Court will give, on request, a limiting instruction as to the Trial 2 Defendants who are not charged in Counts 1 and 2. |

| Statement 10: "Leroy Lucero received word from Billy Garcia that several hits were supposed to happen. Garcia told him he didn't need help since Lucero was getting out."<br><br>Declarant: Billy Garcia<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | Part of this statement -- "Leroy Lucero received word from Billy Garcia that several hits were supposed to happen" -- is a statement of B. Garcia's then-existing state of mind, specifically his plan, so that portion of the statement is admissible for its truth under rule 803(3). The remainder of the statement, B. Garcia's refusal of Lucero's proffered assistance, is admissible for its truth against the Counts 1 and 2 Defendants under rule 801(d)(2)(E), because the Court finds, by a preponderance of the evidence, that the refusal was part of making the arrangements for the Castillo and Garza murders. See March 13 Tr. at 16:16-21 (Castellano, Stemo). Thus, this statement was made during and in furtherance of the conspiracies to kill Castillo and Garza, and is admissible for its truth against the Counts 1 and 2 Defendants under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see C. Chavez Response ¶ 12, at 4; Patterson Response ¶ 14, at 6. The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Counts 1 or 2. |
| Statement 11: "Leroy Lucero confirmed the message that several hits were supposed to happen with Angel Munoz. Munoz said 'Something has to happen Carnal Billy's on his way.'"<br><br>Declarant: Angel Munoz<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | The Court finds, by a preponderance of the evidence, that A. Munoz -- a member of both the Counts 1 and 2 conspiracies, see supra FOF ¶¶ 3, 7 -- made this statement before the alleged murders during a telephone call with Lucero to prompt action in carrying out the conspiracies. See March 13 Tr. at 16:22-24 (Castellano, Stemo); id. at 17:17-18:9 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Counts 1 and 2 conspiracies, and therefore is admissible for its truth against the members of the Counts 1 and 2 conspiracies, under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see C. Chavez Response ¶ 13, at 4-5; Patterson Response ¶ 15, at 6. The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Counts 1 or 2. |

| | |
|---|---|
| Statement 12: "Leonard Lujan met with Eugene Martinez and tasked him with the murder of Garza by strangulation and told Martinez to pick people to help."<br><br>Declarant: Leonard Lujan<br><br>Source: Leonard Lujan, Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | The Court finds, by a preponderance of the evidence, that Lujan -- a member of the Count 2 conspiracy, see supra FOF ¶ 6 -- made this statement before the alleged murder, to get E. Martinez to carry out the Garza murder and enlist others to help. See March 13 Tr. at 18:10-21 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Count 2 conspiracy, and is therefore admissible for its truth against the Count 2 Defendants under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see C. Chavez Response ¶ 14, at 5; Patterson Response ¶ 16, at 6-7. The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Count 2. |
| Statement 13: "Leonard Lujan met with Joe Gallegos, Angel DeLeon, and 'Criminal'[28] and ordered Castillo murdered by strangulation."<br><br>Declarant: Leonard Lujan<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: J. Gallegos Response, Patterson Response | Stemo's testimony indicates that she is aware of this statement, which Lujan made in 2001, via another out-of-court statement, which Lujan made circa 2007. See March 13 Tr. at 66:11-67:15 (Benjamin, Stemo). The 2007 statement was made long after the Count 1 conspiracy ended, so it is not admissible under rule 801(d)(2)(E). See United States v. Alcorta, 853 F.3d 1123, 1139 (10th Cir. 2017)("Statements made after the objectives of the conspiracy have either failed or been achieved are not made during the conspiracy and must be excluded."). The Court finds, by a preponderance of the evidence, that the earlier statement, however, was made during and in furtherance of the Count 1 conspiracy, because Lujan -- a member of the Count 1 conspiracy, see supra FOF ¶ 2 -- told others how to carry out the murder. See March 13 Tr. at 18:22-19:4 (Castellano, Stemo); id. at 20:2-9 (Castellano, Stemo). Patterson is not a member of the Count 1 conspiracy, see supra FOF ¶¶ 2-3, so the Court sustains Patterson's objection insofar as it requests a limiting instruction, which the Court will give at Patterson's in-court request, see Patterson Response ¶ 17, at 7. The Court will give, on request, a limiting instruction as to the other Defendants who are not charged in Count 1.<br><br>J. Gallegos requests the opportunity to voir dire Lujan, because "he is referred to in an audio recording by Leroy Lucero as 'crazy Leonard, no one would believe |

---

[28]"Criminal" refers to Michael Jaramillo. See March 13 Tr. at 130:24-131:1 (Castellano, Stemo).

Leonard.'" J. Gallegos Response ¶ 1, at 3 (source of quote not provided). If J. Gallegos wants to voir dire Lujan outside the presence of the jury, he may. Based on what the Court knows at the present time, it will allow Lujan to relay the statement. J. Gallegos is free to argue to the jury that it should not credit this statement, however.

J. Gallegos argues that this <u>James</u> Proffer statement is an action -- giving an order -- and not a statement for Federal Rules of Evidence purposes. <u>See</u> J. Gallegos Response ¶ 1, at 3; March 13 Tr. at 66:17-19 (Benjamin). Under the Federal Rules of Evidence, all statements are assertions. <u>See</u> Fed. R. Evid. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). <u>See</u> <u>also</u> <u>id.</u> advisory committee's notes to 1972 proposed rules ("The effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion."). Verbal actions like orders and commands -- <u>e.g.</u>, "fetch me a shrubbery" -- as well as questions -- <u>e.g.</u>, "what do you want to eat for lunch?" -- are not always assertions, because they are neither true nor false. [29] <u>See also</u> Fed. R.

---

[29] At least according to Aristotle, contingent predictions are another example of utterances that are neither true nor false:

In the case of that which is or which has taken place, propositions, whether positive or negative, must be true or false. Again, in the case of a pair of contradictories, either when the subject is universal and the propositions are of a universal character, or when it is individual, as has been said,[] one of the two must be true and the other false . . . .

When the subject, however, is individual, and that which is predicated of it relates to the future, the case is altered. For if all propositions whether positive or negative are either true or false, then any given predicate must either belong to the subject or not, so that if one man affirms that an event of a given character will take place and another denies it, it is plain that the statement of the one will correspond with reality and that of the other will not. For the predicate cannot both belong and not belong to the subject at one and the same time with regard to the future.

. . . .

. . . [T]o say that neither the affirmation nor the denial is true, maintaining, let us say, that an event neither will take place nor will not take place, is to take up

- 96 -

Evid. 801 advisory committee's notes to 1972 proposed rules ("When evidence of conduct is offered on the theory that it is not a statement, and hence not hearsay, a preliminary determination will be required to determine whether an assertion is intended.").  Consequently, orders and questions generally are not hearsay both because hearsay must be a statement, see Fed. R. Evid. 801(c) ("'Hearsay' means a statement . . . ."), and because something that is neither true nor false cannot be offered to prove the truth of the matter asserted, see Fed. R. Evid. 801(c)(2).  See also 4 Saltzburg et al., supra, § 801.02[1][c], at 801-17 ("If proffered evidence is not a 'statement' within the meaning of Rule 801(a), then it cannot be hearsay, and so cannot be excluded under the rule.").

While orders and commands are not, themselves, assertions, they may -- like questions -- contain implicit assertions.  See United States v. Summers, 414 F.3d 1287, 1298 (10th Cir. 2005)(concluding that a defendant's question -- "'How did you guys find us so fast?'" -- was an implicit assertion of "both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly").  For example, a lawyer asking a witness whether the witness stopped beating his wife

---

a position impossible to defend.  In the first place, though facts should prove the one proposition false, the opposite would still be untrue.  Secondly, if it was true to say that a thing was both white and large, both these qualities must necessarily belong to it; and if they will belong to it the next day, they must necessarily belong to it the next day.  But if an event is neither to take place nor not to take place the next day, the element of chance will be eliminated.  For example, it would be necessary that a sea-fight should neither take place nor fail to take place on the next day.

    . . . .

        . . . A sea-fight must either take place to-morrow or not, but it is not necessary that it should take place to-morrow, neither is it necessary that it should not take place, yet it is necessary that it either should or should not take place to-morrow.  Since propositions correspond with facts, it is evident that when in future events there is a real alternative, and a potentiality in contrary directions, the corresponding affirmation and denial have the same character.

Aristotle, On Interpretation § I, Pt. 9, available at http://classics.mit.edu/Aristotle/interpretation.html.

indicates both that the witness has a wife and that the witness abused his wife. Whether those two indications are assertions, however, depends on the lawyer's intent.

> Taken together, [United States v. Jackson, 88 F.3d 845 (10th Cir. 1996),] and [United States v. Long, 805 F.2d 1572 (D.C. Cir. 1990)(Thomas, J.),] do not foreclose the possibility that a declaration in the form of a question may nevertheless constitute an assertion within the meaning of Rule 801(a) and (c). Rather, both cases properly focus the inquiry on the declarant's intent.

United States v. Summers, 414 F.3d at 1300. Thus, the verbal acts that the James Proffer identifies can qualify as statements -- and, hence, as hearsay -- if they were intended to be assertions. See Fed. R. Evid. 801 advisory committee's notes to 1972 proposed rules ("The key to the definition is that nothing is an assertion unless intended to be one."). The Court, when it comes across verbal actions listed in the James Proffer will, thus, assess whether those verbal acts contain implicit assertions.

That the United States lists, in the James Proffer, verbal acts is useful even if those verbal acts do not contain implicit assertions, because people often take verbal actions and make statements in quick succession and people who are not lawyers do not always scrupulously distinguish between verbal actions and statements. For instance, Statement 13 indicates that Lujan ordered others to kill Castillo, but Lujan may testify that he told people that "I want you to kill Castillo," which is a statement regarding Lujan's desires. Alternatively, Lujan may testify that he gave the order that Statement 13 describes and immediately followed that order with an explanation regarding why Castillo should be killed. That the United States included Statement 13 in the James Proffer puts the Defendants on notice that Lujan may testify regarding the sort of statements associated with the order that Statement 13 describes. It also allows the Court to make findings that will permit it to rule quickly on unexpected statements closely associated with those orders, e.g., if an order was made during a conspiracy by a conspirator then statements

| | made by the same person at much the same time were also made during a conspiracy by a conspirator.[30] |
|---|---|
| Statement 14: "Billy Garcia wanted knowledge of the plan kept to very few individuals."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | This is a statement of B. Garcia's then-existing state of mind, specifically his intent, so it is admissible for its truth under rule 803(3). <u>See</u> March 13 Tr. at 20:10-17 (Castellano, Stemo). The Court accordingly overrules C. Chavez' and Patterson's objections. <u>See</u> C. Chavez Response ¶ 15, at 5; Patterson Response ¶ 18, at 7-8. |
| Statement 15: "Once alarms were sounded and the murders discovered, Billy Garcia congratulated Leonard Lujan with 'Amor.'"<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | This statement was made after Castillo and Garza died, so it was not made during the Counts 1 and 2 conspiracies. Accordingly, it is not admissible under rule 801(d)(2)(E). It is admissible, however, as an implicit statement of B. Garcia's then-existing state of mind, <u>i.e.</u> that he approves of Lujan's job. <u>See</u> Fed. R. Evid. 803(3). If it is offered for such a non-hearsay purpose, the Court will give a limiting instruction informing the jury that it can use the statement for that limited purpose and not for its truth. Accordingly, the Court sustains C. Chavez' and Patterson's objections to admitting this statement for its truth under rule 801(d)(2)(E), <u>see</u> C. Chavez Response ¶ 16, at 5; Patterson Response ¶ 19, at 8, but the Court may admit this statement for a non-hearsay purpose. |

---

[30]Whether a statement is made in furtherance of a conspiracy, however, depends on the statement's content. Is the statement to be made differs from the one in the chart, the United States should approach the bench and see if the Court still will allow the statement to be admitted.

| | |
|---|---|
| Statement 16: "Frederico Munoz [was] part of the committee that sanctioned the hit on Garza and Castillo. Munoz wanted Garza killed for being Los Carnales."<br><br>Declarant: Billy Garcia<br><br>Source: Federico Munoz<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | The testimony at the Court's <u>James</u> hearing indicates that Federico Munoz admitted to the information contained in this statement. <u>See</u> March 13 Tr. at 21:10-22:1 (Castellano, Stemo). Federico Munoz testifying and repeating that admission raises no hearsay issues, because F. Munoz has personal knowledge regarding his own motives and regarding whether he was part of a group that ordered the Castillo and Garza murders. <u>See</u> Fed. R. Evid. 602. Accordingly, the Court overrules C. Chavez' and Patterson's objections. <u>See</u> C. Chavez Response ¶ 17, at 6; Patterson Response ¶ 20, at 8. |
| Statement 17: "Arturo Garcia placed [a] hit on Sanchez because he was suspected to be cooperating with law enforcement."<br><br>Declarant: Arturo Garcia<br><br>Source: Eric Duran<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This is a statement of A.A. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth against all the Defendants under rule 803(3). <u>See</u> March 13 Tr. at 22:2-12 (Castellano, Stemo). |
| Statement 18: "Ben Clark passed around paperwork on Sanchez's cooperation with police. Stating 'everyone who needs to see it has seen it, get rid of it.'"<br><br>Declarant: Ben Clark<br><br>Source: Ruben Hernandez<br><br>Date: On or before June 17, 2007<br><br>Objections: None | The Court finds, by a preponderance of the evidence, that the statement that "everyone who needs to see it has seen it" was made before the alleged murder by a member of the Count 3 conspiracy -- Clark, <u>see</u> <u>supra</u> FOF ¶ 10 -- to prompt action and to prevent the conspiracy's disclosure, <u>see</u> March 13 Tr. at 22:13-25 (Castellano, Stemo). Accordingly, this portion of the statement was made during and in furtherance of the Count 3 conspiracy by a member of that conspiracy, and is admissible against the Count 3 conspirators under rule 801(d)(2)(E). The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Count 3.<br><br>The act of passing around paperwork is not a statement, however, so it is admissible against all the Defendants. <u>See</u> <u>supra</u> Statement 13 (analyzing the relationship between acts and statements). |
| Statement 19: "Arturo Garcia wrote to Frankie Gonzales that | The Court finds, by a preponderance of the evidence, that A.A. Garcia -- a member of the Count 3 conspiracy, <u>see</u> |

| | |
|---|---|
| Brian and Raymond Rascon were to take care of the next murder for SNM." | _supra_ FOF ¶ 10 -- made this statement before the alleged murder, providing instruction as to who was to kill Sanchez, _see_ March 13 Tr. at 23:1-12 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Count 3 conspiracy by a member of that conspiracy, and is admissible against the Count 3 conspirators under rule 801(d)(2)(E). The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Count 3. |
| Declarant: Arturo Garcia<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | |
| Statement 20: "Ben Clark put Javier Alonso in charge of making sure Sanchez was killed and told the Rascon brothers to complete the hit."<br><br>Declarant: Ben Clark<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | The Court finds, by a preponderance of the evidence, that Clark -- a member of the Count 3 conspiracy, _see supra_ FOF ¶ 10 -- made this statement before the alleged murder, to carry out the conspiracy's purpose and to provide instruction as to who was to kill Sanchez, _see_ March 13 Tr. at 23:13-21 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Count 3 conspiracy by a member of that conspiracy, and is admissible against the Count 3 conspirators under rule 801(d)(2)(E). The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Count 3. |
| Statement 21: "Word was sent from the green pod that if Sanchez was not killed, others in the Blue pod would be killed."<br><br>Declarant: FNU [First Name Unknown] LNU [Last Name Unknown]<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | The Court finds, by a preponderance of the evidence, that Guerrero sent this message to FNU/LNU to pass on to the green pod, to prompt action in the Count 3 conspiracy. _See_ March 13 Tr. at 23:22-24:7 (Castellano, Stemo). Both Guerrero and FNU/LNU are members of the Count 3 conspiracy. _See supra_ FOF ¶ 11. Accordingly, this statement was made during and in furtherance of the Count 3 conspiracy by a member of that conspiracy, and is admissible against the Count 3 conspirators under rule 801(d)(2)(E). The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Count 3. |
| Statement 22: "Edward Troup was told to go help with Sanchez's murder."<br><br>Declarant: Javier Alonso<br><br>Source: Javier Alonso | The Court finds, by a preponderance of the evidence, that Alonso -- a member of the Count 3 conspiracy, _see supra_ FOF ¶ 10 -- made this statement before the alleged murder, to get Troup to join the conspiracy and help carry out its goal, _see_ March 13 Tr. at 25:2-8 (Castellano, Stemo). Accordingly, the statement was made during and in furtherance of the Count 3 conspiracy by a member of that conspiracy, and therefore is admissible against the Count 3 |

| | |
|---|---|
| Date: On or before June 17, 2007<br><br>Objections: None | conspirators under rule 801(d)(2)(E). The Court will give, on request, a limiting instruction as to the Defendants who are not charged in Count 3. |
| Statement 23: "While Edward Troup and Javier Alonso were finishing killing Sanchez, Brian and Raymond Rascon came and asked if they could help."<br><br>Declarant: Brian Rascon and/or Raymond Rascon<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | This statement is a verbal action -- specifically an offer -- and not an assertion, so it cannot be hearsay. <u>See</u> March 13 Tr. 25:9-26:2 (Castellano, Stemo).<br><br><blockquote>The Rascon brothers were tasked to do the hit originally but when Javier Alonso approached them. Raymond Rascon said they didn't want to do it because they were short to the door, meaning they were going to get out of prison shortly. Therefore, Javier Alonso instructed Edward Troup and they both went into Freddie Sanchez' cell and took care of business. When they were doing that, the Rascon brothers came to offer their aid as a way to save face with the gang.</blockquote><br>March 13 Tr. at 25:15-24 (Stemo). <u>See</u> <u>supra</u> Statement 13 (discussing the relationship between actions and statements). The Rascon brothers were not members of the Count 3 conspiracy, so none of the statements that they made are admissible for their truth under rule 801(d)(2)(E). <u>See</u> <u>supra</u> note 17. This statement is a verbal action, however, and not an assertion, it is admissible non-hearsay<br><br>Troup argues that this statement lacks a sufficient foundation, because the <u>James</u> Proffer identifies the declarant as "Brian Rascon and/or Raymond Rascon." Troup Response ¶ 4, at 2 (internal quotation marks omitted)(quoting <u>James</u> Proffer at 13). This statement's admissibility does not depend on whether the person who offered assistance is Brian Rascon, Raymond Rascon, or both, because it is not hearsay. <u>See</u> <u>United States v. Brinson</u>, 772 F.3d 1314, 1321-22 (10th Cir. 2014)(concluding that an unidentified declarant's statements were admissible, because they were not offered to prove the truth of the matter asserted). Accordingly, the Court overrules Troup's objection. <u>See</u> Troup Response ¶ 4, at 2. |
| Statement 24: "Javier Alonso told the Rascon brothers to keep a look out when the brothers asked if they | This statement is an action -- giving the Rascon brothers an order -- so it is not hearsay. <u>See</u> March 13 Tr. at 26:3-10 (Stemo, Castellano). <u>See also</u> <u>supra</u> Statement 13 |

| | |
|---|---|
| could help." <br><br> Declarant: Javier Alonso <br><br> Source: Javier Alonso <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | (discussing the relationship between actions and statements). That Alonso gave this order after Sanchez' death indicates that any associated statements were not made during the Sanchez conspiracy, so those statements are not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E). See United States v. Alcorta, 853 F.3d at 1139. |
| Statement 25: "Edward Troup kissed Javier Alonso on the cheek and told him he was proud of him." <br><br> Declarant: Edward Troup <br><br> Source: Javier Alonso <br><br> Objections: None | This is a statement of Troup's then-existing state of mind, so it is admissible against all Defendants under rule 803(3). See March 13 Tr. at 26:11-19 (Castellano, Stemo). |
| Statement 26: "After Sanchez was murdered, Edward Troup began telling Ruben Hernandez that he was next." <br><br> Declarant: Edward Troup <br><br> Source: Javier Alonso; Ruben Hernandez <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | Stemo's testimony indicates that this James Proffer statement is several closely associated statements: <br><br> Q.  Following the murder in Statement Number 26 was an indication that Edward Troup began telling Ruben Hernandez that he was next? <br><br> A.  Yes. <br><br> Q.  And what was the indication about Ruben Hernandez at or around the time -- at or around the time of the murder? <br><br> A.  I believe Mr. Hernandez did not cover the cameras properly. <br><br> Q.  At that point, according to statements by Javier Alonso and others, was Ruben Hernandez seen as possibly scared and weak? <br><br> A.  Yes, he was actually on crutches at the time. <br><br> Q.  Related to the statement is there another statement related to Edward Troup stating, in part, that Ruben Hernandez failed |

| | to cover the camera because he was scared? |
|---|---|
| | A. Yes. |
| | March 13 Tr. at 26:20-27:13 (Stemo, Castellano). |
| | The portion of this statement that articulates Troup's plan, _i.e._, a plan to assault or kill Hernandez, is admissible as a statement of Troup's then-existing state of mind under rule 803(3). To the extent that these statements are offered for their effect on Hernandez, _i.e._, intimidation, they are not offered to prove the truth of the matter asserted, so they are not hearsay, and the Court will give a limiting instruction. |
| Statement 27: "Arturo Garcia sent word about Sanchez to Ben Clark." Declarant: Arturo Garcia Source: Ben Clark, Eric Duran Date: On or before June 17, 2007 Objections: None | The Court finds, by a preponderance of the evidence, that A.A. Garcia -- a member of the Count 3 conspiracy, see supra FOF ¶ 10 -- told Clark about the plan to murder Sanchez, before the alleged murder, to enlist Clark's help in carrying out the plan. See March 13 Tr. at 27:14-23 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Count 3 conspiracy by a member of that conspiracy, and therefore is admissible for its truth against the Count 3 conspirators under rule 801(d)(2)(E). The Court will, on request, give a limiting instruction as to the Defendants who are not charged in Count 3. |
| Statement 28: "Ben Clark and Arturo Garcia sent several letters about Sanchez to each other." Declarant: Arturo Garcia Source: Ben Clark Date: On or before June 17, 2007 Objections: None | Sending letters is an action and not a statement, but the statements in those letters regarding the Sanchez murder are admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E), because such statements were made by members of the Count 3 conspiracy -- A.A. Garcia and Clark, see supra FOF ¶ 10 -- during and in furtherance of the Count 3 conspiracy to murder Sanchez, see March 13 Tr. at 27:24-28:7 (Castellano, Stemo). The Court will, on request, give a limiting instruction as to the Defendants who are not charged in Count 3 for any letter statements admitted under rule 801(d)(2)(E). |
| Statement 29: "Javier Alonso and Edward Troup were expected to oversee the murder, and Troup told the Rascon brothers to hit Sanchez." Declarant: Ben Clark | Troup argues that Benjamin Clark's expectations circa 2007 are not statements. See Troup Response ¶ 5, at 2. Troup is correct; expectations are not statements, but Clark can testify about what his expectations were at that time if he remembers. If, however, this statement refers to expectations that belong to someone other than Clark, the United States would need to establish how Clark knows |

| | |
|---|---|
| Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | about those expectations. If that foundation is statements of someone's then-existing state of mind, then those statements are admissible for their truth under rule 803(3). If that foundation is statements that are circumstantial evidence of the declarant's state of mind, then those statements are not offered to prove the truth of the matter asserted, so they are not hearsay and the Court will instruct the jury that it can use these statements only for this limited purpose. In any event, the Court overrules Troup's objection. <u>See</u> Troup Response ¶ 5, at 2.<br><br>Troup's telling the Rascon brothers to murder Sanchez is an order and not a statement, so it is not hearsay, <u>see</u> <u>supra</u> Statement 13, but any associated statement Troup made is admissible against the Count 3 coconspirators for its truth under rule 801(d)(2)(E), <u>see</u> March 13 Tr. at 28:8-15 (Castellano, Stemo), because it was made by a "coconspirator during and in furtherance of the conspiracy," Fed. R. Evid. 801(d)(2)(E). That the Rascon brothers did not join the Count 3 conspiracy, <u>see</u> <u>supra</u> note 17, does not affect whether Troup's statements to them are admissible under rule 801(d)(2)(E). |
| Statement 30: "Leonard Lujan told Willie Amador and Jesse Ibarra to 'handle that' and told Eugene Martinez that 'I'm running this prison now.'"<br><br>Declarant: Leonard Lujan<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | Stemo's testimony indicates that "Statement Number 30 is incorrect" and that "[w]hat it actually says is, Lujan told Martinez to tell SNM members Willie Amador and Jesse Martinez to handle that." March 13 Tr. at 176:24-177:2 (Stemo). Lujan's order to E. Martinez is an action and not an assertion, <u>see</u> <u>supra</u> Statement 13 (discussing the relationship between actions and statements), but any associated statements would be admissible for their truth against the Count 2 Defendants under rule 801(d)(2)(E), because Lujan is a member of the Count 2 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 6, and made the statements before the alleged murder, to carry out the murder. C. Chavez and Patterson are members of the Count 2 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 6, so the Court overrules their objections, <u>see</u> C. Chavez Response ¶ 18, at 6; Patterson Response ¶ 21, at 8-9. For any related statements admitted under rule 801(d)(2)(E), the Court will, on request, give a limiting instruction as to the Defendants who are not charged in Count 2. |
| Statement 31: "Christopher Chavez heard about the hit on Garza and volunteered to participate in the operation." | That C. Chavez volunteered is an action and not a statement. <u>See</u> <u>supra</u> Statement 13 (discussing the relationship between actions and statements). This statement is not hearsay, because C. Chavez' act, volunteering to participate in the Garza murder, is neither |

| | |
|---|---|
| Declarant: Chris Chavez<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Patterson Response | true nor false. The Court anticipates that there are other statements associated with C. Chavez' act which could be offered for their truth. For example, it would have been natural for C. Chavez to state that he wanted to participate in the Garza murder, which would be a statement of then-existing state of mind under rule 803(3). Any statements made by Count 2 conspirators attempting to induce C. Chavez to volunteer would have been made during and in furtherance of the Count 2 conspiracy, so they would be admissible for their truth under rule 801(d)(2)(E) as to the Count 2 conspirators. As this statement is not hearsay, and B. Garcia and Patterson are members of the Count 2 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 6, the Court overrules their objections, <u>see</u> B. Garcia Response ¶ 4, at 2; Patterson Response ¶ 22, at 9. |
| Statement 32: "Willie Amador told Eugene Martinez to be lookout during the Garza murder and stated, 'If something happens, you already know.'"<br><br>Declarant: Willie Amador<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: C. Chavez Response, Patterson Response | Willie Amador, a member of the Count 2 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 7, made this statement before the alleged murder, to effectuate the Garza murder, <u>see</u> March 13 Tr. at 29:23-30:11 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Count 2 conspiracy by a member of that conspiracy, and therefore is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 6, so the Court overrules their objections, <u>see</u> C. Chavez Response ¶ 19, at 6; Patterson Response ¶ 23, at 9-10. The Court will, on request, give a limiting instruction as to the Defendants who are not charged in Count 2. |
| Statement 33: "While strangling Garza someone in the room yelled 'Close the door!'"<br><br>Declarant: Allen Patterson or Christopher Chavez<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Patterson Response | B. Garcia argues that, because the <u>James</u> Proffer lists this statement's declarant as "Allen Patterson or Christopher Chavez," <u>James</u> Proffer at 18, "[t]here is no ability to properly attribute or authenticate the statement to any particular declarant." B. Garcia ¶ 5, at 2-3. Patterson argues that the uncertainty "about the declarant renders the statement inadmissible, in that the probative value is greatly outweighed by the danger of unfair prejudice to Mr. Patterson." Patterson Response ¶ 4, at 2.<br><br>This statement -- "Close the door!," <u>James</u> Proffer at 18-- is a command, so it is neither true nor false, and is not hearsay, <u>see</u> <u>supra</u> Statement 13 (analyzing the relationship of actions and statements). Associated statements are probably admissible against the Count 2 conspirators under rule 801(d)(2)(E), if uttered before Garza's death -- <u>i.e.</u>, |

| | before the conspiracy's termination. See <u>United States v. Alcorta</u>, 853 F.3d at 1139. |
| | |

As to authentication, rule 901 states that "the proponent [of an item of evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 609(a). Accordingly, so long as the United States asserts only that this statement was made by either Patterson or Chavez, it only needs, under rule 609, to introduce evidence sufficient to support a finding that one of those two individuals made the statement. See Fed. R. Evid. 609(a). The testimony of the witness who relates this statement to the jury -- assuming that the witness has knowledge -- satisfies that requirement. See Fed. R. Evid. 609(b)(1) (stating that the testimony of a witness with knowledge satisfies rule 609's authentication requirement). Accordingly, the Court overrules B. Garcia's objection. See B. Garcia Response ¶ 5, at 2-3. The uncertainty of the declarant would not provoke an emotional response from the jury or adversely affect its attitude toward Patterson, so the introduction of this statement is not unfairly prejudicial, and the Court will not exclude it. See Fed. R. Evid. 403; <u>United States v. Rodriguez</u>, 192 F.3d at 951. Accordingly, the Court also overrules Patterson's objection. See Patterson Response ¶ 4, at 2.

| | |
|---|---|
| **Statement 34:** "Leonard Lujan approached Eugene Martinez and told him to talk to Willie Amador about the murders." <br><br> Declarant: Leonard Lujan <br><br> Source: Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objection: C. Chavez Response, Patterson Response | The Court finds, by a preponderance of the evidence, that Lujan -- a member of the Count 2 conspiracy, see supra FOF ¶ 6 -- before the alleged murder, made this statement to elicit E. Martinez' and Amador's participation in the conspiracy to murder Garza, see March 13 Tr. at 30:20-31:1 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Count 2 conspiracy by a member of that conspiracy, and therefore is admissible for its truth against the Count 2 Defendants under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy. See supra FOF ¶ 6. The Court accordingly overrules C. Chavez' and Patterson's objections. See C. Chavez Response ¶ 20, at 6-7; Patterson Response ¶ 24, at 10. The Court, on request, will give a limiting instruction as to the Defendants who are not charged in Count 2. |
| **Statement 35:** "Eugene Martinez asked Billy Garcia and Garcia confirmed the order and said 'it's | The Court finds, by a preponderance of the evidence, that B. Garcia -- a member of the Count 2 conspiracy, see supra FOF ¶ 6 -- before the alleged murder, made this statement |

| | |
|---|---|
| coming from me' and 'make sure it happens.'" <br><br> Declarant: Billy Garcia <br><br> Source: Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objections: C. Chavez Response, Patterson Response | to ensure that Garza would be killed, see March 13 Tr. at 31:2-12 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Count 2 conspiracy by a member of that conspiracy, and is admissible for its truth against the Count 2 Defendants under rule 801(d)(2)(E). C. Chavez and Patterson are members of the Count 2 conspiracy. See supra FOF ¶ 6. The Court accordingly overrules C. Chavez' and Patterson's objections. See C. Chavez Response ¶ 21, at 7; Patterson Response ¶ 25, at 10. The Court will, on request, give a limiting instruction as to the Defendants who are not charged in Count 2. |
| Statement 36: "Joe Gallegos later informed Leroy Lucero that Lawrence Torres saw and was concerned Torres might snitch." <br><br> Declarant: Joe Gallegos <br><br> Source: Leroy Lucero <br><br> Date: On or before March 26, 2001 <br><br> Objections: B. Garcia Response, C. Chavez Response, A. Gallegos Response, J. Gallegos Response, Troup Response, Patterson Response | The United States orally conceded that this statement is not admissible under rule 801(d)(2)(E), because it was made four or five years after the Castillo and Garza murders. See March 13 Tr. at 32:5-13 (Castellano). The Court thus sustains B. Garcia's, C. Chavez', and Troup's objections insofar as they assert that this is not a coconspirator statement. See B. Garcia Response ¶ 6, at 3; C. Chavez Response ¶ 22, at 7; Troup Response ¶ 6, at 2. <br><br> The United States suggests, however, that the statement is admissible against J. Gallegos under rule 801(d)(2)(A). See March 13 Tr. at 32:11-13 (Castellano). The statement also appears to be a statement of then-existing state of mind under rule 803(3) to the extent that it expresses J. Gallegos' concerns and as circumstantial evidence of J. Gallegos' state of mind, i.e. consciousness of guilt. It is not admissible under rule 803(3), however, to show that Lawrence Torres saw anything, because rule 803(3) does not permit a statement of belief to be used to prove the fact believed. See Fed. R. Evid. 803(3). The Court accordingly overrules Patterson's objection. See Patterson Response ¶ 26, at 10-11. If the statement comes in under rule 801(d)(2)(A), all Defendants other than J. Gallegos may request a limiting instruction. If the statement is admitted for a non-hearsay purpose, the Court will instruct the jury that it can consider the statement only for this purpose. <br><br> That this statement is nontestimonial means that its admission does not offend the Confrontation Clause. Accordingly, the Court overrules A. Gallegos' objection alleging a confrontation violation and, for the reasons stated supra note 27, the Court overrules A. Gallegos' negative spillover objection. See A. Gallegos Response |

| | |
|---|---|
| | ¶ 4, at 2.  J. Gallegos also objects to this statement "on confrontation grounds," but, because he is the declarant, there is no confrontation issue and the Court overrules his objection.  <u>See</u> J. Gallegos Response ¶ 2, at 4.  The Court can also use limiting instructions to mitigate any prejudice to other Defendants. |
| Statement 37: "Edward Troup told Lawrence Torres, 'This has nothing to do with you.  Don't come up here.'"<br><br>Declarant: Edward Troup<br><br>Source: Lawrence Torres<br><br>Date: On or before March 26, 2001<br><br>Objections:  B. Garcia Response, C. Chavez Response, Patterson Response | The United States provided additional context for this statement at the Court's <u>James</u> hearing:<br><br>> On the morning of the murder, March 26, 2001, Lawrence Torres woke up.  As he walked out to heat up water for his coffee, he saw Angel DeLeon and Edward Troup, and it looked like to him that they were disassembling a laundry bag.  He put his water into the microwave, went back to his cell.  He heard a struggle, so he looked out to see what was happening, and he saw Mr. Edward Troup sitting at a table.  Mr. Torres tried go upstairs to see what was happening, and that's when Mr. Troup made that statement.<br><br>March 13 Tr. at 32:20-33:5 (Stemo).  The Court therefore finds, by a preponderance of the evidence, that Troup, a member of the Count 1 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 3, made this statement during the alleged Castillo murder to prevent outside interference with the murder.  Accordingly, this statement was made during and in furtherance of the Count 1 conspiracy by a member of that conspiracy, and is admissible against the Count 1 Defendants under rule 801(d)(2)(E).  B. Garcia is a member of the Count 1 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 3, so the Court overrules B. Garcia's objection, <u>see</u> B. Garcia Response ¶ 7, at 3.  C. Chavez and Patterson are not members of the Count 1 conspiracy, <u>see</u> <u>supra</u> FOF ¶¶ 2-3, so the Court sustains C. Chavez' and Patterson's objections insofar as they request a limiting instruction, which the Court will give at C. Chavez' or Patterson's in-court request, <u>see</u> C. Chavez Response ¶ 23, at 7-8; Patterson Response ¶ 27, at 11.  The Court will, on request, give a limiting instruction to any of the other Defendants who are not charged in Count 1. |
| Statement 38: "Angel Deleon had a scratch on his finger and told a | The <u>James</u> hearing testimony indicates that DeLeon made this statement after the Castillo murder, so it was not made during the conspiracy to commit that murder.  <u>See</u> March |

| | |
|---|---|
| female CO that he cut himself." <br><br> Declarant: Angel DeLeon <br><br> Source: Lawrence Torres <br><br> Date: On or before March 26, 2001 <br><br> Objections: B. Garcia Response, C. Chavez Response, Patterson Response | 13 Tr. at 33:9-21(Castellano, Stemo). Consequently, it is not admissible for its truth under rule 801(d)(2)(E). The statement is admissible, however, as circumstantial evidence of DeLeon's state of mind, specifically his consciousness of guilt, and the Court will give a limiting instruction that the jury can consider this statement for only this purpose. The Court accordingly overrules B. Garcia's, C. Chavez', and Patterson's objections that this is inadmissible hearsay. <u>See</u> B. Garcia Response ¶ 8, at 4; C. Chavez Response ¶ 24, at 8; Patterson Response ¶ 28, at 11-12. <br><br> Offering an out-of-court statement for a purpose other than to prove its truth does not implicate the Confrontation Clause, <u>see</u> <u>Tennessee v. Street</u>, 471 U.S. 409, 417 (1985), so the Court overrules B. Garcia's and C. Chavez' objections that "this is a testimonial statement made to a CO during the process of an investigation and therefore is inadmissible," B. Garcia Response ¶ 8, at 4. |
| Statement 39: "Kyle Dwyer came to SNMCF with 'paperwork' on Sanchez." <br><br> Declarant: Kyle Dwyer <br><br> Source: Ben Clark <br><br> Date: On or before June 17, 2007 <br><br> Objections: Troup Response | That Dwyer brought the Sanchez paperwork to SNMCF is an action and not a statement. <u>See supra</u> Statement 13 (analyzing the relationship between actions and statements). Accordingly, it is not hearsay and is admissible, so the Court overrules Troup's objection. <u>See</u> Troup Response ¶ 7, at 2. |
| Statement 40: "The 'paperwork' came from the Crazy Town Roswell gang." <br><br> Declarant: Ben Clark <br><br> Source: Ben Clark <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | Clark likely does not have personal knowledge regarding the paperwork's origins; he probably knows that the paperwork came from the Crazy Town Roswell gang because somebody told him about the paperwork's origins. <u>See</u> Fed. R. Evid. 602. The Court has no information regarding that out-of-court statement to Clark, so it cannot analyze whether that statement is admissible for its truth. |
| Statement 41: "Joe and Andrew Gallegos just pulled 'a job' and had to go 'clean up.' They were giving money and heroin to friends to | This statement is not admissible under rule 801(d)(2)(E), because the United States has not provided evidence for the Court to conclude, by a preponderance of the evidence, that a conspiracy to murder Adrian Burns existed. |

'help them out.' Joe Gallegos said, 'I just came up.'"

Declarant: Joe and/or Andrew Gallegos

Source: Leroy Vallejos, Michael Sutton

Date: On or about November 12, 2012

Objections: A. Gallegos Response, J. Gallegos Response

The James Proffer is not entirely clear regarding which statements A. Gallegos made and which statements J. Gallegos made. Rule 801(d)(2)(A) permits the statement to be admitted against whichever Gallegos brother made the statement. If one Gallegos brother made a statement, it may be admissible against the other under rule 801(d)(2)(B), which permits a statement to be introduced against a party that "manifested that it adopted or believed [the statement] to be true." Fed. R. Evid 801(d)(2)(B). See id. advisory committee's notes to 1972 proposed rules ("Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue."). Additionally, the statement might be admissible as an excited utterance. See Fed. R. Evid. 803(2).

A. Gallegos objects to this statement on confrontation grounds, but because this statement is nontestimonial, the Court overrules this objection. See A. Gallegos Response ¶ 4, at 2. A. Gallegos also objects to this statement because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point. It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge. See 2 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 602.02[2] (11th ed. 2015)("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible."). Accordingly, the Court overrules A. Gallegos' authentication objection for now, although he may renew it at trial if the authentication is lacking. See A. Gallegos Response ¶ 5, at 3.

J. Gallegos objects to this statement and Statement 42, because admitting them "is probably in-violation [sic] of the holding in *Bruton v. United States*, 391 U.S. 123 (1968)." J. Gallegos Response ¶ 3, at 4. That this

| | statement is nontestimonial indicates that admitting it for its truth does not offend the Confrontation Clause. Further, if rule 801(d)(2)(A) and rule 801(d)(2)(B) both apply, the statement is admissible against both Gallegos brothers. The Court accordingly overrules J. Gallegos' objection. <u>See</u> J. Gallegos Response ¶ 3, at 4. |
|---|---|
| Statement 42: "Joe and Andrew Gallegos were covered in blood and advised they were 'cleaning the house.' Joe Gallegos later went by Leroy Vallejos' house and tried to give Vallejos his and Andrew Gallegos' truck."<br><br>Declarant: Joe and/or Andrew Gallegos<br><br>Source: Daniel Orndorff, Michael Sutton, Leroy Vallejos<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | This statement is not admissible under rule 801(d)(2)(E), because the United States has not provided evidence for the Court to conclude, by a preponderance of the evidence, that a conspiracy to murder Burns existed.<br><br>Part of this statement -- that J. Gallegos tried to give Vallejos the truck -- is an action and not a statement, so it is not hearsay. <u>See</u> <u>supra</u> Statement 13 (analyzing the relationship between actions and statements). Statements indicating why J. Gallegos was giving Vallejos the truck are admissible as circumstantial evidence of J. Gallegos' state of mind or as statements of J. Gallegos' then-existing state of mind under rule 803(3). That "they were 'cleaning the house,'" James Proffer at 22, is admissible for its truth against the declarant under 801(d)(2)(A), and likely against the other brother under 801(d)(2)(B).<br><br>A. Gallegos objects to this statement on confrontation grounds, but because this statement is nontestimonial, the Court overrules this objection. <u>See</u> A. Gallegos Response ¶ 4, at 2. A. Gallegos also objects to this statement because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point. It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge. <u>See</u> 2 Saltzburg et al., <u>supra</u>, § 602.02[2] ("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible."). Accordingly, the Court overrules A. Gallegos' authentication objection for now, although he may renew it at trial if the authentication is |

| | lacking.  <u>See</u> A. Gallegos Response ¶ 5, at 3. |
|---|---|
| | J. Gallegos objects to this statement's admission, as discussed <u>supra</u> Statement 41.  The Court overrules this objection, because the statement is nontestimonial and, if rule 801(d)(2)(A) and rule 801(d)(2)(B) both apply, the statement is admissible against both Gallegos brothers. <u>See</u> J. Gallegos Response ¶ 3, at 4. |
| Statement 43: "Charlene Baldizan agreed to get rid of the van because the Gallegos brothers knew police were looking for it."<br><br>Declarant: Gallegos brothers<br><br>Source: Charlene Baldizan<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Burns existed by a preponderance of the evidence, so this statement is not admissible under rule 801(d)(2)(E). Accordingly, the Court sustains the portion of J. Gallegos' objection as to the statement's admission under this hearsay exclusion.  <u>See</u> J. Gallegos Response ¶ 4, at 4. |
| | A. Gallegos objects to this statement on confrontation grounds, but because this statement is nontestimonial and A. Gallegos one of the declarants, the Court overrules this objection.     <u>See</u> A. Gallegos Response ¶ 4, at 2. A. Gallegos also objects to this statement because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3.  At the <u>James</u> hearing, however, Agent Stemo indicated that Baldizan specifically attributed this statement to both brothers, and was physically present with them as they hid from police.  <u>See</u> March 13 Tr. at 36:18-37:19 (Castellano, Stemo). Accordingly, this statement is admissible as evidence of the brothers' then-existing state of mind -- specifically, their motive for getting rid of the van -- under rule 803(3). It is also admissible as circumstantial evidence of the brothers' consciousness of guilt.  Any statements made that the police were looking for the van are admissible against only the declarant brother under rule 801(d)(2)(A) -- although rule 801(d)(2)(B) may apply to the other brother  -- because rule 803(3) does not permit a statement of belief to be used to prove the fact believed.  <u>See</u> Fed. R. Evid. 803(3) (excluding from admissibility "a statement of memory or belief to prove the fact remembered or believed[,] unless  it relates to the validity or terms of the declarant's will").   Accordingly, the Court overrules A. Gallegos' authentication objection.   <u>See</u> A. Gallegos Response ¶ 5, at 3. |

| | |
|---|---|
| | J. Gallegos also objects to this statement, because "this appears to be an act or action rather than a statement." J. Gallegos Response ¶ 4, at 4. An action which is not meant as an assertion is not a statement, and is admissible non-hearsay. <u>See</u> <u>supra</u> Statement 13. There appears to be statements within the statement, as analyzed above, and the Court overrules this objection. <u>See</u> J. Gallegos Response ¶ 4, at 4. |
| **Statement 44:** "Joe and Andrew Gallegos asked Jason Van Veghel to clean up the living room and pull the carpet up and gave him 2-3 hits of heroin for it. Joe Gallegos also asked Van Veghel to clean blood off air compressor."<br><br>Declarant: Joe Gallegos<br><br>Source: Jason Van Veghel<br><br>Date: On or about November 13, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The United States orally struck "and Andrew" from statement 44, so the Court analyzes the statement without this phrase. March 13 Tr. at 37:21-24 (Castellano).<br><br>A. Gallegos objects to this statement on confrontation grounds, but, as there is no Confrontation Clause issue here, the Court overrules this objection. <u>See</u> A. Gallegos Response ¶ 4, at 2.<br><br>J. Gallegos objects to this statement, because Van Veghel "has never been alleged or identified as a co-conspirator." J. Gallegos Response ¶ 5, at 4. After J. Gallegos filed his response, the United States orally identified Van Veghel as a conspirator in the Burns homicide coverup at the Court's <u>James</u> hearing. <u>See</u> March 12 Tr. at 99:23-100:3 (Castellano). Additionally, whether a statement is admissible under rule 801(d)(2)(E) depends on whether the statement was made by a conspirator and not on whether the statement was made to a conspirator. <u>See</u> 4 Saltzburg et al., <u>supra</u>, § 801.02[7], at 801-74.<br><br>Rule 801(d)(2)(E) does not apply to this statement, however, because the Court has not found that a conspiracy to murder Adrian Burns existed by a preponderance of the evidence. Nonetheless, Van Veghel can testify regarding the actions he took without running afoul of the rule against hearsay. <u>See</u> Fed. R. Evid. 801(c). Any instructions J. Gallegos gave Van Veghel are orders, not statements, and thus admissible non-hearsay as well. <u>See</u> <u>supra</u> Statement 13. Any statement J. Gallegos may have said to Van Veghel is admissible against J. Gallegos under 801(d)(2)(A). <u>See</u> Fed. R. Evid. 801(d)(2)(A). Accordingly, the Court overrules J. Gallegos' objection. <u>See</u> J. Gallegos Response ¶ 5, at 4. The Court, upon request, will give a limiting instruction for any such statements as to the other Defendants. |
| **Statement 45:** "The next day, at Joe Gallegos[']  request, Andrew | The Court has not found that a conspiracy to murder Burns existed by a preponderance of the evidence, so this |

| | |
|---|---|
| Gallegos threw a set of keys and a wrist watch into a field."<br><br>Declarant: Andrew Gallegos<br><br>Source: Jason Van Veghel<br><br>Date: On or about November 13, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | statement is not admissible under rule 801(d)(2)(E). Van Veghel can testify regarding the actions he observed, such as A. Gallegos throwing a set of keys and a wrist watch into a field, without running afoul of the rule against hearsay, however. See March 13 Tr. at 38:16-39:7 (Castellano, Stemo); Fed. R. Evid. 801(c). Further, J. Gallegos' order to A. Gallegos to throw out the keys and wrist watch is not an assertion, so it is admissible non-hearsay. See supra Statement 13.<br><br>J. Gallegos' order is nontestimonial, so there is no Confrontation Clause issue. Accordingly, the Court overrules A. Gallegos' and J. Gallegos' objections. See A. Gallegos Response ¶ 4, at 2; J. Gallegos Response ¶ 6, at 4-5. |
| Statement 46: "Joe Gallegos found out the police were coming to search the house and he gave several guns and other stolen goods to Jason Van Veghel to store elsewhere."<br><br>Declarant: Joe Gallegos<br><br>Source: Jason Van Veghel<br><br>Date: On or about November 13, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Burns existed by a preponderance of the evidence, so this statement is not admissible under rule 801(d)(2)(E).<br><br>Van Veghel can testify regarding actions he observed -- such as J. Gallegos giving him several guns and stolen goods -- without running afoul of the rule against hearsay. See Fed. R. Evid. 801(c). Statements indicating why J. Gallegos was giving Van Veghel those guns and goods are admissible as circumstantial evidence of J. Gallegos' state of mind or as statements of J. Gallegos' then-existing state of mind, specifically his motive, under rule 803(3).<br><br>There is no Confrontation Clause issue here, because any statements are nontestimonial, so the Court overrules A. Gallegos' objection. See A. Gallegos Response ¶ 4, at 2. J. Gallegos argues that this statement is "inconsistent with the discovery provided." J. Gallegos Response ¶ 7, at 5. J. Gallegos can impeach this statement based on that inconsistency, but it does not render the statement inadmissible. Accordingly, the Court overrules this objection. See J. Gallegos Response ¶ 7, at 5. |
| Statement 47: "Santos Gonzale[z] told Gomez 'You remember me?' They then told Gomez that Joe Gallegos put a hit out and they were there to kill him."<br><br>Declarant: Santos Gonzalez | Any statements that J. Gallegos made ordering others to kill Gomez are admissible against the members of the Gomez conspiracy -- Counts 14, 15, and 16 -- under 801(d)(2)(E). See supra FOF ¶ 14. Statements that those others made to Gomez are either circumstantial evidence of the declarant's state of mind or statements of then-existing state of mind under 803(3), specifically their motive for assaulting Gomez. |

| | |
|---|---|
| Source: Jose Gomez<br><br>Date: On or about February 27, 2016<br><br>Objection: Gutierrez Response, J. Gallegos Response | Gutierrez objects to this statement, because, "as part of his plea agreement," Gonzalez "agreed not to testify," and because it is "factually inconsistent with the statements given by Jose Gomez during" his interview. Gutierrez Response ¶ 2, at 1. This statement is admissible under 803(3) "regardless of whether the declarant," <u>i.e.</u>, Gonzalez, "is available as a witness." Fed. R. Evid. 803. Further, Gutierrez may impeach the statement based on that inconsistency, but this possible inconsistency does not render the statement inadmissible. Accordingly, the Court overrules Gutierrez' objection. <u>See</u> Gutierrez Response ¶ 2, at 1.<br><br>J. Gallegos argues that this statement is inadmissible, because "Santos Gonzalez is not expected to testify and this statement is contained in the factual portion of his plea agreement." J. Gallegos Response ¶ 8, at 5. The United States probably reused language from Gonzalez' plea agreement when drafting the <u>James</u> Proffer, but that does not render Jose Gomez' testimony relating the substance of Gonzalez' out-of-court statement inadmissible. The Court overrules this objection. <u>See</u> J. Gallegos Response ¶ 8, at 5. |
| Statement 48: "Shauna Gutierrez said 'they didn't finish him' when Gomez ran away."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Brandy Rodriguez<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, J. Gallegos Response | Gutierrez "objects to the statement as factually inaccurate and simply untrue," and notes that B. Rodriguez has given inconsistent statements during her multiple interviews. Gutierrez Response ¶ 3, at 1. Gutierrez can deal with this inconsistency at trial through B. Rodriguez' impeachment, so the Court overrules this objection. <u>See</u> Gutierrez Response ¶ 3, at 1.<br><br>The United States orally indicated that it will offer this statement only if Brandy Rodriguez testifies to it. <u>See</u> March 13 Tr. at 41:7-12 (Castellano)("Brandy Rodriguez is not cooperating with the Government at this time, but I am submitting this statement for the Court's consideration in case that changes."). Consequently, J. Gallegos' assertion that "neither the declarant nor the source is expected to testify" creates no admissibility issues. J. Gallegos Response ¶ 48, at 5. If B. Rodriguez testifies, then J. Gallegos' assertion is false. If B. Rodriguez does not testify, this statement will not be offered into evidence, so whether it is admissible is moot.<br><br>J. Gallegos also asserts that "there is no indicia of trustworthiness based on the multiple versions of |

| | |
|---|---|
| | statements given by" B. Rodriguez and Gutierrez. J. Gallegos ¶ 9, at 5. J. Gallegos can argue to the jury that this statement is untrustworthy, but that does not render the statement inadmissible. The Court overrules J. Gallegos' objection. See J. Gallegos Response ¶ 9, at 5. |
| | This statement is not admissible under 801(d)(2)(E), because the United States has not shown by a preponderance of the evidence that the conspiracy continued once the conspirators failed at killing Gomez. See United States v. Alcorta, 853 F.3d at 1139. The statement is admissible against Gutierrez under 801(d)(2)(A). The Court, on request, will give a limiting instruction as to the other Defendants. |
| Statement 49: "Santos Gonzalez and Paul Rivera knocked on the door and asked for Gomez. They then told Charlene Parker-Johnson that she should leave the house."<br><br>Declarant: Santos Gonzalez and/or Paul Rivera<br><br>Source: Charlene Parker-Johnson<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, J. Gallegos Response | Gutierrez objects to this statement "as factually inaccurate." Gutierrez Response ¶ 4, at 2. Gutierrez can deal with this problem at trial through impeachment, so the Court overrules this objection. See Gutierrez Response ¶ 4, at 2.<br><br>J. Gallegos "objects to this statement to the extent that it may have come from Santos Gonzale[z] who probably will not testify. Defendant further objects as this statement does not appear trustworthy as the source is not provided ostensibly because he/she remains unknown." J. Gallegos Response ¶ 10, at 5. First, coconspirator statements are admissible under 801(d)(2)(E) regardless whether the declarant testifies. See Fed. R. Evid. 801(d)(2)(E). Second, contrary to the J. Gallegos Response, the James Proffer identifies the source of this statement as Charlene Parker-Johnson, and not as Gonzalez or unknown. See James Proffer at 26. To the extent that J. Gallegos' actual objection is to the uncertainty of the declarant, this issue likely will be cleared up during Parker-Johnson's testimony. Accordingly, the Court overrules this objection. J. Gallegos Response ¶ 10, at 5.<br><br>The Court finds, by a preponderance of the evidence, that a member of the Counts 14-16 conspiracy -- either Gonzalez or Rivera, see supra FOF ¶ 14 -- made this statement, before the alleged attempt to murder Gomez, to get Parker-Johnson to leave the house so the coconspirators could kill Gomez unimpeded. See March 13 Tr. at 42:2-11 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Counts 14-16 conspiracy by a member of that conspiracy, and is |

| | |
|---|---|
| | admissible for its truth against the Counts 14-16 Defendants -- including J. Gallegos and Gutierrez, <u>see</u> <u>supra</u> FOF ¶ 14 -- under 801(d)(2)(E). The Court, on request, will give a limiting instruction as to the Defendants who are not charged in Counts 14-16. |
| Statement 50: "Santos Gonzalez and Paul Rivera yelled, 'He's running!' and 'He's getting away!' when Gomez started to run."<br><br>Declarant: Santos Gonzalez and/or Paul Rivera<br><br>Source: Charlene Parker-Johnson<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, J. Gallegos Response | Gutierrez objects to this statement "as factually inaccurate." Gutierrez Response ¶ 4, at 2. Gutierrez can deal with this issue at trial through impeachment, so the Court overrules this objection. <u>See</u> Gutierrez Response ¶ 4, at 2.<br><br>J. Gallegos "objects to this statement to the extent that it may have come from Santos Gonzale[z] who probably will not testify. Defendant further objects as this statement does not appear trustworthy as the source is not provided ostensibly because he/she remains unknown." J. Gallegos Response ¶ 10, at 5. First, coconspirator statements are admissible under 801(d)(2)(E) regardless whether the declarant testifies. <u>See</u> Fed. R. Evid. 801(d)(2)(E). Second, contrary to the J. Gallegos Response, the <u>James</u> Proffer identifies the source of this statement as Charlene Parker-Johnson, and not as Gonzalez or unknown. <u>See</u> <u>James</u> Proffer at 26. To the extent that J. Gallegos' objection is to the uncertainty of the declarant, this issue likely will be cleared up during Parker-Johnson's testimony. Accordingly, the Court overrules this objection. <u>See</u> J. Gallegos Response ¶ 10, at 5.<br><br>These statements are admissible as excited utterances, <u>see</u> Fed. R. Evid. 803(2), or as present-sense impressions, <u>see</u> Fed. R. Evid. 803(1). <u>See</u> <u>also</u> March 13 Tr. at 42:12-43:2 (Castellano, Stemo). |
| Statement 51: "Joe Gallegos placed a hit on Gomez because Joe Gallegos feared Gomez would testify against him on a state murder charge."<br><br>Declarant: Shauna Gutierrez and Brandy Rodriguez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, | Gutierrez objects to this statement, because neither she nor B. Rodriguez made this statement and because it is inconsistent. <u>See</u> Gutierrez Response ¶ 5, at 2. Gutierrez can deal with this credibility question and inconsistency at trial, so the Court overrules this objection. <u>See</u> Gutierrez Response ¶ 5, at 2.<br><br>J. Gallegos "objects to this statement to the extent that its source is unidentified." J. Gallegos Response ¶ 11, at 5. The source of this statement, however, is not unidentified. <u>See</u> <u>James</u> Proffer at 27. <u>See</u> <u>also</u> March 13 Tr. at 43:3-11 (Castellano, Stemo). To the extent that J. Gallegos' objection is to the uncertainty of the declarant, this issue likely will be cleared up during Rivera's testimony. The |

| | |
|---|---|
| A. Gallegos Response, J. Gallegos Response | Court overrules this objection. |
| | This statement is admissible for its truth against the members of the Counts 14-16 conspiracy under rule 801(d)(2)(E). Both declarants -- B. Rodriguez and Gutierrez -- are members of the Counts 14-16 conspiracy. See supra FOF ¶ 14. The statement was made in furtherance of that conspiracy, because it enlisted Rivera's assistance in the conspiracy. This statement is not, however, admissible against A. Gallegos, because he was not a member of the Counts 14-16 conspiracy, and the Court, at A. Gallegos' request, will give the jury a limiting instruction. See A. Gallegos Response ¶ 4, at 2-3. The Court, on request, will give a limiting instruction as to the other Defendants who are not charged in Counts 14-16. |
| Statement 52: "Upon learning where Gomez was staying, Shauna Gutierrez and Brandy Rodriguez agreed they needed to go after Gomez."<br><br>Declarant: Shauna Gutierrez and Brandy Rodriguez<br><br>Source: Paul Rivera, Brandy Rodriguez<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, J. Gallegos Response | Gutierrez objects to this statement "as Gutierrez and Brandy never agreed to do anything. Brandy and Rivero agreed to go after Gomez." Gutierrez Response ¶ 6, at 2. Gutierrez may deal with inaccuracy during trial, so the Court overrules this objection. Gutierrez Response ¶ 6, at 2.<br><br>J. Gallegos objects that there is no statement and that "it appears to be factually inaccurate." J. Gallegos Response ¶ 12, at 6. The action of going after Gomez is likely not meant as an assertion, and thus not a statement, so it is admissible non-hearsay. See supra Statement 13. Any corresponding statements about going after Gomez are admissible against the members of the Counts 14-16 conspiracy under 801(d)(2)(E). J. Gallegos also asserts that "the source is vague," but Stemo indicated that both Rivera and B. Rodriguez gave this statement. See March 13 Tr. at 44:2-7 (Castellano, Stemo). The Court overrules this objection. See J. Gallegos Response ¶ 12, at 6. |
| Statement 53: "Paul Rivera agreed to help with the hit on Gomez."<br><br>Declarant: Paul Rivera<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | Paul Rivera's testimony stating that he agreed to help with the hit on Gomez is not an out-of-court statement offered "to prove the truth of the matter asserted," so it raises no hearsay issues. Fed. R. Evid. 801(c). That Rivera's testimony may be "self-serving" does not render it inadmissible. J. Gallegos Response ¶ 13, at 6. Accordingly, the Court overrules J. Gallegos' objection. See J. Gallegos Response ¶ 13, at 6. |

| | |
|---|---|
| Statement 54: "You better not testify against my Jefe, or I'll kill you!"<br><br>Declarant: Brandy Rodriguez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: None | This statement is admissible as circumstantial evidence of B. Rodriguez' state of mind. |
| Statement 55: "Santos Gonzale[z] also stated he was going to kill Gomez."<br><br>Declarant: Santos Gonzalez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, J. Gallegos Response | This statement is admissible as a statement of Gonzalez' then-existing state of mind, specifically his plan, under rule 803(3). See Fed. R. Evid. 803(3).<br><br>Gutierrez argues that this statement is "factually inaccurate" and contrary to Gomez' statement given to law enforcement. Gutierrez Response ¶ 7, at 2. Gutierrez may note the factual inconsistencies at trial, so the Court overrules this objection. See Gutierrez Response ¶ 7, at 2.<br><br>J. Gallegos asserts that this statement is inaccurate, because it is not consistent with Gonzalez' plea agreement. See J. Gallegos Response ¶ 14, at 6. J. Gallegos can use that inconsistency to impeach this statement, but it does not render this statement inadmissible. The Court overrules this objection. See J. Gallegos Response ¶ 14, at 6.<br><br>No limiting instruction is appropriate. |
| Statement 56: "Told Shauna Gutierrez they had completed their mission. Shauna Gutierrez laughed and said she was 'happy to hear' Gomez was likely dead."<br><br>Declarant: Brandy Rodriguez, Paul Rivera, Santos Gonzalez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, | The Gutierrez statement -- that "she was 'happy to hear' Gomez was likely dead, James Proffer at 29 -- is admissible as a statement of Gutierrez' then-existing emotional condition, as is thus admissible under rule 803(3). See Fed. R. Evid. 803(3).<br><br>B. Rodriguez', Rivera's, and Gonzalez' statements occurred immediately after the assault on Gomez. See March 13 Tr. at 45:6-13 (Castellano, Stemo). These statements are, accordingly, admissible under rule 803(2) as excited utterances. See Fed. R. Evid. 803(2).<br><br>Gutierrez objects to this statement as untrue, self-serving, and inconsistent with B. Gutierrez' and Gonzalez' accounts. See Gutierrez Response ¶ 8, at 2. That Rivera's testimony may be "self-serving" does not render it |

| | |
|---|---|
| J. Gallegos Response | inadmissible, and Gutierrez can deal with credibility and inconsistencies at trial, so the Court overrules Gutierrez' objection. Gutierrez Response ¶ 8, at 2. |
| | J. Gallegos objects to this statement, because "[t]hree individuals are listed as the source." J. Gallegos Response ¶ 15, at 6. Three individuals, however, can make the same statement. For example, one person can make an oral statement, and two others can make the same statement nonverbally by nodding their heads. See Fed. R. Evid. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). The Court thus overrules J. Gallegos' objection. See J. Gallegos Response ¶ 15, at 6. |
| Statement 57: "Shauna Gutierrez told Santos Gonzalez to move the truck they used to another location and leave it for a few days."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, J. Gallegos Response | Gutierrez' giving orders to Gonzalez is an action and not a statement, and is thus admissible non-hearsay. See supra Statement 13. It is also a statement of Gutierrez' then-existing state of mind if Rivera testifies that Gutierrez elaborated regarding her plans, e.g., to tell someone to retrieve the truck in a few days. See Fed. R. Evid. 803(3). |
| | Gutierrez objects that this statement is "untrue and self-serving," and inconsistent with her and B. Rodriguez' accounts. Gutierrez Response ¶ 9, at 2. That Rivera's testimony is self-serving does not make the statement inadmissible, and Gutierrez can deal with credibility and inconsistency issues at trial, so the Court overrules her objection. See Gutierrez Response ¶ 9, at 2. |
| | J. Gallegos argues that this statement is inadmissible, because "it is apparent that it was not made by the claimed declarant." J. Gallegos Response ¶ 16, at 6. J. Gallegos is free to argue to the jury that it should not credit the evidence that the United States introduces to show that this statement was made, but such an argument does not render this statement inadmissible hearsay. Accordingly, the Court overrules this objection. See J. Gallegos Response ¶ 16, at 6. |
| Statement 58: "'How come you guys didn't do the job more fully?' after she previously told Rivera, Gonzalez, and Rodriguez to 'Go get him.'" | The James hearing testimony indicates that this is a two-part statement. First, before the Gomez assault, Gutierrez "told Paul Rivera, Santos Gonzalez to go get him." March 13 Tr. at 46:11-13 (Castellano). See id. at 46:9-16 (Castellano, Stemo). Second, after the assault, when Rivera, Gonzalez, and B. Rodriguez reported back to Gutierrez, "Gutierrez said, 'How come you guys didn't do |

| | |
|---|---|
| Declarant: Shauna Gutierrez<br><br>Source: Brandy Rodriguez, Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: Gutierrez Response, J. Gallegos Response | the job more fully?'" March 13 Tr. at 46:18-19 (Castellano). See id. at 46:17-24 (Castellano, Stemo).<br><br>Gutierrez' pre-assault order is an action, not a statement, and is thus admissible non-hearsay. See supra Statement 13. Any associated statements were made during and in furtherance of the conspiracy to assault Gomez, so they are admissible against the members of the Counts 14-16 conspiracy under rule 801(d)(2)(E). See March 13 Tr. at 46:9-16 (Castellano, Stemo). The post-assault statement is admissible as circumstantial evidence of Gutierrez' state of mind, i.e., to show that she expected and intended Gomez to be killed or hurt more seriously.<br><br>Gutierrez objects to this statement as untrue, but this possible problem is a credibility issue -- not an admissibility issue -- with which she can deal at trial, so the Court overrules her objection. See Gutierrez Response ¶ 10, at 2.<br><br>J. Gallegos "objects to this statement as it is not attributed to one individual" and asserts that it is "unreliable as it is inconsistent with other statements." J. Gallegos Response ¶ 17, at 6. The statement is attributed to one individual, Gutierrez, and that two individuals provided the same indication of what Gutierrez said alleviates some reliability issues -- J. Gallegos can deal with the rest at trial. The Court overrules this objection. See J. Gallegos Response ¶ 17, at 6. |
| Statement 59: "Don't Testify"<br><br>Declarant: Paul Rivera<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | The Court finds by a preponderance of the evidence, that Rivera -- a member of the Counts 14-16 conspiracy, see supra FOF ¶ 14 -- made this statement during the Gomez assault, to induce Gomez not to testify against J. Gallegos. See March 13 Tr. at 46:25-47:5 (Castellano, Stemo). Accordingly, this statement was made during and in furtherance of the Counts 14-16 conspiracy by a member of that conspiracy, and therefore is admissible against the members of the Counts 14-16 conspiracy under rule 801(d)(2)(E). That Rivera's testimony may be "self-serving" does not render it inadmissible. J. Gallegos Response ¶ 13, at 6. Further, this testimony is admissible against J. Gallegos as a member of the Counts 14-16 conspiracy to murder Gomez and prevent him from testifying, see supra FOF ¶ 14, so the Court overrules his objection, see J. Gallegos Response ¶ 13, at 6. The Court, on request, will give a limiting instruction as to the Defendants who are not charged in Counts 14-16. |

| Statement 60: "Brandy Rodriguez and Shauna Gutierrez had people in place for an attack on Gomez." <br><br> Declarant: Brandy Rodriguez <br><br> Source: Mario Chavez <br><br> Date: On or about March 29, 2017 <br><br> Objections: Gutierrez Response, J. Gallegos Response | The United States orally indicated that the date refers to Mario Chavez' interview with the FBI and not to the date the statement was made. See March 13 Tr. at 47:6-12 (Castellano, Stemo). <br><br> According to the United States, M. Chavez "would pass letters between Joe Gallegos, who was in county jail at the time, and Brandy Rodriguez and Shauna Gutierrez." March 13 Tr. at 47:15-18 (Stemo). That M. Chavez passed letters back and forth between J. Gallegos, B. Rodriguez, and Gutierrez is an action, and not a statement, and thus admissible non-hearsay. See supra Statement 13. Statements ordering or arranging the Gomez assault that were made before the assault took place are admissible against the members of the Counts 14-16 conspiracy -- including Gutierrez and J. Gallegos, see supra FOF ¶ 14 -- under rule 801(d)(2)(E). The source of the statements, i.e., the person testifying, need only have firsthand knowledge of the statements heard for the statement to be admitted, see Fed. R. Evid. 602, so the Court overrules Gutierrez' and J. Gallegos' objections, see Gutierrez Response ¶ 11, at 2; J. Gallegos Response ¶ 18, at 6-7. J. Gallegos requests the opportunity to voir dire M. Chavez to test his personal knowledge of this statement. See J. Gallegos Response ¶ 18, at 6-7. The Court denies this request, as the United States must establish this personal knowledge for M. Chavez' testimony to be admitted at trial. See Fed. R. Evid. 602. Credibility and inconsistency issues also may be dealt with at trial. See J. Gallegos Response ¶ 18, at 6-7. <br><br> At the James hearing, the United States conceded that if B. Rodriguez made this statement after the assault on Gomez then it would not be admissible under rule 801(d)(2)(E). See March 13 Tr. at 49:4-10 (Castellano)(addressing statement 61); id. at 49:20-21 (Castellano)("But the same applies, I would say, with Statements 60 and 61."). The United States argued that the statement "would then be considered a statement against interests or an admission by Brandy Rodriguez." March 13 Tr. at 49:8-10 (Castellano). The United States has not, however, shown that B. Rodriguez -- who has already pled guilty -- is unavailable, which is a prerequisite to admitting an out-of-court statement as a declaration against interest. See Fed. R. Evid. 804(b)(3). That B. Rodriguez made the statement means that it is |

| | admissible for its truth against B. Rodriguez under rule 801(d)(2)(A), but B. Rodriguez is not a Trial 2 Defendant, so the statement would not be admissible at Trial 2 under rule 801(d)(2)(A). |
|---|---|
| Statement 61: "Joe Gallegos ordered the hit on Gomez, and Shauna Gutierrez planned the hit." Declarant: Brandy Rodriguez Source: Mario Chavez Date: On or about March 29, 2017 Objections: Gutierrez Response, A. Gallegos Response, J. Gallegos Response | The United States orally indicated that the declarant should be B. Rodriguez, not Gutierrez as provided in the James Proffer, see James Proffer at 32, and that it does not know whether the statement was made before or after the assault on Gomez. See March 13 Tr. at 48:6-8 (Castellano)(declarant); id. at 48:11-15 (Castellano, Stemo)(timing). |
| | At the James hearing, the United States conceded that, if B. Rodriguez made this statement after the assault on Gomez, then it would not be admissible under rule 801(d)(2)(E). See March 13 Tr. at 49:4-10 (Castellano). The United States argued that the statement "would then be considered a statement against interests or an admission by Brandy Rodriguez." March 13 Tr. at 49:8-10 (Castellano). The United States has not, however, shown that B. Rodriguez -- who has already pled guilty -- is unavailable, which is a prerequisite to admitting an out-of-court statement as a declaration against interest. See Fed. R. Evid. 804(b)(3). That B. Rodriguez made the statement means that it is admissible for its truth against B. Rodriguez under rule 801(d)(2)(A), but B. Rodriguez is not a Trial 2 Defendant, so the statement would not be admissible at Trial 2 under rule 801(d)(2)(A). |
| | Even if B. Rodriguez made this statement before the Gomez assault, it would not be admissible against the members of the Counts 14-16 conspiracy under rule 801(d)(2)(E), because the statement was not made in furtherance of the Counts 14-16 conspiracy. M. Chavez was not a member of this conspiracy, and the United States has not introduced evidence showing that divulging details to this non-member advanced the conspiracy's goals. No other exception to the rule against hearsay applies, so this statement is not admissible for its truth. M. Chavez apparently lacks personal knowledge as to the substance of B. Rodriguez' statement -- as opposed to that she made the statement -- so he cannot testify that J. Gallegos ordered the Gomez hit and Gutierrez planned it, even if M. Chavez does not relate this statement to the jury. See Fed. R. Evid. 602. |
| | Because the statement is inadmissible hearsay and |

| | |
|---|---|
| | M. Chavez has no personal knowledge of the underlying facts contained in the statement, the Court sustains Gutierrez' and J. Gallegos' objections. <u>See</u> Gutierrez Response ¶ 11, at 2; J. Gallegos Response ¶ 18, at 6-7. Because the statement is not admissible for its truth, the Court cannot address A. Gallegos' contention of negative spillover, but the Court will, if it admits the statement for a non-hearsay purpose, provide, on request, a limiting instruction. <u>See</u> A. Gallegos Response ¶ 4, at 2. |
| Statement 62: "'Paperwork' on Sanchez was delivered from Arturo Garcia to Ben Clark, approving the murder."<br><br>Declarant: Arturo Garcia<br><br>Source: Samuel Gonzales, John Montano, Javier Rubio<br><br>Date: On or before June 17, 2007<br><br>Objections: None | That the paperwork was sent is an action and not a statement, and is thus admissible non-hearsay. <u>See</u> <u>supra</u> Statement 13. Associated statements by A.A. Garcia, a member of the Count 3 conspiracy, <u>see</u> <u>supra</u> FOF ¶ 10, approving the Sanchez murder or conveying that approval to other members of the Sanchez conspiracy were made during and in furtherance of the conspiracy, so they are admissible against the Count 3 Defendants under rule 801(d)(2)(E). |
| Statement 63: "'Cheeky' and 'Coquito' were tasked with the murder of Sanchez but did not want to carry it out."<br><br>Declarant: Cheeky and Coquito<br><br>Source: Samuel Gonzales<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | Cheeky and Coquito are Raymond and Brian Rascon, respectively. <u>See</u> March 13 Tr. at 50:15-21 (Castellano, Stemo). The Rascon brothers conveyed the information in this statement to S. Gonzales. <u>See</u> March 13 Tr. at 50:22-24 (Castellano, Stemo). The Court has concluded that the Rascon brothers are not members of the Count 3 conspiracy, <u>see</u> <u>supra</u> note 17, so their statements to S. Gonzales are not admissible under rule 801(d)(2)(E). No other exception to the rule against hearsay applies, so the Rascon brothers' statement is not admissible for its truth. S. Gonzales apparently lacks personal knowledge as to the substance of the Rascon brothers' statement -- as opposed to that they made that statement -- so he cannot testify that the Rascon brothers were tasked with the Sanchez murder even if S. Gonzales does not relate that statement to the jury. <u>See</u> Fed. R. Evid. 602. Although multiple people may make the same statement, <u>see</u> <u>supra</u> Statement 56, because this statement is inadmissible hearsay and S. Gonzales has no personal knowledge of the underlining facts, the Court sustains Troup's objection, <u>see</u> Troup Response ¶ 8, at 3. |
| Statement 64: "Javier Alonso asked how to get rid of the marks on his | Alonso made this statement after Sanchez' death, so it was made after the conspiracy to kill Sanchez ended and is |

| | |
|---|---|
| hands from strangling Sanchez." <br><br> Declarant: Javier Alonso <br><br> Source: Samuel Gonzales <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | thus not admissible for its truth against the Count 3 conspirators under rule 801(d)(2)(E). See United States v. Alcorta, 853 F.3d at 1139. That Alonso asked how to get rid of the marks from strangling Sanchez is a question, but it implicitly asserts that he strangled Sanchez, so it is hearsay. See United States v. Summers, 414 F.3d at 1298. That Alonso made this statement means that it is admissible for its truth against him under rule 801(d)(2)(A), but Alonso is not a Trial 2 Defendant, so the statement would not be admissible at Trial 2 under rule 801(d)(2)(A). No other hearsay exception applies, so the statement is inadmissible for its truth. <br><br> If S. Gonzales saw marks on Alonso's hands, S. Gonzales could testify to that fact, as opposed to Alonso's statement regarding that fact. If, additionally, S. Gonzales is sufficiently familiar with the sort of marks that stranglers typically have on their hands, he could testify to his opinion regarding whether strangling someone could have caused those marks. See Fed. R. Evid. 701. |
| Statement 65: "'That'd be messed up if the paperwork on the guy I just got showed up.' Ben Clark also sent Arturo Garcia a list of names of people in the pod." <br><br> Declarant: Ben Clark <br><br> Source: John Montano <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | The James hearing testimony indicates that Clark's oral remark referred to Sanchez, but the Court does not have enough context regarding that remark to determine whether it was made in furtherance of the conspiracy to kill Sanchez, as opposed to being an off-hand remark made for no particular purpose. <br><br> The James hearing testimony indicates that Clark provided the list of names to A.A. Garcia, "[s]o that he would know who was present at the pod and who would be next, or who hasn't put in work." See March 13 Tr. at 51:18-23 (Castellano, Stemo). Although providing a list is an action, it was thus meant as an assertion, see supra Statement 13, and is hearsay. The Court finds, by a preponderance of the evidence, that, in providing the list to A.A. Garcia, Clark -- a member of the Count 3 conspiracy, see supra FOF ¶ 10 -- made the statement during and in furtherance of the Count 3 conspiracy, however, so it is admissible for its truth against the Count 3 conspirators under rule 801(d)(2)(E). The Court, on request, will give a limiting instruction as to the Defendants who are not charged in Counts 14-16. |
| Statement 66: "Edward Troup and Javier Alonso attempted to hide in John Montano's cell after lock | The United States orally indicated that this statement is just an action, but it indicated that it is uncertain whether there were statements made that are associated with that |

| | |
|---|---|
| down after the murder of Sanchez."<br><br>Declarant: Edward Troup and Javier Alonso<br><br>Source: John Montano<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | act. <u>See</u> March 13 Tr. at 52:5-16 (Castellano, Court). As an action, this statement is admissible non-hearsay. <u>See</u> <u>supra</u> Statement 13. Further, Montano can testify what he personally witnessed after Sanchez' murder, such as Troup and Alonso attempting to hide in his cell if he saw this action occur. <u>See</u> Fed. R. Evid. 602. This statement "is not a statement made by an individual," so it is admissible, and the Court thus overrules Troup's objection. Troup Response ¶ 9, at 3. |
| Statement 67: "Jimmie Gordon was asked to get information on Garza from Geraldine Martinez."<br><br>Declarant: Jimmie Gordon<br><br>Source: Jimmie Gordon<br><br>Date: On or before March 26, 2001<br><br>Objections: None | Geraldine Martinez was a prison librarian, and that Jimmie Gordon was asked to get information about Garza from Geraldine Martinez is a verbal action and not a statement. <u>See</u> <u>supra</u> Statement 13. Accordingly, Gordon's testimony about the request to obtain information about Garza does not relate hearsay and is admissible for its truth. <u>See</u> Fed. R. Evid. 801(c). |
| Statement 68: "Billy Garcia put a hit on Archuleta which was communicated to Archuleta through 'Baby Zac' over a disagreement about Castillo's murder."<br><br>Declarant: Baby Zac<br><br>Source: Gerald Archuleta<br><br>Date: None<br><br>Objections: B. Garcia Response | This statement is not admissible for its truth under rule 801(d)(2)(E), because Baby Zac did not tell Archuleta about the conspiracy to murder him in furtherance of that conspiracy. Accordingly, the Court sustains B. Garcia's objection. <u>See</u> B. Garcia Response ¶ 9, at 4. |
| Statement 69: "Brandy Rodriguez kicked Gomez and said, 'This is a message from Joe!'"<br><br>Declarant: Brandy Rodriguez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: A. Gallegos Response | This statement is admissible as an excited utterance, <u>see</u> Fed. R. Evid. 803(2), and as a statement of B. Rodriguez' then-existing state of mind, specifically her motive, <u>see</u> Fed. R. Evid. 803(3).<br><br>A. Gallegos objects, because the statement's reference to J. Gallegos, who is A. Gallegos' "sole co-defendant" in counts 4 and 5, would "have a negative spillover effect on Andrew." A. Gallegos Response ¶ 4, at 2. The Court overrules A. Gallegos' objection for the reasons stated <u>supra</u> note 27. <u>See</u> A. Gallegos Response ¶ 4, at 2. |

| | |
|---|---|
| Statement 70: "Shauna Gutierrez stated she is 'ride or die' with Joe Gallegos, after admitting that she and Joe Gallegos put a hit on Brandy Rodriguez based on the belief Rodriguez was a cooperator."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Paul Rivera<br><br>Date: On or about November 2016<br><br>Objections: Gutierrez Response, A. Gallegos Response, J. Gallegos Response | The United States intends to offer this statement under 801(d)(2)(E), and asserts that this statement was made in furtherance of an uncharged conspiracy to harm B. Rodriguez premised on an erroneous belief that she was cooperating with law enforcement. See March 13 Tr. at 55:9-14 (Castellano); id. at 55:19-56:16 (Court, Castellano). The Court has not found that such a conspiracy existed, however, so this statement is not admissible for its truth under rule 801(d)(2)(E). See supra note 13.<br><br>Gutierrez' statement that she is "ride or die"[31] with J. Gallegos is admissible as a statement of the declarant's then-existing emotional condition. James Proffer at 37. See Fed. R. Evid. 803(3). Accordingly, this portion of the statement is admissible for its truth, i.e., that Gutierrez believed at the time that she was ride or die with J. Gallegos.<br><br>Gutierrez alleges that this statement is not true, but she can deal with Rivera's credibility at trial, so the Court overrules her objection. See Gutierrez Response ¶ 12, at 2. The Court overrules A. Gallegos' objection of negative spillover for the reasons stated supra note 27. See A. Gallegos Response ¶ 4, at 2. J. Gallegos objects that Rivera has no personal knowledge, see J. Gallegos Response ¶ 20, at 7, but Rivera and Gutierrez were in a transport van together and were speaking, see March 13 Tr. at 55:2-5 (Stemo). The Court therefore overrules J. Gallegos' objection. See J. Gallegos Response ¶ 20, at 7. |
| Statement 71: "Christopher Chavez asked 'Is this right?' in reference to the Garza murders and Leroy Lucero said 'you got to do what you got to do.'"<br><br>Declarant: Christopher Chavez<br><br>Source: Leroy Lucero | When C. Chavez indicated that he "wasn't sure about the murder, [he was] clarifying whether or not there was, in fact a green light on Mr. Garza[.]" March 13 Tr. at 57:17-19 (Castellano). See id. at 57:16-20 (Castellano, Stemo). Consequently, the Court finds, by a preponderance of the evidence, that both C. Chavez' question and Lucero's response were made before the alleged Garza murder to underscore the conspiracy's existence and to prompt action. See March 13 Tr. at 56:18-57:20 (Castellano, Stemo). Both C. Chavez and Lucero are members of the Count 2 conspiracy. See supra FOF ¶ 6. Accordingly, |

---

[31]The phrase "ride or die" "was originally a biker term meaning if you couldn't ride you'd rather die," and now means, in reference to another person, "that you will 'ride' ANY problems out with them or 'die' trying." Ride or Die, Urban Dictionary (Aug. 30, 2015), https://www.urbandictionary.com/define.php?term=Ride%20or%20Die.

| | |
|---|---|
| Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Patterson Response | these statements were made during and in furtherance of the Count 2 conspiracy by members of that conspiracy, so they are admissible for their truth against the Count 2 conspirators under rule 801(d)(2)(E). B. Garcia and Patterson are members of the Count 2 conspiracy to murder Garza, see supra FOF ¶ 6, so the Court overrules their objections. See B. Garcia Response ¶ 10, at 5-6; Patterson Response ¶ 29, at 12. The Court, on request, will give a limiting instruction as to the Defendants who are not charged in Count 2. |
| Statement 72: "Javier Alonso asked if the marks on his hands were noticeable."<br><br>Declarant: Javier Alonso<br><br>Source: John Montano<br><br>Date: On or about June 17, 2007<br><br>Objections: None | Alonso asked Montano this question after the Sanchez murder. See March 13 Tr. at 57:21-58:5 (Castellano, Stemo). Consequently, this statement was not made during the conspiracy to kill Sanchez, so it is not admissible for its truth under rule 801(d)(2)(E). Alonso's question implicitly asserts that he has marks on his hands and is thus a statement for hearsay purposes, see United States v. Summers, 414 F.3d at 1298, but that implicit assertion is admissible for its truth as a present-sense impression, see Fed. R. Evid. 803(1). |
| Statement 73: "Ordered the surveillance cameras covered."<br><br>Declarant: Edward Troup and/or Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | Hernandez and Trujillo were both supposed to cover the surveillance cameras during the Sanchez murder, so corrections officers could not watch what was happening. See March 13 Tr. at 58:15-24 (Castellano, Stemo). In separate statements to the United States, Hernandez mentioned both Trujillo and Troup. See March 13 Tr. at 58:11-14 (Castellano, Stemo). An order is an action, not a statement, and is thus admissible non-hearsay. See supra Statement 13. Any associated statements directing Hernandez to cover the surveillance cameras -- no matter whether Troup or Trujillo made those statements -- were made by a Count 3 conspirator during and in furtherance of that conspiracy, so they are admissible for their truth under rule 801(d)(2)(E) against the Count 3 Defendants. See supra FOF ¶¶ 10-11 (identifying Troup and Trujillo as members of the Count 3 conspiracy to kill Sanchez).<br><br>Troup objects that "[t]here is insufficient foundation for this statement." Troup Response ¶ 10, at 3. This statement's admissibility does not depend on whether Troup or Trujillo provided the order. See United States v. Brinson, 772 F.3d at 1321-22. Accordingly, the Court overrules Troup's objection. See Troup Response ¶ 10, at 3. |

| | |
|---|---|
| Statement 74: "'Now hurry Bolo now you know what time it is.' (In reference to covering the cameras.)"<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | The Court finds, by a preponderance of the evidence, that Trujillo -- a member of the Count 3 conspiracy, see supra FOF ¶ 11 -- made this statement before the alleged Sanchez murder, to get Hernandez to do his part in the conspiracy, i.e., cover the cameras. See March 13 Tr. at 58:25-59:8 (Castellano, Stemo). Accordingly, this statement was made by a Count 3 conspirator during and in furtherance of that conspiracy, so it is admissible for its truth against the Count 3 Defendants under 801(d)(2)(E). The Court, on request, will give a limiting instruction as to the Defendants who are not charged in Count 3. |
| Statement 75: "Just stay there and don't let no one in, use your crutch to block the door if you have to."<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objection: None | The Court finds, by a preponderance of the evidence, that Trujillo -- a member of the Count 3 conspiracy, see supra FOF ¶ 11 -- made this statement before the alleged murder, directing Hernandez to take a different action in the conspiracy, because he was failing at covering the camera. See March 13 Tr. at 59:9-21 (Castellano, Stemo). Accordingly, this statement was made by a Count 3 conspirator during and in furtherance of the Count 3 conspiracy, so it is admissible for its truth against the Count 3 Defendants under rule 801(d)(2)(E). |
| Statement 76: "'Ya stuvo (all done) take them off.' (In reference to the camera covers.)"<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | Trujillo made this statement after Sanchez' death, see March 13 Tr. at 59:22-60:5 (Castellano, Stemo), so it was not made during the conspiracy to kill Sanchez, and is not admissible for its truth under rule 801(d)(2)(E), see United States v. Alcorta, 853 F.3d at 1139. The statement is admissible for its truth, however, as an excited utterance, because Trujillo made this statement immediately after the murder, while still under the excitement caused by the murder. See Fed. R. Evid. 803(2); 4 Saltzburg et al., supra, at § 803.02[3][a]-[3], at 803-22 to -25. |
| Statement 77: "Kyle asked Ruben Hernandez to take something to Samuel Gonzales and to tell Samuel Gonzales 'that was all he had.'"<br><br>Declarant: Kyle Dwyer<br><br>Source: Ruben Hernandez<br><br>Date: On or before June 17, 2007 | The James hearing testimony indicates that Hernandez took a single folded piece of paper to S. Gonzales and that the contents of that piece of paper are unknown. See March 13 Tr. at 221:19-222:3 (Blackburn, Stemo). Hernandez can testify to Dwyer's asking him to bring the paper to S. Gonzales and to his completing this task without running into hearsay issues. See Fed. R. Evid. 801(c); supra Statement 13.<br><br>Dwyer's statement to Hernandez "to tell Samuel Gonzales 'that was all he had'" is not admissible for its truth under |

| | |
|---|---|
| Objections: Troup Response | 801(d)(2)(E), because Dwyer said this after Sanchez' death. James Proffer at 40. See United States v. Alcorta, 853 F.3d at 1139; March 13 Tr. at 60:19-22 (Castellano, Stemo)(providing that Statement 77 is tied to Statement 78, in which S. Gonzales "asked if Sanchez was dead"). No other hearsay exception applies, so this statement is inadmissible hearsay. Accordingly, the Court sustains Troup's objection. See Troup Response ¶ 11, at 3. This statement is potentially admissible, however, as circumstantial evidence of Dwyer's state of mind and for its effect on S. Gonzales. |
| Statement 78: "Samuel Gonzales asked if Sanchez was dead, then again asked 'For real is he dead?'" <br><br> Declarant: Samuel Gonzales <br><br> Source: Ruben Hernandez <br><br> Date: On or about June 17, 2007 <br><br> Objections: None | S. Gonzales asked Hernandez this question immediately after he delivered a piece of paper to S. Gonzales from Kyle Dwyer. See March 13 Tr. at 61:1-3 (Castellano, Stemo). S. Gonzales' questions are not statements, so they are admissible non-hearsay. See supra Statement 13. Those questions are also admissible as circumstantial evidence of S. Gonzales' state of mind. |
| Statement 79: "'Chicky' was cutting his sleeves off and asked Ruben Hernandez to hang up his wet sleeves." <br><br> Declarant: "Chicky" <br><br> Source: John Montano <br><br> Date: On or about June 17, 2007 <br><br> Objections: None | This statement was made after Sanchez died, so it was not made during the conspiracy to kill Sanchez. See March 13 Tr. at 61:8-14 (Castellano, Stemo). Accordingly, it is not admissible for its truth against the Count 3 Defendants under rule 801(d)(2)(E). See United States v. Alcorta, 853 F.3d at 1139. <br><br> "Chicky" is meant to be "Cheeky," which refers to R. Rascon. March 13 Tr. at 61:4-7 (Castellano, Stemo). That R. Rascon was cutting up his sleeves and requested to Hernandez to hang them up are actions and not hearsay, and therefore admissible. See supra Statement 13. That there was "an indication or concern that Raymond Rascon was cutting off his sleeves because there might be something incriminating on the material," March 13 Tr. at 61:15-19 (Castellano, Stemo), may, with a proper foundation, be admissible as a present-sense-impression, an excited utterance, or a statement of the declarant's then-existing state of mind, see Fed. R. Evid. 803(1)-(3). |
| Statement 80: "Edward Troup told 'Chicky' to cut his sleeves in small pieces or give the sleeves to | This statement was made after Sanchez died, so it was not made during the conspiracy to kill Sanchez. See March 13 Tr. at 61:12-14 (Castellano, Stemo); id. at 61:20-24 |

| | |
|---|---|
| someone next door." <br><br> Declarant: Edward Troup <br><br> Source: Ruben Hernandez <br><br> Date: On or about June 17, 2007 <br><br> Objections: Troup Response | (Castellano, Stemo). Accordingly, it is not admissible for its truth against the Count 3 Defendants under rule 801(d)(2)(E). See United States v. Alcorta, 853 F.3d at 1139. It, however, is admissible as circumstantial evidence of Troup's state of mind, e.g., consciousness of guilt. <br><br> Troup's statement is admissible against him for its truth under rule 801(d)(2)(A). Troup will have the opportunity at trial to object to the statement's admittance if the United States does not lay the proper foundation, but for now the Court overrules Troup's objection. See Troup Response ¶ 12, at 3. |
| Statement 81: "First thing in the morning we need you to move the body in the fetal position and wipe down the toilet." <br><br> Declarant: Brian Rascon and/or Edward Troup <br><br> Source: Ruben Hernandez <br><br> Date: On or about June 17, 2007 <br><br> Objections: Troup Response | The United States indicated, at the James hearing, that both Brian Rascon and Troup made this statement at different times. See March 13 Tr. at 62:15-18 (Castellano, Stemo). Accordingly, the Court overrules Sanchez' objection, although the United States will have to lay the proper foundation at trial. See Sanchez Response ¶ 13, at 3. This statement is admissible as a statement of the declarants' then-existing state of mind, i.e., B. Rascon and Troup's plan to have Hernandez clean the cell. See Fed. R. Evid. 803(3). It is also admissible to show its effect on Hernandez. Further, Troup's statement is admissible against him for its truth under rule 801(d)(2)(A). It is not, however, admissible for its truth under rule 801(d)(2)(E), because it was made after Sanchez' death and thus was not made during the conspiracy to kill Sanchez. See United States v. Alcorta, 853 F.3d at 1139. |
| Statement 82: "'That's what we are all asking of you.' (Told to Ruben Hernandez when he didn't want to clean the cell.)" <br><br> Declarant: Brian Rascon <br><br> Source: Ruben Hernandez <br><br> Date: On or about June 17, 2007 <br><br> Objections: Troup Response | This statement is admissible for its effect on Hernandez and as circumstantial evidence of B. Rascon's state of mind. It is not, however, admissible for its truth under rule 801(d)(2)(E), because it was made after Sanchez' death and thus was not made during the conspiracy to kill Sanchez. See United States v. Alcorta, 853 F.3d at 1139. As no other hearsay exception applies, it is not admissible for its truth and the Court therefore sustains Troup's objection. See Troup Response ¶ 14, at 3-4. |
| Statement 83: "'Not [sic] that's an order, you already know what time it is.' (Told to Ruben Hernandez when he continued to not want to | This statement is admissible for the non-hearsay purposes of showing its effect on Hernandez and as circumstantial evidence of B. Rascon's state of mind, i.e., B. Rascon's plan to have Hernandez clean the cell. See Fed. R. Evid. |

| | |
|---|---|
| clean the cell.)" <br><br> Declarant: Brian Rascon <br><br> Source: Ruben Hernandez <br><br> Date: On or about June 17, 2007 <br><br> Objections: Troup Response | 803(3) (providing that a statement may be admitted to show the declarant's belief, but not to prove that the belief is true "unless it relates to the validity or terms of the declarant's will). It is not, however, admissible for its truth under rule 801(d)(2)(E), because it was made after Sanchez' death and thus was not made during the conspiracy to kill Sanchez. See United States v. Alcorta, 853 F.3d at 1139. As no other hearsay exception applies, this statement is not admissible for its truth and the Court therefore sustains Troup's objection. See Troup Response ¶ 15, at 4. |
| Statement 84: "Ruben Hernandez asked if he was next for refusing to clean the cell and Brian Rascon said 'no, if the door is closed what can you do?'" <br><br> Declarant: Brian Rascon <br><br> Source: Ruben Hernandez <br><br> Date: On or about June 17, 2007 <br><br> Objections: Troup Response | Hernandez' question and B. Rascon's reply are admissible as circumstantial evidence of Hernandez' state of mind. The assertion implicit in B. Rascon's reply -- that Hernandez was not able to enter Sanchez' cell -- is not admissible for its truth unless Hernandez' testimony indicates that B. Rascon's implicit assertion is a present-sense impression. See Fed. R. Evid 803(1). The Court does not have enough context now to determine this implicit admissibility's admissibility. The Court thus overrules Troup's objection for now, although he may raise it again at trial if the United States does not establish that the present-sense-impression exception applies. See Troup Response ¶ 16, at 4. |
| Statement 85: "'Your [sic] next mother fucker.' Said to Ruben Hernandez as they passed each other." <br><br> Declarant: Edward Troup <br><br> Source: Ruben Hernandez <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | This statement is admissible either for its truth as a statement of Troup's then-existing state of mind, i.e., as a statement of Troup's plan, see Fed. R. Evid. 803(3), or as circumstantial evidence of Troup's state of mind, see Fed. R. Evid. 801(c). This statement is also admissible for its truth against Troup under rule 801(d)(2)(A). |

| | |
|---|---|
| Statement 86: "We better be ready for hell cause we we're [sic] fixing to go through hell."<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | This statement -- indicating that Trujillo expects law enforcement scrutiny, see March 13 Tr. at 64:19-22 (Castellano, Stemo) -- is admissible as a statement of Trujillo's then-existing state of mind, see Fed. R. Evid. 803(3). |
| Statement 87: "Edward Troup stated that it was every man for themselves and if you can get a plea bargain for 15 or less do it but 'no fucking ratting,' 'that's a no no.'"<br><br>Declarant: Edward Troup<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | Troup -- and not B. Rascon, as the James Proffer indicates, see James Proffer at 45 -- made this statement, see March 13 Tr. at 65:1-4 (Castellano, Stemo). This statement is admissible for its truth against Troup under rule 801(d)(2)(A). Accordingly, the Court overrules Troup's objection. See Troup Response ¶ 17, at 4. If any other Defendant wants a limiting instruction, they may request one and the Court will give it. |
| Statement 88: "Go wipe down the toilet, don't worry about moving the body."<br><br>Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | This statement is admissible notwithstanding the general rule against hearsay, because it is a verbal action and not an assertion. See supra Statement 13. Accordingly, the Court overrules Troup's objection. See Troup Response ¶ 18, at 4. |

## IV. THE COURT MAKES PARTICULARIZED JUDGMENTS REGARDING THE CO-DEFENDANT STATEMENTS' ADMISSIBILITY UNDER RULES 801(d)(2)(A) AND 804(b)(3) OF THE FEDERAL RULES OF EVIDENCE.

A statement that "is offered against an opposing party," and "was made by the party in an individual or representative capacity," is not hearsay even if that statement is offered for its truth. Fed. R. Evid. 801(d)(2)(A). The Advisory Committee's notes to rule 801 explain:

Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility.

Fed. R. Evid. 801 advisory committee's notes to 1972 proposed rules (citations omitted). Consequently, the Federal Rules of Evidence exclude a criminal defendant's out-of-court statements that the United States offers against that defendant from the general rule against hearsay. See Fed. R. Evid. 802 (stating that "[h]earsay is not admissible unless" "a federal statute," the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court" provides otherwise).

An out-of-court statement is admissible hearsay -- no matter who made the statement or who offers it into evidence -- if the declarant is unavailable and if "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability[.]" Fed. R. Evid. 804(b)(3)(A). In addition to being against the declarant's interest, a statement must also be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3)(B). "The Tenth Circuit has not squarely addressed how a statement must be corroborated." United States v. Lovato, 776 F.3d at 1132. United States v. Lovado indicates, however, that the presence -- or absence -- of evidence corroborating a statement's contents, the circumstances in which a statement was made, the declarant's credibility, whether the declarant had a motive to lie, and whether the statement is internally

consistent are all relevant to the rule 804(b)(3)(B) inquiry. See 776 F.3d at 1132-33.

In United States v. Smalls, the Tenth Circuit commented that "[w]e may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend." 605 F.3d at 783. In its James MOO, however, the Court concluded that United States v. Smalls' generalization does not apply to in-prison statements that one SNM member makes to another. See James MOO at 103-04, 287 F. Supp. 3d at 1255-56. See also United States v. Smalls, 605 F.3d at 782 (stating that whether a statement is so self-inculpatory that it is admissible under rule 804(b)(3) "depends not only on the contextual wording of the statement itself but also on the circumstances under which it was made"). The Court reasoned that, "[w]hile people in ordinary situations expose themselves to both social censure and criminal liability" when they make inculpatory statements, "prison-gang members speaking to fellow members earn social benefits -- such as respect or an appearance of power -- when they make inculpatory claims." James MOO at 103, 287 F. Supp. 3d at 1256. The Court also reasoned that declarants who makes inculpatory statements to fellow prison-gang members have some assurance that those statements will not make their way to law-enforcement ears, "because prison-gang members face violent retaliation for collaborating with law enforcement." James MOO at 103-04, 287 F. Supp. 3d at 1256. Consequently, the Court concluded that "a reasonable prison-gang member might make self-inculpatory statements even if those statements were not true," so in-prison statements that one SNM member makes to another "are not typically admissible under rule 804(b)(3)." James MOO at 104, 287 F. Supp. 3d at 1256.

The United States correctly argues that, when applying rule 804(b)(3), "the Court must look at each statement individually and assess whether the factors that courts look to for the

required corroboration apply to each of the offered statements." 804(b)(3) MIL at 2. The Court's comments about in-prison statements that one SNM member makes to another is not contrary to that principle, because, under some circumstances, an in-prison statement that one SNM member makes to another is such that "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true." Fed. R. Evid. 804(b)(3)(A). For example, in the <u>James</u> MOO, the Court applied its analysis to the particular facts surrounding the statements at issue:

> [W]hen Perez made his statements to Cordova, prison-yard rumors indicated, falsely, that Perez cooperated with the United States regarding the Molina murder. Perez' statements to Cordova suggest that those life-threatening rumors are false, because they demonstrate loyalty to the SNM, and because, if Perez helped carry out the Molina murder, then providing information to law enforcement would expose him to criminal liability. Consequently, a reasonable person in Perez' position might make self-incriminating statements regarding the Molina murder to another SNM member to combat life-threatening prison-yard rumors, even if those self-incriminating statements were not true.

<u>James</u> MOO at 104, 287 F. Supp. 3d at 1256. The Court accordingly assesses individually each of the out-of-court statements that B. Garcia identifies to determine whether that statement is admissible for its truth against all the Defendants under rule 804(b)(3) as provided in the table that follows.[32]

---

[32]Although the Court analyzes whether the statements that B. Garcia has identified are admissible for their truth under rule 804(b)(3), the United States can attempt to admit statements under rule 804(b)(3) even if the Defendants had no pretrial notice regarding those statements. The United States has no obligation to provide pretrial notice regarding the substance of its non-expert witnesses' testimonies before trial. That B. Garcia chose to identify out-of-court statements that he anticipates the United States will offer under rule 804(b)(3) allows the Court to provide pretrial guidance to the parties that will -- hopefully -- facilitate trial, but it does not accelerate the United States burden to establish -- under rule 804(b)(3) or otherwise -- that its evidence is admissible.

| Co-Defendant Statement[33] | Ruling |
|---|---|
| Statement 1: Alleged statement made by Edward Troup to James "Daffy" Garcia in which he allegedly indicates that B. Garcia ordered the hits.<br><br>Declarant: Edward Troup<br><br>Source: James Garcia<br><br>Date: 11/2012 | According to the J. Garcia 302, the FBI interviewed J. Garcia on May 9, 2013. See J. Garcia 302 at 1. This interview, again according to the J. Garcia 302, provides,<br><br>    [i]n late November 2012, [J. Garcia] had a conversation with SNM gang member EDWARD TROUP in [redacted] back yard off of [redacted] in Albuquerque. During the conversation, TROUP confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico. Troup stated that during one of the murders, he held "Fred Dawg's" (agent note: identified as FREDDIE SACHEZ . . . ) legs while "Wino" (agent note: identified as SNM gang member JAVIER ALONSO, Jr. . . . ) strangled him to death with a drawstring from a laundry bag. Both TROUP and ALONSO disposed of the drawstring and then took off their clothes and tore up the evidence in an attempt to hide their part in the murder. TROUP told [J. Garcia] that CHICKIE LNU [Last Name Unknown] and his brother cleaned up the mess that was made during the murder, to include Sanchez' urine. TROUP also said that an unknown Corrections Officer (CO) thought that the inmates were giving each other tattoos, and did not respond to the area of the commotion, despite the fact that tattooing was considered contraband inside the prison facility. As a result, the SNM gang members were able to carry out the murder without any CO intervention. |

---

[33]The Court draws its list of co-Defendant statements from a table that B. Garcia submitted at the Court's request, because the Defendants wanted a pre-trial determination of the statements' admissibility. The Court supplements that list of co-Defendant statements with entries for Joseph Otero and Josh Mirka; B. Garcia did not identify statements that those two individuals made until he filed the B. Garcia Supplement. See B. Garcia Supplement ¶¶ 2-3, at 1-3.

TROUP also mentioned that the murder of Fred Dawg was an order from headquarters, to which [J. Garcia] interpreted the term "headquarters" to mean the main New Mexico Prison Facility in Santa Fe, New Mexico, where the majority of the SNM leadership was incarcerated. [J. Garcia] stated that TROUP was remorseful and was crying during much of the conversation. TROUP told [J. Garcia] that Fred Dawg provided information on a murder, which was against the SNM by-laws, and that was the cause for his murder.

[J. Garcia] stated that TROUP had told him about SANCHEZ's murder in approximately 2008 when [J. Garcia] violated his probation/parole and was incarcerated in the New Mexico Prison System. Additionally, during the same conversation, TROUP provided [J. Garcia] with information regarding his role in the murder of "Poncho" (agent note: identified as FRANK CASTILLO . . .) in approximately 2001 at the SNMCF. TROUP told [J. Garcia] that that BILLY GARCIA, aka Wild Bill, gave the order to kill Poncho, and that TROUP walked Poncho into his (Poncho's) cell where ANGEL DELEON and and [sic] others were waiting for Poncho. Once inside the cell, TROUP slammed the door, while DELEON and another SNM gang member/associate strangled Poncho to death.

J. Garcia 302 at 2-3.

Assuming that Troup invokes his right to remain silent, he is unavailable for rule 804 purposes. See Fed. R. Evid. 804(a). Troup's statements indicating that he killed Sanchez and Castillo are sufficiently against Troup's penal interest to be admissible under rule 804(b)(3). See United States v. Smalls, 605 F.3d at 783 ("We may safely surmise that from time immemorial, only on the rarest occasion, if

ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend."). Troup's statement indicating that B. Garcia ordered the Castillo murder is not, however, sufficiently self-inculpatory to be admissible under rule 804(b)(3). See Williamson v. United States, 512 U.S. at 599 (stating that rule 804(b)(3) "cover[s] only those declarations or remarks within the confession that are individually self-inculpatory"); id. ("The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts."). Additionally, Troup's statements are admissible against him as admissions of a party opponent. See Fed. R. Evid. 801(d)(2)(A).

Whether Troup's statements are "supported by corroborating circumstances that clearly indicate [their] trustworthiness" is an issue that the Court will need to assess in light of the other evidence introduced at trial. Fed. R. Evid. 804(b)(3)(B).

> We believe that a showing of corroborating circumstances is sufficient if it gives the judge some assurance -- when added to the fact that the statement was against the declarant's interest -- that the declarant was telling the truth. And in determining corroborating circumstances, the court should consider *all* the factors listed in the draft Advisory Committee Note -- not just the additional circumstantial guarantees of reliability but also the amount of independent evidence supporting the truth of the declarant's statement. All the listed factors are pertinent to whether the declarant made an accurate statement; and figuring out whether the declarant gave an accurate account is, after all, the point of the enterprise.

4 Saltzburg et al., supra, § 804.02[9], at 804-23 to -24 (emphasis in original).

When J. Garcia testified at the Court's hearing on March 15, 2018, however, he disavowed portions of the J. Garcia

302:

> Q. Has anybody ever admitted to you in a conversation with you that they were involved in those murders that happened at the Southern New Mexico Correctional Facility in 2001? Has anyone ever told you that they did it?
>
> A. No, not that I remember, no.
>
> . . . .
>
> Q. Now, have you heard rumors about what happened there in 2001, from other inmates, or other people?
>
> A. Yeah.
>
> Q. But no one has personally said to you, "I did it," or "I was part of it"?
>
> A. No.
>
> Q. Or say out loud, "I was part of it"?
>
> A. No.

March 15 Tr. at 315:11-316:4 (Castle, J. Garcia). J. Garcia's hearing testimony is inconsistent with the J. Garcia statements that the J. Garcia 302 memorializes, which renders those statements -- including the J. Garcia 302 statements relating the Troup statements -- less credible. See Fed. R. Evid. 612 (stating that a hearsay declarant's credibility may be attacked via "evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred"). J. Garcia's hearing testimony does not, however, make the Troup statements -- as opposed to the J. Garcia 302 statements relating the Troup statements -- any more or less credible, so that testimony is irrelevant to whether the Troup statements are "supported by corroborating circumstances that clearly indicate [their] trustworthiness." Fed. R. Evid. 804(b)(3)(B). Put another way, J. Garcia's testimony is relevant to whether Troup made the statements that the J. Garcia 302 describes, but it is not relevant to whether those statements -- if Troup

made them -- are trustworthy. While the Court must determine, by a preponderance of the evidence, whether those statements are admissible for their truth, see Fed. R. Evid. 104(a), whether the statement was made at all is a conditional-relevance question which the jury decides if "proof [is] introduced sufficient to support a finding" that the statement was made, Fed. R. Evid. 104(b). See id. advisory committee's notes to 1972 proposed rule (listing, as a conditional relevance example, "when a spoken statement is relied upon to prove notice to X, it is without probative value unless X heard it")

If J. Garcia does not testify that Troup made the statements that the J. Garcia 302 describes, then the J. Garcia 302 is the only evidence indicating that Troup made such a statement, and the J. Garcia 302 is not admissible for its truth. Hearsay within hearsay "is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See 4 Saltzburg et al., supra, § 805.02[2], at 805-3 ("[A] statement admissible under Rule 801(d) can be admitted when included in another hearsay statement if the other hearsay statement qualifies as an exception."). The J. Garcia 302 is hearsay within hearsay within hearsay, because the J. Garcia 302 is a collection of out-of-court statements memorializing J. Garcia's out-of-court statements to the FBI, which relate Troup's out-of-court statements.

The first hearsay level -- the J. Garcia 302 itself -- is not admissible for its truth unless its author, Special Agent Lance Roundy, testifies, because "the primary purpose for which the [J. Garcia 302] was made was that of establishing or proving some fact potentially relevant to a criminal prosecution," so the J. Garcia 302 is testimonial. United States v. Smalls, 605 F.3d at 778. See Crawford v. Washington, 541 U.S. at 68 ("Where testimonial evidence is at issue [and the declarant does not testify], the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Further, the Federal Rules of Evidence do not permit the J. Garcia 302 to be admitted for its truth as a public record, because it is a record setting out "a matter observed by law-enforcement personnel," which does not qualify as a public record "in a criminal case." Fed. R.

Evid. 803(8)(A)(ii).  See 4 Saltzburg et al., supra, § 803.02[9][d], at 803-71 to -72 ("Under the predominant view, the exclusionary language [of rule 803(8)(A)(ii) and 803(8)(A)(iii)] covers only those police-generated reports that are prepared under adversarial circumstances -- in anticipation of litigation -- and so are subject to manipulation by authorities bent on convicting a particular criminal defendant.").  But see id. § 803.02[9][d], at 803-73 ("Courts have held, correctly we think, that the law enforcement exclusion in the rule is inapplicable if the public official who prepared the report actually testifies at trial.  The confrontation concerns that give rise to the statutory exclusions are allayed where the declarant is subject to cross-examination at trial.").  For the same reason, the J. Garcia 302 is not admissible as a record of a regularly conducted activity:

> In criminal cases, the argument has sometimes been made that a law enforcement report that is inadmissible due to the exclusionary language of Rule 803(8)(A)(ii) and (iii) can nonetheless be admitted as a record of regularly conducted activity under Rule 803(6). However, if the exclusionary language is properly applied so as to exclude only those law enforcement reports that are subjective and made under adversarial circumstances -- which is the position taken by most courts, as discussed above -- then there is no conflict between the rules.  This is because records that are prepared in anticipation of litigation are excluded under the trustworthiness criterion of Rule 803(6); and those are, in effect, the only records that are excluded under the prevailing view of Rule 803(8).

4 Saltzburg et al., supra, § 803.02[9][e].  None of the other exceptions to the rule against hearsay apply, so the J. Garcia 302 is admissible only if Roundy testifies.

Even if the United States renders the J. Garcia 302 admissible for its truth by calling Roundy as a witness, the second hearsay level -- the J. Garcia statements that the J. Garcia 302 contains -- is not admissible for its truth.  No

| | exception to the general rule against hearsay applies, <u>see</u> Fed. R. Evid. 802; those statements are not excited utterance, for example, <u>see</u> Fed. R. Evid. 803(2). Additionally, J. Garcia's statements in an FBI interview are testimonial, so the Confrontation Clause permits their introduction only if J. Garcia takes the stand or if J. Garcia is unavailable.[34] <u>See</u> <u>Crawford v. Washington</u>, 541 U.S. at 68.<br><br>The third level of hearsay -- the Troup statements that the J. Garcia statements relate -- are admissible for their truth against Troup. <u>See</u> Fed. R. Evid. 802(d)(2)(A). They are not admissible against any other Defendant, however, under rule 802(d)(2)(A). |
|---|---|
| Statement 2: Leroy Lucero is a government witness. Lucero indicates Chavez and Joe Gallegos admitted involvement in the murder of Garza to him as did others. It is unknown whether Chavez and Gallegos implicated B. Garcia.<br><br>Declarant: Christopher Chavez, Joe Gallegos<br><br>Source: Leroy Lucero<br><br>Date: unknown | C. Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A). J. Gallegos' statements are likewise admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence. The Court will give, on request, a limiting instruction as to all other Defendants.<br><br>When Lucero testified on March 16, 2018, he invoked his right to remain silent regarding the Castillo and Garza murders. <u>See</u> March 16 Tr. at 160:3-7 (Castle, Lucero). The Court sustained that invocation, because Lucero had not been afforded any kind of immunity. <u>See</u> March 16 Tr. at 157:18-20 (Beck)("I don't believe at this point we have provided him a Kastigar letter and adequately debriefed him to have the protection."); <u>id.</u> at 158:24-25 (Court)("I'm inclined to sustain the privilege."). The Court is, thus, unable to make a pretrial determination regarding whether Lucero will testify at trial regarding statements that C. Chavez or J. Gallegos made, or whether those statements will be admissible for their truth under rule 804(b)(3) as statements against C. Chavez' or J. Gallegos' penal interests. |
| Statement 3: Fred Quintana is a government witness. Quintana indicates both Troup and Chavez admitted to involvement in the | C. Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A). Troup's statements are likewise admissible against him for their truth as admissions of a party |

---

[34]Showing that J. Garcia is unavailable satisfies the Confrontation Clause, because J. Garcia testified at a pretrial hearing, so the Defendants have had "a prior opportunity for cross-examination." <u>Crawford v. Washington</u>, 541 U.S. at 68.

| | |
|---|---|
| 2001 murders. It is unknown whether Chavez and Troup implicated B. Garcia.<br><br>Declarant: Edward Troup, Christopher Chavez<br><br>Source: Fred Quintana<br><br>Date: unknown | opponent under rule 801(d)(2)(A). The Court will give, upon request, a limiting instruction as to the other Defendants.<br><br>The Quintana 1023 states: "2001 Murder of Frank Castillo and Rolando Garcia at the Southern New Mexico Correctional Facility in Las Cruces were called by BILLY GARCIA ('Wild Bill'). Several members participated in the double homicide and EDWARD TROUP and CHRITOPHER CHAVEZ admitted to the murders during conversations with [Quintana]." Quintana 1023 at 2. The Quintana 1023 does not provide enough details about the statements that Troup and C. Chavez allegedly made to Quintana for the Court to make the fine-grained inquiry that Williamson v. United States requires. Consequently, the Court does not now conclude that those statements are admissible under rule 804(b)(3) (the "statement-against-interest" exception). The Court is willing to reconsider whether Troup or C. Chavez made statements that are admissible under rule 804(b)(3) when it has more information. |
| Statement 4: Ben Clark is a witness for the government. Clark indicated Angel Deleon, Troup and Joe Gallegos confessed their involvement in the 2001 murders to him and that one or both may have indicated that B. Garcia called the hit.<br><br>Declarant: Angel DeLeon, Edward Troup, Joe Gallegos<br><br>Source: Ben Clark<br><br>Date: 2004 | Troup's statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A). J. Gallegos' statements are likewise admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A). The Court will give, upon request, a limiting instruction as to the other Defendants. DeLeon's statements, however, are not admissible under rule 801(d)(2)(A), because DeLeon is not a Trial 2 Defendant.<br><br>Clark testified on March 15, 2018, and indicated that he had spoken with four individuals about the Castillo and Garza murders: "Eugene Martinez, Leonard Lujan, Edward Troup, and Joe Gallegos." March 15 Tr. at 159:6-7 (Clark). Clark indicated that E. Martinez, Troup, and J. Gallegos did not say that B. Garcia ordered the Castillo and Garza murders. See March 15 Tr. at 159:9-12 (Cooper, Clark)(discussing E. Martinez' statements); id. at 159:24-16:2 (Cooper, Clark)(discussing Troup's statements); id. at 160:9-12 (Cooper, Clark)(discussing J. Gallegos' statements). Clark indicated, however, that "Leonard Lujan did tell me Billy Garcia had something to do with it." March 15 Tr. at 159:16-17 (Clark). See id. at 159:13-17 (Cooper, Clark). According to Clark, Lujan told him |

| | |
|---|---|
| | "multiple times from '03 to '04 that Billy Garcia called those hits." March 15 Tr. at 162:14-15 (Beck). See id. at 162:14-16 (Clark).[35] That B. Garcia ordered the Castillo and Garza murders does not, taken alone, tend to subject Lujan to criminal liability, so those statements are not admissible for their truth under rule 804(b)(3). See Williamson v. United States, 512 U.S. at 599.[36]<br><br>Additionally, the United States has not established that Lujan is unavailable, which is a prerequisite for introducing any of Lujan's statements under rule 804(b)(3). See Fed. R. Evid. 804(b)(3). See also United States' Sealed Supplemental Witness List for Trial II at 2, filed April 9, 2018 (Doc. 2089)(listing Lujan as a witness). |
| Statement 5: Samuel Gonzales is a witness for the government. He indicates Troup made statements about the 2001 murders. It is unknown whether Gonzales indicates Troup implicated Billy Garcia.<br><br>Declarant: Edward Troup<br><br>Source: Samuel Gonzales<br><br>Date: unknown | Troup's statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A). The Court will give, upon request, a limiting instruction as to the other Defendants.<br><br>According to the Samuel Gonzales 302:<br><br>Edward TROUP spoke to GONZALES about the 2001 murder of Rolando GARZA. TROUP did not provide details, but told GONZALES that he was there. GARZA was killed because he was a known member of the rival prison gang Los Carnales. Francisco CASTILLO was killed in 2001 because he "messed up" with Billy GARCIA.<br><br>Samuel Gonzales 302 at 5. Those statements do not incriminate Troup, so they are not admissible as declarations against Troup's penal interests under rule 804(b)(3). See Williamson v. United States, 512 U.S. at 599. |

---

[35]Clark's testimony regarding Lujan's statements indicates that B. Garcia's recent assertion that "[w]itnesses Munoz, Clark, Lucero, Quintana, and Otero all testified that none of Billy Garcia's codefendants made any statements to them which implicated Billy Garcia" is false. B. Garcia Brief ¶ 5, at 3.

[36]The Court can imagine, however, Lujan statements indicating that B. Garcia ordered the Castillo and Garza murders which would incriminate Lujan, e.g., "I obeyed B. Garcia's order to kill Castillo."

| | |
|---|---|
| Statement 6: Robert Lovato is a government witness. Lovato indicates that Christopher Chavez admitted involvement in the 2001 murder of Garza.<br><br>Declarant: Christopher Chavez<br><br>Source: Robert Lovato<br><br>Date: 2012 | C. Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A). If the statement is admitted only under rule 801(d)(2)(A), the Court will give a limiting instruction as to the other Defendants.<br><br>The Lovato 302 indicates that "CHAVEZ talked about the murder of Rolando Garza and was paranoid that he might get caught for it. CHAVEZ was under the impression that law enforcement might be making some arrests in the case and was worried." Lovato 302 at 2. This statement is sufficiently inculpatory that a reasonable person in C. Chavez' position would not have made it if it were false. See Fed. R. Evid. 804(b)(3) (the "statement-against-interest" exception); United States v. Smalls, 605 F.3d at 783. The Lovato 302 indicates that that C. Chavez was very fearful when he talked to Lovato, see Lovato 302 at 2, which is a circumstance that corroborates the substance of C. Chavez' statement, see Fed. R. Evid. 804(b)(3)(B) (requiring corroborating circumstances indicating a statement-against-penal-interest's trustworthiness if offered in a criminal case). The Court will have to assess at trial whether there are enough corroborating circumstances indicating the trustworthiness of C. Chavez' statement. Fed. R. Evid. 804(b)(3)(B). |
| Statement 7: Julian Romero is a government witness. Romero indicates that Christopher Chavez confessed to his role in the 2001 murders.<br><br>Declarant: Christopher Chavez<br><br>Source: Julian Romero<br><br>Date: unknown | C. Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A). If the statement is admitted only under rule 801(d)(2)(A), the Court will give a limiting instruction as to the other Defendants.<br><br>According to the Romero 302, "CHAVEZ admitted to Romero that he killed Garza." Romero 302 at 7. This statement is sufficiently inculpatory that a reasonable person in C. Chavez' position would not make the statement unless that person believed it to be true. See United States v. Smalls, 605 F.3d at 783 ("We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend."). The Court will have to assess at trial whether there are enough corroborating circumstances indicating the trustworthiness of C. Chavez' statement for it to be |

| | |
|---|---|
| | admitted under rule 804(b)(3) (the "statement-against-interest" exception). <u>See</u> Fed. R. Evid. 804(b)(3)(B). |
| Statement 8: Timothy Martinez is a government witness. T. Martinez claims that Christopher Chavez confessed to his involvement in the murders and during such confession implicates Allen Patterson in the murder.<br><br>Declarant: Christopher Chavez<br><br>Source: Timothy Martinez<br><br>Date: unknown | C. Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A). The Court will, upon request, give a limiting instruction as to the other Defendants.<br><br>The T. Martinez 302 indicates that C. Chavez told T. Martinez that Garza "was getting up and was gonna escape and then Allen PATTERSON came in and tackled him (GARZA). PATTERSON wasn't even in on the hit. He just gave skina and helped." T. Martinez 302 at 5. This statement incriminates only Patterson and not C. Chavez, so it is not admissible under rule 804(b)(3). <u>See</u> <u>Williamson v. United States</u>, 512 U.S. at 599.<br><br>Under rule 801(d)(2)(A), the jury can use C. Chavez' statement to T. Martinez against C. Chavez and not against any other Defendant. The portion of that statement describing Patterson's actions has little probative value vis-à-vis C. Chavez, but the jury may improperly use that portion of the statement against Patterson even if the Court gives a limiting instruction. Consequently, serious rule 403 issues would attend any attempt to introduce that portion of C. Chavez' statement to T. Martinez. The Court will not admit the portion relevant to Patterson. |
| Statement 9: "The defense is objecting to an alleged statement made by an unidentified declarant to Joseph Otero in which he allegedly indicates that Billy Garcia ordered the hits." B. Garcia Supplement ¶ 2, at 1-2. | In a March 21, 2018, interview, Otero told the FBI that "Billy GARCIA gave the orders to kill GARZA." 3/21/2018 Conversation with Joseph Otero at 1 (drafted March 22, 2018), filed March 31, 2018 (Doc. 2009-1)("Otero 302"). The Otero 302 does not indicate whether Otero has personal knowledge regarding whether B. Garcia ordered the Garza murder, <u>e.g.</u>, Otero could have overheard B. Garcia giving the order to kill Garza. If, on the other hand, Otero lacks personal knowledge and believes that B. Garcia ordered the Garza murder because of someone else's out-of-court statement, Otero cannot testify that B. Garcia ordered the Garza murder. <u>See</u> Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Otero could testify regarding the statements that he heard, because Otero would have personal knowledge that the statements were made, but the rule against hearsay potentially excludes those out-of-court statements. The |

| | |
|---|---|
| | limited record before the Court, however, does not permit it to make a definite determination one way or the other |
| Statement 10: "Josh Mirka is a witness for the government. He has made statements about who was responsible for the 2001 murders and recounts statements Christopher Chavez allegedly made to him which implicate Billy Garcia." B. Garcia Supplement ¶ 3, at 2. | In a March 22, 2018, interview with the FBI, Mirka indicated that "CHAVEZ said that he was 'Sindicato,' that 'Bill runs the car' and all of the defendants planned to stick together." 3/22/2018 Interview of Josh Mirka at 1 (drafted March 23, 2018), filed March 31, 2018 (Doc. 2009-2). The United States indicates that it does not intend to offer the statements that C. Chavez made to Mirka under rule 804(b)(3). See Response Brief at 9. The United States intends, instead, to offer those statements as statements of the declarant's then-existing state of mind under rule 803(3), because C. Chavez' statement to Mirka "shows Defendant Chavez's intent in making statements to Josh Mirka at all: he intends to stick together with the SNM and Defendant B. Garcia is the leader of those in the SNM currently." Response Brief at 9-10.<br><br>C. Chavez' statement to Mirka is not, however, admissible for its truth under rule 803(3). That C. Chavez believes that B. Garcia is an SNM leader, i.e., that B. Garcia runs the car, cannot be offered under rule 803(3) to show that C. Chavez' belief is true. See Fed. R. Evid 803(3) (stating that the then-existing state-of-mind exception to the rule against hearsay does not apply to "a statement of memory or belief to prove the fact remembered or believed"). C. Chavez' told Mirka that all of the Defendants plan to stick together, but rule 803(3) applies only to a statement of the declarant's then-existing plan. See Fed. R. Evid. 803(3). Thus, to the extent that C. Chavez' statement refers to the plans of Defendants other than C. Chavez, rule 803(3) does not apply. |

## V. THE COURT MAKES PARTICULARIZED JUDGMENTS REGARDING THE ADMISSIBILITY OF JAMES STATEMENTS FROM THE FIRST TRIAL UNDER THE FEDERAL RULES OF EVIDENCE.

The United States filed a notice stating that it "may use the co-conspirator statements referenced in the attachment during Trial #2 in this case" and attached a document including all the co-conspirator statements provided at the first trial. Trial 1 James Notice at 1 (attaching James MOO at 117-23, 287 F. Supp. 3d at 1264-70). The Court noted, and the United States

verified, that Trial 1 involved different conspiracies than Trial 2.  See March 15 Tr. at 310:16-18

(Court, Beck).  Accordingly, because Trial 2 involves different Defendants, i.e., conspirators,

and different conspiracies, none of the Trial 1 James statements are admissible in Trial 2 as co-

conspirator statements.  See March 15 Tr. at 310:19-22 (Court).  See also Fed. R. Evid.

801(d)(2)(E).  As the Court stated at the Trial 2 James hearing, these statements are

"inadmissible in this trial[,]" as "[t]here is not a party in here that they can be used against,"

because none of the statements relate to the conspiracies and Defendants in Trial 2.  March 15

Tr. at 311:5-6 (Court).  See id. at 311:18-23 (Court).  Even the statements which the Court ruled

were generally admissible in Trial 1 under 803(3) (the "then-existing state-of-mind" exception),

as opposed to being admissible only against certain Defendants under rules 801(d)(1)(A) or

801(d)(2)(E), see James MOO at 117-23, 287 F. Supp. 3d at 1264-70, are inadmissible in Trial 2,

because they are irrelevant to the Trial 2 conspiracies and Defendants, see Fed. R. Evid. 402

("Irrelevant evidence is not admissible.").  If the United States wants to admit statements

admissible at the first trial, it will need to justify in detail each and state which evidence rules

apply to the Defendants.

        **IT IS ORDERED** that the United States' Sealed Opposed Motion *In Limine* Regarding

Statements Against Penal Interest Under Rule 804(b)(3), filed March 10, 2018 (Doc. 1912), is

granted in part and denied in part.  The Court makes particularized judgments for each statement

and determines that certain statements are potentially admissible under rule 804(b)(3) of the

Federal Rules of Evidence as provided in the table above.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

      *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

      *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

*Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

*Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

*Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

*Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

*Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

    *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

    *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

    *Attorneys for Defendant Benjamin Clark*

Leon Encinias
Lean Encinias Attorney at Law
Albuquerque, New Mexico

--and--

Pedro Pineda
Las Cruces, New Mexico

    *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

*Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

*Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

*Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

*Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

      *Attorneys for Defendant Mauricio Varela*

Richard Jewkes
El Paso, Texas

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

      *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Brusuelas-Benavidez
Albuquerque, New Mexico

      *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

      *Attorneys for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

*Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

*Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

*Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

    *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Santos Gonzalez*

Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

    *Attorneys for Defendant Brandy Rodriguez*