## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                                      No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a. "Huero
Troup"; LEONARD LUJAN; BILLY GARCIA,
a.k.a. "Wild Bill"; EUGENE MARTINEZ, a.k.a.
"Little Guero"; ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter";
JAVIER ALONSO, a.k.a. "Wineo"; ARTURO
ARNULFO GARCIA, a.k.a. "Shotgun";
BENJAMIN CLARK, a.k.a. "Cyclone"; RUBEN
HERNANDEZ; JERRY ARMENTA, a.k.a.
"Creeper"; JERRY MONTOYA, a.k.a. "Boxer";
MARIO RODRIGUEZ, a.k.a. "Blue"; TIMOTHY
MARTINEZ, a.k.a. "Red"; MAURICIO VARELA,
a.k.a. "Archie," a.k.a. "Hog Nuts"; DANIEL
SANCHEZ, a.k.a. "Dan"; GERALD
ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma";
CONRAD VILLEGAS, a.k.a. "Chitmon";
ANTHONY RAY BACA, a.k.a. "Pup"; ROBERT
MARTINEZ, a.k.a. "Baby Rob"; ROY PAUL
MARTINEZ, a.k.a. "Shadow"; CHRISTOPHER
GARCIA; CARLOS HERRERA, a.k.a. "Lazy";
RUDY PEREZ, a.k.a. "Ru Dog"; ANDREW
GALLEGOS, a.k.a. "Smiley"; SANTOS
GONZALEZ; PAUL RIVERA; SHAUNA
GUTIERREZ and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Angel DeLeon's Objections to

Presentence Report and Response to Addendum to Presentence Report, filed December 9, 2021

(Doc. 3521)("Objections"). The primary issues are: (i) whether Defendant Angel DeLeon has

aliases; (ii) whether Defendant Benjamin Clark testified that DeLeon admitted to Clark that

DeLeon participated in Frank Castillo's murder; (iii) whether the Court can apply United States

Sentencing Guidelines ("U.S.S.G.") § 3A1.1(b)(1)'s 2-level sentencing enhancement, because the

victim, Frank Castillo, was a vulnerable victim; and (iv) whether DeLeon wants to live in Texas.

The Court concludes that: (i) DeLeon has at least one alias; (ii) Clark did not testify that DeLeon

admitted his participation in Castillo's murder; (iii) Castillo was a vulnerable victim, because there

was a hit on him, he was outnumbered in his prison cell, he was intoxicated with heroin, and he

had a limited ability to defend himself or escape from the surprise attack in his prison cell; and

(iv) DeLeon wants to be incarcerated at a prison facility in Texas, but does not want to live in

Texas if he is not incarcerated.  Accordingly, the Court will overrule DeLeon's first and third

Objections, but will sustain his second and fourth Objections.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, filed November 15,

2021 (Doc. 3510)("PSR"), the Addendum to the Presentence Investigation Report, filed December

6, 2021 (Doc. 3519)("First Addendum"), the Objections, and the Second Addendum to the

Presentence Investigation Report, filed December 10, 2021 (Doc. 3522)("Second Addendum").

The Court makes its findings of fact by a preponderance of the evidence.  See United States v.

Williams, No. CR. 17-2556 JB, 2020 WL 4016108, at *6 (D.N.M. July 16, 2020)(Browning,

J.)(citing United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)).  Accord United States v.

Zapata, 546 F.3d 1179, 1192 (10th Cir. 2008).  The Court may rely on hearsay if the hearsay is

reliable.[1]     See    United   States   v.   Banda,    168    F. App'x   284,   289   (10th   Cir.

---

[1]In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the introduction of testimonial hearsay statements from witnesses not subjected to cross examination at trial violates a defendant's Sixth Amendment confrontation right.  See 541 U.S. at 68-69.  There is no binding precedent from the Supreme Court or the United States Court of Appeals for the Tenth Circuit concerning whether Crawford v. Washington applies to proceedings outside of the trial context.

2006)(unpublished)("[T]here is no prohibition on considering hearsay testimony at sentencing,

provided it bears indicia of reliability.").[2]   The evidence and information upon which the Court

_____

The Tenth Circuit has indicated in unpublished caselaw that <u>Crawford v. Washington</u> does not bar hearsay statements at a suppression hearing.  In <u>United States v. Ramirez</u>, the Tenth Circuit notes:

> It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant.  The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings.  <u>See</u> <u>United States v. Garcia</u>, 324 Fed. App'x. 705, 708 (10th Cir. [2009]), <u>cert. denied</u>, [558] U.S. [890] . . . (2009)(collecting cases).  Nonetheless, even if we assume that the Confrontation Clause applies to the hearings at issue here, the admission of the confidential informant's statements was harmless.

388 F. App'x 807, 810 (10th Cir. 2010)(unpublished).  Moreover, based on the same reasoning as the Tenth Circuit in <u>United States v. Ramirez</u>, 388 F. App'x 807 (10th Cir. 2010)(unpublished), the Court has concluded that hearsay statements are admissible in a detention hearing.  <u>See</u> <u>United States v. Hernandez</u>, 778 F. Supp. 2d 1211, 1227 (D.N.M. 2011)(Browning, J.)("Before <u>Crawford v. Washington</u>, courts held that the Confrontation Clause did not attach to detention hearings. Nothing in the Supreme Court's opinion in <u>Crawford v. Washington</u> undermines those holdings. Moreover, what authority exists after <u>Crawford v. Washington</u> rejects the proposition that <u>Crawford v. Washington</u> applies outside of trial.").  Moreover, other Circuit Courts that have addressed this question have held that hearsay evidence's introduction at pre-trial proceedings does not violate the Confrontation Clause.  <u>See</u> <u>Peterson v. California</u>, 604 F.3d 1166 (9th Cir. 2010)(concluding that the admission of hearsay evidence at a preliminary hearing does not violate the Confrontation Clause because the right to confrontation is a trial right).  <u>See also</u> <u>United States v. Mitchell-Hunter</u>, 664 F.3d 45, 52 (1st Cir. 2011)(holding that the defendant did not have a confrontation right in a pretrial jurisdictional hearing).  Here, the Court largely relies on trial testimony to determine its factual findings.  To the extent that the Court relies on hearsay, the Court concludes that it does not violate DeLeon's Confrontation right.

[2]<u>United States v. Banda</u> is an unpublished opinion, but the Court can rely on a United States Court of Appeals for the Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

relies must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

1. **SNM Background.**

2. The Syndicato de Nuevo Mexico ("SNM") is a "powerful and violent prison gang" that was formed in February, 1980, after a large prison riot at the Penitentiary of New Mexico in Santa Fe, New Mexico.  PSR ¶ 6, at 8.

3. Soon after SNM formed, "prison gangs such as the SNM and Los Carnales began to emerge within" the New Mexico Corrections Department ("NMCD").  PSR ¶ 6, at 8.

4. These prison gangs "began to organize themselves and focused primarily on gaining their own status within the correctional institutions by employing violence upon the inmate population to assume a position of leadership and control."  PSR ¶ 6, at 8.

5. Since the 1980s, there have been over 500 SNM members.  See PSR ¶ 6, at 8.

6. SNM "operates under a 'panel' or 'mesa' (Spanish for [']table[']) of leaders who issue orders to subordinate gang members."  PSR ¶ 7, at 8 (no citation for quotation).

7. "Despite being imprisoned and being closely scrutinized by prison officials, SNM gang leaders managed to convey orders to SNM gang members and associate throughout the prison

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Banda, United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014)(unpublished), United States v. Joe, 785 F. App'x 528 (10th Cir. 2019)(unpublished), United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)(unpublished), and United States v. Talk, 446 F. App'x 114 (10th Cir. 2011)(unpublished) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

system through a variety of means, including secret notes called 'kites' or 'welas,' coded letters, and messages conveyed by complicit visitors."  PSR ¶ 7, at 8 (no citation for quotations).

8.      "These messages would provide SNM gang members with the gang's operational strategies to facilitate their illegal criminal activities within the penal system."  PSR ¶ 7, at 8.

9.      "SNM gang members discussed the proposed actions to be taken on those who cooperated against SNM gang members and associates, to include plans and agreements regarding the commission of future crimes, which involved murders, drug distribution, possession of firearms, and assaults, as well as ways to conceal these acts."  PSR ¶ 8, at 8.

10.     "SNM gang members provided information and financial support to other members and associates of the enterprise, including those who were incarcerated, for the purpose of committing criminal acts."  PSR ¶ 8, at 8.

11.     "SNM gang members are bound to protect the enterprise's members and associates who commit crimes by hindering, obstructing, and preventing law enforcement officers from identifying, apprehending, and successfully prosecuting and punishing the offenders."  PSR ¶ 8, at 8.

12.     "During the mid-1980s through 2014, high-ranking SNM gang members ordered numerous assaults and murders of other SNM gang members and rival gang members within the NMCD, as well as assaults on correctional officers."  PSR ¶ 9, at 8.

13.     "From July 5, 1988, through September 28, 2014, at least 15 homicides and/or assaults occurred within the NMCD and Metropolitical Detention Center in Bernalillo County, each of which has been directly tied to the SNM gang."  PSR ¶ 9, at 8-9.

14.     "As a result of these murders and assaults, the SNM gang was locked down, and SNM gang leadership were transferred out to out-of-state institutions."  PSR ¶ 9, at 9.

15.     "Due to these lockdowns and transfers, the SNM gang leadership felt they were being unjustly punished by the Cabinet Secretary," because the Cabinet Secretary previously was a Bernalillo County Sheriff's Office ("BCSO") Sheriff, and was "instrumental in the investigation, prosecution, and conviction of SNM gang member Michael Astorga for the Murder of BCSO Deputy Jim McGrane."  PSR ¶ 10, at 9.

16.     The SNM used the Cabinet Secretary's prior work as a tool "to propagate within its membership that the Cabinet Secretary was using his position to advance a personal agenda against the SNM gang."  PSR ¶ 10, at 9.

**2.     The FBI Investigation.**

17.     In March, 2015, a high-ranking NMCD official alerted the FBI that SNM gang leadership placed a hit on Cabinet Secretary Gregg Marcentel and Security Threat Intelligence Unit ("STIU") Administrator Dwayne Santistevan.  PSR ¶ 11, at 9.

18.     An ensuing FBI investigation "led to the indictment of forty SNM members in December 2015 on federal charges related to the Violence Crimes in Aid of Racketeering (VICAR)[3] and [Racketeer-Influenced and Corrupt Organizations Act] RICO[4] offenses."  PSR ¶ 12, at 9.

19.     In April, 2016, the United States Attorney's Office indicted 39 SNM members and SNM associates.  See PSR ¶ 12, at 9.

20.     "Approximately 127 individuals have been arrested in relation to this investigation."  PSR ¶ 12, at 9.

21.     "The FBI continues to monitor the SNM organization and target members of the

_____

[3] 18 U.S.C. § 1959.

[4] 18 U.S.C. §§ 1961-1968.

organization engaged in on-going criminal activity."  PSR ¶ 12, at 9.

    **3.**    **DeLeon's Involvement**.

22.    In March, 2001, Castillo, DeLeon, Rolando Garza, Leonard Lujan, Joe Gallegos, Michael Jaramillo, and Edward Troup were inmates at the Southern New Mexico Correctional Facility in Las Cruces, New Mexico.  See PSR ¶¶ 15-30, at 9-12.

23.    Castillo's nickname was "Pancho."  PSR ¶ 19, at 11.

24.    Defendant Billy Garcia, a.k.a. "Wild Bill," was a high-ranking SNM member and wanted Castillo killed,[5] because Garcia believed Castillo to be a "rat," meaning that he cooperated with law enforcement and had "'ratted' on an inmate while at the Penitentiary of New Mexico in Santa Fe."  PSR ¶ 17, at 10.

25.    Garcia ordered Lujan to "put together two teams of SNM members to carry out the 'hits' on" Garza and Castillo.  PSR ¶ 17, at 10 (no citation for quotation).

26.    Lujan selected Gallegos, DeLeon, Jaramillo, and Troup to carry out the Castillo hit. PSR ¶ 17, at 10.

27.    The two murders were "to be carried out simultaneously in the early morning hours by strangulation and not by a 'hot shot,' meaning a heroin overdose."  PSR ¶ 17, at 10 (no citation for quotation).

28.    Strangulation is "a trademark method of murder by the SNM."  PSR ¶ 17, at 10.

29.    Lujan also selected others to kill SNM members who failed to follow through with the murders, meaning that, if Gallegos, DeLeon, Jaramillo, or Troup, failed to kill Castillo, they

---

[5]The PSR states that "Garcia, a.k.a. "'Looney,' a high-ranking member of the SNM, advised that he wanted" Castillo "'taken out.'"  PSR ¶ 17, at 10 (no citation for quotation).  The USPO corrects this error, noting that, in PSR ¶ 17, at 10, "the name 'Wild Bill should be substituted for the name 'Looney.'"  Addendum to the Presentence Report, filed December 6, 2021 (Doc. 3519)(no citation for quotations).

would be killed themselves.  <u>See</u> PSR ¶ 17, at 10.

30.     In March, 2001, Jaramillo met with DeLeon and Gallegos in Gallegos' prison cell, where Gallegos "told them they 'were going to be doing a hit on Pancho.'"  PSR ¶ 19, at 11 (quoting trial transcript).

31.     Gallegos told DeLeon and Jaramillo that "they were waiting for heroin to be brought into the prison in the next day or two, and when that happened, they would kill 'Pancho.'"  PSR ¶ 19, at 11 (no citation for quotation).

32.     At a second meeting, "the three devised a plan to go into [Castillo's] room, give him a shot of heroin, and then strangle him."  PSR ¶ 19, at 11.

33.     Gallegos assigned everyone a role: Gallegos and DeLeon would hold Castillo, while Jaramillo strangled him; Troup was to act as the lookout and keep the other inmates in their cells.  <u>See</u> PSR ¶¶ 19, 22, at 11.

34.     In the early hours of March 26, 2011, the group carried out their plan: after Castillo entered his cell and injected himself with heroin, Gallegos and DeLeon grabbed Castillo by his arms, and rolled him over onto his bed, where Jaramillo strangled him with a laundry bag's drawstring while Gallegos and DeLeon held him down.  <u>See</u> PSR ¶¶ 15, 19, at 9, 11.

35.     Prison officials discovered Castillo's body on March 26, 2001.  <u>See</u> PSR ¶ 15, at 9.

36.     The Office of the Medical Examiner conducted an autopsy on Castillo's body on March 27, 2001.  <u>See</u> PSR ¶ 16, at 10.

37.     The autopsy reveals that "a tightly rolled laundry bag was around" Castillo's neck and was "twisted around itself," creating a ligature that "passed just below the mouth across the upper part of the chin and wrapped tightly around the back of the neck just below the base of the skull."  PSR ¶ 16, at 10.

38.     The autopsy reported the following injuries:

the face and chest were marked with postmortem lividity; petechial hemorrhages were extremely apparent within both eyes; there was hemorrhaging within the left sternocleidomastoid muscle of the lower neck; there was a large contusion on the left upper chest area and left shoulder that was not apparent on the surface of the skin due to the high levels of livor mortis; there was a 1½ x ¾ inch contusion on the right hip; and there were several abrasions and contusions of both knees as well as on the left foot.

PSR ¶ 16, at 10.

39.     The autopsy concludes that homicide caused Castillo's death.  See PSR ¶ 16, at 10.

40.     Kristen Radecki, a New Mexico Department of Public Safety Crime Laboratory employee, found DeLeon's DNA on the rope used to kill Castillo.  See PSR ¶ 22, at 11.

41.     Some time after Castillo's death, Phillip Gonzales heard DeLeon make several statements about Castillo, including "'Did you hear that? . . . Oh, Pancho asked me why'"; and "'Did you see that?' . . . 'There is a ghost.  It's Pancho, He's haunting me.'"  PSR ¶21, at 11.

## PROCEDURAL BACKGROUND

After an eight-day jury trial, a jury convicted DeLeon of one count of Violent Crimes in Aid of Racketeering (murder), in violation of 18 U.S.C. §§ 1959(a)(1) and 2.  See PSR ¶ 3, at 7; Redacted Jury Verdict at 1, filed September 16, 2021 (Doc. 3474).  18 U.S.C. §§ 1959(a)(1) requires that someone who violates 18 U.S.C. §§ 1959(a) with murder be punished "by death or life imprisonment."  18 U.S.C. § 1959(a)(1).  Nevertheless, the United States Probation Office ("USPO") calculates DeLeon's total offense level to be 43 under the U.S.S.G.  See PSR ¶ 37, at 13.  The USPO notes that, pursuant to U.S.S.G. §§ 2E1.3(a)(2) and 2A1.1, DeLeon's base offense level is 43.  See PSR ¶ 28, at 12.  The USPO then recommends U.S.S.G. § 3A1.1(b)(1)'s 2-level vulnerable-victim enhancement, and U.S.S.G. § 3A1.3's 2-level enhancement, because the victim was physically restrained during the offense.  See PSR ¶¶ 30, 31, at 12.  USPO calculates DeLeon's adjusted offense level to be 47, see PSR ¶ 34, at 12, but notes that U.S.S.G. Chapter 5, Part A, n.2,

states that offense levels over 43 should be treated as 43, see PSR ¶ 37, at 13.  The USPO contends, therefore, that DeLeon's U.S.S.G. sentence is life.  See PSR ¶ 82, at 21.

Before DeLeon objected to the PSR, the USPO amended the PSR.  See Addendum to the Presentence Report, filed December 6, 2021 (Doc. 3519)("First Addendum").  In the First Addendum the USPO makes four correctios to the PSR.  See First Addendum at 1.  First, the USPO corrects PSR ¶ 17, at 10, noting that "Wild Bill," not "Looney," is the "high-ranking member of the SNM."  First Addendum at 1.  Second, the USPO corrects PSR ¶ 20, at 11, noting that it was "Joe Gallegos, not DeLeon, who admitted to Clark that he murdered [Castillo]," and substitutes "Joe Gallegos" for "DeLeon."  First Addendum at 7.  Third, the USPO states that the PSR mistakenly omits victim impact information, see First Addendum at 1, and attaches a statement from S.C., Castillo's sister, see Victim Impact Statement, filed December 6, 2021 (Doc. 3519-1).  Fourth, the USPO states that PSR ¶ 58, at 18, does not list all of DeLeon's tattoos, and notes that DeLeon "has a tattoo on his forearm of a woman with a headband with a Zia symbol and the letters 'SNM'" and a "tattoo of another woman also has a headband with the letter 'S' on it."  First Addendum at 1 (no citation for quotations).

DeLeon objects to the PSR.  See Objections at 1.  DeLeon acknowledges that he filed his Objections after D.N.M.LR-Crim. 32.C's twenty-one day deadline passed, but "requests that the Court accept these objections" due to "the difficulty in arranging visits at Cibola Country Correctional Center to visit with Mr. DeLeon in person to review" the PSR and the First Addendum.  Objections at 1.  See D.N.M.LR-Crim. 32.C.  DeLeon makes four objections.  See Objections at 1-2.  First, DeLeon argues that, although the PSR lists his aliases, "he does not have any aliases" and "all but one of the alleged aliases are reversals" of his given name and are the result of "law enforcement's errors in properly documenting Mr. DeLeon's name."  Objections at

1.  Second, DeLeon argues that PSR ¶ 20, at 11, mistakenly states that "Benjamin Clark testified that Mr. DeLeon admitted to Mr. Clark that he participated in" Castillo's murder.  Objections at 1. DeLeon notes that, the First Addendum already makes this correction, but nevertheless requests that the PSR "be revised to reflect the correction."  Objections at 2.  Third, DeLeon objects to the USPO's recommendation of U.S.S.G. § 3A1.1(b)(1)'s 2-level vulnerable-victim enhancement. See Objections at 2.  DeLeon argues that U.S.S.G. § 3A1.1(b)(1)'s enhancement only applies to a victim who is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  Objections at 2.  DeLeon argues that USPO does not justify its decision to recommend this enhancement "[o]ther than stating that Mr. Castillo's cell was 'close quarters' with one exit/entry and that he was not able to fight off his assailants." Objections at 2.  Fourth, DeLeon objects to PSR ¶ 56, at 17, because it states incorrectly that he "wants to live in Texas."  PSR ¶ 56, at 17.  See Objections at 2.  DeLeon asserts that he "would like to be housed at a prison facility in Texas, not live in Texas if not incarcerated" and that he "maintains regular and even daily contact with his family, not sporadic, as stated in this paragraph." Objections at 2.

The United States does not respond to DeLeon's Objections, but the USPO responds to DeLeon's Objections in its Second Addendum to the Presentence Report, filed December 10, 2021 (Doc. 3522)("Second Addendum").  First, the USPO argues that DeLeon has aliases, as the PSR notes, because the aliases "were obtained from law enforcement records and will remains as written."  Second Addendum at 1.  Second, the USPO states that its First Addendum addressed already DeLeon's second Objection, and that "the correction to the presentence report is incorporated by way of the first addendum."  Second Addendum at 1.  Third, the USPO maintains that the Court should apply U.S.S.G. § 3A1.1(b)(1)'s 2-level vulnerable-victim enhancement,

because the Court "previously ruled . . . that [Castillo] was in fact a vulnerable victim."  Second Addendum at 1.  Fourth, the USPO argues that DeLeon "waived the presentence interview" and that "Defense counsel subsequently provided very limited information," but agrees with DeLeon that he wants to be incarcerated in Texas, not live in Texas if not incarcerated, and agrees that he has more frequent contact with his family than the PSR states.  Second Addendum at 2.  The USPO states, therefore that the PSR is corrected through the Second Addendum to reflect DeLeon's preferences about being incarcerated in Texas and how frequently he contacts his family.  See Second Addendum at 2.

## LAW REGARDING THE SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective

> manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"). They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)). A

reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251, n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[6] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States,

---

[6]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must

552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

       While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-Guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13,

---

follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

2008)(Browning, J.).  The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89.   Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.  See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other hand, in United States v.  Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute."  530 U.S. at 481 (emphasis in original).  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding

in Apprendi v. New Jersey, stating that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2012)). In United States v. Booker, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement." (second alteration added by United States v. Booker)(quoting United States v. Booker, 543 U.S. at 221). More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005)(McConnell, J.), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine. See United States v. Magallanez, 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony

of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount.  See United States v. Magallanez, 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before," United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[7]  "[T]he application of an enhancement . . . does not implicate

_____

[7]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher

the Supreme Court's holding in *Apprendi v. New Jersey*."  United States v. Reyes-Vencomo, No.

CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.).  The Tenth

Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where

the fact would increase a defendant's sentence "above the statutory maximum permitted by the

statute of conviction."  United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005).  Accord United

States v. Ray, 704 F.3d at 1314.  A defendant may assert an error under Apprendi v. New Jersey

only where the fact at issue increased his sentence beyond the statutory maximum.  See United

States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not

assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory

maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)

(holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need

not be charged in an indictment and need only be proved to the sentencing judge by a

preponderance of the evidence").  The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v.
> United States . . . expands the rule from Apprendi v. New Jersey, . . . (holding that
> facts that increase the maximum sentence a defendant faces must be proven to a
> jury beyond a reasonable doubt), to cover facts that increase the mandatory

---

standard of proof for certain facts that enhance a defendant's sentence.  *United States v. Olsen*,
519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is
required to sentence a defendant for committing perjury in relation to a grand jury investigation,
because the enhancement did not require the district court to determine that the defendant
committed murder, but only that he obstructed a homicide investigation).  *See United States v.
Constantine*, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence
standard for facts that enhance a defendant's offense level 4 levels); *United States v. Valdez*, 225
F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase
in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine
associated with acquitted charges entitled the defendant to a clear-and-convincing evidence
standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this
argument); *United States v. Washington*, 11 F.3d at 1516 (concluding that a district court need not
find by any more than a preponderance of the evidence the amount of cocaine a defendant
distributed, even though its findings increased the defendant's sentence from twenty years to
consecutive forty-year terms).

minimum sentence, as well as the maximum sentence, it does not prohibit district
judges from continuing to find advisory sentencing factors by a preponderance of
the evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL
4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The

Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the

legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the

legally prescribed punishment so as to aggravate it[,]' that finding must be made by a jury of the

defendant's peers beyond a reasonable doubt."  United States v. Haymond, 139 S. Ct. 2369, 2378

(2019)(quoting Alleyne v. United States, 570 U.S. at 112-14).  Further, the Tenth Circuit has

determined that a district court could use its own finding on drug quantity to enhance a defendant's

Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its

own drug quantity finding to alter the defendant's *statutory* sentencing range."  United States v.

Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

## LAW REGARDING THE VULNERABLE-VICTIM ENHANCEMENT

The vulnerable-victim enhancement, U.S.S.G. § 3A1.1(b), provides:

(b)     (1)     If the defendant knew or should have known that a victim of the
                offense was a vulnerable victim, increase by 2 levels.

        (2)     If (A) subdivision (1) applies; and (B) the offense involved a large
                number of vulnerable victims, increase the offense level determined
                under subdivision (1) by 2 additional levels.

U.S.S.G. § 3A1.1(b)(1).  Application Note 2 to U.S.S.G. § 3A1.1 explains:

For purposes of subsection (b), "vulnerable victim" means a person (A) who
is a victim of the offense of conviction and any conduct for which the defendant is
accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually
vulnerable due to age, physical or mental condition, or who is otherwise particularly
susceptible to the criminal conduct.

Subsection (b) applies to offenses involving an unusually vulnerable victim
in which the defendant knows or should have known of the victim's unusual
vulnerability.  The adjustment would apply, for example, in a fraud case in which

the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

U.S.S.G. § 3A1.1 Application Note 2. "In order to classify a victim as 'vulnerable,' 'the sentencing court must make particularized findings of vulnerability.'" United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995)(quoting United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992)). "The focus of the inquiry must be on the 'victim's personal or individual vulnerability.'" United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 835).

"'[V]ulnerable victims' are those who are in need of greater societal protection." United States v. Brunson, 54 F.3d at 676. "Specifically, the enhancement should apply when the victim is 'less able to resist than the typical victim.'" United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)(quoting United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001)). "Moreover, the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged." United States v. Smith, 133 F.3d at 749.

In United States v. Janusz, 135 F.3d 1319 (10th Cir. 1998), the Tenth Circuit held that an enhancement under U.S.S.G. § 3A1.1 was appropriate. See United States v. Janusz, 135 F.3d at 1325. The enhancement was appropriate because the sentencing court "made specific findings as to the vulnerability of both [of the victims]. [One victim] was bedridden, unable to tend for himself, sick and extremely vulnerable." United States v. Janusz, 135 F.3d at 1325 (internal

quotation marks omitted).  The other victim "was confused about many things, very susceptible to suggestion from anyone, including the defendant [and] . . . was extremely trusting in many respects."  United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted).  The enhancement was also appropriate because the sentencing court "found a nexus between [the victims]' vulnerability and the commission of the crimes."  United States v. Janusz, 135 F.3d at 1325.  The Tenth Circuit commented:

> It would be difficult, indeed, to imagine a stronger nexus.  The evidence indicate[d that the defendant] recognized [the victims]' age, wealth, and diminished physical capacity, and believing they would both soon die . . . devised a scheme to separate them from their money by making loans which he would collect for himself after their death.

United States v. Janusz, 135 F.3d at 1325  (citations omitted).  The Tenth Circuit provides that the vulnerable-victim adjustment is warranted where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics."  United States v. Pearce, 967 F.2d 434, 435 (10th Cir. 1992).  The vulnerable-victim adjustment, however, "does not require a finding that the defendant targeted the victim because of the victim's vulnerability."  United States v. Checora, 175 F.3d 782, 789 n.4 (10th Cir. 1999).  See United States v. Smith, 133 F.3d at 749; United States v. Hardesty, 105 F.3d 558, 560-61 (10th Cir.1997); United States v. Joe, 325 F. Supp. 3d 1226, 1230-31 (D.N.M. 2018)(Browning, J.), aff'd 2019 WL 3956431 (10th Cir. Aug. 22, 2019); United States v. Hubbard, No. CR 15-0430, 2016 WL 4009826, *4-5 (D.N.M. June 8, 2016)(Browning, J.).

## ANALYSIS

The Court will consider DeLeon's Objections.  D.N.M.LR-Crim. 32.C. imposes a twenty-one-day deadline on parties to file objections to the PSR.  See D.N.M.LR-Crim. 32.C.  USPO filed the PSR on November 15, 2021, see PSR at 1, but DeLeon did not object until December 9, 2021, see Objections at 1, three days after the deadline.  Although DeLeon missed the deadline, the Court

will, in the interest of justice, consider DeLeon's Objections.  The Court is not willing to enforce a strict filing deadline that would preclude DeLeon from raising objections to the PSR merely because, as DeLeon argues, he had difficulty arranging an in-person meeting with his attorneys. See Objections at 1.  It would not be in justice's interest to prioritize a rigid filing deadline over DeLeon's attorneys' honest efforts to comply with the rules and raise objections to the PSR, especially in a case as serious as DeLeon's.  Consequently, the Court will consider the Objections, and concludes that: (i) DeLeon has at least one alias; (ii) Clark did not testify that DeLeon admitted his participation in Castillo's murder; (iii) Castillo was a vulnerable victim, because there was a hit on him, he was outnumbered in his prison cell, he was intoxicated with heroin, and he had a limited ability to defend himself or escape from the surprise attack in his cell; and (iv) DeLeon wants to be incarcerated at a prison facility in Texas, but does not want to live in Texas if he is not incarcerated, and has more frequently contact with his family than the PSR indicates.  Accordingly, the Court will overrule DeLeon's first and third Objections, but will sustain his second and fourth Objections.

First, DeLeon has at least one alias.  In the PSR, the USPO contends that DeLeon has six aliases: Jose Mata, Jose Angel Luna DeLeon, Jose Angel De-Leon, Angel Luna, Jose Angel Luna, and Angel Luna DeLeon.  See PSR at 4.  DeLeon states that his birth name is Jose Angel Luna DeLeon, and "all but one of the alleged aliases" are variations of his birth name that are likely the result of law enforcement errors.  Objections at 1.  The USPO responds only that it found the aliases in "law enforcement records."  Second Addendum at 1.  The Court observes that all but one of the alleged aliases are variations on DeLeon's birth name, and notes that it is possible they resulted from law enforcement errors.  The USPO offers no reason to reject DeLeon's argument that all but one of the alleged aliases resulted from law enforcement errors, because noting that

they "were obtained from law enforcement records" does not preclude the possibility that the law enforcement records from which the USPO drew the aliases recorded DeLeon's name incorrectly. Second Addendum at 1. Nevertheless, the USPO lists aliases in the PSR in part to account for situations when law enforcement records may use several names to refer to one person. Moreover, DeLeon offers no response to the one alleged alias that is not strictly a variation on his birth name: Jose Mata. The Court concludes, therefore, that, although they could be the result of errors in law enforcement records, DeLeon has at least one alias. The Court will add a section to the PSR stating that DeLeon states that he does not use the aliases, and that they are possibly errors, but that they appear in law enforcement records, and that Jose Mata is not a variation of his given name.

Second, Clark did not testify that DeLeon admitted his participation in Castillo's murder. DeLeon acknowledges that "[b]oth the government and probation admit this is an error in the [First] Addendum," but "requests that the Pre-Sentence Report be revised to reflect the correction." Objections at 2. The USPO twice agrees with DeLeon that the PSR states mistakenly that DeLeon admitted to Clark that he had participation in Castillo's murder. See First Addendum at 1; Second Addendum at 2. The USPO agrees that "[i]t was Joe Gallegos, not Deleon, who admitted to Clark that he murdered" Castillo. First Addendum at 1. The Court concludes, therefore, that DeLeon did not admit to Clark that he had participated in Castillo's murder.

Third, DeLeon argues that the Court should not apply U.S.S.G. § 3A1.1(b)(1)'s 2-level vulnerable-victim enhancement, because Castillo is not a vulnerable victim. See Objections at 2. In response, the USPO asserts that Castillo is a vulnerable victim, because the "Court previously ruled . . . that [Castillo] was in fact a vulnerable victim." Second Addendum at 1. A "vulnerable victim" is "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually

vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2. A victim is vulnerable when "the victim is 'less able to resist than the typical victim.'" United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)(quoting United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001)). "The status of 'vulnerable victim' hinges on the idea that some characteristic renders a victim 'particularly susceptible' to the criminal conduct." United States v. Shumway, 112 F.3d 1413, 1423 (10th Cir. 1997)(quoting U.S.S.G. § 3A1.1 cmt. n.2). "In assessing vulnerability, the sentencing court must make an individualized determination; it is not enough that a victim belongs to a class generally considered vulnerable." United States v. Scott, 529 F.3d at 1300-01.

The Court twice has concluded that Castillo is a vulnerable victim. See United States v. Troup, 426 F. Supp. 3d 1072, 1133 (D.N.M. 2019)(Browning, J.); United States v. DeLeon, 437 F. Supp. 3d 955, 1020 (D.N.M. 2020)(Browning, J.). In United States v. Troup, the Court determined that Castillo was a vulnerable victim, because "the SNM had hit on him, he was incarcerated with other SNM members who were ordered to act on the hit, he was outnumbered, he was intoxicated from the heroin, and he had limited ability to defend himself or escape from the surprise attack in his cell." United States v. Troup, 426 F. Supp. 3d at 1133. Further, the Court concludes that "Troup knew or should have known of these particular vulnerabilities, because he was privy to the planning of Castillo's murder, acted as a lookout to prevent others from interfering with the murder, and held Castillo's cell door closed to prevent his escape." 426 F. Supp. 3d at 1133. In United States v. DeLeon, the Court determines that "the greenlight on Castillo made him particularly vulnerable to being murdered," because "Castillo's incarceration with other SNM members who knew of the greenlight and were ordered to act on it increased Castillo's

vulnerability."[8]   437 F. Supp. 3d at 1020.   Specifically, the Court notes that Castillo was a

vulnerable victim, because:

> (i) the SNM placed a hit on Castillo; (ii) Castillo was incarcerated with other SNM members who were ordered to carry out the hit; (iii) DeLeon, J. Gallegos, and Jaramillo outnumbered Castillo when they attacked and killed Castillo; (iv) DeLeon, J. Gallegos, and Jaramillo attacked and killed Castillo while he was intoxicated from heroin; and (v) Castillo could not defend himself or escape from the surprise attack in his cell.

437 F. Supp. 3d at 1021.   Here, DeLeon in effect asks the Court to revisit this conclusion and

determine that Castillo is not a vulnerable victim.

The Court has applied the vulnerable-victim enhancement in other, similar situations,

however.  In another SNM case, the Court applies the vulnerable-victim enhancement, because the

victim's "greenlight made him particularly vulnerable to being murdered, because, if he survived,

SNM would kill those responsible."  United States v. Martinez, No. CR 15-4268 JB, 2019 WL

5395979, at *1 (D.N.M. Oct. 22, 2019)(Browning, J.).   The Court reasoned that the victim's

"status as an SNM target imprisoned with SNM members," of which the defendant was aware,

"establishes" that the defendant was a vulnerable victim under U.S.S.G. § 3A1.1(b)(1).   United

States v. Martinez, 2019 WL 5395979, at *1.  In United States v. Baca, 428 F. Supp. 3d 800, 838

(D.N.M. 2019), another SNM case, the Court concluded that the victim, who was stabbed forty-

three times in his prison cell, was a vulnerable victim, because the defendant knew that the victim

had cooperated with law enforcement.  See United States v. Baca, 428 F. Supp. 3d at 838.   The

Court also notes that several inmates attacked the victim in "a small, enclosed cell, where he was

particularly vulnerable, and [the victim's] assailants continued to attack him when he tried to

---

[8]The United States Probation Office explains that putting a "green light" on someone means that person is "mean[t] . . . to be killed."  United States v. Martinez, No. CR 19-3725 JB, Addendum to the Presentence Report at 1, filed July 12, 2021 (Doc. 301).

escape the cell." United States v. Baca, 428 F. Supp. 3d at 839.  Similarly, in United States v. Clark, 403 F. Supp. 3d 1185 (D.N.M. 2019)(Browning, J.), the Court concludes that the victim was "particularly susceptible to being murdered," because "of the SNM hit on him, because of his incarceration with other SNM members who were ordered to act on the hit, and because of his limited ability to defend himself or escape from the surprise attack in his cell." 403 F. Supp. 3d at 1194-95.

Recently, in another SNM case, the Court concludes that the vulnerable-victim enhancement does not apply "simply because [the victim] is in the class of people who have green lights on them." United States v. Martinez, No. CR 19-3725, Memorandum Opinion and Order at 36, filed December 2, 2021 (Doc. 314)("Martinez MOO").  The Court notes that, in United States v. Martinez, the victim was not incarcerated when he was killed, which weighed in favor of determining that the victim is not a vulnerable victim under U.S.S.G. § 3A1.1(b)(1).  Martinez MOO at 37.  The Court observed that a prisoner

can run and hide some, but not like a person outside of prison; a prison, by its very nature, imposes limits on running and hiding. Also, on the outside, a victim has a better chance of having a personal, powerful weapon -- whether legally or illegally -- than a person on the inside.

Martinez MOO at 37.  The Court concluded that a "green light alone is not enough to render a victim vulnerable." Martinez MOO at 37.

DeLeon does not provide sufficient justification for the Court to revisit its earlier determinations that Castillo is a vulnerable victim. See United States v. Troup, 426 F. Supp. 3d at 1133; United States v. DeLeon, 437 F. Supp. 3d at 1020.  Castillo had a green light on him, was incarcerated, was greatly outnumbered when he was attacked, and was intoxicated.  See PSR ¶¶ 17-19, at 10-11.  Moreover, the Tenth Circuit notes that the vulnerable-victim enhancement applies when "an individual's level of intoxication reaches the point that he is incapable of

- 27 -

protecting himself from the harm that is a reasonably foreseeable product of the defendant's criminal conduct." <u>United States v. Talk</u>, 446 F. App'x 114, 124 (10th Cir. 2011)(unpublished). Castillo's attackers purposefully waited until Castillo had injected himself with heroin before attacking him. <u>See</u> PSR ¶¶ 15, 19, at 9, 11. The Court concludes, therefore, that Castillo is a vulnerable victim for U.S.S.G. § 3A1.1(b)(1)'s purposes.

Fourth, DeLeon objects that the PSR states incorrectly that he wants to live in Texas and mischaracterizes how often he speaks to his family. <u>See</u> Objections at 2. The USPO agrees with DeLeon's Objection, noting that "the corrections regarding defendant's desire to be housed at a prison facility in Texas and the frequency of contact with his family are incorporated by way of this addendum." Second Addendum at 2. The Court has no sound reason to doubt either DeLeon's preferences regarding where he is incarcerated or his claims regarding how frequently he contacts his family. The Court concludes, therefore, that DeLeon wants to be incarcerated in Texas, but does not want to live there if he is not incarcerated, and that he "maintains regular and even daily contact with his family." Objections at 2.

**IT IS ORDERED** that the Objections in Defendant Angel DeLeon's Objections to Presentence Report and Response to Addendum to Presentence Report, filed December 9, 2021 (Doc. 3521), are overruled with respect to DeLeon's first and third Objections, and are sustained with respect to his second and fourth Objections.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred J. Federici
  Acting United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

-- and --

Maria Ysabel Armijo
Randy M. Castellano
Ryan Ellison
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

       *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

-- and --

Heather M. LeBlanc
Bailey, LeBlanc & Lane, P.C.
Albuquerque, New Mexico

       *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

       *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

       *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

       *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm
Albuquerque, New Mexico

       *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

       *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

-- and --

Jeffrey C. Lahann
Las Cruces, New Mexico

       *Attorneys for Defendant Allen Patterson*

Eduardo Solis
Law offices of Eduardo Solis
El Paso, Texas

-- and --

John L. Granberg
Granberg Law Office
El Paso, Texas

-- and --

Orlando Mondragon
The Law Office of Orlando Mondragon
El Paso, Texas

       *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

-- and --

Noel Orquiz
Deming, New Mexico

       *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

-- and --

Scott Moran Davidson
Law Offices of Scott Moran Davidson
Albuquerque, New Mexico

-- and --

Billy R. Blackburn
Billy Blackburn Law Office
Albuquerque, New Mexico

       *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

-- and --

Jerry Daniel Herrera
Albuquerque, New Mexico

       *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

-- and --

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

       *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

       *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

       *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

-- and --

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

       *Attorneys for Defendant Mario Rodriguez*

Ray Velarde

El Paso, Texas

-- and --

Steven Lorenzo Almanza
Las Cruces, New Mexico

>*Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

-- and --

Mary Stillinger
El Paso, Texas

>*Attorneys for Defendant Mauricio Varela*

Richard Jewkes
El Paso, Texas

-- and --

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

-- and --

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

>*Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

-- and --

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

>*Attorneys for Defendant Gerald Archuleta*

B.J. Crow

Crow Law Firm
Roswell, New Mexico

   *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

   *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

   *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner Attorney at Law
Las Cruces, New Mexico

   *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Adams & Bischoff, L.L.C.
Charleston, South Carolina

-- and --

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

   *Attorneys for Defendant Christopher Garcia*

William R. Maynard
William R. Maynard Attorney at Law
El Paso, Texas

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

      *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Justine Fox-Young Attorney at Law
Albuquerque, New Mexico

-- and --

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

      *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts Attorney at Law
Albuquerque, New Mexico

-- and --

Lisa Torraco
Lisa Torracco Attorney at Law
Albuquerque, New Mexico

      *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

      *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

      *Attorney for Paul Rivera*

Angela Arellanes
Angela Arellanes Attorney at Law
Albuquerque, New Mexico

*Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*