# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                 No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN, BILLY
GARCIA, a.k.a. "Wild Bill," EUGENE
MARTINEZ, a.k.a. "Little Guero," ALLEN
PATTERSON, CHRISTOPHER CHAVEZ,
a.k.a. "Critter," JAVIER ALONSO, a.k.a.
"Wineo," ARTURO ARNULFO GARCIA,
a.k.a. "Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ; JERRY
ARMENTA, a.k.a. "Creeper," JERRY
MONTOYA, a.k.a. "Boxer," MARIO
RODRIGUEZ, a.k.a. "Blue," TIMOTHY
MARTINEZ, a.k.a. "Red," MAURICIO
VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts,"
DANIEL SANCHEZ, a.k.a. "Dan," GERALD
ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma,"
CONRAD VILLEGAS, a.k.a. "Chitmon,"
ANTHONY RAY BACA, a.k.a. "Pup,"
ROBERT MARTINEZ, a.k.a. "Baby Rob,"
ROY PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS, a.k.a.
"Smiley," SANTOS GONZALEZ; PAUL
RIVERA, SHAUNA GUTIERREZ, and
BRANDY RODRIGUEZ,

      Defendants.

## **MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant Angel DeLeon's Motion for

Indicative Ruling Pursuant to Federal Rule of Criminal Procedure 37 and Federal Rule of

Appellate Procedure 12.1, filed July 31, 2023 (Doc. 3711)("Indicative Ruling Motion").  The issue

presented is whether the Defendant Angel DeLeon's Rule 33 Motion for a New Trial Due to Newly

Discovered Evidence, filed July 31, 2023 (Doc. 3712)("New Trial Motion"), raises a "substantial

issue" such that the Court should issue an indicative ruling pursuant to rule 37 of the Federal Rules

of Criminal Procedure while this matter is pending appeal.  Fed. R. Crim. P. 37.  The Court

concludes that the New Trial Motion does not raise a substantial issue, because it concerns

cumulative evidence related to the DNA evidence that Plaintiff United States of America presented

against Defendant Angel DeLeon at trial.

## FACTUAL BACKGROUND

The Court takes its facts from its Memorandum Opinion and Order, filed December 29,

2021 (Doc. 3544).  First, the Court sets out background facts related to the Syndicato de Nuevo

Mexico ("SNM").  Second, the Court describes the facts that apply specifically to DeLeon's case.

### 1.    **Background Facts**.

SNM is a "powerful and violent prison gang" that was formed in February, 1980, after a

large prison riot at the Penitentiary of New Mexico in Santa Fe, New Mexico.  Presentence

Investigation Report ¶ 8, at 8, filed November 15, 2021 (Doc. 3510)("PSR").  Soon after SNM

formed, "prison gangs such as the SNM and Los Carnales began to emerge within" the New

Mexico Corrections Department ("NMCD").  PSR ¶ 6, at 8.  These prison gangs "began to

organize themselves and focused primarily on gaining their own status within the correctional

institutions by employing violence upon the inmate population to assume a position of leadership

and control."  PSR ¶ 6, at 8.  Since the 1980s, there have been over 500 SNM members.  See PSR

¶ 6, at 8.  SNM "operates under a 'panel' or 'mesa' (Spanish for [']table['']) of leaders who issue

orders to subordinate gang members."  PSR ¶ 7, at 8 (no citation given for internal quotation).

"Despite being imprisoned and being closely scrutinized by prison officials, SNM gang leaders managed to convey orders to SNM gang members and associates throughout the prison system through a variety of means, including secret notes called 'kites' or 'welas,' coded letters, and messages conveyed by complicit visitors."  PSR ¶ 7, at 8 (no citation given for internal quotations). "These messages would provide SNM gang members with the gang's operational strategies to facilitate their illegal criminal activities within the penal system."  PSR ¶ 7, at 8.  "SNM gang members discussed the proposed actions to be taken on those who cooperated against SNM gang members and associates, to include plans and agreements regarding the commission of future crimes, which involved murders, drug distribution, possession of firearms, and assaults, as well as ways to conceal these acts."  PSR ¶ 8, at 8.  "SNM gang members provided information and financial support to other members and associates of the enterprise, including those who were incarcerated, for the purpose of committing criminal acts."  PSR ¶ 8, at 8.  "SNM gang members are bound to protect the enterprise's members and associates who commit crimes by hindering, obstructing, and preventing law enforcement officers from identifying, apprehending, and successfully prosecuting and punishing the offenders."  PSR ¶ 8, at 8.

"During the mid-1980s through 2014, high-ranking SNM gang members ordered numerous assaults and murders of other SNM gang members and rival gang members within the NMCD, as well as assaults on correctional officers."  PSR ¶ 9, at 8.  "From July 5, 1988, through September 28, 2014, at least 15 homicides and/or assaults occurred within the NMCD and Metropolitan Detention Center in Bernalillo County, each of which has been directly tied to the SNM gang."  PSR ¶ 9, at 8-9.   "As a result of these murders and assaults, the SNM gang was locked down, and SNM gang leadership were transferred out to out-of-state institutions."  PSR ¶ 9, at 9.  "Due to

these lockdowns and transfers, the SNM gang leadership felt they were being unjustly punished

by the Cabinet Secretary [Gregg Marcentel]," because Secretary Marcentel previously was a

Bernalillo County Sheriff's Office ("BCSO") Sheriff, and was "instrumental in the investigation,

prosecution, and conviction of SNM gang member Michael Astorga for the Murder of BCSO

Deputy Jim McGrane." PSR ¶ 10, at 9. The SNM used Secretary Marcentel's prior work as a tool

"to propagate within its membership that the Cabinet Secretary was using his position to advance

a personal agenda against the SNM gang." PSR ¶ 10, at 9.

### 2.    <u>Facts Specific to DeLeon.</u>

In March, 2001, Frank Castillo, DeLeon, Rolando Garza, Leonard Lujan, Joe Gallegos,

Michael Jaramillo, and Edward Troup were inmates at the Southern New Mexico Correctional

Facility in Las Cruces, New Mexico. <u>See</u> PSR ¶¶ 15-30, at 9-12. Castillo's nickname was

"Pancho." PSR ¶ 19, at 11. Defendant Billy Garcia, a.k.a. "Wild Bill," was a high-ranking SNM

member and wanted Castillo killed,[1] because Garcia believed Castillo to be a "rat," meaning that

he cooperated with law enforcement and had "'ratted' on an inmate while at the Penitentiary of

New Mexico in Santa Fe." PSR ¶ 17, at 10 (no citation given for internal quotation). Garcia

ordered Lujan to "put together two teams of SNM members to carry out the 'hits' on" Garza and

Castillo. PSR ¶ 17, at 10 (no citation given for internal quotation). Lujan selected Gallegos,

DeLeon, Jaramillo, and Troup to carry out the Castillo hit. PSR ¶ 17, at 10. The two murders

were "to be carried out simultaneously in the early morning hours by strangulation and not by a

---

[1]The PSR states that "Garcia, a.k.a. 'Looney,' a high-ranking member of the SNM, advised that he wanted" Castillo "'taken out.'" PSR ¶ 17, at 10 (no citation given for internal quotations). The United States Probation Office corrects this error, noting that, in PSR ¶ 17, at 10, "the name 'Wild Bill' should be substituted for the name 'Looney.'" Addendum to the Presentence Report, filed December 6, 2021 (Doc. 3519)(no citation given for internal quotations).

'hot shot,' meaning a heroin overdose." PSR ¶ 17, at 10 (no citation given for internal quotation). Strangulation is "a trademark method of murder by the SNM." PSR ¶ 17, at 10. Lujan also selected others to kill SNM members who failed to follow through with the murders, meaning that, if Gallegos, DeLeon, Jaramillo, or Troup, failed to kill Castillo, they would be killed themselves. See PSR ¶ 17, at 10.

In March, 2001, Jaramillo met with DeLeon and Gallegos in Gallegos' prison cell, where Gallegos "told them they 'were going to be doing a hit on Pancho.'" PSR ¶ 19, at 11 (quoting trial transcript). Gallegos told DeLeon and Jaramillo that "they were waiting for heroin to be brought into the prison in the next day or two, and when that happened, they would kill 'Pancho.'" PSR ¶ 19, at 11 (no citation given for internal quotation). At a second meeting, "the three devised a plan to go into [Castillo's] room, give him a shot of heroin, and then strangle him." PSR ¶ 19, at 11. Gallegos assigned everyone a role: DeLeon and Gallegos would hold Castillo down, while Jaramillo strangled him; Troup was to act as the lookout and keep the other inmates in their cells. See PSR ¶¶ 19, 22, at 11.

In the early hours of March 26, 2001, the group carried out their plan: after Castillo entered his cell and injected himself with heroin, DeLeon and Gallegos grabbed Castillo by his arms, and rolled him over onto his bed, where Jaramillo strangled him with a laundry bag's drawstring while DeLeon and Gallegos held Castillo down. See PSR ¶¶ 15, 19, at 9, 11. Prison officials discovered Castillo's body later that day. See PSR ¶ 15, at 9. The Office of the Medical Examiner conducted an autopsy on Castillo's body on March 27, 2001. See PSR ¶ 16, at 10. The autopsy reveals that "a tightly rolled laundry bag was around" Castillo's neck and was "twisted around itself," creating a ligature that "passed just below the mouth across the upper part of the chin and wrapped tightly

around the back of the neck just below the base of the skull." PSR ¶ 16, at 10.    The autopsy

reported the following injuries:

> the face and chest were marked with postmortem lividity[2]; petechial
> hemorrhages[3] were extremely apparent within both eyes; there was hemorrhaging
> within the left sternocleidomastoid muscle[4] of the lower neck; there was a large
> contusion on the left upper chest area and left shoulder that was not apparent on the
> surface of the skin due to the high levels of livor mortis; there was a 1½ x ¾ inch
> contusion on the right hip; and there were several abrasions and contusions of both
> knees as well as on the left foot.

PSR ¶ 16, at 10.  The autopsy concludes that homicide caused Castillo's death.  See PSR ¶ 16, at

10.  Kristen Radecki, a New Mexico Department of Public Safety ("NMDPS") Crime Laboratory

employee, found DeLeon's DNA on the rope used to kill Castillo.  See PSR ¶ 22, at 11.  Some

time after Castillo's death, Phillip Gonzales heard DeLeon make several statements about Castillo,

including "'Did you hear that? . . . . Oh, Pancho asked me why'"; and "'Did you see that?'

. . . . 'There is a ghost.  It's Pancho, He's haunting me.'" PSR ¶ 21, at 11.

---

[2]Postmortem lividity, also known as livor mortis, is "the fourth stage of death and one of
the signs of death."  Livor Mortis, Wikipedia, https://en.wikipedia.org/wiki/Livor_mortis (last
visited June 3, 2022). Postmortem lividity is "a settling of the blood in the lower, or dependent,
portion of the body postmortem, causing a purplish red discoloration of the skin."  Livor Mortis,
Wikipedia, https://en.wikipedia.org/wiki/Livor_mortis (last visited June 3, 2022).

[3]A petechial hemorrhage "appear[s] when capillaries bleed, leaking blood into the skin";
prolonged straining, as well as certain medications and medical conditions, can cause a petechial
hemorrhage.  Petechiae, Mayo Clinic, https://www.mayoclinic.org/symptoms/petechiae/basics/ca
uses/sym-20050724 (last visited June 3, 2022).

[4]The sternocleidomastoid muscle is "one of the largest and most superficial cervical
muscles" and its primary actions are "rotation of the head to the opposite side and flexion of the
neck."  Sternocleidomastoid Muscle, Wikipedia, https://en.wikipedia.org/wiki/Sternocleidomasto
id_muscle (last visited June 3, 2022).

## PROCEDURAL BACKGROUND

The Court outlines the relevant procedural background.  The Court begins by summarizing the evidence and testimony presented at trial that is pertinent to its decision on the Indicative Ruling Motion.  Next, the Court provides an overview of the recent investigation at the NMDPS lab, and DeLeon's filings therein.  Finally, the Court summarizes the arguments that DeLeon raises in his Indicative Ruling Motion and New Trial Motion.

### 1.   **Trial**.

DeLeon proceeded to trial on September 7, 2021.  See Clerk's Minutes at 1, filed September 7, 2021 (Doc. 3479).  In his opening statement, DeLeon asserted that the United States' case comes down to two key types of evidence: DNA evidence and cooperating witness testimony.  See Transcript of Trial at 390:18-25 (taken September 7, 2021, through September 16, 2021), filed June 10, 2022 (Docs. 3586, 3589, 3591, 3593, 3595-99)(LeBlanc)("Trial Tr.").[5]  DeLeon admitted that DNA testing conducted in 2001 revealed that he could be a source of DNA found on the murder weapon.  See Trial Tr. at 392:4-8 (LeBlanc).  DeLeon attacked that DNA evidence's reliability by suggesting that it was the product of shoddy DNA testing at the NMDPS lab that led to DNA cross-contamination.  See Trial Tr. at 394:21-395:21 (LeBlanc).

The parties addressed the risk of cross-contamination at the NMDPS lab throughout trial.  For example, the United States called two DNA expert witnesses: Radecki and Eve Tokumura.  See Clerk's Minutes at 20-21.  The United States covered the risk of cross-contamination during

---

[5]The court reporter produced and filed a final trial transcript.  Although the trial transcript is consecutively paginated, the court reporter filed it in eight separate volumes.   The Court's electronic filing system, CM/ECF, added its own pagination to each individual volume, but CM/ECF's pagination is not consecutive across volumes.  Accordingly, the Court's page and line citations refer to the court reporter's pagination, and not CM/ECF's pagination.

Radecki's direct examination.  See Trial Tr. at 1839:24-18421:2 (Castellano, Radecki).  DeLeon cross-examined Radecki on cross-contamination at the NMDPS lab as well.  See Trial Tr. at 1865:19-21 (LeBlanc, Radecki). Additionally, DeLeon cross-examined Tokumaru on the risk of cross-contamination at the NMDPS lab.  See Trial Tr. at 1928:18-22 (LeBlanc, Tokumura). DeLeon called his own DNA expert witness, Michael Spence.  See Clerk's Minutes at 23.  DeLeon addressed the risk of cross-contamination at the NMDPS lab during Spence's direct examination. See Trial Tr. at 2134:2-2135:5 (LeBlanc, Spence).[6]

The United States also presented several fact witnesses who testified to DeLeon's role in Castillo's murder.  For example, Lujan testified that Garcia ordered Lujan to select SNM members to kill Castillo and Garza.  See Trial Tr. at 921:20-922:13 (Castellano, Lujan).  Similarly, Jaramillo testified that Lujan selected Jaramillo and DeLeon to kill Castillo.  See Trial Tr. at 1556:7-10 (Jaramillo).  Finally, Jaramillo testified that he and DeLeon did as they were directed, and, along with Troup and Gallegos, killed Castillo.  See Trial Tr. at 1567:4-19 (Ellison, Jaramillo).

---

[6]DeLeon addressed the risk of cross-contamination at the crime scene, and not at the NMDPS lab, with two other witnesses at trial.  First, DeLeon cross examined Roberta Stellman, a psychiatrist who worked at the Southern New Mexico Correctional Facility, see Trial Tr. at 1041:14-1042:13 (Armijo, Stellman), about the risk of cross-contamination at crime scenes, see Trial Tr. at 1051:15-1054:18 (LeBlanc, Stellman).  Stellman acknowledged that "DNA is very sensitive," Trial Tr. at 1052:7-9 (LeBlanc, Stellman), and that it is important "not to touch or move anything" at a crime scene, Trial Tr. at 1052:10-13 (LeBlanc, Stellman).  Ultimately, however, Stellman testified that her knowledge of cross-contamination at crime scenes "is through watching crime investigation series and Law and Order."  Trial Tr. at 1054:11-13.  DeLeon concluded his cross examination shortly thereafter.  See Trial Tr. at 1054:19-20 (LeBlanc).

Second, DeLeon brought up the risk of cross-contamination at crime scenes again during his cross examination of Robert Duncan, an officer with the New Mexico State Police.  See Trial Tr. at 1200:13-17 (Ellison, Duncan).  See Trial Tr. at 1229:21-25 (LeBlanc, Duncan).  Duncan acknowledged the risk that, "once you step in[to a crime scene], the evidence changes in some way."  Trial Tr. at 1228:17-20 (LeBlanc, Duncan).  Leon then questioned Duncan regarding the "precautions that [he is] trained to take to guard against contamination of a scene."  Trial Tr. at 1229:22-23 (LeBlanc).

At the trial's end, the United States contended during its closing argument that there was "no proof of cross-contamination" at the NMDPS lab in DeLeon's case.   Trial Tr. at 2406:24-25 (Castellano).  The United States argued that "DNA is important in this case, but really, for us, it's just the icing on the cake.  We had Leonard Lujan and Michael Jaramillo tell you what happened. The DNA is just further corroboration . . . ."  Trial Tr. at 2404:6-9 (Castellano).  During his closing, DeLeon argued that the United States' DNA evidence was "flawed," in large part because of the risk of cross-contamination at the NMDPS lab.   Trial Tr. at 2440:22 (Gorman).  DeLeon submitted to the jury that his DNA samples aerosolized during testing and contaminated the samples taken from the murder weapon.   See Trial Tr. at 2441:13-2442:15 (Gorman).   The jury convicted DeLeon.  See Verdict, filed September 16, 2021 (Doc. 3474).  The Court sentenced DeLeon to the custody of the Bureau of Prisons for a term of life.   See Judgment in a Criminal Case at 2, filed March 14, 2022 (Doc. 3571).  DeLeon appealed.  See Defendant Angel DeLeon's Notice of Appeal at 1, filed March 24, 2022 (Doc. 3572).  DeLeon's appeal is still pending, but he has not yet filed his opening brief.  See New Trial Motion at 4.

**2.        Post-Trial Investigation at NMDPS Crime Lab.**

In February, 2023, Spence alerted DeLeon that he had filed a complaint against the NMDPS lab with the American Association for Laboratory Accreditation ("AALA").  See New Trial Motion at 6.  Spence explained that he had concerns about the risk of cross-contamination at the NMDPS lab based on his experience in DeLeon's case and another case that went to trial in 2022.  See New Trial Motion at 7.  He explained that his complaint prompted AALA to conduct a "red alert" investigation of NMDPS.  New Trial Motion at 7.  The AALA produced, among other documents, the Deficiency Summary (dated December 16, 2022), filed July 31, 2023 (Doc. 3712-

2), and the Deficiency Detail Report (dated January 15, 2023), filed July 31, 2023 (Doc. 3712-3), as part of its investigation.

On March 6, 2023, DeLeon filed the Defendant's Emergency Sealed Ex Parte Motion for Rule 17(c) Subpoenas (Doc. 3681)("Subpoena Motion").[7]  In the Subpoena Motion, DeLeon explains that Spence made a complaint against NMDPS with AALA and that Spence's complaint led to an investigation.  See Subpoena Motion at 3.  DeLeon states that he attempted "to obtain all information regarding the complaints, corrective actions, accreditation concerns, and formal reports" related to the AALA investigation, but that he did not receive any responsive records. Subpoena Motion at 3.  Accordingly, DeLeon asks the Court, pursuant to rule 17(c) of the Federal Rules of Criminal Procedure, to issue a subpoena duces tecum for those records.  See Subpoena Motion at 10; Fed. R. Crim. P. 17(c).

On March 9, 2023, the Court issued the requested subpoena.  See Ex Parte Sealed Order (Doc. 3682).  On March 14, 2023, the United States Marshal Service received responsive records. See Receipt for Delivery/Pickup of Actionable* Document(s) at 1 (Doc. 3683)(Court only).  The Court permitted DeLeon's counsel to come review the records at the courthouse.  The Court informed DeLeon's counsel that if she decided to use the records as the basis for a motion for post-conviction relief, the Court would provide her with copies of the records, but she would have to alert the United States to the records and provide it with copies as well.  DeLeon's counsel

---

[7]DeLeon originally filed the Subpoena Motion ex parte.  See Subpoena Motion at 1.  When preparing this Memorandum Opinion and Order, the Court got permission from DeLeon's counsel to cite and quote the Subpoena Motion -- and the related order -- in its recitation of the relevant procedural background.  The Court has since removed viewing restrictions on the Subpoena Motion and related order on the Court's electronic filing system.

indicated that she would use the responsive records in a motion for post-conviction relief and agreed to tell the United States what was happening.

    **3.**     **Indicative Ruling Motion.**

On July 31, 2023, DeLeon filed the Indicative Ruling Motion. <u>See</u> Indicative Ruling Motion at 1. In the Indicative Ruling Motion, DeLeon asserts that "[i]t has come to light that contamination and cross-contamination has been a pervasive problem" at the NMDPS crime lab where DNA testing occurred in DeLeon's case. Indicative Ruling Motion at 1. He contends that this information "requires that this Court grant a new trial" for DeLeon. Indicative Ruling Motion at 2.

DeLeon highlights that, under rule 37 of the Federal Rules of Criminal Procedure, the Court may consider DeLeon's New Trial Motion if the Court determines that it "'would grant the motion or that the motion raises a substantial issue'" and the United States Court of Appeals for the Tenth Circuit remands DeLeon's case to the Court. Indicative Ruling Motion at 8 (quoting Fed. R. Crim. P. 37(b)). DeLeon emphasizes that "'[t]he district court is not bound to grant the motion after stating that the motion raises a substantial issue; further proceedings on remand may show that the motion ought not be granted.'" Indicative Ruling Motion at 8 (quoting Advisory Committee Notes to Fed. R. Crim. P. 37(b)). DeLeon explains that he "is not asking or binding the Court" to grant his New Trial Motion, but that he would like the Court to issue an indicative ruling that his New Trial Motion raises a substantial issue. Indicative Ruling Motion at 8. He underscores the "significant nature of the newly discovered evidence," and asks that the Court make an indicative ruling so that it can consider the issues that DeLeon raises in the New Trial Motion. <u>See</u> Indicative Ruling Motion at 8-9.

4.     <u>**New Trial Motion**</u>.

Shortly after DeLeon filed the Indicative Ruling Motion, he filed the New Trial Motion. <u>See</u> New Trial Motion at 1.  He begins by summarizing this case's procedural background.  <u>See</u> New Trial Motion at 2-8.  DeLeon reminds the Court that he proceeded to trial in September, 2021, for his role in Castillo's murder.  <u>See</u> New Trial Motion at 3.  He asserts that "[o]ne of the government's key pieces of evidence against Mr. DeLeon was DNA evidence."  New Trial Motion at 3.  He elaborates that testimony from the United States' expert witness, Radecki, showed that "DeLeon's DNA was found on the . . . murder weapon involved in this case" when it was tested in 2001.  New Trial Motion at 3.  He adds that a second United States expert witness, Tokumaru, testified that she did not identify DeLeon's DNA on the murder weapon when she tested it in 2015. <u>See</u> New Trial Motion at 3.

DeLeon highlights that he cross-examined Tokumaru and "specifically" Radecki about "the possibility of cross-contamination as the reason Mr. DeLeon's DNA was found on the [murder weapon] in 2001 and not . . . in 2015."  New Trial Motion at 3.  He indicates that in the course of that line of questioning "[i]t was revealed that Radecki tested the [murder weapon] within the same space and the same time as a shirt belonging to Mr. DeLeon that had his own blood stains on the shirt."  New Trial Motion at 3.  DeLeon underscores that his cross-examination of Radecki illuminated that "[b]lood is a rich source of DNA" and that "DNA can be aerosolized."  New Trial Motion at 3.  <u>See</u> New Trial Motion at 3-4 (excerpting relevant portions of the transcript of Radecki's cross-examination).

DeLeon adds that he called his own expert witness, Spence.  <u>See</u> New Trial Motion at 5. DeLeon contends that "Spence testified at length that the procedures used by . . . Radecki were not

those mandated by [the Scientific Working Group on DNA Analysis Methods] and increased the likelihood of cross-contamination." New Trial Motion at 5. DeLeon asserts that Spence's testimony showed that "there was a possibility that a true source of Mr. DeLeon's DNA, the blood on his shirt, contaminated the sample from the [murder weapon] since the testing of both items was not separated by time and space." New Trial Motion at 5. See New Trial Motion at 5-6 (excerpting relevant portions of the transcript of Spence's direct examination). DeLeon states that "[t]he remaining evidence presented by the government was self-serving testimony from cooperating witnesses receiving significant benefits from the government." New Trial Motion at 6.

DeLeon states that while his case has been pending on appeal, Spence informed DeLeon about the AALA's investigation of the NMDPS lab. See New Trial Motion at 6. DeLeon gestures to several documents created in connection with the NMDPS investigation, namely the NMDPS Responses to the Deficiency Summary (undated), filed July 31, 2023 (Doc. 3712-4)("NMDPS Responses"), which indicates that "[t]he current laboratory facility has very limited space, and this could be a contributing factor to the contamination issue." NMDPS Response at 1-2. See New Trial Motion at 7. DeLeon argues that "these admissions by the lab are exactly this issue that was present in Mr. DeLeon's case." New Trial Motion at 7. DeLeon contends that the investigation and the documents created in connection with the investigation are newly discovered evidence that "was never turned over by the government." New Trial Motion at 8.

For these reasons, DeLeon contends that the "interest of justice" requires the Court to grant DeLeon a new trial on the basis of newly discovered evidence and the Supreme Court of the United States' decisions in Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), and Giglio v. United States,

405 U.S. 150 (1972)("Giglio").   New Trial Motion at 8.   In support of his newly-discovered-evidence argument, DeLeon invokes the Tenth Circuit's decision in United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997).   United States v. Sinclair establishes that the interest of justice requires a new trial on the basis of newly discovered evidence where:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

United States v. Sinclair, 109 F.3d at 1531.   See New Trial Motion at 9.   DeLeon contends that this case "meet[s] all of the factors articulated in Sinclair."   New Trial Motion at 9.   First, DeLeon asserts that the new evidence came to light in "late 2022 and 2023," well after trial ended.   New Trial Motion at 13.   Second, DeLeon argues that "discovery of this evidence was not caused by any lack of diligence on Mr. DeLeon's part," because, according to DeLeon, the NMDPS lab was "not forthcoming" with information until December 2022.   New Trial Motion at 13.   Third, DeLeon asserts that the "newly discovered evidence go[es] far beyond impeaching," because it shows that it is "quite probable" that cross-contamination occurred during the 2001 testing on the murder weapon.   New Trial Motion at 14.   Fourth, DeLeon argues that the new evidence is "very material," because "DNA evidence goes to the heart of the government's case against Mr. DeLeon."   New Trial Motion at 16.   Finally, DeLeon states that, if he offered the newly discovered evidence at a new trial, it would "probably produce an acquittal," because it would undercut the "only piece of physical, scientific evidence presented to the jury."   New Trial Motion at 17.

DeLeon also asserts that the interest of justice requires a new trial under Brady and Giglio. See New Trial Motion at 18-23.   DeLeon asserts that a defendant seeking a new trial based on an

alleged <u>Brady</u> violation "has the burden to show that: '[(i)] the prosecution suppressed evidence, [(ii)] the evidence was favorable to the defendant, and [(iii)] the evidence was material.'"  New Trial Motion at 19 (quoting <u>United States v. Velarde</u>, 485 F.3d 553, 558 (10th Cir. 2007))(brackets in New Trial Motion, but not in <u>United States v. Velarde</u>).  DeLeon argues that all three conditions are met here.  <u>See</u> New Trial Motion at 20.  First, DeLeon highlights that he became aware of the <u>Brady</u> material "through his own investigation," and the United States never produced the reports associated with the NMDPS investigation, even though it "was required to turn over this information."  New Trial Motion at 20.  Second, DeLeon contends that the <u>Brady</u> material is favorable to him, because it tends to show that Radecki's DNA testing was unreliable and, by extension, is helpful in impeaching Radecki.  <u>See</u> New Trial Motion at 21-22.  Finally, DeLeon argues that the <u>Brady</u> material is material, because it "would have . . . . severely undermined" the United States' DNA evidence and related expert testimony.  New Trial Motion at 23.  For all these reasons, DeLeon asks the Court to grant him a new trial.  <u>See</u> New Trial Motion at 23.

     **5.**    **<u>Tenth Circuit Abates DeLeon's Appeal</u>.**

On August 1, 2023, the United States Court of Appeals for the Tenth Circuit abated DeLeon's appeal pending the Court's resolution of the Indicative Ruling Motion.  <u>See</u> Order at 2, filed August 1, 2023 (Doc. 3723).  The Tenth Circuit establishes that within 30 days of the Order's entry, DeLeon "shall file a written report notifying [the Tenth Circuit] as to the status of the district court proceedings."  Order at 2.  The Tenth Circuit "urge[s] the district court to act promptly" on the Indicative Ruling Motion.  Order at 2.

## ANALYSIS

The Court denies the Indicative Ruling Motion.  Rule 37 provides:

(a)     Relief Pending Appeal.  If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:

      (1)     defer considering the motion;

      (2)     deny the motion; or

      (3)     state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

(b)     Notice to the Court of Appeals.  The movant must promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 if the district court states that it would grant the motion or that the motion raises a substantial issue.

(c)     Remand.  The district court may decide the motion if the court of appeals remands for that purpose.

Fed. R. Crim. P. 37.  Rule 37 is identical to its civil counterpart, rule 62.1 of the Federal Rules of Civil Procedure.   See United States v. Xiao-Ping Su, Nos. 11-cr-00288-JST, 17-cv-02885-JST, 2019 WL 1283937, at *6 n.9 (N.D. Cal. March 20, 2019)(Tigar, J.)(acknowledging that rule 37 and rule 62.1 are "identical").

Here, the New Trial Motion does not raise a "substantial issue;" accordingly, the Court will not issue an indicative ruling on a motion for relief that is otherwise barred by a pending appeal. Fed. R. Crim. P. 37(a)(3).  DeLeon first asks the Court to grant him a new trial on the basis of so-called "newly discovered evidence" regarding the risk of cross contamination at the NMDPS lab. New Trial Motion at 9.  The Court acknowledges that the AALA's investigation of the NMDPS lab, and the documents related to it, are "newly discovered" in the sense that the investigation occurred after trial, and, accordingly, the documents related to it were generated after trial as well.

<u>See</u> Trial Clerk's Minutes at 26 (indicating that DeLeon's trial concluded on September 16, 2021);

Department of Public Safety Intra-Departmental Correspondence (dated February 21, 2023), filed

July 31, 2023 (Doc. 3712-5)(indicating that the AALA's investigation of NMDPS occurred in

December, 2022).    Nevertheless, the NMDPS lab investigation evidence is not "newly

discovered," because the so-called "new" evidence speaks to an issue that DeLeon raised

thoroughly and exhaustively at trial: the risk of cross-contamination at the NMDPS lab.  New Trial

Motion at 9.  The allegedly "new" NMDPS investigation evidence tends to show that there was a

risk of DNA cross-contamination at the NMDPS lab in DeLeon's case.   <u>See</u> NMDPS Responses

at 1-2.  At trial, DeLeon also presented evidence that tends to show that there was a risk of DNA

cross-contamination at the NMDPS lab in his case.   For example, DeLeon cross-examined

Tokumaru and Radecki about the risk of cross-contamination at the NMDPS lab.  <u>See</u>, <u>e.g.</u>, Trial

Tr. at 1865:19-21 (LeBlanc, Radecki); <u>id.</u> at 1928:18-22 (LeBlanc, Tokumura).  Similarly, in his

case-in-chief, DeLeon called Spence to testify to the risk of cross-contamination at the NMDPS

lab.  <u>See</u>, <u>e.g.</u>, Trial Tr. at 2134:2-2135:5 (LeBlanc, Spence).

    In short, the so-called "new" evidence concerning the NMDPS investigation is cumulative;

it does not add anything new to the conversation on the risk of DNA-cross contamination at the

NMDPS lab.  The evidence concerning the NMDPS investigation indicates a lack of time and

space between DNA tests might have contributed to cross-contamination at the NMDPS lab.  <u>See</u>

NMDPS Responses at 1-2.  The evidence presented at trial addressed those same temporal and

spatial concerns.   <u>See</u>, <u>e.g.</u>, Trial Tr. at 1840:11-19 (Radecki)(explaining on direct examination

that she reduces the risk of cross-contamination by "having dedicated spaces and equipment for

certain processes"); <u>id.</u> at 1887:22-1889:13 (LeBlanc, Radecki)(cross examining Radecki on the

separation of time and space when conducting analyses").  The so-called "new" evidence does not illuminate new issues with the DNA testing at the NMDPS lab that the jury has not already considered.  For example, it does not shed light on some previously undiscovered problem in the procedures and methods that NMDPS staff use at the NMDPS lab, like faulty equipment or slipshod record keeping.  Instead, the NMDPS investigation evidence piles on more evidence concerning the time and space that NMDPS allotted between DNA tests in DeLeon's case.

The Court adds that evidence regarding the NMDPS investigation is not only cumulative evidence, it is duplicative of evidence that the Court does not believe the jury gave much weight. Trial lasted eight days.  See Clerk's Minutes at 1-2.  In that time, the jury heard from twenty-five witnesses.  See Clerk's Minutes at 2-26.  Several of those witnesses were cooperating witnesses -- former SNM gang members -- including one former SNM member -- Jaramillo -- who murdered Castillo with DeLeon.   See Trial Tr. at 921:20-922:13 (Castellano, Lujan)(testifying that Garcia ordered Lujan to select SNM members to kill Castillo and Garza); id. at 1556:7-10 (Jaramillo)(testifying that higher ranking SNM members selected Jaramillo and DeLeon to kill Castillo); id. at 1567:4-19 (Ellison, Jaramillo)(testifying that DeLeon and Gallegos held Castillo down while Jaramillo strangled Castillo).   Only three of those witnesses -- Radecki, Tokumura, and Spence -- addressed the risk of DNA cross-contamination at the NMDPS lab.  See Trial Tr. at 1865:19-21 (LeBlanc, Radecki); id. at 1928:18-22 (LeBlanc, Tokumura); id. at 2134:2-2135:5 (LeBlanc, Spence).  During its closing argument, the United States submitted to the jury that the DNA evidence was "just the icing on the cake."  Trial Tr. at 2404:7 (Castellano).  The Court agrees with the United States' characterization of the DNA evidence, particularly the cross-contamination evidence.  Taken together, the United States' fact witnesses demonstrate beyond a reasonable

doubt that DeLeon murdered Castillo. The DNA evidence corroborated the fact witness' narrative. DeLeon was effective in casting doubt on the DNA evidence's reliability, namely through his questioning on cross-contamination. That questioning was, however, a sideshow. The Court watched the jury listen to the DNA evidence and the cross-contamination evidence. The jurors' eyes glazed over. One juror even fell asleep, and the Court had to pause for a stretch break and to remind the jurors to caffeinate. See Trial Tr. at 2132:19-2133:2 (Court, LeBlanc). If the DNA experts had testified that the DNA evidence was conclusive, the jury might have paid more attention to the evidence. As it was, the DNA portion of the trial was so muddled that the Court thinks the jury discounted the DNA evidence.

In the end, the Court believes that the DNA cross-contamination evidence largely went in the jury's ear and out the other. In the Court's experience, flashy viva voce testimony engages jurors more than expert testimony, especially highly-technical expert testimony. The Court thinks that experience holds true here: the exciting testimony about a prison gang murdering one of its own members with a laundry bag drawstring engaged the jury more than three expert witnesses opining on DNA cross-contamination in a State crime lab. Accordingly, the Court thinks that the jury discounted the DNA cross-contamination evidence in its deliberations. For that reason, allowing DeLeon to pile on further evidence of DNA cross-contamination is unlikely to change a jury's thinking in a new trial. For these reasons, the Court will not issue an indicative ruling that the so-called new evidence related to the NMDPS investigation amounts to a "substantial issue." Fed. R. Crim. P. 37(a)(3).

DeLeon further contends that the "interest of justice" requires the Court to grant DeLeon a new trial, because the United States failed to comply with its obligations under Brady and Giglio

when it did not turn over documents related to the NMDPS investigation to DeLeon.  See New Trial Motion at 8.  When the United States withholds exculpatory evidence that a defendant demands, such suppression of evidence can violate the defendant's due process rights.  See Brady, 373 U.S. at 87.  A defendant seeking a new trial based on an alleged Brady violation has the burden to demonstrate that: "'(i) the prosecution suppressed evidence, (ii) the evidence was favorable to the defendant, and (iii) the evidence was material.'"  United States v. Velarde, 485 F.3d at 558 (quoting United States v. Quintanilla, 193 F.3d 1139, 1149 & n.10 (10th Cir. 1999)).  Under Brady, "[t]he prosecution must only reveal information that it had in its possession or knowledge -- whether actual or constructive."  United States v. Beers, 189 F.3d 1297, 1304 (10th Cir. 1999). See United States v. Velarde, No. CR 98-0391 JB, 2008 WL 5993210, at *16 (D.N.M. May 16, 2008)(Browning, J.)("Brady requires disclosure of information only in the government's possession or knowledge, whether actual or constructive.").

Here, the Court has no reason to believe that the United States knew, actually or constructively, of the NMDPS investigation or the documents related to it.  See United States v. Beers, 189 F.3d at 1304.  To the contrary, DeLeon was in the best position to know of AALA's investigation into NMDPS.  Spence -- DeLeon's DNA expert witness -- initiated AALA's investigation into NMDPS.  See New Trial Motion at 6-7.  Spence predicated his complaint to the AALA, in part, on the risk of cross-contamination at the NMDPS lab in DeLeon's case.  See New Trial Motion at 6-7.  The Court has no reason to believe, on the basis of the record before it, that the United States became aware of the AALA's investigation sometime between December, 2022, when the AALA commenced the investigation, and July, 2023, when DeLeon filed the New Trial Motion.  It follows that the United States could not have suppressed any evidence related to the

investigation, and therefore could not have violated its obligations under <u>Brady</u> and <u>Giglio</u>.  <u>See</u>

<u>United States v. Beers</u>, 189 F.3d at 1304.  For these reasons, the Court will not issue an indicative

ruling that the alleged <u>Brady</u> and <u>Giglio</u> violations amount to a "substantial issue."  Fed. R. Crim.

P. 37(a)(3).

**IT IS ORDERED** that the Defendant Angel DeLeon's Motion for Indicative Ruling

Pursuant to Federal Rule of Criminal Procedure 37 and Federal Rule of Appellate Procedure 12.1,

filed July 31, 2023 (Doc. 3711), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M. M. Uballez
  United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

-- and --

Maria Ysabel Armijo
Randy M. Castellano
Ryan Ellison
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

    *Attorney for Defendant Angel DeLeon*